UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**LEE PAIGE**
**(2018 Watermere Lane**
**Windermere, Florida 34786)**
**(407) 876-0948),**

      **Plaintiff,**

**v.**                              **CASE NO.:**

**UNITED STATES OF AMERICA,**

      **Defendant.**

_____/

## COMPLAINT

Plaintiff, Lee Paige, complains of the Defendant, the United States of America, as follows:

1.    This action arises under 5 U.S.C. 552a and 28 U.S.C. § 1331, as hereinafter more fully appears.

2.    The United States Drug Enforcement Administration ("DEA") is an agency within the United States Department of Justice and both are agencies of the United States Government.

3.    Plaintiff, Lee Paige, is a resident of Orange County, Florida. Prior to becoming a Special Agent with the DEA, Mr. Paige was a highly respected football player for Florida State University and played professional football for both the Tampa Bay Buccaneers and the Tampa Bay Bandits. Mr. Paige was subsequently a Corrections Officer at Polk Correctional Institution, a Florida State Prison, and a Deputy Sheriff with the Hillsborough County Sheriff's Office in Tampa, Florida.

4.      In 1990, Mr. Paige became a Special Agent with the DEA. From approximately April, 1990 to July 1999, he was assigned to the Tampa District Office; from July 1999 to July 2003 to the Nassau Country Office; and from July 2003 to the present to the Orlando District Office. During his career with the DEA, Mr. Paige has been a very effective Special Agent and was frequently involved in dangerous assignments, including several life-threatening situations. For example, Mr. Paige spent a substantial part of his career at the DEA working in an undercover capacity and was once regarded as one of the best undercover agents, if not the best, in the DEA. On at least seven occasions he was subjected to armed confrontations and had to be rescued by other agents on two of these occasions. On another occasion, an informant for Mr. Paige was apparently murdered by member(s) of a Columbian drug cartel who then threatened to kill Mr. Paige unless he paid six million dollars to the cartel. In addition to his undercover activities, Mr. Paige also, *inter alia,* has served as the Assistant Demand Reduction Coordinator for the Miami Field Division and with the High Intensity Drug Trafficking Area Heroin Overdose Unit.

5.      During his career at the DEA, Mr. Paige was also a highly regarded and frequently requested educational and motivational speaker on drug education, drug prevention and law enforcement techniques to many organizations, including schools, charitable organizations, little league teams, college and professional football teams, law enforcement agencies and numerous businesses. He served as the spokesman for the United States Ambassador at Nassau, Bahamas with respect to the DEA and drug related issues. He also served as a member of the Bahamas National Drug Council/Coalition for a drug-free Bahamas with whom he organized numerous drug-prevention programs.

6.      On April 9, 2004 Mr. Paige was making a drug education presentation to children at the Orlando Youth Minority Golf Association in Orlando, Florida.  Part of this presentation involved Mr. Paige showing his firearm to the children and speaking to them about gun safety. Seconds after Mr. Paige warned the children that he was the only person that he knew of in the room professional enough of to carry the firearm, the firearm accidentally discharged, wounding Mr. Paige.

7.      At the time of the aforesaid accidental discharge, Mr. Paige's presentation was being videotaped.  Shortly after the accidental discharge, the videotape, which was the only video and audio recording of the accidental discharge, was turned over to the DEA.  Later, the videotape was returned to the person who had made the videotape, but the video and audio portions of the accidental discharge had been removed from the videotape by the DEA. Consequently, at all the material times, the DEA had exclusive control of the video and audio recording of the accidental discharge.

8.      At all material times, the video and audio recording of the accidental discharge was a record pertaining to Mr. Paige which was contained in a system of records as defined by 5 U.S.C. 552a.  Mr. Paige never consented to any disclosure by the DEA of the video and audio recording of the accidental discharge.

9.      After the videotape of the accidental discharge was in the exclusive control of the DEA, employees and agents of the DEA, whose identities are presently unknown to Mr. Paige, improperly, illegally, willfully and/or intentionally disclosed the contents of the videotape to other individuals within the DEA as well as to individuals and/or entities outside of the DEA in violation of 5 U.S.C. § 552a..

10.    As a result of the improper disclosure by the DEA of the videotape of the accidental discharge, the videotape of the accidental discharge became widely circulated on the internet, both in the United States and overseas, and has appeared on a large number of websites. GOOGLE reflects, for example, approximately 347,000 hits on "DEA Agent Shoots Himself." Audio and video from the videotape were also widely broadcast worldwide on various radio and television shows.  For example, the videotape of the accidental discharge has been broadcast, *inter alia,* on the Jay Leno Show, a Current Affair, Jimmy Kimbel Live, CNN Headline News, CNN News, Fox News and VH1: Show "Webjunk20" (regarding "Volume 1 Stupid Cops"). Typically, the videotape of the accidental discharge has been broadcast, presented or disclosed to others for purposes of amusement and to demean and to ridicule Mr. Paige, especially in light of the accidental discharge occurring at virtually the same time that Mr. Paige told his audience that he was the only person in the room sufficiently professional enough to carry the firearm.

11.    As a result of the disclosure of the audio and video portions of the videotape by the DEA, Mr. Paige became and is the target of jokes, derision, ridicule and disparaging comments.  Mr. Paige has also been subjected to such comments made to his wife and children. Mr. Paige has been frequently confronted with embarrassing and humiliating comments from people both inside and outside the United States about the accidental discharge, including, *inter alia,* by people at restaurants, grocery stores and airports.  White supremacy organizations have used the videotape to ridicule black Americans in general and Mr. Paige in particular.  Because he became highly recognizable as a result of the disclosure of the videotape, Mr. Paige has been unable to act as an undercover agent.  As a result of the notoriety arising from the disclosure of the videotape, Mr. Paige is no longer permitted or able to give educational motivational speeches and presentations.

12.     As a direct and proximate result of the improper conduct of the defendant through its agents and employees, as alleged above, Mr. Paige has suffered past and will suffer future damages, including but not limited to emotional and mental pain and suffering, mental anguish, loss of enjoyment of life, loss of reputation, loss of opportunity, loss of money, embarrassment, humiliation and anxiety.

WHEREFORE, plaintiff demands judgment against defendant for damages, interest, costs, and for such a relief as this court deems just and proper.


Respectfully submitted,


_____
Lee Paige
2018 Watermere Lane
Windermere, Florida 34786
Tel: (407) 876-0948
Pro Se Plaintiff