**RECEIVED**

NOV 0 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

NOV 0 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

LEE PAIGE,

     Plaintiff,

v.                                          CASE NO.: 01:06-cv-0644-EGS

UNITED STATES OF AMERICA,

     Defendant.

_____/

## PLAINTIFF'S RESPONSE TO GOVERNMENT'S MOTION TO DISMISS

The government has filed a motion to dismiss the plaintiff's complaint pursuant to Rule 12(b)(6). This is plaintiff Lee Paige's response in opposition to that motion.

### Summary of Case

Mr. Paige is a DEA agent who, until the instant violation of the Privacy Act, had been highly successful working as an undercover agent, including assignments which were particularly dangerous. On April 9, 2004, Mr. Paige gave a drug education presentation to children at a meeting of a private association for minority children. During the presentation, which was videotaped, Mr. Paige accidentally shot himself during his comments about gun safety. The videotape of the presentation was obtained by the DEA after the incident, and the relevant portion involving the shooting was excised from the videotape and kept by the DEA so it would not become public. Nonetheless, someone at the DEA subsequently leaked the excised portion of the videotape to the public. The video and sound tracks of the leaked videotape were then widely published on national television and radio shows and reportedly became the twentieth most watched video in the world on the internet in 2005. This resulted in enormous, worldwide publicity of the incident which jeopardized Mr. Paige's safety to the point that the

DEA directed that he no longer work undercover or do drug education presentations. Further, the publicity from the videotape has been highly embarrassing and demeaning to Mr. Paige and has also resulted in harassment of him and his family.

### The Government's Motion

The government asserts in its motion to dismiss that the drug presentation at which Mr. Paige accidentally shot himself was "highly public" and that the incident was reported by the press before the videotape was leaked. The government argues that the disclosure of the videotape by the DEA was therefore not a violation of the Privacy Act.[1] By way of summary, the government asserted at page 2 of its memorandum:

> As a legal matter, therefore, plaintiff placed himself in the public view, and cannot now recover under the Privacy Act by alleging essentially that the DEA should have concealed or hidden his public behavior, which he himself made no effort to keep private.

There are several critical errors in the government's argument. First, the government is basically requesting the court to enter summary judgment on the issue of whether the private presentation at which the accidental shooting occurred was "highly public." Similarly, the government appears to be seeking summary judgment on the issue of whether the initial reports of the accidental shooting by the press contained the same information and were of the same nature, quality and importance as the disclosure of the actual videotape itself. This is inappropriate in a Rule 12(b)(6) motion. To the extent that the government is attempting to turn its Rule 12(b)(6) motion into one for summary judgment, Mr. Paige has attached an affidavit contradicting the government's contentions.

---

[1] The Government also suggests at footnote 1 of its memorandum that the DEA, as opposed to the United States, is the proper defendant. It appears that the Government's contention is correct. Consequently, Mr. Paige is filing a motion to substitute the DEA for the United States. to which the government has no objection.

2

Next, Mr. Paige did in fact contact the DEA after he had been taken to the hospital to make sure that the videotape was obtained from the videographer so that it would not become public. Moreover, the DEA itself did in fact conceal and hide information, images and sounds on the videotape from public view by obtaining the videotape, ordering that no copies be made, and excising and not returning the portion of the videotape containing the accidental shooting. It was contrary to the DEA's initial conduct and its own orders and procedures that someone at the DEA leaked the videotape to the public in violation of the Privacy Act.

The most critical error in the government's argument is its failure to distinguish between Mr. Paige's presentation and the videotape itself. It is the videotape, which became a "record" protected by the Privacy Act after it was seized by the DEA, that is the subject of this lawsuit, not the presentation or statements made about the accidental shooting by the DEA or members of the audience at the presentation. As discussed below, the videotape is an intrinsically different "record" than the presentation itself or the attendees' memories and statements about it. Finally, the Government also attempts to improperly incorporate various common law or state law principles into the Privacy Act.

### The Privacy Act

5 U.S.C. § 552a(b) provides the following:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual of whom the record pertains...

The Privacy Act then sets forth various exceptions to the general rule which are not applicable here. The government does not contend that the videotape was not a "record" as defined by the Privacy Act in § 552a(a)(4). Moreover, the Privacy Act does not limit the type of information about the individual that may not be disclosed if it constitutes a "record" protected by the

3

Privacy Act. It is the "dissemination" of a protected record, whether or not it would violate common law privacy principles, which is prohibited by the Privacy Act. *See Pilon v. U.S. Dept. of Justice,* 73 F.3d 1111, 1121 (D.C. Cir. 1996).

### Background Facts

Prior to becoming a Special Agent with the DEA, Mr. Paige was a highly respected football player for Florida State University and played professional football for both the Tampa Bay Buccaneers and the Tampa Bay Bandits. Complaint ("Com."), ¶3. Mr. Paige was subsequently a Corrections Officer at Polk Correctional Institution, a Florida State Prison, and a Deputy Sheriff with the Hillsborough County Sheriff's Office in Tampa, Florida. *Id.*

In 1990, Mr. Paige became a Special Agent with the DEA. Com., ¶3. From approximately April, 1990 to July 1999, he was assigned to the Tampa, Florida District Office; from July 1999 to July 2003 to the Nassau, Bahamas Country Office; and from July 2003 to the present to the Orlando, Florida District Office. *Id.* Mr. Paige has been a particularly effective agent for the DEA and was frequently involved in dangerous assignments, including several life-threatening situations. *Id.* For example, Mr. Paige spent a substantial part of his career at the DEA working in an undercover capacity and was regarded as one of the best undercover agents in the DEA. *Id.* On at least seven occasions he was subjected to armed confrontations and had to be rescued by other agents on two of these occasions. *Id.* On another occasion, an informant for Mr. Paige was apparently murdered by member(s) of a Columbian drug cartel who then threatened to kill Mr. Paige unless he paid six million dollars to the cartel. *Id.*

In addition to his undercover activities, Mr. Paige was also the Assistant Demand Reduction Coordinator for the Miami Field Division and was a member of the High Intensity Drug Trafficking Area Heroin Overdose Unit. *Id.* Mr. Paige was a well regarded educational

and motivational speaker on drug education, drug prevention and law enforcement techniques. He was frequently requested to make such presentations to many organizations, including schools, charitable organizations, little league teams, college and professional football teams, law enforcement agencies and numerous businesses. Com., ¶5. He served as the spokesman for the United States Ambassador in Nassau, Bahamas with respect to the DEA and drug related issues. *Id.* He also served as a member of the Bahamas National Drug Council/Coalition for a drug-free Bahamas with whom he organized numerous drug-prevention programs. *Id.*

On April 9, 2004 Mr. Paige was making a drug education presentation to children at the Orlando Youth Minority Golf Association in Orlando, Florida.[2]   Com., ¶6.   Part of this presentation involved Mr. Paige showing his firearm to the children and lecturing them about gun safety. *Id.* Virtually immediately after Mr. Paige told the children that he was the only person that he knew of in the room professional enough of to carry the firearm, the firearm accidentally discharged, shooting Mr. Paige in his leg. *Id.* The portion of the presentation involving the accidental shooting is sometimes referred to herein as the "incident."

Mr. Paige's presentation was videotaped by a private person. Com. ¶7; Paige Affidavit ("Aff't."), ¶1. This was the only video and audio recording of the presentation. Com., ¶7. After he was taken to the hospital, Mr. Paige requested a DEA agent to obtain the videotape so it would not become public. Aff't., ¶2. The DEA agent obtained the videotape from the videographer. Com., ¶7' Aff't., ¶2. The Assistant Special Agent in Charge of the Orlando DEA office ordered that no copies of the videotape be made and that the videotape be sent to DEA headquarters in Washington, D.C. Aff't. ¶2. The videotape of the incident was not to be made

---

[2] Mr. Paige is not paid for these presentations and does them through the DEA. In fact, the DEA Special Agent in Charge of the DEA Regional Office in Miami apparently is eligible to receive a bonus based in part on these presentations.

public, because, in part, it was part of a classified DEA investigation.[3]    Aff't., ¶2. Sometime later, the DEA returned the videotape to the videographer. Com., ¶7. However, the portion of the videotape showing the accidental shooting had been excised from the videotape and kept by the DEA. *Id.* Consequently, at all the material times, the DEA had exclusive control of the video and audio recording of the incident.

After the portion of the videotape containing the accidental shooting was in the exclusive control of the DEA, employees and agents of the DEA, whose identities are presently unknown to Mr. Paige, improperly disclosed the videotape of the shooting to other individuals within the DEA as well as to individuals or entities outside of the DEA in violation of the DEA's own orders (i.e. the Orlando ASAC) and 5 U.S.C. § 552a. Com., ¶9.

As a result of the improper disclosure by the DEA of the videotape of the incident, the videotape of the incident became widely circulated on the internet, both in the United States and overseas, and has appeared on a large number of websites. Com., ¶ 10. In 2005, it was reported to be the twentieth most watched video on the internet. Aff't, ¶4.   GOOGLE reflects approximately 347,000 hits on "DEA Agent Shoots Himself." Com., ¶10. Audio and video of the incident were also widely broadcast on various radio and national television shows. *Id.* For example, the videotape of the incident has been broadcast, *inter alia,* on the Jay Leno Show, a Current Affair, Jimmy Kimmel Live, CNN Headline News, CNN News, Fox News and VH1: Show "Webjunk20" (regarding "Volume 1 Stupid Cops"). *Id.* Typically, the videotape of the shooting has been broadcast, presented or disclosed to others for purposes of amusement and to demean and to ridicule Mr. Paige, especially since the accidental shooting occurred at virtually

---

[3] In addition, of course, the excised portion of the videotape became a "record" under the Privacy Act which could not be disclosed without Mr. Paige's consent.

the precise moment that Mr. Paige told his audience that he was the only person in the room sufficiently professional enough to carry the firearm. *Id.*

As a result of the disclosure of the video and audio portions of the videotape of the incident by the DEA and the resulting enormous publicity, which included Mr. Paige's identity and distinctive appearance, Mr. Paige's safety was jeopardized to the point that he has been prohibited by the DEA itself from engaging in undercover activities or giving educational or motivational speeches and presentations. Com., ¶11; Aff't., ¶5. Further, Mr. Paige became and continues to be the target of jokes, ridicule and disparaging comments. Com., ¶ 11. Mr. Paige has also been subjected to such comments made to his wife and children. *Id.* Mr. Paige has been frequently confronted with embarrassing and humiliating comments from people both in and even outside the United States about the incident, including, *inter alia,* people at restaurants, grocery stores and airports. *Id.*

## ARGUMENT

### Mr. Paige's Presentation Was Not "Highly Public"

First, the Government asserts that Mr. Paige's presentation was "highly public." It is not clear on what the government bases this assertion, but presumably it is based on the newspaper articles which are attached to the government's motion. Mr. Paige's affidavit points out that the presentation was not "highly public." In fact, it was not even public. The presentation was not open to the public and the invitees to the event only included the children who were served by the Orlando Youth Minority Golf Association, their parents and a number of people associated with the association. Aff't. ¶1. No press was present. *Id.* As reported in the newspaper articles included with the government's motion, only approximately fifty people attended the event. The articles included with the government's motion are all dated between April 30 and May 3, 2004,

approximately three weeks after the incident. Thus, not only was the presentation not "highly public," but the incident itself was not even reported until approximately three weeks after the presentation.

The newspaper articles included with the Government's motion are notable for another reason. They are all short,[4] pretty much report the same thing and do not provide anything close to the information contained on the videotape. Basically, the articles point out that an unidentified DEA agent accidentally shot himself during a presentation to children about drugs at the Orlando Youth Minority Golf Association and that the DEA was investigating. Mr. Paige is not identified by name or by description. The articles do not describe Mr. Paige's conduct in any detail, do not set forth Mr. Paige's statements during the presentation and do not juxtapose those statements with the timing of the accidental shooting. Moreover, obviously, the newspaper articles do not contain any visual images or audio sounds of the incident. Mr. Paige has never contended that these newspaper articles or the information given by the DEA or members of the audience to the media for these articles violated the Privacy Act. Indeed, a simple comparison of these newspaper articles with the actual videotape leaked by the DEA demonstrates well the critical difference between the presentation itself, which was a non-event as far as the media and public were concerned, and the actual disclosed "record" (i.e. the videotape) which caused a media frenzy that jeopardized Mr. Paige's and his family's safety, destroyed his ability to work undercover or to give presentations and seriously harmed his reputation.

---

[4] Most of the articles are less than ten sentences long. Moreover, it is not unlikely that the initial newspaper reports three weeks after the incident were themselves the result of the leaking of the videotape within the DEA. In fact, at this point, that is the most likely explanation for the time delay between the incident and the initial newspaper articles.

## The Videotape Is Significantly
## Different Than Initial Press Reports and Oral Reports of the Incident

Even if Mr. Paige's presentation had been "highly public," the release of the videotape, which was a protected "record" under the Privacy Act, would still have been a violation of the Privacy Act. In the cases relied on by the Government and discussed below, various disclosures were held not to be violations of the Privacy Act because they had been previously released by the agency or otherwise fully aired in the public domain. Here, the videotape of the incident was not released to the public by anybody until the DEA disclosed it. Consequently, the "record" released here had not been previously released, much less fully aired in the public domain.

The Government appears to be suggesting that there is no difference between Mr. Paige's presentation at a relatively small, private gathering (and the very limited newspaper coverage three weeks later) and the videotape itself. However, the difference between the videotape itself and the early press reports or the memories of the individuals who witnessed the incident is very substantial, which the government completely ignores. The disclosed videotape reflects the following information and qualities which were not available to the public before the videotape was improperly disclosed:[5]

1.      Unlike the newspaper articles, the videotape reveals Mr. Paige's appearance, voice and demeanor. This is important for a least three reasons. First, it identifies him, which has jeopardized his and his family's safety and has destroyed his ability to be an undercover agent or give motivational or educational presentations.[6] Mr. Paige has spent much of his DEA

---

[5] A copy of the relevant portion of the videotape, which is about 2 ½ minutes long, is included on a DVD with Mr. Paige's attached affidavit.

[6] In the normal course, Mr. Paige's presentations, such as the one in this case, would not interfere with his ability to work as an undercover agent or jeopardize his safety because these presentations are isolated and not highly public and the targets of Mr. Paige's investigations do not attend such presentations. If such presentations interfered with Mr. Paige's success as an undercover agent, the DEA obviously would not have permitted him to give the presentations. Similarly, Mr. Paige's court appearances as a witness do not interfere with his ability to act as an

career as an undercover agent dealing with highly dangerous drug dealers, which on several occasions has involved armed confrontations including two in which Mr. Paige had to be rescued by other agents. Even other DEA agents have expressed concerns about their own safety if they work with Mr. Paige as a result of the publicity of the videotape and Mr. Paige's identity. Aff't., ¶5. Second, Mr. Paige's actual appearance, voice and demeanor add to the entertainment value of the videotape which resulted in its widespread popularity. Mr. Paige, who at one point played professional football, is a large, muscular man. He was dressed in a tee shirt which had an emblem of a badge and large letters which said "POLICE." In addition to his physically imposing size, Mr. Paige had long dreadlocks which gave him an additionally distinctive, recognizable and interesting appearance, particularly for a police officer. As can be seen from the enclosed DVD showing the incident, Mr. Paige has a commanding, authoritative and confident manner and voice. Not only does this make the video and audio interesting to the public but, as discussed below, it adds to the irony of the incident which is the primary reason why the videotape was so popular to the public and humiliating to Mr. Paige. Third, the videotape reflects that Mr. Paige is an African-American. As a result, various white supremacy websites have used the video to attempt to demean Mr. Paige in particular and blacks in general. Com., ¶11. ·

2.    Next, unlike the newspaper articles, the videotape reflects Mr. Paige's actual statements and the timing of these statements with the accidental shooting. At virtually the precise moment that Mr Paige authoritatively and confidentially told the children that he was the only person in the room professional enough to carry a firearm, the firearm accidentally

---

undercover agent since any publicity concerning his court appearances are minimal or non-existent. However, the ongoing and wide publication of Mr. Paige's distinctive appearance as a result of the leaking of the videotape has caused the government itself to direct that Mr. Paige not work in an undercover capacity or give presentations as a result of concerns for his safety.

discharged, wounding Mr. Paige. Both the video and audio of the incident graphically reflect the remarkable irony of Mr. Paige's impressive appearance and his statement that he was the only one professional enough to carry the firearm on the one hand; immediately followed, on the other hand, by his accidentally shooting himself. It is this irony that has largely made the videotape so popular with the media and demeaning and humiliating to Mr. Paige. Not only was this aspect of the incident not reported by the newspaper media, but newspaper articles and oral statements about the incident could not remotely approach the dramatic impact of the irony as the videotape of the incident does.

3.      Third, unlike the newspaper articles, the videotape shows Mr. Paige's remarkable conduct after the shooting in which he calmly makes sure that none of the children have been injured and, although shot in the leg, remains standing and explains to the children that what just happened was an example of why they should never touch firearms. This, of course, also enhances the entertainment value or appeal of the videotape in general.

4.      Fourth, unlike the newspaper articles, the videotape contains actual images and sounds which are intrinsically different than a newspaper article or someone's description of the event. This is well demonstrated by the well known adage that a picture is worth a thousand words. In addition to the events discussed above, the videotape shows a real-life shooting of a person and the reaction of the victim thereafter. As noted above, it also dramatically shows the irony of the incident which the newspapers did not and could not report. Without the videotape, the media could not have provided the video images and audio sounds that were so compelling, popular and damaging to Mr. Paige. Without the videotape, radio stations would literally have nothing to play. Without the video recording, the internet and national television shows, such as

11

Jay Leno, Jimmy Kimmel, CNN and Fox News, would have nothing to show. To ignore this difference is to ignore the obvious.

To quote another well known adage, the proof is in the pudding. Without the videotape a limited number of newspapers reported the incident in substantially neutral printed articles about three weeks after the incident. However, after the videotape was released, the incident was not only widely reported on national television, but the videotape itself was played on national television and radio stations. Further, the video ended up on many websites and became one of the most watched videos in the world. If, as the government asserts, the disclosure of the videotape was irrelevant because the incident had been previously "fully aired" in public, the videotape would not have received this type of reception after its improper disclosure. It should also be emphasized that the government itself has recognized the independent significance of the videotape. It was the DEA itself which seized that portion of the videotape showing the actual shooting and it was the DEA who ordered that no copies be made. The DEA obviously recognized at that time that the videotape had independent and intrinsic significance and that the information, images and sounds on the videotape had not been aired in the public domain. Further it was the DEA who directed that Mr. Paige no longer work undercover or give presentations because the improper release of the videotape had jeopardized his safety.

## Case Law Relied on By The Government

The issue here seems to turn more on common sense than fine points of the law. The fact is that the DEA released a "record" (the videotape) which was protected by the Privacy Act. This videotape had never been shown in public. Consequently, the dramatic images and sounds as well as the information on the videotape, including Mr. Paige's identity and appearance as

well as the humiliating irony of the timing of the shooting with Mr. Paige's comments and authoritative demeanor, were never aired in the public domain.

In *Pilon v. U.S. Dept. of Justice*, 73 F.3d 1111 (D.C. Cir. 1996) the Justice Department faxed a confidential memorandum to a former Justice Department employee. The D.C. Circuit held that the unauthorized release of this record was a "disclosure" prohibited by the Privacy Act even though the recipient had come into contact with the memorandum in the course of his duties. The court held at 1124:

> ... we hold today that an agent's unauthorized release of a protected record does constitute a disclosure under the Privacy Act except in those rare instances, like *Hollis*, where the record merely reflects information that the agency has previously, and lawfully, disseminated outside the agency to the recipient, who is fully able to reconstruct its material contents.

The Justice Department argued in *Pilon* that disclosure under the Privacy Act could not include disclosures to individuals who were previously aware of the disclosure. The D.C. Circuit rejected this interpretation and noted that the Privacy Act included the need to safeguard against "dissemination" of protected information as well as the need to limit the improper use of protected records.[7]    *Id.* at 1121. Nowhere is that more true than in the instant case where the dissemination of the videotape, which was a protected record, has led to one of the most breathtakingly improper uses of a government record imaginable -- the world-wide distribution of a videotape of one of the DEA's most successful undercover agents which has jeopardized his and his family's welfare and which has been used by the media to seriously ridicule and demean

---

[7] The D.C. Circuit's opinion in *Pilon* appears to substantially limit if not overrule its decision in *Hollis v. U.S. Dept. of Army*, 856 F.2d 1541, 1544 (D.C. Cir. 1988) where the court suggested that the Privacy Act is not violated when a disclosure merely involves information which the recipient of the disclosure already knows. In addition, *Hollis* indicated that courts have expressed the sentiment that the Privacy Act is not violated where the disclosure consists merely of information to which the general public already has access. However, *see Gowan v. U.S. Dept. of Air Force*, 148 F.3d 1182, 1193 (10th Cir. 1998) (Matters of public record are subject to the Privacy Act); *Quinn v. Stone*, 978 F.2d 126, 134 (3rd Cir. 1992) (concluding that "making available information which is readily accessible to the members of the public is a disclosure under 552a(b), subject, of course, to the Act's exceptions".) In any event, as noted throughout this memorandum, the public did not have access to the videotape at issue here.

an agent who on several occasions has literally risked his life in undertaking the most dangerous assignments the DEA has to offer.

The government attempts to distinguish *Pilon* with footnote 10 in which the court states that "[t]his case does not present the question of whether an agency may, consistent with the Privacy Act's disclosure provisions, release a document that has already been fully aired in the public domain through the press or some other means." However, this case also does not present the question mentioned in footnote 10 of *Pilon*. As is crystal clear, the "document" here (i.e. the videotape) was never aired, much less fully aired, in the public domain at any time prior to the improper disclosure by the DEA. Indeed, the DEA's very purpose in securing the videotape was to prevent the videotape from being aired in the public domain in the first place. It is not logical for the government to have seized the videotape to avoid it being publicly aired on the one hand, but to now argue on the other hand that it was somehow publicly aired.

In *Wright v. FBI*, 385 F.Supp.2d 1038, 1041 (C.D. Cal. 2005) the court held that the plaintiff's Privacy Act claims were already in the public domain because the plaintiff himself had revealed the information to the public through press conferences, his own website and then the publicly filed lawsuit. In the instant case, however, had Mr. Paige disclosed nothing about the incident and the videotape was not disclosed by anyone until the DEA leaked it.

In *Tripp v. Dept. of Defense*, 193 F.Supp.2d 229 (D.D.C. 2002) this court held that the release of the names, title, salaries and salary-levels of public employees involved information generally in the public domain and was not even information about the plaintiff. The record here, the videotape, was never in the public domain, and in fact was seized by the DEA to avoid it becoming part of the public domain.

In *Barry v. U.S. Dept. of Justice,* 63 F.Supp.2d 25 (D.D.C. 1999) this court held that a report that had been previously fully released to the media on two prior occasions was not covered by the Privacy Act because the information had already been fully disclosed to the public. Once again, the videotape here had never been disclosed at all to the public prior to its disclosure by the DEA.

*Winters v. Board of County Com'rs,* 4 F.3d 848 (10th Cir. 1993) involved a case in which the disclosed information did not even originate from any federal agency records and therefore enjoyed no protection under the Privacy Act. It is undisputed in this case that the videotape did originate from and was disclosed by the DEA.

In *Ash v. United States,* 608 F.2d 178 (5th Cir. 1979) the plaintiff's name, offense and punishment following a disciplinary proceeding were published in a daily bulletin of his Navy command. The court held that disclosure of the results of the proceeding did not violate the Privacy Act because the disclosure was made to personnel who were entitled to attend the proceeding in the first place. The videotape at issue here had never been provided to or open to anyone outside the DEA.

In *Federal Deposit Ins. Corp. v. Dye,* 642 F.2d 833 (5th Cir. 1981), the court held that the release of information previously legally published in an adjoining county was not a "disclosure" under the Privacy Act. The videotape here was never published anywhere. In addition, the decision of other courts seem to raise questions of the viability of *Dye. See Gowan v. U.S. Dept. of Air Force, supra; cf. Quinlan v. Stone, supra.*

The government also cites *Chung v. U.S. Dept. of Justice,* 333 F. 3d 273, 277 (D.C. Cir. 2003) for the proposition that principles of the common law tort of invasion of privacy are applicable to the Privacy Act. First, *Chung* does not stand for any such proposition. All the

15

court in *Chung* did was to point out that the Privacy Act claim in that case was sufficiently similar to a traditional tort claim for invasion of privacy that the court would apply a procedural "rebuttable presumption" that the principle of equitable tolling was applicable to the Privacy Act's statute of limitations. This has absolutely nothing to do with the substantive protection provided by or the essential elements of a claim under the Privacy Act.

In any event, the authority cited by the government concerning common law invasion of privacy do not help the government's position.[8]  First, the government cites the Restatement (Second) of Torts and the example at § 652B that "B" has not invaded "A's" privacy when he takes a photograph of A when A is drunk on a public street. This lawsuit is not against the videographer who originally videotaped the incident. The issue here is not whether the videographer's conduct in filming Mr. Paige invaded his privacy. The issue is whether the DEA violated the Privacy Act by disclosing the videotape after it had taken the videotape in order to keep it from becoming public and after it had become a "record" for purposes of the Privacy Act.

In *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029 (1975) the Supreme Court held that a state may not impose sanctions on the accurate publication of a rape victim's name obtained from judicial records that are maintained in connection with a public prosecution which are themselves open to public inspection and that the interest of privacy fades when the information involved appears on a public record. *See also Bergman v. Stein,* 404 F.Supp. 287, 296 (S.D. N.Y. 1975) (citing *Cox* and stating that the right of privacy under the Civil Rights Act does not protect an individual from the dissemination of information in the public record.) Here, of course, the videotape and the information discussed above, including Mr. Paige's identity, his

---

[8] Mr. Paige has filed an administrative claim under the Federal Tort Clams Act claiming a violation of his common law right to privacy. If that claim is denied in the administrative process, which would not be atypical, Mr. Paige will seek to amend his complaint in this case to add that claim to the instant claim under the Privacy Act.

actual statements, the timing of his statements with the shooting, and the dramatic images and sounds in the videotape were never in the public record.

*Dasey v. Anderson,* 304 F.3d 148, 154 (1st Cir. 2002) involved the Massachusetts right-of-privacy statute. For there to be a violation under the Massachusetts statute, there apparently must be a "gathering and dissemination" of facts of a "personal or intimate nature." *Id.* In *Dasey,* a state trooper was discharged after police officials viewed a legally seized videotape showing him smoking marijuana with others. The court dismissed the claim for invasion of privacy on the grounds that smoking marijuana in the presence of others who owed no duty of confidentiality did not meet the Massachusetts requirement of privacy and that there had been no dissemination of the videotape since the defendants only watched the tape and did not distribute it. First, the Massachusetts definition of privacy for its right-to-privacy statute does not apply here since the federal Privacy Act has no such definition. Next, the case actually supports the plaintiff's position here because implicit in the court's decision is that the dissemination of the tape would have violated the Massachusetts privacy statute, assuming the tape involved private facts of a personal or intimate nature, just as dissemination of the videotape here violated the federal Privacy Act.

## CONCLUSION

For the reasons set forth above, the Government's Motion to Dismiss must be denied.

Respectfully submitted,

Joseph D. Magri
DC No.: 349191
Ward A. Meythaler
Florida Bar No. 0832723
Merkle & Magri, P.A.
550 North Reo Street, Suite 301
Tampa, Florida 33609
(813) 281-9000 (phone)
(813) 281-2223 (fax)
wamsecy@merklemagri.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. mail, postage prepaid this ___6___ day of November, 2006 to

Peter J. Phipps
United States Department of Justice
Civil Division
Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044.

Ward A. Meythaler

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

LEE PAIGE,

     Plaintiff,

v.                            **CASE NO.: 06-0643-EGS**

UNITED STATES OF AMERICA,

     Defendant.

_____/

## AFFIDAVIT

I, Lee Paige, having been duly sworn, states as follows:

1.     The drug education presentation which I was making when I accidentally shot myself on April 9, 2004 at the Orlando Youth Minority Golf Association was not a highly public event. It was a presentation as part of a class arranged by that association to which children served by the association and their parents were invited. There were approximately 50 people at the presentation and there was no one present from the press. The presentation was being video-recorded by a private videographer.

2.     After the accidental shooting, I called my wife from the emergency room and told her to tell Walter Walker, a DEA agent, to make sure that he obtained the videotape of the accidental shooting so that it would not become public. Mr. Walker obtained the videotape and took it into the DEA's custody. The Assistant Special Agent in Charge of the DEA Orlando, Florida office, Steve Collins, ordered that no copies be made of the videotape and that it be sent directly to headquarters in Washington, D.C. I understand that no copies were to be made of the videotape and it was not to be made public because, in part, it was part of a classified DEA investigation.

3.    The videotape was later returned by the DEA to the person who had made the videotape, but the video and audio portions of the accidental shooting had been excised from the videotape by the DEA and were not returned to the videographer.

4.    Attached hereto as Exhibit A is a DVD (approximately 2 minutes and 30 seconds in length) which contains a copy of that portion of the videotape showing the accidental shooting. It was basically this portion of the videotape which was excised from the videotape by the DEA. It is basically this portion of the videotape which was obtained by the media as a result of some person or persons at the DEA disclosing a copy of it to an unauthorized person or persons. It is this portion of the videotape which was widely publicized by the national media and on the internet. I have been advised that VH1 ranked the videotape of the accidental shooting as the twentieth most viewed video on the internet for 2005.

5.    I have been advised by Mr. Collins that I can no longer work undercover or give educational or motivational speeches or presentations because my physical welfare would be in jeopardy as a result of the release of the videotape and the resulting publicity. In addition, other DEA agents have expressed concern for my safety as well as their safety if they work with me because the release of the videotape and resulting publicity has made me recognizable to individuals who have been or who are involved in the illegal drug trade.

Lee Paige

STATE OF FLORIDA              )
                                             )ss.
COUNTY OF Seminole       )

2

BEFORE ME, personally appeared _LEE PAIGE_ who is personally known to me or who produced __N/A__ as identification, and who, after first being duly sworn, deposes and says that he/she executed the foregoing and that they are true and correct.

SWORN TO AND SUBSCRIBED BEFORE ME this _2nd_ day of _November_, 2006.

NOTARY PUBLIC

State of Florida at Large
My Commission Expires:

NANCY A. BELL
MY COMMISSION # DD 264237
EXPIRES: May 4, 2007
Bonded Thru Budget Notary Services

3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**LEE PAIGE,**

      **Plaintiff,**

                                   **CASE NO.: 1:06-CV-00644(EGS)**

**v.**

                                   **Hon. Emmet G. Sullivan**

**UNITED STATES OF AMERICA,**

      **Defendant.**

_____/

## PROPOSED ORDER

Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) having come before the Court,

and the Court having considered that motion, it is hereby

      ORDERED that the motion is denied.


                                   _____
                                   UNITED STATES DISTRICT JUDGE