# EXPERT REPORT

Paige v. United States Department of Justice,
Drug Enforcement Administration et al., 06cv644.

## Keith S. Santillo

Special Agent/Firearms Instructor
DEA Office of Training
Firearms Training Unit
Quantico, Virginia

November 29, 2007

# I.    GENERAL INTRODUCTION

As video footage depicts, numerous incidents of firearms mishandling occurred during S/A Paige's Demand Reduction presentation.  These violations of some of the most basic, critical and fundamental firearms safety rules and procedures culminated in S/A Paige's suffering a self-inflicted gunshot wound.  This gunshot wound was caused by a negligent discharge of the firearm in front of an audience of civilians including children.  S/A Paige's improper actions during this Demand Reduction presentation unnecessarily endangered the lives of others present in addition to his own life.  Because of the very egregious and unsafe actions committed by S/A Paige, which were captured on video, the video footage could be a very useful training tool for future firearms safety and safe handling presentations.

# II.    STATEMENT OF EXPERT QUALIFICATIONS

I am a GS Series 1811 Criminal Investigator/Special Agent with the U.S. Drug Enforcement Administration (DEA).  I have been a Special Agent with the DEA since 1990.  I am also a Firearms Instructor with the DEA with an expertise in firearms training and safe weapons handling.

I received a Bachelor of Science Degree from Slippery Rock University in Pennsylvania in Recreation Resource Management in 1981.  I then received my certification as a Police Officer under PA Act 120, Commonwealth of Pennsylvania, from Indiana University of Pennsylvania's Criminal Justice Training Center, School of Continuing Education in Meadville, Pennsylvania in September of 1984.  I graduated as Class Valedictorian; I also served as Class President and achieved the qualification of Firearms Expert.

Prior to my employment with the DEA, I served as a part time Police Officer with the city of Cochranton, Pennsylvania while employed full time as a Park Technician with the U.S. Army Corps of Engineers in Saegertown, Pennsylvania.  I then became an Investigator with the U.S. Department of Labor, Office of Labor Management Standards in Pittsburgh, Pennsylvania.  Shortly thereafter, I transferred over to the U.S. Department of Labor, Office of Inspector General in Pittsburgh, Pennsylvania as a GS Series #1811 Criminal Investigator.

My background in firearms and firearms safety began at a very early age with my father.  An avid shooter, hunter and outdoorsman, my father introduced me to firearms safety as a child.  I grew up in an environment of the shooting sports, firearms safety, the outdoors and conservation.  My father took me with him as an observer prior to my being of the legal age to hunt.  My father instilled in me the proper firearms safety rules and procedures before ever putting a firearm in my hands.  I started off with a single shot .22 rifle and a single shot .20 gauge shotgun; I progressed up to a pump-action shotgun and

eventually to a high-powered rifle.  At the age of 12 my father took me to a Hunter's Safety Course in Pennsylvania which I passed.  By passing this Hunter's Safety Course, I earned the privilege to hunt in the State of Pennsylvania.

While in college, I was on the Slippery Rock University Trap Shooting Team. We competed at the national level for three years.  During this time, I hand loaded my own practice ammunition and practiced daily.

I was hired by DEA in the Pittsburgh, Pennsylvania office in 1990 and served in the Miami Field Division in both the Fort Lauderdale District Office and the West Palm Beach Resident Office.  I graduated from the DEA Basic Agent Academy in 1991, having achieved the title of Distinguished Weapons Expert in firearms proficiency.

While a Special Agent assigned to the DEA's Fort Lauderdale and West Palm Beach offices from 1990 to 2001, I assisted the Firearms Instructors in range safety and range duties as I learned and practiced to become a certified Firearms Instructor.  I attended the Federal Bureau of Investigation's (FBI) Firearms Instructor School in January 2000 in Tampa, Florida and became a certified Firearms Instructor.   I was then immediately assigned as the Firearm's Instructor for the DEA West Palm Beach Resident Office.  My duties included all firearms and range safety duties, firearms inspection, inventory and maintenance, ammunition inventory and management.

From 2001 until present, I have been employed full-time as a staff Firearms Instructor with the DEA Firearms Training Unit at Quantico, Virginia.  While assigned to the Firearms Training Unit (FTU) I have been the Primary Firearms Instructor (PFI) for DEA Basic Agent (BA) Classes #148, #156, #158, #166 and #174.  I am the scheduled PFI for BA-#177 scheduled in January 2008.  As PFI, I was/am responsible for the overall planning, safety, instruction and operation of an entire BAT (Basic Agent Training) class of up to 50 BAT's (Basic Agent Trainees).  Since coming to the FTU, I have assisted in the training of 35 BA classes that have gone through the DEA Academy. At an average of 45 shooters per class, I have observed and been a part of training approximately 1,600 new DEA Special Agents in firearms safety and proficiency.

In addition, I have been assigned as a Bay Instructor for every BA class since I have been a member of the FTU.  As a Bay Instructor, I have been directly responsible for the safety and "hands on" one-on-one instruction of up to 12 BA Trainees on my team on a live firing line.

While a member of the FTU, I have been assigned the duties of teaching the BA Trainees the more advanced firearms techniques in the "combat rotations" portion of the training regiment.  These combat techniques include Close Quarters Battle (CQB), which is a very advanced shooting technique in which the shooter fires the weapon from within very close proximity to the shooters body and the threat.  This drill simulates the shooter being attacked and having to engage the threat at very close distances, which is where the majority of law enforcement shooting occur.  This is an extremely advanced drill for

2

which I have been responsible for developing a lesson plan and providing detailed instruction in the past.

Another technique is the Disabled Shooter Drill which simulates the shooter becoming disabled in the deadly encounter and losing the use of an arm. This drill then requires the shooter to fully function the weapon with only one hand, both strong hand and support hand only, to include drawing the weapon, safely and accurately firing the weapon, clearing malfunctions, reloading the weapon and re-holstering the weapon, all with only one hand. This is an extremely advanced drill for which I have been responsible for developing a lesson plan and providing detailed instruction in the past.

Additional combat techniques for which I have been responsible for instruction include the use of cover, moving and shooting, shooting on the move with the handgun and carbine, shooting in and around vehicles, low light and no light shooting techniques with both hand-held white lights and weapon-mounted white lights and engaging moving targets.

I have provided firearms safety briefings as well as safe firearms handling instruction to DEA Basic Agent Trainees, DEA Special Agents, Department of Justice, Office of Inspector General, U.S. Marine Corps Military Police, U.S. Marine Corps Presidential Helicopter Squadron HMX-1, the Fort Myer Military Community Special Reaction Team (SRT), high ranking government officials, state and local police officers, including SWAT Teams, members of the CIA, BATF, attorneys, DARE groups, colleges and university groups.

In 2007, I was assigned as the Program Manager for the DEA Firearms Instructor School Program. I was assigned to plan, coordinate, and administer the 2007 DEA Firearms Instructor School #2007-1 at Quantico, Virginia. The program was completed which certified 14 new DEA Firearms Instructors to DEA field offices throughout the country.

I am currently assigned as the Primary Firearms Instructor for the DEA Office of Training. As the PFI for Training, I am responsible for the safety, firearms training, scheduling and running of firearms qualifications courses for all Series #1811 personnel for the Office of Training.

Throughout my career with DEA, I have attended numerous firearms training classes. For an eight week period in 1989, I attended Criminal Investigator Training CI-907, at the Federal Law Enforcement Training Center in Glenco, Georgia. In 1996, I further attended a 40 hour Counterdrug Special Reaction Team Course – SWAT at the U.S. Army Military Police School at Fort McClellan, Alabama. Also in 1996, I attended a 24 hour U.S. Army Basic Combat Medical Training Course presented by the U.S. Army 20th Special Forces Group, 1st Special Forces. In 1997, I attended a 40 hour Narco-Terrorism Personal Protection Course, again at the U.S. Army Military Police School at Fort McClellan, Alabama. In 2000, I attended a Firearms Instructor School presented by the Federal Bureau of Investigation, in Tampa, Florida. In September of 2001, I attended

an Instructor Development Course, presented by the DEA, Office of Training, Quantico, Virginia. In 2002, I attended an Urban Tactical Rifle Instructor Course, presented by Crisis Resolution Training Consultants at Quantico, Virginia. In 2005, I attended an Objective Based Training for Instructors Course, presented by the Sigarms Academy at Quantico, Virginia. In August of 2005, I attended the Glock Armorer's Course, presented by Glock, Inc. at Quantico, Virginia and became a certified Glock Armorer. In 2006, I attended a Teaching Women to Shoot Instructor's Course, presented by Defensive Training International, at Quantico, Virginia. Again in 2006, I attended a Combative Handgun Course, presented by Crucible Learning Center, in Stafford County, Virginia. In May 2007, I attended the Rock River Arms Comprehensive Armorer School and became a certified Rock River Arms Armorer. In August 2007, I attended the Smith & Wesson M&P Armorer School and became a certified Smith & Wesson M&P Armorer.

Finally, my service with DEA has been recognized by several performance awards throughout my career. While assigned to the Fort Lauderdale District Office, I received a $2,500.00 DEA Special Act Award for a criminal narcotics case I was assigned to. I also received the Outstanding Law Enforcement Officer Award, from the U.S. Department of Justice, Office of the U.S. Attorney, Southern District of Florida in 1996. In 1997, while assigned to the DEA West Palm Beach Resident Office, I was additionally assigned to the Palm Beach County Sheriff's Office Domestic Interdiction Unit where I received a Letter of Commendation. In 1998, I also received a Letter of Commendation from the United States Attorney, District of Connecticut, for a criminal narcotics case on which I was assigned. In 2004, while assigned to the DEA Office of Training, Firearms Training Unit, I received the DEA Exceptional Performance Award from John R. McCarty, Special Agent in Charge.

## III.    BACKGROUND ON GLOCK MODEL 22 HANDGUN

The Glock is a magazine fed, recoil operated, semi-automatic handgun. The Glock Model 22 handgun is known as a "Safe-Action" pistol. The Glock has three safeties: the Trigger Safety, the Firing Pin Safety and the Drop Safety.

The Trigger Safety is a small lever on the face of the trigger, preventing the trigger from moving until pressed by the operator. At rest, the Trigger Safety is blocked by the receiver and prevents trigger movement. Once the Trigger Safety lever is pressed, the trigger can then move freely.

The Firing Pin Safety is a spring loaded plunger which prevents the firing pin from moving forward to strike the chambered round unless the trigger is pressed. At rest, the Firing Pin Safety blocks firing pin movement. As the trigger moves to the rear, the vertical extension of the trigger bar pushes the Firing Pin Safety up allowing the firing pin access to the chambered round.

The Drop Safety is designed to operate while the cruciform part of the trigger bar is held in a small cut in the ejection housing. This small cut in the ejection housing

4

prevents the cruciform from dropping down and releasing the firing pin until the trigger is pressed. The cruciform is held upward by the shape of the cutout in the ejector housing. As the trigger is pressed, the cruciform moves to the rear, where the cutout is wider. The cruciform is then free to drop, releasing the firing pin.

Each of these three safeties is disengaged by pressing the trigger.

## IV.     PROPER WEAPONS HANDLING PROCEDURES

There are fundamental firearms safety rules in existence that govern the safe handling of firearms. As taught by the DEA, the General Rules of safe handling are as follows:

1. Treat all firearms as if they are loaded.
2. Never point a weapon at anyone unless you are justified.
3. Keep your finger off the trigger unless you intend to shoot.
4. Make certain of your target and what is beyond before shooting.[1]

DEA Basic Agent Trainees are provided with these rules. They are instructed to read and acknowledge by printing their name and social security number and signing and dating the form. The signed forms are maintained in the individual class files at the DEA Office of Training. In addition, as required by DEA policy pursuant to the Agents Manual, all S/A's will attend firearms training quarterly and must qualify semiannually with their DEA issued handguns and/or approved personally owned handguns they desire authorization to carry.[2] At the time of the incident, S/A Paige was required to maintain firearms training and proficiency on a continuing basis according to the above DEA policy.

Similar in substance to the DEA's General Rules are the rules from other agencies. For instance, the FBI provides three Cardinal Rules:

1. Treat all weapons as if they are loaded.
2. Keep your finger off the trigger unless you intend to press it.
3. Never point a weapon at anyone unless you are justified.[3]

---

[1] FIREARMS SAFETY RULES, DEA TRAINING ACADEMY.

[2] DEA Agents Manual Section 6122.43 Firearms Qualifications.

[3] FIREARMS INSTRUCTOR HANDBOOK, FIREARMS TRAINING UNIT, FEDERAL BUREAU OF INVESTIGATION, FIREARMS SAFETY RULES, FIREARMS SAFETY, Part 2-4, CARDINAL RULES: 1 thru 3.

Additionally, the manufacturer of the weapon S/A Paige was handling at the time of the negligent discharge (Glock) sets forth additional firearms safety rules that are consistent with DEA's General Rules:

1. Handle all firearms as if they were loaded.
2. Always keep the firearm pointed in a safe direction.
3. Keep your finger out of the gun's trigger guard and off the trigger until you have aligned the gun's sights on a safe target and you have made the decision to fire.
4. Always be certain that your target and the surrounding area are safe before firing.
5. Whenever you handle a firearm, the first thing you should do (while keeping it pointed in a safe direction with your finger outside the trigger guard) is to open the action to determine whether or not the firearm is loaded.
6. Thoroughly read the instruction manual supplied with your firearm.
7. Before firing your weapon, you should routinely make sure that your firearm is in good working order and that the barrel is clear of dirt and obstructions.
8. Only use ammunition recommended by the firearm manufacturer, and always be certain that the ammunition matches the caliber for your gun.
9. Quality ear and eye protection should always be worn when shooting or observing.
10. Never use firearms while under the influence of drugs or alcohol.
11. All firearms should be stored unloaded and secured in a safe storage case, inaccessible to children and untrained adults.
12. The transportation of firearms is regulated by Federal, State and local laws. Always transport your firearm in a safe, unloaded condition and in accordance with applicable laws.[4]

In summary, it is generally accepted firearms safe handling procedures that the weapon is always treated as if it were loaded, and the muzzle should always be pointed in a safe direction, and the finger should be kept off of the trigger until ready to fire.

## V.    PROPER WEAPONS UNLOADING AND CLEARING PROCEDURES

The procedure for properly unloading a handgun is essentially the same for all makes of handguns and is essentially the same for all law enforcement agencies. The unloading or "clearing" process consists of a series of steps. Stated generally, those steps

---

[4] The Basic Rules of FIREARM SAFETY, GLOCK, INC., 6000 Highlands Parkway, Smyrna, GA 30082 USA.

are: (1) Point the muzzle in a safe direction; (2) Remove the source of ammunition; and (3) Perform a safety check both visually and physically and check it twice.

It is imperative that these steps be conducted in the proper sequence.  If the steps are conducted in an improper sequence the result will be that the weapon is not properly unloaded or cleared, making it possible for a negligent or accidental discharge to occur. For example, if the slide is locked to the rear prior to removing the source of ammunition (the magazine), when the slide is sent back forward it will strip off a round from the top of the magazine and chamber that round.  If the trigger is then pressed, the weapon will fire as designed.   (This is the exact scenario which occurred in S/A Paige's incident.)

The importance of this series of steps is explained in further detail in DEA firearms training and other law enforcement and firearms training materials.  The weapon clearing procedure as taught by the DEA Firearms Training Unit for the Glock Model 22, .40 S&W pistol is an administrative unloading and clearing procedure as follows:

- With the weapon securely holstered
- Check for and remove the source of ammunition (remove the magazine).
- Finger off the trigger and outside of the trigger guard
- Draw the weapon and either point the weapon into a clearing barrel or in a safe direction.
- Invert the weapon and rack the slide several times to the rear.
- Lock the slide to the rear.
- Conduct a safety check, both visually and physically.  This means to visually look into the weapon and look down through the magazine well to see the ground while physically reaching a finger into the magazine well to verify that no magazine remains in the weapon.  Next visually look into the chamber area of the weapon while physically reaching into the chamber with the tip of the little finger to determine that no round is present in the chamber.  The shooter is then to look away to refocus the eyes and then the process is then repeated a second time for duplication.
- The next step in the process is to have the weapon inspected a second time by another S/A trained and knowledgeable in firearms safety or a certified firearms instructor.
- Once inspected by a second person and verified "safe and clear", it is then recommended that the muzzle of the weapon be pointed into a clearing barrel or in a safe direction and the slide sent forward.  With the weapon remaining pointed into a clearing barrel or in a safe direction the trigger is then pressed.  The weapon in now in the proper condition to be taken down for field stripping.[5]

In checking with the Federal Bureau of Investigation, Firearms Training Unit, the U.S. Secret Service, the Bureau of Alcohol, Tobacco, Firearms and Explosives, The Federal Law Enforcement Training Center (FLETC) and the National Rifle Association

---

[5] DEA Lesson Plan, Basic Marksmanship, #5 Unloading the Weapon, pages #6 and #7.

(NRA), the weapons unloading and clearing procedures are essentially the same.  For instance, the unloading /clearing procedure taught by the FBI is as follows:

- Step 1:  Draw and come to Position 2.  Keep muzzle pointed in a safe direction (down range, junction of floor and wall, clearing barrel, or safety wall).

- Step 2:  Remove the magazine (source of ammunition) and retain it.

- Step 3:  Conduct a safety check.  Check again for redundancy.[6]

The weapon manufacturer, Glock, provides essentially the same rules for safely unloading a weapon:

1. Remove magazine by depressing MAGAZINE CATCH (source of ammunition).
2. Pull slide back to eject the round which is in the chamber.
3. Check to ensure that there is no round in the chamber.
4. Allow the slide to spring forward by releasing it.  Pull the trigger into the full pulled position with the pistol pointing in a safe direction.[7]

This publication from Glock is included within the factory box for each Glock handgun.  Also, included in each factory box is a copy of the Basic Rules of Firearm Safety referenced in the prior section.  Each DEA Basic Agent Trainee is given copies of these manuals in the factory box with their firearm.

Other sources further confirm the basic principals of firearms safety for safely unloading weapons.  For example, the NRA teaches the following steps for safely unloading a firearm:

1. Hold the pistol in right hand.  Activate magazine release, and remove magazine from gun.
2. Grasp rear portion of slide with left hand and move slide completely to the rear, ejecting the cartridge from the chamber.  If the pistol has a slide stop, use it to keep the slide open.
3. Inspect chamber to be sure that it is empty.[8]

In summary, as this variety of sources demonstrates, to safely unload and clear a firearm properly requires adherence to a very specific sequence of steps.  If this sequence

---

[6] FBI Firearms Training Modules, NAT Package v3.0.

[7] GLOCK INSTRUCTIONS FOR USE MANUAL, Page 23 UNLOADING.

[8] NRA Guide to Forearms Safety To Include Semi-Automatic.

is conducted out of order, then the possibility exists for an accidental or negligent discharge to occur.

## VI.  FIREARMS SAFETY VIOLATIONS AND WEAPONS MISHANDLING BY SPECIAL AGENT PAIGE (USER ERROR).

Based upon a review of video footage[9] of S/A Paige's negligent discharge, it is my opinion that S/A Paige committed several errors with regard to safe weapons handling procedures.  These errors begin with bringing a loaded weapon to a Demand Reduction presentation[10] and negligently utilizing that loaded weapon as a "prop" in a Demand Reduction presentation.  These events are further exacerbated by the fact that S/A Paige did not have an actively participating DEA S/A co-presenter with him.  The errors continue when S/A Paige repeatedly fails to point the weapon in a safe direction and then improperly attempts to unload and clear the weapon.  This improper sequence of events leads to a negligent discharge in which S/A Paige is injured.  The event of S/A Paige being shot then leads to his failing to maintain control of the loaded weapon by his placing the loaded weapon down on a table and walking away from it in a room with children present.  This event then leads to an unauthorized civilian (Robin) picking up the loaded DEA weapon and manipulating it in the classroom.  These errors in totality are very serious in nature and pose serious safety risks and could have been avoided by the proper following of weapons safety procedures as taught.

The following are some of the most critical issues by which members of the public were endangered by the actions of S/A Paige and others in this incident.

### 1.  Special Agent Paige's negligent utilization of a loaded weapon as a "prop" in the Demand Reduction presentation.

Training, education, good judgment and common sense dictate that a loaded weapon not be used in a Demand Reduction presentation.  At no time should S/A Paige have drawn, handled and displayed a loaded weapon in a classroom with civilians and children during a Demand Reduction presentation.  A cardinal rule in firearms training is NEVER use a loaded weapon for teaching or demonstration purposes, unless of course, it is a live fire demonstration on a safe firearms range.

It is recommended that an "inert" weapon or red-handled non-firing training weapon be utilized for such an event.  If an inert training weapon was unavailable, an

---

[9] I reviewed video footage from two sources, labeled N-4 and N-8-2.  Due to the higher quality resolution of N-8-2, all time references in this report are with respect to N-8-2.

[10]  A Demand Reduction presentation is a presentation seeking to reduce the demand for and describe the dangers of illegal drugs.

alternative would be to safely unload all weapons at a secure location such as a weapons clearing barrel and to conduct safety checks both visually and physically by at least two trained S/A's prior to entering the presentation site.  Additionally, all live ammunition should have been secured in a separate location and kept separated from the weapons.  As a further safety precaution, if inert weapons were unavailable, would have been to remove the firing pin from the "live" weapon, thereby rendering it incapable of firing.

## 2. Special Agent Paige's failure to have a DEA Special Agent co-presenter actively participating in the Demand Reduction presentation for duplication and as a safety net.

S/A Paige should have had another DEA S/A actively participating with him as a partner and co-presenter at this Demand Reduction presentation in which he drew, handled and displayed firearms.  Special Agents in the DEA routinely operate in partners of at least two.  This is done for many reasons, the most important being safety, and to have another DEA witness present at all times.  When firearms are involved, having another S/A actively present allows for a second pair of eyes, a second person on scene trained in firearms to conduct a safety check, both visually and physically and a second brain to process events clearly.  Having a second S/A actively present allows for safety, duplication and confirmation that the weapon is unloaded, safe and empty.  Having a second S/A actively participating on scene during this incident to inspect the firearms would have quite probably prevented this incident from occurring.

## 3. Initial violations of the "Laser Rule" by Special Agent Paige.

A fundamental concept of firearms safety is the "Laser Rule."  The concept of the Laser Rule is to imagine a laser beam constantly emitting from the muzzle of the weapon. Anything that the laser touches, it destroys.  This concept teaches constant awareness of where the muzzle of the weapon is pointed at all times.  By S/A Paige drawing and displaying the weapon in front of the group during the presentation and crossing or "lazing" his lower body with the muzzle, he violated the laser rule and endangered himself.

S/A Paige enters the video on N-8-2 at approximately 0:00:27.   At approximately 0:13:29 into the video S/A Paige begins to speak about guns.  At approximately 0:13:53 minutes into the video, S/A Paige states "see this is a unloaded gun" and draws the handgun from a thigh tactical holster.  As S/A Paige draws the firearm it appears that he crosses or "lazes" his own lower body with the muzzle of the weapon.   From this series of events, S/A Paige lazes his own body with the muzzle of the weapon and by doing so violates the fundamental rules of safe weapons handling.

### 4. By Special Agent Paige failing to inspect the weapon both visually and physically for purposes of conducting a safety check

In observing the video, it appears that at no time did S/A Paige visually or physically inspect the weapon for the purpose of conducting a proper safety check. First, at no time on video did S/A Paige visually or physically inspect the weapon to verify a safe and empty weapon. Second, at no time on video did S/A Paige check the weapon, both visually and physically a second time for redundancy. S/A Paige is off video for several seconds when he shows the weapon to the man at video right to verify safe and empty. Had S/A Paige conducted even a cursory check of the weapon it should have been quite apparent to him that the magazine was still in place in the weapon and that live rounds were visible in the magazine. Therefore, I conclude that S/A Paige did not properly inspect his weapon to determine whether the weapon was loaded or was safe and empty.

### 5. Special Agent Paige utilizing a "civilian" to verify a safe and empty weapon.

Related to the fact that S/A Paige failed to visually and physically check the status of his weapon, S/A Paige then elicited the assistance of a civilian man with unknown firearms knowledge and experience who was wearing a dark shirt and was observed standing against the wall to frame right.

At approximately 0:13:54, S/A Paige is seen walking to frame right and out of the video. It appears that S/A Paige has walked over to this civilian. A metallic sound can then be heard on the audio. From my training and experience I conclude that this is the sound of a slide being locked to the rear on the Glock handgun. When the slide is racked and locked to the rear on a loaded weapon, any round that might be in the chamber would be extracted from the chamber and brought back in contact with the ejector which then ejects the round from the weapon. From my observation of the video, and due to the fact that it was done off camera, I cannot determine if a round was in the chamber and whether a round was ejected onto the floor or captured by S/A Paige.

It appears that S/A Paige went over to the civilian man, locked the slide to the rear and showed the man the weapon in an attempt to verify that the weapon was safe and empty. S/A Paige is then heard saying something which is inaudible. S/A Paige is then heard saying "empty weapon" then again "empty weapon," as if first asking and then confirming. At this point it is unknown if S/A Paige was acquainted with this civilian and what training, knowledge and experience this civilian may or may not have had in safe firearms handling. It is at this point that had a second DEA S/A been actively participating, he/she could have been the second person to visually and physically safety check the weapon. It would have been noticed by a second S/A that the condition of the weapon was not safe and empty at this point, and that the weapon still contained a loaded magazine with live rounds.

11

It is my conclusion that S/A Paige failed to follow proper weapons safe handling and unloading procedures by relying on an apparently untrained person to verify that the weapon was "safe and clear". This failure by S/A Paige unnecessarily jeopardized the safety of the audience at this Demand Reduction presentation.

## 6.  Successive violations of the "Laser Rule" by Special Agent Paige.

While handling the loaded weapon, after showing it to the civilian, S/A Paige violates the laser rule by improperly pointing the muzzle of his weapon in unsafe directions: at the civilian and the ceiling.

At approximately 0:13:59, S/A Paige is observed walking back into the video with the slide locked to the rear and the weapon pointed in the direction of the civilian man standing against the wall, again in violation of the laser rule.

At 0:14:04, S/A Paige transfers the weapon from his left to his right hand. S/A Paige then brings the weapon up to face level with the slide still locked to the rear and the muzzle pointed up toward the ceiling. Again, taking into consideration the laser rule, it is unknown what is on the second floor of the building. It would have been safer to point the muzzle of the weapon down toward the floor, if on the ground floor.

## 7.  Special Agent Paige's improper weapons unloading/clearing by failing to remove the source of ammunition.

The video recording makes clear that S/A Paige failed to properly remove the source of ammunition (the magazine) from the weapon in violation of proper weapons handling, unloading and clearing procedures.

At approximately 0:13:59, S/A Paige is observed as he walks back into the video holding the weapon in his right hand and identifying the weapon as a "Glock 40", meaning a Glock chambered in .40 S&W caliber. S/A Paige is seen holding the weapon at head level with the slide locked to the rear. The muzzle of the weapon appears to be pointed in the direction of the civilian standing against the wall who S/A Paige just had inspect the weapon. S/A Paige is describing the weapon as a Glock .40 as the camera zooms in on the weapon. At this point at approximately 0:14:04, the magazine floor plate is clearly visible extending from the grip of the weapon, indicating that the magazine had not been removed and is still in the weapon. (See Exhibit #1)

With the weapon in this position, the ejection port of the weapon is facing the audience and the camera. At approximately 0:14:05, the top round in the magazine is clearly visible in the weapon sitting in the feed clips of the magazine at the base of the feed ramp. (See Exhibit #2) S/A Paige then raises the weapon overhead with the muzzle

still pointing in the direction of the ceiling as he activates the Slide Lock/Slide Release Lever with his right thumb.  This action, by design, causes the slide to go forward, thereby stripping the top round off of the magazine and chambering it.  At approximately 0:14:06, the weapon is still loaded and ready to fire, clearly in violation of safe weapons handling procedures.

### 8.  Additional violations of the "Laser Rule" by Special Agent Paige.

S/A Paige again violates the laser rule by pointing the muzzle of the weapon in the direction of the civilian and his own left arm and hand and ultimately his upper left leg area.

At approximately 0:14:07, the weapon is still being held in S/A Paige's right hand at head level with the muzzle pointed up at the ceiling.  S/A Paige then begins to bring the weapon down past his face and across his body.  At approximately 0:14:14, the muzzle of the weapon is pointed in the direction of the civilian man standing against the wall in frame right.  Additionally, at approximately 0:14:14, it is clearly seen that the muzzle of the weapon crosses or "lazes" S/A Paige's left hand and wrist.  This is another example of a safety violation of the "Laser Rule" and mishandling of the weapon by failing to point the muzzle in a safe direction.  Also at approximately 0:14:14, S/A Paige continues to move the muzzle of the weapon to a point near his left hip area.  S/A Paige's left hand then comes over the top of the slide of the weapon.

### 9.  Special Agent Paige's improper placing of his finger on the trigger leading to a negligent discharge and injury.

S/A Paige again violates the firearms safety rules by failing to keep his finger off the trigger.  In reviewing the video and the teletype of this incident, which states that the weapon was inspected and found to be functioning as designed,[11] I conclude that S/A Paige must have had his finger on the trigger which caused the weapon to discharge as designed.  It is at approximately 0:14:14 that the weapon is discharged.  S/A Paige reacts to the impact of the shot and doubles over.

---

[11] DEA Teletype dated 06/21/2004, SUBJECT: ACCIDENTAL DISCHARGE BY SPECIAL AGENT (SA) LEE PAIGE.

### 10. Special Agent Paige's failing to maintain control of a loaded weapon by placing it on the table and leaving it unattended in a room with children present.

After being shot, S/A Paige again violates firearms safe handling procedures by placing the loaded weapon down on a table and leaving it unattended in a room containing children.[12]  At approximately 0:14:16, the weapon is visible in S/A Paige's right hand, the weapon is lowered out of frame and is placed on a table in the front of the room at approximately 0:14:18.  At approximately 0:14:18, the loaded weapon is clearly visible on the table, unattended, in a room with children present.  (See Exhibit #3)

### 11. Special Agent Paige's permitting a civilian to handle the loaded weapon.

Several other firearms violations occur following the negligent discharge.

First among these, the Glock 22 weapon is handled by non-DEA personnel, Robin, the white female on the video.  Robin with a dark top and light colored shorts immediately comes over and picks up the weapon at approximately 0:14:31 and walks over to frame right.

Later at approximately 0:14:37, Robin goes over to the wall to frame right and is seen manipulating the weapon.  Robin, with the weapon still clearly visible in her right hand, then goes over to the area where the weapon was discharged and appears to be searching for something on the floor, possibly the brass casing that was ejected from the weapon.   A member of the audience sitting in the first row is then seen holding up an object, possibly the ejected brass casing in his hand.  Robin then comes over with the Glock still in hand and takes possession of the object in her right hand.

S/A Paige, after being injured by the negligent discharge, then calls for two persons to bring out another gun to show.  S/A Paige again states "I'm hit", and goes on to say "I made a mistake" and "see how that accident happened, it can happen to you and you could be blown away, so guys never  play with guns".  S/A Paige states "now I'll probably never be able to show guns again".  S/A Paige then immediately points over toward frame right and calls "Brian, bring that other gun out Brian".  S/A Paige then tells Robin to bring the other gun out.

Robin, at approximately 0:15:25, is seen picking up what appears to be some type of a Colt Pattern rifle or carbine, either a version of the Colt M16 or possibly the Rock River Arms LAR-15 rifle.  Robin then is observed swinging the carbine up to waist level

---

[12] GLOCK INSTRUCTIONS FOR USE MANUAL, Page 19, SPECIAL PRECAUTIONS CONCERNING CHILDREN, #3.

and then at approximately 0:15:26 proceeds to cross or "laze" the muzzle of the carbine directly across the body of the civilian man standing against the wall. Robin then brings the carbine up to near her head level. It is unknown if the weapon is loaded at this time, at no time on the video does it show this carbine being safety checked for safe and empty. As Robin is holding the carbine the muzzle is pointed up toward the ceiling, in violation of the laser rule. Calls can be heard on the audio emanating from the audience of "put it down, put it down". At this point, at approximately 0:15:36 - 0:15:37, Robin brings the carbine down to about her waist level at which time the muzzle of the carbine is again pointed in the direction of the civilian standing against the wall. Robin then continues over to frame right and places the carbine down out of sight. At approximately 0:16:12, S/A Paige is then seen walking off to frame left and out of the video.

Exhibit N-4 was also reviewed. Exhibit N-4 was of shorter duration at approximately 4:08 total time and of lower quality resolution.

## VII.  THE VIDEO FOOTAGE OF SPECIAL AGENT PAIGE'S FIREARMS MISHANDLING IS USEFUL AS A FIREARMS SAFETY TRAINING TOOL.

In my training and experience as a Firearms Instructor, the DEA Firearms Training Unit and other agencies and departments utilize video recordings as training tools for safe firearms handling, unloading and clearing procedures. It is my opinion that this video recording of the Paige negligent discharge would be a valuable tool in the training of safe weapons handling.

This incident occurred as a result of a compilation of numerous violations of the most fundamental rules of firearms safety as described previously. Specifically, the primary reason why S/A Paige was shot in this incident was because he failed to follow the *proper sequence* of events during the process of unloading and clearing the weapon. In review, the source of ammunition (the magazine) must first be removed from the weapon before racking and locking the slide to the rear. In attempting to unload the weapon in the classroom, S/A Paige failed to remove the source of ammunition (magazine) prior to racking/locking the slide to the rear. By getting these events out of the proper sequence and by leaving the source of ammunition (magazine) in the weapon, **then** locking the slide to the rear **(improper sequence)** the round in the chamber was extracted and ejected. However, when the slide was then sent forward a new round was stripped from the top of the magazine and was chambered. The weapon was then loaded and again ready to fire.

The totality of the circumstances surrounding this incident as depicted on the video would be extremely useful as a firearms safety training tool. This incident is a classic example of how ***NOT*** to conduct a firearms safety demonstration. Subsequently, this incident would be a valuable training tool to various groups training on firearms safety, including BAT's and all Firearms Instructor Candidates.

## VIII.  OTHER WORK AS AN EXPERT WITNESS AND COMPENSATION

I have not testified as an expert witness in the past.  I am not being specially compensated for my work as an expert witness in this case.


Keith S. Santillo
Special Agent
U.S. Department of Justice
Drug Enforcement Administration
Office of Training
Firearms Training Unit
Quantico, Virginia

11/29/2007
November 29, 2007

16

## BIBLIOGRAPHY OF MATERIALS CONSIDERED FOR THIS REPORT

Videos identified as N-8-2 and N-4.

DEA Teletype dated 06/21/2004, SUBJECT: ACCIDENTAL DISCHARGE BY SPECIAL AGENT (SA) LEE PAIGE

Glock 22 Pistol Basic Agent Trainee Manual
Chapter on Disassembly
Firearms Training Unit, Office of Training, Quantico, Virginia

FIREARMS SAFETY RULES DEA TRAINING ACADEMY

FIREARMS INSTRUCTOR HANDBOOK, FIREARMS TRAINING UNIT, FEDERAL BUREAU OF INVESTIGATION.

The Basic Rules Of  FIREARM SAFETY GLOCK, Inc., 6000 Highlands Parkway, Smyrna, GA 30082 USA

GLOCK INSTRUCTIONS FOR USE MANUAL

NRA Guide to Firearm Safety / Semi-Automatics / To Unload Semi-Automatics (Internet Search) http://www.aaof.com/gsrl.htm

FBI Firearms Training Modules, NAT Package v3.0 & v3.4

DEA Office of Training form PISTOL QUALIFICATION STANDARDS, dated: 05/31/90, Class: BA #70, Name: L. Paige

DEA Agents Manual Section 6122.1 GENERAL

DEA Agents Manual Section 6122.33 Authorized Shoulder Weapons

DEA Agents Manual Section 6122.43 Firearms Qualifications

DEA Agents Manual Section 6122.45 Remedial Training for Accidental Discharge Occurrence

DEA Lesson Plan, Basic Marksmanship, #5 Unloading the Weapon.

FUNDAMENTALS OF GUN SAFETY
With Susan Howard and Steve Kanaly
The Basic Rules of Safe Firearms Ownership
A Production of the Safety and Education Division of the NRA of America 1991.
VHS Video, FBI Library

October 19, 2007

# BIOGRAPHICAL INFORMATION

Keith S. Santillo                                              703-632-5202 (Office)
U.S. Department of Justice                            703-632-5204 (Fax)
Drug Enforcement Administration             Keith.S.Santillo@doj.gov
Office of Training
2500 Investigation Parkway
Quantico, Virginia 22135
Attn: Firearms Training Unit

## CURRENT POSITION

Special Agent/Firearms Instructor
Drug Enforcement Administration
Office of Training
Firearms Training Unit
Quantico, Virginia

## EDUCATION

- B.S., Recreation Resource Management, Slippery Rock University,  Slippery Rock, Pennsylvania. 1981.
- PA Act 120 Certification, Police Officer, Commonwealth of Pennsylvania Indiana University of Pennsylvania, School of Continuing Education, Criminal Justice Training Center, Meadville, Pennsylvania. 1984.
- Drug Enforcement Administration, Basic Agent Training Academy,  Quantico, Virginia 1990 - 1991.
- Federal Law Enforcement Training Center, Criminal Investigator Training Glenco, Georgia 1989.
- U.S. Department of Justice, Federal Bureau of Investigation, Firearms Instructor School, 2000.
- Armorer's Course, Glock, Inc. 2005.

## EMPLOYMENT

- U.S. Department of Labor, Office of Labor Management Standards, Investigator, Pittsburgh, Pa. 1985 - 1988.
- U.S. Department of Labor, Office of Inspector General, Criminal Investigator/Special Agent, Pittsburgh, Pa.  1988 - 1990.
- DEA, Pittsburgh Resident Office, Pittsburgh, Pa. DEA date of hire 07/09/90.
- DEA, Special Agent, Miami Field Division, Fort Lauderdale District Office, 05/06/91 - 1997.

- DEA, Special Agent, Miami Field Division, West Palm Beach Resident Office, 1997 - 2001.
- DEA, Special Agent/Firearms Instructor, Office of Training, Firearms Training Unit, 2001 to present.

## HONORS AND AWARDS

- Outstanding Law Enforcement Officer Award
  U.S. Department of Justice
  Office of the United States Attorney for the Southern District of Florida.
  1996.
- DEA Special Act Award.
- DEA Exceptional Performance Award
  Office of Training
  John R. McCarty, Special Agent in Charge
  2004.

## PERFORMANCE APPRAISALS

- 01/01/2006 - 12/31/2006  Outstanding
- 01/01/2005 - 12/31/2005  Outstanding
- 01/01/2004 - 12/31/2004  Outstanding

## EXHIBITS



**Exhibit 1**
This frame shows the magazine floor plate extending from the grip of the weapon.



**Exhibit 2**
This frame shows the glint of a live round in the magazine.



**Exhibit 3**
This frame shows the unattended weapon on the table and the presence of children in the room.