**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**LEE PAIGE,**

**Plaintiff,**

**v.**                                          **CASE NO.: 01:06-cv-0644**

**UNITED STATES DRUG**
**ENFORCEMENT ADMINISTRATION, et al.**

**Defendants.**

_____/

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AND TO STRIKE VARIOUS DEFENSES**

**SUMMARY OF THE CASE**

Paige is a DEA agent who had spent a substantial part of his career working in dangerous, including life threatening, undercover assignments and making drug-education presentations on behalf of the DEA. On April 9, 2004, Paige had an accidental discharge ("AD")[1] during comments about gun safety at a drug education presentation. The incident was video-recorded. The video-recording was almost immediately taken into custody by the DEA as evidence and, *inter alia,* to protect Paige. The DEA's Office of Inspections ("IN") automatically opened a file and investigated the incident. The video was part of the IN file, and no more than two copies of the video were to have been made for purposes of the investigation and review of the AD. Only authorized DEA officials with a need to know were to view the video. However, in a massive violation of DEA rules, it appears that over thirty copies of the video or the AD portion of the video were made by DEA agents and employees. Most of these copies were improperly distributed to others within the DEA, and the DEA cannot presently account for most

---

[1] Acronyms used herein are set forth in the attached appendix of acronyms.

of the copies. Moreover, there was virtually no record-keeping with respect to the copying of the video and the chain-of-custody of the video and the copies of it.   The AD portion of the video was widely distributed over Firebird, the DEA's computer network system.   Someone at the DEA also disclosed the video of the AD to the public outside the DEA.   The video of the AD was ultimately widely published on national television and radio shows and has become one of the most widely watched videos in the world on the internet.   This has resulted in enormous, world-wide publicity of the incident which has been highly embarrassing and demeaning to Paige and his family and has resulted in extensive damages to Paige.   For the most part, the video has been used in the public as entertainment and to ridicule Paige, particularly as a result of the irony of Paige's AD occurring just as he stated that he was the only one professional enough in the room to carry a firearm.          Ex.90,p.10;Ex.84,pp.22-25;Ex.73,pp.119-120;Ex.91,p.207;Ex.85,pp.34-35,37.   The video has also been the subject of remarkably mean and crude comments directed at Paige on blog sites, including blatantly racist remarks.

## PLAINTIFF'S AMENDED COMPLAINT AND INSTANT MOTION

Paige's Amended Complaint alleges two counts.   Count I alleges that the disclosure of the video constituted a violation of the Privacy Act.   Count II alleges a claim for invasion of privacy under the Federal Tort Claims Act ("FTCA").   Paige seeks summary judgment on the issue of liability as to both counts. The Government's answer to the Amended Complaint sets forth a number of affirmative defenses asserting that Paige's action is barred.   Paige also seeks to dismiss or for partial summary judgment on those defenses.

## THE OPR INVESTIGATION OF THE DISCLOSURE

Following complaints by Paige's attorney of a Privacy Act violation, the Deputy Chief Inspector ("DCI") in charge of IN advised the Chief Inspector of the DEA that an investigation

of the improper disclosure of the video was warranted.   Exs.48,49,50.   Consequently, in

approximately January, 2006, the Office of Professional Responsibility ("OPR") was advised to

start an investigation of the wrongful disclosure of the video.   Ex.91,pp.7-9.   This investigation

has involved investigatory efforts by at least thirteen agents, interviews of at least 54 people, and

the inspection of documents as well as computers in various DEA offices around the country.

Ex.91,pp.21-23,171;Ex.2,p.10,¶9.   Discovery in this case was delayed so that OPR could

complete its investigation which would, according to the Government, facilitate responding to

Paige's discovery requests.   These included interrogatories requesting the DEA to identify all

copies of the video and to set forth the chain-of-custody of the video and all copies.  See Ex.2.

## MATERIAL FACTS ABOUT WHICH THERE IS NO DISPUTE

### DEA Organizational Structure

The head of the DEA is the Administrator.   The DEA is organized into a number of

divisions, including field divisions as well as various divisions at Headquarters in Arlington,

Virginia.   The field divisions include the various field division offices around the country, such

as the Miami Field Division Office, which are headed by Special Agents in Charge ("SAC").

The field divisions contain district offices which are headed by Assistant SAC's ("ASAC").

Ex.55;Ex.73,p.21.   For example, both the Orlando District Office ("ODO") and the Tampa

District Office are within the Miami Field Division.

There are several divisions at DEA Headquarters which report to the Administrator or

Deputy Administrator.   Each division contains various offices.   The divisions at Headquarters

include, among others, the Inspection Division and the Human Resources Division.   The Human

Resources Division includes the Office of Training and the Board of Professional Conduct.   The

Inspection Division includes, among others, IN and OPR.   The Chief Inspector of the DEA is the

head of the Inspection Division.  Ex.55.  At the relevant times here, the Chief Inspector was Roger Guevara.

IN conducts inspections and investigations of various internal DEA matters, including all shootings involving an injury to a DEA agent.  Ex.83,p.11;Ex.82,p.9.  At the time of the AD, the DCI in charge of IN was James McAleer.  Ex.83,p.9.  Below McAleer was an Associate Deputy Chief Inspector ("ADCI"), who at that time was Richard Dearing.[2]  Ex.82,p.9-10.  There were five inspection teams within IN.  Each team included a Senior Inspector, who reported to the ADCI, and three to five inspectors.  Ex.82,p.11-12.

## The Accidental Discharge

Paige became a Special Agent with the DEA in 1990.[3]  From approximately April, 1990 to July 1999, Paige was assigned to the Tampa District Office; from July 1999 to July 2003 to the Nassau, Bahamas Country Office; and from July 2003 to the present to the ODO.  Ex.64,¶2. At the relevant times here, the ASAC of the ODO was Stephen Collins.  Ex.73,pp.6-7.  Paige worked in a group at the ODO, which consisted of a number of DEA agents supervised by their group supervisor, Peter Gruden.  Ex.78,pp.35-36.

Paige was highly regarded as an undercover agent.  Ex.90,p.6.  He was involved in hundreds of undercover assignments, including sixty-seven undercover assignments in his first year alone.  Ex.64,¶3.  While working undercover, Paige was involved in armed confrontations on seven occasions, including situations where his life was in danger, and he had to be rescued by other agents on two of these occasions.  Ex.90,pp.6-8;Ex.66,p.45;Ex.64,¶'s3,4.  On another

---

[2]  Dearing is deceased and was never deposed.

[3]  Paige is a graduate of Florida State University.  He was also a member of the Florida State football team and played professional football for the Tampa Bay Bandits and the Tampa Bay Buccaneers.  After playing professional football, he was a Corrections Officer at the Polk Correctional Institution, a Florida State Prison, and a Deputy Sheriff with the Hillsborough County Sheriff's Office in Tampa, Florida.  Ex.64,¶1.

occasion, one of Paige's informants was apparently murdered by member(s) of a Colombian drug cartel who then threatened to kill Paige unless he paid six million dollars to the cartel. *Id.*

The DEA provides speakers to various organizations for "Demand Reduction Presentations" ("DRP"). Ex.64,¶5. A DRP involves a presentation by a DEA agent intended to reduce the demand for drugs. From 1993 to April 9, 2004 Paige gave hundreds of DRP's to many organizations, including schools, charitable groups, little league teams, college and professional football teams, law enforcement agencies and numerous businesses.[4] *Id.* Paige was highly regarded as a DRP speaker and received many dozens of commendations for his presentations. *Id.*;Ex.95,p.5;Ex.1,pp.102-225*op.cit.* In August, 2003 Paige became the Assistant DRP Coordinator for the Miami Field Division. Ex.64,¶5.

On Friday, April 9, 2004 Paige made a DRP to approximately 50 youths and parents at a meeting of the Orlando Minority Youth Golf Association ("OMYGA") in Orlando, Florida. Ex.76,p.16. The OMGYA is a private organization whose mission is to acquaint inner city and urban minority youth with golf and to teach and to promote, *inter alia,* life skills, character, motivation, control and self-esteem through golf. Ex.31;Ex.69,p.32;Ex.76,p.6.

Paige's DRP was part of a regularly scheduled Friday private meeting of the OMYGA at the Callahan Recreation Center in Orlando from 6:30 to 9:00 p.m. Ex.76,p.8;Ex.69,p.32. The Friday meetings typically included instruction and remarks about golf and life by the OMYGA's founder and Executive Director, Dr. T.J. Dorsey, as well as by volunteers and occasional guest speakers.[5] Ex.76,pp.8,10. Up until the videographer's tape was taken by the DEA, the meeting

---

[4] Paige also served as the spokesman for the United States Ambassador in Nassau, Bahamas with respect to the DEA and drug related issues. He was also a member of the Bahamas National Drug Council/Coalition for a drug-free Bahamas with whom he organized numerous drug-prevention programs. Ex.64,¶4.

[5] In addition to the Friday instructional meeting, the youths had practice on various days. Ex.76,pp.8-9.

was video-recorded by one of the parents, Joseph Brunson, who was involved in the OMYGA. Brunson video-recorded the meeting with a Panasonic GS-19 camera. The camera could record to either a mini-DV cassette tape or a micro SD card, but not both at the same time. On this occasion, Brunson recorded to a mini-DV cassette tape ("**Mini-DV**"). Ex.69,pp.7,11. Therefore, the only video of the meeting was on the **Mini-DV**. The video on the **Mini-DV** is approximately 69-70 minutes long. Ex.6.

After opening remarks and recognition of accomplishments by various youths, Paige started his DRP approximately 6 1/2 minutes into the meeting (i.e. approximately 6:36 p.m.). He spoke for approximately 13 minutes about drugs and then started his remarks about gun safety.[6] During his remarks about gun safety, Paige removed his firearm, a Glock 22 pistol, from a holster on his hip and displayed it to the audience. As he displayed his firearm, Paige told the audience that he was the only person that he knew of in the room professional enough to carry the firearm. Immediately after making this comment and approximately 20 ½ minutes into the video (i.e. approximately 6:50 p.m.), the firearm accidentally discharged, shooting Paige in his thigh.[7] Despite his injury, Paige attempted to continue with the DRP, but left the room after a

---

[6] Typically, Paige's DRP involved displaying various firearms to the audience and making comments about gun safety. In order to make his message more meaningful for the youth attending the DRP, Paige wore raid gear and a Glock 22 pistol on his hip, which he thought was unloaded. Paige had also brought with him an unloaded DEA-owned carbine and shotgun, which he intended to use as props. Paige also carried a concealed, loaded pistol in an ankle holster concealed in his boot and under his pants. This firearm was for Paige's personal protection and was not to be displayed to the audience. Ex.64,¶6. Dr. Dorsey, who invited Paige for the DRP, expected Paige to tell the audience the "harsh, cold facts" and the "rough side" of drug use. He expected it to be as "real as possible," including Paige wearing raid gear. Dorsey testified that Paige's presentation was "excellent," "top shelf and a great job" and that the youth were impressed by Paige. Although he did not expect Paige to bring weapons, he thought the weapons demonstration was "very good…very, very appropriate." Ex.76,pp.15,16,17,28.

[7] Paige only used unloaded firearms for his presentations. However, on this occasion, Paige forgot to remove the magazine from the Glock before he began the DRP. As part of the DRP, Paige slid the slide mechanism of the Glock back and locked it to the rear so that the chamber could be inspected to ensure that the firearm was not loaded. This caused the bullet in the chamber to eject. As a demonstration of gun safety, Paige asked a member of the audience to inspect the chamber to confirm that there was no bullet in the chamber. Paige then slid the slide mechanism forward into its original position which caused a bullet from the magazine, which Paige had failed to remove, to automatically enter the chamber. Thinking the pistol was unloaded, Paige then pointed the gun toward the floor, intending to disassemble the pistol as part of his presentation. In order to disassemble this particular pistol, the

couple minutes (approximately 22 minutes into the tape or 6:52 p.m.) and was thereafter taken to the hospital by ambulance. Ex.6.

Following the AD, Dorsey continued with his instructional part of the meeting. Approximately 49 minutes after the AD (approximately 69 minutes into the video or approximately 7:39 p.m.), another DEA agent, Walter Walker, who had also attended the DRP, demanded that the videographer immediately surrender the **Mini-DV**. [8]  At that point, the video ends. *Id.*  According to the videographer, he and Walker left the room to discuss Walker's demand for the immediate surrender of the **Mini-DV**, which the videographer was resisting, and were shortly joined by other DEA agents. Ex.69,pp.19-21.  According to the videographer, Walker and other agents told him that the **Mini-DV** was "evidence" and they needed to take it immediately. Ex.69,pp.18,20-21,23-24.  The videographer surrendered the **Mini-DV** to Walker, who has acknowledged that he "seized" the **Mini-DV**. Ex.95,pp.13,16,22.

Since the ASAC, Collins, was on leave, Robert Patterson, the Acting ASAC, came to the scene. Ex.88.p.15;Ex.73,p.31.  The **Mini-DV** was turned over to Patterson, and he took it to the ODO and made a VHS copy ("**VHS-1**") that evening.  Ex.88,pp.25-26,30,42,43.  He left the **Mini-DV** and **VHS-1** in Collins' office for the weekend.  Ex.88,p.37.

When he returned to the office on Monday, April 12, Collins gave custody of the **Mini-DV** and **VHS-1** to Gruden, Paige's group supervisor. Ex.78,pp.30-31,82-84.  Collins knew that it was more than likely that the IN inspection team would need the **Mini-DV** or a copy.

---

trigger must be pulled.  When Paige pulled the trigger to initiate the disassembly of the pistol, the pistol discharged. Ex.64,¶7.

[8] When he was at the hospital, Paige called his wife, Robbin Paige, and requested her to tell Walker to get the video because he did not want it on the news.  Ex.86,pp.81-82.  Robbin Paige requested Walker to obtain the video. Ex.87,pp.37-38.   In addition, Gruden testified that when he learned at the scene that there was a video, he stopped an interview he was conducting in order to get the video.  Ex.78,pp.217-218.  Charles West, an Associate SAC in Miami, also directed Collins to get the video.  Ex.73,p.34.

Ex.73,p.65.   Gruden maintained this evidence until he provided it to IN. Ex.78,pp.29,30-31;Ex.97,pp.50-51;Ex.2,p.3.

### The IN Investigation of the AD

The DEA Agents Manual and the DEA Planning and Inspection ("P&I") Manual set forth the procedures for a shooting incident and its investigation.  Any discharge of a firearm by a DEA special agent must be "reported, documented and investigated."   AgentsManual, §6114.41(A)(Ex.56);P&IManual,§8231.1,§8233.1(Ex.57).   Among other things, both non-supervisory and supervisory personnel on the scene are to take custody of evidence. AgentsManual,§6114.3(Ex.56).  The ASAC is to remain at the scene until "all physical evidence [including "any weapon fired"] has been collected."  AgentsManual,§6114.3,§6114.31(Ex.56).

The SAC is to immediately notify the DEA Headquarters Command Center of the shooting.  AgentsManual,§6114.3(Ex.56);Ex.70,p.9.   The Command Center immediately reports the shooting to many DEA officials, including the DCI in charge of IN.   Ex.70,pp.9-10;P&IManual,§8231.3(Ex.57).   In this case, the Command Center was notified by Patterson of the shooting at approximately 8:15 p.m. on April 9, approximately 85 minutes after the AD. Ex.1,p.41.  The Command Center notified the head of IN (McAleer) by phone and by e-mail at 8:42 p.m.  Ex.1,pp.41-42,43.  The SAC must also send a teletype detailing the shooting to DEA Headquarters to the attention of, *inter alia,* the IN Shooting Incident Team Coordinator within twelve hours of the shooting.   P&IManual,§8231.3(D)(Ex.57);*cf.*AgentsManual,§6114.41(G) (Ex.56)(twenty-four hour requirement).  In this case, this was not accomplished until April 12, three days later.[9]  Ex.1,p.39.

---

[9]  Although Patterson and Collins discussed the details of the teletype on the night of the AD, which was a Friday, the teletype, according to Collins, could not be sent until Monday, April 12, because the classified mechanism to send it was reportedly not available until Monday.  Ex.73,pp.39-40.

All shooting incidents are investigated by IN. Ex.82,p.11;Ex.70,p.8;AgentsManual, §6114.61,§6114.71(Ex.56);P&IManual,§8233.41(Ex.57). An IN Shooting Incident Team ("SIT") "conduct[s] and/or directs[s]/monitor[s] the investigation of all shooting incidents." AgentsManual,§6114.61(Ex.56);P&IManual,§8233.42(Ex.57). The SIT functions under the direction of an IN Senior Inspector designated as the Shooting Incident Team Coordinator ("SITC"). *Id.* In this case, the SITC was James Burns. Ex.70,p.14. The SITC assures that the shooting investigation file gets completed and presents the results of the investigation to the Shooting and Assault Incident Review Committee ("SAIRC"). Ex.70,p.14. The SIT is comprised of the SITC, the SIT Program Analyst, and generally two IN inspectors designated by the ADCI. AgentsManual,§6114.61(Ex.56);P&IManual,§8233.42(Ex.57);Ex.82,p.14;Ex.70,p.13; Ex.72,p.8;Ex.70,p.15.

The SIT will either conduct the investigation or delegate the investigation to the field. AgentsManual,§6114.61(Ex.56); P&IManual,§8233.51(Ex.57);Ex.82,pp.12-13. If the investigation is delegated to the field, the SIT will "direct/monitor" or oversee the investigation. AgentsManual,§6114.61,§6114.62(Ex.56);Ex.82,pp.12-13. In general, the SIT will conduct an on-site investigation of any shooting incident which results in injury to a DEA employee or involves a recognized potential for adverse publicity. AgentsManual,§6114.61(Ex.56); P&IManual,§8233.42(Ex.57);Ex.82,p.19.

The IN file for the investigation of a shooting incident is automatically opened as a result of a shooting incident. Ex.83,p.14;Ex.82,p.25. The file is opened whether IN conducts the on-site investigation or oversees an investigation delegated by IN to the field office. Ex.70,p.20;Ex.72,pp.12-13. If the on-site investigation is delegated back to the field by IN, a

teletype is to be sent to the field providing instructions and the IN case number and file title to be used on reports.  Ex.70,p.21;P&IManual,§8231.3(Ex.57);AgentsManual,§6114.41(H)(Ex. 56).

The SIT Program Analyst is responsible for assigning file numbers to shooting investigations, maintaining the shooting incident database, maintaining the correspondence part of the IN file during an investigation, keeping track of and following the shooting investigations and keeping shooting incident records.  Ex.82,p.16;Ex.70,p.15;Ex.72,pp.7,8.  The Program Analyst is to "immediately enter the shooting incident in a Shooting Incident Data Base." P&IManual,§8234.31(2007)(Ex.57).  At that time, a file number and file title are assigned to the shooting incident investigation.  *Id.*  This is to be done as soon as possible after the shooting incident has occurred and reported to IN.  Ex.82,p.25.  The "file title" is the "name of the shooter." *Id.*

In this case, the two IN inspectors assigned to the SIT were L. D. Matthews and Gregg White.  Ex.82,pp.7,19.  Matthews, a Senior Inspector, was the lead inspector of the investigation. Ex.82,p.19.  The IN Program Analyst for shooing investigations was Amy Clifford.  Ex.72,p.6. Clifford assigned the file number, which was "IN-GB-04-032S," and the file title, which was "SA Lee Paige." Ex.72,p.7.  The IN stands for Office of Inspections; GB stands for the ODO; 04 stands for 2004; 032 is the number applicable to the particular investigation of Lee Paige's shooting; S stands for shooting; and SA stands for Special Agent.  Ex.72,pp.16-17.

Because Paige had been injured and there was a potential for adverse publicity, the IN inspectors conducted an on-site investigation, rather than delegate this part of the investigation to the ODO.  Ex.83,pp.10,11.  Matthews and White traveled to Orlando on April 19, 2004 and returned to IN on April 21.  Ex.83,p.15;Ex.1,p.7.  During that trip, the two IN inspectors

interviewed various witnesses and obtained the **Mini-DV** from Gruden and took it back to IN. The **Mini-DV** remains in the IN file.  Ex.1,p.78.

White was responsible for writing the Final Report of Investigation and maintaining the investigatory part of the file, including the evidence such as the **Mini-DV**, until the final report was completed.  Ex.70,p.32.  Much of the IN file was placed in a binder.[10]  It included a cover, a table of contents and tabbed sections containing, *inter alia,* the Final Report, other investigative reports and records, a Shooting Incident Checklist, the **Mini-DV,** a VHS copy (i.e. **VHS-1** discussed below) of the **Mini-DV**, a VHS video of news coverage of the AD, various photographs, a shooting scene diagram and materials about Paige.  See Ex.1,pp.1-225, which is a copy of the investigatory part of the file.

After the Final Report was prepared by White, the binder part of the IN file was sent for review to the ADCI (i.e. Dearing) and to the DCI (i.e. McAleer).  Ex.70,pp.31,82-84.  After Dearing and McAleer had a chance to review the IN file, the file was put in IN's "armory" for security reasons.  Ex.70,pp.31,84,86;Ex.72,pp.31,63-64.  The armory was a locked room within the IN offices which was used to store firearms and various open files such as Paige's.[11] Ex.70,pp.31,86.

DEA regulations provide that most shooting incidents, including Paige's, will also be reviewed by the SAIRC.  AgentsManual§6114.71(Ex.56);P&IManual,§8234.1(Ex.57).  The

---

[10]  While the binder contains most of the IN file, it does not include certain correspondence, such as the Command Center notification and the initial teletype.  Ex.70,pp.22-24.  Such correspondence is kept in a correspondence folder by the Program Analyst until the IN file is closed, at which time the correspondence folder and the binder are placed together in a locked file cabinet.  Ex.70,p.25.  A copy of the correspondence part of the IN file appears at Ex.1a,pp.226-322.

[11]  The IN offices are on the fourth floor of DEA Headquarters.  Ex.70,p.86.  The fourth floor, which also includes OPR's office, is secured with key-card access.  Ex.70,p.32.  Moreover, only people assigned to IN have key-cards that will open IN's door on the fourth floor.  Further, there is stringent security at the entrance to DEA Headquarters. *Id.*

SAIRC at that time consisted of the Chief Inspector of the DEA, the Chief of Operations of the DEA, and the SAC of the DEA's Office of Training.[12]   Ex.37;AgentsManual,§6114.71(Ex.56). The SAIRC is to review the IN investigation and to make various determinations. AgentsManual,§6114.71(Ex.56);Ex.37.

On September, 2, 2004, Burns, the SITC, made a presentation to the SAIRC concerning Paige's AD. Ex.70,pp.87-88;Exs.36,37.   During the meeting, the SAIRC made the required determinations, which were entered on a form checklist and then signed by the three committee members. Ex.37;Ex.70,p.99.  Among other things, the SAIRC found evidence of malfeasance in Paige's handling of the weapon and determined that the shooting incident should be referred to the Board of Professional Conduct ("BPC") for further action, but that the Office of Training should not examine the incident for lessons learned. Ex.37;Ex.39;Ex.72,p.51.

Ordinarily, two copies of the IN file would be made for review, one for the BPC and one for the Office of Training.   AgentsManual,§6114.63(Ex.56);P&IManual,§8233.62(Ex.57); Ex.70,pp.97-98,52-53.  Here, however, the Program Analyst (i.e. Clifford) testified that a copy would not have been made for the Office of Training since the SAIRC, which included the SAC of the Office of Training, decided that it was not necessary that the Office of Training review the incident. Ex.72,pp.56-58.

By a memorandum dated October 6, 2004, the SAIRC referred the shooting incident to the BPC for review.  IN provided a copy of the IN file with this memorandum to the BPC. Ex.70,pp.104-105;P&IManual,§8233.63(Ex.57);§8234.35(2007)(Ex.57).   The BPC conducts a review of the file and makes recommendations to the Deciding Official regarding disciplinary action. AgentsManual,§6114.71(Ex.56).  After its review of the matter here, the BPC prepared a

---

[12]   The Office of Training is the DEA's training facility at Quantico, Virginia.  The Firearms Unit is one of the units in the Office of Training.  Ex.70,p.54.

letter to Paige dated December 2, 2004, proposing a five-day suspension for "poor judgment" and "endangering."  Ex.42.

The proposed suspension letter and a copy of the IN file were sent to the Miami Field Division and then forwarded to the ODO and made available to Paige on December 6, 2004. Ex.40;Ex.42;Ex.73,pp.133-134.  Paige was given the copy of the IN file for a few days so he could review it and, if he chose, contest the proposed suspension.  Ex.42.  However, he was not allowed to copy anything in it.  Ex.73,p.137.  Paige kept the file locked in his desk file cabinet at the ODO and did not copy anything in it.  Ex.73,p.136;Ex.64,¶8.  The copy of the IN file temporarily provided to Paige had no VHS video-recordings, but did have a CD or DVD. However, when Paige attempted to view the disc on DEA computers, nothing came up and Paige was unable to view what, if anything, was on the disc.  Ex.64,¶8.  This file was reportedly returned to IN where it would be destroyed.  Ex.47;Ex.70,pp.102,128-129.

On December 2, 2004, the BPC also sent a copy of the proposed suspension letter and a copy of the IN file to the DEA's Deciding Official.  Ex.41.  The Deciding Official is responsible for reviewing the recommendation of the BPC and determining the disciplinary remedy. AgentsManual,§6114.71(Ex.56);P&IManual,§8234.33(Ex.57).    Paige did not contest the proposed five-day suspension, and the Deciding Official found that the charges were "supported by the evidence" and suspended Paige for five days.  Ex.43.

According to procedure, the file sent to the Deciding Official should have been the file copy provided to the BPC by IN.    P&IManual,§8233.63(Ex.56);Ex.70,pp.105-106.    The Deciding Official is required to return the file to IN where it is shredded. AgentsManual,§6114.81(Ex.56);P&IManual,§8233.63(Ex.57);Ex.72,pp.47,48,62.

The Program Analyst testified that after a case is closed, she would destroy any copies of the IN file, including pulling video-tape off a cassette and then cutting it. Ex.72,pp.62-63. In addition, the original investigative part of the file is moved from IN's armory and kept with the correspondence file in a locked cabinet at IN. Ex.72,p.23. When Paige and the undersigned were permitted to view this cabinet, the DEA placed stickers over tabs of other files in order to prevent Paige and the undersigned from seeing any labels on any other files that were stored in the cabinet with Paige's file. Ex.64,¶10.

## Record-keeping

The **Mini-DV** seized from the videographer was "non-drug evidence" in the IN investigation which automatically resulted from Paige's AD. In fact, the agents told the videographer that they had to take the **Mini-DV** because it was evidence. Ex.1,p.36;Ex.43; Ex.80,pp.31-32;Ex.82,pp.66-67,86-87;Ex.97,pp.52,55-56. In addition to being evidence in the IN investigation, the **Mini-DV** was also evidence of any potential state or federal criminal charges. P&IManual,§8233.3(Ex.57);AgentsManual, §6681.11(2007)(Ex.58);Ex.6;Ex.1,pp.9,35.

According to the lead IN Senior Investigator, DEA procedures for processing non-drug evidence would apply to IN. Ex.82,pp.71-72. DEA procedures provide that various reports, including a DEA-6 (Report of Investigation), a DEA-7a (Acquisition of Non-Drug Property and Regulatory Seizures) and a DEA-12 (Receipt for Cash or Other Items) must be used to document the acquisition and chain-of-custody of non-drug property. AgentsManual,§6681.21(2007) (Ex.58). The Program Analyst also testified that any time a copy of an IN file is made and provided to somebody, a DEA-12 must be prepared and put in the file.[13] Ex.72,p.29. Non-drug property is also to be submitted to a Non-Drug Evidence Custodian ("NDEC").

---

[13] For example, see Ex.1a,pp.257,258,259 which are DEA-12's showing that the **Mini-DV** and **VHS-1,** among other things, were temporarily transferred from IN to OPR after this case was filed.

AgentsManual,§6681.43(2007)(Ex.58).  All non-drug property taken into custody by the DEA must be assigned a non-drug exhibit number preceded by the letter "N." AgentsManual,§6681.44(2007)(Ex.58).  For example, the evidence gathered by OPR in this case is kept as "N" exhibits.  *See* Ex.21.

Even if the **Mini-DV** were somehow not "evidence" here, it was personal property that must be held for safekeeping pending return to the lawful owner, either Brunson or the OYMGA. AgentsManual,§6681.11(2007)(Ex.58).  Personal property that is not returned to the owner within ten working days of seizure must be processed as non-drug evidence and submitted to an NDEC custodian for safe keeping and documented on a DEA-7a.  AgentsManual,§6681.47 (2007)(Ex.58).

None of the foregoing record-keeping procedures designed to secure and protect the integrity of the **Mini-DV** and copies of it were employed by either the ODO or IN.  Rather than prepare appropriate records and turn the **Mini-DV** and **VHS-1** over to the ODO's NDEC, Gruden kept the tapes and caused several CD and VHS copies to be made which he distributed. It appears that IN does not use a NDEC.

<u>**Additional Copies**</u>

The cover of the IN file here states the following (Ex.1,p.1):

> **This report of investigation is made available to you for official use by the Office of Inspections…The use of this report must be restricted to authorized personnel.  While in your custody, this report must be stored in a secure facility.  This report must be returned to the Office of Inspections … after it has served its purpose.** [emphasis in original]

The cover of the file is also marked "**DEA SENSITIVE**" (emphasis in original). *Id.*  Clifford and McAleer testified that the IN file is DEA sensitive which means that only DEA agents with a need to know can view the file, including the video.  Ex.83,pp.30-31;Ex.72,p.63;Ex.63.    Burns

testified that personnel authorized to look at the IN file included the inspectors involved in the investigation, the BPC, the Deciding Official, the Office of Training, OPR, and Paige. Ex.70,pp.67-68.

The DEA's rules and procedures only refer to making two copies of the IN file. There was no apparent reason here to make more than two copies (i.e. one for the BPC and Deciding Official and one for Paige to review). Matthews, the lead Senior Inspector of the investigation, testified that a determination was made to make only one or two copies of the video. Burns, the SITC, also indicated there was no need for more than two copies. Ex.82,p.66;Ex.70,pp.49-50.

Nonetheless, it appears that over 30 copies of the video (or the AD portion of it) were made by DEA agents or employees. The exact number and chain-of-custody of the copies is unknown due to the large number of copies made, the absence of virtually any record-keeping, and contradictory testimony and purported failures of recollection by various DEA agents. Paige requested the Government through interrogatories to identify every copy of the **Mini-DV** (or portions of it) and to set forth the chain-of-custody of every such copy. Ex.2. Because of the foregoing problems, the DEA has not been able to do this even through the OPR investigation of the improper disclosure of the video has gone on for over two years. Ex.2.

Potential copies of the **Mini-DV** or the AD portion of the **Mini-DV** include those discussed below.

**VHS-1.**  When Patterson returned to the ODO with the **Mini-DV** after the AD, he made a VHS copy (**VHS-1**) of the **Mini-DV** and left both tapes in ASAC Collins' office for the weekend. Ex.8;Ex.88,p.37. Collins gave custody of both the **Mini-DV** and **VHS-1** to Gruden who would do the on-site investigation of the shooting if IN did not send a shooting team. Ex.78,pp.30-31,35-36,82,83. Prior to the IN SIT going to the ODO, IN asked the ODO for a

copy of the video. Ex.73,p.67. As a result, on April 15, Gruden sent **VHS-1** by overnight Federal Express to IN. Ex.78,pp.83-84,100-106,110-111;Ex.73,pp.69,106-108;Ex.33. **VHS-1** was viewed by Matthews and White at IN before they traveled to Orlando on April 19 for the on-site investigation.[14] Ex.82,p.29;Ex.97,pp.22-23. **VHS-1** remains in the IN file. Ex.1,p.82; Ex.2,p.5, ¶14.

**VHS-2.** According to the Government's answers to interrogatories, "at least" one VHS copy ("**VHS-2**") of the **Mini-DV** or **VHS-1** was made at Gruden's direction by Jeffrey Shaffer, one of the ODO's two technicians. Ex.2,p.5,¶4. However, Gruden testified that he was purportedly not sure whether he asked a technician to provide him a VHS tape. Ex.78,p.123. In addition, Shaffer denied that he made any VHS tapes. Ex.94,pp.29-30,34-35,49,52-53. It appears that Collins obtained **VHS-2** from Gruden several weeks after the IN inspection team left Orlando on April 21 and that he sent it to Charlie West, the Associate SAC of the Miami Field Division, on June 23, 2004.[15] Ex.73,pp.67,76-79,106-108;Ex.34. The Government admits that it does not know what happened to this video, which no one in the ODO acknowledges making.[16] Ex.2;p.5,¶4;Ex.91,p.198.

**VHS-3.** According to the Government's answers to interrogatories, Gruden or the ODO tech office (i.e. Shafer or James Wise) gave Kevin Scully, a DEA agent at the ODO, a copy ("**VHS-3**") of the video. Ex.2,p.6. Gruden testified that some time during the week of April 12, he gave Scully the **Mini-DV** or a larger video-tape (presumably **VHS-1**) and that Scully returned it the same day. Ex.78,pp.99-100,178-179. Gruden assumed that Scully had it copied.

---

[14]  In addition, it was watched by virtually everyone else at IN even if they were not assigned to the investigation. Ex.82,pp.32-34;Ex.97,pp.25,29.

[15]  Since the **Mini-DV** and **VHS-1** had already been provided to IN by then, **VHS-2** must have been made prior to April 21, the date the IN inspectors left Orlando, or was copied from yet another undisclosed VHS copy.

[16] West is deceased and was never deposed.

Ex.78,p.178.  This occurred, according the Gruden, right after Gruden had provided Scully with a disc copy of the video (see **D-4**), which Scully purportedly returned within minutes because he could not view it on a computer.  Ex.78,pp.177-178.  Scully testified that he thinks he obtained **VHS-3** shortly after he had difficulty viewing the video of the AD on a disc copy (see **D-4**) which Gruden had given him.  Ex.93,pp.28-29.  He testified he received **VHS-3** from the tech office.  Ex. 93,p.27.  Both the technicians at the ODO deny making any VHS tapes.  Ex.94,pp.29-30,34-35,49,52-53;Ex.98,pp.15-16.  Scully claimed he only requested a copy of the video and not any specific portion of it. Ex.93,p.29.  Nonetheless, **VHS-3,** judging from a copy of it (i.e. **VHS-4),** only contained the AD portion of the video.[17]

Scully testified that he was transferred to the Tampa District Office in May, 2004 to be a group supervisor and that he took **VHS-3** (and **D-4**) with him to Tampa.  Ex.93,pp.39,38,44-45.  He showed either **VHS-3** or **D-4** to various DEA and task force agents in Tampa.[18]  Ex.93,pp.35,38-40,43.  Within a day or two of the showing, Kevin Clark, one of the agents in Scully's group, borrowed Scully's disc copy (**D-4**).  Ex.71,pp.18,19,22,26,29-30.  Because the quality of the disc was poor, Clark returned the disc and borrowed **VHS-3**.  Ex.71,p.33-34,36;Ex.93,pp.44,45.  Clark took **VHS-3** home where he watched it and showed it to his wife.  Ex.71,p.37.

Clark testified that after he had a copy of **VHS-3** made for DEA agent Mark Baughman (see **VHS-4**), he left **VHS-3** in his truck or put it in his house.  Ex.71,pp.54,56,57,59,63.  Clark further claimed that he has purportedly never seen or even thought about **VHS-3** again and does

---

[17]  As with the Gruden CD's, nobody can, purportedly, or wants to explain why only the 4 to 6 minute AD portion of the 70 minute **Mini-DV** was copied.

[18]  The agents made fun of Paige when they watched the video.  Ex.93,pp.41-42;Ex.71,pp.26-27.

not know what happened to it.  *Id.*  The Government admits that it does not know what happened to **VHS-3**. Ex.2,p.6.

**VHS-4.**  According to the Government's answers to interrogatories, Clark caused a copy ("**VHS-4**") of **VHS-3** to be made on June 20, 2004, and provided **VHS-4** to DEA agent Mark Baughman. Ex.2,p.6.  Clark testified that Baughman, his former group supervisor in Tampa who was then a group supervisor in Jacksonville, called him and requested a copy of the video. Ex.71,pp.6,43,46;Ex.66,pp.5,9-10.  In order to avoid people in his office knowing that he had a copy of the video, Clark had a deputy sheriff at the Hillsborough County Sheriff's Office make **VHS-4** from **VHS-3**.  Ex.71,pp.44-47.  Clark then sent **VHS-4** to Baughman, who immediately and repeatedly showed the film to various DEA agents and non-DEA task force agents until he was told by the Jacksonville ASAC to stop.[19]  Ex.66,pp.29-30,32,38,52;Ex.71,p.52. After OPR began its investigation, Baughman turned **VHS-4** over to OPR.  Ex.66,p.21;Ex.27.  **VHS-4** is five to six minutes long and basically includes the AD portion of the video. Ex.9.

**VHS-5.**  Christopher Bowman, a DEA agent at the ODO, testified that at least a month after the AD, Gruden provided him with a VHS copy ("**VHS-5**") of the AD which Gruden had in his office.  Ex.68,pp.8-9,15,16.  According to Bowman, **VHS-5** was about 5 minutes long and basically included the AD portion of the video. Ex.68,p.19.  As noted above, the two technicians at the ODO have denied making any VHS copies, and the Government has not explained who made **VHS-5**.  Bowman testified that he returned **VHS-5** to Gruden.  Ex.68,p.23.  Gruden testified that he purportedly did not remember if he gave Bowman a CD or a VHS and further said he did not know if Bowman gave the video back to him.  Ex.78,pp.161,167,168-170.  The Government admits that it does not know what happened to **VHS-5**.  Ex.2,p.6.

---

[19]  The Jacksonville agents also made fun of Paige.  Ex.66,pp.33-34,44.

**VHS-6.**  A couple of days after the AD, Lenora Morris, a DEA agent at the ODO, saw Karl Weiss and Jeff Harmon, two other DEA agents at the ODO, watch a VHS tape that contained the AD.  Ex.84,pp.10-14.  It is unknown where Weiss and Harmon obtained this VHS-tape.  The Government's answers to interrogatories did not mention this viewing or the chain-of-custody involving this viewing.  See Ex.2,pp.2-7.

**VHS-7.**  After IN became aware that a video was appearing on the internet, Burns attempted to make a determination whether the improper disclosure came from IN.  Ex.47.  Burns was advised by White that White had put two copies of the video in the IN file.  Ex.70,pp.125-126.  Burns testified that when he checked the file, there were no copies missing.  Ex.70,p.123.  However, there is only one copy (i.e. **VHS-1**) of the video in the IN file.  Ex.70,p.126.  Consequently, another copy ("**VHS-7**") appears to be unaccounted for.  This must have been a VHS copy because Burns also testified he never saw any CD's or DVD's.  Ex.70,p.90.

**VHS-8.**  The DVD's turned in by White to OPR (i.e. **D-10, D-11, D-12** discussed below) include several seconds in which letters, numbers and symbols appear on the screen.  Ex.'s15,18,19.  Presumably, these letters, numbers and symbols were on the video that was copied to the DVD's.  Since these letters, numbers and symbols do not appear on the **Mini-DV** or **VHS-1**, it appears that the DVD's (i.e. **D-10, D-11 and D-12**) turned over by White to OPR were not copied from the M**ini-DV** or **VHS-1**, but another apparent tape copy of either the **Mini-DV** or **VHS-1**.  The Government has provided no explanation as to this apparent video.

### Disc Copies (CD's or DVD's)

Gruden testified that during the week of April 12 (the week following the AD), he gave one of the technicians at the ODO the **Mini-DV** or **VHS-1** and asked for a few copies.[20] Ex.78,p.109.  According to Gruden, he received a small stack of CD's the same or the next day. Ex.78,pp.116-118.  Shafer, the ODO technician who made the CD's, testified that he made four CD's of the video for Gruden. Ex.94,pp.15-18.  As discussed below, these CD's only included the AD portion of the video.  Gruden claimed that he could not remember why he had the copies made, and he and Shafer both claimed not to know why copies of only the AD portion of the video were made.  Ex.78,pp.115,121,166;Ex.94,pp.23-27.

**D-1.**  According to Gruden, he sent one of the CD's ("**D-1**") with a Report of Shooting to the Firearms Unit at the DEA's Office of Training during the week of April 12.  Ex.78,pp.154-155,155-156,212.  The Government's answers to interrogatories state that it does not know what happened to **D-1**.  Ex.2,p.6.

William Lutz was the Chief of the Firearms Unit from August, 2003 to the end of the summer, 2004.  Ex.80,pp.5-6.  Gruden testified that he told Lutz by phone that he would be sending him a disc of the shooting with the Report of Shooting.  Ex.78,pp.158-159.  Lutz testified that he received a CD or DVD showing the AD from someone, but he could not remember who provided it to him.  Ex.80,pp.17-18.  Presumably, this was **D-1**.  Lutz testified that he stored this disc in a locked locker at the Firearms Unit to avoid "improper dissemination." Ex.80,pp.27-28,29.  He does not have a clear memory of what happened to it, but he assumes that when he left the Firearms Unit, he broke it in half and put it in a burn bag because he is "a little bit anal, so I know how I would normally destroy evidence." Ex.80,pp.31-32.

---

[20]  In addition to requesting copies of the video, Gruden showed the video to other agents and allowed agents access to the **Mini-DV** or copies of the video.  Ex.78,pp.91-92,95-96.  See also discussion of **VHS-3** and **VHS-6**.

**D-2.**  Gruden sent another CD ("**D-2**") to Steven Derr, a friend of his who was then a DEA agent in New Mexico, purportedly because it was unusual and not something you see every day.  Ex.78,pp.123-125,127-129.  Derr turned **D-2** over to the OPR during its investigation.  Exs.29,30.  **D-2** is 4 minutes and 9 seconds long and includes only Paige's comments about gun safety and the AD.  Ex.10.  Notably, a directory embedded in **D-2** shows that the electronic video file from which **D-2** was copied was created on April 15 at 3:12 p.m.  Ex.10;Ex.100,pp.7,8.  This suggests that the copies made for Gruden by Shafer were made for Gruden on April 15 or shortly thereafter.

**D-3.**  Gruden sent another CD ("**D-3**") to Rick Bendekovic, another friend of his who was then a DEA agent in New York.  Ex.78,pp.123,146.  According to Bendekovic, Gruden sent him **D-3** after he called Gruden to ask about the AD after he saw a press release about the AD.  Ex.67,pp.7,14.  This must have been some time in May, 2004, since the first local (i.e. Orlando) news coverage was April 29 and the first national news coverage was May 1 or 2.  Ex.1,pp.13-14.  This was after the time that Gruden claims to have destroyed the CD's in his possession.  Ex.78,pp.193-194. After Bendekovic received **D-3**, he talked to Gruden by phone and indicated to Gruden that he (Bendekovic) was amused by the video.  Ex.78,p.152.  Bendekovic had a copy of **D-3** made for Derek Maltz.  See **D-7**.  Bendekovic turned **D-3** over to OPR during its investigation.  Ex.67,pp.25-26;Ex.21.  **D-3** is identical to **D-2**, including its embedded directory showing that the CD was copied from an electronic video file that was created on April 15, 2004.  Ex.11.

**D-4.**  During the week of April 12, Gruden provided another CD ("**D-4**") to Scully, who was the DEA agent who had also obtained **VHS-3** from Gruden.  Ex.78,pp.174-178;Ex.93,pp.12-16. Gruden testified that Scully returned **D-4** because it could not be viewed on the computers in

22

the office. Ex.78,p.177. Contrary to Gruden's testimony, Scully testified that he kept **D-4** and took **D-4** (and **VHS-3**) to Tampa when he was transferred from Orlando to the Tampa office. Ex.93,pp.17,19-21,25. Corroborating Scully, Clark, the Tampa DEA agent to whom Scully gave **VHS-3**, testified that after Scully arrived in Tampa, Scully provided him (Clark) a CD of the AD, which he returned to Scully because the quality was bad and that Scully gave him **VHS-3** in return. Ex.71,pp.29-30. Both Scully and the Government claimed not to know what happened to **D-4**. Ex.2,p.6;Ex.93,pp.19,53-54.

**D-5.** Gruden testified that he believes he also provided a disc ("**D-5**") of the AD to the Miami Field Division during the week of April 12. Ex.78,pp.161-162. The Government's answers to interrogatories did not identify this copy or otherwise indicate what happened to it. See Ex.2.

**D-6.** The Government's answers to interrogatories indicate that Gruden may have had a disc ("**D-6**") as a spare. Ex.2,p.6. Gruden denied that he had a spare for himself. Ex.78,p.192. He did testify that he had two or three remaining discs which he claimed to have destroyed around the time he gave the original **Mini-DV** to IN during their visit on April 19-21. Ex.78,p.193-194. This, of course, is inconsistent with Shafer's testimony that he only made four CD's and testimony that he was passing out VHS copies of the video and at least one disc well after IN had left Orlando (i.e. **VHS-2**, **VHS-5** and **D-3**).

**D-7.** Bendekovic had a CD copy ("**D-7**") of **D-3** made by one of the technicians in the New York office and gave it to Derek Maltz, another New York DEA agent. Ex.67,pp.17-18;Ex.81,pp.4-5,14;Ex.67,pp.23-25. Maltz downloaded **D-7** to his laptop. Maltz could not explain what happened to **D-7**. Ex.81,p.20. The Government's answers to interrogatories make no effort to indicate what happened to **D-7**. Ex.2,p.6.

**LT-1, LT-2 and LT-3.** Maltz downloaded **D-7** to his DEA laptop ("**LT-1**"). Ex.81,p.18. This was eventually transferred to a new laptop ("**LT-2**") and then to a third laptop ("**LT-3**"). Ex.81,pp.27-28,36-37. Apparently, the videos (i.e. **LT-1** and **LT-2**) on the first two laptops were deleted. Ex.81,pp.31,39-41. Maltz burned a copy of the video on his third laptop and turned it over to OPR after OPR initiated its investigation. Ex.81,pp.41-42;Ex.23. This video is identical to **D-2** and **D-3**, which it should be since it is ultimately a copy of one of the Gruden CD's (i.e. **D-3**). See Exs.12 and 11.

**D-8.** Kevin Naughton, one of the primary firearms instructors in the Miami Field Office, testified that he received a CD ("**D-8**") of the AD in the interoffice mail within a couple of months of the AD. Ex.85,pp.4,8,32. Naughton claimed that he had not asked for it and that he had no idea who provided it to him, why it was provided, or who created it. Ex.85,pp.9-10. Naughton testified that he showed **D-8** to various agents until he was ordered by an ASAC to stop showing it. [21] Ex.85,pp.20-22,24-25. Naughton admitted that he took **D-8** home and was plainly evasive as to whether he kept or intended to keep **D-8** for his own personal use. Ex.85,pp.25-30,36.

Naughton turned **D-8** over to OPR after OPR began its investigation. Ex.22. **D-8** starts and ends at the very same points as the CD's provided by Gruden to Derr and Bendevokic (i.e. **D-2** and **D-3**). See Exs.10,11,13. However, the embedded directory for **D-8** shows that **D-8** was copied from an electronic video file which was created on May 10, 2004 at 5:54 p.m. Ex.13. This indicates that someone took one of the Gruden CD's and copied it to an electronic video file which was then used to make **D-8** and perhaps other unaccounted-for discs. It also indicates that **D-5** and **D-8** are not the same disc.

---

[21] Naughton acknowledged that various agents who watched the video made fun of Paige. Ex.85,pp.34-35,37.

**D-9.**  The Government has offered an expert report from Kevin Santillo, a firearms instructor at the Firearms Unit, concerning Paige's mishandling of his firearm when the AD occurred.  Ex.54.  The Government's answers to interrogatories identify various agents at the Firearms Unit who viewed a copy of the video, but Santillo is not mentioned.  See Ex.2,p.6. During a deposition about his expert report, Santillo admitted that Richard Inscore, who was an inspector at IN at the time of the AD, had actually provided him a CD or DVD ("**D-9**") of the AD during a visit by Inscore to the Firearms Unit in mid to late 2004 or early 2005. Ex.92,pp.33,34-35.  Santillo testified that he returned **D-9** to Inscore within a couple of days. Ex.92,pp.42,52.  The Government did not reveal **D-9** in its answers to interrogatories and, of course, has not accounted for this video. [22]    See Ex.2.  Moreover, although Santillo is the Government's expert and was also one of the people interviewed by OPR, the Government did not identify Santillo in its answers to interrogatories as one of the DEA agents who viewed the video at the Office of Training or who had custody of one of the videos. Ex.2,p.6.

**D-10, D-11, D-12.**  White, one of the IN investigators, testified that he took custody of the **Mini-DV** from Gruden when he (White) and Matthews went to the ODO to conduct the on-site IN investigation. Ex.97,pp.50-51.  White testified that after he returned to IN on April 21, he caused the Audio Visual Services Unit at DEA Headquarters to initially make five DVD copies of the **Mini-DV** "in its entirety."[23]  Ex.97,pp.73,74.  He further testified that when he could not view the DVD's in that format on the DEA Firebird computers, he requested the same woman to make five more copies in a different format (apparently CD) so they could be viewed on Firebird

---

[22] Inscore also told Lutz that he had a copy of the video.  Ex.80,p.34.  Inscore has retired from the DEA and has not yet been deposed because Paige could not locate him.

[23] White also testified that he did not think that he had any reason to have copies of only the AD part of the **Mini-DV** made.  Ex.97,p.92.  Moreover, he claimed he did not remember asking anyone to do that. Ex.97,p.105.

computers. Ex.97,pp.77-78,80,85-87,94-95. White gave conflicting and confusing testimony as to the purported purpose of the ten discs (See,e.g,Ex.97,pp.74-76,79,80), but finally asserted that he created five sets of discs. Ex.97,p.95. Each set contained one CD of the video that could be viewed on a Firebird computer, one DVD of the video that could not be viewed on a Firebird computer and one DVD of news reports about the AD. *Id.* He claimed that he "turned in all the stuff [he] had with the file" to Burns, the SITC. Ex.97,p.79. Contrary to this testimony, White then admitted that he kept two sets of discs (i.e. two DVD's and two CD's of the video and two DVD's of news coverage) for himself and took them to Philadelphia when he was transferred there from IN. Ex.97,pp.95-97,105. White claimed that he turned over these two sets of discs to OPR after OPR began its investigation. Ex.97,p.99.

White's testimony appears to be demonstrably false. White turned over a total of seven CD's or DVD's to OPR. See Exs.26,28. Four of these included one CD and three DVD's of TV news coverage of the AD. See Exs.14 through 20. White turned over only three discs containing a video of the AD, and they were all DVD's ("**D-10**," "**D-11**," and "**D-12**"), rather than two CD's and two DVD's. *Id.* Moreover, these three DVD's did not contain the entire 69 to 70 minute **Mini-DV,** as he testified he requested, but were 23 minutes and 34 seconds long and included Paige's DRP, the AD, and approximately 7 minutes of comments by other speakers. Exs.15,18,19. Further, contrary to White's testimony, Burns testified that he was never provided and never saw any CD's or DVD's. Ex.70,p.46-48,90.

Notably, each of the directories imbedded in **D-10**, **D-11** and **D-12** reflect that the original electronic video file from which White's DVD's were made was created on April 17, 2004 at 4:05 a.m. Exs.15,18,19. In other words, the DVD copies which White turned over to OPR (i.e. **D-10**, **D-11**, **D-12**) were not directly created from the original **Mini-DV** which he

brought back to IN on April 21 and subsequently had copied. The electronic video file from which **D-10**, **D-11** and **D-12** were made was created on April 17 before White even went to Orlando to obtain the **Mini-DV**. The logical explanation is that somebody created **D-10**, **D-11** and **D-12** from **VHS-1** which was sent to IN by Federal Express delivery on April 15. The Government's answers to interrogatories make no reference to this electronic file or the creation of any DVD's at IN prior to April 21.

**D-13 through D-22.** As discussed above, White asserted that he had ten copies of the **Mini-DV** made after he returned to IN from Orlando, including five CD's and five DVD's ("**D-13** through **D-22**"). The Government has not accounted for the disposition of the CD's and DVD's which White said he had made other than the three produced by White to OPR which do not even appear to be part of the ten White said he had made.

**D-23.** White initially denied that any copies of the video were made after he completed his August 10, 2004 Final Report of Investigation. Ex.97,pp.99,102. However, Exhibit 38 is a record showing that a DVD copy ("**D-23**") of the video was made at White's request on September 7, 2004, which was confirmed by the person who made it, Marquitta Queen. Ex.38;Ex.89,p.22. Upon being confronted with this document, White admitted that such a DVD was made, but he had no explanation for what it was used for. Ex.97,pp.103-104.

**D-24, D-25.** White's testimony can not be reconciled with the testimony of Marquitta Queen, who has been with the Audio Visual Services Unit at DEA Headquarters since 1991. Queen testified that White gave her the **Mini-DV** for copying after he returned from Orlando. Ex.89,pp.5,10. Queen testified that she digitized the **Mini-DV** into a computer system and then burned a master DVD copy ("**D-24**") of the entire **Mini-DV**; a master DVD copy ("**D-25**") of the AD portion of the **Mini-DV**; a master DVD of the entire **Mini-DV** without the AD; and a Mini-

DV copy of the original **Mini-DV** without the AD. Ex.89,pp.10-12. The Mini-DV copy without the AD was provided to Dr. Dorsey, as had been promised. Ex.35. The Government has never explained what was done with the master DVD copy that Queen made of the entire **Mini-DV** without the AD. The Government has not produced and there has also been no explanation of what has happened to the master DVD copy (**D-24**) of the entire **Mini-DV** and the master DVD copy (**D-25**) of the AD portion of the **Mini-DV**, even though the Government's answers to interrogatories seem to indicate, although not clearly, that the copies made by Queen were believed to be in the possession of IN or OPR. Ex.2,p.7. Paige (and the undersigned) has inspected the IN file and there are no CD's or DVD's of the video in the IN file. Ex.64,¶11.

**D-26-D-?.** Queen testified that White returned within a couple of days and requested additional copies of each of the aforesaid master DVD copies. Ex.89,pp.16-17. Queen testified that she did not know how many copies she made, but it was from one to six DVD copies of each of the foregoing master DVD copies. Ex.89,pp.16-20. The Government has not explained what has happened to the DVD copies of **D-24** and **D-25** except to seemingly state in its answers to interrogatories that they are in the custody of IN or OPR, which is not the case.

**D-?.** Kent Reinke, the lead OPR investigator, testified that Gruden told him he also sent a disc to IN. Ex.91,p.195. This is not reflected in the Government's answers to interrogatories or Gruden's deposition.

**Electronic Files.** In order to create disc copies, electronic video files had to have been created. Shafer and Queen testified that they deleted the electronic files they created. Ex.94,p.18;Ex.89,pp.14-15,20. The Government has never acknowledged the electronic video files used to create **D-8, D-10, D-11** and **D-12.**

## Firebird System

The DEA has its own internal computer network system called Firebird.  The Firebird system cannot be used to access websites on the internet.  Ex.64,¶12.  However, it can be used to send e-mail and attachments, such as the video of the AD, to other DEA agents and to e-mail addresses outside of the Firebird network.  *Id.*

At some point, the AD portion of the video started circulating by e-mail on the Firebird network.  For example, Walker, the DEA agent who seized the original **Mini-DV**, testified that he saw a video of the AD on Firebird some time approximately two weeks after the AD and in any event, before he was transferred to the Bahamas in November, 2004.  Ex.95,pp.4,21-24. Other agents said they saw a video of the AD on Firebird some time toward the end of 2004 or early 2005.  Ex.75,pp.23-24;Ex.92,pp.27-28,33,34-36.

The Government has apparently only attempted a limited search for e-mails on the Firebird system which forwarded copies of the video of the AD.  Ex.77,pp.18-19,44.  However, in unrelated investigations, the Government did find e-mail chains forwarding the video of the AD over Firebird.  Ex.77,pp.36,37,52-54,60,75.  For example, in one single e-mail chain from March 7 to March 10, 2005, the video was sent to thirty-eight people.  Ex.45.  Exhibit 44 reflects another chain forwarding the video involving thirty-nine people from March 8 to March 10, 2005.[24]  These e-mail chains do not indicate the e-mail activity prior to the first person or subsequent to the last person in the chain.  Moreover, no one knows who else was sent the video by any of the people in these single chains and to whom any such other recipients forwarded the video, etc.

---

[24] The subject matter listed on these e-mails was: "Shooting your own leg, 'priceless.'"  Exs. 44,45.

Notably, the particular video that was being forwarded over Firebird in both of these chains begins and ends at the same exact points, contains the same exact content, and is the same exact length (4 minutes and 9 seconds) as the video which Gruden caused to be made on or about April 15, 2004. Exs.10,11,44a,45a;Ex.77,p.68. In other words, the video of the AD circulating on Firebird must have come from one of the copies which Gruden caused to be made or, at least, the odds are astronomically high that it did.

### Internet

At some point, someone in the DEA provided the AD portion of the video to someone outside the DEA. The video of the AD appears to have been widely noticed on the internet in March, 2005. Exs.46,47. On the other hand, the videographer of the **Mini-DV** testified that he saw the video of the AD on the internet within one to six weeks after the AD. Ex.69,pp.26-28,31. One agent said he saw it on the internet within a month of the AD while three others said they saw it on the internet before 2005. Ex.95,pp.4,24;Ex.65,pp.6-7;Ex.75,p.24;Ex.66,pp.52-56.

### PAIGE IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO LIABILITY WITH RESPECT TO HIS CLAIM UNDER COUNT I (PRIVACY ACT)

5 U.S.C. § 552a(b) of the Privacy Act provides the following:

(b) Conditions of Disclosure. No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless . . .

The Act then sets forth various exceptions to the general rule which are not applicable here.

Paige did not consent in writing to any disclosure of the video of the AD. Ex.64,¶ 14.

§ 552a(a)(4) of the Act defines a "record" as follows:

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

There is no dispute that the **Mini-DV** was a record.  It was about Paige and contained his name and a film of him and was kept in a file with his name and file number on it.

§ 552a(a)(5) of the Act defines a "system of records" as follows:

(5)    The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

There is also no dispute that the IN file of the investigation of Paige's AD constitutes or is a part of a system of records.  The IN file has a file number and the title of the file is S/A Lee Paige.  It can be and is retrieved by reference to the file number or file title.  The Government admitted in its answers to interrogatories that the IN file is a system of records and that the **Mini-DV** became a record within a system of records.[25]  Ex.4,p.3,¶17;Ex.5,p.4,¶20.

5 U.S.C. § 552a(g)(1) provides in pertinent part:

Civil Remedies.  Whenever any agency –
                                     * * *
(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an **adverse effect** of an individual,

the individual may bring a civil action against the agency . . .   [emphasis added]

5 U.S.C. § 552 a(g)(4) provides the following:

(4) In any suit brought under the provision of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was **intentional or willful**, the United States shall be liable to the individual in an amount equal to the sum of ----

(A)  **actual damages** sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000, and

(B)   the costs of the action together with reasonable attorney fees as determined by the court. [emphasis added]

---

[25]  Apparently, the Government contests when the **Mini-DV** became a record within a system of records. Ex.4,p.3,¶17.

"Intentional" includes "flagrantly disregarding others' rights under the Act." *Albright v. United States,* 732 F.2d 181, 189 (D.C. Cir 1984); *Dong v. Smithsonian Inst.,* 943 F.Supp 69, 73 (D.D.C. 1996) ("reckless disregard").

There is no dispute that someone within the DEA must have been responsible for disclosing the video to unauthorized parties since the DEA had exclusive possession of the **Mini-DV**.  Next, there is no doubt that the disclosures here, whether to other unauthorized DEA agents or to someone outside the DEA, were intentional and willful.  Paige's computer expert has submitted an expert report detailing all the steps that are necessary in order to disclose the video to another party.  Ex.100,pp.1-2.  In light of the steps necessary as well as the security precautions in place regarding the confidentiality of IN files, it is virtually impossible for the various disclosures of the video to have been anything other than intentional.  In fact, the Government's forensic computer analyst who has been assisting OPR with the investigation of the improper disclosure of the video acknowledged at his deposition that he had no opinion that the disclosure of the video was accidental. Ex.77,p.131.  Moreover, the large number of disclosures and the obvious purpose of the disclosures – entertainment – further confirm that the disclosures were intentional.

A large number of unauthorized and improper disclosures of the video within the DEA are set forth above.  No records were kept and so many improper copies of the video were made that the Government to this day can not locate or even account for most of the copies.  In addition to each intentional disclosure, the entire course of conduct here constituted a reckless disregard for Paige's Privacy Act rights that "promoted an environment in which Privacy Act violations can readily and easily occur." *Dong,* 943 F.Supp at 73.

The primary injury here was the disclosure by someone within the DEA to someone outside the DEA such that the video ended up on the internet and national television and radio. Paige is not required to prove precisely which particular individual within the DEA disclosed the video to someone outside of the DEA. The evidence shows that however that happened, it was intentional and resulted from a reckless disregard of Paige's rights. In addition, the disclosure to the public had to have resulted from one of the unauthorized copies that was intentionally made in the first place. Moreover, it would be remarkably unfair and make no sense to require Paige to pinpoint the precise person who leaked the video to the public.[26]   Ironically, such a burden would become increasingly difficult, if not impossible, as the wrong-doing increased. In other words, the greater the number of violations (i.e. the larger the number of improper copies), the greater the number of instances of failures to keep records, and the greater the number of purported failures of recollections or instances of inconsistent testimony by the agents; the more difficult it becomes to pinpoint the exact employee(s) who leaked the video to the public. This is well demonstrated here by the fact that in this case OPR opened a file over two years ago, has the power to compel statements from DEA employees and used at least thirteen agents in its investigation and has still not been able to locate the DEA employee(s) who disclosed the video

---

[26]   The person most likely to have leaked the video to the public would be Gruden. He had a known animous towards Paige, attempted to give Paige a career-wrecking evaluation when he was not permitted to, and at one time pointed a firearm at Paige. Ex.73,pp.148,149;Ex.95,pp.26-27;Ex.86,pp.166-167;Ex.101. In addition, his testimony at his deposition is replete with failures of recollection (e.g. he could not remember why he had copies of the Mini-DV made) and statements inconsistent with other witnesses, including his testimony that he destroyed extra CD's in his possession. In addition, it is known that Gruden distributed CD's and VHS copies of the AD to friends; one of his CD's was widely disclosed to other DEA agents through Firebird; and one of his CD's was used to create the video that mysteriously appeared from nowhere at Naughton's office in Miami. At one time, the Chief Inspector of the DEA was Gruden's father. Ex.78,p.11. Moreover, Gruden's father was at various times the SAC of the Miami Field Division and the SAC of the Hartford office. Ex.78,pp.11-12. As a result of an apparent ability to avoid discipline for alleged misconduct, Gruden has been referred to as the "teflon" or "untouchable" agent. Ex.64,¶13. Both Scully and Clark would also be potential candidates since each had copies of the video of the AD originally from Gruden and made them available to others. Further, Scully's testimony was notable for failures of recollection and he could not account for his copy of the video (i.e. **D-4**). Clark also had a failure of recollection and could not account for his copy of the video (i.e. **VHS-3**). Moreover, Clark admitted to referring to blacks as "niggers." Ex. 71, p. 78. In any event, their copies originated with Gruden who intentionally provided copies to Scully who intentionally provided a copy to Clark.

to the public.  Not only does the DEA's failed investigation demonstrate how out of control the handling of the video was here, but it also shows that Paige, with far less resources and powers of investigation, cannot be expected to do that which the DEA itself could not.

The D.C. Circuit recognized in *Doe v. U.S. Postal Service,* 317 F.3d 339, 343 (D.C. Cir. 2003) that "because plaintiffs can rarely produce direct evidence that the government has disclosed confidential information obtained from their private records, requiring such evidence would eviscerate the protections of the Privacy Act.  "*Cf. Teleconnect Co. v. Ensrud,* 55 F.3d 357, 360 (8th Cir. 1995) (Rejecting "the notion that only a 'smoking gun' will suffice to defeat a motion for summary judgment in suits predicated upon asserted disclosures of confidential information")."

There is uncontested direct evidence that the video of the AD was improperly and intentionally copied many times by agents within the DEA.  There is also irrefutable circumstantial evidence that someone at the DEA intentionally provided the video to someone outside the DEA since no one else could have.  Consequently, Paige is entitled to summary judgment on Count I on the issue of liability.

### PAIGE IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON LIABILITY WITH RESPECT TO HIS CLAIM UNDER COUNT II (FTCA)

Count II alleges the common law violation of Paige's right to privacy under the FTCA. This claim asserts two theories for liability, including (1) "disclosure of private facts" and (2) "false light in the public eye."  Paige seeks summary judgment with respect to liability under the theory of "public disclosure of private facts."

The elements of the tort of invasion of privacy by "public disclosure of private facts" "can be summarized as 1) the publication, 2) of private facts, 3) that are offensive, and 4) are not

of public concern." *Doe v. Univision Television Group, Inc.,* 717 So.2d 63, 64 (Fla. 3 DCA 1998); *Cape Publications, Inc. v. Hitchner,* 549 So.2d 1374, 1377 (Fla. 1989).

First, there is no dispute that the video was published. Next, it is the video of the AD that constitutes the private fact that was disclosed. The Government in the past has attempted to characterize the private fact disclosed here as the AD itself. Paige has never asserted that the disclosure of the fact of the AD is actionable. The improper disclosure of private facts at issue here was the disclosure of the video of the AD. The video of the AD was clearly private as shown above. Not only Paige's group supervisor, but the Associate SAC in Miami directed that the video be seized. Moreover, the video of the AD was considered to be DEA SENSITIVE, was kept under lock and key, only two copies were to be made, and copies were to be destroyed when the case was closed. Further, the Agents Manual directs that the SAC is to ensure that names of DEA agents involved in shootings are not released to the media in order to protect the "safety of these individuals." AgentsManual,§6114.4(B)(Ex.56). The Government's expert witness testified that the video should not be disclosed if it would reveal Paige's identity. Ex.92,pp.113-114,116. In fact, the DEA's OPR opened an investigation precisely because the disclosure of the video was improper.

Next, there can be no doubt that the disclosure of the video is patently outrageous to the reasonable man. No reasonable person would want to become an object of worldwide derision and have his reputation destroyed, especially after being a dedicated agent, trying more than most agents to help children, and having undertaking so many dangerous assignments on behalf of the DEA. Moreover, any reasonable person would find it outrageous that the disclosure of the video reveals in a very public way the identity of an undercover DEA agent who has been

subjected to several armed confrontations and who has been the subject of a $6 million threat on his life.

Finally, while the fact of an accidental discharge by a DEA agent at a drug-education program for youths may well be a matter of legitimate public concern, the actual video of that incident was not a matter of legitimate public concern, especially since Paige was an undercover drug agent and the video was unduly damaging to him.

### PAIGE IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO THE GOVERNMENT'S DEFENSES

1.     The Government's second affirmative defense asserts the doctrines of assumption of the risk and contributory negligence.  Doc.16,p.4.  Contributory negligence is not a defense to an intentional tort under either federal or Florida law.  *U.S. v. Cushman & Wakefield, Inc.,* 275 F.Supp.2d 763, 773 (N.D. Texas, 2002) and cases cited therein; *Cruise v. Graham,* 622 So.2d 37, 40 (Fla. 4th DCA 1993).  Since both Counts I and II involve elements of intentional conduct, contributory negligence is no defense here.

To the extent that the Government is suggesting that Paige was somehow contributorily negligent with respect to the disclosure of the video because he was at fault for the AD, such a defense is also misplaced.  This type of issue has arisen in medical malpractice cases in which allegedly negligent health care providers defended on the grounds that the plaintiff was contributorily negligent in causing his original injuries which created the need for the medical treatment.  These arguments have been repeatedly rejected on the grounds that the plaintiffs purported contributory negligence was not a legal or proximate cause of the injury.  *See Matthews v. Williford,* 318 So.2d 480, 481, 483 (Fla. 2nd DCA 1975) ("a remote condition or conduct which furnishes only the occasion for someone else's supervening negligence is not a proximate cause of the result of the subsequent negligence."); *Whitehead v. Linkous,* 404 So.2d

377, 379 (Fla. 1st DCA 1981); *Kroon v. Beech Aircraft Corporation,* 628 F.2d 891, 894 (5th Cir. 1980); *Baras v. United States of America,* Case No. 8:02-cv-660-t-27-TBM (M.D. Fla., 2004) (See Ex. 60); *Lamoree v. Binghampton General Hospital*, 68 Misc.2d 1051, 329 N.Y.S.2d 85 (1972) (Plaintiff's negligent gunshot wound to his thigh no defense to subsequent negligent treatment of wound).

The doctrine of assumption of the risk does not exist in Florida. It was merged into the defense of contributory negligence by the Florida Supreme Court in *Blackburn v. Dorta,* 348 So.2d 287, 293 (Fla. 1977). Consequently, it is not available with respect to Count II.

It does not appear that the doctrine of assumption of the risk applies to intentional misconduct under federal law or to the Privacy Act. Even if the doctrine of assumption of the risk did apply here, the Government must prove that Paige had actual and subjective knowledge of the danger and that he had full comprehension and appreciation of the risk he was assuming. *Krombein v. Gali Service Industries, Inc.,* 317 F.Supp.2d 14, 20-21 (D.D.C. 2004). In response to a contention interrogatory, the Government stated that Paige "consented to be video-recorded and by so doing assumed all the risk associated with the re-broadcast of the video-recording." Ex.3,p.2,¶11. Assuming Paige consented to be video-recorded in the first instance, he did not consent to the video being disclosed after it was seized by the DEA and became subject to the Privacy Act or otherwise private. Paige did not know, could not know, and did not assume any risk that the DEA would make an improper disclosure of the video after it was taken into custody. Ex.64,¶16.

Finally, the Government appears to assert that Paige somehow assumed the risk of the improper disclosure of the video because he appeared on media shows after the disclosure of the video. Ex.3,p.2,¶11. It makes no sense that Paige's conduct after the improper disclosure

somehow caused him to assume the risk of the improper disclosure in the first place. Further, the issue of Paige's media appearances is an issue to be considered with respect to mitigation of damages or the doctrine of "avoidable consequences," not liability.[27]  *See Federal Ins. Co. v. Sabine Towing & Transp. Co.,* 783 F.2d 347, 350 (2nd Cir. 1986) ("Unlike the doctrine of contributory negligence, which traditionally provides a defense to a negligence action, the rule of avoidable consequences is not a defense; it applies 'only to the diminution of damages and not to the existence of a cause of action.'")

2.    The Government's third affirmative defense asserts the doctrine of unclean hands. Doc.16,p.4.  In response to a contention interrogatory, the Government asserted that Paige is barred or estopped from seeking recovery because "Plaintiff was in the wrong with respect to the accidental discharge on April 9, 2004." Ex.3,p.3,¶12.

Under both federal and Florida law, the doctrine of "unclean hands acts only as a defense to equitable, and not legal, actions."  *First American Corp. v. Al-Nahyan,* 17 F.Supp.2d 10, 29 (D.D.C. 1998); *Pennington v. Pennington,* 390 So.2d 809, 810 (Fla. 5th DCA 1980). Consequently, the defense of unclean hands is not available here.

Even if the defense were available, it would not apply here.  The type of conduct constituting unclean hands includes only unconscionable conduct that has a close nexus to the transaction on which the party seeks relief and upon which the defendant has relied.  *Matter of Garfinkle,* 672 F.2d 1340, 1346n7 (11th Cir. 1982); *Hensel v. Aurilio,* 417 So. 2d 1035, 1038 (Fla. 4th DCA 1982); *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct.

---

[27]   The only reason Paige made media appearances after his lawsuit was filed was to attempt to mitigate the damage to him that was caused by the improper disclosure.  Paige even obtained permission from the DEA to make media appearances.  See Exs.52,53.  In fact, as long as Paige acted reasonably, even if his efforts turn out to be unsuccessful and actually increase the loss, he can still recover for the loss incurred in the process. *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930, 933 (5th Cir., 1979).

146 (1933) (Predicate unconscionable act underlying an unclean hands defense must have an "immediate and necessary relation to the equity that [one] seeks in respect of the matter in litigation."); *McIntosh v. Hough,* 601 So.2d 1170, 1172-1173 (Fla. 1992) (party asserting unclean hands must have taken "action in reliance on that conduct.").

In the instant case, Paige had absolutely nothing to do with the disclosure of the video. His AD at the DRP bears no relationship to the disclosure of the video, and the Government took no action in reliance on Paige's conduct at the DRP. Moreover, Paige did not engage in any type of conduct that constitutes unclean hands. Paige was involved in a well-meaning presentation to convince children at risk not to use drugs or to touch weapons.

3.    The Government's fourth affirmative defense asserts that Paige's action is barred by the doctrine of waiver and forfeiture. See Doc.16,p.4. In its answer to a contention interrogatory, the Government asserted that it understood "that plaintiff had several opportunities to prevent or restrict the release and/or circulation of the video-recording but Plaintiff did not fully avail himself of these opportunities." Ex.3,p.3,¶13.

The only way in which Paige could have waived or forfeited his rights under the Privacy Act was through "written consent." 5 U.S.C. § 552a(b). It is undisputed that Paige never gave written consent for the disclosure of the video. *See also* Ex.64,¶14.

Further, Paige never waived any right to privacy. Waiver requires (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. *Matter of Garfinkel,* 672 F.2d 1340, 1347 (11th Cir. 1982); *Destin Sav. Bank v. Summerhouse of FWB,* 579 So.2d 232, 235 (Fla. 1st DCA 1991).

There is no evidence that Paige had any intention to relinquish any right to privacy. Indeed, he is the person who initially requested that the video be obtained.  Further, after he learned that individuals in the Miami Field Office had viewed the video, Paige complained to both White and his ASAC, Collins.  Ex.1,p.14;Ex.73,p.115.  In addition, Paige complained to Collins that a video of the AD was being shown on Firebird and asked if there was anything that he could do about it.[28]  Ex.73,pp.50-51.

4.    The Government's sixth affirmative defense asserts that Paige's action is barred by the fellow-servant doctrine.  Doc.16,p.4.  The fellow-servant doctrine does not apply to intentional conduct and has never been applied to the Privacy Act.  Indeed, it would make no sense to apply this doctrine to the Act since it would basically deprive most federal employees of the protection of the Act.  Moreover, as shown in the cases cited in the next section concerning FECA, there have been many cases brought in this court involving the violation of federal employees' rights under the Act by fellow employees.  No one has ever suggested that the fellow-servant doctrine applies.  Moreover, the legislative history of the Act points out that one of the purposes of the Act is to ensure that "employees" take the necessary steps to protect the privacy of citizens, which includes fellow employees.  For example, the court in *Johnson v. Department of Treasury, IRS,* 700  F.2d 971, 975 (5th Cir. 1983) noted that the congressional purpose in enacting the Act is found in a report from the Committee on Government Operations which stated:

> The purpose of [the Act] is to promote government respect for the privacy of citizens by requiring all departments and agencies of the executive branch and their employees to observe certain constitutional rules in the . . . disclosure of personal information about individuals.

---

[28] After Paige complained, Collins contacted an Associate SAC in Miami to see if the video could be removed from the Firebird system, but was advised by that person they did not have the mechanism to find and remove it from the system.  Ex.73,pp.51-52.  Collins also contacted the ASAC in Miami, who confirmed that the video was being shown to agents in firearms training, and Collins requested that they refrain from showing it.  Ex.73,pp.116-117.

Further, the Senate Report on the bill stated that the remedial section of the bill was "designed to encourage the widest possible citizen enforcement through the judicial process." *Parks v. United States Internal Revenue Service,* 618 v. Fd.2d 677, 682 (10th Cir. 1980). Obviously, these salutary purposes would be lost if the fellow-servant doctrine applied.

In Florida, the fellow-servant rule remains a common law concept, but it has been widely criticized and limited. *See Crenshaw Bros. Produce Co. v. Harper,* 142 Fla. 27, 194 So. 353, 361 (Fla. 1940). In *Wilson & Toomer Fertilizer Co. v. Lee,* 90 Fla 632, 644, 106 So. 462, 467 (Fla. 1924), the Florida Supreme Court described the doctrine as follows:

> All who serve the same master, work under the same control, derive authority and compensation from the same common source, are engaged in the same general business, though it may be in different grades or departments of it, are fellow servants who take the risk of each other's negligence and the master is not bound to indemnify one servant for injuries caused by the negligence of another servant in the same common employment as himself, unless the negligent servant was the master's representative.

The rationale behind this rule is that an employee is more likely to be careful for his own safety in the absence of a remedy when injured by a co-worker. *Carnival Corp. v. Hertz Corp.,* 748 So.2d 323, 326 (Fla. 3rd DCA 1999).

The Florida fellow-servant doctrine does not apply, in part, because the invasion of privacy claim set forth in Count II involves intentional conduct and the fellow-servant doctrine only applies to negligence actions.[29] This is consistent with the rationale for the fellow-servant rule and the fact that an employee cannot be expected to anticipate intentional misconduct.

5. The Government's seventh affirmative defense asserts that Paige's action is barred by the Federal Employee Compensation Act ("FECA"). FECA does not and it was never intended to preempt the Privacy Act. It is clear from the legislative history of the Privacy Act

---

[29] There are other reasons that the doctrine does not apply, but they may raise disputed issues of material facts.

that it is intended to protect all citizens, including federal employees.  In fact, the legislative history makes reference to federal employees, personnel and employee records as being protected by the Act.  *See Parks,* 618 F.2d at 681n1.  Moreover, the Government's own guidelines concerning the protections which federal employees have, include the right to file a suit under the Act.  For example, in describing the civil remedies portion of the Act, the Government's Privacy Act Guidelines state that this "subsection prescribes the circumstances under which an individual may seek court relief in the event a Federal Agency violates any requirements of the Privacy Act."  Ex.101,p.7.  The Guidelines then point out that "an individual may have grounds for action under other provisions of the law in addition to those provided in this section," including, "[f]or example" that "[a] Federal employee may file a grievance under personnel procedures."  *Id.*  In short, the Government's own Guidelines understood the Privacy Act to include federal employees.

At no time has the district court or the court of appeals for D.C. ever hinted that a federal employee could not pursue a remedy under the Privacy Act.  See for example, *Albright v. United States,* 732 F.2d 181 (D.C. Cir. 1984); *Doe v. United States Postal Service,* 317 F.3d 339 (D.C. Cir. 2003); *Dong v. Smithsonian Inst.,* 943 F.Supp. 69 (D.D.C. 1996); *Waters v. Thornburgh,* 888 F.2d 870 (D.C. Cir. 1989); *Tripp v. Department of Defense,* 219 F.Supp.2d 85 (D.D.C. 2002); *see also Johnson v. Department of Treasury, I.R.S.,* 700 F.2d 971 (5th Cir. 1983); *Parks v. United States Internal Revenue Service,* 618 F.2d 677 (10th Cir. 1980).  In fact, in *Dong,* 943 F.supp at 73, the D.C. District Court specifically noted that the conduct of the defendant federal agency in that case "constitutes reckless disregard for the Privacy Act rights of the approximately two-thirds of the Smithsonian staff who are federal service employees."  In *Parks,* 618 F.2d at 685, which was cited in *Albright,* 732 F.2d at 189, the Tenth Circuit specifically noted with

reference to the federal employee plaintiffs that the Privacy Act "seeks to prevent rummaging through his personnel file in a search for information which will advance objectives that are not incident to the mission of the agency."

6.    The Government's eighth affirmative defense asserts that Paige may not recover emotional damages under the Privacy Act.  Doc. 16, p. 4.  There is conflict on this issue among the circuits.  *See Johnson v. Department of Treasury, I.R.S.,* 700 F. 2d 971 (5th Cir. 1983) (emotional damages allowed); *Parks v. United States Internal Revenue Serv., supra,* (emotional damages seemingly allowed); *Fitzpatrick v. Internal Revenue Service,* 665 F.2d 327 (11th Cir. 1982) (emotional damages not allowed).  The superior and more considered view, which is also the prevailing view in this court, is that Paige may recover emotional damages under the Privacy Act.

In *Albright v. United States, supra*, a number of federal employees claimed emotional injuries as a result of an alleged violation of the Privacy Act resulting from the video-taping of a meeting they attended.  The district court found the plaintiffs' case deficient on several independent grounds, including that they had failed to demonstrate that their alleged injuries were caused by the video-taping or that the agency had acted willfully or intentionally.  The district court also interpreted the Privacy Act to authorize recovery only to the extent of pecuniary loss and not for emotional injuries unaccompanied by out of pocket expenses.  On appeal, the D.C. Circuit agreed with the plaintiffs that emotional trauma alone was sufficient to qualify as an "'adverse affect' under Section 552a(g)(1)(D) of the Act."  *Id.* at 186.  The court then stated that if the plaintiffs could establish that they suffered the claimed emotional injuries and that those injuries were caused by the video-taping, then it "would consider the extent to which 'non-economic injuries or damages other than out-of-pocket expenses could qualify as

'actual damages' under § 552a(g)(4)." *Id.* However, the court did not resolve this issue because the court held that the plaintiffs had failed to establish causation. Consequently, the D.C. Circuit did not resolve the issue of emotional damages.

In a later case in this court, *Dong v. Smithsonian Institution, supra,* a federal employee brought a Privacy Act claim against the Smithsonian Institution. Referring to *Johnson v. Department of Treasury,* 700 F.2d 971 (5th Cir. 1983) the court found that plaintiff could collect non-economic damages and stated (943 F.Supp. at 74):

> Actual damages under this provision of the statute encompass not only pecuniary losses, but also the ordinary elements of compensatory damages, such as mental depression and physical injury when these elements are supported by evidence in the record.

Moreover, after finding for the plaintiff, the court awarded damages for emotional trauma and distress and harm to her reputation even though there were no out of pocket expenses.

In *Alexander v. FBI,* 971 F.Supp 603, D.D.C. 1997) various plaintiffs alleged, *inter alia,* a violation of Privacy Act by the White House in connection with "Filegate" where the FBI had allegedly provided the White House with hundreds of FBI files of former political appointees and government employees under the Reagan and Bush administrations. The Government moved the court to limit the plaintiffs' damages to economic losses arguing that the Privacy Act did not permit recovery for non-pecuniary injuries. Denying this motion, the D.C. District Court ruled that plaintiffs could pursue non-economic damages. In doing so, the court specifically adopted "the thorough analysis used by the Fifth Circuit in *Johnson v. Department of Treasury,* 700 F.2d 971, 986 (5th Cir. 1983)."

In *Johnson v. Department of Treasury, IRS, supra,* the Fifth Circuit conducted a thorough analysis of the purposes of the Privacy Act, its legislative history and other statutory uses of the term "actual damages" and concluded that the plaintiff was entitled to compensation under the

Act for the ordinary elements of compensatory damages, including mental depression and suffering. Rather than repeat that court's thoughtful, thorough analysis, it is assumed that the court will specifically review that court's opinion. In addition, in *Parks,* 618 F.2d 677, the Tenth Circuit recognized that the plaintiff had stated a viable cause of action even though he had only sought damages based upon the alleged psychological damage or harm from the unauthorized and illegal disclosures alleged in that case.

### CONCLUSION

For the reasons set forth above, summary judgment as to liability on Counts I and II should be granted to Paige. In addition, Paige is entitled to partial summary judgment as to the Government's defenses or they should be stricken.

Respectfully submitted,

S/Ward A. Meythaler
Ward A. Meythaler

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044

s/Ward A. Meythaler
Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5415 Mariner Street, Suite 103
Tampa, Florida 33609
TEL: (813) 281-9000
FAX: (813) 281-2223
wamsecy@merklemagri.com

## APPENDIX OF ACRONYMS

AD – Accidental discharge;
ADCI – Assistant Deputy Chief Inspector;
ASAC – Assistant Special Agent in Charge;
BPC – Board of Professional Conduct;
DCI - Deputy Chief Inspector;
DEA – Drug Enforcement Administration;
DRP – Demand Reduction Presentation;
FECA – Federal Employment Compensation Act;
FTCA – Federal Tort Claims Act;
IN – Office of Inspections;
NDEC – Non-Drug Evidence Custodian;
ODO – Orlando District Office;
OYMGA – Orlando Youth Ministry Golf Association;
OPR – Office of Professional Review;
P&I – Planning and Inspection;
SA – Special Agent;
SAIRC – Shooting and Assault Incident Review Committee;
SAC - Special Agent in Charge;
SIT – Shooting Incident Team;
SITC – Shooting Incident Team Coordinator.