**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEE PAIGE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:06cv00644 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DRUG ) | |
| ENFORCEMENT ADMINISTRATION ) | |
| and UNITED STATES OF AMERICA, ) | Hon. Emmet G. Sullivan |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants the United States Department of Justice, Drug Enforcement Administration, and United States of America respectfully move this Court to enter summary judgment in their favor. Points and authorities in support of this motion are attached in the Memorandum in Support of Defendants' Motion for Summary Judgment. Defendants' Statement of Material Facts under D.C. Rule 56.1 is also attached.

Dated: May 16, 2008                    Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

    /s/  Peter J. Phipps

PETER J. PHIPPS
PAUL A. DEAN
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
peter.phipps@usdoj.gov


Mailing Address:
Post Office Box 883
Washington, D.C.  20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEE PAIGE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00644 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| and UNITED STATES OF AMERICA, | ) | Hon. Emmet G. Sullivan |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY JUDGMENT STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      PLAINTIFF FAILS TO SATISFY THE ELEMENTS OF A PRIVACY ACT
       DISCLOSURE CLAIM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.     The Shooting Video on the Internet Was Not Retrieved from a System of
            Records.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       B.     Plaintiff Cannot Satisfy the Intentional or Willful Element.. . . . . . . . . . . . . . . . . 19

       C.     Plaintiff's Shooting Was Already in the Public Domain.. . . . . . . . . . . . . . . . . . . . 20

       D.     Plaintiff Cannot Recover Non-Pecuniary Damages under the Privacy Act. . . . . . . 21

            1.     Sovereign Immunity Requires the Narrowest Construction of the
                 Ambiguous Term "Actual Damages.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            2.     The Privacy Act's Legislative History Indicates That "Actual
                 Damages" Was Meant to Refer Only to Out-Of-Pocket Losses. . . . . . . . . 26

II.     PLAINTIFF CANNOT RECOVER FOR HIS INVASION OF PRIVACY CLAIMS.. . . . 30

       A.     Plaintiff Cannot Satisfy the Elements for "Publicity Given to a Private Fact.". . . . 30

            1.     Plaintiff's Presentation Was Not a Private Fact.. . . . . . . . . . . . . . . . . . . 31

            2.     Plaintiff Cannot Satisfy the "Giving Publicity" Element.. . . . . . . . . . . . . 32

            3.     Plaintiff's Presentation Was Not Highly Offensive.. . . . . . . . . . . . . . . . . 34

            4.     Plaintiff's Conduct During His Presentation Is a Matter of Legitimate
                 Public Interest.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

            5.     As a Public Figure, Plaintiff Cannot Recover for Unwanted Publicity
                 Associated with His Shooting.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

B.    Plaintiff Cannot Sustain a False Light Claim.............................. 38

     1.    The Court Lacks Subject Matter Jurisdiction over Plaintiff's False Light Invasion of Privacy Claim.................................... 38

     2.    Beyond the Jurisdictional Failure, Plaintiff Cannot Recover for the False Light Tort Claim......................................... 40

III.    THE EQUITABLE DOCTRINE OF UNCLEAN HANDS BARS PLAINTIFF FROM RECOVERING....................................................... 42

CONCLUSION............................................................ 45

**INTRODUCTION**

This suit arose after plaintiff Lee Paige, a Drug Enforcement Administration ("DEA") special agent, shot himself while presenting an anti-drug lecture to an audience of approximately 50 children and parents at a community center in Orlando, Florida. With plaintiff's consent, the presentation was video-recorded. When video footage of plaintiff's shooting found its way to the internet, however, plaintiff sued the DEA and the United States under the Privacy Act and the Federal Tort Claims Act ("FTCA"), alleging unlawfully disclosures of protected information and invasions of privacy. As demonstrated below, plaintiff cannot recover under either theory.

Plaintiff's claim under the Privacy Act fails because he cannot satisfy critical elements of a disclosure claim. First, plaintiff cannot establish that the video footage of his shooting that became public was retrieved from a protected system of records. The relevant system of records contained videos of plaintiff's shooting in different media: it had a Mini-DV version of the shooting (over an hour in length), and VHS version of the shooting (also over an hour in length), and DVDs of the shooting (approximately 23 minutes, 34 seconds in length), but it never had a CD version of the shooting video, or any version of the video 4 minutes, 9 seconds in length (the duration of the shooting video that appeared on the internet). Second, because plaintiff does not know the identity or the circumstances surrounding the release of video footage, he is unable to prove that any disclosure was done with the requisite "intentional and willful" mental state. Third, plaintiff cannot recover under the Privacy Act's disclosure provisions because his presentation and shooting were in the public domain as of April 2004, well before their appearance on the internet in early March 2005. Fourth, plaintiff cannot show out-of-pocket pecuniary damages caused by the alleged disclosure, and the Privacy Act waives sovereign immunity only for the recovery of "actual damages," which when read narrowly, precludes recovery for emotional and reputational injury.

Plaintiff's FTCA claims similarly fail. With respect to his claim for unwanted publicity,

1

plaintiff cannot establish the four elements required to establish such a cause of action. First, the shooting was not a private fact because it occurred while plaintiff was on duty, in a public place, to an audience that owed him no duty of confidentiality and plaintiff consented to his presentation being videotaped. Second, plaintiff cannot show that DEA "gave publicity" to the video footage of his shooting. Third, plaintiff's shooting was not "highly offensive" because it did not involve a highly personal or intimate matter. Fourth, because plaintiff shot himself while on-duty as a law enforcement officer, the incident is a matter of legitimate public concern. Moreover, plaintiff's claim for unwanted publicity is barred because he qualifies as a "voluntary public figure" and/or an "involuntary public figure," neither of which can recover for unwanted publicity.

Likewise, plaintiff cannot prove his false light claim. This court lacks jurisdiction over this claim because a false light claim arises out of libel, slander, and misrepresentation, and therefore cannot be brought under the FTCA. See 28 U.S.C. § 2680(h). Even if jurisdictional, a false light claim may not even be recognized under Florida law and that issue is presently under review by the Florida Supreme Court. See Rapp v. Jews for Jesus, Inc., No. SC06-2491 (Fla.). Even if actionable under the FTCA and recognized by Florida law, plaintiff still fails to satisfy the four elements of a false light tort as articulated in the Restatement (Second) of Torts.

Finally, plaintiff has forfeited his right to recover due to his own "unclean hands." Plaintiff repeatedly violated firearms safe-handling rules to the peril of the audience members (and to himself). Plaintiff not only engaged in misconduct during his presentation by violating firearms safe-handling rules, but he also acted inconsistently with the protection of his privacy. He consented to a video-recording while presenting to an audience of 50 children and parents, who were then unrestricted in their ability to further convey the substance of the presentation. To make matters worse, after filing this lawsuit, plaintiff made multiple appearances on national television. For all these reasons, summary judgment should be entered in favor of defendants.

## STATEMENT OF FACTS

Plaintiff Lee Paige is employed by DEA as a Special Agent in the Orlando District Office, within the Miami Division of DEA.  See Defendants' Statement of Material Facts ("SMF") ¶ 1 (copy attached as Ex. 1).  Before joining DEA, plaintiff played football at Florida State University, and he later played professional football with the Tampa Bay Bandits and the Tampa Bay Buccaneers.  Id. ¶ 5.  As a football player, he appeared on television and in the press.  Id. ¶ 6.

During his career with DEA, plaintiff gave many 'demand reduction' presentations, which are educational, informative events that explain the dangers associated with illegal drugs in an attempt to reduce the demand for such illegal substances.  Id. ¶ 8.  By his own estimate, plaintiff has given around 500 such presentations to various audiences, such as nurses, students of all ages, church members, and juvenile detention detainees, as well as college and professional sports teams.  Id. ¶¶ 9-10.  The sizes of these audiences varied from 10 or 12 persons to hundreds of people.  Id. ¶ 11.  While giving presentations, plaintiff has been photographed and videotaped, and afterwards, he has signed autographs.  Id. ¶ 12.  Plaintiff does not recall ever giving an instruction that audience members could not photograph or video-record him.  Id. ¶ 13.

Plaintiff has also received media attention for his work with DEA.  His demand reduction activity has been the subject of newspaper articles and photographs.  Id. ¶ 14.  In addition, Sports Illustrated identified plaintiff as a former professional football player who worked for DEA, and the article also specified the location where he worked.  Id. ¶ 7.

**The April 9, 2004 Demand Reduction Presentation**

On Friday, April 9, 2004, plaintiff gave a demand reduction presentation at the Dr. J.B. Callahan Community Center in Orlando, Florida, to an audience of approximately 50 children and parents.  SMF ¶ 15.  Plaintiff wore DEA raid-gear as he presented to the Orlando Minority Youth Golf Association (the "OMYGA"), a golf association in which his own children are involved.  Id.

3

¶¶ 17-18, 27.  Plaintiff's children and wife, Robbin Paige, attended the meeting that night, as did DEA Special Agent ("SA") Walter Walker of the Orlando District Office, who brought his children as well.  Id. ¶¶ 18-19.  Plaintiff had told his Group Supervisor ("GS"), Peter Gruden, that he would be giving a demand reduction presentation that night, but he did not mention that he intended to display firearms.  Id. ¶ 20.  Nor did plaintiff receive permission from GS Gruden to show firearms at his presentations.  Id. ¶ 21.

The OMYGA generally video-records its meetings, and the April 9, 2004 meeting was no exception.  Id. ¶ 24.  Using his own Panasonic video-recorder, Joseph Brunson, a parent-volunteer for the OMYGA, video-recorded the April 9 meeting onto his own Mini-DV microcassette tape.  Id. ¶¶ 25-26.  As he gave his presentation, plaintiff was aware that he was being video-recorded by Mr. Brunson, but plaintiff did not object; nor did plaintiff give an instruction that he should not be video-recorded or photographed.  Id. ¶ 28.  Ultimately, Mr. Brunson video-recorded plaintiff's entire presentation, including the part where plaintiff shot himself in the leg.  Id. ¶ 30.

During his presentation, plaintiff unholstered and displayed a Glock Model 22, 40-caliber handgun, which DEA had issued to him.  Id. ¶ 31.  As his duty weapon, the firearm was loaded when plaintiff entered the community center.  Id. ¶ 32.  After unholstering his handgun for display to the audience, plaintiff did not remove the magazine, which contained the live ammunition.  Id. ¶ 33.  Because he failed to properly visually and physically inspect the weapon, plaintiff did not know that the magazine, with live ammunition, was still in place.  Id. ¶ 34.  During his presentation, plaintiff did notice a live round in the chamber of the handgun, and he removed it and placed it in his left pants pocket.  Id. ¶ 35.  Nonetheless, with the magazine still in place, another round seated in the chamber of the handgun.  Id. ¶ 36.

As he displayed the loaded Glock, plaintiff continued to expose the unknowing audience to danger.  Plaintiff did not have another firearms-trained DEA special agent inspect the weapon (as is

required under safe-handling rules). <u>Id.</u> ¶ 37. Instead, plaintiff had Brian Covington, a civilian in the audience with unknown firearms knowledge and experience, inspect plaintiff's duty weapon. <u>Id.</u> ¶ 38. While displaying his loaded gun, plaintiff repeatedly pointed the muzzle in unsafe directions – toward his own lower body, toward Mr. Covington, and toward the ceiling. <u>Id.</u> ¶¶ 39-40.

These continued violations of safe-handling rules culminated with plaintiff shooting himself. At one point, plaintiff placed his finger on the trigger while pointing the gun toward his own lower body. <u>Id.</u> ¶ 41. At approximately that same time, plaintiff stated, "I am the only one in the room professional enough, that I know of, to carry this Glock .40." <u>Id.</u> ¶ 42. Moments later, while the muzzle of the gun was aimed at his own leg, plaintiff pulled the trigger and discharged a live round into his left thigh. <u>Id.</u> ¶ 43. That live round hit the bullet that plaintiff had previously placed in his left pants pocket, causing the bullets to ricochet – one into the air, the other through plaintiff's left leg. <u>Id.</u> ¶¶ 44-45. Fortunately, no audience members were hit by these bullets. <u>Id.</u> ¶ 45.

Even after he shot himself, plaintiff continued to handle his weapon dangerously. First, he failed to maintain control of his loaded weapon and instead placed it on a table in front of the audience. <u>Id.</u> ¶ 46. Next, plaintiff stated that he would "probably never be able to show guns again," but then, in direct contradiction of that statement, he attempted to display more firearms. <u>Id.</u> ¶ 47. Specifically, plaintiff instructed the civilian, Mr. Covington, to bring over an additional weapon for further display. <u>Id.</u> ¶ 48. Mr. Covington refused to do so. <u>Id.</u> ¶ 49. Plaintiff next instructed his wife, Robbin Paige, a non-DEA agent, to bring a rifle to him. <u>Id.</u> ¶ 50. She obliged and began to display the rifle – until children in the audience yelled for her to put down the weapon, at which point in time plaintiff ended his presentation. <u>Id.</u> ¶¶ 51-52.

**DEA's Custody of the Mini-DV and the Making of a VHS Copy**

Plaintiff was then able to walk out of the community center into the parking lot with SA

Walker, who had called for emergency medical care. SMF ¶ 54. As plaintiff was tended to and transported to the hospital, additional DEA agents learned of the shooting and arrived on the scene, including GS Gruden and GS Robert Patterson, who was Acting Assistant Special Agent in Charge ("ASAC") that night in place of ASAC Stephen Collins, who was on leave. Id. ¶ 56. Plaintiff was then transported by ambulance away from the community center and to the hospital. Id. ¶ 55.

After arriving at the hospital, plaintiff called his wife to ask her to obtain the video-recording from Mr. Brunson. Id. ¶ 57. Robbin Paige in turn communicated plaintiff's request to SA Walker, who approached Mr. Brunson while he was still video-recording the remainder of the OMYGA meeting. Id. ¶¶ 58, 60. Mr. Brunson initially did not want to hand over the Mini-DV microcassette to SA Walker, but ultimately, he did so. Id. ¶ 61. SA Walker then took the Mini-DV to either GS Gruden or Acting ASAC Patterson. Id. ¶ 64. Upon leaving the community center that night, Acting ASAC Patterson took the Mini-DV with him to the Orlando District Office. Id. ¶ 65.

At the Orlando District Office, Acting ASAC Patterson went to the Tech Room to watch the Mini-DV to determine exactly what had happened (the eye-witness accounts that he had heard at the community center were not consistent). Id. ¶ 67. After he had watched the video, Acting ASAC Patterson completed the requisite initial paperwork, a DEA teletype reporting the shooting. Id. ¶ 71. In so doing, Acting ASAC Patterson entered the file number GFAO-04-9020, which is a DEA general file, not indexed to any particular individual, but rather referring to "assaults / threats / shootings." Id. He also decided to copy the Mini-DV into a more presentable format for ASAC Collins to view upon his return to the office. Id. ¶ 68. Acting ASAC Patterson found a way to copy the Mini-DV onto a VHS tape, and afterwards he took the Mini-DV and the VHS copy into ASAC Collins's secure office, and left them there, where they remained over the weekend. Id. ¶¶ 69-70.

On Monday morning, April 12, 2004, ASAC Collins, GS Gruden, and possibly GS Patterson watched the VHS copy of the shooting video in a conference room to find out precisely what had

happened.  Id. ¶ 72.  After watching the video, ASAC Collins gave both the Mini-DV and the VHS copy of the video to GS Gruden, who kept them in a desk drawer in his office on a secure floor.  Id. ¶¶ 73-74.  Because other employees of his group were curious and concerned about what had happened to plaintiff, GS Gruden showed the VHS copy of the shooting video one or two additional times in conference rooms in the Orlando District Office.  Id. ¶ 77.

**The Creation of CD copies of Plaintiff's Shooting Video that are 4:09 Minutes in Duration**

That same week, GS Gruden requested that Tech Room personnel in the Orlando District Office make additional copies of the Mini-DV.  SMF ¶ 78.  At that point in time, GS Gruden did not anticipate that DEA's Office of Inspections in Headquarters would investigate SA Paige's shooting, nor did he know what, if any, information the Office of Inspections would want.  Id. ¶ 75. In response to GS Gruden's request, Tech Room personnel made between four and six copies of the video onto red unlabeled CDs, each containing a 4 minute and 9 second excerpt of SA Paige shooting himself, and gave them to GS Gruden on April 15, 2004.  Id. ¶ 79-80.  (At some point in time, GS Gruden may have also requested that one or two VHS copies of the shooting video be made as well.)  Id. ¶¶ 100, 241.  The Tech Room personnel made these CD versions on a password protected computer in the Tech Room and deleted the video file from the computer afterward.  Id. ¶¶ 81, 84.

Also during the week of April 12, 2004, GS Gruden wrote up the required "Report of Shooting" form to send to DEA's Office of Training, Firearms Training Unit in Quantico, Virginia. Id. ¶ 85.  In completing the Report of Shooting, GS Gruden used the file identifier of GFAO-04-9020, a general file for "assaults / threats / shootings."  Id. ¶ 86.  On or about April 15, 2004, GS Gruden sent a completed Report of Shooting along with a 4:09 CD version of the shooting video to GS Bill Lutz, in the Firearms Training Unit.  Id. ¶ 87.

During that same time frame, news of plaintiff's shooting spread throughout DEA.  In

speaking with other DEA agents, GS Gruden mentioned that there was video footage of the shooting, and in response to those conversations or requests for the video footage, he distributed some of the CDs with 4:09 versions of the shooting video to other DEA agents. Id. ¶ 88. As explained further below, GS Gruden sent one CD copy to Steve Derr, who was then the ASAC in Albuquerque, New Mexico; one CD copy to Rick Bendekovic, who was then a GS in New York; and one CD copy to Kevin Scully, who was then a SA in Orlando. Id. ¶¶ 89, 92-93. SA Scully had some difficulty viewing the CD he received, so he asked GS Gruden for another version of the shooting video. Id. ¶¶ 94, 96. GS Gruden had a VHS version available and provided it to SA Scully, who took it to the Orlando Tech Room and requested one VHS copy, which he received that day. Id. ¶ 97. SA Scully then returned the VHS to GS Gruden. Id. ¶ 98.

**A VHS Copy Goes to DEA's Office of Inspections, Who Later Acquires the Mini-DV**

DEA's Office of Inspections ("IN") at DEA Headquarters in Arlington, Virginia was sent a copy of the teletype that GS Patterson prepared, and on or about April 15, 2004, in response to a request from the Associate Deputy Chief Inspector for IN, Richard Dearing, ASAC Steve Collins directed GS Gruden to send a copy of the shooting video to IN. SMF ¶¶ 99-100. On April 15, 2004, GS Gruden sent a VHS copy of the shooting video for next-day delivery to Mr. Dearing. Id. ¶¶ 101, 103.

Also on April 15, 2004, IN assigned Senior Inspector L.D. Mathews and Inspector Greg White to investigate plaintiff's shooting. Id. ¶ 102. The next day, April 16, 2004, IN opened in its system of records file IN-GB-04-32S, linked to plaintiff's name, for the investigation of plaintiff's shooting. Id. ¶ 104.

The following week, between Monday, April 19 and Wednesday, April 21, 2004, Inspectors Mathews and White traveled to Orlando to investigate the shooting. Id. ¶ 105. They personally met with employees of the Orlando District Office as well as with eyewitnesses to the shooting. Id.

¶ 106.  They also telephoned other persons whom they could not interview in person.  Id. ¶ 107.

During the meeting with GS Gruden, the inspectors requested the original Mini-DV of the shooting,

which GS Gruden provided to them.  Id. ¶ 108.  However, in meeting with OMYGA volunteers, the

investigators learned that OMYGA wanted the Mini-DV back, but without the shooting footage.  Id.

¶ 109.  The investigators accommodated this request by agreeing to send a copy of the video with

the shooting deleted back to OMYGA.  Id. ¶ 110.

Upon returning to DEA Headquarters in Arlington, Virginia, Inspector Greg White kept

custody of the Mini-DV and the VHS tape, previously sent to Mr. Dearing.  Id. ¶¶ 111, 113.  These

copies remained in Inspector White's custody as he prepared the shooting report, which was

completed in August 2004.  Id. ¶¶ 115, 123, 125, 131.

**DVD Copies Made at the Request of the Office of Inspections**

At various times, Inspector White also had DVD copies of the Mini-DV microcassette made

at DEA's audio-visual department.  SMF ¶ 115.

Because members of the OMYGA wanted a copy of the video back with the shooting

redacted, Inspector White requested and received one DVD copy with plaintiff's shooting deleted,

and it was sent to OMYGA later in April 2004.  Id. ¶¶ 117-18.

Inspector White also requested that approximately five additional DVD copies of the Mini-

DV be made for the IN file, and copies of that file.  Id. ¶ 120.  Those DVDs that Inspector White

received in response were approximately 23 minutes and 34 seconds in duration.  Id. ¶ 124.

**The Versions of the Shooting Video in the Office of Inspections Were Not Released Publicly**

After the IN file was completed, it was copied for distribution consistent with DEA's

policies, and some of the 23 minute, 34 second DVDs were distributed along with copies of the IN

file.  SMF ¶ 129.  The copies of the file and DVD went to destinations such as the Office of

Training (to review for "lessons learned"), the DEA Board of Professional Conduct (as part of the

disciplinary procedure), offices within DEA's Miami Division for transmittal to plaintiff (same), and the DEA Deciding Official (same).  Id.  Greg White also retained extra copies of the DVDs along with his notes of the shooting investigation.  Id. ¶ 130.

In September 2004, after IN completed its review of the file, James Burns, who was then a Senior Inspector in IN, made a presentation to DEA's Shooting Assault Incident Review Committee about plaintiff's shooting.  Id. ¶ 132.  At some point after that presentation, a copy of the IN file was delivered to DEA's Office of Training in Quantico, Virginia.  Id. ¶¶ 137-38.

Copies of the IN file were also needed for DEA's disciplinary procedures.  Id. ¶ 139.  In December 2004, after the DEA Board of Professional Conduct had reviewed a copy of the IN file, the board members proposed discipline for plaintiff.  Id. ¶ 143.  As part of the procedure, the file, including a DVD, was sent to the Acting Special Agent in Charge ("SAC") for the Miami Division, who at that time was Robert Joura.  Id.  Acting SAC Joura sent the file to ASAC Collins in Orlando, who then let plaintiff review the file on his own.  Id. ¶¶ 144-46.  After reviewing the file for three or four days, plaintiff asked to make copies of the video, and pursuant to DEA policy, ASAC Collins denied that request.  Id. ¶ 147.  After holding the file for some time longer, plaintiff then returned it to ASAC Collins, who returned it to the Miami Division Office.  Id. ¶ 148.

As the next step in DEA's disciplinary procedure, DEA's Deciding Official reviewed a copy of the IN file.  Id. ¶¶ 150-51.  In March 2005, the Deciding Official concluded that plaintiff should be disciplined due to the "potential for serious injury to children and adults in the audience" that resulted from plaintiff's "serious lack of judgment."  Id. ¶ 154.

There is no evidence that any of the versions of the shooting video in the IN file, or in copies of the IN file (the Mini-DV, the VHS tape, or the 23 minutes, 34 second DVDs), ever became public, were taken outside of DEA property, or were distributed within DEA to persons without a need for the information.  Id. ¶ 168.  Nor did a 4:09 version of the shooting video ever enter the IN-

GB-04-32S file.  Id. ¶¶ 165, 167, 260.

**Plaintiff's Shooting Received Media Attention**

Plaintiff's shooting attracted attention at three distinct stages: in April and May 2004, shortly after the shooting; in March 2005, after shooting video footage appeared on the internet; and in April 2006, after plaintiff filed this lawsuit.

In late April and early May 2004, news of plaintiff's shooting had spread in the press. Newspapers throughout the state of Florida published articles on the shooting.  SMF ¶ 155. Moreover, the story was picked up by the Associated Press and United Press International, and republished throughout the nation.  Id. ¶ 156-57.  Local television stations in Orlando also reported on the incident.  Id. ¶ 159.  Members of the OMYGA were interviewed by the press and appeared on television.  Id. ¶ 160-61.  In addition, the nationally syndicated radio announcer Paul Harvey mentioned the incident during his broadcast.  Id. ¶ 158.  Although none of the news coverage identified plaintiff by name as the shooter, the press did identify the shooter as a DEA agent.  Id. ¶¶ 155-57, 162.  None of the media reports referred to a video of the shooting.  Id. ¶ 163.

Nearly a year later, in early March 2005, versions of video footage of plaintiff's shooting 4:09 in length, with the same starting and ending points as version made in Orlando, started to appear on internet websites and on DEA's Firebird email system.  Id. ¶ 165.  No video footage of plaintiff's shooting longer than 4:09 has been found on internet webpages or on the Firebird email system.  Id. ¶ 168.

Finally, in April 2006, after plaintiff filed his lawsuit, the news media was again abuzz. Plaintiff publicized his complaint by appearing on national and local television programs, such as the Today Show, CNN News, the Rita Crosby Show, and the O'Reilly Factor.  Id. ¶ 169.  On those programs, the shooting video played while plaintiff was interviewed.  Id. ¶ 170.  Before this publicity and the filing of the lawsuit, there were no known instances of media reports associating

plaintiff's name with the shooting.  Id. ¶ 171.

**Post-Script: Subsequent Histories of Versions of Shooting Videos That IN Never Had**

The subsequent history of versions of the shooting video that were not contained in IN's files is not precisely known.  This is so despite the fact that DEA's Office of Professional Responsibility ("DEA-OPR") conducted an in-depth investigation as to how shooting video footage became public.  SMF ¶¶ 256-59.  Similarly, despite the extensive discovery in this case, plaintiff concedes that he does not know how the video footage of the shooting became public.  Id. ¶ 261.

### The 4:09 CD to GS Lutz

GS Lutz in DEA's Office of Training, Firearms Training Unit in Quantico, Virginia received a CD from GS Gruden with 4:09 shooting video.  GS Lutz watched the video with other members of the DEA Firearms Training Unit to review for training and weapons malfunction purposes, and as part of a "lessons learned" review.  SMF ¶¶ 172-75.  While GS Lutz had custody of the CD, he stored it in a locked locker in his office.  Id. ¶ 176.  Although he is not certain, GS Lutz believes that the CD was destroyed along with other office materials that he would not need in connection with his reassignment to a new position in approximately June of 2004.  Id. ¶ 177.

### The 4:09 CD to ASAC Derr

ASAC Derr also received a CD from GS Gruden, but he never watched it.  SMF ¶¶ 178-79.  Because he received the CD while he was moving from Albuquerque to a new assignment in DEA Headquarters in Arlington, Virginia, ASAC Derr initially put the CD in his desk drawer and later he packed up the CD with other office materials.  Id. ¶ 180.  ASAC Derr did not know the exact whereabouts of the CD until November 2007, when he searched for it and produced it in connection with this litigation.  Id.  Otherwise, he did not provide the CD to anyone else.  Id. ¶ 179.

### The 4:09 CD to GS Bendekovic

GS Bendekovic received the CD with the 4:09 shooting video, wrote "Demand Reduction"

on the face of the CD, and stored it in a locked drawer in his office until he provided it to DEA-OPR.  Id. ¶ 181-82, 192.

Shortly after he received the CD, GS Bendekovic watched it for gun safety purposes, and he made a copy of the CD for ASAC Derek Maltz, who wanted to see for instructional purposes, and who copied the video file onto his laptop computer.  Id. ¶¶ 184, 186, 189, 195.  The copy on ASAC Maltz's laptop was transferred along with his other files onto his subsequent laptop computers on two occasions.  Id. ¶¶ 200, 205.  Ultimately, he copied the shooting video that was on his most recent laptop onto a disc, sent it to DEA-OPR, and deleted the 4:09 shooting video from his computer.  Id. ¶¶ 209-10.

**The 4:09 CD and the VHS given to SA Scully**

As to the video footage that SA Scully had, he took it with him in May 2004, when he was promoted to group supervisor and transferred to the Tampa District Office.  SMF ¶ 212.  While in Tampa, in response to requests from members of his group, GS Scully showed the video footage to a few members of his group, during which time there were discussions to determine how plaintiff actually shot himself.  Id.  Afterwards, one of the SAs in the Tampa District Office, Kevin Clark, asked to see the shooting video, and in response GS Scully loaned him the CD.  Id. ¶¶ 214-15.  SA Clark watched the CD at home and returned it to GS Scully.  Id. ¶¶ 215, 217.  SA Clark also requested a higher quality video from GS Scully, who then provided the VHS copy to SA Clark. Id. ¶¶ 217-18.  At some later point, SA Clark told GS Mark Baughman of the DEA Jacksonville District Office that he had a copy of the shooting video.  Id. ¶ 221.  GS Baughman requested a copy, and while on duty on Sunday, June 20, 2004, at the Hillsborough County Sheriff's Office, SA Clark made one VHS copy for GS Baughman.  Id. ¶¶ 222-23.  While he copied the video, two employees of the Hillsborough County Sheriff's Office watched the video.  Id. ¶ 223.  SA Clark then sent the VHS copy to GS Baughman.  Id. ¶ 225.  GS Baughman watched the VHS of the shooting video and

13

showed it to other SAs in the Jacksonville District Office an example of what not to do.  Id. ¶¶ 227-29.  In response to requests by DEA-OPR, neither SA Scully nor SA Clark could locate any video footage of plaintiff's shooting, but GS Baughman provided DEA-OPR with his VHS version of the shooting video, which was approximately 5 minutes and 42 seconds in duration.  Id. ¶¶ 226.

### The Remaining 4:09 CDs in Orlando

Also, GS Gruden recalls that at some point in time he had one or more unneeded CDs containing a 4:09 version of plaintiff's shooting, and he destroyed it.  SMF ¶ 233.

### A 4:09 Version of the Video Is Received by DEA Firearms Instructors in Miami

The DEA Primary Firearms Instructors ("PFIs") for the Miami  Division also received a CD containing a 4:09 video of plaintiff's shooting.  SMF ¶¶ 243-44.  In late spring or summer 2004, PFIs Kevin Naughton and Natale Gugliotta received a CD through interoffice mail in an unmarked envelope.  Id. ¶ 243.  That CD contained a 4:09 version of plaintiff's shooting video, with the same starting and ending times as the other 4:09 versions.  Id. ¶ 244.  PFIs Naughton and Gugliotta viewed the shooting video, and then used it as a firearms training tool for approximately twelve DEA employees.  Id. ¶¶ 245, 247.  Later, superiors in their chain of command ordered PFIs Naughton and Gugliotta not to show the shooting video again as a firearms training tool.  Id. ¶ 249.  Accordingly, PFIs Naughton and Gugliotta did not show the video for training except when plaintiff came to Miami for remedial firearms training in September 2004.  Id. ¶ 250.  After plaintiff had completed his two days of remedial training, which was done in conjunction with two days of remedial training for another special agent, Jason Weiss, PFIs Naughton and Gugliotta mentioned that they had a copy of the shooting video and asked plaintiff if he wanted to see it.  Id. ¶¶ 250-52.  Plaintiff responded in the affirmative, and PFIs Naughton and Gugliotta asked SA Weiss to leave the room.  Id. ¶ 252.  At that point, plaintiff said that it was okay for SA Weiss to watch the shooting video with him, and then all four agents then reviewed the shooting video.  Id. ¶ 253.

14

Afterwards, PFIs Naughton and Gugliotta stored the shooting video in a locked, secure office at DEA Miami Division Office or at the home of PFI Naughton, and they made no copies.  Id. ¶¶ 254, 256.  Ultimately, PFI Naughton gave the CD to DEA-OPR investigators upon their request.  Id. ¶ 255.

### VHS Versions of Plaintiff's Shooting Video

Two other chains of custody are known to exist for VHS versions of the video.  First, the Firearms Instructor for the Orlando District Office, SA Christopher Bowman spoke with plaintiff upon plaintiff's return to the Orlando District Office several weeks after the shooting.  SMF ¶¶ 234-35.  Plaintiff indicated that the shooting was not his fault, and for that reason SA Bowman, as the Firearms Instructor, needed to see the shooting video to determine the cause of the shooting.  Id. ¶ 236.  SA Bowman asked GS Gruden if he had the shooting video, and GS Gruden provided SA Bowman with a VHS version of the shooting video.  Id. ¶¶ 236-37.  SA Bowman watched the VHS, stored it in the gun vault in the Orlando District Office afterwards, and returned it to GS Gruden.  Id. ¶ 238.  Second, several weeks after the shooting, the Associate SAC for the Miami Division, Charles West, requested the shooting video from ASAC Collins.  Id. ¶ 240.  ASAC Collins coordinated with GS Gruden to send Associate SAC West a copy of the video, and GS Gruden arranged for a VHS version to be sent to Associate SAC West.  Id. ¶ 241.

### SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and [where] the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under this standard, summary judgment must be entered against a party, who "after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**ARGUMENT**

I.    **PLAINTIFF FAILS TO SATISFY THE ELEMENTS OF A PRIVACY ACT DISCLOSURE CLAIM.**

Based on the undisputed material facts, plaintiff fails to satisfy four elements of a Privacy Act disclosure claim: (1) retrieval from a system of records; (2) the intentional and willful mental state requirement; (3) the disclosure element; and (4) the proof of "actual damages."

A.    **The Shooting Video on the Internet Was Not Retrieved from a System of Records.**

The Privacy Act applies only to "records" maintained in a "system of records" by a federal agency that are "retrieved" by the name or other identifying information of the individual. 5 U.S.C. §§ 552a(a) and (b).  In the wake of Watergate, and recognizing that the government was developing ever more "sophisticated new systems of information gathering and retention[,]" Congress enacted the Privacy Act to prevent the misuse of records.  120 Cong. Rec. 12646 (May 1, 1974) (statement of Sen. Ervin, sponsor of the Act) (reprinted in House Comm. on Gov't Operations and Senate Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 -- S. 3418 (Public Law 93-579) Source Book on Privacy at 5 (1976) (hereinafter "Source Book on Privacy")).[1]

The case law thus recognizes that the Act prohibits only "nonconsensual disclosure of any information that has been *retrieved* from a protected record."  Bartel v. Fed. Aviation Admin., 725 F.2d 1403, 1408 (D.C. Cir. 1984) (emphasis in original).  Under the Privacy Act, "there is a rule of retrieval, not a rule of coincidence."  Krieger v. Fadely, 199 F.R.D. 10, 13 (D.D.C. 2001).[2]

---

[1]  As of May 16, 2008, an electronic version of the Source Book on Privacy was available online from a link at http://www.loc.gov/rr/frd/Military_Law/LH_privacy_act-1974.html.

[2]  See also McCready v. Nicholson, 465 F.3d 1, 11 (D.C. Cir. 2006) ("An agency can only be held accountable under Privacy Act provisions tied to a system of records requirement for records it can easily retrieve consistent with its day-to-day practice of information management – records found within a 'system of records.'"); Manuel v. Veterans Admin. Hosp., 857 F.2d 1112, 1117 (6th

16

Indeed, the D.C. Circuit reiterated last year that the disclosure provision contained in § 552a(b) must be "narrowly" construed, and that liability attaches only where records were actually retrieved from a system of records by plaintiff's name.  Sussman v. U.S. Marshalls Serv., 494 F.3d 1109, 1123 (D.C. Cir. 2007).  Thus, proof that a protected record was actually retrieved from a system of records is essential to establish liability under the Privacy Act.

Here, there is no evidence that any recording of plaintiff's shooting was retrieved and disclosed from a system of records.  The only system of records containing any version of the recording keyed to plaintiff's name was housed in DEA's Office of Inspections ("IN").  The copies contained in that system of records – a Mini-DV (over one hour in length), a VHS copy (over one hour in length), and DVD copies (23:34 in length) – were never released publicly and do not match the 4:09 version that appeared on the internet.

The IN system of records – the only system of records containing a video-recording of plaintiff's shooting – is defined as having three classes of documents: (i) investigative reports; (ii) general files; and (iii) audit and inspection reports.  See Justice / DEA-10, 52 Fed. Reg. 47,182, 47,213 (Dec. 11, 1987).  As a shooting investigation file, the IN file pertaining to plaintiff's shooting with file number IN-GB-04-32S, falls into the first listed system of records maintained by IN, the one covering investigative reports.  Thus, the IN shooting report, IN-GB-04-32S, as well as

---

Cir. 1988) ("[R]ecords not kept within a system of records are not protected under the Privacy Act"); Olberding v. U.S. Dep't of Def., Dep't of the Army, 709 F.2d 621, 622 (8th Cir. 1983) (affirming dismissal of Privacy Act complaint where there was no retrieval from a system of records); Thomas v. U.S. Dep't of Energy, 719 F.2d 342, 345 (10th Cir. 1983) ("The disclosure of information derived solely from independent sources is not prohibited by the statute even though identical information may be contained in an agency system of records."); Chang v. Dep't of Navy, 314 F. Supp. 2d 35, 40 (D.D.C. 2004) ("Determining that a system of records exists from which the document at issue was retrieved is a prerequisite to a substantive Privacy Act claim."); Savarese v. U.S. Dep't of Health, Educ. & Welfare, 479 F. Supp. 304, 308 (N.D. Ga. 1979) (denying a Privacy Act claim without a retrieval or disclosure from a system of records); Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,952 (July 9, 1975) (explaining that indexing or retrieval capability must be "built into the system").

supporting memoranda and work papers would be part of the IN system of records, once they were contained in such a system.  See id.

As noted above, the IN file is the only relevant system of records in this litigation.  Before the video appeared publicly, there were no other versions of the video that were indexed by a personal identifier built into a storage system.  See 5 U.S.C. § 552a(a)(5) (defining "system of records" as requiring that information be retrieved by name or some other identifying particular assigned to an individual)  (SMF ¶¶ 69, 87, 89, 92-93, 97, 118, 165, 167, 170, 172, 178, 181, 191, 195-96, 202, 205, 210, 215, 218, 223, 233, 237, 241, 243).  All other versions of the video were stored on unlabeled media or were given titles that in no way related to plaintiff – and thus were not contained in a system of records.  (Id.).  Plaintiff's interrogatory responses confirm this point. (Answer to Interrog. No. 13  (copy attached to SMF as Ex. 52)).[3]

Significantly, no video-recording contained in the IN system of records was ever disclosed in violation of the Privacy Act.  Instead, both testimonial and forensic evidence establish that the videos in the IN files were protected consistent with the Privacy Act.

First, as to the testimonial evidence, plaintiff deposed the relevant IN employees and questioned them about IN's acquisition and handling of the video-recording.  To a person, they testify that they did not improperly release the video-recording.  The two inspectors who went to Orlando to investigate the shooting, Senior Inspector L.D. Mathews and Inspector Greg White, never improperly released a video-recording of the shooting.  (SMF ¶¶ 114, 123, 131).  Nor did anyone else. (SMF ¶¶ 122, 135-36).  Similarly, DEA employees who reviewed the IN file for purposes of disciplining plaintiff for his shooting did not improperly release the file.  (SMF ¶¶ 142,

_____

[3]  The only other systems of records that plaintiff identifies in responding to this interrogatory are those in DEA's Office of Professional Responsibility and the litigation files regarding the video footage; the relevant files in each post-date any public release of the video footage (they were created afterwards), and neither is claimed to be the source of the release.

152-53).  In sum, the testimony is uniform – no one publicly released a video-recording from the IN file in violation of the Privacy Act.

Second, forensic evidence belies any conclusion that a video was released from the IN files. The first versions of the video footage of plaintiff's shooting to appear on internet webpages were 4:09 in length. (SMF ¶¶ 164-65.)  Similarly, the first appearance of the video on DEA's Firebird email systems was also 4:09 in length – with the exact same starting and ending points as the earliest versions on the internet.  (Id. ¶¶ 166-67.)  Yet, *IN never had a 4:09 version of the video.* (Id. ¶¶ 165, 260.)  Rather, after the 4:09 version were made in Orlando, IN received only the original Mini-DV and a VHS copy of the Mini-DV.  (Id. ¶¶ 101, 108.)  Even when Inspector Greg White had additional DVD versions of the video made, those DVDs were not 4:09 in length – they were approximately 23:34 in length.  (Id. ¶ 124.)  There is simply no evidence that a 4:09 version of the video ever appeared in a system of records in IN, or in any other system of records, and plaintiff has not identified any retrieval from that system of records.  (Id. ¶¶ 165, 259-61.)

In sum, the Privacy Act protects only records contained in a system of records.  Here, no record within a protected system of records was released publicly.  Plaintiff therefore fails this element.  See Sussman, 494 F.3d at 1123.

### B.    Plaintiff Cannot Satisfy the Intentional or Willful Element.

The Privacy Act allows for damages only where there is an "intentional or willful" violation. See 5 U.S.C. § 552a(g)(4); see also Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1122 (D.C. Cir. 2007).  Without knowing the identity of the person who publicly released the shooting video and the circumstances of its release, it is impossible for plaintiff to prove the mental state associated with the video's release.  See Edmonds v. U.S. Dep't of Justice, 323 F. Supp. 2d 65, 81 (D.D.C. 2004).  As a foundational matter, the D.C. Circuit has emphasized that the Privacy Act "does not make the Government strictly liable for every affirmative or negligent action that might be said

technically to violate the Privacy Act's provisions." Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984). Instead, the D.C. Circuit has explained that a claim for damages turns on a party's "state of mind." Laningham v. U.S. Navy, 813 F.2d 1236, 1241 n.6 (D.C. Cir. 1987); see also Sussman, 494 F.3d at 1122; Albright, 732 F.2d at 189; Wisdom v. Dep't of Hous. & Urban Dev., 713 F.2d 422, 425 (8th Cir. 1983). Thus, through its mental state element, the Privacy Act requires proof of identity and circumstances. See Edmonds, 323 F. Supp. 2d at 81 (dismissing plaintiff's Privacy Act disclosure claims where plaintiff could not identify the persons responsible for the alleged leaks or the circumstances of the alleged leaks).

Here, however, there is no evidence establishing the identity or the circumstances of any public releases of the shooting video. Despite extensive discovery in this case, no witness testified either that he released the video publicly or that he knew who did. In short, no one – not plaintiff, not investigators at DEA's Office of Professional Responsibility – has been able to determine how the shooting video became public. (SMF ¶¶ 259, 261.) Without this information, plaintiff cannot prove an essential element of his case, and summary judgment should be entered in DEA's favor. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### C.    Plaintiff's Shooting Was Already in the Public Domain.

Plaintiff cannot satisfy the disclosure element because the details of his presentation and shooting were already in the public domain before any video footage appeared on the internet. Plaintiff gave his presentation in April 2004, in a public place, while on-duty, speaking to a group of persons who owed him no duty of confidentiality and who video-recorded the presentation.

A number of court decisions have held that a plaintiff cannot recover under the Privacy Act where the information allegedly disclosed is already within the public domain.[4] In Tripp v. Dep't of

---

[4] The D.C. Circuit has left open the question of whether "an agency may, consistent with the Privacy Act's disclosure provisions, release a document that has already been fully aired in the public domain through the press or some other means." Pilon v. U.S. Dep't of Justice, 73 F.3d

Defense, 193 F. Supp. 2d 229 (D.D.C. 2002), the court held that the Privacy Act was not violated when the information released from an agency's files (names, titles, salary information, and salary-levels of public employees) was already in the public domain.  Id. at 236.  Similarly, in Wright v. Fed. Bureau of Investigation, 385 F. Supp. 2d 1038 (C.D. Cal. 2005), rev'd on other grounds, 241 Fed. Appx. 367 (9th Cir. 2007), the court concluded that where information in government files has been made public by plaintiff, that plaintiff cannot recover under the Privacy Act.  Id. at 1042. In addition, the Privacy Act is not implicated where a plaintiff does not have a protectable privacy interest.[5]  Thus, a plaintiff may not bring a disclosure claim for information that pre-existed in the public domain.

In this case, plaintiff's presentation and a description of the shooting were in the public domain (in April 2004) before a video appeared on the internet (in March 2005).  Therefore, plaintiff cannot recover under the Privacy Act as a result of the video's appearance on the internet.

### D.     Plaintiff Cannot Recover Non-Pecuniary Damages under the Privacy Act.

The Privacy Act limits civil damage recoveries to "actual damages."  See 5 U.S.C. § 552a(g)(4)(A).  Indeed, the Supreme Court has held that a plaintiff must establish some amount of actual damages as an element of liability.  See Doe v. Chao, 540 U.S. 614, 618 (2004).  Plaintiff in

---

1111, 1123 n.10 (D.C. Cir. 1996).  The D.C. Circuit did, however, recognize the essential role of a "prior publication" analysis in the context of the Freedom of Information Act, a sister statute to the Privacy Act.  Id.  And, at least one court in this district has answered the question affirmatively.  See Tripp v. Dep't of Defense, 193 F. Supp. 2d 229, 236 (D.D.C. 2002).

[5]  See Barry v. U.S. Dep't of Justice, 63 F. Supp. 2d 25, 28 (D.D.C. 1999) ("There was no 'disclosure' here because plaintiff had no protectable privacy interest in the Report at the time of its posting on the Internet."); see also Ash v. United States, 608 F.2d 178, 179 (5th Cir. 1979) (holding that 'disclosure' of results of non-judicial proceedings to personnel of a naval command when those results were open to such personnel "and in that sense public" was not a 'disclosure' forbidden by the Privacy Act); Fed. Deposit Ins. Corp. v. Dye, 642 F.2d 833, 836 (5th Cir. 1981) ("[T]he release of public information to the same 'public' is not a disclosure."); Wright, 385 F. Supp. 2d at 1041 ("Courts have held that there is no disclosure under the Privacy Act when the information is already placed in the public record.").

this case has alleged no specific out-of-pocket pecuniary loss, and instead seeks to recover for such alleged injuries as embarrassment, humiliation, anxiety, emotional pain, loss of reputation and loss of enjoyment of life.  (Am. Compl. ¶ 17 (copy attached to SMF as Ex. 1)).[6]  However, as mandated by a majority of circuits to decide the issue and established principles of sovereign immunity, none of these non-pecuniary damages is recoverable under the Privacy Act.  The Privacy Act limits civil damages recoveries to only "actual damages."  See 5 U.S.C. § 552a(g)(4)(A).  Although the meaning of "actual damages" is ambiguous, both sovereign immunity principles and the best interpretation of the legislative history mandate that it refer to only pecuniary losses, i.e., out-of-pocket losses.  Yet, plaintiff seeks recovery for several alleged injuries for which he suffered no pecuniary loss, such as anxiety, embarrassment, humiliation, emotional pain, loss of reputation, and loss of enjoyment of life.  (Am. Compl. ¶ 17 (copy attached to SMF as Ex. 1)).  Those non-pecuniary injuries are not recoverable under the Privacy Act.

The term "actual damages" is not defined in the Privacy Act, and the courts of appeals have agreed that it is ambiguous.[7]  As an ambiguous term, "actual damages" can be read to have two distinct meanings.  One the one hand, it could refer only to out-of-pocket pecuniary expenses; on

---

[6]  Plaintiff's complaint states in conclusory and insufficient fashion that he seeks "loss of money."  (Am. Compl. ¶ 17 (copy attached to SMF as Ex. 1)).  In discovery, the only out-of pocket losses that plaintiff has identified are approximately $2,000 for a family trip to Fort Lauderdale in March 2005 during Spring Break.  (L. Paige Dep. at 149, line 24, to 154, line 2 (copy attached to SMF as Ex. 2)).  The alleged basis for this trip was "because of incidents surrounding the media." (Id. at 151, lines 4-12).  Yet, plaintiff could not identify any specific incidents in March 2005 to prompt such a trip.  Nor has plaintiff produced any travel receipts in discovery.  Without the specific proof necessary to recover, plaintiff has entirely failed to demonstrate any "actual damages" as a result of the shooting video's appearance on the internet.

[7]  See Hudson v. Reno, 130 F.3d 1193, 1207 n.11 (6th Cir. 1997) ("[T]he term 'actual damages' has no plain meaning or consistent legal interpretation . . . ."), abrogated on other grounds by Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848 (2001); Johnson v. Dep't of Treasury, Internal Revenue Serv., 700 F.2d 971, 974 (5th Cir. 1983) ("[T]his Court concludes that the term 'actual damages' has no plain meaning or consistent legal interpretation."); Fitzpatrick v. Internal Revenue Serv., 665 F.2d 327, 329 (11th Cir. 1982) ("'[A]ctual damages' has no 'plain meaning' in legal lexicon . . . .").

the other hand, it is possible to construe "actual damages" as referring to compensatory pecuniary losses and non-pecuniary losses.  See Doe v. Chao, 540 at 627 n.12.

Neither the Supreme Court nor the D.C. Circuit has resolved the meaning of the phrase "actual damages" as it is used in the Privacy Act.  See id.; Albright v. United States, 732 F.2d 181, 186 (D.C. Cir. 1984) (declining to address district court's holding that there were no "actual damages" absent out-of-pocket expenses).  Of the circuits to address the issue, the Sixth and Eleventh have concluded that "actual damages" refers only to pecuniary expenses.[8]  The Fifth Circuit reached a contrary conclusion.[9]

Among the courts in this District, there is a similar level of disagreement.  Some courts have limited "actual damages" to only pecuniary expenses.[10]  Others have not.[11]  Amidst this split in

_____

[8]  See Hudson, 130 F.3d at 1207 ("[T]he weight of authority suggests that actual damages under the Privacy Act do not include recovery for 'mental injuries, loss of reputation, embarrassment or other non-quantifiable injuries.'"); Fitzpatrick, 665 F.2d at 329-31 (relying on legislative history to conclude that the Privacy Act does not permit recovery of non-pecuniary injuries).

[9]  See Johnson, 700 F.2d at 974-83 (relying on legislative history to conclude that the Privacy Act allows recovery of non-pecuniary losses).  After Johnson was decided, the Supreme Court made clear that legislative history cannot supply a waiver of sovereign immunity.  See Lane v. Pena, 518 U.S. 187, 192 (1996); United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992).

[10]  See Pope v. Bond, 641 F. Supp. 489, 501 (D.D.C. 1986) ("'[A]ctual damages' does not include damages for emotional trauma, anger, fright, or fear."); Albright v. United States, 558 F. Supp. 260, 264 (D.D.C. 1982) ("Actual damages under the Privacy Act are limited to 'out-of-pocket' expenses and do not include damages for emotional trauma, anger, fright or fear"); Houston v. U.S. Dep't of Treas., 494 F. Supp. 24, 30 (D.D.C. 1979) (relying on legislative history to conclude that "Congress, concerned about the drain on the treasury created by a rash of Privacy Act suits, indicated its intention to limit 'actual damages' to 'out-of-pocket' expenses").

[11]  See Alexander v. Fed. Bureau of Investigation, 971 F. Supp. 603, 607 (D.D.C. 1997) (relying on the Johnson legislative history analysis without consideration of sovereign immunity principles); Dong v. Smithsonian Inst., 943 F. Supp. 69, 74 (D.D.C. 1996) (same), rev'd on other grounds, 125 F.3d 877 (D.C. Cir. 1997); Montemayor v. Fed. Bureau of Prisons, 2005 WL 3274508, at *5 (D.D.C. Aug. 25, 2005) (same); see also Boyd v. Snow, 335 F. Supp. 2d 28, 39 (D.D.C. 2004) (permitting evidence of emotional injury without consideration of sovereign immunity principles); Rice v. United States, 211 F.R.D. 10, 14 (D.D.C. 2002) (relying on the Fourth Circuit's decision in Doe v. Chao, 306 F.3d 170, 177 (4th Cir. 2002), before the Supreme Court

authority, there is one certainty – the term "actual damages" is ambiguous.

Due to its ambiguity, the term "actual damages" should be read as referring to only out-of-pocket expenses.  First, the doctrine of sovereign immunity dictates that any statutory ambiguity be construed in favor of the sovereign.  Second, the legislative history reveals that the most accurate understanding is that Congress intended to limit "actual damages" to only pecuniary losses.

### 1.    Sovereign Immunity Requires the Narrowest Construction of the Ambiguous Term "Actual Damages."

Sovereign immunity principles guide the interpretation of the term "actual damages," and under those principles, the term refers only to out of-pocket losses.[12]  Any ambiguity in a statutory waiver of sovereign immunity must be construed strictly in favor of the sovereign.  See Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999) ("[A] waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign.");  Galvan v. Fed. Prison Indus., Inc., 199 F.3d 461, 464 (D.C. Cir. 1999) ("If ambiguous, statutes must be construed in favor of immunity."); see also Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1123 (D.C. Cir. 2007) (construing narrowly the Privacy Act's waiver of sovereign immunity).  For that reason, "a waiver of sovereign immunity must be 'unequivocally expressed' and its conditions must be 'strictly observed and exceptions thereto are not to be implied.'"  Blackmon-Malloy v. U.S. Capitol Police Bd., 338 F. Supp. 2d 97, 103 (D.D.C. 2004) (quoting Lehman v. Nakshian, 453 U.S. 156, 160-61 (1981)); see also United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992).  These principles require that "any doubts about the scope of a waiver be resolved in favor of the narrower

decided the case, see 540 U.S. 614, to permit further evidence of emotional injury as "actual damages"); Am. Fed'n of Gov't Employees v. Hawley, 2008 WL 835856, at *7 (Mar. 31, 2008) (permitting plaintiff to proceed past a motion to dismiss without allegations of "actual, financial loss").

[12]  It is well-established that the section of the Privacy Act with the "actual damages" language, see 5 U.S.C. § 552a(g)(4), constitutes a waiver of sovereign immunity.  See Tomasello v. Rubin, 167 F.3d 612, 618 (D.C. Cir. 1999).

governmental liability." <u>Nichols v. Pierce</u>, 740 F.2d 1249, 1257 (D.C. Cir. 1984); <u>see also</u> <u>Trout v. Sec'y of the Navy</u>, 317 F.3d 286, 290 (D.C. Cir. 2003).

As explained above, there are two options for interpreting "actual damages."  That term may be read (a) to expose the sovereign to liability for pecuniary and non-pecuniary losses, or (b) to limit the sovereign's liability to only out-of-pocket, pecuniary losses.  <u>See</u> <u>Doe</u>, 540 U.S. at 627 n.12.  In such a situation, sovereign immunity principles require the narrower construction – that "actual damages" refers only to pecuniary losses.  <u>See</u> <u>Blue Fox</u>, 525 U.S. at 261; <u>Galvan</u>, 199 F.3d at 464; <u>Blackmon-Malloy</u>, 338 F. Supp. 2d at 103.

Courts that apply sovereign immunity principles to the meaning of "actual damages" have reached the same result – "actual damages" refers only to out-of-pocket losses.[13]  Hence, no disagreement exists among courts conducting a sovereign immunity analysis.

Furthermore, the D.C. Circuit has recently relied on sovereign immunity principles to narrowly construe the Privacy Act.  <u>See</u> <u>Sussman</u>, 494 F.3d at 1123.  That is the proper course here as well, and the ambiguity associated with "actual damages" should be resolved in favor of the sovereign to limit the term to only out-of-pocket losses.  This is so without resort to legislative history.  As the Supreme Court has explained:

> A statute's legislative history cannot supply a waiver that does not appear clearly in the statutory text; "the 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in the statutory text."

<u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996) (quoting <u>Nordic Village</u>, 503 U.S. at 37); <u>see also</u> <u>Blackmon-Malloy</u>, 338 F. Supp. 2d at 103.  Without a clear textual waiver of sovereign immunity

---

[13]  <u>See, e.g.</u>, <u>Hudson</u>, 130 F.3d at 1207 n.11; <u>Schmidt v. United States Dep't of Veterans Affairs</u>, 222 F.R.D. 592, 594 (E.D. Wisc. 2004) ("[T]he Privacy Act is a limited waiver of sovereign immunity, and to the extent there may be ambiguity concerning whether the term 'actual damages' includes emotional distress as well as a pecuniary loss, the ambiguity must be resolved by construing the term narrowly."); <u>DiMura v. Fed. Bureau of Investigation</u>, 823 F. Supp. 45, 47-48 (D. Mass. 1993) (because the Privacy Act is a waiver of sovereign immunity and it is "plausible" to read the term "actual damages" to refer only to pecuniary damages, this reading must be adopted).

for non-pecuniary damages, the Privacy Act does not expose the sovereign to such liability.

### 2. The Privacy Act's Legislative History Indicates That "Actual Damages" Was Meant to Refer Only to Out-Of-Pocket Losses.

Even looking to the legislative history – which is unnecessary here – compels the conclusion that the term "actual damages" refers only out-of-pocket expenses.

First, Congress deleted text in earlier drafts of the Privacy Act that would have permitted recovery of non-pecuniary losses. As enacted, the Privacy Act permitted recovery for "actual damages." However, an earlier version of the Act passed by the Senate provided for recovery of "actual damages" and "general damages." S. 3418, 93d Cong. § 303(c)(1) (2d Sess. Nov. 21, 1974) (reprinted in Source Book on Privacy at 371); see generally Doe v. Chao, 540 U.S. 614, 622-23 (2004) (explaining the deletion of "general damages" from the final version of the Privacy Act).

As used at common law, "[g]eneral damages . . . are damages that courts believe 'generally' flow from the kind of substantive wrong done by the defendant." Dan B. Dobbs, Law of Remedies § 3.2, at 138 (1st ed. 1973); see also Restatement (Second) of Torts § 904 (1977) ("'General damages' are compensatory damages for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is normally to be anticipated. . . ."). In the context of "dignitary invasions, such as . . . invasions of privacy," such "general damages" refer to "damages awarded for the affront to the plaintiff's dignity and the emotional harm done" by the tort itself, but they do not include damages for "actual economic harm." Law of Remedies § 3.2 at 139. Thus, through their reference to "general damages," the initial drafts of the Privacy Act would have permitted recovery for reputational and emotional harm.

Significantly, the final, codified version of the Privacy Act did not permit recovery for "general damages." See 5 U.S.C. § 552a(g)(4)(A). This deletion of recovery for "general damages" is compelling evidence that recovery for non-pecuniary losses were not an intended form of relief.

As the Supreme Court has explained "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 442-43 (1987) (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 392-93 (1980) (Stewart, J., dissenting)).

Second, no legislator opposed the statement that only out-of-pocket expenses are recoverable under the Act. In a debate regarding the mental state requirement for civil recovery, Representative Robert Eckhardt from Texas stated that even under a negligence standard, "There is nothing in this [proposal] that would provide for any damages beyond [a potential plaintiff's] actual out-of-pocket expenses because of the flaw." 120 Cong. Rec. 36,956 (Nov. 21, 1974) (statement of Rep. Eckhardt) (reprinted in Source Book on Privacy at 926). This characterization of the relief permitted by the "actual damages" provision went unchallenged for the remainder of the debates. See Houston, 494 F. Supp. at 30 n.13 ("Eckhardt's 'out-of-pocket' characterization went unchallenged."). Such unchallenged statements by legislators are significant indicators of congressional intent. See Barnett v. Weinberger, 818 F.2d 953, 966-67 (D.C. Cir. 1987) (explaining that the "unchallenged statements of legislators" were "especially significant" in evaluating legislative history).

Third, the legislative history evidences Congress's intent to balance the protection of privacy with the potential drain on the public fisc. It is not only the "general damages" language that was excised from the final text of the Privacy Act. Other proposals, such as those allowing punitive damages or imposing a negligence standard for liability, would have likewise increased the exposure of treasury funds. But, those other liability-increasing proposals were all rejected by

Congress – out of concern for the public fisc.[14]   As with these other liability-enhancing proposals, recovery of "general damages" was excised from the final version of the Act.

Fourth, the Privacy Act resulted in the creation of a Privacy Protection Study Commission (the "Commission"), which after study and hearings determined that "actual damages" referred only to pecuniary expenses.  See The Privacy Act of 1974, Pub. L. No. 93-579 § 5(b), 88 Stat. 1896, 1905 (1974) (creating the Commission) (reprinted in Source Book on Privacy at 510).  The Commission's mission was to study government safeguards on personal privacy and then make recommendations to the President and Congress.  See id. 88 Stat. at 1906 (reprinted in Source Book on Privacy at 511).  The Commission also had the specific task of examining whether the government should be liable for "general damages."  See id. 88 Stat. at 1907 (reprinted in Source Book on Privacy at 512).  After two years of study and comprehensive hearings, the Commission concluded that "[t]he legislative history and language of the Act suggest that Congress meant to restrict recovery to specific pecuniary losses until the Commission could weigh the propriety of extending the standard of recovery."  Personal Privacy in an Information Society: The Report of the Privacy Protection Study Commission, at 530 (July 1977).  Based on that conclusion, the Commission recommended that Congress amend the Privacy Act to authorize recovery of "general damages," but to cap those "general damages" at $10,000.  Id.; see also Fitzpatrick, 665 F.2d at 329-31 (detailing the Commission's findings and recommendations).  Despite the Commission's findings and recommendations, Congress did not amend the civil remedy provisions of the Act.

Such subsequent legislative inaction is indicative of congressional intent, especially in the

---

[14]   See, e.g., 120 Cong. Rec. 36,659 (Nov. 20, 1974) (statement of Rep. McCloskey) (opposing a punitive damages provision in an effort to "protect the Government from undue liability") (reprinted in Source Book on Privacy at 922); Id. at 36,956 (Nov. 21, 1974) (statement of Rep. Erlenborn) (opposing a strict liability or a negligence standard because that would "expose the Government to undue liability" which "[w]e just cannot afford")  (reprinted in Source Book on Privacy at 927).

context of important matters within Congress's actual knowledge.  See Bob Jones Univ. v. United States, 461 U.S. 574, 599-601 (1983) (finding legislative inaction as evidence of congressional agreement with IRS rulings denying tax-exempt status to racially-discriminatory educational institutions).  Here, where Congress did not dispute the Commission's findings, but also did not adopt the Commission's recommendation, Congress signaled its agreement with the Commission's conclusion as to the meaning of "actual damages."  See Fitzpatrick, 665 F.2d at 331 (concluding that the Commission's findings "are persuasive authority that 'actual damages' in the Act encompasses only pecuniary losses").

Finally, the only support for a broader reading of "actual damages" are general statements of purpose, which must be treated with caution.  The preamble to the Privacy Act, for example, emphasizes the protection of privacy and indicates that "any damages" would be recoverable:

> (b)   The purpose of this Act is to provide certain safeguards for an individual
> against an invasion of privacy by requiring Federal agencies, except as
> otherwise provided by law, to –
> (6)   be subject to civil suit for any damages which occur as a result
> of willful or intentional action which violates any individual's
> rights under the Act.

Pub. L. No. 93-579, § 2(b), 88 Stat. at 1896 (reprinted in Source Book on Privacy at 501).  The Senate Committee on Government Operations also expressed a broad purpose for the Senate's proposed version of the Privacy Act, which was to "promote governmental respect for the privacy of citizens."  See S. Rep. No. 93-1183, at 1-2 (1974) (reprinted in Source Book on Privacy at 151-52).  The Senate's statement of purpose did not address civil remedy provisions, however.  See id.

While statements of legislative purpose are part of the legislative history, the D.C. Circuit has cautioned against reading these statements in isolation.  See Nat'l Treasury Employees Union v. Fed. Labor Relations Auth., 691 F.2d  553, 560 (D.C. Cir. 1982) (explaining that "expressions of legislative purpose . . . cannot be read in isolation").  Moreover, the broader statements of

legislative purpose can be harmonized with a reading that only out-of-pocket expenses are recoverable. Both congressional goals of guarding privacy rights and protecting the public fisc are achieved by reading the Privacy Act to authorize civil suits for out-of-pocket expenses. Individuals have civil redress for damages, while the public fisc is protected by permitting recoveries only for out-of-pocket expenses. See Houston, 494 F. Supp. at 30 ("Congress, concerned about the drain on the treasury created by a rash of Privacy Act suits, indicated its intention to limit 'actual damages' to 'out-of-pocket' expenses.").[15]

For all these reasons, the best reading of the Privacy Act's legislative history is that Congress limited "actual damages" to only out-of-pocket expenses.

## II.    PLAINTIFF CANNOT RECOVER FOR HIS INVASION OF PRIVACY CLAIMS.

To the extent that the Court has jurisdiction over plaintiff's tort claims for unwanted publicity and false light, Florida law defines those causes of action, which are based on occurrences in Florida. See 28 U.S.C. § 1346(b). Under Florida law, plaintiff cannot prove those tort claims.

### A.    Plaintiff Cannot Satisfy the Elements for "Publicity Given to a Private Fact."

Florida courts use the Restatement (Second) of Torts § 652D to define the tort of publicity given to private facts. See Cape Publ'ns, Inc. v. Hitchner, 549 So.2d 1374, 1377 (Fla. 1989); Williams v. City of Minneola, 575 So.2d 683, 689 n.5 (Fla. Ct. App. 1991); see also Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1148 (S.D. Fla. 1990) ("Florida has adopted the Restatement's test of invasion of privacy based on publication of private facts."). The Restatement defines the tort as follows:

---

[15] In addition, the preamble statement that the Privacy Act permits civil suit for "any damages" is an imprecise overstatement. It is contrary to the Privacy Act's own text, which does not permit punitive damages or general damages. Consequently, such a reading merits little, if any, weight. See Int'l Bhd. of Elec. Workers, Local Union No. 474 v. Nat'l Labor Relations Bd., 814 F.2d 697, 712 (D.C. Cir. 1987) ("[C]ourts have no authority to *enforce* principles gleaned *solely* from legislative history that has no statutory reference point.") (emphasis in original).

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
> > (a) would be highly offensive to a reasonable person, and
> > (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D (1977).  Summarized, this tort has four elements: (1) a private fact; (2) that has been given publicity; (3) that is highly offensive to a reasonable person; and (4) for which there is no legitimate public concern.  See id.  Plaintiff cannot satisfy these elements.

In addition, "public figures," such as public officials, persons voluntarily appearing in public, or persons having notable accidents, cannot recover for unwanted publicity.  See id. § 652D cmts. e & f (1977).  Plaintiff is a "public figure," who cannot recover for unwanted publicity.

### 1.    Plaintiff's Presentation Was Not a Private Fact.

Plaintiff cannot satisfy the private fact element.  His video-recorded presentation to approximately 50 children and parents at the Callahan Community Center was not private for several reasons: it occurred in a public place, while plaintiff was on-duty, speaking to a group of persons who owed plaintiff no duty of confidentiality and being video-recorded with his consent.

First, as a matter of Florida law, "[a] photograph taken in a public place is not private." Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1148 (S.D. Fla. 1990); see also Restatement (Second) of Torts § 652D cmt b (1977).  Under the Code of the City of Orlando, the Callahan Community Center is a public place, which "shall be open for public use between the hours of 7:00 a.m. and 9:00 p.m."  Code of City of Orlando, Florida § 18A.02(4)(b) (copy attached to SMF as Ex. 7).  Because plaintiff's presentation took place at the Callahan Community Center between those public use hours, any photographs or videos taken of him then are not private facts.

Next, because plaintiff's shooting took place while he was on duty as a DEA demand reduction speaker, it was a public fact.  Plaintiff was speaking while on-duty and while wearing DEA raid gear at a DEA-sponsored anti-drug initiative, and thus his presentation was not a private

fact.  See Coughlin v. Westinghouse Broad. & Cable, Inc., 603 F. Supp. 377, 390 (E.D. Pa.) ("A

police officer's on-the-job activities are matters of legitimate public interest, not private facts."),

aff'd on other grounds, 780 F.2d 340 (3d Cir. 1985); Rawlins v. Hutchinson Publ'g Co., 543 P.2d

988, 993 (Kan. 1975) (explaining that a truthful account of police misconduct amounted to "public

facts" and could not "form the basis of an action for invasion of privacy").

        In addition, plaintiff's presentation did not constitute a private fact because no one in the

audience was under a duty of confidentiality to plaintiff, nor did they keep secret the news of

plaintiff's shooting.  Rather, members of the OMYGA spoke to the print and television media about

plaintiff's shooting.  (SMF ¶¶ 160-61).  Such occurrences in front of persons who owe no duty of

confidentiality are not private facts.  See Dasey v. Anderson, 304 F.3d 148, 154 (1st Cir. 2002)

(rejecting privacy claim of a police officer smoking marijuana on videotape because "activity in the

presence of others who owe no duty of confidentiality – a category which includes the subject

matter of the videotape – is hardly 'private'"); Mills v. Wenner Media, LLC, 2005 WL 1126662, at

*2 (M.D. Fla. May 5, 2005) (holding that thoughts shared with a stranger are not private matters).

        Nor does plaintiff somehow retain a privacy interest in the video-recording.  Plaintiff

appeared voluntarily, with actual knowledge that he was being video-recorded.  By so doing, he

waived any privacy interest he had in the presentation or the video recording.  See Four Navy Seals

v. Associated Press, 413 F. Supp. 2d 1136, 1144-45 (S.D. Cal. 2005) (holding that soldiers who

were voluntarily photographed had no privacy interest in the photographs when they were

subsequently posted on the internet).

                2.      **Plaintiff Cannot Satisfy the "Giving Publicity" Element.**

        The next element for publicity given to a private fact is that of "giving publicity."  The

Restatement (Second) of Torts distinguishes between the element of "giving publicity" and the

concept of "publication" in the defamation context:

"Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. ***"Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.***

Restatement (Second) of Torts § 652D, cmt. a (1977) (emphasis added); see also Williams v. City of Minneola, 575 So.2d 683, 689 (Fla. Ct. App. 1991).

Plaintiff has not alleged that DEA gave publicity to the shooting video. Plaintiff's amended complaint alleges that there was "a public disclosure of private facts" and that "the improper disclosure by the DEA . . . constituted a publication of private facts . . . ." Am. Compl. ¶ 22 (copy attached to SMF as Ex. 1). These allegations speak only in terms of "publications" and "disclosures" – neither of which is sufficient to satisfy the "giving publicity" element. See Restatement (Second) of Torts § 652D, cmt. a (1977).

Against similarly deficient pleadings, courts applying Florida law have determined that the "publicity" requirement was not satisfied. See Lewis v. Snap-on Tools Corp., 708 F. Supp. 1260, 1262 (M.D. Fla. 1989) (holding that allegation of disclosure to "large number of persons" did not satisfy the giving publicity element); see also Williams, 575 So.2d at 689 (holding that the giving publicity element was not satisfied for a disclosure to very few people without substantial certainty that the pictures would be publicly disseminated). Other courts have likewise held that without proof of giving publicity, a plaintiff cannot prevail for publicity given to a private fact. See Elliott v. Healthcare Corp., 629 A.2d 6, 9 (D.C. 1993) (Sullivan, J.) (upholding summary judgment on publicity given to private fact tort where there was no evidence of giving publicity); see also Swanson v. Civil Air Patrol, 37 F. Supp. 2d 1312, 1331 (M.D. Ala. 1998). Beyond the pleadings, there is no evidence that any DEA agent either communicated the shooting video to the internet or made substantially certain that the video appeared on the internet.

Moreover, plaintiff cannot satisfy the "giving publicity" element under the further publicity doctrine. As a matter of law, "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public." See Restatement (Second) of Torts § 652D, cmt. b (1977); see also Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1149 (S.D. Fla. 1990) ("Republication of facts already publicized elsewhere cannot provide a basis for an invasion of privacy claim."). News of plaintiff's shooting had received local, regional, and national publicity by the end of April 2004. (SMF ¶¶ 155-61). At the time of that publicity, there is no evidence of any public circulation of the shooting video. (SMF ¶¶ 164-65). Rather, the 4:09 video footage of plaintiff's self-shooting first circulated approximately eleven months later, in early March 2005 – well after plaintiff's shooting had already received significant media attention. (SMF ¶¶ 155-61, 164-67). Due to this publicity in April 2004, any later-in-time dissemination of the shooting video constitutes "further publicity," for which no liability attaches.

### 3.    Plaintiff's Presentation Was Not Highly Offensive.

The video-recording is not highly offensive to a reasonable person. As the Restatement explains, many embarrassing moments are not highly offensive:

> Even minor and moderate annoyance, as for example through public disclosure of the fact that the plaintiff has clumsily fallen downstairs and broken his ankle, is not sufficient to give him a cause of action under the rule stated in this section.

Restatement (Second) of Torts § 652D cmt. c (1977). Here, plaintiff and DEA have cause to be embarrassed by plaintiff's shooting, but that does not make the shooting video "highly offensive."

As a legal term, "highly offensive" matters commonly involve the most intimate details of a person's life, such as sexual relations, nudity, and medical conditions.[16] In contrast, the video-

---

[16]    See, e.g., Hill v. McKinley, 311 F.3d 899, 906 (8th Cir. 2002) (holding that the unnecessary restraining of a drunk, naked female prisoner in front of jailers was highly offensive under privacy law); French v. United States ex rel. Dep't of Health & Human Servs., 55 F. Supp. 2d 379,383 (W.D.N.C. 1999) (holding that wrongfully obtaining and using medical records was highly offensive under privacy law); Benz v. Washington Newspaper Publ'g Co., 2006 WL 2844896, at *6

recording does not deal with the intimate details of plaintiff's life, but rather his unsafe handling of a loaded firearm in front of an audience of children and parents.

Also, if the video-recording were obscene, profane, or indecent, it would not have been replayed on national television broadcasts, such as the Today Show, CNN News, the Rita Crosby Show, and the O'Reilly Factor. See 47 C.F.R. § 73.3999 (restricting the television broadcast of obscene, profane, or indecent materials). And, if the shooting video footage were highly offensive, plaintiff should have conditioned his televison appearances upon not showing the video.

Finally, the eye witnesses to the shooting, in later television interviews, did not view the shooting – while very dangerous – as highly offensive. Dr. T.J. Dorsey, the founder of OMYGA, described the shooting as a "blessing" and explained that "someone sitting in here gained some valuable information," presumably about gun safety. (SMF ¶ 160). Similarly, Vivian Farmer, a parent who was present with her child, stated that the incident "allowed children to see that anybody can make a mistake." (SMF ¶ 160). No doubt, plaintiff's shooting endangered the audience members, but as their reactions indicate, it also communicated a valuable warning about gun safety.

### 4. Plaintiff's Conduct During His Presentation Is a Matter of Legitimate Public Interest.

To prevail on a claim for publicity given to private facts, plaintiff must also prove that there is no legitimate public interest in the matters disclosed. See Woodard v. Sunbeam Television Corp., 616 So.2d 501, 503 (Fla. Ct. App. 1993); Restatement (Second) of Torts § 652D cmt. d (1977). Proving this lack of "newsworthiness" is a "formidable obstacle," and one that plaintiff cannot pass. See Cape Publ'ns, Inc. v. Hitchner, 549 So.2d 1374, 1377 (Fla. 1989).

---

(D.D.C. Sept. 29, 2006) (Sullivan, J.) (holding that articles implying that plaintiff used her job in the media to obtain sexual relationships were highly offensive under privacy law); see generally Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1229 (7th Cir. 1993) (explaining that the right to privacy protects the intimate details of life through examples of nudity, sexual relations, and defecation).

Plaintiff shooting himself in front of an audience of children and parents is of public concern.  News of the shooting attracted a great deal of media attention from the Associated Press, United Press International, and multiple reputable newspapers throughout the nation – before any video-recording of the shooting circulated publicly.  (SMF ¶¶ 155-57).  Such widespread, credible news coverage of plaintiff's shooting makes clear that his shooting was newsworthy and of legitimate public concern.  See Cason v. Baskin, 20 So.2d 243, 251 (Fla. 1945) ("[T]he right of privacy has its limitations . . . [t]he right of the general public to the dissemination of news and information must be protected and conserved."); Cape Publ'ns, Inc. v. Bridges, 423 So.2d 426, 427 (Fla. Ct. App. 1982) ("Within the scope of legitimate public concern are matters customarily regarded as 'news.'"); Restatement (Second) of Torts § 652D cmt. g (1977).

In addition, plaintiff's presentation is of legitimate public concern because it affects a law enforcement officer's on-duty conduct.  As explained by another state supreme court, the public has a vital interest in the on-duty performance of law enforcement officers:

> It is difficult to conceive of an area of greater public interest than law enforcement.  Certainly the public has a legitimate interest in the manner in which law enforcement officers perform their duties.

Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781, 789 (Ariz. 1989).[17]  Here, plaintiff mishandled a weapon during an on-duty demand reduction presentation and by so doing endangered the safety of every member of the audience – as well as his own.  (SMF ¶¶ 34, 36-39, 41, 43, 45-46, 51; Expert Report of Keith S. Santillo ("Santillo Rep.") at 9-15 (copy attached to SMF as Ex. 14))  Such dangerous on-the-job conduct by a law enforcement officer is properly within the public's

---

[17]  See also Meiners v. Moriarity, 563 F.2d 343, 353 (7th Cir. 1977) (explaining that "[t]he public is certainly interested in an important and special way in the qualifications and performance of federal agents . . . whose decisions to search and to arrest directly and personally affect individual freedoms."); Coughlin v. Westinghouse Broad. & Cable, Inc., 603 F. Supp. 377, 390 (E.D. Pa.) ("A police officer's on-the-job activities are matters of legitimate public concern . . . ."), aff'd on other grounds, 780 F.2d 340 (3d Cir. 1985).

legitimate interest, and therefore, plaintiff has no a claim for unwanted publicity.

### 5.    As a Public Figure, Plaintiff Cannot Recover for Unwanted Publicity Associated with His Shooting.

The Restatement recognizes two types of public figures – voluntary and involuntary –

neither of which can recover for the tort of unwanted publicity.  Restatement (Second) of Torts

§ 652D cmts. e & f (1977).  Due to his prior public attention, plaintiff is a voluntary public figure,

and due to his self-shooting, he also qualifies as an involuntary public figure.

A person who seeks and receives publicity is a voluntary public figure, who cannot recover

for unwanted publicity:

> One who voluntarily places himself in the public eye, by engaging in public
> activities, or by assuming a prominent role in institutions or activities having general
> economic, cultural, social or similar public interest, or by submitting himself or his
> work for public judgment, cannot complain when he is given publicity that he has
> sought, even though it may be unfavorable to him.  So far as his public appearances
> and activities themselves are concerned, such an individual has, properly speaking,
> no right or privacy, since these are no longer his private affairs.  Thus an actor, prize
> fighter or a public officer has no cause of action when his appearances or activities in
> that capacity are recorded, pictured or commented upon in the press. . . .

Restatement (Second) of Torts § 652D cmt. e (1977) (citations omitted).

Plaintiff is a voluntary public figure.  He has sought and received publicity for his sports

career, for his employment with DEA, and specifically for his prominent role as a DEA demand

reduction speaker.  (SMF ¶¶ 5-14).

Even if he did not have a long history of being in the public eye, plaintiff would nonetheless

constitute an involuntary public figure.  As the Restatement explains, even victims of accidents that

attract public attention lose their ability to recover for unwanted publicity:

> There are other individuals who have not sought publicity or consented to it, but
> through their own conduct or otherwise have become a legitimate subject of public
> interest . . . . Those who commit crime or are accused of it may not only not seek
> publicity but may make every possible effort to avoid it, but they are nevertheless
> persons of public interest, concerning whom the public is entitled to be informed.
> The same is true as to those who are . . . victims of catastrophes or accidents  . . . or

37

other events that attract public attention . . . .

Restatement (Second) of Torts § 652D cmt. f (1977) (citations omitted); see also Cape Publ'ns, Inc.
v. Bridges, 423 So.2d 426, 427 n.4 (Fla. Ct. App. 1982) (acknowledging the applicability of the
involuntary public figure doctrine in Florida). Because his shooting attracted a great deal of media
attention within a month of its occurrence, plaintiff was an involuntary public figure, and he cannot
recover for the resulting unwanted publicity. (SMF ¶¶ 155-61).

### B.    Plaintiff Cannot Sustain a False Light Claim.

#### 1.    The Court Lacks Subject Matter Jurisdiction over Plaintiff's False Light Invasion of Privacy Claim.

As a matter of sovereign immunity, plaintiff cannot sue the United States under the FTCA
for a false light privacy tort. This is so because the United States has not waived its sovereign
immunity for any tort "***arising out of*** assault, battery, false imprisonment, false arrest, malicious
prosecution, abuse of process, ***libel***, ***slander, misrepresentation***, deceit, or interference with
contract rights . . . ." See 28 U.S.C. § 2680(h) (emphasis added). Because false light claims fall
within the libel-slander-misrepresentation exception, sovereign immunity is preserved, and plaintiff
cannot proceed as a matter of jurisdiction.

As discussed above, under the principle of sovereign immunity, the United States can be
sued only where it has expressly consented to such suit by statute. See Fed. Deposit Ins. Corp. v.
Meyer, 510 U.S. 471, 475 (1994); Block v. North Dakota, 461 U.S. 273, 287 (1983); Settles v. U.S.
Parole Comm'n, 429 F.3d 1098, 1105 (D.C. Cir. 2005). The FTCA is a limited waiver of sovereign
immunity because it provides a remedy against the United States for certain torts of its officers and
employees. See 28 U.S.C. §§ 1346(b), 2674; United States v. Orleans, 425 U.S. 807, 813 (1976);
Tri-State Hosp. Supply Corp. v. United States, 341 F.3d 571, 575 (D.C. Cir. 2003). However, as
articulated in 28 U.S.C. § 2680(h), certain intentional torts are specifically excluded from the

FTCA's waiver of sovereign immunity.  See 28 U.S.C. § 2680(h); Moore v. Valder, 65 F.3d 189, 196 (D.C. Cir. 1995).  As to the excluded torts, the United States' immunity is preserved, and a court lacks subject matter jurisdiction over those prospective torts.  See, e.g., Sloan v. U.S. Dep't of Hous. & Urban Dev., 236 F.3d 756, 759, 765 (D.C. Cir. 2001).

The libel-slander-misrepresentation exception applies to false light claims because the false light tort arises out of libel, slander, and misrepresentation.[18]  Libel and slander are predicated on false statements that result in the communication of a false and defamatory message.  See Thomas v. Jacksonville Television, Inc., 699 So.2d 800, 803-04 (Fla. Ct. App. 1997); Restatement (Second) of Torts § 558 (1977) (explaining that defamation requires a false and defamatory statement).  Similarly, false light invasion of privacy is premised on a communication that results in a false and objectionable message, as recently explained by a Florida court:

> Whether the claim is based on the publication of false facts or the publication of true facts that are stated in such a way as to create a false impression is a distinction of no consequence.  In either case, the falsity of what the publication communicates is the essence of the [false light] claim.

Gannett Co., Inc. v. Anderson, 947 So.2d 1, 8 (Fla. Ct. App. 2006); see also Restatement (Second) of Torts § 652E, cmt. b (1977) (explaining that false light protects "the interest of the individual in not being made to appear before the public in an objectionable false light or false position").  In other words, libel, slander, and false light all arise out of a common desire to protect persons from

---

[18]  While the D.C. Circuit has not specifically addressed whether the libel-slander-misrepresentation exception applies to false light claims, it has made clear the close relationship between false light claims and libel and slander claims.  See Mittleman v. United States, 104 F.3d 410, 415 (D.C. Cir. 1997) (concluding that a false light claim is so "thoroughly intertwined" with libel and slander that it should be governed by the one-year libel-slander statute of limitations); cf. Kugel v. United States, 947 F.2d 1504, 1508 (D.C. Cir. 1991) (stating that a false light claim of privacy may be cognizable under the FTCA *without* addressing whether the libel-slander-misrepresentation exception in § 2680(h) would then bar such a claim).  Moreover, the D.C. Circuit has applied the exception to a wide range of claims.  See, e.g., Art Metal-USA, Inc. v. United States, 753 F.2d 1151, 1156 (D.C. Cir. 1985) (explaining that injurious falsehood, disparagement of property, slander of goods, and trade libel are "claims arising out of libel or slander").

communications that result in a false and damaging message.  False light claims also arise out of

misrepresentation.  The Restatement is explicit that false light claims are premised on

"misrepresentation":

> It is only when there is a such a ***major misrepresentation*** of his character, history,
> activities or beliefs that serious offense may reasonably be expected to be taken by a
> reasonable man in his position, that there is a cause of action for [false light]
> invasion of privacy.

Restatement (Second) of Torts § 652E, cmt. c (1977) (emphasis added).  With misrepresentation as

a foundational element, there is no doubt that false light claims are precluded under the FTCA.

This conclusion is hardly novel.  Courts have repeatedly and consistently held that false light

privacy actions are covered by the libel-slander-misrepresentation exception.[19]  As summed up by a

court in this district:  "Courts consistently have held that claims for 'false light' invasion of privacy

are barred by the libel and slander exception."  Edmonds v. U.S., 436 F. Supp. 2d 28, 35 (D.D.C.

2006).  After so assessing the law, the Edmonds court dismissed false light claims under the FTCA

for lack of subject matter jurisdiction.  Id.; see also Kugel v. Small, 519 F. Supp. 2d 66, 75 n.8

(D.D.C. 2007) (dismissing false light claims under the § 2680(h) exception).  This Court should

proceed similarly and enter summary judgment on behalf of defendant United States.

### 2. Beyond the Jurisdictional Failure, Plaintiff Cannot Recover for the False Light Tort Claim.

It is an open issue whether Florida law recognizes the tort of false light invasion of privacy.

---

[19]  See Johnson v. Sawyer, 47 F.3d 716, 732 n.34 (5th Cir. 1995) (en banc) (explaining that
"'false light' invasion of privacy essentially amounts to libel, slander, or misrepresentation" and that
such claims are excluded from the FTCA by § 2680(h)); Metz v. United States, 788 F.2d 1528,
1535 (11th Cir. 1986) (dismissing false light privacy and intentional infliction of emotional distress
claims because "the government officials' allegedly slanderous statements are essential" to both
claims); Hobdy v. United States, 762 F. Supp. 1459, 1462 (D. Kan. 1991) (claim of false light
invasion of privacy "arises out of conduct which allegedly involves the communication of false
statements" and is barred by § 2680(h)), aff'd, 968 F.2d 20 (10th Cir. 1992); Bosco v. U.S. Army
Corps. of Eng'rs, 611 F. Supp. 449, 452-53 (N.D. Tex. 1985) (dismissing false light invasion of
privacy claim because "the gravamen of Plaintiff's complaint is injury to reputation which is the
interest protected by the law of defamation").

That question is presently under consideration by the Florida Supreme Court.  See Rapp v. Jews for Jesus, Inc., No. SC06-2491 (Fla.).  Nevertheless, the Florida Supreme Court has already determined that false light claims cannot be based on true and accurate photographs.  Fla. Publ'g Co. v. Fletcher, 340 So.2d 914, 918 (Fla. 1976) (agreeing that there can be "no recovery under the 'false light' doctrine of invasion" without a contention that the photograph and corresponding article were "in any way false or inaccurate" (quoting Fla. Publ'g Co. v. Fletcher, 319 So.2d 100, (Fla. Ct. App. 1975) (McCord, J., dissenting))); see also Easter Seal Soc'y for Crippled Children & Adults of La., Inc., v. Playboy Enters., Inc., 530 So.2d 643, 647-48 (La. Ct. App. 1988) (denying a false light claim where there was no falsity or fiction in the video footage of a parade, despite such footage being used as a backdrop for an adult movie).  Thus, this claim fails because the video-recording of plaintiff's shooting was a true and accurate portrayal of his presentation.

Plaintiff also fails to satisfy any elements of a false light tort as defined in the Restatement (Second) of Torts.  Under the Restatement, a false light claim has four elements: (1) the giving of publicity; (2) that places another person in a false light; (3) that is highly offensive;  and (4) with knowledge or reckless disregard for the false light in which the other person would be placed.  See Restatement (Second) of Torts § 652E (1977).  The giving publicity and the highly offensive elements overlap with the tort of unwanted publicity.  And, as explained above, plaintiff cannot satisfy those.  Plaintiff likewise cannot meet the placed-in-a-false-light and the mental state elements because the shooting video did not portray him falsely – the camera did not lie.  The Restatement acknowledges that being portrayed 'as is' cannot form the basis for a false light claim: "The interest protected by [the false light tort] is the interest of the individual in not being made to appear before the public in an objectionable false light or false position, or in other words, other than he is."  Restatement (Second) of Torts § 652E, cmt. b (1977).

### III.    THE EQUITABLE DOCTRINE OF UNCLEAN HANDS BARS PLAINTIFF FROM RECOVERING.

Due to his own conduct in relation to the shooting and its video-recording, plaintiff cannot

recover here.  Under the equitable doctrine of unclean hands, the doors of the court are closed to

"one tainted with inequitableness or bad faith relative to the matter for which he seeks relief,

however improper may have been the behavior of the defendant."  Precision Instrument Mfg. Co. v.

Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945); see also Monument Realty LLC v. Washington

Metro. Area Transit Auth., 2008 WL 555967, at *14 (D.D.C. Feb. 28, 2008).  Because the unclean

hands affirmative defense is intended for "the advancement of right and justice," courts are "not

bound by formula or restrained by any limitation that tends to trammel the free and just exercise of

discretion."  Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245-46 (1933); see also

Graphic Scis., Inc. v. Int'l Mogul Mines Ltd., 397 F. Supp. 112, 127 (D.D.C. 1974).  Ultimately, it

has been explained that "courts are concerned primarily with their own integrity in the application

of the clean hands maxim [and] . . . [p]ublic policy not only makes it obligatory for courts to deny a

plaintiff relief once his 'unclean hands' are established but to refuse to even hear a case under such

circumstances."  Gaudiosi v. Mellon, 269 F.2d 873, 882 (3d Cir. 1959).  In light of these principles,

plaintiff's action fails because he does not come before the court with clean hands.

First, by displaying a loaded weapon during his presentation, plaintiff endangered the safety

of the approximately 50 children and parents in the audience.  Plaintiff imperiled these innocent

audience members by failing to abide by a cardinal rule of firearms safe-handling – remove the

source of ammunition.  (SMF ¶¶ 32-34; Santillo Rep. at 9 (copy attached to SMF as Ex. 14)).  Not

only should the weapon have been unloaded but also plaintiff should have secured all live

ammunition separately from the firearms.  (SMF ¶¶ 32-34; Santillo Rep. at 9).  Even if plaintiff

could justify his insistence on using a weapon capable of firing (as opposed to an inert weapon), he

should have unloaded it offsite and then inspected the weapon before he entered the presentation area.  (SMF ¶¶ 32-44; Santillo Rep. at 9-10).  While offsite, plaintiff should have had another trained DEA Special Agent visually and physically inspect the weapon – to ensure that the weapon was not loaded before taking it into the presentation site.  (SMF ¶ 37; Santillo Rep. at 10).

Once plaintiff was on-site with a loaded weapon, he continued to commit safe-handling violations.  He did not adequately visually and physically inspect his weapon.  (SMF ¶ 34; Santillo Rep. at 11 (copy attached to SMF as Ex. 14)).  Plaintiff noticed that the Glock handgun had a round in the chamber, and he removed that round and put it in his left pants pocket.  But, he did not realize that the magazine was still in place, which loaded another live round into the handgun.  (SMF ¶¶ 34-36).  Plaintiff also failed to have a trained firearms co-presenter, and he did not seek assistance from someone who could meaningfully inspect the weapon for him, as is required under safe-handling guidelines.  (SMF ¶ 37; Santillo Rep. at 10).  Instead, plaintiff had a civilian with unknown firearms knowledge and experience inspect his weapon.  (SMF ¶ 38; Santillo Rep. at 11).  Such conduct not only was unsafe but also it belied plaintiff's own statement.  If plaintiff believed that he was "the only one in the room professional enough" to handle a Glock .40, why would he ask a civilian to inspect that weapon?  Doing so was nothing short of reckless behavior.

Plaintiff's use of a loaded weapon as a prop exacerbated his other safe-handling transgressions.  He consistently violated the "laser rule," which dictates that a weapon always be pointed in a safe direction.  (SMF ¶ 39; Santillo Rep. at 10 (copy attached to SMF as Ex. 14)).  Instead, plaintiff pointed the loaded gun in the direction of an audience member, toward himself, and at other potentially dangerous targets, such as the ceiling.  (SMF ¶ 40; Santillo Rep. at 10, 12-13).  Furthermore, plaintiff placed his finger on the trigger while the gun was pointed in an unsafe direction and ultimately discharged a round into his own leg.  (SMF ¶¶ 41, 43; Santillo Rep. at 13).  The discharged round hit the bullet that plaintiff had previously unloaded into his pants pocket

43

causing the bullets to ricochet.  (SMF ¶ 44).

The safe-handling violations continued even after the shooting.  Plaintiff left his loaded handgun on a table in the front of the room, in violation of the rule requiring special agents to maintain control of their loaded weapons.  (SMF ¶ 46; Santillo Rep. at 13 (copy attached to SMF as Ex. 14)).  Then, in a visibly injured state, plaintiff stated that he would "probably never be able to show guns again." (SMF ¶ 47; Santillo Rep. at 10).  Nonetheless, he then requested that the civilian with unknown firearms training bring over an additional weapon for display.  (SMF ¶¶ 38, 48; Santillo Rep. at 10).  When the civilian refused to do so, plaintiff directed his request to his wife. (SMF ¶¶ 49-50; Santillo Rep. at 10).  She obliged, and started to carry a rifle toward plaintiff, until shouts from children in the audience dissuaded her and plaintiff from showing any more firearms. (SMF ¶ 51).  The children's instruction was correct; not only was plaintiff's wife not authorized to carry such a weapon but also in so doing, she violated the laser rule by pointing the rifle in the direction of the civilian and the ceiling.  (Santillo Rep. at 14-15).  Put simply, plaintiff's numerous, repeated weapons-handling violations needlessly endangered children and parents in the audience.

Each of plaintiff's transgressions heighten in significance because he never told his supervisors that he would be displaying firearms at his demand reduction presentation.  (SMF ¶¶ 20-22).  If his supervisors had known, they would have told him not to do so.  (Collins Decl. ¶ 6 (copy attached to SMF as Ex. 35)).

Beyond placing the audience in peril, plaintiff also has unclean hands with respect to his alleged privacy interests.  As discussed above, plaintiff is a public figure due to the prior publicity he received through previous media exposure and from the hundreds of demand reduction presentations he has done.  (SMF ¶¶ 6-7, 9, 14).  Consistent with being a public figure, plaintiff took no precautions to preserve his privacy during his presentation.  He appeared at a public place, to an audience of approximately 50 children and parents, and did not object to the video-recording

of his presentation.  (Id. ¶¶ 15, 28).  Nor did he instruct the audience not to photograph or video-record him.  (Id. ¶ 29).  As an equitable matter, each of those instances in which he failed to protect his privacy extinguishes his "clean hands" as to privacy claims.

In addition, plaintiff's later-in-time actions increased the circulation and knowledge of the video footage of his self-shooting.  At his remedial training in Miami, he consented to let another special agent watch the shooting video with him.  (Id. ¶ 253).  More dramatically, by filing his lawsuit he created the first publicly documented identification of himself as the shooter in the video.  (Id. ¶ 171).  And finally, in contravention of his own privacy, plaintiff made numerous media appearances – on the Today Show, CNN News, the Rita Cosby Show, and the O'Reilly Factor, all of which broadcast video footage of his self-shooting.  (Id. ¶¶ 169-70).  All such media attention is clearly at odds with protecting privacy – the principle upon which plaintiff premises his lawsuit.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of the DEA on the Privacy Act count and in favor of the United States on the FTCA count.

Dated: May 16, 2008                                    Respectfully submitted,


GREGORY G. KATSAS                         __/s/  Peter J. Phipps_____
Acting Assistant Attorney General          PETER J. PHIPPS
                                            PAUL A. DEAN
JEFFREY A. TAYLOR                          United States Department of Justice
United States Attorney                      Civil Division, Federal Programs Branch
                                            Tel: (202) 616-8482
ELIZABETH J. SHAPIRO                       Fax: (202) 616-8470
Assistant Branch Director                   peter.phipps@usdoj.gov

Mailing Address:                            Courier Address:
Post Office Box 883                         20 Massachusetts Ave., N.W.
Washington, D.C.  20044                     Washington, D.C. 20001

                                            Attorneys for Defendants