# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEE PAIGE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00644 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| and UNITED STATES OF AMERICA, | ) | Hon. Emmet G. Sullivan |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## PURSUANT TO D.D.C. CIVIL RULE 56.1

### Background Regarding Plaintiff Lee Paige and
### His Role as a Demand Reduction Speaker for DEA

1.      Plaintiff Lee Paige is currently employed by the United States Department of Justice, Drug Enforcement Administration, ("DEA") as a Special Agent ("SA") in the Orlando District Office, within the Miami Field Division of DEA.  (Am. Compl. ¶ 4 (Ex. 1)).

2.      SA Paige joined DEA in 1990, and was first assigned to the Tampa District Office, within the Miami Field Division of DEA, where he worked for approximately nine years.  (Am. Compl. ¶ 4 (Ex. 1)); (L. Paige Dep. at 7, lines 8-19 (Ex. 2)).

3.      In 1999, SA Paige transferred to the DEA Nassau Country Office in Nassau, Bahamas.  (Am. Compl. ¶ 4 (Ex. 1)); (L. Paige Dep. at 18, lines 11-15 (Ex. 2)).

4.      In July 2003, SA Paige transferred to the Orlando District Office, within the Miami Field Division of DEA, and has been employed by DEA continuously since.  (Am. Compl. ¶ 4 (Ex. 1)); (Plaintiff's Answer to Defendant's Req. for Admis. No. 17 (Ex. 3)); (L. Paige Dep. at 25, lines 3-16 (Ex. 2)).

5.    Before joining DEA, SA Paige played college football at Florida State University, and he continued on to play professional football with the Tampa Bay Bandits and the Tampa Bay Buccaneers.  (Am. Compl. ¶ 3 (Ex. 1)).

6.    As a football player, SA Paige appeared on television and in the press.  (L. Paige Dep. at 59, lines 17-22 (Ex. 2)).

7.    Also, SA Paige has received nationwide press for his employment with DEA; specifically, Sports Illustrated identified SA Paige as a former professional football player who worked for DEA, and the article also identified the location where SA Paige worked, which, at the time, was Nassau, Bahamas.  (*Where are they now?*, Sports Illustrated, July 31, 2000, at 142, 143 (Ex. 4)).

8.    In the course of his career with DEA, SA Paige became involved with giving demand reduction presentations, which are educational, informative events that explain the dangers associated with illegal drugs in an attempt to reduce the demand for such illegal substances.  (L. Paige Dep. at 46, lines 5-21 (Ex. 2)).

9.    SA Paige has given hundreds of demand reduction presentations, and by his own estimate, he has given around 500.  (Plaintiff's Answer to Defendant's Interrog. No. 12 (Ex. 5)); (L. Paige Dep. at 51, line 16, to 52, line 2 (Ex. 2)).

10.    SA Paige has given these demand reduction presentations to various segments of society, such as nurses, students of all ages, church members, and juvenile detention detainees, as well as college and professional sports teams.  (L. Paige Dep. at 46, lines 5-21 (Ex. 2)); (Id. at 51, line 16, to 53, line 18).

11.    The sizes of the audiences to which SA Paige made these demand reduction presentation varied from groups of 10 or 12 persons to hundreds of people at a time.  (L. Paige Dep. at 53, lines 5-18 (Ex. 2)).

12.     In the course of giving these DEA demand reduction presentations, SA Paige has been photographed and videotaped; he has also signed autographs at these presentations.  (L. Paige Dep. at 55, lines 12-14 (Ex. 2)); (Id. at 56, line 16, to 57, line 9).

13.     SA Paige does not recall ever instructing audience members not to photograph or video-record his demand reduction presentations.  (L. Paige Dep. at 57, lines 10-22 (Ex. 2)).

14.     SA Paige has also received media attention for his DEA demand reduction activities, such as newspaper articles and photographs reporting on his demand reduction presentations.  (L. Paige Dep. at 59, lines 20-22 (Ex. 2)); (Id. at 60, line 13, to 61, lines 12; ("Hall of Shame" Newspaper Article and Photo DEA 001124 (Ex. 6)).

**SA Paige's April 9, 2004 Demand Reduction Presentation**

15.     On April 9, 2004, SA Paige gave a demand reduction presentation to approximately 50 children and adults at the Dr. J.B. Callahan Community Center in Orlando, Florida.  (Am. Compl. ¶ 6 (Ex. 1)); (Pl's Answer to Defs.' Req. for Admis. No. 3 (Ex. 3)).

16.     The Code of the City of Orlando states that the Callahan Community Center "shall be open for public use between the hours of 7:00 a.m. and 9:00 p.m."  (Code of City of Orlando, Florida § 18A.02(4)(b) (Ex. 7)).

17.     SA Paige's presentation was part of a meeting of the Orlando Minority Youth Golf Association (the "OMYGA"), an association founded in 1991 by Dr. T.J. Dorsey to teach disadvantaged Orlando-area children to golf.  (Am. Compl. ¶ 6 (Ex. 1)); (Dorsey Dep. at 6, lines 1-8 (Ex. 8)).

18.     SA Paige's wife, Robbin Paige, and his children, who were members of the OMYGA, attended the meeting at the Callahan Community Center.  (L. Paige Dep. at 73, lines 2-4 (Ex. 2); R. Paige Dep. at 23, line 14, to 24, line 9 (Ex. 9)).

19.     Also, a DEA SA assigned to the Orlando District Office, Walter Walker, attended

the meeting with his children, none of whom were members of the OMYGA. (L. Paige Dep. at 101, lines 13-21 (Ex. 2)); (Walker Dep. at 4, line 23, to 5, line 25 (Ex. 10)).

20.    SA Paige had told his immediate supervisor, Group Supervisor ("GS") Peter Gruden, that he would be giving a demand reduction presentation that night, but he did not mention that he would be showing firearms at the presentation. (Gruden Dep. at 35, lines 17-21 (Ex. 11)); (Id. at 46, lines 19-21); (L. Paige Dep. at 76, lines 20-22 (Ex. 2)).

21.    SA Paige had not previously received permission from GS Gruden to show firearms at demand reduction presentations. (Gruden Dep. at 240, lines 6-9 (Ex. 11)); (L. Paige Dep. at 77, lines 6-16 (Ex. 2)).

22.    Assistant Special Agent in Charge ("ASAC"), Stephen Collins, who was the head of the Orlando District Office, was not aware that SA Paige had ever displayed firearms at a demand reduction presentation. (Collins Dep. at 7, lines 12-15 (Ex. 12)); (Id. at 21, lines 7-9); (Id. at 29, lines 16-18).

23.    Similarly, SA Walker, who attended the presentation, was not aware that SA Paige had ever brought firearms to display at demand reduction presentations, or that he would do so that evening. (Walker Dep. at 5, line 25, to 6, line 2 (Ex. 10)).

24.    The OMYGA video-records its meetings, and the April 9, 2004 meeting was video-recorded by Mr. Joseph Brunson, a parent-volunteer for the OMYGA. (Brunson Dep. at 6, lines 16-18 (Ex. 13)); (Id. at 8, lines 3-18).

25.    Mr. Brunson video-recorded the meeting using his Panasonic video-recorder. (Brunson Dep. at 11, lines 2-19 (Ex. 13)).

26.    Mr. Brunson's Panasonic video-recorder had the ability to record pictures into a micro-SD memory card, but he video-recorded the April 9, 2004 meeting onto his own Panasonic

Mini-DV micro-cassette tape.[1]  (Brunson Dep. at 11, lines 2-19 (Ex. 13)); (Id. at 12, lines 16-18).

27.    When SA Paige began his presentation while wearing DEA raid gear, Mr. Brunson was recording the meeting.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Brunson Dep. at 10, lines 16-18 (Ex. 13)).

28.    As he gave his presentation, SA Paige was aware that he was being video-recorded by Mr. Brunson, but SA Paige did not object to being video-recorded.  (Pl's Answer to Defs.' Req. for Admis. Nos. 1-2 (Ex. 3)); (L. Paige Dep. at 78, lines 21-25 (Ex. 2)); (Id. at 80, lines 11-14);(R. Paige. Dep. at 25, lines 12-23 (Ex. 9)).

29.    Similarly, SA Paige did not instruct the audience not to photograph or video-record him or his presentation.  (L. Paige Dep. at 57, lines 11-22 (Ex. 2)).

30.    Ultimately, Mr. Brunson video-recorded SA Paige's entire presentation, including SA Paige shooting himself, and Mr. Brunson continued to video-record the meeting after SA Paige's presentation ended.  (Brunson Dep. at 14, line 21, to 15, line 6 (Ex. 13)); (Id. at 17, line 14, to 18, line 12); (Id. at 23, lines 1-8).

**SA Paige Shoots Himself During His Presentation**

31.    During his presentation, SA Paige unholstered and displayed a Glock Model 22 handgun, a 40-caliber firearm, which was his duty weapon.  (L. Paige Dep. at 87, line 1, to 89, line 12 (Ex. 2)).

32.    SA Paige did not unload the Glock handgun before entering the Callahan Community Center; thus, it was loaded when he unholstered and displayed it.  (L. Paige Dep. at 87, line 1, to 89, line 12 (Ex. 2)).

---

[1]  Several types of electronic storage devices can contain audio and video footage.  In this case, the relevant forms are the following: a Mini-DV microcassette, a VHS videotape, a CD (compact disc, capable of storing audio and video files), and a DVD (similar in appearance to a CD, but capable of storing more information that a CD).

33.     Upon unholstering his handgun, SA Paige did not remove the magazine, which contained live ammunition.  (L. Paige Dep. at 87, line 1, to 89, line 12 (Ex. 2)); (Keith S. Santillo, Expert Rep. at 12-13 ("Santillo Rep.") (Ex. 14)).

34.     SA Paige did not properly visually and physically inspect the handgun, so that he did not realize that the magazine, with the live ammunition was still in the gun.  (L. Paige Dep. at 87, lines 1-7 (Ex. 2)); (Santillo Rep. at 11 (Ex. 14)).

35.     During his presentation, SA Paige did realize that there was a live round in the chamber, and he removed that round, and put it in his left pants pocket.  (L. Paige Dep. at 87, line 8, to 89, line 12 (Ex. 2)).

36.     With the magazine with the live ammunition still in place, another round seated in the chamber.  (L. Paige Dep. at 87, line 8, to 89, line 12 (Ex. 2)); Santillo Rep. at 12-13 (Ex. 14)).

37.     SA Paige did not have a firearms-trained DEA SA visually and physically inspect the handgun (as is required under safe-handling rules).  (Santillo Rep. at 10 (Ex. 14)).

38.     Instead, SA Paige had a civilian acquaintance who was in the audience, Brian Covington, with unknown firearms knowledge and experience, inspect his duty weapon. (L. Paige Dep. at 94, lines 8-17 (Ex. 2)); (Santillo Rep. at 11-12 (Ex. 14)).

39.     While displaying his handgun, SA Paige consistently violated the "laser rule," which dictates that a weapon never be pointed in an unsafe direction.  (Santillo Rep. at 10, 12-13 (Ex. 14)).

40.     SA Paige did this by pointing the muzzle of the weapon in the direction of his own lower body repeatedly, as well as toward Mr. Covington and toward the ceiling.  (Santillo Rep. at 10, 12-13 (Ex. 14)).

41.     SA Paige also placed his finger on the trigger of the handgun, and while so doing, pointed the gun in an unsafe direction – toward his own lower body.  (L. Paige Dep. at 88, line 10, to 89, line 12 (Ex. 2)); (Santillo Rep. at 9 (Ex. 14)).

42.    At approximately that same time, SA Paige stated, "I am the only one in the room professional enough, that I know of, to carry this Glock .40."  (Am. Compl. ¶ 6 (Ex. 1)); (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14).

43.    Moments later, while the muzzle of the gun was aimed at his own leg, SA Paige pulled the trigger, discharging a live 40-caliber round into his left thigh.  (Am. Compl. ¶ 6 (Ex. 1)); (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Pl's Answer to Defs.' Req. for Admis. No. 8 (Ex. 3)); (Santillo Rep. at 12-13 (Ex. 14)).

44.    That 40-caliber round hit the bullet that SA Paige had previously placed in his left pants pocket, causing the bullets to ricochet into the air.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Pl's Answer to Defs.' Req. for Admis. No. 9 (Ex. 3)); (L. Paige Dep. at 87, line 8, to 89, line 12 (Ex. 2)).

45.    This shooting injured SA Paige's left leg, but the ricocheting bullets did not hit anyone else.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14).

46.    After shooting himself, SA Paige no longer held his loaded weapon, and instead he placed it on a table in front of the audience.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Santillo Rep. at 14 (Ex. 14)).

47.    SA Paige also said that he would "probably never be able to show guns again," but then he attempted to continue on with the presentation.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Santillo Rep. at 14 (Ex. 14)).

48.    SA Paige then instructed the civilian, Brian Covington, to bring an additional firearms over for further display.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Santillo Rep. at 14 (Ex. 14)).

49.    Brian Covington refused to do so. (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Santillo Rep. at 14 (Ex. 14)).

50.     SA Paige next instructed his wife, Robbin Paige, a non-DEA agent, to bring a rifle over to him for further display.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Santillo Rep. at 14 (Ex. 14)).

51.     Robbin Paige then began to display a rifle and was pointing it in unsafe directions (toward Mr. Covington and the ceiling) – until children in the audience yelled for her to put down the weapon.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14); (Santillo Rep. at 14-15 (Ex. 14)).

52.     At that point in time SA Paige ended his presentation.  (Am. Compl. Ex. 1 (video), attachment to Docket Entry #14).

53.     All of these events at the presentation were video-recorded by Mr. Brunson. (Brunson Dep. at 14, line 21, to 15, line 6 (Ex. 13)).

### SA Walker Takes Custody of the Mini-DV with a
### Video-Recording of SA Paige's Shooting

54.     After he shot himself, SA Paige walked into the parking lot of the Callahan Community Center with SA Walker, who had previously called for emergency medical care. (Walker Dep. at 7, line 25, to 8, line 12 (Ex. 10)).

55.     Paramedics arrived, administered medical attention to SA Paige, and transported him the hospital.  (R. Paige Dep. at 35, lines 15-21 (Ex. 9)); (Walker Dep. at 8, line 5-23 (Ex. 10)).

56.     Also, having been informed of the shooting, additional DEA agents arrived on the scene, including GS Gruden and GS Robert Patterson, who was Acting ASAC that night in place of ASAC Stephen Collins, who was on leave.  (Collins Dep. at 27, lines 10-21 (Ex. 12)); (Id. at 31, lines 16-18); (Gruden Dep. at 74, line 21, to 75, line 1 (Ex. 11)); (Patterson Dep. at 14, lines 11-14 (Ex. 15)).

57.     At the hospital, SA Paige called his wife, Robbin Paige, to direct her to have SA

Walker get the video taken during SA Paige's presentation.  (L. Paige Dep. at 81, line 25, to 82, line 11 (Ex. 2)); (Id. at 82, line 23, to 83, line 3); (R. Paige Dep. at 37, lines 8-24 (Ex. 9)).

58.     In response to SA Paige's call, Robbin Paige notified SA Walker that SA Paige requested that SA Walker get Mr. Brunson's video.  (R. Paige Dep. at 38, lines 8-12 (Ex. 9)); (Walker Dep. at 10, lines 1-7 (Ex. 10)).

59.     SA Walker indicated to Robbin Paige that he understood SA Paige's request.  (R. Paige Dep. at 38, lines 13-19 (Ex. 9)).

60.     SA Walker then approached Mr. Brunson, who was still video-recording the remainder of the OMYGA meeting, to secure the video recording.  (Brunson Dep. at 18, lines 1-22 (Ex. 13)); (Walker Dep. at 8, line 18 to 9, line 15 (Ex. 10)); (Id. at 10, lines 1-15).

61.     Mr. Brunson initially did not want to hand over the Mini-DV micro-cassette, but after a discussion with SA Walker and others, he provided the MiniDV to SA Walker on the premises of the Callahan Community Center.  (Brunson Dep. at 20, lines 1, to 22, line 8 (Ex. 13)); (Walker Dep. at 10, line 21, to 11, line 6 (Ex. 10)); (Id. at 12, line 16 to 13, line 8); (Id. at 13, lines 15-18).

62.     Neither GS Gruden nor GS Patterson (the Acting ASAC) directed SA Walker to obtain the Mini-DV.  (Walker Dep. at 11, lines 7-11 (Ex. 10)).

63.     The Mini-DV contains over an hour of audio and video footage, all taken at the OMYGA April 9, 2004 meeting.  (DEA 001417.)

64.     While still on the premises of the Callahan Community Center, SA Walker provided the Mini-DV to GS Patterson (or to GS Gruden, who then provided the Mini-DV to GS Patterson).  (Gruden Dep. at 73, lines 12-22 (Ex. 11)); (Patterson Dep. at 24, lines 13-18, at 25, lines 11-18 (Ex. 15)); (Walker Dep. at 14, lines 2-7 (Ex. 10)).

## GS Patterson Watches the Mini-DV and Makes a VHS Copy

65.    Later that evening, GS Patterson (the Acting ASAC) transported the Mini-DV to

DEA's Orlando District Office.  (R. Patterson Dep. at 25, line 11, to 26, line 9 (Ex. 15)).

66.    No one else was present at the DEA Orlando District Office when GS Patterson

arrived.  (R. Patterson Dep. at 26, lines 10-12 (Ex. 15)).

67.    Because the eye-witness accounts that he had heard at the Callahan Community

Center were not consistent, GS Patterson went to the Tech Room to watch the Mini-DV to

determine exactly what had happened to report to his chain of command.  (Patterson Dep. at 27,

lines 14-22 (Ex. 15)); (Id. at 33, lines 4-6).

68.    After he had watched the video, GS Patterson completed the paperwork, and he

decided to copy the Mini-DV into a more accessible format.  (Patterson Dep. at 30, lines 4-15 (Ex.

15)).

69.    That night GS Patterson found a way to copy the Mini-DV onto a VHS video-

cassette tape.  (Patterson Dep. at 29, line 21, to 30, line 6 (Ex. 15)).

70.    He then secured the Mini-DV and the VHS copy (both with video footage over an

hour in length) in ASAC Collins's office.  (Patterson Dep. at 37, lines 3-7 (Ex. 15)).

71.    After he had watched the video, GS Patterson completed the requisite initial

paperwork, a DEA teletype reporting the shooting, and in so doing he used file number GFAO-04-

9020, which is a DEA general file, not indexed to any particular individual, but rather referring to

"assaults/threats/shootings."  (Collins Dep. at 39, lines 19-25 (Ex. 12)); (Id. at 40, lines 9-11); (Id. at

99, lines 6-25); (Patterson Dep. at 33, lines 4-6 (Ex. 15)); (Teletype, DEA000989 - DEA000990

(Ex. 16)).

**GS Gruden Receives Custody of the Mini-DV and the VHS, and He
Has Additional Copies Made During the Week of April 12, 2004**

72.     On Monday morning, April 12, 2004, ASAC Collins, GS Gruden, and possibly GS

Patterson viewed the VHS copy of the shooting in a conference room at the Orlando District Office

to find out precisely what had happened.  (Collins Dep. at 56, lines 13-19 (Ex. 12)); (Id. at 58, lines

22-24); (Gruden Dep. at 81, line 21, to 82, line 9 (Ex. 11)); (Id. at 86, lines 5-9).

73.     On Monday, April 12, 2004, after viewing the video, ASAC Collins gave custody of

both the Mini-DV and the VHS copy to GS Gruden.  (Gruden Dep. at 83, lines 4-6 (Ex. 11)).

74.     GS Gruden kept both the Mini-DV and the VHS copy in a desk drawer in his office

on a secure floor. (Gruden Dep. at 30, line 21, to 31, line 2 (Ex. 11)); (Id. at 84, lines 4-11); (Id. at

100, lines 10-13).

75.     At that time, neither GS Gruden nor ASAC Collins knew that any of the video

footage would have further use.  ASAC Collins initially heard from DEA's Office of Inspections at

DEA Headquarters that they would not be sending anyone down to investigate the shooting.

Similarly, GS Gruden did not anticipate that DEA's Office of Inspections at DEA Headquarters

would come and investigate SA Paige's shooting or that they would have an interest in the video

footage of SA Paige's shooting.  (Collins Dep. at 67, line 22, to 68, line 24 (Ex. 12)); (Id. at 69,

lines 19-22); (Id. at 74, line19, to 75, line 3); (Gruden Dep. at 20, line 14, to 21, line 15 (Ex. 11));

(Id. at 24, lines 11-13); (Id. at 25, line 13, to 26, line 12); (Id. at 75, lines 9-11); (Id. at 106, line 16,

to 107, line 7).

76.     Also at that point, neither ASAC Collins nor GS Gruden knew that DEA's Office of

Inspections would have an interest in video footage of SA Paige's shooting.  (Collins Dep. at 67,

line 22, to 68, line 24 (Ex. 12)); (Id. at 69, lines 19-22); (Id. at 74, line19, to 75, line 3); (Id. at 83,

lines 18-22); (Gruden Dep. at 27, line 17, to 29, line 3 (Ex. 11)).

77.    During the week of April 12, 2004, GS Gruden showed the VHS copy of the Paige shooting video to approximately six DEA agents in his group in a conference room in the DEA Orlando District Office.  (Gruden Dep. at 92, lines 18-19 (Ex. 11)); (Id. at 93, line 15, to 94, line 9).

### GS Gruden Distributes Copies of the Paige Shooting Video

78.     During the week of April 12, 2004, GS Gruden requested that Tech Room personnel in the DEA Orlando District Office make copies of the Mini-DV of the shooting.  (Gruden Dep. at 114, lines 2-8; at 116, lines 11-18 (Ex. 11)); (Schafer Dep. at 15, lines 6-12 (Ex. 17)).

79.    SA Jeffrey Schafer in the Tech Room made approximately four CD copies of the Mini-DV and provided them along with the Mini-DV to GS Gruden.  (Gruden Dep. at 116, lines 11-15 (Ex. 11)); (Id. at 117, lines 18-21); (Schafer Dep. at 15, lines 21-25 (Ex. 17)).

80.    Each CD copy contained approximately 4 minutes and 9 seconds of audio and video footage of SA Paige's presentation to the OMYGA at the Callahan Community Center on April 9, 2004.  (DEA 001419, DEA 002163.)

81.    The Tech Room computer that SA Schafer used to make the CDs with SA Paige's shooting was password protected, and SA Shafer did not provide that password to anyone else.  (Schafer Dep. at 22, lines 1-8 (Ex. 17)).

82.    While making those copies of the shooting, SA Schafer saw the video recording of SA Paige's April 9, 2004 presentation, including the shooting.  (Schafer Dep. at 16, lines 15-25 (Ex. 17)).

83.    James Wise, a Telecommunications Specialist in the DEA Orlando District Office, also saw the video recording of the shooting while SA Schafer was copying the video.  (Wise Dep. at 8, lines 4-9 (Ex. 18)).

84.    After he returned the Mini-DV and the CDs to GS Gruden, SA Shafer did not access the computer file used to create the discs again; rather he deleted it.  (Schafer Dep. at 18, lines 3-9;

at 19, lines 8-10 (Ex. 17)); (Id. at 21, lines 1-4).

85.     Also during the week of April 12, 2004, GS Gruden wrote up a required "Report of Shooting," on a DEA Form-485, to send to the Firearms Training Unit in the Office of Training in Quantico, Virginia regarding SA Paige's self-shooting.  (Collins Dep. at 103, lines 17-18 (Ex. 12)); (Gruden Dep. at 155, line 19, to 156, line 17 (Ex. 11)); (Id. at 158, line 12, to 159, line 5); (Report of Shooting, DEA001263 - DEA 001264 (Ex. 19)).

86.     In completing the Report of Shooting, GS Gruden identified the file number for the form as GFAO-04-9020, which is a DEA general file, not indexed to any particular individual, but rather with a general title "assaults/threats/shootings."  (Collins Dep. at 92, lines 9-25 (Ex. 12)); (Id. at 99, lines 6-25); (Gruden Dep. at 160, lines 15-21 (Ex. 11)); (Id. at 212, lines 2-9); (Report of Shooting, DEA001263 - DEA 001264 (Ex. 19)).

87.     On or about April 15, 2004, GS Gruden sent a completed Report of Shooting along with a 4:09 CD version of the shooting video to GS Bill Lutz, in the Firearms Training Unit in Quantico, Virginia.  (Gruden Dep. at 159, lines 2-22 (Ex. 11)).

88.     In response to conversations and requests from other DEA agents, GS Gruden also distributed some of the CDs with 4:09 versions of the shooting video.  (Gruden Dep. at 123, lines 14-15 (Ex. 11)); (Id. at 155, lines 14-16); (Id. at 159, lines 16-22); (Id. at 175, lines 1-2).

89.     During the week of April 12, 2004, after speaking about SA Paige's shooting with Steve Derr, who was then the ASAC in Albuquerque, New Mexico, GS Gruden sent ASAC Derr one CD copy with 4:09 video footage of SA Paige's shooting.  (Gruden Dep. at 126, lines 3, to 128, line 21 (Ex. 11)).

90.     Also during the week of April 12, 2004, GS Rick Bendekovic, who was a GS in the New York Office called GS Gruden to inquire about the shooting in Orlando.  (Bendekovic Dep. at 7, lines 5-18 (Ex. 20)); (Gruden Dep. at 148, lines 1-9 (Ex. 11)).

91.    After GS Bendekovic asked some questions about the details of the shooting, GS Gruden told him that he had a copy of the video. (Bendekovic Dep. at 9, lines 9-20 (Ex. 20)).

92.    At that point, GS Bendekovic requested a copy of the shooting video to learn from what went wrong, and GS Gruden sent him one unlabeled CD with 4:09 video footage of SA Paige's shooting. (Bendekovic Dep. at 9, lines 11-18 (Ex. 20)); (Id. at 12, lines 10-13); (Gruden Dep. at 148, lines 7-22 (Ex. 11)).

93.    Furthermore, during the week of April 12, 2004, SA Kevin Scully, who was then assigned to the Orlando District Office, asked GS Gruden for a copy of the shooting video footage, and GS Gruden initially gave SA Scully one CD copy with video footage of SA Paige's shooting. (Gruden Dep. at 175, lines 1, to 176, line 16 (Ex. 11)).

94.    SA Scully had some difficulty watching the CD he received from GS Gruden. (Gruden Dep. at 176, line 17, to 177, line 19 (Ex. 11)); (Scully Dep. at 28, lines 11-14 (Ex. 21)).

95.    SA Scully never attempted to copy the CD he received. (Scully Dep. at 20, lines 20-22 (Ex. 21)).

96.    Consequently, SA Scully requested another copy of the shooting from GS Gruden. (Gruden Dep. at 177, line 20, to 178, line 19 (Ex. 11)).

97.    GS Gruden had a VHS version available, and he provided it to SA Scully, who then took it to the Orlando Tech Room and requested one VHS copy. (Gruden Dep. at 178, line 12-19 (Ex. 11)); (Scully Dep. at 27, lines 6-9 (Ex. 21)); (Id. at 29, lines 14-16).

98.    SA Scully received one VHS copy from the Orlando Tech Room, which was over 5 minutes in length, and he then returned the VHS to GS Gruden. (Gruden Dep. at 178, line 20, to 179, line 5 (Ex. 11)); (Scully Dep. at 27, lines 6-9 (Ex. 21)); (Id. at 29, lines 17-23).

**DEA's Office of Inspections Receives a VHS Copy of SA Paige's Shooting Video
and Begins a Shooting Investigation**

99.     During the week of April 12, 2004, Richard Dearing, then the Associate Deputy

Chief Inspector ("ADCI") for DEA's Office of Inspections ("IN") at DEA Headquarters in

Arlington, Virginia had heard of SA Paige's shooting (per policy GS Patterson send the teletype to

IN, among other destinations), and he telephoned ASAC Collins to request a copy of SA Paige's

self-shooting video.  (Burns Dep. at 7, lines 12-18 (Ex. 22)); (Collins Dep. at 67, lines 24-25 (Ex.

12)).

100.    ASAC Collins ordered GS Gruden to send a copy of the video recording of the

shooting to ADCI Dearing.  (Collins Dep. at 69, lines 9-18 (Ex. 12)).

101.    GS Gruden sent a VHS copy of the shooting video (over an hour in length) to ADCI

Dearing on April 15, 2004.  (Collins Dep. at 54, lines 17-20 (Ex. 12)); (Id. at 67, lines 5-8); (Id. at

69, lines 7-8); (Id. at 105, line 23, to 106, line 6); (Gruden Dep. at 101, line 12, to 102, line 15 (Ex.

11)); (Id. at 105, line 19, to 106, line 3).

102.    Also on April 15, 2004, IN assigned Senior Inspector L.D. Mathews and Inspector

Greg White to investigate SA Paige's shooting.  (Clifford Dep. at 17, line 14, to 18, line 1 (Ex. 23));

(Mathews Dep. at 20, lines 4-6 (Ex. 24)); (McAleer Dep. at 10, lines 14-22 (Ex. 25)); (White Dep.

at 20, line 22, to 21, line 7 (Ex. 26)); (Id. at 26, lines 6-10).

103.    On or about April 16, 2004, IN received (an unlabeled) VHS copy of SA Paige's

shooting, from which members of the IN shooting investigation team watched the video footage of

SA Paige's shooting.  (Burns Dep. at 13, lines 2-5 (Ex. 22)); (Mathews Dep. at 32, lines 7-14 (Ex.

24)); (Id. at 33, line 25, to 34, line 1); (Id. at 41, lines 8-10); (White Dep. at 22, line 3, to 23, line 22

(Ex. 26)).

104.    On April 16, 2004, an analyst in IN opened file IN-GB-04-32S for the investigation

of SA Paige's shooting.  (Clifford Dep. at 18, lines 2-16 (Ex. 23)); (Mathews Dep. at 25, lines 14-18

(Ex. 24)).

105.    The following week, between Monday, April 19 and Wednesday, April 21, 2004,

Inspectors Mathews and White traveled to Orlando to investigate SA Paige's shooting.  (Mathews

Dep. at 46, lines 18-23 (Ex. 24)); (White Dep. at 33, lines 7-11 (Ex. 26)).

106.    Investigators Mathews and White personally met with employees of the DEA

Orlando District Office as well as with eyewitnesses to the shooting.  (Mathews Dep. at 49, lines 4-

11 (Ex. 24)); (White Dep. at 45, line 20, to 46, line 9 (Ex. 26)).

107.    Investigators Mathews and White also telephone interviewed other persons who they

could not interview in person.  (Mathews Dep. at 49, lines 13-15 (Ex. 24)); (Id. at 49, line 23, to 50,

line 5).

108.    During the meeting with GS Gruden, the inspectors requested the original Mini-DV

of the shooting, which GS Gruden provided to them.  (Collins Dep. at 83, line 23 to 84, line 19 (Ex.

12)); (Gruden Dep. at 29, lines 16-19 (Ex. 11)); (Mathews Dep. at 60, lines 3-8 (Ex. 24)); (White

Dep. at 50, line 7, to 51, line 11 (Ex. 26)).

109.    However, in meeting with OMYGA, Investigators Mathews and White learned that

OMYGA wanted the Mini-DV back, but that OMYGA had no interest in the shooting portion of the

video.  (Brunson Dep. at 25, line 21 (Ex. 13)); (White Dep. at 89, line 22, to 90, line 8 (Ex. 26)).

110.    Investigators Mathews and White accommodated OMYGA's request by agreeing to

send a copy of the video with the shooting deleted back to OMYGA.  (Mathews Dep. at 51, line 21,

to 52, line 5 (Ex. 24)); (White Dep. at 129, lines 17-22 (Ex. 26)).

111.    After returning from Orlando, Inspector White brought the Mini-DV back to IN, and

placed the video recording in a locked cabinet in his cubicle on a secure floor.  (White Dep. at 53,

lines 17-21 (Ex. 26)); (Id. at 54, lines 1-3); (Id. at 56, lines 19-22); (Id. at 57, lines 1-18).

16

112.    Inspector White received the file number for the investigation, IN-GB-04-32S, when he returned from Orlando.  (White Dep. at 39, lines 3-4 (Ex. 26)).

113.    Also, at some point after his return from Orlando, Inspector White received the VHS copy of SA Paige's shooting, which he also placed in the locked cabinet in his cubicle.  (White Dep. at 31, line 10, to 32, line 10 (Ex. 26)).

114.    Senior Inspector Mathews had little further involvement in the investigation, and he neither created nor maintained additional copies of the video recording of the shooting.  (Mathews Dep. at 66, lines 3-5 (Ex. 24)); Id. at 68, lines 6-8).

115.    At some time before August 2004, Inspector White removed the Mini-DV from the locked cabinet to make copies for later copies of the IN file.  (White Dep. at 72, line 20, to 73, line 1 (Ex. 26)).

116.    Inspector White provided the Mini-DV of the shooting to Marquita Queen, who was an audio-visual specialist at DEA headquarters in Arlington, Virginia, to copy.  (Queen Dep. at 5, lines 11-13 (Ex. 27)).

117.    Per Inspector White's request, Ms. Queen made one DVD copy of the video-recording with SA Paige's self-shooting removed.  (Queen Dep. at 10, lines 1-13 (Ex. 27)); (Id. at 12, lines 6-9).

118.    That DVD with SA Paige's shooting removed was then sent to Dr. T.J. Dorsey of OMYGA on April 29, 2004.  (Queen Dep. at 30, line 11, to 31, line 2 (Ex. 27)); (White Dep. at 92, lines 1-4 (Ex. 26)).

119.    Dr. Dorsey believes that he received the video recording, but he could not locate it. (Dorsey Dep. at 21, lines 3-21 (Ex. 8)).

120.    Inspector White had also requested approximately five additional DVD copies of the Mini-DV, which he intended to distribute as needed to DEA's Board of Professional Conduct, the

Office of Training in Quantico, and he also retained extras for the IN file. (White Dep. at 73, line 4, to 75, line 20 (Ex. 26)).

121.    After Ms. Queen made the requested copies, Inspector White regained custody of all video recordings.  (Queen Dep. at 15, lines 9-19 (Ex. 27)).

122.    Ms. Queen provided all the DVDs she created to Inspector White, and she did not retain any copies of the video recording either in a physical format or on her computer.  (Queen Dep. at 14, lines 12-20 (Ex. 27)); (Id. at 14, line 22, to 15, line 19); (Id. at 20, lines 18-19); (Id. at 23, lines 13-15); (Id. at 30, lines 4-6).

123.    Inspector White did not provide or show the DVDs with SA Paige's shooting video footage to anyone until after this litigation commenced.  (White Dep. at 106, line 1, to 107, line 1 (Ex. 26)).

124.    The DVD copies that Inspector White requested included video footage of SA Paige's shooting were each approximately 23:34 in duration.  (DEA 001430, DEA 001445, and DEA 001447.)

125.    After completing his investigation, Inspector White completed the shooting investigation report for file IN-GB-04-32S in August 2004.  (Clifford Dep. at 20, line 15, to 21, line 9 (Ex. 23)); (White Dep. at 68, line 21, to 69, line 4 (Ex. 26)); (Id. at 97, lines 9-12).

126.    Inspector White's report was reviewed by Senior Inspector Richard Inscore, who was Inspector White's senior team leader at the time.  (White Dep. at 67, lines 6-12 (Ex. 26)).

127.    An IN file is neither official nor complete until the Deputy Chief Inspector signs off on it, and that was done on August 13, 2004.  (White Dep. at 9, lines 10-12 (Ex. 26)); (Id. at 37, lines 10-19); (Id. at 97, lines 9-14).

128.    The original IN filed contained the Mini-DV and the VHS copy of the shooting. (Burns Dep. at 33, line 6, to 34, line 6 (Ex. 22)); (Id. at 127, lines 3-13).

129. After the IN file was completed, copies of the IN file, each containing DVD video footage of SA Paige's shooting, were distributed to destinations such as the Firearms Training Unit (to review for "lessons learned"), the DEA Board of Professional Conduct (as part of the disciplinary procedure), the DEA Deciding Official (same).  (Burns Dep. at 54, lines 1-9 (Ex. 22)); (Clifford Dep. at 47, lines 3-7 (Ex. 23)); (White Dep. at 96, lines 2-5 (Ex. 26)); (Id. at 101, lines 13-15); (Dunn Decl. (Ex. 28)); (Halligan Decl. (Ex. 29)); (Yates Decl. (Ex. 30)); (Moorin Decl. (Ex. 31)).

130. Inspector White also retained some of the extra copies of the DVDs along with his notes of the shooting investigation.  (White Dep. at 97, line 15, to 98, line 1 (Ex. 26)).

131. Inspector White never provided or showed the DVDs with the shooting in his possession to anybody until DEA's Office of Professional Responsibility requested those copies. (White Dep. at 106, line 1, to 107, line 1 (Ex. 26)).

### Presentation to the Shooting Assault Incident Review Committee, and transmission of a copy of the IN-GB-04-32S to the Office of Training

132. In September 2004, after IN completed file IN-GB-04-32S, James Burns, who was then a Senior Inspector in IN, and who served as the Shooting Incident Team Coordinator for IN, reviewed the original IN file (with the Mini-DV and the VHS) to make a presentation to DEA's Shooting Assault Incident Review Committee (the "SAIRC") regarding SA Paige's shooting (per DEA procedures). (Burns Dep. at 14, lines 14-20 (Ex. 22)); (Id. at 35, line 19, to 36, line 5); (Id. 87, line 12, to 88, line 5); (Clifford Dep. at 53, lines 10-13 (Ex. 23)); (White Dep. at 79, lines 13-17 (Ex. 26)).

133. As part of his review, Senior Inspector Burns watched the VHS video recording of SA Paige's shooting, and when he was done, he returned the complete file to the secure Armory. (Burns Dep. at 90, line 8, to 91, line 6 (Ex. 22)).

134.    Later, on September 2, 2004, Senior Inspector Burns showed the VHS recording of SA Paige's shooting to the SAIRC.  (Burns Dep. at 97, lines 11-14 (Ex. 22)); (Id. at 61, lines 6-8).

135.    Senior Inspector Burns did not show the video recording to any one other than the members of the SAIRC.  (Burns Dep. at 91, lines 4-6 (Ex. 22)).

136.    Senior Inspector Burns never obtained a personal copy of the video recording of the shooting.  (Burns Dep. at 51, lines 2-4 (Ex. 22)).

137.    Also, as a matter of procedure, after a presentation to the SAIRC, the Office of Training was always provided with a copy of the relevant shooting file to review for lessons learned.  (Burns Dep. at 54, lines 2-9 (Ex. 22)); (Id. at 109, lines 17-19); (Id. at 110, lines 1-5); (Lutz Dep. at 8, line 8, to 9, line 18 (Ex. 32)); (Id. at 12, lines 10-19); (McAleer Dep. at 32, lines 11-22 (Ex. 25)).

138.    At some point after his presentation, Senior Inspector Burns hand-delivered a copy of the IN file, including the video recording of the shooting, to the Office of Training in Quantico.  (Burns Dep. at 50, lines 7-10 (Ex. 22)).

139.    After the presentation to the SAIRC, a copy of the IN-GB-04-32S file was sent to DEA's Board of Professional Conduct for review per DEA disciplinary procedure.  (Burns Dep. at 24, line 16, to 25, line 5 (Ex. 22)); (Id. at 97, line 11, to 98, line 6); (Clifford Dep. at 58, line 22 to 59, line 5 (Ex. 23)); (McAleer Dep. at 38, line 23, to 39, line 6 (Ex. 25)).

**DEA's Board of Professional Conduct reviews a copy of IN-GB-04-32S**

140.    As part of its review of SA Paige's shooting, DEA's Board of Professional Conduct received a copy of IN-GB-04-32S.  (Dunn Decl. (Ex. 28)); (Halligan Decl. (Ex. 29)); (Yates Decl. (Ex. 30)).

141.    Members of DEA's Board of Professional Conduct, Patrick Dunn, Randall Yates, and Edward Halligan, reviewed the IN file and watched video footage of SA Paige's shooting.

20

(Dunn Decl. (Ex. 28)); (Halligan Decl. (Ex.29)); (Yates Decl. (Ex. 30)).

142.    None of those Board Members maintained or created additional copies of the video recording of the shooting.  (Dunn Decl. (Ex. 28)); (Halligan Decl. (Ex.29)); (Yates Decl. (Ex. 30)).

**DEA's Board of Professional Conduct sends a copy of IN-GB-04-32S, including video footage of SA Paige's shooting to the Miami Division for SA Paige to review.**

143.    After their review of the file and the video, the Board Members proposed discipline for SA Paige, and on December 2, 2004, as part of the disciplinary procedure (which lets the subject of an investigation review the file), Board Member Halligan sent Acting DEA Miami Division Special Agent in Charge ("SAC") Robert Joura a copy of IN-GB-04-32S, which included a copy of the video recording.  (Halligan Decl. (Ex. 29)); (DEA001190 (transmittal letter only) (Ex. 33)).

144.    SAC Joura sent that copy of IN-GB-04-32S, including the video footage of SA Paige's shooting to ASAC Collins in Orlando.  (Collins Dep. at 133, line 21, to 134, line 3 (Ex. 12)); (DEA001190 (transmittal letter only) (Ex. 33)).

145.    ASAC Collins then provided SA Paige with that copy of IN-GB-04-32S on or about December 6, 2004.  (Collins Dep. at 133, line 21 to 134, line 3 (Ex. 12)); (L. Paige Dep. at 121, lines 6-10 (Ex. 2)); (DEA001190 (transmittal letter only) (Ex.33)); (Signature Page DEA 000936 (Ex. 34)).

146.    SA Paige had sole custody of IN-GB-04-32S, including a copy of his shooting video, for approximately three or four days.  (Collins Dep. at 136, lines 18-25 (Ex. 12)); (L. Paige Dep. at 122, lines 17-19 (Ex. 2)); (Id. at 122, lines 20, to 123, line 8).

147.    At some point during his custody of the file, SA Paige indicated to ASAC Collins that he wanted to copy shooting video recording, and ASAC Collins denied that request pursuant to DEA policy.  (Collins Dep. at 137, lines 1-24 (Ex. 12)); (L. Paige Dep. at 122, lines 20-23 (Ex. 2)).

148.    After his review, SA Paige returned the file and the video recording to ASAC

Collins, who sent the file and the video back to the DEA Miami, Florida Division Office.  (Collins Decl. (Ex. 12)).

149.    ASAC Collins did not create any additional copies of IN-GB-04-32S, or the video recording of the shooting, rather he returned the file, with the video to the Miami Division.  (Collins Dep. at 140, lines 3-5 (Ex. 12)); (Collins Decl. (Ex. 35)).

**The Deciding Official Reviews a copy of IN-GB-04-32S and the video footage of SA Paige's shooting.**

150.    Per DEA's disciplinary procedures, after SA Paige had reviewed a copy of the file, a copy was sent to DEA Human Resources Deciding Official, Arnold Moorin.  (Dunn Decl. (Ex. 28)); (Halligan Decl. (Ex. 29)); (Yates Decl. (Ex. 30)); (Moorin Decl. (Ex. 31)).

151.    Deciding Official Moorin reviewed IN-GB-04-32S, and as part of that review, he watched a video recording SA Paige's shooting, which was included with his copy of the file. (Moorin Decl. (Ex.31)).

152.    Deciding Official Moorin did not copy or authorize the copying of any material in the file, including the video recording of SA Paige's shooting.  (Moorin Decl. (Ex. 31)).

153.    Deciding Official Moorin retained custody of the file on a secure floor at DEA Headquarters until he completed his review, and then he caused the complete file, including the video footage to be returned to IN.  (Moorin Decl. (Ex. 31)).

154.    After his review of the file, Deciding Official Moorin determined that SA Paige's actions deserved disciplinary sanctions and, Deciding Official Moorin wrote SA Paige and explained the basis for SA Paige's discipline as follows:

> The potential for serious injury to children and adults in the audience as a result of your displaying firearms displays a serious lack of judgment on your part; that ultimately caused you to sustain a serious injury.  Your actions overshadowed the purpose of your presentation and reflected negatively on your professionalism and the [DEA] as an agency.

(Moorin Decl. (Ex. 31)); (Deciding Official Letter DEA001195-1196 (Ex. 36)).

### News of SA Paige's Self-Shooting Spread in the Media in April and May 2004

155.    Within a month of SA Paige's April 9, 2004 self-shooting, newspapers throughout the state of Florida published articles on the shooting.  (Drug Agent Shoots Self During Gun Presentation, Tampa Trib., May 2, 2004, at 2; DEA Agent Shoots Self During Gun Safety Class, Sun-Sentinel (Fort Lauderdale), May 1, 2004, at 6B; DEA Investigates after Agent Shoots Himself in Safety Class for Kids, Orlando Sentinel, Apr. 30, 2004, at B2; Drug Agent Shoots Self During Gun-safety Class, Tallahassee Democrat, May 1, 2004, at B4; Gun Safety Demonstrator Shoots Self, St. Petersburg Times, May 1, 2004, at 4B (Ex. 37)).

156.    The story was also picked up by the Associated Press and United Press International. (DEA Agent Shoots Self During Gun Safety Class for Florida Children, The Associated Press, May 1, 2004; DEA Agent Shoots Self During Gun Safety Class for Orlando Kids, The Associated Press State & Local Wire, Apr. 30, 2004; DEA Agent Shoots Self in Gun Safety Class, Associated Press Online, May 1, 2004; DEA Agent Shoots Self in Gun Safety Class, United Press Int'l, Apr. 30, 2004 (Ex. 38)).

157.    Those reports of SA Paige's shooting spread throughout the nation.  (Agent Shoots Own Leg in Safety Presentation, Augusta Chron., May 2, 2004, at B03; Agent Shoots Self During Safety Class, Duluth News Trib., May 2, 2004; Agent Shoots Self During Safety Talk, Akron Beacon J., May 3, 2004, at A5; Agent Shoots Self in Leg During Presentation, The State (Columbia, SC), May 2, 2004, at A17; United States: Gun Safety Lecturer Shoots His Own Leg, Ottawa Citizen, May 2, 2004, at A7; U.S. Drug Agent Shoots Leg During Safety Class, Deseret Morning News (Salt Lake City), May 2, 2004 (Ex. 39)).

158.    In addition, SA Paige's shooting was mentioned by Paul Harvey on his May 3, 2004, radio broadcast, which is syndicated throughout the nation.  (This fact may be judicially noticed.)

159.    Also, at the local level, Orlando-area television broadcasts covered news of SA Paige's self shooting, and they interviewed members of the OMYGA.  (Media DVD, Track 1 (Ex. 40)).

160.    Dr. T.J. Dorsey, the founder of OMYGA, described the shooting as a "blessing" and explained that "someone sitting in here gained some valuable information," presumably about gun safety.  (Media DVD, Track 1 (Ex. 40)).

161.    Similarly, Vivian Farmer, a parent who was present with her child at the OMYGA meeting, stated that the incident "allowed children to see that anybody can make a mistake." (Media DVD, Track 1 (Ex. 40)).

162.    Despite all of this media coverage in April and May of 2004, none of it mentioned SA Paige by name.  (See citations supra ¶¶ 155-161).

163.    Nor did any of the media coverage in April and May of 2004 mention that a video-recording existed of the OMYGA's April 9, 2004 meeting.  (See citations supra ¶¶ 155-161).

**In early March 2005, video footage of SA Paige's self-shooting that was
4 minutes and 9 seconds in duration began to appear on internet webpages.**

164.    In the first week of March 2005, versions of shooting video began to appear on internet websites.  (Gregg Decl. ¶ 5 (Ex. 41)).

165.    The earliest known versions of the video that appeared on websites were 4:09 in length, and they had the same starting and ending points as the 4:09 version of the shooting video that was created in Orlando.  These versions were never included in IN file IN-GB-04-32S.  (Gregg Decl. ¶ 5 (Ex. 41)); (Reinke Decl. ¶ 8 (Ex. 42)).

166.    Also starting on March 7, 2005, the shooting video began to circulate on DEA's internal email system, known as Firebird.  (Gregg Decl. ¶ 6 (Ex. 41)).

167.    The earliest known version on the shooting video that circulated on the Firebird

email system was 4:09 in length, and it had the same starting and ending points as the 4:09 version

of the shooting video that was created in Orlando.  These versions were never included in IN file

IN-GB-04-32S.  (Gregg Decl. ¶ 6 (Ex. 41)); (Reinke Decl. ¶ 8 (Ex. 42)).

168.    No version of video footage of SA Paige's self-shooting longer than 4:09 has ever

appeared on the internet or on DEA's Firebird email system.  (Gregg Decl. ¶ 7 (Ex. 41)).

**By filing this lawsuit in April 2006, SA Paige attracted more media attention
to the video footage of his self-shooting.**

169.    In April 2006, after SA Paige filed his lawsuit, he publicized his case by appearing

on national and local television programs, such as the Today Show, CNN News, the Rita Crosby

Show, and the O'Reilly Factor.  (Media DVD, Tracks 2-10 (Ex. 40)).

170.    On those programs, video footage of SA Paige's self-shooting played while SA

Paige was interviewed.  (Media DVD, Tracks 2-10 (Ex. 40)).

171.    Before this publicity and the filing of the lawsuit, there are no known instances of

media reports that associated SA Paige's name with the self-shooting video footage.  (See citations

supra ¶¶ 155-163).

**Before video footage of SA Paige' self-shooting appeared on internet webpages, other
versions– which never entered the IN file, IN-GB-04-32S – circulated within DEA**

**The 4:09 CD version received by GS Lutz**

172.    GS Lutz in DEA's Office of Training, Firearms Training Unit in Quantico,Virginia

received from GS Gruden an unlabeled CD with a 4:09 version of SA Paige's self-shooting video,

and GS Lutz viewed it.  (Gruden Dep. at 159, lines 2-22 (Ex. 11)); (Lutz Dep. at 17, line 11, to 18,

line 2 (Ex. 32)); (Id. at 19, lines 16-18); (Id. at 18, line 25, to 19, line 11).

173.    GS Lutz wanted to view the video to see if there had been a weapon malfunction, to

determine what happened, and to review for lessons learned.  (Lutz Dep. at 23, line 23, to 24, line

10 (Ex. 32)); (Id. at 24, line 25, to 25, line 14).

174.    GS Lutz could not watch the CD on the computers in his office, and he went to a firearms training machine to watch the video footage along with other DEA personnel.  (Lutz Dep. at 19, lines 20-22 (Ex. 32)); (Id. at 20, lines 15-20); (Id. at 28, lines 13-19).

175.    After that review, GS Lutz believed that the video footage of SA Paige's self-shooting had training value because it illustrated many safety violations.  (Lutz Dep. at 26, lines 10-14 (Ex. 32)).

176.    GS Lutz secured the video in a locked locker in his office.  (Lutz Dep. at 27, lines 12-16 (Ex. 32)).

177.    In connection with a reassignment in approximately June 2004, GS Lutz believes that he subsequently destroyed the CD.  (Lutz Dep. at 30, lines 4-17 (Ex. 32)); (Id. at 31, lines 22-25).

**The 4:09 CD version received by ASAC Derr**

178.    In April 2004, ASAC Derr of the Albuquerque District Office received a red, unlabeled CD with a 4:09 version of SA Paige's self-shooting video from GS Gruden.  (Gruden Dep. at 131, line 16, to 132, line 6 (Ex. 11)); (Derr Dep. at 13, lines 12-13 (Ex. 43)); (Id. at 15, lines 1-2); (Id. at 15, lines 14-22).

179.    ASAC Derr never viewed the CD, nor did he provide the CD to anyone else.  (Derr Dep. at 18, line 17, to 19, line 4 (Ex. 43)); (Gruden Dep. at 138, lines 10-12 (Ex. 11)).

180.    Because he received the CD while he was moving from Albuquerque to a new assignment in DEA Headquarters in Arlington, Virginia, ASAC Derr initially put it in his desk drawer and later he packed up the CD with other office materials, where he kept the CD until he provided the video recording to DEA's Office of Professional Responsibility in November 2007.  (Derr Dep. at 5, lines 13-15 (Ex. 43)); (Id. at 18, line 5, to 19, line7); (Id. at 22, lines 5-8).

**The 4:09 CD version received by GS Bendekovic and subsequent 4:09 copies**

181.    In April 2004, in response to his request to see the video to learn from, GS
Bendekovic of the New York Office received an unlabeled CD with a 4:09 version of SA Paige's
self-shooting video from GS Gruden.  (Bendekovic Dep. at 9, lines 9-20 (Ex. 20)); (Id. at 11, lines
18-21); (Gruden Dep. at 148, lines 16-17 (Ex. 11)).

182.    GS Bendekovic wrote "Demand Reduction" on the CD.  (Bendekovic Dep. at 14,
line 5 (Ex. 20)).

183.    GS Bendekovic was unable to view the CD of the shooting on his work computer, so
he viewed the video recording of the shooting at home.  (Bendekovic Dep. at 11, line 25, to 12, line
4 (Ex. 20)); (Id. at 14, lines 11-15).

184.    Thinking that the video could be useful for gun safety and/or demand reduction
purposes, the next day GS Bendekovic took the CD to the Associate SAC for the New York Office,
Derek Maltz.  (Bendekovic Dep. at 17, line 22, to 18, line 15 (Ex. 20)); (Maltz Dep. at 12, lines10-
15 (Ex. 44)).

185.    The CD was able to play on a laptop in Associate SAC Maltz's office, and GS
Bendekovic and Associate SAC Maltz watched it in Associate SAC Maltz's office.  (Bendekovic
Dep. at 19, lines 19-25 (Ex. 20)); (Maltz Dep. at 12, lines 10-15 (Ex. 44)).

186.    Associate SAC Maltz wanted to see the video to learn from it and out of concern for
how such an incident could take place.  (Maltz Dep. at 17, lines 2-14 (Ex. 44)).

187.    At some point in time while in Associate SAC Maltz's office, GS Bendekovic may
have offered to make a copy of the video for Associate SAC Maltz or he may have just given a copy
of the video for Associate SAC Maltz.  (Bendekovic Dep. at 22, lines 7-10 (Ex. 20)); (Maltz Dep. at
11, lines 15-18 (Ex. 44)).

188.    After leaving Associate SAC Maltz's office, GS Bendekovic went to a tech officer,

SA Tom Panzitta, who had newer generation computer equipment, to make a copy of the shooting video for Associate SAC Maltz.  (Bendekovic Dep. at 22, lines 1-5 (Ex. 20)); (Id. at 22, line 25, to 23, line 13).

189.    SA Panzitta made a copy of the video recording of the shooting, and while so doing GS Bendekovic and SA Panzitta viewed the video recording of the shooting.  (Bendekovic Dep. at 23, line 17, to 24, line 25 (Ex. 20)).

190.    SA Panzitta returned the original CD and the copy to GS Bendekovic after he created the copy.  (Bendekovic Dep. at 24, lines 5-13 (Ex. 20)).

191.    Immediately after receiving the copy, GS Bendekovic took it to Associate SAC Maltz.  (Bendekovic Dep. at 25, lines 10-15 (Ex. 20)).

192.    Afterwards, GS Bendekovic retained custody of the CD with the 4:09 video recording of the shooting in a locked drawer until he provided the video recording to DEA's Office of Professional Responsibility.  (Bendekovic Dep. at 32, line 15, to 33, line 2 (Ex. 20)); (Id. at 26, lines 23-25).

193.    Neither GS Bendekovic nor SA Panzitta created or maintained any other copies of the video recording of the shooting.  (Bendekovic Dep. at 24, lines 5-13 (Ex. 20)); (Id. at 26, lines 8-12); (Id. at 25, lines 7-11).

194.    Neither GS Bendekovic nor SA Panzitta provided the video recording of the shooting to anyone else.  (Bendekovic Dep. at 26, lines 20-22 (Ex. 20)); (Id. at 28, lines 23-25); (Id. at 24, lines 1-13).

195.    Associate SAC Maltz copied the 4:09 video recording of the shooting provided by GS Bendekovic onto his laptop.  (Maltz Dep. at 18, lines 12-16 (Ex. 44)).

196.    Associate SAC Maltz titled the video recording of the shooting, "Orlando" when he saved it to his hard drive.  (Maltz Dep. at 18, line 21, to 19, line 7 (Ex. 44)).

197.    In 2005, Associate SAC Maltz was promoted to SAC of DEA's Special Operations Division in Chantilly, VA.  (Maltz Dep. at 5, line 22, to 6, line 1 (Ex. 44)).

198.    As a result of his promotion and change of offices, SAC Maltz had to turn in his laptop to the New York office.  (Maltz Dep. at 26, line 22, to 27, line 3 (Ex. 44)).

199.    SAC Maltz received a new laptop from the Special Operations Division.  (Maltz Dep. at 27, lines 4-5 (Ex. 44)); (Id. at 28, lines 12-14).

200.    Tech personnel at Special Operations Division transferred the contents of SAC Maltz's New York laptop onto his Special Operations Division laptop.  (Maltz Dep. at 28, line 16, to 29, line 6 (Ex. 44)).

201.    SAC Maltz's New York laptop was then reassigned in New York DEA office after all files on the laptop were deleted per policy.  (Maltz Dep. at 31, lines 1-12 (Ex. 44)).

202.    Along with a number of other videos, SAC Maltz had the Tech personnel transfer the video recording of the shooting because it served as a gun safety reminder.  (Maltz Dep. at 24, lines 5-7 (Ex. 44)).

203.    SAC Maltz was not able to watch the video recording of the shooting on his Special Operations Division laptop computer.  (Maltz Dep. at 33, lines 14-17 (Ex. 44)).

204.    Nor was SAC Maltz able to watch a variety of other videos from his New York laptop.  (Maltz Dep. at 38, lines 14-19 (Ex. 44)).

205.    SAC Maltz subsequently had Tech personnel in the Special Operations Division copy the contents of his Special Operations Division laptop, including the video recording of the shooting, onto a newer Hewlett Packard laptop.  (Maltz Dep. at 36, lines 10-16 (Ex. 44)); (Id. at 37, line 22, to 38, line 2).

206.    SAC Maltz's first Special Operations Division laptop was then "wiped" clean. (Maltz Dep. at 39, line 15, to 40, line 2 (Ex. 44)).

207.    SAC Maltz did not email the video recording to anyone.  (Maltz Dep. at 48, line 21 to 49, line 1 (Ex. 44)).

208.    Nor did he did show the video recording of the shooting to anyone else.  (Maltz Dep. at 25, lines 12-16 (Ex. 44)).

209.    After a discussion with DEA's Office of Professional Responsibility, SAC Maltz burned the video recording from his laptop to a CD and deleted the file from his laptop.  (Maltz Dep. at 42, lines 7-8 (Ex. 44)); (Id. at 47, lines 3-5); (Id. at 48, lines 13-16).

210.    SAC Maltz then provided his CD copy of the video recording of the shooting entitled "Orlando" to DEA's Office of Professional Responsibility.  (Maltz Dep. at 55, lines 10-20 (Ex. 44)).

### The video footage of SA Paige's shooting received by SA Scully and subsequent VHS copies

211.    In May 2004, SA Scully was promoted to GS and transferred to the Tampa District Office.  (Scully Dep. at 5, lines 8-9 (Ex. 21)); (Id. at 5, lines 13-19).

212.    SA Scully took whatever video footage he had with him to Tampa during his transfer, and subsequently as a GS, in response to requests from members of his group, he showed the video footage in the Tampa Office to a few members of his group, during which time there were discussions trying to determine how SA Paige actually shot himself.  (Clark Dep. at 18, lines 1-2 (Ex. 45)); (Id. at 19, lines 6-8); (Id. at 23, line 24, to 24, line 4); (Id. at 27, line 23, to 28, line 12); (Gruden Dep. at 175, line 1, to 177, line 22 (Ex. 11)); (Scully Dep. at 35, line 12, to 26, line 1 (Ex. 21)); (Id. at 37, line 10, to 38, line 9).

213.    SA Kevin Clark, who worked in DEA's Tampa District Office, became aware that GS Scully had at least one copy of the video recording of the shooting.  (Clark Dep.at 5, lines 10-14 (Ex. 45)); (Id. at 16, lines 14-15).

214.    SA Clark requested a copy of the video recording of the shooting from GS Scully. (Clark Dep. at 17, lines 19-20 (Ex. 45)); (Id. at 29, lines 20-23).

215.    GS Scully provided SA Clark with a CD video recording of the shooting, which SA Clark viewed at home.  (Clark Dep. at 30, lines 15-17 (Ex. 45)); (Id. at 32, lines 23-34).

216.    SA Clark did not show the CD video recording of the shooting to anyone, nor did he make copies of the CD.  (Clark Dep. at 33, lines 19-22 (Ex. 45)).

217.    SA Clark returned the CD video-recording to GS Scully, told him the quality was bad, and requested to see a better video quality version of the video.  (Clark Dep. at 35, lines 23-25 (Ex. 45)).

218.    In response, GS Scully provided his VHS version of the video recording to SA Clark.  (Clark Dep. at 36, lines 4-8 (Ex. 45)); (Gruden Dep. at 180, lines 3-8 (Ex. 11)); (Scully Dep. at 44, lines 5-8 (Ex. 21)); (Id. at 45, lines 11-12).

219.    SA Clark watched the VHS version of the video recording of the shooting at his home.  (Clark Dep. at 36, line 24, to 37, line 6 (Ex. 45)).

220.    No one but SA Clark and his wife watched the VHS version of the video recording of the shooting at SA Clark's home.  (Clark Dep. at 38, lines 6-8 (Ex. 45)).

221.    GS Mark Baughman in DEA's Jacksonville, Florida District Office became aware that SA Clark had a copy of the video recording of the shooting and requested a copy from SA Clark.  (Baughman Dep. at 5, lines 18-22 (Ex. 46)); (Id. at 9, lines 13-25); (Id. at 10, lines 19-22); (Clark Dep. at 43, lines 17-21 (Ex. 45)).

222.    GS Baughman requested a copy of the video recording of the shooting because SA Paige had given demand reduction presentations while under GS Baughman's supervision, and GS Baughman was curious if SA Paige had done similar things during that time.  (Baughman Dep. at 11, lines 9-12 (Ex. 46)); (Id. at 11, line 23, to 12, line 1).

223.    On June 20, 2004, SA Clark copied his VHS copy of the shooting at the Hillsborough County Sheriff's Office, and two employees of the Hillsborough County Sheriff's Office viewed the video of SA Paige's shooting while it was being copied.  (Clark Dep. at 47, line 21, to 48, line 9 (Ex. 45)); (Id. at 44, lines 6-7).

224.    Before copying the VHS recording of the shooting at the Hillsborough County Sheriff's Office, SA Clark did not provide the VHS recording of the shooting to anyone else. (Clark Dep. at 41, lines 9-12 (Ex. 45)).

225.    SA Clark retained custody of the VHS, and he later provided the VHS copy to GS Baughman.  (Baughman Dep. at 14, lines 18-24 (Ex. 46)); (Clark Dep. at 49, lines 2-3 (Ex. 45)); (Id. at 52, lines 1-8).

226.    That VHS was approximately 5 minutes and 42 seconds in duration.  DEA 001436.

227.    GS Baughman watched the VHS of the shooting by himself initially.  (Baughman Dep. at 26, lines 1-5 (Ex. 46)).

228.    GS Baughman invited approximately six DEA Special Agents in the DEA Jacksonville Office to view the VHS copy for training purposes, and GS Baughman showed that video in a conference room with the door closed.  (Baughman Dep. at 29, lines 6-19 (Ex. 46)); (Id. at 30, lines 1-12); (Id. at 36, lines 1-4); (Id. at 37, lines 1-2).

229.    GS Baughman showed the VHS video recording of the shooting because it was an example of what not to do during a demand reduction presentation.  (Baughman Dep. at 30, lines 14-17 (Ex. 46)); (Id. at 38, lines 13-16).

230.    After the showing, GS Baughman kept the VHS video recording of the shooting in a locked safe in the DEA's Jacksonville District Office and did not show the video recording of the shooting again, nor did he watch it again.  (Baughman Dep. at 23, lines 19-25 (Ex. 46)); (Id. at 40, lines 1-8); (Id. at 41, lines 3-6); (Id. at 53, lines 3-5).

231.    GS Baughman did not make any copies of the video recording of the shooting. (Baughman Dep. at 41, lines 9-10 (Ex. 46)); (Id. at 59, lines 16-18).

232.    GS Baughman subsequently provided the VHS copy to DEA's Office of Professional Responsibility . (Baughman Dep. at 21, lines 10-12 (Ex. 46)); (Id. at 22, lines 8-10).

**GS Gruden destroys unneeded CD copies of the shooting video**

233.    GS Gruden recalls that at some point in time he had one or more unneeded CDs containing a 4:09 version of SA Paige's shooting, and because he had no need from them, he destroyed them by breaking them in half. (Gruden Dep. at 193, lines 7-21 (Ex. 11)).

**SA Christopher Bowman receives from GS Gruden a VHS containing video footage of SA Paige's self-shooting**

234.    In April 2004, SA Christopher Bowman worked in the DEA's Orlando District Office and he also served as DEA's Firearms Instructor in the Orlando District Office. (Bowman Dep. at 4, lines 6-10 (Ex. 47)); (Id. at 8, lines 3-7); (Id. at 10, line 22); (Gruden Dep. at 161, lines 20-21 (Ex. 11)).

235.    Some weeks after the shooting, SA Paige told SA Bowman about the shooting. (Bowman Dep. at 8, line 19, to 9, line 9 (Ex. 47)).

236.    Afterwards, SA Bowman requested a copy of the video from GS Gruden because he thought he should see the video as the Firearms Instructor in the DEA's Orlando District Office in light of SA Paige's statement that the weapon had malfunctioned. (Bowman Dep. at 8, lines 6-9 (Ex. 47)); (Id. at 8, line 19, to 9, line 5); (Gruden Dep. at 167, lines 4-5 (Ex. 11)).

237.    GS Gruden gave a black, unlabeled VHS copy of the video of the shooting to SA Bowman for him to review. (Bowman Dep. at 16, lines 8-9 (Ex. 47)); (Id. at 30, lines 4-11).

238.    SA Bowman viewed the VHS video recording of the shooting and stored it in a locked, secure firearms vault until he returned it to GS Gruden. (Bowman Dep.at 15, line 25, to 16,

line 21 (Ex. 47)); (Id. at 21, lines 18-21); (Id. at 23, lines 7-14).

239.    SA Bowman did not create any copies of the video recording of the shooting, nor did

he provide the VHS to anyone else while it was in his custody.  (Bowman Dep. at 24, lines 7-12

(Ex. 47)); (Id. at 27, lines 19-21).

<strong>Associate SAC Charles West receives a VHS<br>containing video footage of SA Paige's self-shooting</strong>

240.    Several weeks after the shooting, Associate SAC Charles West of the DEA Miami

Division Office requested a copy of SA Paige's shooting video.  (Collins Dep. at 54, line 20 (Ex.

12)); (Id. at 76, line 23, to 77, line 3); (Gruden Dep. at 186, lines 2-7 (Ex. 11)).

241.    In response to that request, ASAC Collins coordinated with GS Gruden to send a

VHS copy of SA Paige's self-shooting to Associate SAC West.  (Collins Dep. at 54, lines 17-20

(Ex. 12)); (Id. at 67, lines 3-5); (Id. at 78, lines 4-8); (Gruden Dep. at 186, lines 2-7 (Ex. 11));

(Wheeler Decl. (Ex. 48)).

<strong>DEA Primary Firearms Instructors in Miami Receive a 4:09 CD copy</strong>

242.    In 2004, SAs Kevin Naughton and Natale Gugliotta were Primary Firearms

Instructors ("PFIs") in DEA's Miami Division.  (Gugliotta Dep. at 4, lines 23-24 (Ex. 49));

(Naughton Dep. at 4, lines 16-24 (Ex. 50)).

243.    In late spring or summer 2004, PFIs Naughton and Gugliotta received a CD copy of

video recording of SA Paige's self-shooting labeled "Training MPEG" through interoffice mail in

an unmarked envelope with no indication as to where it was from.  (Gugliotta Dep. at 10, line 25 to

12, line 24 (Ex. 49)); (Naughton Dep. at 9, line 9, to 10, line 18 (Ex. 50)); (Id. at 11, line 25, to 12,

line 2); (Id. at 15, lines 22, to 16, line 4); (Id. at 32, lines 5-6).

244.    The video footage on the CD is 4:09 in duration, and it had the same starting and

ending points as the 4:09 version of the shooting video that was created in Orlando.  (DEA 001421.)

245.    PFIs Naughton and Gugliotta watched the video recording of the shooting to learn from it and to analyze what happened and because the video recording contained important learning points.  (Gugliotta Dep. at 14, lines 19-21 (Ex. 49)); (Id. at 23, lines 5-8); (Naughton Dep. at 14, lines 4-8 (Ex. 50)); (Id. at 20, line 1); (Id. at 38, lines 5-20).

246.    PFIs Naughton and Gugliotta did not create any additional copies of the CD they received, nor did they provide the CD to anyone else.  (Gugliotta Dep. at 17, lines 9-13 (Ex. 49)); (Id. at 19, lines 20-23); (Id. at 35, line 22, to 36, line 2); (Naughton Dep. at 13, line 22, to 14, line 3 (Ex. 50)); (Id. at 39, lines 5-7).

247.    PFIs Naughton and Gugliotta did play the video recording of the shooting for some DEA personnel for training and instruction purposes, to show why the shooting occurred, and as a learning tool.  (Gugliotta Dep. at 20, lines 21-24 (Ex. 49)); (Id. at 21, lines 8-11); (Id. at 23, lines 13-16); (Naughton Dep. at 20, lines 17-18 (Ex. 50)); (Id. at 20, line 22 to 21, line 1); (Id. at 21, lines 5-7).

248.    But, PFIs Naughton and Gugliotta never incorporated the video recording of the shooting as part of official, formal DEA training.  (Gugliotta Dep. at 45, lines 15-18 (Ex. 49)); Naughton Dep. at 20, lines 12-18 (Ex. 50)).

249.    At some point in time, PFIs Naughton and Gugliotta were told through their chain of command to stop showing the video.  (Gugliotta Dep. at 38, line 11, to 39, line 9 (Ex. 49)); (Naughton Dep. at 25, lines 21-24 (Ex. 50)).

250.    In September 2004, SA Paige went to PFIs Naughton and Gugliotta to receive two-days of remedial firearms training as a result of his self-shooting.  (L. Paige Dep. at 115, line 24, to 116, line 2 (Ex. 2)); (Naughton Dep. at 53, lines 7-8 (Ex. 50)); (Id. at 46, line 22, to 47, line 19); (Gugliotta Dep. at 36, lines 11-16 (Ex. 50)); (Remedial Training Letter DEA 000913 (Ex. 51).

251.    Also at the remedial firearms training was SA Jason Weiss.  (L. Paige Dep. at 117,

lines 3-18 (Ex. 2)); (Gugliotta Dep. at 32, lines 16-19 (Ex. 49)); (Id. at 41, lines 1-2); (Naughton

Dep. at 47, line 23, to 48, line 1 (Ex. 50)).

252.    At the conclusion of that remedial training, PFIs Naughton and Gugliotta offered to

play CD for SA Paige, and asked SA Weiss to leave the room.  (L. Paige Dep. at 118, lines 1-4 (Ex.

2)); (Gugliotta Dep. at 41, lines 9-18 (Ex. 49)); (Id. at 43, lines 1-5); (Naughton Dep. at 51, lines 2-

17 (Ex. 50)).

253.    At that point, SA Paige spoke up and indicated that SA Weiss could stay and watch

the video of his shooting with them.  (Gugliotta Dep. at 41, line 19, to 42, line 3 (Ex. 49)); (Id. at

43, lines 1-7); (Naughton Dep. at 52, lines 1-8 (Ex. 50)).

254.    While the video recording of the shooting was in the custody of PFIs Naughton and

Gugliotta it was in a secure office or at the home of PFI Naughton.  (Naughton Dep. at 24, lines 20-

25 (Ex. 50)).

255.    In response to a request from DEA's Office of Professional Responsibility , PFI

Naughton mailed the CD with the video recording of the shooting to DEA's Office of Professional

Responsibility.  (Gugliotta Dep. at 25, lines 20-22 (Ex. 49)); (Naughton Dep. at 36, lines 7-12 (Ex.

50)).

### It is unknown how a 4:09 version of the video appeared on the internet or on DEA's Firebird Email System

256.    DEA's Office of Professional Responsibility ("DEA-OPR") began its investigation

of the alleged public release of video footage in January 2006.  (Reinke Decl. ¶ 4 (Ex. 42)).

257.    As part of this investigation, DEA-OPR interviewed several witnesses, searched

computer hard drives, and had certain DEA employees' email searched.  (Reinke Decl. ¶ 5 (Ex.

42)).

258.    In addition, DEA-OPR assigned a senior Information Technology security specialist,

Thomas Gregg, who specializes in digital evidence investigations, to search DEA emails and the internet to investigate how the video footage appeared on the internet.  (Reinke Decl. ¶ 6 (Ex. 42)).

259.    DEA-OPR has not been able to conclusively determine how video footage of SA Paige's shooting made its way to an internet website or precisely how video footage of the shooting appeared on the DEA's Firebird email system on the internet.  (Reinke Decl. ¶ 7 (Ex. 42)).

260.    DEA-OPR found no indication that a 4:09 version of the video footage of SA Paige shooting himself was ever placed in the Office of Inspections file IN-GB-04-32S.  (Reinke Decl. ¶ 8 (Ex. 42)).

261.    Similarly, SA Paige states that he does not know how a version of the shooting video made its way to the internet.  (L. Paige Dep. at 145, lines 7-18 (Ex. 2)).

# Defendants' Statement of Material Facts
## Exhibit Index
### Paige v. DEA, 06-644 (D.D.C.)

**EXHIBIT**                                                                                           **NO.**

Amended Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Deposition of Lee Paige. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Plaintiff's Response to Defendant's Request for Admission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Sports Illustrated Article. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Plaintiff's Response to Defendant's Interrogatories. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
"Hall of Shame" Newspaper Article (DEA001124). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
City Code of Orlando, Florida § 18A.02(4)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Deposition of Dr. T.J. Dorsey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Deposition of Robbin Paige. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Deposition of Walter Walker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Deposition of Peter Gruden. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Deposition of Stephen Collins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Deposition of Joseph Brunson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Expert Report of Keith Santillo. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Deposition of Robert Patterson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
DEA Teletype (Apr. 9, 2004) (DEA000989-90). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Deposition of Jeffrey Shafer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Deposition of James Wise Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Report of Shooting (Apr. 15, 2005) (DEA001263-64). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Deposition of Richard Bendekovic. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Deposition of Kevin Scully. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Deposition of James Burns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Deposition of Amy Clifford. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Deposition of L.D. Mathews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Deposition of Gerard McAleer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Deposition of Gregory White. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Deposition of Marquita Queen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Declaration of Patrick Dunn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Declaration of Edward Halligan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Declaration of Randall Yates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Declaration of Arnold Moorin. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Deposition of William Lutz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Transmittal Letter (DEA001190). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
Signature Page (DEA000936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Declaration of Stephen Collins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Deciding Official Letter (DEA001195-96). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Newspapers (Florida). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Wire Service Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Newspapers (national). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Media DVD (Tr.1-Local News, Tr.2-CNN, Tr.3-Fox News, Tr.4-Today Show, Tr.7-O'Reilly Factor, Tr.9-Rita Crosby). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Declaration of Tom Gregg. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Declaration of Kent Reinke. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Deposition of Steve Derr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Deposition of Derek Maltz.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Deposition of Kevin Clark. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Deposition of Mark Baughman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Deposition of Chris Bowman.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Declaration of Frances Wheeler.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Deposition of Natale Gugliotta. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Deposition of Kevin Naughton. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Remedial Training Letter (DEA000913). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Plaintiff's Response to Defendant's Interrogatory No. 13. . . . . . . . . . . . . . . . . . . . . . . . . . . 52