## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**LEE PAIGE,**

     **Plaintiff,**

**v.**                                                    **CASE NO.: 01:06-cv-0644**

**UNITED STATES DRUG**
**ENFORCEMENT ADMINISTRATION, et al.**

     **Defendants.**
_____/

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## PURSUANT TO D.D.C. CIVIL RULE 56.1

1.     The video of Paige's accidental discharge ("AD")[1] has been used in the public as entertainment and to ridicule Paige, particularly as a result of the irony of Paige's AD occurring just as he stated that he was the only one professional enough in the room to carry a firearm. Ex.90,p.10;Ex.84,pp.22-25;Ex.73,pp.119-120;Ex.91,p.207;Ex.85,pp.34-35,37.

### OPR Investigation of the Disclosure

2.     Following complaints by Paige's attorney of a Privacy Act violation, the Deputy Chief Inspector ("DCI") in charge of the Office of Inspections ("IN") advised the Chief Inspector of the DEA that an investigation of the disclosure of the video was warranted. Exs.48,49,50.

3.     In approximately January, 2006, the Office of Professional Responsibility ("OPR") was advised to start an investigation of the disclosure of the video. Ex.91,pp.7-9.

4.     The OPR investigation has involved investigatory efforts by at least thirteen DEA agents, interviews of at least 54 people and the inspection of documents as well as computers in various DEA offices around the country. Ex.91,pp.21-23,171;Ex.2,p.10,¶9.

---

[1] See attached Appendix of Acronyms.

5.    Discovery in this case was delayed so that OPR could complete its investigation which would, according to the Government, facilitate responding to Paige's discovery requests. Court Doc.17,p3,¶14.  These included interrogatories requesting the DEA to identify all copies of the video and to set forth the chain-of-custody of the video and all copies.  Ex.2.

## DEA Organizational Structure

6.    The head of the DEA is the Administrator.  Ex.55.  The DEA is organized into a number of divisions, including field divisions as well as various divisions at Headquarters in Arlington, Virginia.  Ex.55.

7.    The field divisions include the various field division offices around the country, such as the Miami Field Division Office, which are headed by Special Agents in Charge ("SAC").  Ex.55;Ex.73,p.21.

8.    The field divisions contain district offices which are headed by Assistant SAC's ("ASAC").  Ex.55;Ex.73,p.21.  The Orlando District Office ("ODO") is within the Miami Field Division.  Ex.73,p.21.

9.    There are several divisions at DEA Headquarters which report to the Administrator or Deputy Administrator. Ex.55.  Each division contains various offices.  Ex.55.

10.    The divisions at Headquarters include, among others, the Inspection Division and the Human Resources Division.  Ex.55.

11.    The Human Resources Division includes the Office of Training and the Board of Professional Conduct.  Ex.55.

12.    The Inspection Division includes, among others, IN and OPR.  Ex.55.

13.    The Chief Inspector of the DEA is the head of the Inspection Division.  Ex.55.

14.    At relevant times here, the Chief Inspector was Roger Guevara.  Ex.36,37,49.

15.    IN conducts inspections and investigations of various internal DEA matters, including all shootings involving an injury to a DEA agent. Ex.83,p.11;Ex.82,p.9.

16.    At the time of the AD, the DCI in charge of IN was James McAleer. Ex.83,p.9.

17.    Below McAleer was an Associate Deputy Chief Inspector ("ADCI"), who at the time of the AD was Richard Dearing. Ex.82,p.9-10. Dearing is deceased and was never deposed.

18.    There were five inspection teams within IN and each team included a Senior Inspector, who reported to the ADCI, and three to five inspectors. Ex.82,p.11-12.

## The Accidental Discharge

19.    Paige became a Special Agent with the DEA in 1990. From approximately April, 1990 to July 1999, Paige was assigned to the Tampa District Office; from July 1999 to July 2003 to the Nassau, Bahamas Country Office; and from July 2003 to the present to the ODO. Ex.64,¶2.

20.    At the relevant times here, the ASAC of the ODO was Stephen Collins. Ex.73,pp.6-7.

21.    Paige worked in a group at the ODO, which consisted of a number of DEA agents supervised by their group supervisor, Peter Gruden. Ex.78,pp.35-36.

22.    Paige is a graduate of Florida State University. Ex.64,¶1.

23.    Paige was a member of the Florida State football team and played professional football for the Tampa Bay Bandits and the Tampa Bay Buccaneers. Ex.64,¶1.

24.    After playing professional football, Paige was a Corrections Officer at the Polk Correctional Institution, a Florida State Prison, and a Deputy Sheriff with the Hillsborough County Sheriff's Office in Tampa, Florida. Ex.64,¶1.

25.    Paige was highly regarded as an undercover agent. Ex.90,p.6.

26.    Paige was involved in hundreds of undercover assignments, including sixty-seven undercover assignments in his first year alone.  Ex.64,¶3.

27.    While working undercover, Paige was involved in armed confrontations on seven occasions, including situations where his life was in danger, and he had to be rescued by other agents on two of these occasions. Ex.90,pp.6-8;Ex.66,p.45;Ex.64,¶3.

28.    On another occasion, one of Paige's informants was apparently murdered by member(s) of a Colombian drug cartel who then threatened to kill Paige unless he paid six million dollars to the cartel.  Ex.64,¶3.

29.    The DEA provides speakers to various organizations for "Demand Reduction Presentations" ("DRP").  Ex.64,¶5.  A DRP involves a presentation by a DEA agent intended to reduce the demand for drugs.  Ex.64,¶5.

30.    From 1993 to April 9, 2004, Paige gave hundreds of DRP's to many organizations, including schools, charitable groups, little league teams, college and professional football teams, law enforcement agencies and numerous businesses.  Ex.64,¶5.

31.    Paige served as the spokesman for the United States Ambassador in Nassau, Bahamas with respect to the DEA and drug related issues.  Ex.64,¶4.  He was also a member of the Bahamas National Drug Council/Coalition for a drug-free Bahamas with whom he organized numerous drug-prevention programs. Ex.64,¶4.

32.    Paige was highly regarded as a DRP speaker and received many dozens of commendations for his presentations.  Ex.64,¶5;Ex.95,p.5;Ex.1,pp.102-225*op.cit.*

33.    In August, 2003 Paige became the Assistant DRP Coordinator for the Miami Field Division.  Ex.64,¶5.

34.     On Friday, April 9, 2004 Paige made a DRP to approximately 50 youths and parents at a meeting of the Orlando Minority Youth Golf Association ("OMYGA") in Orlando, Florida.  Ex.76,p.16.

35.     The OMGYA is a private organization whose mission is to acquaint inner city and urban minority youth with golf and to teach and to promote, *inter alia,* life skills, character, motivation, control and self-esteem through golf.  Ex.31;Ex.69,p.32;Ex.76,p.6.

36.     Paige's DRP was part of a regularly scheduled Friday private meeting of the OMYGA at the Callahan Recreation Center in Orlando from 6:30 to 9:00 p.m. Ex.76,p.8;Ex.69,p.32.

37.     The Friday meetings typically included instruction and remarks about golf and life by the OMYGA's founder and Executive Director, Dr. T.J. Dorsey, as well as by volunteers and occasional guest speakers.  Ex.76,pp.8,10.

38.     In addition to the Friday instructional meeting, the youths had practice on various days.  Ex.76,pp.8-9.

39.     Up until the videographer's tape was taken by the DEA, the April 9, 2004 meeting of the OMYGA was video-recorded by one of the parents, Joseph Brunson, who was involved in the OMYGA.  Ex.69,pp.7,11;Ex.6.

40.     Brunson video-recorded the meeting with a Panasonic GS-19 camera. Ex.69,pp.7,11.

41.     Brunson's camera could record to either a mini-DV cassette tape or a micro SD card, but not both at the same time.  Ex.69,pp.7,11.

42.     On this occasion, Brunson recorded to a mini-DV cassette tape ("**Mini-DV**"). Ex.69,pp.7,11.  Therefore, the only video of the meeting was on the **Mini-DV**.  Reason and logic

43. The video on the **Mini-DV** is approximately 69-70 minutes long. Ex.6.

44. After opening remarks and recognition of accomplishments by various youths, Paige started his DRP approximately 6 1/2 minutes into the meeting (i.e. approximately 6:36 p.m.). Ex.6. He spoke for approximately 13 minutes about drugs and then started his remarks about gun safety. Ex.6.

45. Typically, Paige's DRP involved displaying various firearms to the audience and making comments about gun safety. Ex.64,¶6.

46. In order to make his message more meaningful for the youth attending the DRP, Paige wore raid gear and a Glock 22 pistol on his hip, which he thought was unloaded. Ex.64,¶6.

47. Paige had also brought with him an unloaded DEA-owned carbine and shotgun, which he intended to use as props. Ex.64,¶6.

48. Paige also carried a concealed, loaded pistol in an ankle holster concealed in his boot and under his pants. Ex.64,¶6. This firearm was for Paige's personal protection and was not to be displayed to the audience. Ex.64,¶6.

49. Dr. Dorsey, who invited Paige for the DRP, expected Paige to tell the audience the "harsh, cold facts" and the "rough side" of drug use. Ex.76,pp.14-15.

50. Dr. Dorsey expected the DRP to be as "real as possible" and was not surprised that Paige wore raid gear because it was "life-like." Ex.76,p.15.

51. Dr. Dorsey testified that Paige's presentation was "appropriate," "excellent," "top shelf and a great job" and that the youth were impressed by Paige. Ex.76,pp.16,17,28.

52. Although he did not expect Paige to bring weapons, he thought the weapons demonstration was "very good…Very, very appropriate." Ex.76,p.16.

53.     During his remarks about gun safety, Paige removed his firearm, a Glock 22 pistol, from a holster on his hip and displayed it to the audience. Ex.6; Ex.64.p.22..

54.     As he displayed his firearm, Paige told the audience that he was the only person that he knew of in the room professional enough to carry the firearm. Ex.6. Immediately after making this comment and approximately 20 ½ minutes into the video (i.e. approximately 6:50 p.m.), the firearm accidentally discharged, shooting Paige in his thigh. Ex.6.

55.     Despite his injury, Paige attempted to continue with the DRP, but left the room after a couple minutes (approximately 22 minutes into the tape or 6:52 p.m.) and was thereafter taken to the hospital by ambulance. Ex.6.

56.     Paige only used unloaded firearms for his presentations. Ex.64,¶7. However, on this occasion, Paige forgot to remove the magazine from the Glock before he began the DRP. Ex.64,¶7.

57.     As part of the DRP, Paige slid the slide mechanism of the Glock back and locked it to the rear so that the chamber could be inspected to ensure that the firearm was not loaded. Ex.64,¶7. This caused the bullet in the chamber to eject. Ex.64,¶7.

58.     As a demonstration of gun safety, Paige asked a member of the audience to inspect the chamber to confirm that there was no bullet in the chamber. Ex.64,¶7.

59.     Paige then slid the slide mechanism forward into its original position which caused a bullet from the magazine, which Paige had failed to remove, to automatically enter the chamber. Ex.64,¶7.

60.     Thinking the pistol was unloaded, Paige then pointed the gun toward the floor, intending to disassemble the pistol as part of his presentation. Ex.64,¶7.

61.     In order to disassemble this particular pistol, the trigger must be pulled. Ex.64,¶7.

62.    When Paige pulled the trigger to initiate the disassembly of the pistol, the pistol discharged. Ex.64,¶7.

63.    Following the AD, Dorsey continued with his instructional part of the meeting. Approximately 49 minutes after the AD (approximately 69 minutes into the video or approximately 7:39 p.m.), another DEA agent, Walter Walker, who had also attended the DRP, demanded that the videographer immediately surrender the **Mini-DV**. Ex.6. At that point, the video ends. Ex.6.

64.    According to the videographer, he and Walker left the room to discuss Walker's demand for the immediate surrender of the **Mini-DV**, which the videographer was resisting, and were shortly joined by other DEA agents. Ex.69,pp.19-21.

65.    According to the videographer, Walker and other agents told him that the **Mini-DV** was "evidence" and they needed to take it immediately. Ex.69,pp.18,20-21,23-24.

66.    The videographer surrendered the **Mini-DV** to Walker, who has acknowledged that he "seized" the **Mini-DV**. Ex.95,pp.13,16,22.

67.    When he was at the hospital, Paige called his wife, Robbin Paige, and requested her to tell Walker to get the video because he did not want it on the news. Ex.86,pp.81-82.

68.    Robbin Paige requested Walker to obtain the video. Ex.87,pp.37-38.

69.    Gruden testified that when he learned at the scene that there was a video, he stopped an interview he was conducting in order to get the video. Ex.78,pp.217-218.

70.    Charles West, an Associate SAC in Miami, also directed Collins to get the video. Ex.73,p.34.

71.    The ASAC, Collins, was on leave, and Robert Patterson, the Acting ASAC, came to the scene of the AD. Ex.88.p.15;Ex.73,p.31.

72.    The **Mini-DV** was turned over to Patterson, and he took it to the ODO and made a VHS copy ("**VHS-1**") that evening.  Ex.88,pp.25-26,30,42,43.

73.    Patterson left the **Mini-DV** and **VHS-1** in Collins' office for the weekend. Ex.88,p.37.

74.    When he returned to the office on Monday, April 12, Collins gave custody of the **Mini-DV** and **VHS-1** to Gruden, Paige's group supervisor. Ex.78,pp.30-31,82-84.

75.    Collins knew that it was more than likely that the IN inspection team would need the **Mini-DV** or a copy.  Ex.73,pp.65, 79.

76.    Gruden maintained this evidence (the **Mini-DV** and **VHS-1**) until he provided it to IN. Ex.78,pp.29,30-31;Ex.97,pp.50-51;Ex.2,p.3.

### The IN Investigation of the AD

77.    The DEA Agents Manual and the DEA Planning and Inspection ("P&I") Manual set forth the procedures for a shooting incident and its investigation. Ex.56;Ex.57.

78.    Any discharge of a firearm by a DEA special agent must be "reported, documented and investigated."  Agents  Manual,§6114.41(A)  (Ex.56);  P&IManual, §8231.1,§8233.1(Ex.57).

79.    Among other things, both non-supervisory and supervisory personnel on the scene of a shooting incident are to take custody of evidence.  AgentsManual,§6114.3(Ex.56).

80.    The ASAC is to remain at the scene until "all physical evidence has been collected," including "any weapon fired."  AgentsManual,§6114.3,§6114.31(Ex.56).

81.    The SAC is to immediately notify the DEA Headquarters Command Center of the shooting.  AgentsManual,§6114.3(Ex.56);Ex.70,p.9.

82.     The Command Center immediately reports the shooting to many DEA officials, including the DCI in charge of IN.  Ex.70,pp.9-10;P&IManual,§8231.3(Ex.57).

83.     In this case, the Command Center was notified by Patterson of the shooting at approximately 8:15 p.m. on April 9, approximately 85 minutes after the AD.  Ex.1,p.41.

84.     The Command Center notified the head of IN (McAleer) by phone and by e-mail at 8:42 p.m.  Ex.1,pp.41-42,43,87.

85.     The SAC must also send a teletype detailing the shooting to DEA Headquarters to the attention of, *inter alia,* the IN Shooting Incident Team Coordinator within twelve hours of the shooting.    P&IManual,§8231.3(D)(Ex.57);*cf.*AgentsManual,§6114.41(G)  (Ex.56)(twenty-four hour requirement).

86.     In this case, the teletype detailing the shooting was not sent to DEA Headquarters until April 12, three days after the AD.  Ex.1,p.39.

87.     Although Patterson and Collins discussed the details of the teletype on the night of the AD, which was a Friday, the teletype, according to Collins, could not be sent until Monday, April 12, because the classified mechanism to send it was reportedly not available until Monday.  Ex.73,pp.39-40.

88.     All  shooting  incidents  are  investigated  by  IN.      Ex.82,p.11;Ex.70,p.8; AgentsManual, §6114.61,§6114.71(Ex.56);P&IManual,§8233.41(Ex.57).

89.     An IN Shooting Incident Team ("SIT") "conduct[s] and/or directs[s]/monitor[s] the  investigation  of  all  shooting  incidents."      AgentsManual,§6114.61(Ex.56); P&IManual,§8233.42(Ex.57).

90.     The SIT functions under the direction of an IN Senior Inspector designated as the Shooting Incident Team Coordinator ("SITC"). AgentsManual,§6114.61(Ex.56); P&IManual,§8233.42(Ex.57).

91.     In this case, the SITC was James Burns.  Ex.70,p.14.

92.     The SITC assures that the shooting investigation file gets completed and presents the results of the investigation to the Shooting and Assault Incident Review Committee ("SAIRC").  Ex.70,p.14.

93.     The SIT is comprised of the SITC, the SIT Program Analyst, and generally two IN inspectors designated by the ADCI. AgentsManual,§6114.61(Ex.56); P&IManual,§8233.42(Ex.57);Ex.82,p.14;Ex.70,p.13; Ex.72,p.8;Ex.70,p.15.

94.     The SIT will either conduct the investigation or delegate the investigation to the field.  AgentsManual,§6114.61(Ex.56); P&IManual,§8233.51(Ex.57);Ex.82,pp.12-13.

95.     If the investigation is delegated to the field, the SIT will "direct/monitor" or oversee the investigation.   AgentsManual,§6114.61,§6114.62(Ex.56);Ex.82,pp.12-13.

96.     In general, the SIT will conduct an on-site investigation of any shooting incident which results in injury to a DEA employee or involves a recognized potential for adverse publicity. AgentsManual,§6114.61(Ex.56); P&IManual,§8233.42(Ex.57);Ex.82,p.19.

97.     The IN file for the investigation of a shooting incident is automatically opened as a result of a shooting incident.  Ex.83,p.14;Ex.82,p.25.

98.     The IN file is opened whether IN conducts the on-site investigation or oversees an investigation delegated by IN to the field office.  Ex.70,p.20;Ex.72,pp.12-13,100.

99.    If the on-site investigation is delegated back to the field by IN, a teletype is to be sent to the field providing instructions and the IN case number and file title to be used on reports. Ex.70,p.21;P&IManual,§8231.3(Ex.57);AgentsManual,§6114.41(H)(Ex.56).

100.    The SIT Program Analyst is responsible for assigning file numbers to shooting investigations, maintaining the shooting incident database, maintaining the correspondence part of the IN file during an investigation, keeping track of and following the shooting investigations and keeping shooting incident records.  Ex.82,p.16;Ex.70,p.15;Ex.72,pp.7,8.

101.    The Program Analyst is to "immediately enter the shooting incident in a Shooting Incident Data Base."  P&IManual,§8234.31(2007)(Ex.57).  At that time, a file number and file title are assigned to the shooting incident investigation.  P&IManual,§8234.31(2007)(Ex.57). This is to be done as soon as possible after the shooting incident has occurred and reported to IN. Ex.82,p.25.

102.    The "file title" of the IN file is the "name of the shooter." P&I Manual,§8234.31(2007)(Ex.57).

103.    The **Mini-DV** was part of the IN file.  Ex. 1.

104.    The **Mini-DV** constituted a record under the Privacy Act. Ex.6;Ex.4,p.3,¶17;Ex.5.p.4,¶20.

105.    The IN file constitutes or is a part of a system of records under the Privacy Act. Ex.4.p.3,¶17;Ex.5,p.4,¶20.

106.    In this case, the two IN inspectors assigned to the SIT were L. D. Matthews and Gregg White.  Ex.82,pp.7,19.

107.    Matthews, a Senior Inspector, was the lead inspector of the investigation. Ex.82,p.19.

108.    The IN Program Analyst for shooing investigations was Amy Clifford. Ex.72,p.6.

109.    Clifford assigned the file number, which was "IN-GB-04-032S," and the file title, which was "SA Lee Paige."  Ex.72,p.7.  The IN stands for Office of Inspections; GB stands for the ODO; 04 stands for 2004; 032 is the number applicable to the particular investigation of Lee Paige's shooting; S stands for shooting; and SA stands for Special Agent.  Ex.72,pp.16-17.

110.    Because Paige had been injured and there was a potential for adverse publicity, the IN inspectors conducted an on-site investigation, rather than delegate this part of the investigation to the ODO.  Ex.83,pp.10,11.

111.    Matthews and White traveled to Orlando on April 19, 2004 and returned to IN on April 21.  Ex.83,p.15;Ex.1,p.7.

112.    During the aforesaid trip, the two IN inspectors interviewed various witnesses and obtained the **Mini-DV** from Gruden and took it back to IN.  Ex.1,pp.4,36,78;Ex.97,p.53.

113.    White considered the **Mini-DV** to be the best evidence of the AD.  Ex.97,p.52.

114.    The **Mini-DV** is in the IN file.  Ex.1,p.78.

115.    White was responsible for writing the Final Report of Investigation and maintaining the investigatory part of the file, including the evidence such as the **Mini-DV**, until the final report was completed.  Ex.70,p.32.

116.    Much of the IN file was placed in a binder.  Ex.1.

117.    The binder included a cover, a table of contents and tabbed sections containing, *inter alia,* the Final Report, other investigative reports and records, a Shooting Incident Checklist, the **Mini-DV,** a VHS copy (i.e. **VHS-1** discussed below) of the **Mini-DV**, a VHS

video of news coverage of the AD, various photographs, a shooting scene diagram and materials about Paige.  See Ex.1,pp.1-225, which is a copy of the binder or investigatory part of the file.

118.    While the binder contains most of the IN file, it does not include certain correspondence, such as the Command Center notification and the initial teletype.  Ex.70,pp.22-24.  Such correspondence is kept in a correspondence folder by the Program Analyst until the IN file is closed, at which time the correspondence folder and the binder are placed together in a locked file cabinet.  Ex.70,p.25.  A copy of the correspondence part of the IN file appears at Ex.1a,pp.226-322.

119.    After the Final Report was prepared by White, the binder part of the IN file was sent for review to the ADCI (i.e. Dearing) and to the DCI (i.e. McAleer).  Ex.70,pp.31,82-84.

120.    After Dearing and McAleer had a chance to review the binder part of the IN file, the binder part of the file was put in IN's "armory" for security reasons. Ex.70,pp.31,84,86;Ex.72,pp.31,63-64.

121.    The armory was a locked room within the IN offices which was used to store firearms and various open files such as Paige's.  Ex.70,pp.31,86.

122.    The IN offices are on the fourth floor of DEA Headquarters.  Ex.70,p.86.

123.    The fourth floor, which also includes OPR's office, is secured with key-card access.  Ex.70,p.32.

124.    Only people assigned to IN have key-cards that will open IN's door on the fourth floor.  Ex.70,p.32.

125.    There is stringent security at the entrance to DEA Headquarters. Ex.70,p.32.

126.    DEA regulations provide that most shooting incidents, including Paige's, will also be reviewed by the SAIRC.  AgentsManual§6114.71(Ex.56);P&IManual,§8234.1(Ex.57).

127.    The SAIRC at that time consisted of the Chief Inspector of the DEA, the Chief of Operations of the DEA, and the SAC of the DEA's Office of Training. Ex.37;AgentsManual,§6114.71(Ex.56).

128.    The Office of Training is the DEA's training facility at Quantico, Virginia.  The Firearms Unit is one of the units in the Office of Training.  Ex.70,p.54.

129.    The SAIRC is to review the IN investigation and to make various determinations. AgentsManual,§6114.71(Ex.56);Ex.37.

130.    On September, 2, 2004, Burns, the SITC, made a presentation to the SAIRC concerning Paige's AD. Ex.70,pp.87-88;Exs.36,37.

131.    During the meeting, the SAIRC made the required determinations, which were entered on a form checklist and then signed by the three committee members.  Ex.37;Ex.70,p.99.

132.    Among other things, the SAIRC found evidence of malfeasance in Paige's handling of the weapon and determined that the shooting incident should be referred to the Board of Professional Conduct ("BPC") for further action, but that the Office of Training should not examine the incident for lessons learned.  Ex.37;Ex.39;Ex.72,p.51.

133.    Ordinarily, two copies of the IN file would be made for review, one for the BPC and one for the Office of Training.    Agents Manual, §6114.63(Ex.56);P&I Manual,§8233.62(Ex.57);  Ex.70,pp.97-98,52-53.

134.    The Program Analyst (i.e. Clifford) testified that a copy would not have been made for the Office of Training since the SAIRC, which included the SAC of the Office of Training, decided that it was not necessary that the Office of Training review the incident. Ex.72,pp.56-58.

135.    By a memorandum dated October 6, 2004, the SAIRC referred the shooting incident to the BPC for review.  Ex.39.

136.    IN provided a copy of the IN file with the October 6, 2004, memorandum to the BPC.  Ex.70,pp.104-105;P&IManual,§8233.63(Ex.57);§8234.35(2007)(Ex.57).

137.    The BPC conducts a review of the file and makes recommendations to the Deciding Official regarding disciplinary action.  AgentsManual,§6114.71(Ex.56).

138.    After its review of the matter here, the BPC prepared a letter to Paige dated December 2, 2004, proposing a five-day suspension for "poor judgment" and "endangering." Ex.42.

139.    The proposed suspension letter and a copy of the IN file were sent to the Miami Field Division and then forwarded to the ODO and made available to Paige on December 6, 2004.  Ex.40;Ex.42;Ex.73,pp.133-134.

140.    Paige was given the copy of the IN file for a few days so he could review it and, if he chose, contest the proposed suspension.  Ex.42.

141.    Paige was not allowed to copy anything in the copy of the IN file.  Ex.73,p.137.

142.    Paige kept the copy of the IN file locked in his desk file cabinet at the ODO and did not copy anything in it.  Ex.73,p.136;Ex.64,¶8.

143.    The copy of the IN file temporarily provided to Paige had no VHS video-recordings, but did have a CD or DVD. When Paige attempted to view the disc on DEA computers, nothing came up and Paige was unable to view what, if anything, was on the disc. Ex.64,¶8.

144.    The IN file temporarily provided to Paige was reportedly returned to IN where it would be destroyed.  Ex.47;Ex.70,pp.102,128-129.

145.    On December 2, 2004, the BPC also sent a copy of the proposed suspension letter and a copy of the IN file to the DEA's Deciding Official.  Ex.41.

146.    The Deciding Official is responsible for reviewing the recommendation of the BPC and determining the disciplinary remedy.    AgentsManual,§6114.71 (Ex.56);P&IManual,§8234.33(Ex.57).

147.    Paige did not contest the proposed five-day suspension, and the Deciding Official found that the charges were "supported by the evidence" and suspended Paige for five days. Ex.43.

148.    According to procedure, the file sent to the Deciding Official should have been the file copy provided to the BPC by IN.  P&IManual,§8233.63(Ex.56);Ex.70,pp.105-106.

149.    The Deciding Official is required to return the file to IN where it is shredded. AgentsManual,§6114.81(Ex.56);P&IManual,§8233.63(Ex.57);Ex.72,pp.47,48,62.

150.    The Program Analyst testified that after a case is closed, she would destroy any copies of the IN file, including pulling video-tape off a cassette and then cutting it.  Ex.72,pp.62-63.

151.    In addition, the original investigative part of the file is moved from IN's armory and kept with the correspondence file in a locked cabinet at IN.  Ex.72,p.23.

152.    When Paige and his attorney were permitted to view the aforesaid locked cabinet, the DEA placed stickers over tabs of other files in order to prevent Paige and his attorney from seeing any labels on any other files that were stored in the cabinet with Paige's file.  Ex.64,¶10.

### Record-keeping

153.    The **Mini-DV** seized from the videographer was non-drug evidence in the IN investigation.    Ex.1,p.36;   Ex.69,pp.18,20-21,23-24;AgentsManual,§6114.3,§6114.31(Ex.56); Ex.43;Ex.97,pp.52,55-56;Ex.80,pp.31-32; Ex.82,pp.66-67,86-87.

154.    The agents told the videographer that they had to take the **Mini-DV** because it was evidence.  Ex.97,pp.52,55-56.

155.    In addition to being evidence in the IN investigation, the **Mini-DV** was also evidence    of    any    potential    state    or    federal    criminal    charges. P&IManual,§8233.3(Ex.57);AgentsManual, §6681.11(2007)(Ex.58);Ex.6;Ex.1,pp.9,35.

156.    According to the lead IN Senior Investigator, DEA procedures for processing non-drug evidence would apply to IN.  Ex.82,pp.71-72.

157.    DEA procedures provide that various reports, including a DEA-6 (Report of Investigation), a DEA-7a (Acquisition of Non-Drug Property and Regulatory Seizures) and a DEA-12 (Receipt for Cash or Other Items) must be used to document the acquisition and chain-of-custody of non-drug property.  AgentsManual,§6681.21(2007) (Ex.58).

158.    The Program Analyst testified that any time a copy of an IN file is made and provided to somebody, a DEA-12 must be prepared and put in the file.  Ex.72,p.29.

159.    Ex.1a,pp.257,258,259 are DEA-12's showing that the **Mini-DV** and **VHS-1,** among other things, were temporarily transferred from IN to OPR after this case was filed.

160.    Non-drug property is also to be submitted to a Non-Drug Evidence Custodian ("NDEC").  AgentsManual,§6681.43(2007)(Ex.58).

161.    All non-drug property taken into custody by the DEA must be assigned a non-drug exhibit number preceded by the letter "N." AgentsManual,§6681.44(2007)(Ex.58).

162.    The evidence gathered by OPR in this case is kept as "N" exhibits.  Ex.21.

163.    The **Mini-DV** was also personal property that must be held for safekeeping pending return to the lawful owner.  AgentsManual,§6681.11(2007)(Ex.58).

164.    Personal property that is not returned to the owner within ten working days of seizure must be processed as non-drug evidence and submitted to an NDEC custodian for safe keeping and documented on a DEA-7a.  AgentsManual,§6681.47 (2007)(Ex.58).

165.    None of the foregoing record-keeping procedures were employed by either the ODO or IN.  Ex.1.

166.    It appears that IN does not use a NDEC.  Ex.70,p.42.

### Additional Copies

167.    The cover of the IN file here states the following (Ex.1,p.1):

> **This report of investigation is made available to you for official use by the Office of Inspections…The use of this report must be restricted to authorized personnel.  While in your custody, this report must be stored in a secure facility.  This report must be returned to the Office of Inspections … after it has served its purpose.** [emphasis in original]

The cover of the file is also marked "**DEA SENSITIVE**" (emphasis in original).  Ex.1,p.1.

168.    Clifford and McAleer testified that the IN file is DEA sensitive which means that only DEA agents with a need to know can view the file, including the video.  Ex.83,pp.30-31;Ex.72,p.63;Ex.63.

169.    Burns testified that personnel authorized to look at the IN file included the inspectors involved in the investigation, the BPC, the Deciding Official, the Office of Training, OPR, and Paige.  Ex.70,pp.67-68.

170.    The DEA's rules and procedures only refer to making two copies of the IN file. AgentsManual,§6114.63(Ex.56); P&IManual,§8233.62(Ex.57).

171.     Matthews, the lead Senior Inspector of the investigation, testified that a determination was made to make one or two copies of the video.  Ex.82,p.66.

172.     Burns, the SITC, indicated there was no need for more than two copies. Ex.70,pp.49-50.

173.     Paige requested the Government through interrogatories to identify every copy of the **Mini-DV** (or portions of it) and to set forth the chain-of-custody of every such copy.  Ex.2. The DEA has not been able to identify every copy of the **Mini-DV** (or portions of it) and to set forth the chain-of-custody of every such copy even through the OPR investigation of the improper disclosure of the video has gone on for over two years.  Ex.2.

## VHS-1

174.     When Patterson returned to the ODO with the **Mini-DV** after the AD, he made a VHS copy (**VHS-1**) of the **Mini-DV** and left both tapes in ASAC Collins' office for the weekend.  Ex.8;Ex.88,p.37.

175.     Collins gave custody of both the **Mini-DV** and **VHS-1** to Gruden who would do the on-site investigation of the shooting if IN did not send a shooting team. Ex.78,pp.30-31,35-36,82,83.

176.     Prior to the IN SIT going to the ODO, IN asked the ODO for a copy of the video. Ex.73,p.67.

177.     As a result of IN's request for a copy of the video, on April 15, Gruden sent **VHS-1** by overnight Federal Express to IN.    Ex.78,pp.83-84,100-106,110-111;Ex.73,pp.69,106-108;Ex.33.

178.     **VHS-1** was viewed by Matthews and White at IN before they traveled to Orlando on April 19 for the on-site investigation**.**  Ex.82,p.29;Ex.97,pp.22-23.

179.    In addition, **VHS-1** was watched by virtually everyone else at IN even if they were not assigned to the investigation.  Ex.82,pp.32-34;Ex.97,pp.25,29.

180.    **VHS-1** is in the IN file.  Ex.1,p.82; Ex.2,p.5, ¶14.

### VHS-2

181.    According to the Government's answers to interrogatories, "at least" one VHS copy ("**VHS-2**") of the **Mini-DV** or **VHS-1** was made at Gruden's direction by Jeffrey Shaffer, one of the ODO's two technicians.  Ex.2,p.5,¶4.

182.    Gruden testified that he was purportedly not sure whether he asked a technician to provide him a VHS tape.  Ex.78,p.123.

183.    Shaffer denied at his deposition that he made any VHS tapes.  Ex.94,pp.29-30,34-35,49,52-53.

184.    It appears that Collins obtained **VHS-2** from Gruden several weeks after the IN inspection team left Orlando on April 21 and that he sent it to Charlie West, the Associate SAC of the Miami Field Division, on June 23, 2004.  Ex.73,pp.67,76-79,106-108;Ex.34.

185.    Since the **Mini-DV** and **VHS-1** had already been provided to IN on or before April 21, **VHS-2** must have been made prior to April 21, the date the IN inspectors left Orlando, or was copied from yet another undisclosed VHS copy.  Reason and logic.

186.    The Government admits that it does not know what happened to **VHS-2**, which no one in the ODO acknowledges making.  Ex.2;p.5,¶4;Ex.91,p.198.

187.    West has not been deposed.

## VHS-3

188.    According to the Government's answers to interrogatories, Gruden or the ODO tech office (i.e. Shafer or James Wise) gave Kevin Scully, a DEA agent at the ODO, a copy ("**VHS-3**") of the video.  Ex.2,p.6.

189.    Gruden testified that some time during the week of April 12, he gave Scully the **Mini-DV** or a larger video-tape copy and that Scully returned it the same day.  Ex.78,pp.99-100,178-179.  According to Gruden, this occurred right after Gruden had provided Scully with a disc copy of the video (see **D-4**), which Scully purportedly returned within minutes because he could not view it on a computer.  Ex.78,pp.177-178.

190.    Gruden assumed that Scully had the video copied.  Ex.78,p.178.

191.    Scully testified that he thinks he obtained **VHS-3** shortly after he had difficulty viewing the video of the AD on a disc copy (see **D-4**) which Gruden had given him. Ex.93,pp.28-29.

192.    Scully testified that he received **VHS-3** from the tech office.  Ex. 93,p.27.

193.    At their depositions, both the technicians at the ODO denied making any VHS tapes.  Ex.94,pp.29-30,34-35,49,52-53;Ex.98,pp.15-16.

194.    Scully claimed at his deposition that he only requested a copy of the video and not any specific portion of it. Ex.93,p.29.

195.    **VHS-3,** judging from a copy of it (i.e. **VHS-4**), only contained the AD portion of the video.  Ex.9.

196.     Scully testified that he was transferred to the Tampa District Office in May, 2004 to be a group supervisor and that he took **VHS-3** (and **D-4**) with him to Tampa. Ex.93,pp.39,38,44-45.

197.    Scully showed either **VHS-3** or **D-4** to various DEA and task force agents in Tampa. Ex.93,pp.35,38-40,43.

198.    The agents in Tampa made fun of Paige when they watched the video. Ex.93,pp.41-42;Ex.71,pp.26-27.

199.    Within a day or two of the showing of the video in Tampa by Scully, Kevin Clark, one of the agents in Scully's group, borrowed Scully's disc copy (**D-4**). Ex.71,pp.18,19,22,26,29-30.

200.    Because the quality of the disc was poor, Clark returned the disc and borrowed **VHS-3**. Ex.71,p.33-34,36;Ex.93,pp.44,45.

201.    Clark took **VHS-3** home where he watched it and showed it to his wife. Ex.71,p.37.

202.    Clark testified that after he had a copy of **VHS-3** made for DEA agent Mark Baughman (see **VHS-4**), he left **VHS-3** in his truck or put it in his house. Ex.71,pp.54,56,57,59,63.

203.    Clark claimed at his deposition that he has purportedly never seen or even thought about **VHS-3** again and does not know what happened to it. Ex.71,pp.54,56,57,59,63.

204.    The Government admits that it does not know what happened to **VHS-3**. Ex.2,p.6.

### VHS-4

205.    According to the Government's answers to interrogatories, Clark caused a copy ("**VHS-4**") of **VHS-3** to be made on June 20, 2004, and provided **VHS-4** to DEA agent Mark Baughman. Ex.2,p.6.

206.     Clark testified that Baughman, his former group supervisor in Tampa who was then a group supervisor in Jacksonville, Florida, called him and requested a copy of the video. Ex.71,pp.6,43,46;Ex.66,pp.5,9-10.

207.     In order to avoid people in his office knowing that he had a copy of the video, Clark had a deputy sheriff at the Hillsborough County Sheriff's Office make **VHS-4** from **VHS-3**. Ex.71,pp.44-47.

208.     Clark sent **VHS-4** to Baughman, who immediately and repeatedly showed the film to various DEA agents and non-DEA task force agents in Jacksonville until he was told by the Jacksonville ASAC to stop.  Ex.66,pp.29-30,32,38,52;Ex.71,p.52.

209.     The Jacksonville agents made fun of Paige when they saw the video. Ex.66,pp.33-34,44.

210.     After OPR began its investigation, Baughman turned **VHS-4** over to OPR. Ex.66,p.21;Ex.27.

211.     **VHS-4** is five to six minutes long and basically includes the AD portion of the video.  Ex.9.

## VHS-5

212.     Christopher Bowman, a DEA agent at the ODO, testified that at least a month after the AD, Gruden provided him with a VHS copy ("**VHS-5**") of the AD which Gruden had in his office.  Ex.68,pp.8-9,15,16.

213.     According to Bowman, **VHS-5** was about 5 minutes long and basically included the AD portion of the video.  Ex.68,p.19.

214.    At their depositions, the two technicians at the ODO denied making any VHS copies, and the Government has not explained who made **VHS-5**.   Ex.2;Ex.94,pp.29-30,34-35,49,52-53;Ex.98,pp.15-16.

215.    Bowman testified that he returned **VHS-5** to Gruden.  Ex.68,p.23.

216.    Gruden testified that he purportedly did not remember if he gave Bowman a CD or a VHS and further said he did not know if Bowman gave the video back to him. Ex.78,pp.161,167,168-170.

217.    The Government admits that it does not know what happened to **VHS-5**. Ex.2,p.6.

## VHS-6

218.    A couple of days after the AD, Lenora Morris, a DEA agent at the ODO, saw Karl Weiss and Jeff Harmon, two other DEA agents at the ODO, watch a VHS tape ("**VHS-6**") that contained the AD.  Ex.84,pp.10-14.

219.    It is unknown where Weiss and Harmon obtained this VHS-tape.  Ex.2.

220.    The Government's answers to interrogatories did not mention the aforementioned viewing of **VHS-6** or the chain-of-custody involving this viewing.  Ex.2,pp.2-7.

## VHS-7

221.    After IN became aware that a video of the AD was appearing on the internet, Burns attempted to make a determination whether the improper disclosure came from IN.  Ex.47.

222.    According to Burns, he was advised by White that White had put two copies of the video in the IN file.  Ex.70,pp.125-126.

223.    Burns testified that when he checked the file, there were no copies missing. Ex.70,p.123.

224.    There is only one copy (i.e. **VHS-1**) of the video in the IN file.  Ex.70,p.126. Therefore, another copy ("**VHS-7**") appears to be unaccounted for.  Reason and Logic

225.    **VHS-7** must have been a VHS copy because Burns also testified that he never saw any CD's or DVD's.  Ex.70,p.90.

## VHS-8

226.    The DVD's turned in by White to OPR (i.e. **D-10, D-11, D-12** discussed below) include several seconds in which letters, numbers and symbols appear on the screen. Ex.'s15,18,19.

227.    Since these letters, numbers and symbols do not appear on the **Mini-DV** or **VHS-1**, it appears that the DVD's (i.e. **D-10, D-11 and D-12**) turned over by White to OPR were not copied from the M**ini-DV** or **VHS-1**, but another apparent tape copy ("**VHS-8**") of either the **Mini-DV** or **VHS-1**.

228.    The Government has provided no explanation as to **VHS-8**.  Ex.2.

## Disc Copies (CD's or DVD's)

229.    Gruden testified that during the week of April 12 (the week following the AD), he gave one of the technicians at the ODO the **Mini-DV** or **VHS-1** and asked for a few copies. Ex.78,p.109.

230.    In addition to requesting copies of the video, Gruden showed the video to other agents and allowed agents access to the **Mini-DV** or copies of the video.  Ex.78,pp.91-92,95-96. See also discussion of **VHS-3** and **VHS-6**.

231.    According to Gruden, he received a small stack of CD's the same or the next day. Ex.78,pp.116-118.

232.    Shafer, the ODO technician who made the CD's, testified that he made four CD's of the video for Gruden. Ex.94,pp.15-18.

233.    The CD's made by Shafer only included the AD portion of the video.  Exs.10,11.

234.    Gruden claimed that he could not remember why he had the copies made, and he and Shafer both claimed not to know why copies of only the AD portion of the video were made. Ex.78,pp.115,121,166;Ex.94,pp.23-27.

## D-1

235.    According to Gruden, he sent one of the CD's ("**D-1**") with a Report of Shooting to the Firearms Unit at the DEA's Office of Training during the week of April 12.  Ex.78,pp.154-155,155-156,212.

236.    The Government's answers to interrogatories state that it does not know what happened to **D-1**.  Ex.2,p.6.

237.    William Lutz was the Chief of the Firearms Unit from August, 2003 to the end of the summer, 2004.  Ex.80,pp.5-6.

238.    Gruden testified that he told Lutz by phone that he would be sending him a disc of the shooting with the Report of Shooting.  Ex..78,pp.158-159.

239.    Lutz testified that he received a CD or DVD showing the AD from someone, but he could not remember who provided it to him.  Ex.80,pp.17-18.

240.    Lutz testified that he stored the disc of the shooting in a locked locker at the Firearms Unit to avoid "improper dissemination."  Ex.80,pp.27-28,29.

241.    Lutz testified that he does not have a clear memory of what happened to the disc he received, but he assumes that when he left the Firearms Unit, he broke it in half and put it in a

burn bag because he is "a little bit anal, so I know how I would normally destroy evidence." Ex.80,pp.31-32.

### D-2

242.    Gruden sent another CD ("**D-2**") to Steven Derr, a friend of his who was then a DEA agent in New Mexico, purportedly because it was unusual and not something you see every day.  Ex.78,pp.123-125,127-129.

243.    Derr turned **D-2** over to the OPR during its investigation.  Exs.29,30.  **D-2** is 4 minutes and 9 seconds long and includes only Paige's comments about gun safety and the AD. Ex.10.

244.    A directory embedded in **D-2** shows that the electronic video file from which **D-2** was copied was created on April 15 at 3:12 p.m.  Ex.10;Ex.100,pp.7,8.

### D-3

245.    Gruden sent another CD ("**D-3**") to Rick Bendekovic, a friend of his who was then a DEA agent in New York.  Ex.78,pp.123,146.

246.    According to Bendekovic, Gruden sent him **D-3** after he called Gruden to ask about the AD after he saw a press release about the AD.  Ex.67,pp.7,14.

247.    The first local (i.e. Orlando) news coverage was April 29 and the first national news coverage was May 1 or 2.  Ex.1,pp.13-14.  This was after the time that Gruden claims to have destroyed the CD's in his possession.  Ex.78,pp.193-194.

248.    After Bendekovic received **D-3**, he talked to Gruden by phone and indicated to Gruden that he (Bendekovic) was amused by the video.  Ex.78,p.152.

249.    Bendekovic had a copy of **D-3** made for Derek Maltz.  See **D-7**.

250.    Bendekovic turned **D-3** over to OPR during its investigation.    Ex.67,pp.25-26;Ex.21.

251.    **D-3** is identical to **D-2**, including its embedded directory showing that the CD was copied from an electronic video file that was created on April 15, 2004.  Ex.11.

## D-4

252.    During the week of April 12, Gruden provided another CD ("**D-4**") to Scully, who was the DEA agent who had also obtained **VHS-3** from Gruden.  Ex.78,pp.174-178;Ex.93,pp.12-16. Gruden testified that Scully returned **D-4** because it could not be viewed on the computers in the office.  Ex.78,p.177.

253.    Contrary to Gruden's testimony, Scully testified that he kept **D-4** and took **D-4** (and **VHS-3**) to Tampa when he was transferred from Orlando to the Tampa office.  Ex.93,pp.17,19-21,25.

254.    Clark, the Tampa DEA agent to whom Scully gave **VHS-3**, testified that after Scully arrived in Tampa, Scully provided him (Clark) a CD of the AD, which he returned to Scully because the quality was bad and that Scully gave him **VHS-3** in return.  Ex.71,pp.29-30.

255.    Both Scully and the Government claim not to know what happened to **D-4**.  Ex.2,p.6;Ex.93,pp.19,53-54.

## .D-5

256.    Gruden testified that he believes he also provided a disc ("**D-5**") of the AD to the Miami Field Division during the week of April 12.  Ex.78,pp.161-162.

257.    The Government's answers to interrogatories did not identify **D-5** or otherwise indicate what happened to it.  See Ex.2.

258.

## D-6

259.    The Government's answers to interrogatories indicate that Gruden may have had a disc ("**D-6**") of the video as a spare.  Ex.2,p.6.

260.    Gruden denied that he had a spare disc for himself.  Ex.78,p.192.

261.    Gruden did testify that he had two or three remaining discs which he claimed to have destroyed around the time he gave the original **Mini-DV** to IN during their visit on April 19-21.  Ex.78,p.193-194.

## D-7

262.    Bendekovic had a CD copy ("**D-7**") of **D-3** made by one of the technicians in the New York office and gave it to Derek Maltz, another New York DEA agent.  Ex.67,pp.17-18;Ex.81,pp.4-5,14;Ex.67,pp.23-25.

263.    Maltz downloaded **D-7** to his laptop.  Ex.81,p.18.

264.    Maltz could not explain what happened to **D-7**.  Ex.81,p.20.

265.    The Government's answers to interrogatories make no effort to indicate what happened to **D-7**.  Ex.2,p.6.

## LT-1, LT-2 and LT-3

266.    Maltz downloaded **D-7** to his DEA laptop ("**LT-1**").  Ex.81,p.18.

267.    **LT-1** was eventually transferred to a new DEA laptop ("**LT-2**") of Maltz's and then to a third DEA laptop ("**LT-3**") of Maltz's.  Ex.81,pp.27-28,36-37.

268.    The videos (i.e. **LT-1** and **LT-2**) on the first two laptops were apparently deleted. Ex.81,pp.31,39-41.

269.    Maltz burned a copy of the video (i.e. **LT-3**) on his third laptop and turned it over to OPR after OPR initiated its investigation.  Ex.81,pp.41-42;Ex.23.

270.    **LT-3** is identical to **D-2** and **D-3**, which it should be since it is ultimately a copy of one of the Gruden CD's (i.e. **D-3**).  See Exs.12 and 11.

## **D-8**

271.    Kevin Naughton, one of the primary firearms instructors in the Miami Field Office, testified that he received a CD ("**D-8**") of the AD in the interoffice mail within a couple of months of the AD.  Ex.85,pp.4,8,32.

272.    Naughton claimed at his deposition that he had not asked for it and that he had no idea who provided it to him, why it was provided, or who created it.  Ex.85,pp.9-10.

273.    Naughton testified that he showed **D-8** to various agents until he was ordered by an ASAC to stop showing it.  Ex.85,pp.20-22,24-25.

274.    Various agents who watched the video shown by Naughton made fun of Paige.  Ex.85,pp.34-35,37.

275.    Naughton admitted that he took **D-8** home and was plainly evasive as to whether he kept or intended to keep **D-8** for his own personal use. Ex.85,pp.25-30,36.

276.    Naughton turned **D-8** over to OPR after OPR began its investigation.  Ex.22.

277.    **D-8** starts and ends at the very same points as the CD's provided by Gruden to Derr and Bendevokic (i.e. **D-2** and **D-3**).  See Exs.10,11,13.

278.    The embedded directory for **D-8** shows that **D-8** was copied from an electronic video file which was created on May 10, 2004 at 5:54 p.m.  Ex.13.

## **D-9**

279.    The Government has offered an expert report from Kevin Santillo, a firearms instructor at the Firearms Unit, concerning Paige's mishandling of his firearm when the AD occurred.  Ex.54.

280.    The Government's answers to interrogatories identify various agents at the Firearms Unit who viewed a copy of the video, but Santillo is not mentioned.  Ex.2,p.6.

281.    During a deposition about his expert report, Santillo admitted that Richard Inscore, who was an inspector at IN at the time of the AD, had actually provided him a CD or DVD ("**D-9**") of the AD during a visit by Inscore to the Firearms Unit in mid to late 2004 or early 2005.  Ex.92,pp.33,34-35.

282.    Santillo testified that he returned **D-9** to Inscore within a couple of days. Ex.92,pp.42,52.

283.    The Government did not reveal **D-9** in its answers to interrogatories and has not accounted for this video.  Ex.2.

284.    Inscore told Lutz that he had a copy of the video.  Ex.80,p.34.

285.    Inscore has retired from the DEA and has not yet been deposed because Paige could not locate him.

286.    Although Santillo is the Government's expert and was also one of the people interviewed by OPR, the Government did not identify Santillo in its answers to interrogatories as one of the DEA agents who viewed the video at the Office of Training or who had custody of one of the videos. Ex.2,p.6.

### D-10, D-11, D-12

287.    White, one of the IN investigators, testified that he took custody of the **Mini-DV** from Gruden when he (White) and Matthews went to the ODO to conduct the on-site IN investigation.  Ex.97,pp.50-51.

288.    White testified that after he returned to IN on April 21, he caused the Audio Visual Services Unit at DEA Headquarters to initially make five DVD copies of the **Mini-DV** "in its entirety." Ex.97,pp.73,74.

289.    White testified that he did not think that he had any reason to have copies of only the AD part of the **Mini-DV** made and that he did not remember asking anyone to do that. Ex.97,pp.92,105.

290.    White testified that when he could not view the DVD's in that format on the DEA Firebird computers, he requested the same woman to make five more copies in a different format (apparently CD) so they could be viewed on Firebird computers.  Ex.97,pp.77-78,80,85-87,94-95.

291.    White gave conflicting and confusing testimony as to the purported purpose of the ten discs (See,e.g,Ex.97,pp.74-76,79,80), but finally asserted that he created five sets of discs. Ex.97,p.95.  Each set purportedly contained one CD of the video that could be viewed on a Firebird computer, one DVD of the video that could not be viewed on a Firebird computer and one DVD of news reports about the AD.  Ex.97,p.95.

292.    White claimed that he "turned in all the stuff [he] had with the file" to Burns, the SITC.  Ex.97,p.79.

293.    Contrary to his prior testimony, White admitted that he kept two sets of discs (i.e. two DVD's and two CD's of the video and two DVD's of news coverage) for himself and took them to Philadelphia when he was transferred there from IN.   Ex.97,pp.95-97,105.   White claimed that he turned over these two sets of discs to OPR after OPR began its investigation. Ex.97,p.99.

294.    White turned over a total of seven CD's or DVD's to OPR.  See Exs.26,28.

295.    Four of the discs turned over by White to OPR included one CD and three DVD's of TV news coverage of the AD.  Exs.14 through 20.

296.    White turned over only three discs containing a video of the AD, and they were all DVD's ("**D-10**," "**D-11**," and "**D-12**").  Exs. 14 through 20.  These three DVD's did not contain the entire 69 to 70 minute **Mini-DV,** but were 23 minutes and 34 seconds long and included Paige's DRP, the AD, and approximately 7 minutes of comments by other speakers. Exs.15,18,19.

297.    Burns testified that he was never provided and never saw any CD's or DVD's. Ex.70,p.46-48,90.

298.    Each of the directories imbedded in **D-10**, **D-11** and **D-12** reflect that the original electronic video file from which these DVD's were made was created on April 17, 2004 at 4:05 a.m.  Exs.15,18,19.

## **D-13 through D-22**

299.    White asserted that he had ten copies of the **Mini-DV** made after he returned to IN from Orlando, including five CD's and five DVD's ("**D-13** through **D-22**"). Ex.97,pp,73,74,77-78,80,85-87,94-95.

## **D-23**

300.    White initially denied that any copies of the video were made after he completed his August 10, 2004 Final Report of Investigation.  Ex.97,pp.99,102.

301.    Exhibit 38 is a record showing that a DVD copy ("**D-23**") of the video was made at White's request on September 7, 2004, which was confirmed by the person who made it, Marquitta Queen.  Ex.38;Ex.89,p.22.

302.    Upon being confronted with this document, White admitted that such a DVD was made, but he had no explanation for what it was used for.  Ex.97,pp.103-104.

### **D-24, D-25**

303.    Marquita Queen has been with the Audio Visual Services Unit at DEA Headquarters since 1991. Ex.89,p.5.

304.    Queen testified that White gave her the **Mini-DV** for copying after he returned from Orlando.  Ex.89,pp.5,10.

305.    Queen testified that she digitized the **Mini-DV** into a computer system and then burned a master DVD copy ("**D-24**") of the entire **Mini-DV**; a master DVD copy ("**D-25**") of the AD portion of the **Mini-DV**; a master DVD of the entire **Mini-DV** without the AD; and a Mini-DV copy of the original **Mini-DV** without the AD.  Ex.89,pp.10-12.

306.    The Mini-DV copy without the AD was provided to Dr. Dorsey, as had been promised.  Ex.35.

307.    The Government has never explained what was done with the master DVD copy that Queen made of the entire **Mini-DV** without the AD.  Ex.2.

308.    The Government has not produced and there has also been no explanation of what has happened to the master DVD copy (**D-24**) of the entire **Mini-DV** and the master DVD copy (**D-25**) of the AD portion of the **Mini-DV**, even though the Government's answers to interrogatories seem to indicate, although not clearly, that the copies made by Queen were believed to be in the possession of IN or OPR.  Ex.2,p.7.

309.    Paige inspected the IN file and there are no CD's or DVD's of the video in the IN file. Ex.64,¶11.

### D-26-D-?

310.    Queen testified that White returned within a couple of days of her makng the master DVD copies and requested additional copies of each of the aforesaid master DVD copies. Ex.89,pp.16-17.

311.    Queen testified that she did not know how many copies she made, but it was from one to six DVD copies of each of the foregoing master DVD copies.  Ex.89,pp.16-20.

312.    The Government has not explained what has happened to the DVD copies of **D-24** and **D-25** except to seemingly state in its answers to interrogatories that they are in the custody of IN or OPR, which is not the case.  Ex.2.

### D-?

313.    Kent Reinke, the lead OPR investigator, testified that Gruden told him he also sent a disc to IN.  Ex.91,p.195.

314.    The aforesaid disc referred to by Reinke is not reflected in the Government's answers to interrogatories or Gruden's deposition.    Ex.2.

### Electronic Files

315.    Shafer and Queen testified that they deleted the electronic files they created. Ex.94,p.18;Ex.89,pp.14-15,20.

316.    The Government has never acknowledged the electronic video files used to create **D-8, D-10, D-11** and **D-12.**  Ex.2.

### Firebird System

317.    The DEA has its own internal computer network system called Firebird.   The Firebird system cannot be used to access websites on the internet.  Ex.64,¶12.

318.    The Firebird system can be used to send e-mail and attachments, such as the video of the AD, to other DEA agents and to e-mail addresses outside of the Firebird network. Ex.64,¶12.

319.    Walker, the DEA agent who seized the original **Mini-DV**, testified that he saw a video of the AD on Firebird some time approximately two weeks after the AD and in any event, before he was transferred to the Bahamas in November, 2004.  Ex.95,pp.4,21-24.

320.    Other agents said they saw a video of the AD on Firebird some time toward the end of 2004 or early 2005.  Ex.75,pp.23-24;Ex.92,pp.27-28,33,34-36.

321.    The Government has apparently only attempted a limited search for e-mails on the Firebird system which forwarded copies of the video of the AD.  Ex.77,pp.18-19,44.

322.     In unrelated investigations, the Government found e-mail chains forwarding a video of the AD over Firebird.  Ex.77,pp.36,37,52-54,60,75.

323.    In one single e-mail chain from March 7 to March 10, 2005, a video of the AD was sent to thirty-eight people.  Ex.45.

324.    Exhibit 44 reflects another single e-mail chain forwarding a video of the AD to thirty-nine people from March 8 to March 10, 2005.

325.    The subject matter listed on the aforesaid e-mails was: "Shooting your own leg, 'priceless.'"  Exs. 44,45.

326.    The aforesaid e-mail chains do not indicate the e-mail activity prior to the first person or subsequent to the last person in the chain.  Exs.44,45.

327.    The aforesaid e-mail chains do not indicate who else was sent the video by any of the people in those single chains and to whom any such other recipients forwarded the video. Exs.44,45.

**328.** The particular video that was being forwarded over Firebird in both of the foregoing e-mail chains begins and ends at the same exact points, contains the same exact content, and is the same exact length (4 minutes and 9 seconds) as the video which Gruden caused to be made on or about April 15, 2004.  Exs.10,11,44a,45a;Ex.77,p.68.

### Internet

329.   The video of the AD appears to have been widely noticed on the internet in March, 2005.  Exs.46,47.

330.   The videographer of the **Mini-DV** testified that he saw the video of the AD on the internet within one to six weeks after the AD.  Ex.69,pp.26-28,31.

331.   One DEA agent said he saw a video of the AD on the internet within a month of the AD while three other agents said they saw it on the internet before 2005. Ex.95,pp.4,24;Ex.65,pp.6-7;Ex.75,p.24;Ex.66,pp.52-56.

### Other

332.   Paige's computer expert has submitted an expert report detailing the steps that are necessary to disclose the video to another party and concluding that the disclosure of the video was intentional and willful.  Ex.100,pp.1-2.

333.   The Government's forensic computer analyst who has been assisting OPR with the investigation of the disclosure of the video acknowledged at his deposition that he had no opinion that the disclosure of the video was accidental.  Ex.77,p.137

334.   Paige did not know, could not know, and did not assume any risk that the DEA would make an improper disclosure of the video after it was taken into custody.  Ex.64,¶16.

335.    The SAC is to ensure that names of DEA agents involved in shootings are not released to the media in order to protect the "safety of these individuals." AgentsManual,§6114.4(B)(Ex.56).

336.    The Government's expert witness testified that the video of the AD should not be disclosed if it would reveal Paige's identity.  Ex.92,pp.113-114,116.

337.    Paige did not consent in writing to any disclosure by the DEA of the video-recording of the AD.  Ex.64,¶14.

338.    Paige did not forward or disseminate the video to anyone other than himself and his attorney.  Ex.64,¶15.

339.    After Paige learned that individuals in the Miami Field Office had viewed the video, Paige complained to both White and his ASAC, Collins.  Ex.1,p.14;Ex.73,p.115.

340.    Paige complained to Collins that a video of the AD was being shown on Firebird and asked if there was anything that he could do about it.  Ex.73,pp.50-51.

341.    After Paige complained about the disclosure of the video, Collins contacted an Associate SAC in Miami to see if the video could be removed from the Firebird system, but was advised by that person that they did not have the mechanism to find and remove it from the system.  Ex.73,pp.51-52.  Collins also contacted the ASAC in Miami, who confirmed that the video was being shown to agents in firearms training, and Collins requested that they refrain from showing it.  Ex.73,pp.116-117.

342.    Paige agreed to certain media interviews in an effort to mitigate the damage which he had suffered and was suffering as a result of the disclosure by the DEA of the video-recording to the public in the first instance.  Ex.61.

343.    Paige sought permission from the DEA before making any media appearances, which was granted with various conditions which were observed by Paige.  Ex.'s 61, 62.

344.    In order to help his reputation by showing the type of danger to which Paige was subjected during his service to the United States, Paige sought permission from the DEA to show a surveillance film during a media interview which showed Paige being held with a gun pointed at him by a drug dealer before he was rescued by other DEA agents.  Ex.52.

345.    The DEA would not permit Paige to show the aforesaid surveillance film during a media interview at which Paige was attempting to mitigate the damage to him caused by the disclosure of the video of the AD.  Ex.53.

346.    The DEA's reasons for not allowing Paige to show the aforesaid surveillance film were that it was "DEA Sensitive," the DEA's standards of conduct prohibited the public release of such information, and the film was purportedly covered by the Privacy Act.  Ex. 53.

Respectfully submitted

S/Ward A. Meythaler
Ward A. Meythaler

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 4, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:


Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044

s/Ward A. Meythaler
Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5415 Mariner Street, Suite 103
Tampa, Florida 33609
TEL: (813) 281-9000
FAX: (813) 281-2223
wamsecy@merklemagri.com

## APPENDIX OF ACRONYMS

AD – Accidental discharge;
ADCI – Assistant Deputy Chief Inspector;
ASAC – Assistant Special Agent in Charge;
BPC – Board of Professional Conduct;
DCI - Deputy Chief Inspector;
DEA – Drug Enforcement Administration;
DRP – Demand Reduction Presentation;
FECA – Federal Employment Compensation Act;
FTCA – Federal Tort Claims Act;
IN – Office of Inspections;
NDEC – Non-Drug Evidence Custodian;
ODO – Orlando District Office;
OYMGA – Orlando Youth Ministry Golf Association;
OPR – Office of Professional Review;
P&I – Planning and Inspection;
SA – Special Agent;
SAIRC – Shooting and Assault Incident Review Committee;
SAC - Special Agent in Charge;
SIT – Shooting Incident Team;
SITC – Shooting Incident Team Coordinator.