# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**LEE PAIGE,**

      **Plaintiff,**

**v.**                                          **CASE NO.: 01:06-cv-0644**

**UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION, et al.**

      **Defendants.**

_____/

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Both Lee Paige and the Government have filed motions for summary judgment. This is Paige's response to the Government's motion for summary judgment. The Government also filed a separate Statement of Material Facts ("GSMF"). Paige has filed his own Statement of Material Facts as well as a response to the GSMF disputing many of the Government's asserted facts.

Paige's response to the GSMF disputes well over half of the assertions.[1] Some assertions are not supported by the cites[2] and many are contested by other witnesses. In a number of instances the cites actually support the contrary proposition.[3] The Government's brief

---

[1]  To set forth all of the disputed facts as this point would take up much of this memorandum.

[2]  For example, ¶ 14 of the GSMF asserts that Paige's DRP's have been the subject of "newspaper articles and photographs." However, the cites only refer to one article containing one photograph. ¶'s 44 and 45 assert that there were ricocheting bullets when in fact the cites only show that there was one bullet that ricocheted through Paige's thigh after striking a bullet in his pocket.

[3]  For example, ¶ 20 of the GSMF asserts that Paige told Gruden that he would be giving a DRP that night, but did not mention that he would be showing firearms. However, the cite (Govt. Ex. 2, p. 76) shows that Paige did tell Gruden that he would be showing firearms. Moreover, the fact that Gruden knew about the weapons demonstration and did not object shows that no "permission" was required or that Gruden implicitly gave permission, which contradicts ¶ 21 of the GSMF.

ignores inconsistencies between its own employees and cherry-picks testimony from various witnesses to attempt to create consistency.[4]  In discussing copies of the **Mini-DV**, the Government's brief leaves out, mischaracterizes, or does not address problems with three potential VHS tapes (i.e. **VHS-6**, **VHS-7** and **VHS-8**) and many discs (i.e. **D-5**, **D-7**, **D-9**, **D-13 through D-22**, **D-23**, **D-24**, **D-25**, **D-26 – D-?**, a 4:09 CD which Gruden said he sent to IN, another 23:34 DVD the Government produced after Paige had completed his motion for summary judgment,[5] and the 4:09 CD's which Gruden claims to have destroyed.)  For example, in a mischaracterization that is particularly pertinent here, the Government now asserts at page 7 of its brief that Gruden had "between four to six" 4:09 CD copies made for him by Shafer. As authority for this number of 4:09 CD copies, the Government cites to paragraphs 79-80 of its GSMF, which actually state that Shafer made "approximately four" CD's (not "between four to six").  Moreover, the authority cited for paragraphs 79-80 of the GSMF is page 15 of Shafer's deposition where he actually states that he made only four CD's (not "approximately four"). Ex.94,p.15.  Consequently, the Government has taken Shafer's original testimony that he only made four CD's and turned it into "approximately four" and then four to six.[6] The Government

---

[4]  For example, citing Queen's testimony, the Government claims that White originally had one copy of the **Mini-DV** made.  Then, citing White's testimony, the Government claims that White then had approximately five copies made from this original copy.  Further, referring to the DVD's which White kept for his personal use, the Government claims that all the copies White had made were 23 minutes and 34 seconds ("23:34") long.  However, White actually testified that he initially had five DVD's of the entire (i.e. 69-70 minutes) **Mini-DV** made and then had an additional five CD's and one DVD made for a total of eleven discs that were 69-76 minutes long.  Contrary to White, Queen testified that she made master DVD's of the entire **Mini-DV**, the AD only, and the **Mini-DV** without the AD; and then an unknown number of copies of each.  Further, White's 23:34 DVD's contain embedded directories showing that the 23:34 DVD's were not even made by Queen but by someone before Queen was provided the **Mini-DV** to copy.  See Paige's Summary Judgment Memorandum, pp. 25-27 (**D-10**, **D-11**, **D-12**).

[5]  On May 15, 2008, the Government produced another DVD of Paige's presentation which the Government found in the Miami Field Office. Ex.104.  It appears to be identical to **D-10** and **D-12**, two of the 23:34 DVD's which White kept for himself.  This late find illustrates once again the reckless manner in which copies of the **Mini-DV** were unaccountably distributed around the DEA.

[6]   In its answers to interrogatories, which were based on OPR's interviews of witnesses, the Government asserted that Shafer made "three or four" 4:09 CD's for Gruden. Ex. 2, p. 5.

is doing this because if Shafer only made four CD's, then Gruden, contrary to his testimony, must have independently burned several CD's himself since, according to Gruden and other witnesses, Gruden had at least 8 to 9 CD's (i.e. **D-1**, **D-2**, **D-3**, **D-4**, **D-5**, a CD Reinke said Gruden told him he sent to IN; and the two or three CD's[7] which Gruden claims to have destroyed.

## THE PRIVACY ACT CLAIM

The Government asserts that the 4:09 video was not retrieved from a system of records, that the disclosure of the 4:09 video was not intentional and willful, that the details of Paige's presentation were in the public domain and that emotional damages are not covered by the Privacy Act.

### The 4:09 Video Was Retrieved From  A System Of Records

The Government's brief admits the following:

1.      The IN file constituted or was part of a system of records;

2.      The **Mini-DV** was a record within that file and was therefore a record within a system of records;

3.      Gruden caused the 4:09 CD of the AD to be copied from the **Mini-DV** which was a record within the system of records;

4.      The 4:09 copy was disclosed on Firebird and the internet.

The logical conclusion is that the 4:09 copy was disclosed from a system of records (i.e. the IN file).  The Government appears to argue that the "4:09 version"[8]  disclosed on Firebird

---

[7]  Citing to Gruden's deposition, which clearly states two or three CD's, the Government also mischaracterizes this at page 14 of its brief as one or more CD's in an apparent effort to reduce the number of unaccounted for Gruden CD's.  See Gruden deposition, Gov't. Ex. 11, p. 193.

[8]  The Government refers to the disclosed 4:09 copy of the **Mini-DV** as the 4:09 "version," which appears to be designed to make it appear that the 4:09 video is something other than a copy of part of the **Mini-DV.**

and the internet was not retrieved from a system of records (i.e. the IN file) because "IN never had a 4:09 version of the video." Government's brief, p. 19.  Although it does not argue it, the Government also alleges in its statement of facts that Gruden purportedly did not know what the DEA would do with the video-recording and the IN file was not opened until April 16.  All of these propositions are untrue or irrelevant or both.

First, it is particularly notable that the Government makes no reference whatsoever to its own rules and regulations for the investigation of shooting incidents.  Those rules and regulations are set forth in the DEA's Agents Manual (Ex.56) and the Planning and Inspection Manual ("P&I") (Ex.57).  As pointed out in Paige's Summary Judgment Memorandum, there are several clear rules.  First, **all shooting incidents involving an injury to a DEA agent are investigated.**  Next, **all shooting investigations are conducted by or directed and monitored by IN**.  IN will either send its own shooting team to conduct an on-site investigation or it will delegate the on-site investigation to the local office.

If the on-site investigation is delegated to the local office, IN still directs and monitors the investigation.  The supervisor in the local office who would conduct the investigation for IN, in this case Gruden, must prepare a DEA-6 Report of Investigation and a DEA-485 Report of Shooting.  He is responsible for "construction" of the IN "file" in a specific format set out in the Agents Manual and the P&I Manual.  *See* AgentsManual,§6114.63(B)(2)(Ex.56);P&IManual, §8231.4,§8233.62(C)(Ex.57).  The "file construction" to be done by Gruden is identical to that which would be done by the IN investigators themselves and includes, *inter alia,* the DEA-6 Report of Investigation, the DEA-485 Report of Shooting, other reports, and relevant evidence such as the video here.  *See* P&IManual,§8233.62(C)andEx.1.  The file title and number to be used for the file "constructed" by Gruden are the IN file title and number, which are to be sent to

the local office by IN.   AgentsManual,§6114.41(H)(Ex.56);P&IManual,§8231.3(E)(Ex.57). Upon completion of the IN investigation file by Gruden, he is to send the investigation package to IN which then reviews it to ensure that it was properly done and complete.  IN then uses the Report of Investigation and investigation file in the same way as if IN had constructed the file itself.  P&IManual,§8233.63(Ex.57).  In short, the local office, here Gruden, would literally construct IN's file for it.

Paige's AD occurred on the evening of April 9.  IN was notified of the AD later that evening by phone.  The local office (i.e. the ODO) was also supposed to fax a "Preliminary Shooting Incident Report" to the Headquarter Command Center within six hours of the incident. P&IManual,§6114.41(E).  This was not done in this case.  Within 12 (or 24 depending on the manual) hours, the ODO is to send a teletype detailing the shooting incident to, *inter alia,* IN. This was not done here until Monday, April 12.

According to his testimony, Collins knew that the IN inspection team would need the **Mini-DV** or a copy.  Ex.73,p.65.  Indeed, on Monday, April 12, Deering in IN called Collins and asked for a copy of the **Mini-DV**.  Ex. 73, pp. 67-68.  In addition, according to Collins, Deering also told Collins that IN would not be sending a shooting team to conduct the on-site investigation.  *Id.*, pp. 68-69.  As discussed above and in Paige's Summary Judgment Memorandum, this does not mean that there is no investigation of the shooting; it means that the investigation and IN "file construction" will be done in the local office by Gruden himself.  On April 12, Collins gave custody of the **Mini-DV** and **VHS-1** to Gruden, directed him to send a copy of the video to IN and told him that IN would not be sending a shooting team.  Ex. 73, p. 69.  Consequently, as of April 12, Gruden was the person initially responsible for the on-site

investigation of the AD and construction of the IN investigation file, which included evidence such as the **Mini-DV** and **VHS-1**.

According to the head of IN at the time (McAleer), the IN file is opened automatically when IN is notified of a shooting. Ex.83,p.14; see also Ex.82,p.25. The IN Program Analyst is to "immediately enter the shooting incident in a shooting incident database" and administratively assign a file title and file number to the investigation. P&IManual,§8234.31(Ex.57). The title of the file is automatically known because it is always the name of the shooter, here Lee Paige. P&IManual,§8234.31(B)(Ex.57). Since the AD occurred and was reported to IN on Friday evening, April 9, the Program Analyst should have administratively assigned a file title and number to the investigation on Monday, April 12. The Program Analyst testified that she enters and updates information about the investigation on the shooting incident database as she receives it and may wait until she receives the teletype from the local office to fill in the database. Although the required teletype was supposed to have been sent by April 10, it was not sent to IN until the evening of April 12, 2004. Consequently, the latest that the Program Analyst would normally have entered the incident on the database, including assigning the file number and file title, would have been April 13. This is the file number and title for the IN file whether construction of the file is done by IN or at the local office by Gruden.

Consistent with the delegation of the investigation to the local office, Gruden prepared the DEA-6 Report of Investigation and the DEA-485 Report of Shooting and maintained the evidence, including the **Mini-DV** and **VHS-1**, which the Government admits are part of the IN file. In other words, Gruden literally had custody of and was responsible for constructing the IN file, including the **Mini-DV**. Since he had actual custody of the IN file he was responsible for constructing, he actually and physically retrieved the **Mini-DV** from the file when he caused the

4:09 CD copies to be made from the **Mini-DV**.  Obviously, a copy of a part of a record retrieved

from a file must be considered a record retrieved from the file.  *Bartel v. F.A.A.,* 725 F.2d 1403,

1408 (D.C. Cir. 1984) ("copies" covered by Privacy Act.).  Otherwise, the Privacy Act could be

easily thwarted by simply copying part of a record and then disclosing it.[9]  In addition, logically,

the 4:09 copies themselves also really became part of the file. In fact, Gruden used one of these

4:09 copies to send to the Firearms Training Unit (Office of Training) as part of the DEA-485

Report of Shooting which was also part of the IN file Gruden was responsible for constructing.

According to Collins, on April 14, Deering called back and advised Collins that IN would

send "a team down to do the investigation from the headquarters level" (as opposed to the

investigation being done at the local level by Gruden).  Ex. 73, p. 70.  "Shortly" after this call,

and in any event within a day or two, Collins relayed this information to Gruden. Ex. 73, p. 72.

Consistent with the April 14 call, it appears that a travel request for the IN inspectors to travel to

Orlando was "entered" on April 14.  Ex. 103.

On April 15, Deering signed the travel authorization for the two IN inspectors to travel to

Orlando for the on-site investigation, and the Program Analyst indicated on her database that

Matthews and White were the two IN inspectors assigned to the IN investigation.  Ex.32; Ex. 72,

p.17.  Also on April 15, Gruden sent **VHS-1** to IN for the IN inspectors to review before

traveling to the ODO for the on-site inspection.  On April 15, Gruden also signed the DEA-485

Report of Shooting which he had prepared to submit to the Firearms Training Unit and, pursuant

---

[9] The Government admits at page 1 of its brief that **VHS-1** and any of the copies which White had made, including the 23:34 copies, were part of the IN file.  Further, although none of the White copies are presently in the IN file, the Government does not suggest that they were not records which were part of the IN file.

to instructions on the form itself, to IN with the "completed investigation package," which would include the **Mini-DV**.[10] Gov't. Ex.19; P&IManual§8231.4(Ex.57); Gov't. Ex. 19.

On April 16, the IN Program Analyst indicated on the database that she had "opened" a file. The Government asserts that the IN file was therefore not opened until April 16. However, the Program Analyst testified that the April 16 date on the database actually represents the date on which she "created the correspondence folder" which is the part of the IN file that she maintains.[11] Ex.72, p.18. The investigation part of the file had already been opened for several days as described above and in Paige's Summary Judgment Memorandum. Also on April 16, Gruden completed and signed his DEA-6 Report of Investigation for the IN file. Ex. 1, p. 20.

In light of the above, any suggestion that Collins or Gruden did not anticipate that there would be an investigation or that they did not know that the **Mini-DV** would be part of that investigation is frivolous. It is contradicted by the Agent's Manual; the P&I Manual; the seizure of the **Mini-DV** by Walker in Gruden's presence because it was "evidence"; Collins' knowledge that IN would need the **Mini-DV;** IN's request for a copy of the **Mini-DV;** Collins' and Gruden's response to that request by sending a copy of the **Mini-DV**; the initial delegation of the investigation to Gruden himself; Gruden's conduct in performing those functions which he was required to perform if the investigation was delegated to him, including preparing the DEA-6 Report of Investigation and the DEA-485 Report of Shooting and attaching one of the 4:09 CD's

---

[10] Obviously, Gruden ultimately did not have to send the completed investigation package because IN took over the on-site investigation. However, the form further shows that Gruden knew he was to complete and send the investigation package if IN did not send a shooting team. Box 9 on the DEA-485 contains a place for the "IN case number." Gruden did not fill in this space with the IN number, presumably because IN, contrary to the Agent's Manual and P&I Manual, had not yet sent it to him and Gruden failed to ask for it. However, Gruden did use the IN file name (i.e. Lee Paige) on the report and the report was part of and is in the IN file.

[11] As discussed in Paige's Summary Judgment Memorandum, the IN file consists of the investigation file or binder, which the IN investigators or the local office constructs, and the correspondence folder which the Program Analyst maintains until the case is closed.

to the DEA-485; the direction on the DEA-485 for Gruden to submit a completed investigation package to IN, which would include the **Mini-DV**; IN's call to Collins that the investigation would be done at "headquarters level" after all; and Collins advising Gruden that the on-site investigation would be done at the headquarters level.  Further, Patterson, the acting ASAC who took the **Mini-DV** to the ODO and made **VHS-1**, testified that he knew that IN reviewed all shootings and "certainly" understood that IN would be investigating the AD.  Ex. 88, p. 31. Moreover, Gruden himself said he prepared the DEA-6 Report of Investigation because the manual required it as part of the shooting investigation.  Ex. 78, p. 210.

Even if Gruden had not been initially responsible for constructing the IN file, the evidence in his possession (i.e. the **Mini-DV** and **VHS-1**) were obviously identified to and to be incorporated in the IN physical file.  It would be purely form over substance to suggest that parts of a file cannot be maintained in different locations, especially when IN was to travel to the ODO to obtain it.  In fact, the Program Analyst kept the correspondence folder for the IN file, Deering had custody of **VHS-1** before he turned it over to White (Ex. 97, pp. 23-23), and the investigators maintained the investigation part of the file.  Under the Privacy Act, a system of records means a "group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number…"  There is no requirement that the group of records be in the same container at all times.  Here, everyone knew that there was a group of records identified to and being maintained for the existing investigation of Paige's AD and that the automatic file title was "Lee Paige" even if a number, which was required by DEA rules to be assigned immediately, had not yet been assigned.  Gruden was holding and maintaining evidence and reports which were parts of the file including his DEA-6

Report of Investigation, the DEA-485 Report of Shooting and the **Mini-DV**.[12]    As pointed out above, the DEA-485, which Gruden filled out and to which he attached to one the 4:09 copies, specifically directed Gruden to submit it (which would include the 4:09 copy) to IN with a "completed investigation package."

The 4:09 CD's which have been recovered contain embedded directories which reflect that the electronic video file that was used to burn the 4:09 CD copies by Shafer for Gruden was created at 3:12 p.m. on April 15.  Gruden testified that he received the 4:09 copies from Shafer either on the same day or the next day that he requested that copies be made.  Ex. 78, p. 118.  Consequently, Gruden did not have the 4:09 CD copies until late on April 15 or April 16.  By then, Gruden had the DEA-485 Report of Shooting directing that he send an investigation package to IN and had also even been told that IN was sending a shooting team.  Moreover, Gruden also knew that the **Mini-DV** was the best evidence of what happened and that IN would want the **Mini-DV**. [13]

In this case, Gruden was initially responsible for constructing the actual IN file regarding Lee Paige.  Consequently, when he had the 4:09 CD's copied made from the **Mini-DV**, he in fact physically retrieved a record (i.e. the **Mini-DV**) from the IN file he was constructing and copied it.  Even if he had not been responsible for constructing the IN file, he was holding and maintaining the **Mini-DV** for IN as part of the IN file.  Since the 4:09 "version" was copied from the **Mini-DV**, which was retrieved from the IN file, the 4:09 "version" was physically retrieved from the IN file.

---

[12]  The Shooting Incident Checklist in the IN file also states that the **Mini-DV** was "secured by SA Walker [and] maintained by GS Gruden." Ex.1,p.36.

[13]  The fact that the **Mini-DV** is the best evidence is intuitively obvious.  Moreover, Gruden himself stopped interviewing witnesses on April 9 in order to obtain the video, which was seized because it was "evidence." Moreover, he attached one of the 4:09 copies to the Report of Shooting because "it depicted what actually happened."  Ex. 78, p. 158.  He also knew that IN had already asked for a copy of the **Mini-DV**.

**Even If The Mini-DV Was Not Retrieved From The IN File,
It Was Still A Disclosure From A System Of Records**

Situations have arisen in which a record was not physically retrieved from a file, but the Courts of Appeal, including the D.C. Circuit, have held that there was a violation of the Privacy Act. In *Bartel v. F.A.A.*, 725 F.2d 1403 (D.C. Cir. 1984), the Plaintiff, an employee of the FAA, had been under investigation for improperly obtaining the files of certain airmen. A Report of Investigation ("ROI") had been generated concerning the plaintiff. After the plaintiff left the FAA, the plaintiff's supervisor disclosed to the airmen that the plaintiff had improperly obtained their records. As a result of this disclosure, the plaintiff brought suit under the Privacy Act. The Government defended on the grounds that the disclosure came from the supervisor's knowledge of the investigation of the plaintiff, rather than as a result of physically retrieving and reading the ROI from the file. Rejecting this argument, the D.C. Circuit noted that the supervisor himself had ordered the investigation and that under such a fact pattern, a "hypertechnical interpretation" of the retrieval rule would make little sense, given the underlying purposes of the act. The court noted the following purpose of the Privacy Act at 1407:

> The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records.

The court concluded at 1409:

> … this case demonstrates that an absolute policy of limiting the Act's coverage to information physically retrieved from a record would make little sense in terms of its underlying purpose.

The court added at 1410:

> But, neither do we think those rationales support reading out of the Act's coverage, the situation we may be dealing with here, where an agency official uses the Government's "sophisticated … information collecting" methods to acquire personal information for inclusion in a record and then discloses that information in an unauthorized fashion without actually physically retrieving it from the record system. Threats to privacy from the government's record-keeping

emanate not only from the ease of retrieval, but also from the ease of collection and utilization of vast amounts of personal information.

In a comment particularly appropriate here, the D.C. Circuit stated the following at 1411, footnote 15:

> Restricting the Act's coverage to disclosure of information retrieved from the record would allow, for example, an agency investigator who, in the process of making a record, learned of some information damaging to an individual to make public that information without violating the Act.  This contravenes the explicit Congressional "design… to prevent … interbureau leaks of information about persons of interest in the agency or community, or such actions as the publishing of information of a sensational or salacious nature or of that detrimental to character or reputation."  [authority omitted].

Consequently, the D.C. Circuit specifically recognized that it would be a violation of the Privacy Act for an investigator to disclose information about a record before it was physically placed in a file.  The situation here involving the disclosure of the Gruden 4:09 copy is more serious than the hypothetical situation in *Bartel's* footnote 15.   That hypothetical situation involves an investigator disclosing information he learned in the process of making a record, while the situation here involves the disclosure of the actual record (i.e. the 4:09 copy of the **Mini-DV**) itself, not just information about the record.  See also *Wilborn v. Department of Health and Human Services,* 49 F.3d 597 (9th Cir. 1995) (finding an improper disclosure of a record that was not physically retrieved from a file): [14]

There is no question that Gruden was, at the very least, in the process of making records when he caused the 4:09 copies to be made from the **Mini-DV**.  It appears that the 4:09 copies were made on April 15, and provided to Gruden on April 15 or 16.  On April 15, Gruden signed

---

[14]   The district court in *Wilborn* had also noted that since the file had been purged of all references to the record at issue, there could not have been a disclosure in violation of the Privacy Act.  The circuit court rejected this proposition noting that such an interpretation was "inconsistent with the spirit of" and "would make a mockery of the Privacy Act" and would allow an agency official to "sidestep the Privacy Act merely by removing a document first, before disclosing its contents." Similarly, here, it would make a mockery of the Privacy Act if Gruden could disclose a record (i.e. a copy of the **Mini-DV**) simply because IN had not yet picked up the **Mini-DV** being maintained by Gruden or was tardy in assigning a file number to the IN file.

the DEA-485 Report of Shooting, the instructions on which directed him to send that report with the investigation package to IN. Also, on April 15, he sent **VHS-1**, which the Government admits is a record in the IN file, to IN. Further, on April 16, Gruden signed the DEA-6 Report of Investigation which he provided to IN and is a record in the IN file. Gruden also knew by then that IN was sending a shooting team and that he had custody of and was maintaining the key evidence (i.e. the **Mini-DV**) in the investigation.

Gruden actually physically retrieved the **Mini-DV** from the IN file that he was initially responsible for constructing or was maintaining for IN. However, if he was not or if there is some other reason to suggest that the **Mini-DV** had not yet been made part of the IN file, then the principles of *Bartel* apply and no physical retrieval from the IN file is required.

### Plaintiff Can And Has Proved That The Disclosure Here Was Intentional And Willful

The Government argues that Paige cannot prove that the disclosure here was intentional or willful because he does not know the identity of the person who disclosed the video to the public. First, as discussed in Paige's Summary Judgment Memorandum, there is no requirement that Paige has to prove the identity of the person who disclosed the video to the public. All he has to prove is that someone at the DEA intentionally and willfully disclosed the video to the public. In fact, the Privacy Act specifically only requires that the court determine that "the **agency** acted in a manner which was intentional or willful" (emphasis added). Moreover, in one of the cases relied on by the Government, *Sussman v. United States Marshals Service,* 494 F.3d 1106, 1122 (CA. D.C.), the court noted that "[]a]n **agency** acts in an intentional or willful manner … by flagrantly disregarding others' rights under the Act'"(emphasis added). In *Dong v. Smithsonian Inst.,* 943 F.Supp. 69, 73 (D. D.C. 1996), the court found that there was an intentional and willful violation of the Act because the **agency** intentionally chose to ignore the

law and not inform its employees that they were covered by the Act because it disagreed with a court decision that the agency was covered by the Act. The court held that this constituted a reckless disregard of the Privacy Act rights of the employees and promoted an "an environment in which Privacy Act violations can readily and easily occur." Thus, in that case, the intentional or willful nature of the conduct was shown by the agency's omissions.

There is no reason that a plaintiff should have to identify a particular person within the agency. In *Doe v. U.S. Postal Service,* 317 F.3d 339, 343 (D.C. Cir. 2003) the D.C. Circuit recognized that "because plaintiff can rarely produce direct evidence that the government has disclosed confidential information obtained from their private records, requiring such evidence would eviscerate the protections of the Privacy Act."[15] Indeed, the more willful and intentional the conduct is, the more likely it will be that the person who disclosed the information will conceal his conduct. The very fact that he DEA cannot identify the particular person who disclosed the video to the public is evidence itself that the disclosure was intentional, especially since the Government's investigation has no evidence of an accidental disclosure,[16]

Paige has proven that the disclosure here was intentional and willful and is entitled to summary judgment on the issue of liability. The Government's motion actually supports Paige's position. The Government's brief points out the earliest video which the DEA has found on Firebird and the internet is the 4:09 copy that Gruden had made from the **Mini-DV**.

---

[15] Obviously, the plaintiff can prove intentional and willful conduct through circumstantial evidence. *Id.* at 343 ("we generally draw no distinction between the value of direct and circumstantial evidence.")

[16] *Edmonds v. U.S. Dept of Justice,* 323 F.Supp.2d 65 (D. D.C.) is inapplicable here. There, as a result of the states secrets privilege, the plaintiff could not conduct sufficient discovery regarding the circumstances of the disclosure, including those involved, to establish either a direct or circumstantial case that there had been an intentional and willful disclosure. Through discovery here, Paige is able to present direct evidence that Gruden improperly and intentionally disclosed the 4:09 video to other DEA agents, which was a violation, of the Privacy Act, and circumstantial evidence that Gruden, or someone to whom he intentionally gave the 4:09 CD intentionally disclosed the video to the public.

Consequently, this video must have originated from one of the CD's which Gruden possessed. No one disputes that Gruden intentionally and willfully disclosed the various 4:09 CD copies to various other DEA agents. Either the disclosure of the 4:09 video to the internet came from Gruden directly or one of the copies he intentionally and willfully provided to the other agents. Gruden was not authorized to provide copies of the 4:09 copy to anybody other than IN. The only authority which he had is set forth in the Agent's Manual and the P&I Manual which provided that if he conducts the on-site investigation at the direction of IN, then he was to send the investigation file which he constructs for IN, including the **Mini-DV,** to IN, along with one copy. AgentsManual,§6114.63(C)(1)(Ex.56). IN then decides to whom the IN file will be distributed. AgentsManual,§6114.63,§6114.71(Ex.56);P&IManual,§8233.63(Ex.57). Moreover, in this case, since IN sent its own shooting team, Gruden did not have to put together the investigation package and had no authority to provide copies of evidence in the investigation to anybody.[17] Further, the **Mini-DV** was private property which Gruden had no authority to copy and distribute outside of the requirements of the IN investigation.

In addition to the foregoing, Paige has provided uncontested expert testimony that the disclosure had to be intentional or willful. There is no way in which the video could have been disclosed here other than in some way that was intentional and willful since the disclosure necessarily required several distinct, intentional physical steps. Indeed, the Government has never contended and its forensic investigator had no opinion that there was any accidental disclosure here. Further, the head OPR investigator testified that there was no evidence that the

---

[17] Gruden was not even authorized to send the video with the DEA-485 Report of Shooting to the Firearms Training Unit. All he was supposed to send was the form itself. Evidence, such as the video, was only to be sent to IN.

disclosure was accidental. Ex. 91, p. 251. The only realistic ways[18] in which the 4:09 Gruden copy could have been disclosed to the public from such a secure location as the DEA includes the following, all of which would violate the Privacy Act:

1.      One of the 4:09 CD's was intentionally handed by Gruden (or someone he intentionally gave it to) to someone outside the DEA;

2.      One of the 4:09 CD's was intentionally taken by a DEA employee from Gruden or someone he intentionally gave it to which then resulted in its being disclosed outside the DEA;

3.      One of the 4:09 CD's was intentionally downloaded to some other electronic storage device, such as another disc, hard drive, or thumb drive, and then intentionally handed to someone else or intentionally taken by another DEA employee.

4.      One of the 4:09 CD's was electronically e-mailed over Firebird to someone else, either within the DEA or outside the DEA. As Paige's expert points out, to accomplish this the person would have to locate and obtain the 4:09 CD; put the CD in a computer; locate the CD on the computer; download the CD to the computer by opening the CD, highlighting the information to be downloaded, and pasting it on the computer's hard drive;  log in to the computer using a password and identifier to obtain access to an e-mail system; open the outlook e-mail software; type in the e-mail address of the recipient; perhaps type in the subject matter; typically type a message to alert the recipient as to the contents of the attachment to provide a reason to open it; click the "insert" or "attach" file functions; search for and identify the file (containing the video) to be sent; click on the file to be sent; and then click "send" to send the e-mail with the attached video file. Ex.100,pp.1-2. In addition to all this, the person would also

---

[18]  It is theoretically possible that someone broke into the DEA's Orlando office and stole a 4:09 copy.   However, there is no evidence of this and the Government has never so contended.  Moreover, if that he happened, there would still be a violation of the Act since the number of copies Gruden had made was a reckless disregard of Paige's rights.

have to ignore his or her training and a banner on the DEA computer screen reminding the person that information on a DEA computer is DEA-Sensitive.  Ex.100,p.2.    This could not possibly be anything other than an intentional disclosure.  The Government has not contested the expert's conclusion in this respect or offered any possible scenario that would not be intentional and willful.

It should also be noted that the video had enormous entertainment value.  As discussed in Paige's Summary Judgment Memorandum, virtually all the times the video was shown to agents, the agents made fun of Paige, particularly in light of his comment right before the AD.[19]  See also Ex 91, p. 207.  The e-mail chains found on Firebird refer to the video in the "subject" section of the e-mail as "shooting your own leg, 'Priceless.'"  The entertainment value of the video, as further indicated by the wide circulation of the video, evidences a motive for the disclosure which adds to the evidence that shows that the disclosure was intentional and willful.

Next, the Government carefully argues that Paige can not identify the person who disclosed the video to the "public."  The Government ignores the fact that the disclosures of the 4:09 video by Gruden to other DEA agents, such as Derr, Bendekovic and Scully, was in and of itself a violation of the Privacy Act.  The natural and probable consequence of such disclosures is that the video will be further disclosed and end up in the public.  That is why IN placed such strict limits on the number of copies of the video that were to be made.  There is no dispute that Gruden initially intentionally distributed the 4:09 video that eventually ended up in the public.  This in itself establishes the requisite intention or willfulness.

Finally, the course of conduct of the DEA here constitutes an intentional and willful violation of the Privacy Act.  Intentional conduct includes the "reckless" or "flagrant" disregard

---

[19]  Despite this, the Government persistently suggests that the video was shown for "gun safety," "training," "lessons learned" and the like.  See Paige's response to GSMF ¶'s 181, 186, 212, 222, 245, 247.

for the privacy rights of others. *Dong v. Smithsonian Inst., supra; Albright v. United States,* 732 F.2d 181, 189 (D.C. Cir. 1984). The excessive number of copies of the video made by the DEA, the absence of virtually any records to document the copies and the chain-of-custody of the copies, and the inability of the DEA to account for most of the copies all constitute a reckless disregard for Paige's privacy rights which caused the disclosure of the video regardless of who actually disclosed it. If Paige or the DEA cannot pinpoint the precise person who disclosed the video to the public, it is because of the reckless disregard of Paige's rights.

If it were necessary to pinpoint a person who disclosed the video on Firebird or to the internet there is compelling, direct and circumstantial evidence that Gruden was that person. First, obviously, it is one of Gruden's 4:09 CD's that the Government asserts first appeared on Firebird and the internet. Next, Gruden had a known animous towards Paige and at one point pointed a gun at him. Shortly after Paige transferred to the Orlando Office, Gruden yelled at Paige in front of his group and sent him home for the day for being five to ten minutes late for a meeting even though it was not Paige's fault that he was late and such punishment is unheard of at the office. Ex. 110, p. 2, ¶ 8. Not long after the AD, Gruden, as Paige's supervisor, purported to make a career-wrecking evaluation of Paige which was illegal. In a six month performance evaluation, Gruden ranked Paige "Unacceptable" in five of seven critical job elements and "Unacceptable" overall. Ex. 107. This would effectively prevent any promotions or transfers for Paige and sends the message that he is not working. Ex. 110, p. 2, ¶ 7. Paige has never had an "Unacceptable" ranking in any category, much less overall either before or since that evaluation in eighteen years with the DEA.[20] *Id.* Gruden's evaluation was actually illegal and was

---

[20] Gruden even criticized Paige in the evaluation for using his Government vehicle to attend the funeral of the wife of another law enforcement officer and using his Government issued cell phone in the month after the AD to respond to calls from DEA Headquarters about matters relating to the AD as well as from DEA employees who were concerned about his condition. Ex. 107; Ex. 186, pp. 172-176. Gruden also criticized Paige for an encounter

withdrawn and replaced with an "acceptable" evaluation because Paige had been in the Orlando office for less than 30 days and Paige had to be under someone's supervision for 90 days in order to be evaluated. Ex. 110, p. 2, ¶ 7. Further, Gruden's deposition is replete with improbable failures of recollection[21] and assertions inconsistent with other witnesses.[22] Moreover, Gruden distributed copies of the video, both VHS and CD, to others, including friends, one of whom did not even ask for it, when he was not authorized to do so. Gruden was also known as the "Teflon" or "untouchable" agent because his father used to be the Inspector General of the DEA, and he (Gruden) had been successful in avoiding discipline. Gruden also has motive to hide his conduct in this case because it appears to be well known that he allegedly helped an acquaintance escape from police surveillance (in Gruden's Government vehicle) of the acquaintance's extortion activities and to elude a police chase (in the Government vehicle) following the burned surveillance. Ex. 110, p. 3, ¶ 10; Ex. 111, pp. 14-16. Gruden was also untruthful with the police as to the acquaintance's location after the police were able to get hold of Gruden.[23] Ex. 111, p. 16. As a result of this and other potential professional misconduct, Gruden could face disciplinary proceedings which would be compounded by misconduct in this case in which he is a subject of an OPR investigation of the disclosure of the video. Ex. 91, p. 9, Ex's. 112, 113.

### The Video of the AD was not in the Public Domain

he had with a local police officer, who made an unjustified stop of Paige's car, without asking Paige his side of the story. Ex. 107; Ex. 186, pp. 177-178.

[21] For example, Gruden claimed not to know why he had copies of the **Mini-DV** made; whether and why only a 4:09 portion of the **Mini-DV** was made; and the reason he kept the CD's even though he claimed he could not view them on a computer. Ex. 78, pp. 114-115, 121, 122.

[22] For example, Gruden claimed to have destroyed his remaining two or three 4:09 CD's about the time IN was doing the on-site investigation because he purportedly had no need for them. Ex. 78, pp. 193-194. However, he distributed at least two 4:09 CD's and 2 VHS recordings well after that date. Paige's Response to GSMF, p. 18, ¶ 233. Moreover, the number of CD's he had is not consistent with the testimony of the technician who made them which indicates that Gruden must have had additional CD's made in a way he has not described.

[23] Paige and others in his office are aware of other alleged professional misconduct by Gruden too sensitive to set forth here. Ex. 110, p. 3, ¶ 10.

The Government argues that Paige cannot satisfy the disclosure element because the "details of his presentation and shooting were already in the public domain before any video footage appeared on the internet." This is essentially one of the same arguments that the Government made in its motion to dismiss, which was denied.

First, the Government asserts that Paige's presentation was "public." However, the presentation was not open to the public and the invitees to the event only included the children who were served by the OYMG, their parents and a number of people associated with the association. No press was present. The fifteen newspaper articles submitted by the Government (Gov't. Ex's. 37-39) are all dated between April 30 and May 3, 2004, approximately three weeks after the incident. Thus, not only was the presentation not public, but the incident itself was not even reported until approximately three weeks after the presentation. In fact, it is fair to infer that the initial newspaper reports three weeks after the incident were themselves the result of the leaking of the video within the DEA.

More importantly, the Government continues to ignore the distinction between Paige's presentation and the video itself.[24] It is the video, which became a "record" after it was seized by the DEA, that is the subject of this lawsuit, not the presentation or statements made about the AD by the DEA or members of the audience at the presentation. As discussed below, the video is an intrinsically different record than the presentation itself or the attendees' memories and statements about it.

The Government has demonstrated in an ironic example in this case that it understands the difference between a video and the event itself or a memory of the event. After Paige filed this lawsuit, he agreed to a number of media interviews to try to mitigate damages to his

---

[24] Paige also made this point in response to the Government's motion to dismiss.

reputation caused by the disclosure of the video. To show the public the type of service he has provided to his country, he requested permission from the DEA to show a surveillance video that showed him being held at gun point by a drug dealer and being rescued by other DEA agents. Ex. 52; Ex. 110, p.5, ¶ 16. Although this incident was previously described in a public federal trial, the DEA told Paige that "under no circumstances" could he show the video because it was "DEA Sensitive" and covered by the Privacy Act. Ex. 53.

**The Video Is Significantly Different Than
Initial Media and Audience Reports of the Incident**

The Government ignores the difference between Paige's presentation at a relatively small, private gathering (and the very limited media coverage three weeks later) and the video itself. However, the difference between the video itself and the initial media reports or the memories of the individuals who witnessed the incident is very substantial. The newspaper articles are all short, pretty much report the same thing and do not provide anything close to the information contained on the video. Basically, the articles point out that an unidentified DEA agent accidentally shot himself during a presentation to children about drugs at the OYMGA and that the DEA was investigating. Paige is not identified by name or by description, and the articles do not set forth any of Paige's statements during the presentation. Paige has never contended that these newspaper articles or the information given by the DEA or members of the audience to the media for these articles violated the Privacy Act.

On the other hand, the disclosed video reflects the following information and qualities which were not available to the public before the video was improperly disclosed:

1.     Unlike the newspaper articles, the video reveals Paige's appearance, voice and demeanor. This is important for several reasons. First, it identifies him, which has jeopardized his and his family's safety and has destroyed his ability to be an undercover agent or give

DRP's.[25]  Even other DEA agents have expressed concerns about their own safety if they work with Paige as a result of the publicity of the videotape and Paige's identity.  Ex. 110, p. 2, ¶ 4. Second, Paige's actual appearance, voice and demeanor add to the entertainment value of the videotape which resulted in its widespread popularity.  Paige is a large, muscular man.  He was dressed in a T-shirt which had an emblem of a badge and large letters which said "POLICE."  In addition to his physically imposing size, Paige had long dreadlocks which gave him an additionally distinctive, recognizable and notable appearance, particularly for a police officer. Paige also had a commanding, authoritative and confident manner and voice.  Not only does this make the video and audio interesting to the public but, as discussed below, it adds to the irony of the incident which is the primary reason why the video was so popular to the public and humiliating to Paige.  Third, the videotape reflects that Paige is an African-American.  As a result, various white supremacy websites have used the video to attempt to demean Paige in particular and blacks in general.

2.     Next, unlike the newspaper articles, the video reflects Paige's actual statements and the timing of these statements with the accidental shooting. At virtually the precise moment that Paige authoritatively and confidentially told the audience that he was the only person in the room professional enough to carry a firearm, the firearm accidentally discharged, wounding Paige.  Both the video and audio of the incident graphically reflect the remarkable irony of Paige's impressive appearance and his statement that he was the only one professional enough to

---

[25]  In the normal course, Paige's presentations, such as the one in this case, would not interfere with his ability to work as an undercover agent or jeopardize his safety because these presentations are isolated and not public and the targets of Paige's investigations do not attend such presentations.  If such presentations interfered with Paige's success as an undercover agent, the DEA obviously would not have permitted him to give the presentations. Similarly, Paige's court appearances as a witness do not interfere with his ability to act as an undercover agent since any publicity concerning his court appearances are minimal or non-existent.  However, the ongoing and wide publication of Paige's distinctive appearance as a result of the leaking of the video has caused the DEA itself to direct that Paige not work undercover as a result of concerns for his safety.

carry the firearm on the one hand; immediately followed, on the other hand, by his accidentally shooting himself. It is this irony that has largely made the video so popular with the media and demeaning and humiliating to Paige. Not only was this aspect of the incident not reported by the newspaper media, but newspaper articles and oral statements about the incident could not remotely approach the dramatic impact of the irony as the actual video of the incident does.

3.    Third, unlike the newspaper articles, the video shows Paige's remarkable conduct after the shooting in which he calmly makes sure that none of the children have been injured and, although shot in the leg, remains standing and explains to the audience that what just happened was an example of why they should never touch firearms. This, of course, also enhances the entertainment value or appeal of the video in general.

4.    Fourth, unlike the newspaper articles, the video contains actual images and sounds which are intrinsically different than a newspaper article or someone's description of the event. This is well demonstrated by the adage that a picture is worth a thousand words. In addition to the events discussed above, the video shows a real-life shooting of a person and the reaction of that person thereafter. As noted above, it also dramatically shows the irony of the incident which the newspapers did not and could not report. Without the video, the media could not have provided the video images and audio sounds that were so compelling, popular and damaging to Paige. Without the video, radio stations would literally have nothing to play. Without the video, the internet and national television shows, such as Jay Leno, Jimmy Kimmel, CNN and Fox News, would have nothing to show.

Without the video a limited number of newspapers and news broadcasts reported the incident in substantially neutral terms over only four days about three weeks after the incident. However, after the video was disclosed by the DEA, the incident was not only widely reported

on national television, but the video itself was played on national television and radio stations. Further, the video appeared on many websites and became one of the most watched videos in the world. If, as the Government asserts, the disclosure of the video was irrelevant because the incident had been previously "fully aired in the public domain," the video would not have received this type of reception after its improper disclosure. The Government itself has recognized the independent significance of the video. It was the DEA which seized the video over the objections of the videographer and then excised the AD from the tape before returning it to the OYMGA. The DEA obviously recognized that the video had independent and intrinsic significance and that the information, images and sounds on the video had not been aired in the public domain.

5.    Finally, unlike newspaper articles and fading memories, the video will never go away, as is evident by its continuing popularity on various websites.

The case law does not support the Government's position. In the cases relied on by the Government, various disclosures were held not to be violations of the Privacy Act because they had been previously released by the agency or otherwise fully aired in the public domain.[26] Here, the video of the AD was not released to the public by anybody until the DEA disclosed it. Consequently, the record released here had not been previously released, much less fully aired in the public domain.

---

[26]  The other cases cited by the Government are inapplicable. See *Wright v. FBI*, 385 F.Supp.2d 1038, 1041 (C.D. Cal. 2005) (the plaintiff himself had first revealed the information to the public through press conferences, his own website and then the publicly filed lawsuit.); *Tripp v. Dept. of Defense*, 193 F.Supp.2d 229 (D.D.C. 2002) (release of the names, title, salaries and salary-levels of public employees involved information generally in the public domain and was not even information about the plaintiff.); *Barry v. U.S. Dept. of Justice*, 63 F.Supp.2d 25 (D.D.C. 1999) (a report that had been previously fully released to the media on two prior occasions was not covered by the Privacy Act); *Ash v. United States*, 608 F.2d 178 (5th Cir. 1979) (disclosure of the results of a disciplinary proceeding were made to personnel who were entitled to attend the proceeding in the first place); *Federal Deposit Ins. Corp. v. Dye*, 642 F.2d 833 (5th Cir. 1981) (release of information previously legally published in an adjoining county was not a "disclosure"). Unlike these cases, the video was never in the public domain, and, in fact, was seized by the DEA to avoid it becoming part of the public domain.

In *Pilon v. U.S. Dept. of Justice,* 73 F.3d 1111 (D.C. Cir. 1996) the Justice Department faxed a confidential memorandum to a former Justice Department employee.  The D.C. Circuit held that the unauthorized release of this record was a "disclosure" prohibited by the Privacy Act even though the recipient had come into contact with the memorandum in the course of his duties.  The court held at 1124:

> … we hold today that an agent's unauthorized release of a protected record does constitute a disclosure under the Privacy Act except in those rare instances, like *Hollis*, where the record merely reflects information that the agency has previously, and lawfully, disseminated outside the agency to the recipient, who is fully able to reconstruct its material contents.

The Justice Department argued in *Pilon* that disclosure under the Privacy Act could not include disclosures to individuals who were previously aware of the disclosure.  The D.C. Circuit rejected this interpretation and noted that the Privacy Act included the need to safeguard against "dissemination" of protected information as well as the need to limit the improper use of protected records.  *Id.* at 1121.

The Government attempts to distinguish *Pilon* with footnote 10 in *Pilon*  in which the court stated that "[t]his case does not present the question of whether an agency may, consistent with the Privacy Act's disclosure provisions, release a document that has already been fully aired in the public domain through the press or some other means."  However, this case also does not present the question mentioned in footnote 10 of *Pilon.* The "document" here (i.e. the video) was never aired, much less fully aired, in the public domain at any time prior to its disclosure by the DEA.  Indeed, the DEA's very purpose in securing the video was to prevent the video from being aired in the public domain in the first place.  It is not logical for the government to have seized the video to avoid it being publicly aired on the one hand, but to now argue on the other hand that it was somehow publicly aired.

## Paige is Entitled to Non-Pecuniary Damages under the Privacy Act

The Government argues that "actual damages" under the Privacy Act do not include non-pecuniary damages such as emotional pain and suffering and loss of reputation. The Government argues that sovereign immunity requires the narrowest construction of the term "actual damages" and that the Act's legislative history indicates that actual damages only refers to out-of-pocket losses.[27]   These arguments have been consistently rejected by this court.

## This Court does not Accept the Narrow Construction/Ambiguous Term Argument of the Government

There is a split of authority on the issue of whether "actual damages" includes non-pecuniary damages.  The Fifth Circuit in *Johnson v. Dept. of Treasury, I.R.S.,* 700 F.2d 971 (5th Cir. 1983) is the leading case in support of the proposition that emotional damages are allowed. The Eleventh Circuit in *Fitzpatrick v. Internal Revenue Service,* 665 F.2d 327 (11th Cir. 1982) appears to be the leading case against allowing non-pecuniary damages.  The Tenth Circuit in *Parks v. United States Internal Revenue Service,* 618 F.2d 677 (10th Cir. 1980) seems to allow

---

[27]  The Government also suggests in its footnote 6 that Paige has no pecuniary out-of-pocket losses because he has not identified any specific incidents in March of 2005 to prompt a family trip to Fort Lauderdale.  In the testimony cited by the Government, Paige testified that he spent approximately $2,000.00 on a trip because he was forced to leave the house in March, 2005 and travel to Fort Lauderdale as a result of media attention when the press first reported the disclosure of the video.  Gov't. Ex. 2, pp. 150-151.  During his testimony, Mr. Paige had difficulty distinguishing between media attention in March, 2005 and media attention a little over a year later when this lawsuit was filed.  He did recall, however, that there was a lot going on with him in March, 2005 (involving the media) and that the video was all over the news.  Gov't. Ex. 2, pp. 150-152.  He testified that after talking to his ASAC and the Associate SAC at the time, they told him that if he was being bothered as a result of the disclosure of the video, he should leave town until things blew over.  Gov't. Ex. 2, pp. 150-151.  In fact, Paige was initially told to use a Government credit card, which he did not, and was then later told that he would not be reimbursed.  Gov't. 2, pp. 151-153.  His wife, Robbin Paige, was able to clarify events and dates.  She testified, which the Government does not report, that in March 2005, the news media was frequently calling their house and that she went home at different times to avoid the press.  Ex. 187, pp. 57-61.  She testified that she, Paige and their family left town and traveled to Fort Lauderdale in March, 2005 and stayed there because Paige was told by a supervisor to leave the area for a while when the press was calling all the time.  Ex. 187, pp. 62-66.  In addition, Paige has refreshed his recollection, and has submitted an affidavit attesting that he spent approximately $2,000.00 traveling in March, 2005 to Fort Lauderdale as a result of media attention and the stress from media attention and the disclosure of the video. Ex. 110, p. 5., ¶ 14.

emotional damages, while the Sixth Circuit in *Hudson v. Reno,* 130 F.3d 1193 (6th Cir. 1997) seems not to allow them.

The Sixth Circuit in *Hudson,* 130 F.3d at 1207, felt that the weight of authority in 1997 was against allowing emotional damages under the Privacy Act, including one case in the D.C. District, *Pope v. Bond,* 641 F.Supp. 489 (D. D.C. 1986). *Hudson* did not take into account *Parks v. United States Internal Revenue Service, supra.* More importantly, the weight of authority in the D.C. District has changed since 1997. The Government claims in their brief that there is "a similar level of disagreement" among the courts in this district as there is in the circuit courts. That is simply not true. Two early cases in the D.C. District found that "actual damages" were limited to "out-of-pocket" expenses. Those included *Houston v. U.S. Dep't. of Treas.,* 494 F.Supp. 24, 30 (D. D.C. 1979) in 1979 and another case in 1986, *Pope v. Bond,* 641 F.Supp. 489, 501 (D. D.C. 1986), which relied on *Houston.* However, after those two cases, as this court pointed out in *Montemayor v. Federal Bureau of Prisons,* 2005 WL 3274508 at *5 (D. D.C. Aug. 25, 2005), "it is clear that the recent trend at the District Court level has been to allow Privacy Act suits seeking general compensatory damages, such as pain and suffering and non-pecuniary losses to proceed." Indeed, every case decided by this district on the issue since the *Pope* case in 1986 allows emotional and other non-pecuniary damages under the Privacy Act. See *Dong v. Smithsonian Inst.,* 943 F.Supp. 69, 74 (D. D.C. 1996); *Alexander v. Fed. Bureau of Investigation,* 971 F.Supp. 603, 607 (D. D.C. 1997); *Rice v. United States,* 211 F.R.D. 10, 14 (D. D.C. 2002); *Boyd v. Snow,* 335 F.Supp.2d 28, 39 (D. D.C. 2004); *Montemayor v. Fed. Bureau of Prisons, supra,* (2005); *Am. Fed'n. of Gov't. Employees v. Hawley,* 2008 WL 835856, at *7 (Mar. 31, 2008). Consequently, there is not a "similar level of disagreement" in this court, but a clear line of authority from 1996 to March, 2008, allowing non-pecuniary damages under the Privacy Act.

The Government's argument is basically the same one that it unsuccessfully pursued in *Montemayor v. Fed. Bureau of Prisons, supra.* The Government argued there, as it does here, that principles of sovereign immunity require the court to adapt a narrow interpretation of the term "actual damages.'" See Ex. 116, pp. 8-11 (the Government's motion and memorandum in that case). This court, through Judge Kessler, concluded that this "Court does not find that rationale persuasive and will follow the lead of the most recent cases in this jurisdiction, such as *Boyd, Rice, Alexander* and *Dong."* *Montemayor,* 2005, WL 3274508 at *5.

### The Privacy Act's Legislative History Indicates That "Actual Damages" Includes Non-Pecuniary Damages

First, this court in *Alexander* and *Dong* has already necessarily rejected the Government's arguments with respect to the legislative history of the Privacy Act because it specifically accepted the court's analysis of the Privacy Act's legislative history in *Johnson v. Dep't. of Treas., supra.* In that case, the court considered, *inter alia,* the same issues the Government has raised here and decided against the Government. In addition to the legislative history, *Johnson* also made a thorough examination of the purposes of the Privacy Act and other statutory uses of the term "actual damages." The Government's argument here does not address the use of the term "actual damages" in other federal statutes where that term has been interpreted to include damages for emotional distress and humiliation as well as out-of-pocket loss. See *Johnson,* 700 F.2d at 983-985. Next, *Johnson* also extensively examined the purposes of the Privacy Act and concluded that its purposes indicated that actual damages include non-pecuniary damages. *Johnson,* 700 F.2d at 974-978. The Government acknowledges that there is support in the purposes of the Privacy Act for non-pecuniary damages. However, rather than discuss all the considerations of the Act's purposes addressed by the court in *Johnson,* the Government attempts to trivialize that aspect of the legislative history.

Each of the Government's arguments concerning the Privacy Act's legislative history were thoroughly considered in *Johnson* and rejected.  First, the disappearance of the term "general damages" in the legislative history was analyzed in detail in *Johnson*.  The court concluded that the most likely explanation "for the disappearance of 'general damages' is that Congress was using the term to mean 'presumed damages' and the term 'actual damages' to mean 'actual injury' in defamation cases" and that "in deleting the term 'general damages,' Congress was rejecting liability for presumed damages" (footnote omitted). *Johnson,* 700 F.2d at 982; *See* discussion at 981-983.

The court also discussed Representative Eckhardt's comment, referred to by the Government here, that "[t]here is nothing in this that would provide for any damages beyond his actual out-of-pocket expenses." *Johnson,* 700 F.2d at 980 n. 24.  After a thorough analysis, the court concluded that the "statement viewed in context, does not support an out-of-pocket definition of actual damages" and that, in any event, "the amendment that representative Eckhardt was referring to was defeated." *Id.*  Moreover, the court noted that statements by other representatives counterbalanced any such comment. *Id.*  Next, the court considered the issue raised by the Government here of the effect of damages on the treasury.  The court concluded that "[n]owhere does the legislative history intimate that there was any congressional concern whatsoever regarding making the Government liable for proven damages in excess of out-of-pocket losses." *Johnson,* 700 F.2d at 978-979.  Finally, contrary to the Government's position here, *Johnson* did not find the Privacy Protection Study Commission's conclusion as to damages persuasive since the Commission's report indicated only that the basis of its conclusion was "'[t]he legislative history and language of the Act,' without any further discussion whatsoever of either the legislative history or the language of the Act." *Id.* at 983 n.33.

Consequently, all the arguments made by the Government here were rejected by *Johnson* and consequently rejected by this court in *Alexander, Dong* and their progeny.

## THE FTCA CLAIMS

In *Cason v. Baskin,* 155 Fla. 198, 20 So.2d 243 (1944), the Florida Supreme Court recognized the tort of invasion of privacy as a distinct cause of action in Florida.  In *Allstate Insurance Co. v. Ginsberg,* 863 So2d 156, 162 (Fla. 2003) (quoting *Agency for Health Care Admin. v. Associated Indus. of Fla., Inc.,* 678 So.2d 1239, 1252 n. 20 (Fla. 1996)), the Florida Supreme Court noted that there are four types of wrongful conduct that can be remedied through an action for invasion of privacy.  These are:

> (1)  appropriation – the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion – physically or electronically intruding into one's private quarters; (3) **public disclosure of private facts** – the dissemination of truthful private information which a reasonable person would find objectionable; and (4) **false light in the public eye** – publication of facts which place a person in a false light even though the facts themselves may not be defamatory. [emphasis added]

*See also Heekin v. CBS Broadcasting, Inc.,* 789 So.2d 355, 358 (Fla. 2nd DCA 2001) (citing *Agency for Health Care Admin. v. Associated Indus. of Fla., Inc., supra,* and recognizing the "four [aforesaid] types of wrongful conduct that can be remedied through an action for invasion of privacy.")   Count II of the Amended Complaint in this case sets forth separate claims based on "public disclosure of private facts" and "false light in the public eye."

## PUBLIC DISCLOSURE OF PRIVATE FACTS

The Government argues that Paige cannot prevail on his "public disclosure of private facts" claim because his  presentation (i.e. DRP) was not a private fact, the DEA did not "give publicity" to the video, the DRP was not highly offensive, Paige's conduct during the DRP is a matter of legitimate public concern, and Paige was a public figure.

A key point in addressing these arguments is that the Government, as it did in its "public domain" argument with respect to the Privacy Act claim, fails to distinguish between Paige's "presentation" and the video that was seized by the DEA.

## The Video was a Private Fact

The Government merely argues that Paige's presentation or DRP was not a private fact. Paige has never asserted that the disclosure of the fact of his presentation or the fact of the AD is actionable. While the meeting was private here, the people present owed Paige no duty of confidentiality. Moreover, if the video had remained in the hands of the OYMGA, it may have had a right to publicize it.[28] However, the video was seized by the DEA, and an agreement was reached with the OYMGA that the DEA would not return the AD portion of the video in order to keep it private. The improper disclosure of private fact at issue here was the disclosure of the actual video of the AD. The video itself was clearly private as shown above and in Paige's Summary Judgment Memorandum. Not only Paige's group supervisor, but the Associate SAC in Miami made efforts to ensure that the video was seized and kept from the public. The DEA specifically worked out an agreement with the OYMGA so that the video would remain private. Moreover, the video was considered to be DEA Sensitive, was kept locked up in secure facilities, only two copies were to be made, and copies were to be destroyed when the IN case was closed. The Government's expert witness testified that the video should not be disclosed if it would reveal Paige's identity. Ex.92,pp.113-114,116. In fact, the DEA's OPR opened an investigation precisely because the disclosure of the video was improper.

The cases cited by the Government are inapplicable. A photograph taken in a public place may not be private if that were all there was to it. However, that photograph would certainly become private if it were given to or seized by an agency for the purpose, in part, of

---

[28] Paige does not necessarily concede that point, but will assume it to be true for the sake of this argument.

keeping it private. [29]  By way of example, someone may cause or consent to a compromising picture being taken of him in a public location which he then stores among his private papers.  If someone were to steal that picture from him and disclose it to the public, that would be an actionable invasion of privacy.  *See* Restatement (Second) of Torts § 652D, Illustrations, p. 386 (plaintiff's privacy is invaded when a photograph "is stolen from his home" and published.).  That is essentially what happened her.  The DEA-Sensitive video, which was to remain private, was improperly copied and removed from the DEA and disclosed to the public.  The issue here is not whether the videographer's conduct in filming Paige invaded his privacy.  The issue is whether the DEA violated Paige's privacy rights by disclosing the video after it had taken the video in order to keep it from becoming public. [30]

Finally, the issue here is not whether Paige waived any privacy interest he may have had in the video before it was it seized.  The issue is whether he waived any privacy interest in the video after it was seized by the DEA in order to keep it private.  Paige has never waived any privacy right, either at common law or under the Privacy Act, with respect to the video after it was taken into custody by the DEA.  See Paige's Summary Judgment Memorandum, pp. 39-40.

---

[29]  Even if the video had not been seized by the DEA, the OYMGA and Paige may have entered into an agreement to keep the video private.  In fact, in light of Dr. Dorsey's character and prior agreement with the DEA on the issue, there is little doubt that he would have agreed to keep the video private.

[30]  *Dasey v. Anderson,* 304 F.3d 148, 154 (1st Cir. 2002), cited by the Government, involved the Massachusetts right-of-privacy statute.   For there to be a violation under the Massachusetts statute, there apparently must be a "gathering and dissemination" of facts of a "personal or intimate nature."  *Id.*  In *Dasey,* a state trooper was discharged after police officials viewed a legally seized videotape showing him smoking marijuana with others.  The court dismissed the claim for invasion of privacy on the grounds that smoking marijuana in the presence of others who owed no duty of confidentiality did not meet the Massachusetts requirement of privacy and that there had been no dissemination of the videotape since the defendants only watched the tape and did not distribute it.  First, the Massachusetts definition of privacy for its right-to-privacy statute does not apply here since Florida has no such definition.  Next, the case actually supports Paige's position here because implicit in the court's decision was that the dissemination of the tape would have violated the Massachusetts privacy statute (assuming the Massachusetts tape involved private facts of a personal or intimate nature) just as dissemination of the videotape here violated the Florida law.

### Paige has Sufficiently Alleged and Provided Evidence of Publicity

First, relying on various Florida cases, the Government argues that Paige has not sufficiently alleged that the DEA "gave publicity" to the video. Those cases apply Florida's "ultimate facts" pleading requirements. *See* Fla. R. Civ. Proc., Rule 1.110(b). The Federal Rules provide for notice pleading. In any event, Paige alleged the elements of the Florida tort of invasion of privacy by disclosure of private facts precisely as set forth by the Florida Supreme Court in *Cape Publications, Inc. v. Hitchner*, 549 So.2d 1374, 1377 (Fla. 1989) ("1) The publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern."). Further, the complaint alleges that the DEA disclosed the video within the DEA and to individuals outside the DEA with the result that it became widely circulated on the internet and widely broadcast worldwide on various radio and television shows. Doc. 14, ¶'s 10, 11. Moreover, the evidence shows that the 4:09 video was put on and widely circulated on Firebird; played on television news and on national television shows such as Jimmy Kimmel; and put on numerous websites which has resulted in over eight million "hits" on Paige or the AD on search engines and the linked websites as of October 15, 2007.[31] Ex. 100, pp. 2-3; Ex. 110, p. 3, ¶ 12; Ex's. 44, 45, 47, 109; Ex. 65, p. 6. This does not even include such things as the number of blogs or copies of the video which were forwarded by end-users to other end-users and viewed or e-mailed to other end-users. Ex. 100, p. 3.

There is no requirement that the private fact be disclosed to many people in the first instance. It is sufficient to disclose the private fact to "only one person, from whom the information predictably goes to many." *Williams v. City of Minneola,* 575 So.2d 683, 689 (Fla. 5th DCA 1991). "'Publicity' … means that the matter is made public by communicating it to the

---

[31] See also Exhibit 114, p. 4 where pcworld.com lists the video of Paige's AD as the second most embarrassing web moment; and Exhibit 15 where Paige is listed on Web junk as the seventeenth greatest internet superstar.

public at large…" *Swanson v. Civil Air Patrol,* 37 F.Supp.2d 1312, 1331 (M.D. Ala. 1998). It involves "a communication that reaches, or is sure to reach the public." *Id.*

First, there is no dispute that the video did reach the "public" through Firebird, the internet and the national media, which satisfies any requirement of the DEA "giving publicity." In addition to that, however, it was certainly predictable that the video would ultimately be publicly disseminated. A DEA employee, regardless of who it was, intentionally and improperly put the video on the DEA Firebird networking computer system by e-mail. Paige points out in an affidavit that notable, especially notorious news, about DEA agents, such as the video of his AD, is certain to rapidly spread across Firebird and to the public internet. Ex. 110, p. 3, ¶ 12. In fact, there is even a website, DEA Watch, which is actually dedicated to posting DEA related gossip and information. *Id.* Moreover, the use of Firebird at the DEA for circulating information about agents, such as the video of Paige's AD, is so widespread that it would have been well-known among DEA agents that his video would be spread all over Firebird as well as to the internet. *Id.* In fact, of all the items that have been spread across the DEA's Firebird system, Paige's video was the most certain to be spread.[32] *Id.* Paige was so certain that the video would spread across Firebird and across the internet that he specifically attempted to have his ASAC attempt to remove it from Firebird, which turned out to be impossible. *Id.*; Ex. 73, pp. 51-52. Confirming Paige's affidavit are Exhibits 44 and 45. Those exhibits involve just two single e-mail chains over 4 days in which the 4:09 video was forwarded to approximately 72 different people with messages such as "you gotta see this!" and "shooting you own leg, Priceless." Each of the 72 people may well have and most certainly probably did forward it to

---

[32]  In addition to Paige's affidavit, it should be noted that the video involved, *inter alia,* a DEA agent, a shooting, an AD, an AD at about the worst possible and most embarrassing time, and an agent showing remarkable toughness (i.e. "taking a bullet" without going down). In light of the widespread use of Firebird to communicate notable information about other agents, the spread of Paige's video on Firebird was a foregone conclusion.

others in other e-mail chains.  For example, one person in one of the chains sent it to nineteen people in that single chain alone.  In the Restatement, one of the illustrations of publicity is the posting of a letter in "the window of a shop where it is read by those passing on the street." Restatement (Second) of Torts § 652D, Comment a, Illustrations 2.  The posting of the video on Firebird, under the circumstances for which it is used and known to be used at the DEA, constitutes for greater publicity than the simple posting of a letter in a store window.

In this day of the internet and extremely popular websites specializing in videos, such as YouTube and VHS-1, simply e-mailing or providing a CD of a particularly notable, entertaining video amounts to giving publicity to the video.[33]  Based on everyday common experience, it is well-known that such videos are virtually always forwarded to others in ever-expanding e-mail chains, which almost always includes a posting on a website if the video is sufficiently entertaining.  This is especially true with respect to matters involving law enforcement officers who make "dumb" mistakes.  For example, one of the agents found the video on a "dumb cops" type of website.  Ex. 65, p. 7.

The video itself is so unique that a typical computer-using person, such as a DEA agent, would know that the video was certain to become widely distributed on the internet.  For example, the video was so entertaining that Bendekovic in Jacksonville and Naughton in Miami had to be directed to stop showing it so much.  Scully repeatedly played it for agents in Tampa and basically all of the IN inspectors, not just the shooting team, watched it.  Many copies of the video are unaccounted for, most likely because people wanted to keep copies.  Gruden himself not only showed the video to people in his group but sent copies to his friends, even one who did not ask for it.  In short, it was well known among the DEA that the video was basically uniquely "entertaining" and that it was certain to be rapidly circulated on both Firebird and the internet.

---

[33]  See Ex. 114 ("the internet is the most efficient information distribution system ever known.")

In addition to the foregoing, the evidence shows that Gruden is the person who probably disclosed the video.  In light of his animus towards Paige, it can be inferred that Gruden himself put the video on the internet to embarrass Paige.

The Government's argument that the video is merely "future publicity" of facts already publicized" is also meritless.  As pointed out above, the video was never previously published. [34]

### The Disclosure of the Video was Highly Offensive

Contrary to the Government's arguments, the issue here is not whether Paige's DRP was highly offensive to the people at the DRP or that the playing of the video in the media was highly offensive to that audience.  The issue is whether the publication would be highly offensive to Lee Paige from the perspective of a reasonable man. See Restatement (Second) of Torts § 652D, comment c ("It is only when the publicity given to him is such that a reasonable person would feel justified in feeling seriously aggrieved by it, that the cause of action arises"). No reasonable person would want to become an object of worldwide derision and continuing belittling and racist comments and have his reputation destroyed, especially after being a dedicated agent, working for years trying to reduce the demand for drugs among children, and having undertaking many dangerous, even life-threatening assignments on behalf of the DEA. Moreover, any reasonable person would find it patently offensive that the disclosure of the video reveals in a very public way the identity of an undercover DEA agent who has been subjected to several armed confrontations and who has been the subject of a $6 million threat on his life.  In fact, as noted above, the Government's firearms expert agreed that the video should not be disclosed if it would reveal Paige's identify as an undercover agent.  See also Agents Manual §

---

[34]   There was not even "significant media attention" regarding the incident and none which would reveal Paige's identity through a video and people identifying him in a video.

6114.4(B) (Ex. 56) (SAC is to ensure that names and DEA agents involved in shootings are not released to the media in order to protect the "safety of these individuals.").

In *Harris v. Dist. Bd. Trustees of Polk Community College,* 9 F.Supp.2d 1319, 1329 (M.D. Fla. 1998), the court found that a newspaper article that said … "[plaintiffs] were part of the problem" could be found to be highly offensive to a reasonable person.  This, obviously, pales in comparison to the disclosure here and only emphasizes how offensive the release of the video was here.  In fact, it is really hard to imagine anything much worse.

## The Video Itself Is Not A Matter Of Legitimate Public Interest

First, Paige does not dispute that the accidental discharge by a DEA agent at a DRP is a matter of legitimate public concern.  However, the Government ignores the fact that the actual video of the incident and the wide publication of Paige's identity through being pictured in the video was not a matter of legitimate public concern.  The facts and circumstances of the AD were obviously available from a press release by the DEA and the eyewitness and press accounts.  The legitimate public concern over the AD is not advanced by the video at all or the identification of Paige through his appearance in the video.  In fact, it is a matter of public concern that the video not be released.  Paige was a DEA undercover agent who had been involved in several armed confrontations and subject to a death threat.  It is a matter of not only Paige's concern, but public concern that the identity of an undercover drug agent and his family not be publicly disclosed through pictures or videos.

Cases recognize that while various subjects or situations may be matters of legitimate public concern, the identity of the people involved are not.  See *Doe v. Univision Television Group, Inc.,* 717 So.2d 63, 65 (Fla. 3 DCA 1998) ("while the topic of the broadcast was of legitimate public concern, the plaintiff's identity was not"); *Veilleux v. National Broadcasting*

*Co., Inc.,* 8 F.Supp.2d 23, 38 (D. Me 1998) ("While drug use among interstate truck drivers … is clearly a matter of legitimate public concern, the identity of a single driver who tested positive is not …).

The DEA itself obviously believed that the video and Paige's identity were not a matter of legitimate public concern since it seized the video from a resisting videographer, kept Paige's identity out of the news, kept the video under lock and key in secure locations, convinced the OYMGA to accept the return of the video without the AD, categorized the video as DEA Sensitive, and ordered agents who were showing it to stop and attempted to remove it from Firebird. Indeed, Collins even convinced one reporter who did discover Paige's identity shortly after the AD that it was "unnecessary" to do a story identifying Paige. Ex. 1, p. 14. The DEA cannot argue now that the video of the AD is a matter of legitimate public concern, especially to justify its own improper disclosure of the video.

## Paige Is Not A Public Figure

The Government makes conclusory suggestions that Paige is a public figure because he played football and did DRP's. First, Paige played college football at Florida State University in 1981 and 1982. He played for the Tampa Bay Bandits in 1986, but because of litigation between the National Football League and the United States Football League, no games were played that year. Paige played for the Tampa Bay Buccaneers in 1987 as a replacement player for three months and in three games. Ex. 110, p. 1, ¶ 1. These activities occurred over 20 years ago and the Government has presented no evidence whatsoever of any meaningful publicity with respect to those activities at any time, much less twenty years later. The Government presents one Sports Illustrated article from July 31, 2000, in which Sports Illustrated listed Lee Paige and five other former football players who were then agents for the DEA in an article about "sporting

characters you probably haven't seen in awhile."  Nothing was said about Paige other than the fact that he was a DEA agent in Nassau, Bahamas.  It is ironic that the Government argues that Paige sought this publicity.  In fact, Paige knew nothing about the possibility of such an article until the DEA advised him that the DEA itself had suggested that Sports Illustrated use his name because it would be good publicity for the DEA.  Ex. 110, p.1, ¶ 2.  Any publicity Paige received while a football player was not significant, occurred long ago, and is not related to the release of the video.  Paige did not give up his right to privacy here simply because he played football in three replacement games in 1987.

Next, the DEA claims that Paige is a public figure because he gave DRP's to various groups at private meetings.  This does not put Paige in the "public eye" or even remotely suggest that he "sought" publicity, as required under Comment e to the Restatement (Second) of Torts §652D.  Indeed, the Government has only cited to a single article and photograph of Paige in a Bahamian newspaper with respect to a DRP in the Bahamas.  The absurdity of the Government's argument is demonstrated by the fact that Paige, an alleged public figure, was a highly successful undercover drug agent for the DEA beginning eighteen year ago.

Paige was also not an involuntary public figure as a result of the AD.  As discussed above, there was no publicity about the incident until about three weeks after the incident.  Even then, there was very little and only neutral, short articles in a few newspapers over only four days and a couple of short segments on television.  Paige's name and identity did not appear in the media.  After that, there was no publicity until the widespread disclosure of the video approximately a year later.    It is impossible to discern how Paige became an involuntary "public figure" when the "public" did not even know who he was or who was involved in the AD which was barely even reported.

Next, the Government has not explained what difference it would make if Paige were a public figure. While such a status may have some bearing on the publication of private facts by someone who came across the facts legitimately, it certainly does not give the DEA an excuse to disclose private facts that it is not permitted to disclose in the first instance regardless of any public figure status Paige might have. The DEA seems to be saying that it can make Paige an involuntary public figure by improperly disclosing the video and then defend the improper disclosure on the grounds that Paige is an involuntary public figure.

### THE COURT HAS JURISDICTION OVER PAIGE'S FALSE LIGHT CLAIM

The FTCA sets forth various exceptions to the waiver of sovereign immunity at 28 U.S.C. §2680(h), including any claim arising out of libel or slander. 28 U.S.C. §2680(h). The controversy concerning false light claims both under Florida state law[35] and the FTCA is that they sometimes duplicate a cause of action for defamation. *Gannett,* 944 So.2d at 468. In *Edmonds, v. U.S.,* 436 F.Supp.2d 28, 35 (D. D.C. 2006) the D.C. District Court stated that false light claims are barred by the FTCA's libel and slander exception and cited *Johnson v. Sawyer,* 47 F.3d 716, 732 n.34 (5th Cir. 1995) and *Metz v. United States,* 788 F.2d 1528, 1535 (11th Cir. 1986) in support. On the other hand, in *Kugel v. United States,* 947 F.2d 1504, 1508 (D.C. Cir. 1991), the D.C. Circuit stated that "a claim of false light invasion of privacy may be cognizable

---

[35] Some uncertainty has arisen in Florida concerning a false light invasion of privacy claim. As pointed out above, the Florida Supreme Court has at least tacitly acknowledged a false light claim. At least one Florida court of appeal has specifically recognized a false light claim. *See Heekin v. CBS Broadcasting,. Inc., supra.* At least three other Florida courts of appeal have at least tacitly recognized a false light invasion of privacy claim and none have repudiated such a claim. *See* discussion in *Gannett Co., Inc. v. Anderson,* 947 So.2d 1, 4-7 (Fla. 1st DCA 2006); *Rapp v. Jews for Jesus, Inc.,* 944 So.2d 460, 467-469 (Fla. 4th DCA 2006). Although recognizing that the Florida Supreme Court has tacitly recognized the cause of action, the court in *Rapp* contended that the Florida Supreme Court "has never expressly held that an action for false light invasion of privacy is cognizable in Florida courts." *Id.* at 468. The court in *Rapp* also asserted that the cause of action "remains the subject of heated debate among judges and legal scholars"; and that if it were "writing on a blank slate," it would be inclined to reject the cause of action. *Id.* Consequently, the *Rapp* court certified the questions to the Florida Supreme Court of whether Florida recognizes the tort of false light invasion of privacy, and if so, are the elements of the tort set forth in Section 652E of Restatement (Second) of Torts. The Florida Supreme Court granted certiorari concerning the issue and the case is presently pending. *See Rapp v. Jews for Jesus, Inc.,* 963 So.2d 702 (Fla. 2007).

under the FTCA." While these cases may appear to be potentially inconsistent, they are reconcilable and the cases relied on by the Government are inapplicable.

In Florida, there are essentially two types of false light claims: one where the facts are true and one where the facts are untrue or defamatory (i.e. libelous or slanderous). The court in *Heekin*, 789 So.2d at 358 recognized this difference in determining that different statutes of limitations would apply depending on whether the facts of the claim are alleged to be true or untrue (i.e. defamatory).

The false light claim in the instant case alleges the publication of truthful, non-defamatory facts in such a manner as to cast Paige in a false light. Consequently, the false light claim here is not a recast defamation claim, should not be treated as a defamation-type claim, and is not subject to the FTCA libel and slander exception.

The cases relied on by the Government involved false and defamatory statements, not truthful non-defamatory facts, that placed the plaintiff in a false light. *See Edmonds v. U.S., supra* ("based on dissemination of defamatory information."); *Johnson v. Sawyer, supra* (false light claim would be actionable under Texas libel law); *Bosco v. United States Army Corp of Eng'rs,* 611 F.Supp. 449 (N.D. Tex 1985) (substance of the plaintiff's claim was defamation.); *Metz v. United States, supra* ("governmental statements complained of constitute[d] slander").

*Metz* relied on the analysis of the Supreme Court in *Block v. Neal,* 460 U.S. 289, 103 S.Ct. 1089 (1983) to determine whether the libel and slander exception in the FTCA should apply. In *Block,* the Supreme Court focused on what was "essential" to the plaintiff's claim in determining whether one of the FTCA exceptions applied. 103 S.Ct. at 1094. Following that analysis, the court in *Metz* noted that "slanderous statements" were "essential" to plaintiff's false light privacy claim in that case. *Metz,* 788 F.2d at 1535. Since the "slanderous statements" were

an essential element of the false light claim in that case, the court held that the claim "[arose] out of slander" and was therefore not actionable under the FTCA.  See also *Hobdy v. United States,* 762 F.Supp. 1459 (D. Kansas 1991) ("defamatory or slanderous statements" found to be "an essential element to plaintiff's claim of false light privacy.").

Unlike the cases cited by the Government, allegations of false or defamatory statements are not an essential element of the false light claim here.  Since the disclosed information (i.e. the video) does not involve defamatory statements, the libel and slander exception in § 2680(h) cannot apply.    It is not the label which determines whether a claim is actionable under the FTCA, but the essential elements and substance of the claim.  *Edmonds,* 436 F.Supp.2d at 35 (the label of "a pleading does not determine the nature of the cause of action.")

The Government asserts that there could be no false light clam here because the disclosed video is an "accurate portrayal of this presentation."   However, the disclosed video actually contains only the AD portion Paige's DRP presentation and does not include the rest of the presentation.  This places him in a false light since it fails to reflect Paige's efforts to provide salutory advice to the audience.

### Paige Does Not Have Unclean Hands

First, as pointed out in Paige's Summary Judgment Memorandum, the defense of unclean hands is not even available to the Government here. See *First American Corp. v. Al-Nahyan,* 17 F.Supp 2d 10, 29 (D. D.C. 1998) ("unclean hands acts only as a defense to equitable, and not legal, actions"). In fact, the Government only cites to cases involving equitable relief, including *Monument Realty v. Washington Metro. Area Transit Auth.*, 540 F.Supp.2d 66 (D. D.C. 2008) where the court observed that unclean hands applies to equitable relief.  *Id.* at 82.   The Government's apparent purpose in arguing this unavailable defense is to use it as an excuse to

attempt to make Paige look bad to the court.  Although, the senior investigator of the shooting team testified that "AD's happen all the time," the Government's firearms expert here takes great pains to break down the AD into every potential firearm violation imaginable, including even not maintaining control of his weapon after he had been shot and pointing an unloaded gun at the ceiling of this one-story building.  Paige made a mistake, did not properly handle his weapon and as a result, had an AD.  Paige has acknowledged his error and he did not contest the punishment recommended for him by the Board of Professional Conduct.  He was suspended for his mistake and attended remedial training.  Paige is not going to make any excuses here for the AD.

However, it is not true that the DEA did not know that he displayed firearms.  First, there is a newspaper article in Paige's file picturing Paige while he was in the Bahamas, which spoke positively about his DRP, including his display of his weapon.  Gov't. Ex. 6.  Next, in testimony incorrectly characterized by the Government, Paige testified that he told Gruden that he would be showing weapons at the DRP.  Gov't. Ex. 2, p. 76.  Further, when Paige was in the Tampa office, Collins was his group supervisor.  On several occasions as he was leaving the office for a DRP, he saw Collins and told him he was leaving to give a DRP.  Collins saw him leave in raid gear, wearing his service pistol on his hip and carrying a submachine gun in a case.  Ex. 110, p. 1, ¶ 3.  Consequently, the DEA has been aware for a long time that Paige included a gun safety presentation involving weapons.

Not only is the unclean hands defense inapplicable here, but Paige was not doing anything that amounts to unconscionable or unethical conduct, especially that has anything to do with the disclosure of the video.  Paige is the great, great grandson of two slaves, George and Susan Paige.  He is proud of his ancestry and strives to help children, especially disadvantaged children.  He has given hundreds of DRP's and he has received many, many commendations

from organizations before whom he has performed DRP's.  Ex. 1, pp. 100-225; Ex. 110, p. 5, ¶ 15.    Even after the AD in this case, Dr. Dorsey spoke highly of Paige's presentation, including the weapons demonstration.[36]

The Government even asserts that Paige has "unclean hands" as a result of "publicity" (i.e. one newspaper article actually) from doing DRP's.  This needs no response.  The Government also asserts that Paige has unclean hands because he filed a lawsuit as a result of the DEA's wrongful disclosure of the video of the AD.  This also needs no response.  However, the Government asserts that by filing the lawsuit, "he created the first publicly documented identification of himself as the shooter in the video."  That is not true.  Over a year earlier, his wife saw the video on a website with a comment identifying Lee Paige as the person in the video along with a comment to the effect that "this is what happens when you give a nigger a gun." Ex. 187, pp. 46-47.  Moreover, the video was widely circulated and people could and did identify him from the video, and it was well known in law enforcement who the person in the video was.

Finally, the Government claims that Paige had unclean hands because he made media appearances after this case was filed.  See Paige's Summary Judgment Memorandum, pp. 37-38. As described there, the only reason Paige made any media appearances was to attempt to mitigate the damages from the disclosure of the video.[37]    See also Ex. 186, pp. 193-196.

---

[36]  In addition, Paige has literally put his life in jeopardy during undercover assignments, including one instance that was caught on a surveillance video-tape.  He worked 67 undercover assignments in his first year alone.  Ironically, the DEA firearms instructor who prepared the expert report critical of Paige, spent approximately ten years in offices in South Florida as a DEA agent and was involved in three or five "undercover" assignments which involved unsuccessful efforts to set up street-level hand-to-hand buys of personal use amounts of cocaine or crack.  Ex. 92, pp. 5-8.

[37]  Paige did not object to one person, who had also had an AD and was at remedial training with Paige, watching the video at remedial training because the instructors had already shown it to so many other people.  Gov't. Ex. 2, p. 188.  Paige did complain to the instructor about showing the video to other agents and asked him not to.  Ex. 85, pp. 50-59; Gov't. Ex. 2, p. 118.

## CONCLUSION

For the reasons stated above, the Government's Motion for Summary Judgment must be denied.

Respectfully submitted,

S/Ward A. Meythaler
Ward A. Meythaler

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 20, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044

s/Ward A. Meythaler
Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5415 Mariner Street, Suite 103
Tampa, Florida 33609
TEL: (813) 281-9000
FAX: (813) 281-2223
wamsecy@merklemagri.com