**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**LEE PAIGE,**

      **Plaintiff,**

**v.**                       **CASE NO.: 01:06-cv-0644**

**UNITED STATES DRUG**
**ENFORCEMENT ADMINISTRATION, et al.**

      **Defendants.**
_____/

**PLAINTIFF'S RESPONSE TO THE GOVERNMENT'S**
**STATEMENT OF MATERIAL FACTS**

The Government has submitted Defendants' Statement of Material Facts. This is Plaintiff's response.

6.      Disputed. Paige appeared on television and in the press as a football player on a few occasions more that twenty yeas ago. He played for Florida State University in 1981 and 1982. He played for the Tampa Bay Bandits in 1986, but there were no actual games played while he was on the team due to litigation between the National Football League and the United States Football League. He played with the Tampa Bay Buccaneers for three or four months in 1987 and appeared as a replacement player in three games during that time. Ex. 110, p. 1, ¶ 1.

7.      Disputed as to whether the Sports Illustrated article constitutes "nationwide press for his employment with DEA." Further, before Paige heard about a possible mention in the Sports Illustrated article, the DEA orchestrated the appearance of Paige's name and work location in Sports Illustrated because it felt it would reflect favorable on the DEA. Ex. 110, p. 1, ¶ 1.

14.     Disputed.  The cite, which refers to an article and one photograph in the Bahamas, does not support the proposition.

16.     Disputed as misleading.  Although the referenced code says what it says, the meeting being held at the Callahan Community Center was private.  See Plaintiff's Statement of Material Facts ("PSMF"), p. 5, ¶ 36.

17.     Disputed as incomplete.  See PSMF, p. 5, ¶ 35.

20.      Disputed as misleading or untrue.  While Paige did not mention to Gruden on the day of the DRP that he was taking firearms to the DRP, he had previously told Gruden that he was taking firearms to that DRP.  Gov't. Ex. 2, p. 76.

21.     Disputed as misleading and not supported by the cites.  Further, permission from Gruden to show firearms at DRP's was never an issue.  It was known to the DEA and to Gruden that Paige displayed weapons at DRP's and no one told him not to.  Gov't. Ex. 2, pp.76- 77; See Gov't. Ex. 6.

22.     Disputed.  On several occasions when Paige was stationed in Tampa, he told Collins that he was leaving to do a DRP and Collins could see that Paige was dressed in raid gear, wearing a sidearm and carrying a SMG (sub machine gun) case (which contained an SMG). Ex. 110, p. 1, ¶ 3.

23.     Disputed.  The cites do not support the proposition.

24.     Disputed that OMYGA video-records all of its meetings.  Ex. 176, pp. 11-12.

28.     Disputed as misleading and not supported by the cites.  Paige became aware of the video-recording at some point in time during the presentation.  See Gov't cites; Ex. 187, pp. 25-26.

35.     Disputed as ambiguous.  Paige realized there was a live round in the chamber when he slid back the slide and the round was ejected.  See Gov't cites.

37.     Disputed.  Paige is a firearms-trained DEA SA who to some extent visually or physically inspected the handgun.  Ex. 6; Ex. 186, pp. 85-86.  See paragraph 34.

38.     Disputed.  See response to paragraph 37.

39.     Disputed as to "consistently."  Ex.6.

40.     Disputed as to Covington and the ceiling.  Ex. 6; Ex. 110, p. 2, ¶ 5.

44.     Disputed.  The cites do not support the proposition that bullets ricocheted into the air.

45.     Disputed to the extent the cites do not support the proposition that both bullets ricocheted.

46.     Disputed.  Paige held his weapon for a period of time and then placed it on the table. Ex. 6.

49.     Disputed as misleading.  Ex. 6.

51.     Disputed.  Ex. 6; Ex. 110, p. 3, ¶ 12.

52.     Disputed as misleading.  Ex. 6.

53.     Disputed to the extent the "events" are mischaracterized in the Defendants' Statement of Material Facts.

54.     Disputed.  Ex. 6. In addition, the cite does not support the proposition as to the parking lot.

60.     Disputed.  The cites do not support the proposition and the word "then" is ambiguous.

62.    Disputed.  The cite does not support the proposition.  Further, Gruden testified he could not remember if he gave a direction to obtain the **Mini-DV** but he said he would have. Ex. 78, p. 71, Next Gruden stopped an interview of a witness to obtain the **Mini-DV** and was one of the agents who approached Brunson in order to have him turn the **Mini-DV** over to the DEA. Ex. 95, p. 14; PSMF, p. 8, ¶'s 64, 65, 69.   Consequently, Gruden probably gave such a direction and was involved in helping Walker obtaining the **Mini-DV** from Brunson.  Further, while at the scene, Patterson ratified the seizing of the **Mini-DV**.  Ex. 88, pp. 20-24.

67.    Disputed.   Cites do not support the statement that "because the eye-witness accounts that he heard at the Callahan Community Center were not consistent."

68.    Disputed.  Not supported by the cite.  Moreover, paragraph 68 fails to identify the paperwork being referred to.  Patterson did not complete the required paperwork, including the "Preliminary Shooting Incident Report" and a required teletype or any documents showing possession and chain of custody of the **Mini-DV** and **VHS-1**.  P&I Manual,  § 6114.41(E); PSMF, p. 10, ¶ 87; p. 18, ¶'s 153-166.

70.    Disputed as to the word "secured."  Patterson did not follow the rules for securing non-drug evidence.  Agents Manual, § 6681.43 (Ex.58).

71.    Disputed.  Not supported by the cites.  See response to paragraph 68.

72.    Disputed in that Patterson denied watching the video on April 12, 2004.  Ex. 88, p. 43.

74.    Disputed.  Gruden showed the **Mini-DV** or **VHS-1** to other agents, allowed other agents to take either or both the **Mini-DV** or **VHS-1**, and had copies made of the **Mini-DV** or **VHS-1**.  PSMF, p. 21, ¶'s 181, 184, 185; p. 22, ¶'s 188, 189; p. 24, ¶ 212; p. 25, ¶ 218; p. 26, ¶'s 229, 230.

75.     Disputed.     See Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment ("Paige's MSJ"), pp. 7-10, 16-17 (**VHS-1**), 21 (**D-1**); Plaintiff's Response to Defendants' Motion for Summary Judgment, pp. 3-9; Ex. 88, p. 31; Ex. 73, p. 65.

76.     Disputed.  See response to paragraph 75.

77.     Disputed.  Cites do not support the proposition that only members of the group or DEA agents watched the video.  In addition, cites do not support that he showed a VHS copy. See also Ex. 78, p. 91.

78.     Disputed.  Cites do not support the suggestion he talked to more than one technician.  Further, since the CD's made by Shafer only include a 4 minute and 9 second segment showing the AD, Gruden did not ask that Shafer copy the entire **Mini-DV** but only to copy the segment including the AD.  See Exs. 10 and 11

79.     Disputed.  See response to paragraph 78 regarding the length of the CD's.  In addition, Shafer testified that he made four CD copies, not "approximately" four CD copies.  See Gov't. cite.  However, more than four CD's were made by someone.  See Paige's MSJ, pp. 21-25.

82.     Disputed. The cite does not support the proposition that he saw the entire presentation.  "Those" copies did not include all of Paige's presentation.  See Exs. 10, 11.

83.     Disputed if the reference is to copying any of the video to discs.  Ex. 98, pp. 6-7, 10, 11-12; Exs. 10's and 11's directories (showing April 15).  Further, the cite does not support any suggestion that Wise saw the entire video-recording.

84.     Disputed.  Someone disclosed the 4:09 video and Paragraph 84 relies on the testimony of Shafer, whose credibility is subject to impeachment as to, *inter alia,* the number of CD's made, the portions of the **Mini-DV** copied, when he deleted the video file and whether

VHS tapes were made.  See Paige's MSJ, pp. 17-19, 21-23; Ex. 2, p. 5; Ex. 94, pp. 29-30, 34-35; Ex. 94, pp. 18, 22-27.  Moreover, his testimony that he threw away the computer and destroyed the hard drive of his computer with a hammer is problematic.  Ex. 94, pp. 35-36.

85.     Disputed.  Gruden also wrote up the DEA-485 to send to IN as part of an investigation package.  See Paige's Response to Defendants' Motion for Summary Judgment, pp. 5-7; Ex. 1, p. 24.

86.     Disputed.  Gruden failed to fill in the space for the IN case number, but did fill in Paige's name which was the IN case title.  Gov't. Ex. 19.  The Report of Shooting was also provided to IN and placed in the IN file.  Ex. 1, p. 24.

87.     Disputed.  Cite does not support date of alleged sending.

88.     Disputed.  Gruden distributed at least one of the CD's to a DEA agent who did not request it.  Ex. 75, p. 13.  Cite does not support any proposition that the CD was sent to the Firearms Unit at the office of Training as a result of conversations and requests from other DEA agents. The cites also do not refer to all the distributions of the CD's made by Gruden.

89.     Disputed as to "week of April 12, 2004."  Ex. 75, pp. 9-10, 14-15.

90.     Disputed.  See PSMF, p. 28, ¶ 245-247.

92.     Disputed. In light of, *inter alia,* the number of copies distributed by Gruden, the entertainment value of the video, the number of agents who were amused by the video, a phone call in which Bendekovic indicated that he was amused by the video, the fact that it was well known what went wrong, and the fact that Gruden had already told Bendekovic what went wrong; the evidence shows that the CD was distributed to Bendekovic for purposes of entertainment.    PSMF, p. 28, ¶'s 242, 245-249; Ex. 67, p. 8;  Paige's MSJ, pp. 21-23. Moreover, after watching the tape and purportedly learning what went wrong, Bendekovic did

not return the CD to Gruden, but kept it and even had a copy made for another DEA agent. PSMF, pp. 28-29, ¶'s 249, 250.

93.    Disputed.   In light of Gruden's lack of credibility and the fact that Gruden provided CD's to others after the week of April 12, it is uncertain whether he provided a CD to Scully during the week of April 12 or sometime later.  See Response to paragraph 178; PSMF, p. 28, ¶'s 245-247; Paige's Response to Defendants' Motion for Summary Judgment, p. 19.

95.    Disputed. Gruden testified that Scully returned the CD to him.  Ex. 93, pp. 177-178.  If that is true, then Scully must have caused a copy of the CD to be made since he took a CD disc to Tampa when he was transferred to the Tampa District Office.  PSMF, p. 29. ¶'s 252-254.  In addition, the proposition relies on Scully's testimony and Scully is not credible due to his repeated failures of recollection and inability to account for his copy of the video.  Ex. 93, *passim* and 19, 53-54.

96.    Disputed.   The reference to "consequently" is ambiguous.   See response to paragraph 95.

97.    Disputed.   The cites do not support the proposition.   Scully claims not to remember whether he took any tapes to the tech room.  Ex. 93, p. 27.  Gruden testified that he provided Scully with a **Mini-DV** or a VHS copy.  PSMF, p. 22, ¶ 189.  Since the VHS obtained by Scully only showed the AD portion of the actual video, he must have asked for only the AD portion of the video unless Gruden provided him with yet another undisclosed VHS tape that only included the AD portion of the video.  PSMF, pp. 23-24, ¶'s 200-202; p. 205, ¶ 211.  See response to paragraph 98.

98.    Disputed.  While this may have happened, both the ODO technicians have denied making any VHS tapes.  PSMF, p. 22, ¶ 193.  See response to paragraph 97 as to whether the **Mini-DV** or a VHS copy was returned to Gruden.

99.    Disputed.  There is no evidence in the cites that Deering learned of the shooting solely as a result of the teletype from Collins or Patterson on April 12.  The DEA Headquarters Command Center sent notification of the shooting on April 9 to Deering through Roger Norman on the evening of April 9.  Ex. 1, p. 47.  Deering called Collins on April 12, 2004 and the teletype was not sent until 7:01 p.m. on April 12.  Ex. 1, p. 39; Ex. 73, p. 68.

102.    Disputed. The proposition is not supported by the cites.  Clifford testified that April 15 was the date on which she was told that the inspectors were assigned that date.  The travel authorization for the inspectors' travel to Orlando was "entered" on April 14.  Ex. 103.

103.    In addition to the shooting incident team, it appears that virtually everyone at IN watched the video footage of the AD.  PSMF, p. 21, ¶ 179.

104.    Disputed.  See Paige's MSJ, pp. 8-10; Paige's Response to Defendants' Motion for Summary Judgment, pp. 4-8.  Further, Clifford was only referring to the correspondence folder, not the investigation file.  See Gov't. cite.  In addition, the title of the file was automatically SA Lee Paige.  Ex. 1, p. 1; P&I Manual, ¶ 8234.34(B) (Ex. 57).  See response to paragraph 105.

105.    Disputed as to the "following week" since the file was automatically opened on April 9, 2004.  PSMF, p. 11, ¶ 97.

107    Disputed.  The cites do not support the proposition that persons who were interviewed could not have been interviewed in person.

112.    Disputed.  White testified that he didn't get the file number until he came back from Orlando and that Burns would have given it to him.  Gov't. cite.  He also already had the file title for the investigation.  P&I Manual, ¶ 8234.31(B) (Ex. 57).

114.    Disputed.  The citations do not support the proposition.

115.    Disputed.  The citation does not support that he removed the **Mini-DV** to make copies for later copies of the IN file.  Further, White had copies made for purposes other than just later copies of the IN file, Burns never saw any disc copies in the IN file, and various copies that White had made which may have been part of copies of the IN file were made from an electronic file created before White went to Orlando.  PSMF, pp. 32-34, ¶'s 285-298; p. 35, ¶'s 305, 308.  Further, all copies of the **Mini-DV** were part of the IN file.  White also testified at one point that three copies (i.e. sets of copies) were to stay with the completed IN file (as opposed to being distributed as part of the review process).  Ex. 97, p. 75.

117.    Disputed.  According to Queen, she made more than one DVD copy of the **Mini-DV** with the AD removed.  PSMF, p. 35, ¶ 305; p. 36, ¶'s 310-312.

118.    Disputed.  The testimony reflects that a **Mini-DV** cassette tape without the AD was sent to Dorsey, not a DVD.  Gov't. cite; PSMF, p. 35, ¶'s 305-306.

119.    Disputed.  Dr. Dorsey testified that he thinks he received something back from the DEA and that he did not look at it.  Gov't. cite.

120.    Disputed.  According to White's testimony, he requested 11 CD or DVD copies of the **Mini-DV**.  In addition, according to Queen, at White's request, she made master DVD's of the entire **Mini-DV** as well as the AD portion of the **Mini-DV** and an unknown number of copies of each.   White's testimony was inconsistent, *inter alia*, as to the purpose of the CD's and DVD's and what he did with them; his testimony was contradicted by Burns who testified that he

never saw any CD's or DVD's; and White kept copies of the DVD's for himself and appears to have provided copies to others in light of the large number of unaccounted for discs which White had made.  PSMF, pp, 32-36, ¶'s 281, 284, 288-305, 310-311.  There is nothing in the cite that supports the proposition that he intended to distribute any of the copies.

121.    Disputed.  Queen made copies of various portions of the video-recording.  See response to paragraph 120.  There were copies of the video recording of the AD, especially in the Orlando office, of which White never had custody.  PSMF, pp. 21-32.  In addition, it is unknown what White did with all of the unaccounted for copies of the video-recording which he caused to be made.

122.    Disputed.  White testified that there were a number of discs made that were apparently not in DVD format.  PSMF, p. 33, ¶ 290.

123.    Disputed.  The Government's assertion is based entirely on White's testimony. White was not credible and, in fact, gave testimony that was inconsistent with Queen's and testimony that was demonstrably false.  See Paige's MSJ, pp. 25-28 (**D-10 – D-26**).  Moreover, most of the copies which White had made are unaccounted for.  Consequently, he must have given them to someone especially since, according to Burns, he never saw them in the IN file. Further, someone, presumably White, provided a disc to Inscore, who was White's supervisor, who has not yet been deposed.  PSMF, pp. 32-36, ¶'s 281, 287-312.  See also responses to paragraphs 120 and 122.  Consequently, the evidence shows that White gave CD's or DVD's to other people.

124.    Disputed.  According to White, he requested that the **Mini-DV** be copied by Queen in its entirety.  PSMF, p. 33, ¶'s 288, 289. Queen testified that she made DVD's of the entire **Mini-DV** as well as the AD portion of the **Mini-DV**, and the entire **Mini-DV** without the

AD.  PSMF, p. 35, ¶ 305.  In addition, the directories embedded in the DVD's that have been produced by White reflect that the electronic file used to create the 23:34 DVD's were created on April 17, 2004, before White requested Queen to make any copies and even before he picked up the **Mini-DV** in Orlando.  PSMF, pp. 33-34, ¶ 293-298.

125.    Disputed to the extent the proposition leaves out the title of the file, Lee Paige.

127.    Disputed.  White's testimony that an IN file is not "official" or "complete" until the DCI signs off on it is contradicted by common sense, DEA rules and regulations and even White's own testimony.  In a litigation-crafted effort to make it appear that there is no file until White's report is completed, White testified that there is no "actual" file, no "authorized" file, no "official" file, no "formal" file and even no "file" at all until his report is signed off on. Ex. 197, pp. 9, 13, 37, 59.  Upon cross-examination, he changed his testimony and admitted that the file is authorized and formal after all.  Ex. 197, pp. 13, 59.  Moreover, DEA rules and regulations specifically authorize and require that a file be opened, actually automatically, following a shooting incident; and nothing in the rules and regulations suggest that the file required by the rules and regulations is "unofficial."   PSMF, pp. 11-12, ¶'s 97-101; Exs. 56, 57.  In addition, materials were added to the file after the DCI signed off on the report.  See Ex. 1a.

128.    As far as it goes, the proposition itself is not disputed except that the word "original" is ambiguous.  The IN file included other copies of the **Mini-DV** or part of it including copies White and Gruden caused to be made.

129.    Disputed.   The reference to the "IN file" in paragraph 129 is really to the investigation part of the IN file.  The "correspondence folder" of the IN file is not distributed as described in paragraph 129.  PSMF, pp. 13-14, ¶'s 117-119.  Similarly, the use of the word "completed" is ambiguous since materials were added to the file after copies of the "IN file"

were provided to others.  See Ex. 1a.  The cites do not support the proposition that a video only including Paige's shooting was in DVD format.  Clifford testified that no files were sent to the Firearms Training Unit since the SAIRC decided that the file should not be reviewed by the Office of Training for lessons learned.   PSMF, p. 15, ¶'s 133-134.  See also Ex. 80, pp. 13, 15, 24; Ex. 92, pp. 20, 22-23; Ex. 70, pp. 51-52.

130.    Disputed.  While White did retain copies of various DVD's, these do not appear to be DVD's that were copied from the **Mini-DV** by Queen.  PSMF, pp. 32-34, ¶'s 288-298.

131.    Disputed.  See response to paragraph 123.

132.    Disputed.  See responses to paragraph 129 regarding the word "completed" and paragraph 125 regarding the file title.  Further, the word "original" is ambiguous.  Burns could not have viewed all of the "original" file because he saw no disc copies of the video-recording such as those which White and Gruden caused to be made.  PSMF, p. 34, ¶ 297.  In addition, it does not appear that Burns reviewed the correspondence portion of the file.  See response to paragraph 129.

133.    Disputed.  Burns only returned to the armory the binder part of the file, not the correspondence part of the file, which was being maintained by the Program Analyst.  See response to paragraph 129.

134.    Probably intended to cite p. 95.

137.    Disputed.  See response to paragraph 129.  Further, McAleer only testified that shooting reports are often sent to the Office of Training.

138.    Disputed.  See responses to paragraphs 129 and 137.

139.    Disputed.  The correspondence folder and various videos, including those which White and Gruden caused to be made, were not sent.  See response to paragraph 129.  See response to paragraph 125 regarding the file title.

140.    Disputed.  See response to paragraph 139.

141.    Disputed.  See response to paragraph 139.

142.    Disputed.  The Government's answers to interrogatories did not originally provide nor were they updated to provide the information contained in the Dunn's, Halligan's and Yates' declarations.  Consequently, no depositions of those individuals were undertaken and their assertions should not be accepted at this point, especially since it is not clear how two copies of the video were purportedly forwarded by the Board of Professional Conduct when it only received one.

143.    Disputed.  See responses to paragraphs 125, 129 and 139 regarding the "file," "IN-GB-04-032S" and the file title.  Next, Paige was unable to see on a DEA computer what was on the disc which was in the copy of the "IN file" which was provided to him and therefore could not see what was on it.  Ex. 64, p. 3, ¶ 8.  Moreover, the Halligan declaration does not indicate whether the "video-recording" was a copy of the entire **Mini-DV** or just a portion of it.

144.    Disputed.  See response to paragraph 143.

145.    Disputed.  See response to paragraph 143.

146.    Disputed.  See response to paragraph  143.

147.    Disputed.  See response to paragraph 143.  See also PSMF, p.16, ¶ 143; Gov't cites.

148.    Disputed.  See response to paragraph 143; PSMF, p. 16, ¶ 143.  Further, it is disputed that Collins knew, as he claimed in his declaration (Gov't. Ex. 35), that the file which

he received from Robert Joura contained video footage of the shooting since he testified that he never watched the disc in the file. Ex. 173, p. 36**.**

149.    Disputed.  See responses to paragraphs 143 and 148.

150.    Disputed.  See responses to paragraphs 125, 129 and 139 regarding "file" and title of file.

151.    Disputed. See responses to paragraphs 125, 129, and 139 regarding file title, "IN-GB-04-32S" and "file."

152.    Disputed as set forth in the response to paragraph 151.

153.    Disputed as set forth in the response to paragraph 151.

154.    Disputed as set forth in the response to paragraph 151.

155.    Disputed to the extent that the word "throughout" is misleading and ambiguous in light of the referenced materials.

157.    Disputed to the extent that the word "throughout" is misleading and ambiguous in light of the referenced materials.

158.    Disputed.  No evidence has been presented.

159.    Disputed as misleading.  The video recording of the AD was not played and Paige was not identified.

160.    Disputed.  Rule of completeness.

161.    Disputed.  Rule of completeness.

162.    Disputed as argumentative and the phrase "all of this" is misleading.

163.    Disputed.  It is not known what is contained in all of the media coverage in April and May, 2004.  In addition, there is evidence that the AD part of the video-recording appeared on the internet in April or May, 2004.  PSMF, p. 38, ¶'s 330, 331.  To the extent that the internet

14

is considered media coverage, media coverage in April and May, 2004 did indicate that a video-recording existed.

164.    Disputed.  There is evidence that the AD portion of the video-recording appeared on the internet in April or May, 2004.   PSMF, p. 38, ¶'s 330, 331.

165.    Disputed that the 4:09 version was never included in the IN file.  The 4:09 version on the internet and Firebird, by Gregg's affidavit (Gov't. Ex. 41), was copied from the **Mini-DV** which has always been in the IN file.  Obviously, the 4:09 version was always in the IN file since it was part of the **Mini-DV**.  Next, Reinke's affidavit does not support the proposition that the actual, physical 4:09 version was never in the IN file.  No where does he state, or could he state, that the 4:09 version was never included in the IN file.  Further, it is unknown what evidence OPR considered and what it considers to be an "indication."  For example, there is no indication in Reinke's affidavit that OPR knew that Gruden was initially delegated the task of constructing the IN file.  Further, Reinke himself testified that Gruden told him he sent the 4:09 version to IN.  Moreover, Gruden included the 4:09 CD with the DEA-485 Report of Shooting which directed him to also send it to IN.  PSMF, p. 36, ¶ 313.  Further, the 4:09 version was in Gruden's possession while he was helping to construct and had possession of part of the IN file and was therefore part of the IN file.  See Paige's Response to Motion for Summary Judgment, pp. 3-10.  See response to paragraph 125 regarding title of file.

166.    Disputed.  Several agents saw the video of the AD on DEA's Firebird system prior to March 7, 2005.  PSMF, p. 37, ¶'s 319-320.  Next, the cite does not support the proposition.  Gregg's affidavit did not say that the video begun to circulate on Firebird on March 7, 2005.  He only said that the earliest Firebird e-mail video he found was circulating on March 7, 2005.  See response to paragraph 258.

167.    Disputed.  See responses to paragraphs 165 and 166.

168.    Disputed.  Gregg's affidavit does not support the proposition.  He said he has not found such a video.

169.    Disputed.  Paige did not "publicize his case," but attempted to mitigate the damage caused by the disclosure of the video.  Exs. 61, 52; Ex. 86, pp. 193-194, 204-205.

171.    Disputed.  At the end of February or beginning of March, 2005, the video of the AD appeared on an internet site which identified Lee Paige by name as the person in the video. Ex. 187, pp. 46-48.  The Government has also cited to no evidence supporting the proposition and has not identified anyone who searched for any such evidence.  Moreover, paragraph 171 refers to this "publicity" and the "filing of the lawsuit" which are two different events which occurred at different times.  See response to paragraph 169 regarding "this publicity."

173.    The cites do not support the proposition concerning lessons learned.

177.    Disputed.  The cites do not support the June date.

178.    Disputed.  Derr said he received the CD around May, 2004.  Gov't. Ex. 43, p. 15.

181.    Disputed. The cites do not support the proposition that Bendekovic requested the video to learn from.  See also PSMF, p. 28, ¶ 248.  Further, Bendekovic spoke to Gruden and received the CD in May, 2004.  PSMF, p. 28, ¶'s 246-247.

184.    Disputed. The cites do not support the proposition about what Bendekovic was purportedly thinking.  See also PSMF, p. 28, ¶ 248.

186.    Disputed. PSMF, p. 28, ¶ 248.

187.    Disputed.  This statement does not make sense.

193.    Disputed.  The cites do not support the proposition with respect to Panzitta.

194.    Disputed.  Bendekovic provided the video of the AD to Maltz, PSMF, p. 30, ¶ 262.  The cites do not support the proposition with respect to Panzitta.

201.    Disputed.  The cites do not support the proposition regarding policy.

202.    Disputed.  The cite does not support the proposition.

208.    Disputed.  The cite does not support the proposition.

210.    Disputed in that it is ambiguous and confusing.  Maltz actually had two CD copies of the video.  One was a CD copy that he burned from the video that was on his laptop and this was provided to the Office of Professional Responsibility as asserted in the Government's Statement of Material Facts.  However, neither Maltz nor the Government have accounted for the CD that Bendekovic provided to Maltz and Maltz downloaded to his laptop. PSMF, p. 30, ¶'s 262-265.

212.    Disputed.  See PSMF, pp. 22-23, ¶'s 188-198; p. 29, ¶'s 252-254.

213.    Disputed.  The cite does not support the proposition.  Clark became aware that Scully had a disc and a VHS copy of the AD.

216.    Disputed.  The cite does not support the proposition that he did not show it to anyone.

217.    Disputed.  The cite indicates that Clark asked to see the video.

222.    Disputed.  Baughman's purported reason for seeking to obtain the video-recording is not credible on its face.  There is nothing in the video which would inform Baughman of what Paige did at DRP's during the time that Paige gave DRP's under Baughman's supervision.  Moreover, Baughman repeatedly showed the film to DEA agents and non-DEA task force agents, many of whom were amused by the film, which obviously had nothing to do with determining what Paige did in prior DRP's.  PSMF, p. 24, ¶'s 208-209.

223.    Disputed.  It does not appear that Clark himself copied the VHS tape, but that he had a Hillsborough County Deputy Sheriff copy the VHS tape.  PSMF, p. 24, ¶ 207.  The cites do not support the proposition that the other two people present were both employees of the Hillsborough County Sheriff's Office.

224.    Disputed. Because, *inter alia,* of Clark's lack of credibility on what ultimately happened to the VHS recording which he had as well as his racist remarks about blacks, Clark's testimony on this issue is not credible. Ex. 71, pp. 56-57, 78.

228.    Disputed.  Baughman also showed the video to non-DEA task force agents. PSMF, p. 24, ¶ 208. Further, the cites indicate he showed it in his office.  In light of, *inter alia,* the amusement it provided the agents, the number of times it was shown, the fact that many of the participants did not do DRP's, the fact that he was told to stop showing it, and the false reason given for obtaining the video; it is disputed that it was shown for training purposes. PSMF, p. 24, ¶'s 208, 209, Gov't. Ex. 46, p. 30; Ex. 66, p. 30.  See response to paragraph 222.

229.    Disputed.  See response to paragraph 228.

233.    Disputed.  Gruden actually testified that he had two or three discs left over after he quit giving the discs to others.  Moreover, he distributed VHS copies of the AD as well as at least two 4:09 CD's of the AD after the time he claims he destroyed the CD's concerning which he purportedly had no need.  PSMF, p. 21, ¶ 184; p. 24, ¶ 212; p. 28, ¶'s 245-247; p. 30, ¶ 261; Gov't. Ex. 43, p. 15.  In addition, Gruden is not credible and has bias against Paige.  See Response to Government's Motion for Summary Judgment, pp. 18-19.

235.    Disputed.  In the reported cite, Bowman believed that he obtained the tape at least a month after the AD and that it could have been after Paige returned to work.  Paige did not talk to Bowman until he returned to work.  Ex. 110, p. 2, ¶ 6; Ex. 186, p. 115.  Paige went back to

work on June 14, 2004.  Ex. 1, p. 15.  In addition, Bowman told Naughton that he did not have

access to a copy of the video after Naughton heard news reports of the AD which would have

been no earlier than the end of April, 2004.  Ex. 85, p.5; PSMF p. 28, ¶ 247.

236.    Disputed.  Paige did not tell Bowman the weapon had malfunctioned.  Ex. 110, p.

2, ¶ 6.

240.    Disputed.  PMSF, p. 21, ¶ 184.

241.    Disputed as being misleading.  See response to paragraph 240.

243.    Disputed. The cites do not support the date.  Naughton testified that he received

the disc a couple of months after the AD.

245.    Disputed as to Gugliotta to the extent the citations to his testimony do not support

the propositions.  Disputed as to Naughton.  In light of, *inter alia,* the number of times the video

was shown by Naughton to others, including apparently a non-DEA police officer; the showing

of the film to agents who just came in and out of the office all the time; the order that Naughton

quit showing it; the failure to include the video as part of any firearms training course; his claim

that he did not purportedly want to be bothered by people about showing it to them;  the fact that

agents who watched it made fun of Paige; Naughton's purported inability to identify agents who

made fun of Paige; the entertainment value of  the video; Naughton's evasive admission that he

made fun of Paige; the lack of explanation for the creation and appearance of the video; the

purported absence of any attempt to find out where the video came from; the purported inability

of Naughton to identify a single agent to whom he showed the video; the initial claim that he

showed it to firearms instructors, who he said he could not identify, and later statement that he

also showed it to others, who he could not identify; Naughton talking the video home for

personal use; Naughton's evasiveness as to whether he kept and intended to keep the video for

personal use; Naughton's claim that he took the video home because it was more secure there than the Miami firearms office; and Naughton's  lack as credibility as to other matters to which he testified; it appears that Naughton watched and showed the video to others for entertainment purposes.  PSMF, p. 31, ¶'s 272-275; Ex. 85, pp. 9-11, 16, 20, 21, 22-23, 25-30, 34-35, 37, 55; Ex. 79, pp. 20, 45; Ex. 85, pp. 20-21, 26.  In addition, Naughton's testimony that the CD showed up with no indication where it came from, who created it, why it was sent, who sent it, etc., is not credible on its face.

246.  Disputed as to Naughton.  See response to paragraph 245.  In addition, somebody provided a 4:09 CD of the shooting to someone else.

247.  Disputed.  See response to paragraph 245.  In addition, Naughton may have shown the video to a Pembroke Pines Police Officers.  Ex. 85, pp. 55-56.

252.  Disputed.  According to Paige, Paige was asked by Naughton and Gugliotta if Paige wanted Weiss to leave when they showed Paige the video of the AD.  Gov't. Ex. 2, p. 118.

253.  Disputed.  See response to paragraph 252.  Further, Paige indicated that Weiss could stay since Naughton and Gugliotta had already showed the video to other people.  Paige also asked Naughton and Gugliotta not to show the video anymore.  Gov't. Ex. 2, p. 118.

254.  Disputed as to the office being secure.  Ex 79, pp. 20, 23.  In addition, the disc was stored in a computer when agents were constantly in and out of the office.  *Id.;* Ex. 85, p. 25. Further, Naughton claimed that the disc was safer at home.  Ex. 84, p. 26.

258.  Disputed as misleading.  The search of DEA e-mails by Gregg was very limited and he could not identify the limited number of people whose e-mail accounts he looked at.  Ex. 177, p. 41, 44, 47.  For example, he did not know that Maltz had downloaded the video to his laptop and had not searched his e-mail.  Ex. 177, pp. 21, 44.  He also said it was difficult to trace

history files because they were corrupt or non-existent and that e-mail data in 2005 would be marginal and there were various reasons why he would not find an earlier email version.   Ex. 177, pp. 31, 53, 54, 59, 77; PSMF, p. 37, ¶ 321. With respect to the limited number of e-mail accounts which he looked at, Gregg said he only looked at e-mail which had a file attached with a name he recognized as containing the video which had appeared on the internet.  Ex.177, pp. 37-40.  If someone simply renamed the file he would not find it.  Ex. 177, p. 38.  If the video had no file name or one Gregg had not seen on the internet, he would not have looked at the e-mail. On the two occasions he found e-mail chains on Firebird with files containing the video, it was in unrelated investigations.  Ex. 177, pp. 36-37, 52, 58, 72. He did not interview the person or examine the e-mail of the person who was the earliest person on the e-mail chain (i.e. Ex. 45) in order to determine, *inter alia,* how the person got the video and whether there were earlier deleted or disconnected e-mails in the e-mail chain.  Ex. 177, pp. 52, 53, 59, 75.

259.    Disputed as misleading, unsupported with evidence, conclusory, ambiguous, evasive, irrelevant and involving legal conclusions.  Reinke asserts that OPR has not been able to "conclusively" determine how video footage ended up on the internet or "precisely" how the video of the AD appeared on Firebird.  These terms appear to indicate that OPR determined how the video of the AD probably appeared on Firebird and the internet.  Further, OPR is relying on interviews and statements which it has refused to produce and therefore Paige cannot determine the accuracy of Reinke's assertion.  Moreover, Reinke's credibility is suspect since he suggested that Paige himself may have inadvertently misplaced the video and someone "unfriendly" picked it up and put it on the website, even though the Government has never suggested that Paige ever had access to the 4:09 CD.  Ex. 91, p. 239.  Further, Paige has conclusively and precisely determined that the video of the AD made its way to Firebird and the internet through an

intentional and willful disclosure by a DEA employee. See Paige's MSJ, pp.32-34; Plaintiff's Response to Defendants' Motion for Summary Judgment, pp.3-10, 13-19.

260. Disputed. See response to paragraph 165.

261. Disputed. First, the paragraph does not indicate what the proposition is purportedly "similar" to. Next, the cite does not support the proposition. Further, what Paige personally "knows" at his December 14, 2007 deposition is only part of the evidence and certainly does not constitute some sort of limit on what can be proven in court. The word "know" is also am-biguous and misleading, especially to lay people. Since Paige did not personally observe anyone disclosing the video to the internet and since no one has admitted doing so, Paige can not "know" precisely and conclusively who did it and how. Paige does know of many apparent violations of the Privacy Act which were set forth in answers to interrogatories. Moreover, Paige knows that someone at the DEA disclosed the video to the public since the DEA had exclusive possession of the video and Paige believes that the evidence will show that this was the result of intentional and willful conduct by one or more individuals at the DEA. Ex. 110, p 5, ¶ 13.

Respectfully submitted,

S/Ward A. Meythaler
Ward A. Meythaler

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 20, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044

s/Ward A. Meythaler
Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5415 Mariner Street, Suite 103
Tampa, Florida 33609
TEL: (813) 281-9000
FAX: (813) 281-2223
wamsecy@merklemagri.com