UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**LEE PAIGE,**

    **Plaintiff,**

v.                                                         CASE NO.: 01:06-cv-0644

**UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION, et al.**

    **Defendants.**
_____/

### SECOND AFFIDAVIT OF LEE PAIGE

I, Lee Paige, the Plaintiff in this case, state as follows:

1. I appeared on television and in the press while a professional football player on a few occasions more than 20 years ago. I played for Florida State University in 1981 and 1982. I played for the Tampa Bay Bandits in 1986, but there were no actual games played while I was on the team due to litigation between the National Football League and the United States Football League. I played with the Tampa Bay Buccaneers for three or four months in 1987 and appeared as a replacement player in three games during that time.

2. Before I heard about any possible mention of the Sports Illustrated article submitted by the Government as Exhibit 4, I was called by someone at the DEA and was told that the DEA had told Sports Illustrated that I should be one of the people in the article. The person at the DEA also told me that Sports Illustrated had been given my name by the DEA because the article in Sports Illustrated would reflect favorably on the DEA.

3. While I was stationed in Tampa and Stephen Collins was my supervisor, on several occasions I encountered Mr. Collins as I was leaving to give a Demand Reduction Presentation when I was wearing raid gear and was wearing my service pistol on my hip and was carrying an SMG (submachine gun) case containing a submachine gun. I told Mr. Collins on those occasions that I was



leaving for the Demand Reduction Presentation, and he could see how I was dressed and that I was wearing my pistol and carrying the SMG case. Mr. Collins did not object to my appearance or any of the weapons that I was carrying.

4. Some time in or about March, 2005, I was advised by Stephen Collins that I can no longer work undercover or give Demand Reduction Presentations because my physical welfare would be in jeopardy as a result of the release of the video of the accidental discharge involving me and the resulting publicity. In addition, other DEA agents have expressed concern for my safety as well as their safety if they work with me because the video and resulting publicity has made me recognizable to individuals who have been or who are involved in the illegal drug trade.

5. The building located at the Callahan Community Center is a one-story building.

6. I did not speak to Christopher Bowman about the accidental discharge until some time after I returned to work which was in June, 2004. I did not tell Christopher Bowman that my weapon had malfunctioned when I had my accidental discharge.

7. On or about July 9, 2004, Peter Gruden prepared a Midyear Progress Review/Interim Evaluation of me that ranked me "Unacceptable" in five of seven critical job elements and "Unacceptable" overall. I have never been ranked as "Unacceptable" in any critical job element before or since that evaluation during my career at the DEA. In my experience, the evaluation made of me by Mr. Gruden would prevent me from being transferred or promoted and would indicate that I was doing no work. In addition, Mr. Gruden listed a number of behavioral issues which are misleading, untrue or unfair. I understand that a supervisor is not to evaluate me unless I have been under his supervision for 90 days. At the time of Mr. Gruden's evaluation, I had only been supervised by Mr. Gruden in the Orlando office for approximately 29 days. As a result of my short time in the Orlando office, my evaluation was changed by the ASAC to "Acceptable."

8. Shortly after I was transferred to the Orlando office, I arrived at a group meeting five to ten minutes late because I experienced unexpected traffic and had difficulty getting into the building because I had not been given a key code. Mr. Gruden yelled at me in front of the group and sent me

2

home for the day. I have never heard of any DEA agent being sent home for a day because the agent was late for a meeting.

9. Around about the time that Mr. Gruden pointed a gun at me, he told me that I should only be doing Demand Reduction Presentations and not be a DEA agent.

10. I have heard and believe that many others in my office have heard that Mr. Gruden, using his government vehicle, allegedly helped an acquaintance elude the police who were conducting surveillance of the acquaintance as a result of alleged criminal conduct by the acquaintance in connection with an attempted extortion of the acquaintance's girlfriend. In addition, I have heard and believe that many others in my office have heard that Mr. Gruden allegedly engaged in professional misconduct of a sensitive nature that will not be detailed here.

11. I told or indicated to Robbin Paige to put the gun down right before she did after my accidental discharge.

12. It has been my experience at the DEA since before my accidental discharge that when something notable or significant happens to a DEA agent, especially something notorious or detrimental such as being injured or charged with a crime, many personal or non-official e-mails are sent by e-mail over Firebird informing other agents of or commenting on the situation. The video of my accidental discharge and its disclosure is such a situation. Typically, such email or the information in the email is then forwarded by the recipient to someone or even to many other people with the result that the information spreads rapidly over the Firebird system across the United States. Based on my experience at the DEA and my knowledge of the use of computers by DEA agents, this has been well-known to DEA agents since before my accidental discharge. In my eighteen years at the DEA, the video of my accidental discharge is clearly the most likely situation or information I have ever seen at the DEA for being spread rapidly across the Firebird system. Based on my experience at the DEA, my knowledge of computer use at the DEA and my knowledge of the interest of typical DEA agents, the certain spread over Firebird of the video of my accidental discharge would have been well-known to DEA agents at the time of my accidental discharge. In addition, it is also my experience since before my accidental discharge that once

3

notable or significant information about a DEA agent starts to spread on Firebird, especially something notorious, it will also spread from Firebird by email to the internet, which in my experience was also well-known to DEA agents since before my accidental discharge. In addition, such notable information typically shows up on a website on the internet called DEA Watch, which is a website dedicated to DEA matters. In my experience, it has been well-known to DEA agents since before the time of my accidental discharge that such notable information will typically show up on DEA Watch. Further, based on my experience with Firebird and the internet as well as my knowledge of the knowledge, use and interest of DEA agents in computers and the internet, I was certain that unless the spread of the video of my accidental discharge on Firebird was stopped, it would rapidly spread on Firebird across the United States and would end up on the public internet including websites, including DEA Watch, where it would be watched by millions of people  Based on my experience at the DEA and the use of computers by DEA agents and the knowledge, use and interest of DEA agents in computers and the internet, this would have been well-known to DEA agents at the time of my accidental discharge. Because of my certainty that the video would spread on Firebird and the internet, I requested Mr. Collins to try to have people at DEA stop showing the video and that the DEA try to take the video off Firebird. I was also certain that if a copy of the video was provided to someone outside of DEA, it would, because of its unique nature (as well as the nature of the internet) and the interests of people, be spread on the internet through e-mail and end up on websites and watched by millions of people, including on many websites that show videos of notorious, unusual and ironic events, which would include the video of my accidental discharge. Based on my experience at the DEA, the use of computers by DEA agents, and the knowledge, use and interest of DEA agents in computers and the internet, this would also have been well-known to DEA agents at the time of my accidental discharge. As I thought would occur, the video of my accidental discharge was in fact widely disseminated on Firebird, played on national television, including Jimmy Kimmel, and became of the most watched videos on the internet.

13. I know that someone at the DEA disclosed the video of my accidental discharge to the public since the DEA had exclusive possession of the video and I believe that the evidence will show that this was the result of intentional and willful conduct by one or more individuals at the DEA.

14. After the video of my accidental discharge was reported on the news in March, 2005, my family and I received substantial media attention concerning the video and the disclosure of the video, including calls to the house and, I was told, media vehicles near our house. As a result of this attention and the stress brought on by this attention and the disclosure of the video, I and my family left the area in March, 2005 to avoid these problems. We traveled to and stayed at a hotel in Fort Lauderdale, Florida. I spent approximately $2,000.00 on this trip.

15. I am the great, great grandson of two slaves, George and Susan Paige. I am proud of my ancestry and strive to help children, especially disadvantaged children.

16. In February, 1996, I was working undercover when I was held at gun point by a drug dealer before I was rescued by other DEA agents. This incident was video-recorded by a surveillance camera. The incident was described in testimony at the drug dealer's federal trial. I wanted to play this video at a media interview after this case was filed in order to mitigate the damages which I had suffered from the release of the video of my accidental discharge.

FURTHER AFFIANT SAYETH NAUGHT

_____
LEE PAIGE
Affiant

Sworn to and subscribed before me on this 20 day of June, 2008, by LEE PAIGE, who is personally known to me or who has produced _____ as identification and who did/did not take an oath, states that he has read the foregoing Affidavit and asserts that all the information contained therein is true and correct to the best of his knowledge and belief.

_____
Notary Public
State of Florida at Large
Printed Name: ANGELA S. MERKLE
My Commission Expires: 3/14/2009



ANGELA S. MERKLE
MY COMMISSION # DD 406857
EXPIRES: March 14, 2009
Bonded Thru Notary Public Underwriters