UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

LEE PAIGE,

   Plaintiff,

vs.                           Case No.: 1:06CV00644

UNITED STATES DRUG

ENFORCEMENT ADMINISTRATION

and UNITED STATES OF AMERICA,

   Defendants.

DEPOSITION OF TOMMY DORSEY, DDS

Taken on Behalf of the Defendant

| | |
|---|---|
| DATE TAKEN: | Tuesday, January 8, 2008 |
| TIME: | 4:09 p.m. - 4:43 p.m. |
| PLACE: | United States Attorney's Office |
| | 501 West Church Street |
| | Orlando, Florida |

STENOGRAPHICALLY REPORTED BY:

Sara Gittins

Sclafani Williams Court Reporters, Inc.
1-(866) SET-DEPO (738-3376)



PLAINTIFF'S EXHIBIT 176

## Page 2

```
 1  APPEARANCES:
 2  Counsel for Plaintiff:
 3    Ward A. Meythaler, Esquire
      Law Offices of Merkle & Magri, P.A.
 4    5415 Mariner Street
      Suite 103
 5    Tampa, Florida 33609
      (813) 281-9000
 6
 7
 8  Counsel for Defendants:
 9    Paul A. Dean, Esquire
      United States Department of Justice
10    Civil Division, Federal Programs Branch
      20 Massachusetts Avenue, N.W.
11    Washington, D.C. 20001
      (202) 616-8482
12
13
14
    ALSO PRESENT:
15
      Lee Paige
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2  WITNESS:                          PAGE:
 3  TOMMY DORSEY, DDS
 4  Called by the Defendant:
 5    Direct Examination by Mr. Dean      4
 6    Cross-Examination by Mr. Meythaler  26
 7    Redirect Examination by Mr. Dean    29
 8  STIPULATIONS                          30
 9  CERTIFICATE OF OATH                   31
10  REPORTER'S DEPOSITION CERTIFICATE     32
11
12
13
14          EXHIBITS
15
    No. 1 OMYGA Pamphlet                  26
16
```

## Page 4

```
 1              PROCEEDINGS
 2      TOMMY DORSEY, DDS, called as a witness by the
 3  Defendant, having been first duly sworn, testified as
 4  follows:
 5      THE WITNESS: I do.
 6            DIRECT EXAMINATION
 7  BY MR. DEAN:
 8    Q. Good afternoon, Dr. Dorsey. My name is Paul
 9  Dean with the Department of Justice. I represent the
10  DEA in this matter. I'll be taking in your deposition
11  today.
12      Can you please state your name for the record?
13    A. Tommy J. Dorsey. Tommy James Dorsey.
14    Q. And, sir, you've been deposed before?
15    A. Yes.
16    Q. So I'll just remind you of a couple of the
17  ground rules for a deposition. Please make sure you're
18  as clear as possible and try to answer orally and not
19  nod or say "uh-huh," or "uh-uh," "huh-uh". Try to
20  answer "yes" or "no" to make it easier on the court
21  reporter.
22      It's very important that you understand my
23  question. If there's anything that's unclear about a
24  question, just let me know and I'll be happy to change
25  the question.
```

## Page 5

```
 1    A. Sure.
 2    Q. If at any time during the deposition you want
 3  to change an answer that you gave me earlier, that's
 4  fine, just let me know what you want to change.
 5      Is there any reason you can think of,
 6  Dr. Dorsey, why you would not be able to answer my
 7  questions fully and truthfully today?
 8    A. Unless I forgot.
 9    Q. Okay. Dr. Dorsey, have you spoken with anyone
10  in preparation for this deposition?
11    A. No.
12    Q. Do you live in the Orlando area?
13    A. I do.
14    Q. And you are a dentist; is that correct?
15    A. By profession.
16    Q. How long have you maintained a dental practice
17  in the Orlando area?
18    A. Since 1976.
19    Q. Okay. And are you still working as a dentist?
20    A. Yes. Currently, yes.
21    Q. Can you tell me what OMYGA stands for?
22    A. The Orlando Minority Youth Golf Association.
23    Q. Did you start that organization?
24    A. I'm its founder, yes.
25    Q. Why did you start that organization?
```

10

1  A. It goes around.
2  Q. Okay. How often do you have guest speakers at
3  the meetings?
4  A. Well, that varies. It depends on what I want
5  to cover. Okay. From time to time, I find someone
6  qualified and worthy to do that. I let them come. I
7  had the head pro at Disney. I've had the head pro at
8  Grand Cypress, several of us.
9  Q. All right. Do these guest speakers usually
10 come for the Friday lecture or do they come --
11 A. Yes. Yes.
12 Q. Okay. And occasionally do you have people,
13 other than golf professionals, speak?
14 A. Uh-huh. Yeah.
15 Q. Could you give me some examples of those?
16 A. Well, I've had Mr. Paige for one. Let me just
17 see if I can recollect. Oh, I have had people to talk
18 about money.
19 Q. Okay.
20 A. Yeah, and maybe some others.
21 Q. Okay. And who usually attends the Friday
22 lectures?
23 A. Kids, their parents, instructors.
24 Q. Okay. Do you usually video record these
25 meetings on Fridays?

11

1  A. That's kind of a volunteer thing. It happens.
2  And if it doesn't happen, it doesn't matter because the
3  actual videos are just there. I have an instructor who
4  started that, who was -- he was a parent instructor and
5  he always videoed. Always videoed. It was good. And
6  then we had records. And if nobody's there to video it,
7  it doesn't matter. But if somebody is there and wants
8  to video, that's fine, too. So it's not mandatory.
9  Q. Would you say your -- the Friday lectures are
10 usually videoed?
11 A. No. I wouldn't say that, but I would say that
12 they can be.
13 Q. They can be?
14 A. Yeah.
15 Q. You wouldn't be surprised if --
16 A. I have parents who sit over there and video all
17 of the time so they can tell their kid what I said and
18 stuff like that.
19 Q. Are there times when you have the meetings
20 video recorded yourself?
21 A. Uh-uh.
22 Q. Okay. But if someone wants to video record the
23 meetings, that's fine with you --
24 A. Yeah.
25 Q. -- is that correct? Okay.

12

1  You said sometimes you have video records of
2  the meetings. Videos as being a record of the meeting?
3  A. That's where it started off. The parent that
4  started videoing these meetings, I think he really
5  wanted to just teach his kids from the video. But he
6  would do it and just sometimes give me a copy of it and
7  all that, but that's about all.
8  Q. Do you usually get a copy of the video?
9  A. Uh-uh. No.
10 Q. Was any of the way the meetings were recorded
11 different in 2004?
12 A. I think they were -- Bronson (phonetic) was
13 probably doing most of it at that time, Bronson.
14 Q. Who is he?
15 A. Bronson had three kids in my program.
16 Q. Okay.
17 A. And he videoed -- he videoed when he was there.
18 I don't hold people that accountable for that. So that
19 particular night, he was there.
20 Q. The night of the incident?
21 A. Uh-huh.
22 Q. Okay. And did Mr. Bronson, was he -- he would
23 be using his own video equipment; is that correct?
24 A. Correct.
25 Q. Did you provide videotapes or anything to

13

1  anybody?
2  A. No.
3  Q. Did you ever pay Mr. Bronson or anyone else to
4  record the meetings?
5  A. No.
6  Q. I believe you said Mr. Bronson was there on the
7  night of the accidental discharge --
8  A. Yes.
9  Q. -- correct?
10 Did Mr. Bronson normally provide you with
11 copies of the video?
12 A. No.
13 Q. He did not. Okay. Do you recall how it came
14 about that Lee Paige gave a presentation to your
15 organization in April of 2004?
16 A. Uh-huh.
17 Q. Could you relate that to me, please.
18 A. Yes. We had talked -- we had talked several
19 times about doing a presentation. We had talked on the
20 driving range. We talked on several different occasions
21 while training was going on, stuff like that. And that
22 was -- that was prior to 2004. This was just
23 conversation.
24 Q. Uh-huh. Okay. And then what happened to bring
25 it up?