Capital Reporting Company

Page 1

IN THE FEDERAL DISTRICT COURT
IN THE DISTRICT OF COLUMBIA
------------------------------X
LEE PAIGE,                    :
                              :
            Plaintiff,        :
      v                       :   CASE NO:
                              :   1:06CV 00644-EGS
DOJ and DEA,                  :
                              :
            Defendant.        :
------------------------------X

Washington, D.C.

Thursday, January 17, 2008

Deposition of:

TOM GREGG

called for oral examination by counsel for Plaintiff, pursuant to Notice, at the US DOJ Civil Division, Federal Programs, 200 Massachusetts Avenue, Northwest, Washington, D.C., before Mary E. Warner of Capital Reporting, sworn by a Notary Public in and for the District of Columbia, beginning at 8:50 a.m.

PLAINTIFF'S EXHIBIT 177

(866) 448 - DEPO
www.CapitalReportingCompany.com
© 2008

Page 2

```
 1       APPEARANCES
 2
 3   On Behalf of the Plaintiff:
 4       WARD A. MEYTHALER, ESQUIRE
 5       Law Offices of Merkle & Magri, P.A.
 6       5415 Mariner Street, Suite 103
 7       Tampa, FL  33609
 8       (813) 281-9000
 9
10   On Behalf of the Defendants:
11       PETER J. PHIPPS, ESQUIRE
12       U.S. Department of Justice
13       20 Massachusetts Avenue, N.W.
14       Washington, D.C.  20530
15       (202) 514-1280
16
17   ALSO PRESENT:
18       Lee Paige
19
20
21
22
```

Page 4

```
 1   33 Disk, 8/28/06              209
 2   36 Disk
 3   44 Acquisition of Nondrug Property
 4   45 E-mails
 5   46 E-mails
 6   (Exhibits were marked prior to deposition
 7   starting.)
```

Page 3

```
 1          CONTENTS
 2   EXAMINATION BY                 PAGE
 3     Counsel for Plaintiff         5
 4
 5   GREGG DEPOSITION EXHIBITS
 6    1  Acquisition of Nondrug Property
 7    2  TDK Disk
 8    2A Exemplar Exhibit
 9    2A Exemplar Exhibit
10    4  Imation Disk
11    5  Acquisition of Nondrug Property
12    6  Acquisition of Nondrug Property
13   11  CD Disk
14   12  N-8-2
15   13  N-8-3
16   18  N-11
17   19  N-12-A
18   20  N-12-B
19   21  N-12-C
20   22  N-12-D
21   25  Memo, 3/25/05
22   32  Acquisition of Nondrug Property
```

Page 5

```
 1          PROCEEDINGS
 2   WHEREUPON,
 3          TOM GREGG
 4   called as a witness, and having been first duly
 5   sworn, was examined and testified as follows:
 6       EXAMINATION BY COUNSEL FOR PLAINTIFF
 7   BY MR. MEYTHALER:
 8       Q  Would you state your name, please?
 9       A  Thomas Gregg.
10       Q  How old are you, Mr. Gregg?
11       A  48 years old.
12       Q  And you reside in the Washington, D.C.
13   area?
14       A  Yes.
15       Q  Married?
16       A  Yes.
17       Q  And who are you presently employed with?
18       A  US Drug Enforcement Administration.
19       Q  Could you give us a brief thumbnail
20   sketch of your background at the DEA, including
21   when you started, the offices you worked at and
22   the positions you've held?
```

Page 18

1  Q  All right. So you're not part of the
2  Office of Inspections at all, you're with the
3  department you've already described?
4  A  No, actually, if you understand, the
5  Office of Inspection has different branches, OPR,
6  Security Programs. I fall under Security
7  Programs. So we are a part of the -- and then the
8  IG has OPR, Inspections and Security Programs.
9  Q  So you're under the IG just as OPR and
10 the Office of Inspections is?
11 A  Correct. All under the same umbrella.
12 Q  Okay. Does the Security Programs become
13 involved in enforcement-type cases or is it
14 mainly --
15 A  No. We do information security.
16 Q  Relating to DEA security?
17 A  Correct.
18 Q  And what have you done as part of the
19 investigation?
20 A  I've examined the e-mail files associated
21 to various people. I've done some research on the
22 Internet as to dates and times the video appeared.

Page 19

1  I traveled down to Florida, looked at some
2  computers down in Florida. That's basically it.
3  Q  Now, do you recall when you went to
4  Florida?
5  A  Yeah. It was approximately -- it was in
6  June of '06 to July of '06.
7  Q  And one of the things you did there was
8  to examine computers?
9  A  Uh-huh, yes.
10 Q  And you made mirror images of two
11 computers, correct?
12 A  Correct.
13 Q  Before you went down there, had you made
14 the decision to make mirror images of computers?
15 A  Well, what the goal was to -- to go
16 through and look at the computers. And if any
17 computer had what appeared to be relevant data,
18 yeah, I would go ahead and make the image of the
19 computer, as opposed to sitting there and trying
20 to analyze it in Florida, and then bring the image
21 back to Virginia to analyze it here.
22 Q  I see. And you planned to do that before

Page 20

1  you went on the trip?
2       MR. PHIPPS: Objection, vague.
3       THE WITNESS: I went there with all my
4  equipment knowing that I could look at the stuff,
5  and, if need be, I had the equipment necessary to
6  do it.
7  BY MR. MEYTHALER:
8  Q  Did you go to other offices and do the
9  same sort of thing?
10 A  I just went to one building.
11 Q  I'm sorry. I apologize. Did you go to
12 any other district offices around the country
13 where you did that?
14 A  No.
15 Q  So Florida is the only one where you
16 went?
17 A  Right.
18 Q  And why is it you picked Florida and none
19 of the others?
20 A  That's just where I was told to go.
21 Q  And who was giving you directions,
22 Mr. Reinke?

Page 21

1  A  Yes.
2  Q  Did you come to learn -- do you know who
3  Mr. Derek Maltz is?
4  A  Huh-uh.
5  Q  Did you come to learn that there was a
6  DEA agent who had downloaded the accidental
7  discharge to his laptop computer?
8  A  Huh-uh, no.
9  Q  Now, did you ever hear of a man named
10 Joseph Brunson?
11 A  No.
12 Q  Did you ever hear that the videographer
13 has asserted that he saw his version of the
14 accidental shooting, his tape of the accidental
15 shooting on the Internet within weeks of the
16 accidental discharge?
17 A  Who is that?
18 Q  The videographer.
19 A  No.
20 Q  So no one's ever told you that before.
21 A  Huh-uh.
22 Q  You have to say yes or no.

Page 30

1  time frame. I think the hits were in '06, I
2  believe.
3     Q  Well, when you did your review -- I mean,
4  did you do anything different than what you had
5  done in Orlando?
6     A  Yes, in Orlando, I ran the key words and
7  if the key word hits, I stop. I had a lot of
8  computers to do. I didn't really analyze what it
9  hit on or if it hit, and that was going to be a
10 plus, and we'd take it. Once I got back here I
11 could really in more depth determine when, where
12 and how. So that's why I did it here.
13    Q  On one of these you found the things you
14 just mentioned. Did you find any on the other
15 one?
16    A  I can't recall which one was which.
17    Q  Was there one where you found nothing?
18    A  I think each one had sort of similar --
19 it was just -- the e-mail account, and it was
20 either a PowerPoint or a PDF, I forget what it
21 was, that was on the same exhibit -- that was on
22 the same one. That was about it.

Page 31

1     Q  Well, then, if the e-mail account and the
2  PowerPoint presentation were on the same mirror
3  image, does that mean there was nothing of
4  significance on the other mirror image?
5     A  Well, now, each one had some general
6  reference to Internet history. The biggest
7  problem was the -- I looked at the computers in
8  '06. And we were trying to go back and look at
9  something that occurred potentially one year or
10 two years prior. So the history files just were
11 corrupt or, in some cases, not existent, so the
12 data was very fragmented, it was just really hard.
13 I wouldn't say that they didn't have a value, they
14 had a value, but did they help further what I was
15 trying to do? No.
16    Q  Now, Mr. Paige's e-mail account, was
17 there anything significant there with respect to
18 the videotape?
19    A  No.
20    Q  And the PowerPoint presentation, I didn't
21 understand what that consisted of.
22    A  I'm trying to think what it was. I just

Page 32

1  remember it was possibly a birthday card. It was
2  something to doing with Father of the Year. I
3  remember seeing it because I was going through
4  searching it. I don't know if possibly one of
5  your kids made it for you, or somebody e-mailed it
6  to you. But it was just, you know, a very
7  innocent -- you know, no big deal.
8     Q  Did you find any videos on either of the
9  mirror images concerning the accidental discharge?
10    A  No.
11    Q  Was there anything on any of these mirror
12 images that assisted you in determining how the
13 video was disclosed to someone outside the DEA?
14    A  No.
15    Q  All right. Is there anything else I
16 should ask you about the mirror images?
17    A  I know it's kind of confusing, you
18 wonder, but no. They really didn't help, you
19 know, advance anything.
20    Q  Well, Mr. Reinke said that -- and I hope
21 I get this right -- that you found, quote,
22 connectivity, end quote.

Page 33

1     And I asked him, "Well, what's that?"
2     And he touched his finger to the table
3  and he said "Well, that's Connectivity."
4     I'm sure he's correct, but what is
5  connectivity?
6     A  I think what he's referring to is through
7  the Internet history. And when you look at
8  Internet history, it appeared to be -- there was
9  activity on the Internet, like I said, putfile.com
10 and different sites. But where I could determine
11 the date and time stamps, time frames, it was
12 outside. It was, you know again, '06 time frame.
13 Some of the other historical data going back to
14 potentially '04 and '05, I couldn't really
15 determine what it was or even if it existed. So
16 the data was so fragmented. It would be like
17 taking your notepad right there and, you know, me
18 scratching out some of your notes with a permanent
19 marker. Now it's all fragmented, I really can't
20 read it. So can I say it happened in '04, '05?
21 No, I really don't know when it happened. So I
22 saw there was activity on the Internet, but I

Page 34

1 couldn't really figure out what it was.
2     Q  All right. So you saw -- when you say
3 "activity on the Internet," you mean someone was
4 accessing the Internet?
5     A  Yeah. It was used as throughout the
6 Internet. Like I said, I found an Internet-based
7 e-mail account for Mr. Paige, so clearly that
8 computer had been used to access the Internet to
9 do some sort of Internet e-mailing.
10    Q  But there was nothing that you found that
11 suggested anyone was connected to the Internet
12 that had anything to do with the disclosure of the
13 video?
14    A  No. I didn't find anything like that.
15    Q  All right. And how about did you find
16 any connectivity with any websites that you
17 thought were suspicious?
18    A  No.
19    Q  Now, did you find anything with respect
20 to the video in the later years like '06 or -- if
21 it was in '07, if it was '07.
22    A  The putfile.com I found. The reference

Page 35

1 to putfile.com was referenced to another video
2 that had nothing to do with this. I really don't
3 recall what it was, but it had nothing to with
4 this incident whatsoever. The only common
5 denominator was putfile.com.
6        Like I said early on, the key word I used
7 was "putfile.com." When I did a further
8 investigation of the computer, I realized it
9 really had no value at that point.
10    Q  And you didn't look at any other
11 computers in any other offices other than Orlando?
12    A  Correct, correct. Just that day.
13    Q  Now, during any of your investigation
14 have you seen any e-mails being sent on the
15 Firebird system that had the video as an
16 attachment?
17    A  What video are you referring to?
18    Q  In general when I say "video," it's the
19 video or a part of the video involving the
20 accidental discharge.
21    A  You're not talking about the original
22 footage, I guess.

Page 36

1     Q  Yeah, a copy of it.
2     A  No, I haven't seen that. I've seen
3 e-mails that have clips.
4     Q  Yes.
5     A  Yes, I've seen that.
6     Q  And how did it come about that you saw
7 those?
8     A  Just from looking at the different
9 e-mails and doing my examination of individuals'
10 Internet histories.
11    Q  All right. Now, how did you get the
12 e-mails?
13    A  Well, the video I found really came from
14 working on a completely unrelated case. I was
15 working a case, searching their video files and
16 documents, and I came across a copy of the -- of a
17 video that had the accidental discharge. And then
18 I determined how that person received it. And
19 they received it through an e-mail. Then I
20 tracked it back to that person that sent the
21 e-mail.
22    Q  Is there only one instance where you were

Page 37

1 able to track an e-mail that way or are there
2 other e-mails as well?
3     A  I tracked two back that way.
4     Q  What I'm wondering, Mr. Gregg, the
5 e-mails that you tracked, how did it come about,
6 other than the one you described that was
7 serendipity, how did it come about that you knew
8 about the e-mails? Was it a result of some
9 computer analysis or did Mr. Reinke tell you or --
10       MR. PHIPPS: Objection, misleading.
11       THE WITNESS: No. I guess I need to go
12 back a little bit. Part of this early on when I
13 did the research on the Internet and tried to
14 determine the origin of the video and when the
15 video first appeared, by doing that, I was able to
16 find the video; but, more importantly, find the
17 names that were associated to the video, what
18 people were calling the video.
19       So once I had the name of the video file,
20 what I believed what people were calling it, I
21 took that name, and as I would go through and
22 search somebody's e-mail account, I would look for

Page 38

1  that video file name.
2      As an example, if the video was called,
3  you know, "Joe" and you name it "Bob," then I'm
4  not going to see it. So I would look for the
5  videos called "Joe."
6      So in this case that's what I did. As I
7  was given names of different people to look at
8  their e-mails, I would go through their e-mail,
9  look for that specific file name. As I came
10 across it or didn't come across it, as the case
11 may be, that's how I -- and then I didn't find
12 anything. I was working on another case, again,
13 completely unrelated, and that file name, as I was
14 searching through their videos, just popped up and
15 I saw it. And I recognized, wait a minute, this
16 is one that I worked on another case.
17 BY MR. MEYTHALER:
18     Q  What are the types of file names that you
19 would --
20     A  For the video?
21     Q  Yes.
22     A  MOS-MD-DEMO, was one of the file names.

Page 39

1  That was really the major file name that I looked
2  for.
3      Q  Now, this file name, is this a file name
4  that was used by people using the Firebird, or was
5  it something on the Internet?
6      A  Whoever created that video, that's the
7  file name that they named it. It's no different
8  than when you create a document, you give it a
9  file name. Whoever created that version gave it
10 that file name. And that's what I saw being
11 e-mailed around.
12     Q  Where did you see it being e-mailed
13 around?
14     A  Well, that's the e-mail that I found
15 through Kimberly Chase had e-mailed. That's
16 originally when I first saw it.
17     Q  Was this on a DEA Firebird system?
18     A  It would be internal to our system,
19 correct. It would be internal to DEA Firebird.
20     Q  Now, how was it that, other than
21 Ms. Chase -- is she a DEA agent by the way?
22     A  I believe so.

Page 40

1      Q  And what office was she in?
2      A  I don't recall where she was.
3      Q  How were you able to look at people's
4  e-mails?
5      A  What do you mean, how --
6      Q  Well, you said you were checking e-mail
7  accounts or e-mail files.
8      A  Right.
9      Q  I mean, how can you do that?
10     A  How can I do that?
11     Q  I mean, can you sit at your office and do
12 that, or do you have to go out and look at
13 someone's computer?
14     A  No. Your e-mail is stored -- within the
15 Firebird network, I mean, with any system, it
16 depends on your system, your e-mail is stored on
17 what's called an exchange server. And that's
18 where your e-mail resides. As e-mail sits on your
19 exchange server, if I'm asked to look into
20 Mr. Paige's e-mail or whomever's e-mail, then they
21 have to extract that data from the exchange server
22 and they give that data to me at that point and I

Page 41

1  examine that data.
2      So this is not like I'm sitting here live
3  watching you send an e-mail back and forth, no.
4  I'm taking the data after it's been extracted from
5  our Firebird network and then I examine that.
6      Q  All right. So one thing you did was to
7  examine the CPUs that you made mirror images of
8  from Orlando?
9      A  Correct.
10     Q  But in addition to that, you also
11 examined e-mails that were extracted from this
12 exchange server?
13     A  Correct.
14     Q  And whose e-mail was it that you
15 examined?
16     A  I don't recall the whole list. Off the
17 top of my head, Kimberly Chase, obviously, was one
18 of them. Mr. Paige's e-mails. I really don't
19 recall the whole list of people.
20     Q  How many people did you examine?
21     A  To give you a fair -- I would say it's
22 definitely more than 15. I really don't know how

Page 42

1  many people.
2      Q  Now, have you prepared any sort of report
3  on all of this?
4      A  I had prepared two reports back in August
5  of '06, I think it was, the first one.
6      Q  And these were the results of --
7      A  Well, the first report, the DEA 6, was as
8  a result of the trip to Orlando, and I really
9  forget what exhibits that report included.
10     And then the second report, the DEA 6,
11  was several months later. And I think that
12  included three additional exhibits. Again, I
13  don't recall exactly what exhibits they were. And
14  that's the only two reports that I generated.
15     Q  Well, what sorts of exhibits are we
16  talking about here?
17     A  They were the N-1 and N-2.
18     Q  Okay.
19     A  Then the e-mail data. I think there were
20  some various CDs I was asked to look at. That was
21  about it.
22     Q  Now, on the -- when you examined

Page 43

1  Mr. Paige's e-mails, did you find any references
2  to the video or a clip of the video of the
3  accidental discharge?
4      A  No.
5      MR. PHIPPS: Objection, vague.
6  BY MR. MEYTHALER:
7      Q  Did you find anything in Mr. Paige's
8  e-mails that would cause you to suspect that
9  Mr. Paige himself disclosed the video to anybody?
10     A  No.
11     Q  Now, do you recall if you examined the
12  e-mail for Mr. Gruden, Peter Gruden?
13     A  You know, yeah, I'm pretty sure I did.
14  Again, I don't recall the exact list of names, but
15  that name does sound very familiar, so I would
16  have to think I probably do.
17     Q  Who gave you the names.
18     A  Two ways. A lot of the names would come
19  up -- Mr. Reinke would give me a list of names,
20  but as I would do the investigation, and when I
21  started to look at, for instance, Kimberly Chase's
22  e-mail, that in itself would spawn off a list of

Page 44

1  names because as I would try to backtrack certain
2  things.
3      Q  Did you check the e-mail for Mr. Derek
4  Maltz?
5      A  That name doesn't sound familiar, so I
6  don't know.
7      Q  Did you check the e-mail for Mr. Gregory
8  White?
9      A  I don't recall that name either.
10     Q  Did you check the e-mail for a Mr. Kevin
11  Clark?
12     A  I don't recall that name.
13     Q  Did you check the e-mail for a Mr. Jeff
14  Shafer?
15     A  I checked the e-mail for a Shafer, but
16  I'm not sure of the first name. What's the
17  spelling of his last name?
18     Q  S-h-a-f-e-r.
19     A  No. Different Shafer.
20     Q  I'm pretty sure there's just one F.
21         Did you check the e-mail for Steve
22  Collins?

Page 45

1      A  I don't recall that name either.
2      Q  Did you check the e-mail for anyone in
3  the Miami office?
4      A  I would have checked quite a few people
5  in the Miami office. I don't recall the names. A
6  lot of the names were given to me. I don't know
7  where they are assigned. If you said some of the
8  names I could possibly say yes or no.
9      Q  Did you check the e-mail for
10  Mr. Naughton, N-a-u-g-h-t-o-n?
11     A  I don't recall that name either.
12     Q  Did you check the e-mail for Mr. Kevin
13  Scully, S-c-u-l-l-y?
14     A  That name sounds familiar.
15     Q  That means you might of, it doesn't mean
16  you did it?
17     A  Yeah, it doesn't mean I did it. There's
18  two problems. This has been awhile ago, so a lot
19  of this is going to be names sound familiar. I
20  really don't recall who I did or didn't do on this
21  list of names.
22     Q  Did you check the e-mail for Richard

Page 46

1  Dearing?
2     A  That name doesn't sound familiar.
3     Q  Do you know who he was?
4     A  No.
5     Q  Did you check the e-mail for Mr. Inscore?
6     A  Again, doesn't sound familiar.
7     Q  Now, in checking any of this e-mail, to
8  what extent did you find, if any, reference to or
9  attachments including the video of the accidental
10 discharge?
11    A  Through the videos, you know, obviously
12 with Mr. Paige's videos, I found reference to
13 people talking about the video. I think Mr. Paige
14 received a couple e-mails from people advising him
15 that this video has been showing around. I found
16 talk in general like that about the video clip.
17 As far as anything else, that was about it.
18    Q  Did any of the e-mails you examined have
19 the video attached to it?
20    A  Yes.
21    Q  And how many such videos -- I mean, how
22 many such instances did that occur during your

Page 47

1  part of the investigation?
2     A  Well, again, when I work -- when I found
3  the e-mail for agent Chase, I really don't recall
4  how many people it had gone through. I just went
5  back to her. So that reference to the video clip
6  was found on her e-mail and one other e-mail. So
7  I guess I'm looking at it backwards, you're
8  looking at it forwards.
9     Q  Let's do it your way.
10    A  I would say I only found one instance
11 then.
12    Q  One instance of a chain?
13    A  Right.
14    Q  And there may be other instances where
15 you saw the video but it was all part of the same
16 chain?
17    A  It appeared to be, yeah. So it's easier
18 to explain it that way than to try to keep going
19 backwards.
20    Q  I agree. That's fine.
21       Now, in addition to examining the
22 e-mails -- where do you do that from, by the way,

Page 48

1  from your office?
2     A  Yes.
3     Q  How is that provided to you? Is it --
4  does somebody send it to you over the computer or
5  provide you --
6     A  What happens is when they pull -- when
7  this mail is extracted from the exchange server,
8  it's saved on a share drive. And at that point
9  that file is called a PST file and then what I do
10 is I go out and take a PST file off the share
11 drive and copy it over to my computer and then
12 process that PST file using forensic software.
13    Q  Who actually does that for you?
14    A  I do that.
15    Q  Oh, you do it?
16    A  I pull it off and do it.
17    Q  You actually extract the e-mails?
18    A  No, no, ni, I'm sorry. The local FIRS,
19 whoever that FIRS is in that office or wherever it
20 is that handles their exchange server would get
21 the request.
22    Q  FIRS?

Page 49

1     A  That's through our Firebird, the managing
2  of the Firebird network.
3     Q  What does FIRS stand for? Is that an
4  acronym, FIRS?
5     A  FIRS, Firebird something. I just call
6  them FIRS.
7        But they would pull the e-mail off the
8  exchange server for me and then save it to the PST
9  file format, and then at that point, that's when I
10 extract it.
11 BY MR. MEYTHALER:
12    Q  All right. Now, you looked at the
13 e-mails. You made the trip to Orlando. You
14 examined the mirror images, you prepared two
15 reports. Is there anything else you did? I guess
16 you examined some CDs or DVDs?
17    A  Correct.
18    Q  Anything other than that, is there
19 anything else that you did?
20    A  Just the -- that's about it.
21    Q  And you did some work on the Internet?
22    A  Correct.

Page 50

1  Q  Now, what CDs or DVDs did you examine?
2  A  I guess it was the CDs. I don't, again,
3  recall the exact exhibits. I think somewhere out
4  of Orlando, possibly some were labeled "Miami."
5  Q  Were these all N exhibits?
6  A  Yes.
7  Q  They were provided to you by Mr. Reinke?
8  A  Yes.
9  Q  And then you did some work on the
10  Internet?
11  A  Yes.
12  Q  And what did that consist of?
13  A  Basically trying to determine when the
14  video first appeared on the Internet.
15     Well, let me rephrase it, when a
16  reference to the video first appeared on the
17  Internet was really my goal.
18  Q  And what were the results?
19  A  It appeared to be from what I determined,
20  the first week in March of '05 is when the first
21  reference to the video containing the discharge
22  started to occur.

Page 51

1  Q  Now, when you say "reference to it," does
2  that mean a copy of the video being on the
3  Internet?
4  A  Correct. Even people talking about it --
5  prior to March of '05, there was obviously people
6  on the Internet talking about the accidental
7  discharge, but nobody that I could find was
8  actually referring to any video actually showing
9  the accidental discharge. And all of a sudden
10  March, that activity started, the people started
11  talking about, Hey, people having different links
12  to the video clip or to versions of the video
13  clip. And that occurred back in that first week
14  in March.
15  Q  And that was on the Internet?
16  A  Yes.
17  Q  Did you find any references to the video
18  earlier than the earliest reference you found on
19  Firebird?
20  A  Say it one more time.
21  Q  What's the earliest reference on Firebird
22  that you found with respect to the video?

Page 52

1  A  March 7th.
2  Q  And was that Kimberly Chase?
3  A  No. That was Leon Palmer.
4  Q  And what is the earliest reference you
5  found on the Internet to the video?
6  A  Sometime that first week, it was in that
7  first week of March. I can't pinpoint down an
8  exact date.
9  Q  Is that because you can't remember or
10  never was able to?
11  A  No. I was never able to. Everything
12  that I determined, nothing was -- the day that I
13  looked at -- I was confident that it happened the
14  first week of March, but I couldn't pinpoint it
15  down to a day. A lot of the Internet history
16  going back, historical records, just won't allow
17  me to point to a specific date.
18  Q  Now, you said that Leon Palmer made a
19  reference to it on March 7th?
20  A  Correct.
21  Q  Is he a DEA agent?
22  A  I believe so.

Page 53

1  Q  And can you determine from your
2  investigation from where Mr. Palmer received the
3  video?
4  A  No.
5  Q  Why is that? Why can't you do that?
6  A  At this point I haven't been able to
7  figure it out. I haven't examined his e-mails at
8  this point. So I don't know how he obtained the
9  video or anything about it.
10  Q  Would that help you determine where it
11  originally came from?
12  A  Again, this is an incident that occurred
13  in '05. So that e-mail data realistically is
14  going to be marginal. You know, we're talking
15  almost three years later. Is it going to be here,
16  I don't know. That's a hard question to answer.
17  Q  Have you talked to Mr. Reinke about
18  trying to track that back?
19  A  I sent an e-mail advising that this
20  person had sent an e-mail containing the video
21  clip.
22  Q  Would the information have been more

Page 54

1 readily available if this had been looked at back
2 in March of 2005?
3     A   Again, it's hard to say. Computer
4 evidence, e-mails, anything is very volatile. So
5 that's a hard thing to answer. The data that
6 could potentially have been available in '05, it's
7 really unknown if the person deleted his e-mail, I
8 mean, it's hard to say.
9         So has anything been lost because it has
10 taken so many years to look at it? That's a
11 question none of us will ever be able to answer.
12     Q   You say e-mail is volatile, what do you
13 mean?
14     A   As you receive an e-mail, if you delete
15 it as soon as you get it and clean up -- if you're
16 one of these people that clean up your e-mail
17 every single day and you're anal about keeping
18 things clean and deleted, it's not going to be
19 there. It wouldn't have been there the next day
20 more or less two years ago. So that's what I'm
21 saying, it's hard to say what -- if there was
22 anything lost, and I really don't know the answer

Page 55

1 to that.
2     Q   Now, other than trying to locate
3 information about the video involving Mr. Paige,
4 did you look at the mirror images for any other
5 type of information?
6     A   I was asked to later on, I was asked to
7 look at them again for additional information.
8     Q   All right. And what type of information
9 were you asked to look for?
10    A   Any type of pornographic images or
11 fantasy football.
12    Q   Did you find any reference to that?
13    A   No.
14    Q   And did you have to use key words to look
15 for pornography?
16    A   That was based more on a search of the
17 pictures. So that's what I examined were picture
18 files, JPEGs, you know, GIFs, image files.
19    Q   Now, were you able to examine every image
20 file in these two?
21    A   Never say all of them. I don't know. I
22 examined what I could see, you know. Based on my

Page 56

1 search, I didn't find any files that contained
2 pornographic images that I saw.
3     Q   I guess what I'm wondering, and I don't
4 want to spend much time on this.
5     A   That's fine.
6     Q   I would have thought that if you had the
7 images of two computers there'd be a lot of
8 potential pictures on there.
9     A   Oh, there were a lot of pictures.
10    Q   How can you know what ones to look at?
11 You can't look at all of them, can you?
12    A   Yes. Well, let me rephrase that, I don't
13 want to say I can look at all. I can --
14    Q   A vast majority, for example?
15    A   When I load the image files into the
16 software that I use, that software will recognize
17 different formats, whether it be a JPEG or a GIF,
18 you know, different formats of the file, whether
19 it be a big picture, small picture.
20        So of the files that my software
21 recognized, those are the ones that I viewed. And
22 of the ones that I viewed, I didn't see any

Page 57

1 pictures that appeared to be pornographic. As far
2 as the fantasy football, that was more done on key
3 word searching of Internet history, as well as
4 looking at image files, like for example, a key
5 word would be "fantasy football," you know,
6 "fantasy." And I don't recall finding anything
7 like that either.
8     Q   Do you know which computers these mirror
9 images of -- wait. My question got convoluted
10 there.
11        Do you know which computers in Orlando
12 you made mirror images of? Is there some way to
13 identify saying, this is the computer from this
14 location?
15    A   Mr. Reinke could because he has a list.
16 I think he has a list that cross-references N-1 to
17 whomever, N-2 to whomever. I'm sure at one point
18 I knew. I don't recall off the top of my head.
19    Q   All right. Let me hand you Exhibit 45.
20    A   Uh-huh.
21    Q   Now, this and the next three exhibits
22 were provided to us yesterday by Mr. Phipps.

Page 58

1   A  Right.
2   Q  Now, for example, on -- what is
3   Exhibit 45?
4   A  Exhibit 45 is an e-mail that Christopher
5   Thompson received -- well, he sent it to Marcus
6   Brown and Kathleen Gilbert. And this is the --
7   what this represents was the case I was working
8   involved Marcus Brown.
9       So while I was examining Marcus Brown's
10  e-mail account -- e-mail activity, I located this
11  e-mail that said, "Shooting your own leg,
12  priceless." And if you notice on the third page
13  of this document, it shows the attachment was
14  MOS-MD-DEMO.wmv, and that contained the following
15  of interest to me.
16      So what I did when I saw this, I
17  backtracked who had sent this because if you look
18  in the subject line, it says "FW," so that would
19  imply that it had been forwarded by many people.
20      So I kept backtracking to figure out who
21  sent this e-mail. Remember, I said it's confusing
22  when you asked how many people had it. And as I

Page 59

1   backtracked it, I come to page 2 which shows
2   Kimberly Chase.
3       And at that point in time that I found
4   this -- I don't recall the exact date that I found
5   this, but at that point in time, this was the
6   first incidence that I found of this video clip
7   MOS-MD-DEMO appearing on the Firebird network.
8       So Kimberly Chase had sent this out to
9   however many people listed here: one, two, three,
10  four, five people. So I was more concerned with
11  Kimberly Chase since she was the origin.
12  Q  Has anyone talked to Kimberly Chase about
13  where she got this?
14  A  You'd have to ask Mr. Reinke if he talked
15  to her at all.
16  Q  Marcus Brown, is he a DEA agent?
17  A  Yes, I believe so.
18  Q  And do you know if Kathleen Gilbert is a
19  DEA agent?
20  A  I don't know.
21  Q  Now, in between, there's a person named
22  Maranello, or first name Steve, do you happen to

Page 60

1   know whether he was a DEA agent?
2   A  Anybody between this list, I didn't look
3   at. Because it had no value because as I went
4   through this, I was more concerned with the
5   origin, who started it. So I didn't worry about
6   the people in the middle. And that's what brought
7   me back to Kimberly Chase. So I was focused on
8   Kimberly Chase.
9   Q  Can you tell from this document that the
10  original message from Kimberly Chase was sent to
11  the people to whom she sent it over Firebird?
12  A  Yeah, this is definitely through
13  Firebird.
14  Q  Everything on here?
15  A  Well, again, I can't tell you -- well,
16  actually I can. Yeah, all these e-mail accounts
17  here are Firebird.
18  Q  What about the -- let's just go to the
19  first one.
20  A  Kimberly?
21  Q  Yes. Let's go to Kimberly. It says here
22  it was sent to, among other people, Michael

Page 61

1   Grossman. And then above it there's a -- you can
2   see where Michael Grossman has sent it to other
3   people, correct?
4   A  Correct.
5   Q  So you can tell from here that the e-mail
6   sent to Michael Grossman was over Firebird?
7   A  Yes.
8   Q  Now how about the -- she sent e-mail also
9   to Edwin R. Outlaw?
10  A  Correct.
11  Q  Can you tell whether that was sent over
12  Firebird?
13  A  It would appear that all these names were
14  Firebird, and the reason why, if wasn't Firebird,
15  typically what would happen -- I say
16  "typically" -- if it's not Firebird, if she had
17  sent something to Edwin Outlaw, let's say, at a
18  Yahoo account, it would have spelled out
19  EdwinOutlaw@yahoo.com, but since it's internal to
20  Firebird, it doesn't need the whole extension of
21  the e-mail address because it's all internal. So
22  you'll just see it listed by name.

Page 70

1  accounts, that brought me back to this original
2  e-mail from Reginald Williams. But that's outside
3  our Firebird net.
4     Q  What does cop.wmv stand for?
5     A  Just a file name. Somebody must have
6  called it that.
7     Q  I see then to the left of it, there's --
8     A  Temp file?
9     Q  A temp file, I guess, as you just called
10  it.
11     A  That's this right here, it's just the
12  HTML.
13     Q  But there's that's that little symbol
14  right before TMP, what is that?
15     A  Oh, Internet Explorer.
16     Q  Okay.
17     A  I'm sorry. Right here? You mean this
18  right here?
19     Q  Yeah. It looked familiar to me, now I
20  understand why.
21     A  Internet Explorer. Yeah, that's all it
22  is. But the print, it's kind of hard to tell.

Page 71

1     Q  Do you know what agency uses the e-mail
2  ED.gov?
3     A  I think it was -- if I recall, it was
4  Department of Education. But, again, I'm not
5  100 percent sure.
6     Q  Now, right below that it says, "Can you
7  believe that?" Now, who is that message written
8  by? Is that by Mr. Williams?
9       MR. PHIPPS: Objection, foundation.
10       THE WITNESS: You know, I really don't
11  know. Again, the e-mail says it's from Reginald
12  Williams. And in the body of the e-mail it says,
13  "Can you believe that?" So whomever sent this
14  e-mail would have typed this.
15  BY MR. MEYTHALER:
16     Q  And the person that sent this e-mail was
17  Mr. Williams?
18     A  Yeah, based on this name, uh-huh.
19     Q  Next is Exhibit 47. And this is the
20  e-mail chain that you referred to earlier
21  involving Mr. Palmer?
22     A  Right. This is why the name Shafer

Page 72

1  sounded familiar. It's the very first name on
2  here.
3      Go to page 1. Remember I asked you to
4  spell Shafer? That's why I recognized the name.
5     Q  I see.
6     A  Yeah. This is another case I was working
7  on involving John T Murray. Again, I found, from
8  locating this e-mail, what was interesting to me
9  about the e-mail was the subject line was
10  identical to the subject line of Kimberly Chase's
11  e-mail. And the attachment had the same file
12  name.
13     Q  All right. Now, help me with that. I'm
14  going to go back to Exhibit 45 here.
15     A  Okay.
16     Q  I see. The subject line is the very
17  same.
18     A  Yes. And then if you go to page 3 of
19  Exhibit 45.
20     Q  Okay.
21     A  And if you go to page 3 of Exhibit 47,
22  the file names of the attachments were the same.

Page 73

1     Q  Oh, down here.
2     A  Go up one line, go up, up, up. There,
3  see it?
4     Q  Now, I can look and see for myself but do
5  you know if there's any --
6     A  Right. So then what I did -- remember I
7  said the hash? I compared the hash of both these
8  files and they were, in fact, identical.
9     Q  The same file?
10     A  Yes. The file that is in attachment --
11  or Exhibit 45 is identical to the file that's
12  located in attachment 47.
13     Q  So that means that it came from this --
14     A  The same origin.
15     Q  The same electronic file, wherever it was
16  stored?
17     A  Wherever it was stored, yeah.
18     Q  But you don't know where it was stored?
19     A  No.
20     Q  All right. Now, do you know if there's
21  anyone in this chain that's related to -- was
22  there any cross-referencing? I don't want you to

Page 74

1  look now. If you didn't look, fine.
2      A  No, I didn't look. All I was concerned
3  about was the original one. I went back to the
4  first. And in his case, he was the first. That
5  takes you back to Leon Palmer.
6      Q  And this is the earliest reference you
7  had found on the Internet at 4:10 p.m. on March 7?
8      MR. PHIPPS: Objection, misleading.
9      THE WITNESS: Not the Internet.
10  BY MR. MEYTHALER:
11     Q  I mean Firebird. I'm sorry.
12     A  As of this date, this is the earliest
13  reference. During the time frame in which I
14  looked at Kimberly Chase's, that was the earliest.
15  And now this has become the earliest.
16     Q  Now, can you tell at all whether the
17  attachment to this e-mail originated through the
18  Firebird?
19     A  I don't know.
20     Q  It could have originated -- someone could
21  have gotten on the Internet and then sent it
22  through the Firebird, is that correct?

Page 75

1      A  You mean how did Mr. Palmer receive it?
2      Q  Yes.
3      A  I have no clue at this point how he
4  received it.
5      Q  And has anyone interviewed Mr. Palmer?
6      A  Again, I'm not privy to that information,
7  so I don't know.
8      Q  Now, Mr. Palmer could have gotten this
9  from any number of sources, he could have had a
10  CD, he could have had a DVD, he could have gotten
11  it off the Internet, he could have gotten it off
12  the Firebird Internet?
13     A  I agree, yeah.
14     Q  All right. So Mr. Palmer's e-mail chain
15  and Ms. Chase's e-mail chain just came across on
16  working on unrelated cases?
17     A  Exactly.
18     Q  And the chain involving Ms. Lattimore you
19  developed during the investigation of this
20  particular video, is that correct?
21     A  This one here?
22     MR. PHIPPS: 46.

Page 76

1      THE WITNESS: Yes, this one here, 46?
2  BY MR. MEYTHALER:
3      Q  Yes.
4      A  Yes.
5      Q  And you got that from examining
6  Mr. Paige's e-mail accounts?
7      A  I honestly don't recall if I got it from
8  examining his e-mails accounts or from examining
9  Lattimore's accounts. I don't really recall which
10  one I got it from.
11     Q  Do you recall if Mr. Reinke told you that
12  Mr. Paige's attorney has pointed out that
13  Ms. Lattimore e-mailed Mr. Paige and that's where
14  you got it?
15     A  I don't recall where -- which e-mail
16  account I got this one from.
17     Q  Let me hand you Exhibit 48.
18     A  Uh-huh.
19     Q  Now, did you obtain these e-mails?
20     A  From Mr. Crawford or Mr. Paige's account?
21     Q  Yes.
22     A  I don't recall which one. I really don't

Page 77

1  recall if I got it from Mr. Crawford's account or
2  Lee Paige. I don't recall.
3      Q  All right. Now, we've looked at, I
4  think, three basic chains of e-mails, one
5  involving Mr. Palmer, one involving Ms. Chase, one
6  involving Ms. Lattimore. Are there any others
7  that you're aware of?
8      A  Well, involving which video clip?
9      Q  Any video clip of the accidental
10  discharge.
11     A  No. I mean, involving MOS-MD video clip,
12  the only chain I'm aware of is the one of Leon
13  Palmer and Kimberly Chase is the only one
14  that's -- and I would assume that Kimberly Chase's
15  e-mail is sort of in that family tree of the Leon
16  Palmer one, it extended from something from that.
17     Q  But are you aware of any instances on
18  Firebird where the video clip has been circulated
19  regardless of its source?
20     MR. PHIPPS: Objection, vague.
21     THE WITNESS: Prior to that date or --
22  BY MR. MEYTHALER: