Page 1

IN THE FEDERAL DISTRICT COURT

IN THE DISTRICT OF COLUMBIA

------------------------------:

LEE PAIGE,                     :

                              :

          Plaintiff, :

         v                     : CASE NO:

                              : 1:06CV 00644-EGS

DOJ and DEA,                   :

                              :

          Defendant.:

------------------------------:


                              Washington, D.C.

               Monday, November 5, 2007


Deposition of:

          PETER GRUDEN


called for oral examination by counsel for

Plaintiff, pursuant to Notice, at the US DOJ Civil

Division, Federal Programs, 200 Massachusetts

Avenue, Northwest, Washington, D.C., before Mary

E. Warner of Capital Reporting, sworn by a Notary

Public in and for the District of Columbia,

beginning at 9:05 a.m.

PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®
178

Capital Reporting Company

Page 2

APPEARANCES

1
2
3   On Behalf of the Plaintiff:
4       WARD A. MEYTHALER, ESQUIRE
5       Law Offices of Merkle & Magri, P.A.
6       5415 Mariner Street, Suite 103
7       Tampa FL 33609
8       (813) 281-9000
9
10  On Behalf of the Defendants:
11      PAUL A. DEAN, ESQUIRE
12      PHILLIP B. SCOTT, ESQUIRE
13      U.S. Department of Justice
14      20 Massachusetts Avenue, N.W.
15      Washington, D.C. 20530
16      (202) 514-1280
17
18  ALSO PRESENT:
19      Lee Paige
20
21          * * * * * *
22

Page 3

CONTENTS

1
2   EXAMINATION BY                      PAGE
3     Counsel for Plaintiff        4
4     Counsel for Defendants       239
5
6   PETER GRUDEN DEPOSITION EXHIBITS    PAGE
7   1 Report of Investigation      209
8   2 DV, N-11                     221
9   3 Redacted Form                104
10  4 Redacted Form                163
11  5 TDK Disk                     221
12  6 Imation Disk                 222
13  7 Imation Disk                 223
14  8 VHS Tape, N-7                224
15  9 VHS Tape, N-10               225
16  10 Memo, 7/9/04                31
17
18
19
20
21
22

Page 4

1              PROCEEDINGS
2   WHEREUPON,
3              PETER GRUDEN
4   called as a witness, and having been first duly
5   sworn, was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR PLAINTIFF
7   BY MR. MEYTHALER:
8       Q  This is a deposition in the case of Paige
9   versus the DEA deposition of Peter Gruden.
10          Would you state your name for the record?
11      A  Peter Gruden, G-r-u-d-e-n.
12      Q  Have you given depositions before?
13      A  I have.
14      Q  If you have any questions about what I
15  say, don't be afraid to ask.  If you need
16  clarification, don't be afraid to ask me.  In that
17  connection, you can't nod your head, you have to
18  say yes or no.
19      A  Okay.
20      Q  How old are you, Mr. Gruden?
21      A  I am 40.
22      Q  Do you live in the Washington, DC area?

Page 5

1       A  I do.
2          MR. MEYTHALER:  Peter, I don't want to
3   ask him his address.  When there's trial
4   subpoenas, how does that work, you guys accept
5   them?
6          MR. PHIPPS:  That's what we'll do.  We'll
7   accept those.  If you want to ask him his work
8   address, we can suffice for that.
9   BY MR. MEYTHALER:
10      Q  What is your work address?
11      A  700 Army Navy Drive, in Arlington,
12  Virginia, 22202.
13      Q  Are you married, sir?
14      A  I am.
15      Q  How long have you been married?
16      A  16 years.
17      Q  Is that your first wife?
18      A  Yes.
19      Q  What is her name?
20      A  Judy.
21      Q  Which office are you now with?
22      A  I am at DEA headquarters.

(866) 448-DEPO
www.capitalreportingcompany.com                    (C) 2007

Capital Reporting Company

| Page 50 | Page 52 |
|---|---|
| 1    MR. PHIPPS: Objection. | 1    A  Not really. I didn't have a call detail |
| 2    THE WITNESS: Yes. | 2  of the records -- I don't believe I had a call |
| 3  BY MR. MEYTHALER: | 3  detail of the records. I did ask him to turn his |
| 4    Q  Yes? | 4  phone in until he came back to work full time. |
| 5    MR. PHIPPS: I'm going to object. It's | 5    Q  And why was that? |
| 6  irrelevant to this proceeding. | 6    A  Well, because his minutes were just |
| 7  BY MR. MEYTHALER: | 7  through the roof and I was getting a lot of |
| 8    Q  Unless he directs you not to answer — I | 8  pressure from my boss and Miami field management |
| 9  guess you've already said yes. I'll go to the | 9  about the cell phone bill. |
| 10  next question since you already answered it. What | 10    Q  Who is your boss in Miami division |
| 11  are the other incidents that you're referring to? | 11  management? |
| 12    A  During the month of April 2004, the Miami | 12    A  That would be Steve Collins's boss, Jim |
| 13  field division received its cell phone bills. | 13  Capra. |
| 14  They sent out a request wanting to know who had | 14    Q  Who was giving you heat, Mr. Capra or |
| 15  the -- who had the highest number of minutes on | 15  Mr. Collins? |
| 16  their cell phone. There was one for Orlando which | 16    A  Mr. Collins. |
| 17  was approximately 2,000 or 2,100 minutes. It | 17    Q  Did you check to see what the minutes |
| 18  ended up being Lee's. I was asked to get some | 18  were for? |
| 19  type of explanation as to why his cell phone bill | 19    A  I simply asked Lee, I asked him what they |
| 20  would be so high during a month where he wasn't at | 20  were for. |
| 21  work. | 21    Q  And based on what he told you, you took |
| 22    Q  What month was that? | 22  his phone away? |

| Page 51 | Page 53 |
|---|---|
| 1    A  The month of the cell phone bill was | 1    A  Just until he came back to work. |
| 2  April. | 2    Q  Any other incidents that you were having |
| 3    Q  April of what year? | 3  difficulty handling? |
| 4    A  April of 2004. | 4    A  The issue with the cell phone actually |
| 5    Q  So this was the month after the | 5  continued in that when he turned in the phone, he |
| 6  accidental discharge? | 6  turned in his government phone but with a |
| 7    A  The month that follows, yeah, that the | 7  different sim card in the phone. |
| 8  accidental discharge fell on. | 8    Q  Okay. And then what happened with |
| 9    Q  Okay. | 9  respect to that? |
| 10    A  He got very upset with me when I | 10    A  Well, I asked him or rather — I did ask |
| 11  questioned him about the number of minutes. | 11  him for the sim card back, because that was what |
| 12    Q  Well, did he tell you why he was upset? | 12  the phone operated on. |
| 13    A  He thought I was messing with him. | 13    Q  And did he give it to you? |
| 14    Q  Did he tell you why his cell phone bill | 14    A  Yes. |
| 15  was high? | 15    Q  All right. What's the difficulty with |
| 16    A  He said he had been talking to | 16  that? |
| 17  Washington. | 17    A  The difficulty is that the whole purpose |
| 18    Q  By Washington, you mean the DEA in | 18  of turning the cell phone in would be to keep his |
| 19  Washington? | 19  minutes down. And if he still had the sim card |
| 20    A  I was led to believe that, yes. | 20  and was simply using it in a different phone, than |
| 21    Q  Anything else about the cell phones that | 21  it wouldn't -- that would defeat the purpose of |
| 22  bothered you? Did you look into it further? | 22  asking for his phone back. |

(866) 448-DEPO

www.capitalreportingcompany.com                    (C) 2007

Capital Reporting Company

Page 54

1    Q  Did he tell you why the phone he gave you
2  did not have the sim card in it?
3    A  He told me he needed his sim card so that
4  he could have the numbers that were stored on the
5  sim card available.
6    Q  For what?
7    A  I suppose he could -- he had these
8  numbers so he could use them.
9    Q  All right.  Any other incidents that you
10  could not get a handle on?
11    A  There was an incident where Lee was
12  apparently stopped by the Windermere police
13  department for speeding and running a stop sign.
14  I got a call from the chief of police in
15  Windermere who told me about the incident and
16  basically told me that he didn't appreciate the
17  fact that Lee had given his officer a hard time.
18    Q  All right.  Now, did you talk to Lee
19  about that before you did this performance
20  evaluation?
21    A  No, no, Lee, I believe -- no, I found out
22  about with this, I think shortly before he

Page 55

1  transferred to the other group.
2    Q  And when did he transfer to the other
3  group?
4    A  Sometime right around July 1st of '04.
5    Q  Okay.  And what's the name of the chief
6  of police at Windermere?
7    A  I don't know off the top of my head.
8    Q  Did you talk to Lee Paige at all about
9  that particular incident involving the Windermere
10  police?
11    A  I don't believe so.
12    Q  Now, he had transferred by the time that
13  you had heard about that report, that incident?
14    A  I don't believe so.
15    Q  All right.  So he had not yet
16  transferred?
17    A  No.
18    Q  All right.  So it would have been prior
19  to July of 2004?
20    A  No.
21    Q  Did you talk to Lee about it?
22    A  No.

Page 56

1    Q  But the incident occurred after you
2  prepared the report?
3    A  No.
4    Q  All right.  Any other incidents that you
5  could not get a handle on?
6    A  None come to mind, no.
7    Q  What did the chief of Windermere say that
8  Lee Paige did?
9    A  I don't remember the exact words he said
10  that when the officer stopped Lee, Lee made some
11  kind of scene.  I don't know the details exactly
12  of what happened.
13    Q  And did you do anything to find out what
14  Lee Paige's story was to that incident?
15    A  No.
16    Q  Why did you assume that he had done
17  something wrong?
18    A  I assumed that he had -- well, I based on
19  my -- that story on what I was told by the chief
20  of police.
21    Q  But why would you believe the chief of
22  police without asking Lee what happened?

Page 57

1    A  Perhaps I should have.
2    Q  Who is Robert Paterson?
3    A  He is a section chief in the special
4  operations division for DEA.
5    Q  What was his position in April of 2004?
6    A  He was a group supervisor in the Orlando
7  task force.
8    Q  And what was the -- what was the nature
9  of your relationship with him professionally?
10    A  It was fine.  Rob was senior to me.  I'd
11  often go to him for advice.
12    Q  Did you have any social relationship
13  outside of the office?
14    A  Very little.
15    Q  Did you ever hear him make derogatory
16  remarks about Mr. Paige?
17    A  No.
18    Q  Did you ever hear Mr. Paterson make any
19  derogatory remarks about Jews?
20    A  No.
21    Q  Did you ever hear Mr. Paterson make any
22  derogatory remarks about black individuals?

15 (Pages 54 to 57)

Page 158

1  with the witness to see if it's the one we just
2  gave you.
3        MR. MEYTHALER: Sure.
4        MR. PHIPPS: I don't want to butt in.
5        MR. MEYTHALER: You can butt in, that's
6  all right.
7  BY MR. MEYTHALER:
8     Q  Mr. Phipps is handing you things that
9  were given to us this morning. Do any of those
10 have the form that you were talking about?
11    A  No, no.
12    Q  Who asked you to fill out the DEA form
13 that you sent to the firearms training unit?
14    A  No one did.
15    Q  And why did you send them a copy of the
16 disk?
17    A  Because it depicted what had actually
18 happened.
19    Q  Did you have any conversations with
20 anyone at the firearms training unit that you
21 would be sending them a copy of the disk?
22    A  Yes.

Page 159

1     Q  Who?
2     A  I believe the gentleman's name was Bill
3  Lutz.
4     Q  When did that happen?
5     A  The week of April 12th.
6     Q  Did he call you or did you call him?
7     A  I believe I called him.
8     Q  Why did you call him?
9     A  I wanted to make sure he was still the
10 section chief of the unit.
11    Q  For what purpose?
12    A  Someone to address the form and the CD
13 to.
14    Q  Did you know him before?
15    A  No.
16    Q  All right. During that conversation with
17 Mr. Lutz, what did you say to him or what did he
18 say to you?
19    A  I remember just asking him if he was
20 still in charge of the unit. He said yes. I told
21 him I would be sending the form and the disk with
22 it.

Page 160

1     Q  Did he say anything in response?
2     A  He must have. I'm not sure what it was
3  that he said.
4     Q  Did he contact you after you had sent the
5  disk and the form to him?
6     A  I don't remember.
7     Q  Did you have any communications with him
8  about whether the disk could be viewed with a
9  normal computer?
10    A  I don't recall having that conversation
11 or not.
12    Q  When you type in the form, did it call
13 for a file number to be placed in the form?
14    A  Yes.
15    Q  What file number did you put on the form,
16 if any?
17    A  It was a -- I don't recall the actual
18 number, it was a headquarters general file number
19 that's sort of used as a catchall for -- its
20 entitled something like assaults, shootings,
21 threats.
22    Q  Where did you get this number from?

Page 161

1     A  It was listed in the -- I believe the DEA
2  agent's manual.
3     Q  You found the number yourself rather than
4  asking someone else for it?
5     A  Correct.
6     Q  Why did you put a number on the form, a
7  file number?
8     A  Because I asked for one.
9     Q  Do you know what the firearms training
10 unit did with the disk that you sent to them?
11    A  No.
12    Q  Did you have any discussions with anyone
13 at the firearms training unit about that disk?
14    A  Not that I recall.
15    Q  All right. Did you send disks to anybody
16 else or provide disks to anybody else?
17    A  I am not sure if they were disks. I
18 provided copies, I believe, they were disks, yes,
19 to Miami field division management and also to
20 Chris Bowman, who was the primary -- I believe the
21 primary firearms instructor in the Orlando office.
22    Q  Let's talk first about the Miami field