UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

CASE NO.: 1:06-cv-00644-EGS

LEE PAIGE,

    Plaintiff,

vs.

UNITED STATES DEPARTMENT OF JUSTICE,

DRUG ENFORCEMENT ADMINISTRATION, ET AL.,

    Defendant.

## DEPOSITION OF LEE PAIGE

Taken on Behalf of the Defendant

VOLUME I

| | |
|---|---|
| DATE TAKEN: | December 14, 2007 |
| TIME: | 9:03 a.m. - 11:46 a.m. |
| | 12:58 p.m. - 4:17 p.m. |
| PLACE: | 300 International Parkway |
| | Suite 424 |
| | Heathrow, Florida |

Stenographically Reported by:

Delina M. Valentik,

Registered Professional Reporter

Florida Professional Reporter

Sclafani Williams Court Reporters, Inc.
1-(866) SET-DEPO (738-3376)


PLAINTIFF'S EXHIBIT 186

```
                                                    2                                                    4
 1                                                      1              PROCEEDINGS
 2   APPEARANCES:                                       2   WHEREUPON
 3   Counsel for Plaintiff:                             3              LEE PAIGE
 4       WARD A. MEYTHALER, ESQUIRE                     4   acknowledged having duly affirmed to tell the truth upon
         Merkle & Magri, P.A.                           5   his oath as follows:
 5       5415 Mariner Street, Suite 103                 6         THE WITNESS: I affirm.
         Tampa, FL 33609                                7              DIRECT EXAMINATION
 6                                                      8   BY MR. PHIPPS:
 7   Counsel for Defendant:                             9      Q.  Well, we've met before, but let me formally
 8       PETER J. PHIPPS, ESQUIRE                      10   introduce myself on the record. My name is Peter
         U. S. Department of Justice                   11   Phipps. I'm with the Department of Justice. And I
 9       Civil Division                                12   represent the defendants in this matter. I know because
         Trial Attorney                                13   you've sat in on other depositions in this case that
10       Federal Programs Branch                       14   you're familiar with depositions. Let me just go over a
         20 Massachusetts Avenue, N.W., Room 7134      15   few of the ground rules here. You have to answer orally
11       Washington, DC 20001                          16   and audibly. Do you understand that?
12                                                     17      A. Yes, sir, I do.
13                                                     18      Q. And, also, if you don't understand a question
14                                                     19   at any point in time, please let me know and I'll
15                                                     20   rephrase it. Can you agree to that?
16                                                     21      A. Yes, sir. I do.
17                                                     22      Q. Okay. Is there any reason why you can't
18                                                     23   testify truthfully and accurately today?
19                                                     24      A. No, sir.
20                                                     25      Q. Let me start with some questions about
21
22
23
24
25

                                                    3                                                    5
 1             INDEX                                    1   perspective after your accidental discharge. After your
 2   WITNESS                       PAGE                 2   accidental discharge do you consider yourself fortunate
 3   Called by the Plaintiff:                           3   to be alive?
 4   LEE PAIGE                                          4      A. Yes, sir, I do.
 5      DIRECT EXAMINATION BY MR. PHIPPS    4           5      Q. Are you thankful to be alive?
 6   VOLUME II                                          6      A. Yes, sir, I am.
 7      DIRECT EXAMINATION (CONTINUED)     204          7      Q. Do you have any new appreciation of each day
 8      CROSS-EXAMINATION BY MR. MEYTHALER  216         8   after the accidental discharge because you're still
 9   ERRATA SHEET INSTRUCTIONS             197          9   alive?
10   ERRATA SHEET                          198         10      A. No different than my convictions any other day.
11   CERTIFICATE OF REPORTER OATH          199         11   Just my convictions basically.
12   REPORTER'S DEPOSITION CERTIFICATE     200         12      Q. That existed beforehand?
13                                                     13      A. Yes.
14                                                     14      Q. Have you ever thought about how amazing it is
15          INDEX OF EXHIBITS                          15   that you survived the accidental discharge?
16   DEFENDANT'S EXHIBIT 1                 21          16      A. I'm aware of the fact that the circumstances
        (mid-year progress review)                     17   surrounding why I survived, yes. It's amazing.
17   DEFENDANTS' EXHIBIT 2                 60          18      Q. Yeah. Do you think that you're lucky to have
        (article "Hall of Shame")                      19   survived?
18   DEFENDANTS' EXHIBIT 3                 68          20      A. Absolutely.
        (letter from cub scout pack)                   21      Q. I don't know if you're religious at all, but if
19   DEFENDANT'S EXHIBIT 4                 85          22   you are, do you think that God is keeping you alive for
        (firearms/tactical qualifications)             23   some reason?
20   DEFENDANT'S EXHIBIT 5                 98          24      A. I think I was spared for a reason.
        (Orlando Sentinel article)                     25      Q. And what do you think that reason is?
21   DEFENDANT'S EXHIBIT 6                 128
        (September 28, 2004 memo)
22   DEFENDANT'S EXHIBIT 7                 144
        (Answers to interrogatories)
23   DEFENDANT'S EXHIBIT 8                 160
        (August 19, 2004 memo)
24   DEFENDANT'S EXHIBIT 9                 170
        (July 9, 2004 memo)
25   DEFENDANT'S EXHIBIT 10                215
```

Page 82

1  A. Yes. There was a police officer in the room
2  with me because the call went out that an officer had
3  got shot from the Orlando Police Department. I'm not
4  sure who the female officer was. But I asked her or
5  requested that I could use her phone. And I requested
6  to use her phone so I could call my wife because there
7  was no phone in the emergency room area where I was.
8      So I called my wife and I remember saying to
9  her, honey, I think we were being -- I was being
10 videotaped. I says can you make sure that -- tell
11 Walter to try and get that videotape because I don't
12 want it to wind up on the news tonight, you know,
13 shooting myself. And so she said okay. And that's the
14 last time I heard or had any -- right then and there, I
15 didn't know -- at some point later, I asked 'em when
16 they came, if -- when Walter Walker came, he told me I
17 think that he got the videotape. I think that he told
18 me he requested it from -- later I found out that the
19 individual that was taping his name was Mr. Bronson, I
20 think, that they gave him the tape and they had it. And
21 I was like, okay, good, I'm glad that they got it. And
22 that's the conversation that I had with Walter.
23  Q. Did -- did your wife ever explain to you, kind
24 of fill in the details after the fact what she did? Did
25 she tell you that she called Walter Walker or anything

Page 83

1  like that?
2  A. I mean my wife went back to the scene and she
3  told Walter Walker.
4  Q. Okay.
5  A. And what I had said and I think Walter Walker
6  in turn -- and I -- don't quote me on this, I think
7  Walter Walker made a request to get the tape. And I
8  don't know all the details that took place. There was a
9  communication between my wife and Walter Walker. She
10 made him aware of it. And from that point, he secured
11 the tape because it was part of -- it was a record of
12 what took place and what happened, a video record of
13 what I -- what had happened. And I'm sure that DEA was
14 going to want to see what happened because I had had an
15 accidental discharge. And any time a DEA weapon is
16 discharged, whether accidentally or during the course of
17 enforcement, it's investigated by, to my understanding,
18 by the shooting team. And they have a shooting team
19 that could be comprised of people from Washington or
20 people from -- that's designated from Washington in the
21 field to just make an assessment and investigate what
22 happened and why it happened. And then they report it
23 to Washington. And then Washington makes the
24 determination whether it was good or if there was any
25 negligence or what have you. So I understood that it

Page 84

1  would probably be taken for that reason. So at that
2  point, I had had an AD and it was caught on tape so...
3  Q. But let me just ask, did Walter Walker ever
4  tell you, oh, good, I was going to go get that tape any
5  way, don't worry I'm already going to get it or did that
6  originate from you, do you think?
7  A. I didn't have -- I don't recall. I don't
8  recall.
9  Q. Talk about the process -- talk about the
10 process for accidental discharges, have you ever had a
11 an accidental discharge before?
12 A. No, not that I can recall. I mean not -- no, I
13 don't recall having an accidental discharge.
14 Q. Prior to having an accidental discharge, had
15 you received training on how to properly handle a
16 firearm?
17 A. Quarterly.
18 Q. And was that quarterly training in addition to
19 kind of initial training that you received?
20 A. I went through firearms training at the
21 Quantico back in 1990. I qualified. My scores
22 qualified me -- they were high enough and qualified me
23 to graduate from the basic agents academy. And I came
24 to Orlando. And I became qualified with a long gun, a
25 semiautomatic machine gun. I was qualified with a

Page 85

1  shotgun. I was qualified with a revolver, a Smith &
2  Wesson .38 revolver. I was qualified with a Glock 9
3  millimeter and I was qualified with a Glock 40 caliber
4  weapon.
5  Q. And all of those qualifications also involved
6  safety lectures, did they, about --
7  A. Yes, sir, they did.
8  Q. Okay. I'm handing you what's been marked as
9  Defendant's Exhibit 4. Do you recognize this document?
10 A. Yes, it's a qual -- it's a record of my scores
11 that I qualified in Dec -- within -- December 12th --
12 I'm sorry. December 11th, 2003. And then there is a
13 qualification where I qualified February 26th, 2004 in
14 my night shooting with flashlights and what have you.
15 And that would have been in Daytona Beach at the Volusia
16 County Sheriff's Office shooting range.
17 Q. And so on both those qualifications that you
18 indicate on this document, there's also a -- looks like
19 there's an X marked for safety lecture on both those.
20 Do you see that right -- right under the dates, there's
21 safety lecture with a box next to it. Do you see those?
22 A. Yes.
23 Q. I take it that indicates that you attended or
24 completed the safety lecture at both of those?
25 A. Yes, sir, I did. Any time we're on the range,

**86**

1  we have -- the firearms instructor goes over safety
2  constantly.
3     Q. And that's obviously important to you?
4     A. It's important to everybody.
5     Q. Okay. And that training, I assume, correct me
6  if I'm wrong, did it tell you to remove the source of
7  ammunition from a weapon to make it safe and clear?
8     A. That's part of the lecture, yes. Kind of
9  similar to the same thing that I said on the videotape
10 when I showed the weapon to Mr. Covington, where I
11 cleared it and made it safe. But then immediately
12 after, I let the slide forward and became unsafe. That
13 was the mistake I made.
14    Q. But on April 9th, though, you didn't know it
15 but you had a loaded weapon in front of the audience at
16 the OMYGA. Right?
17    MR. MEYTHALER: Object to the form of the
18 question.
19    THE WITNESS: I had two loaded weapons there,
20 one on my ankle and one on my side. I -- I thought
21 the one on my side, the one that I injured myself
22 with, was unloaded prior to coming in. But it
23 actually was loaded which was a mistake on my
24 part.
25 BY MR. PHIPPS:

**87**

1     Q. And so during your presentation or at least
2  when you started your presentation, you didn't -- did
3  you know that the one on your side was loaded when you
4  started?
5     A. I was not aware that it was loaded. Usually, I
6  -- I made a mistake and I left the magazine in it and I
7  thought it was unloaded, yes.
8     Q. Maybe it's appropriate to just have you
9  describe to me, in your own words, kind of your own
10 thoughts and perception how the AD happened that day.
11    A. I started talking about the gun before I
12 presented it to the kids that I can remember, because
13 like I said, I haven't had the opportunity to view the
14 tape over and over. And I definitely hadn't seen it in
15 some time. So from my recollection, not specifically,
16 but in my mind that I've gone over it from time to time,
17 I took the gun from my holster. I locked the slide
18 back. I realized then that I had a round in the chamber
19 which it fell in my hand. I took it and I put it in my
20 pocket. At that point when I put it in my pocket, I put
21 the gun down and I let the slide forward. And then, if
22 I can recall, I dropped the magazine and took the
23 magazine out. But it already had seated another round
24 in the magazine -- in the chamber. I was going to at
25 that point attempt to disassemble the weapon and show

**88**

1  the kids that really a weapon that's torn apart really
2  isn't a weapon until it's -- all the parts are put
3  together and that was part of my presentation in the
4  past. I had lead ins that would go along with it as far
5  as being professional and knowing how to do it and what
6  have you and being trained on how to take the gun apart
7  and put it back together. Those were my intentions to
8  do, but -- but, unfortunately, prior to dropping the
9  magazine, I let the slide forward.
10    Q. Look, so you did not drop the magazine that --
11 during that presentation?
12    A. I don't recall dropping the magazine. I know
13 that I didn't drop the magazine prior to letting it
14 slide forward because it seated another round in the
15 chamber. And that round, when I took the gun and
16 pointed it down away from everybody, because you always
17 treat a weapon as a loaded weapon. That's the safety
18 training that I got. I pointed the gun down away from
19 everybody. And I pointed it at myself. And in doing
20 so, when I pulled the trigger, I shot myself in the leg.
21 The round that I had previously taken out, I -- the
22 bullet that I discharged hit that round, lucky for me, a
23 blessing, it hit that round and it ricocheted out the
24 left side of my left thigh. And when I laid there on
25 the emergency room table, the attending physician

**89**

1  informed me that I was lucky and had I not had that
2  bullet in my pocket, that I probably would have bled to
3  death in front of my children and that audience in about
4  22 seconds.
5     So at that time I felt very lucky and I felt
6  very blessed to be alive. Incident took place like this
7  last year where a police officer in New York shot his
8  self and hit his main artery and another agent trained
9  in first aid trauma treatment saved his life by applying
10 first aid to him.
11    And if you remember, just a week and a half
12 ago, the Sean Taylor incident, the Washington Redskin.
13    Q. I thought of you actually when I heard that.
14    A. I thought of that over and over again. And I
15 realized, you asked me earlier about did I feel
16 fortunate --
17    Q. Yeah.
18    A. -- to be alive, to see my son turn 13 and my
19 daughter turn 15 this year, and to be able to help her
20 get her driver's license, I definitely feel blessed and
21 fortunate. That's why I didn't think it was funny at
22 the time when most people made jokes about it and made
23 jokes that I was some -- related to me that I was a
24 Keystone Cop who shot myself in the foot. But I knew
25 exactly how serious my injury was, but...

Page 114

```
 1  Lenora Morris told you or is there some other reason?
 2    A.  Well, I think that prior to Lenora telling me
 3  -- I think at some point in between the time right after
 4  I saw it and in between some time before I came back to
 5  work in July -- I mean a lot of people called me and
 6  talked to me. Someone -- I don't remember who may have
 7  told me that.
 8    Q.  Did anybody ever tell you they had seen a copy
 9  before you came back to work did anybody ever call you
10  up and say, hey, I've seen a copy, want to let you know?
11    A.  I don't recall.
12    Q.  Did -- did you want to see a copy of the
13  video-recording?
14    A.  I requested to see a copy of it.
15    Q.  When?
16    A.  Well, at some point in time I became aware that
17  they were watching it in Miami in 2004. So I came back
18  to work in July. I'm not sure if I was made aware
19  before I came back to work but I know that -- I know
20  that it was being watched. And I was told that -- I was
21  called by an agent that I know by the name of Mark
22  Martolewski who was a firearms guy in the Las Vegas
23  office. And I was told that by somebody that it was
24  being watched at the firearm -- at the range in south
25  Florida. So I in turn, when I came back to work, I know
```

Page 115

```
 1  I made -- I called -- well, prior to that, I called up
 2  Greg White and I asked him how can somebody else see
 3  this video and I have never seen it before. And I said
 4  how did it get down to the firearms unit. And I know I
 5  hadn't come back to work yet. And he told me that well,
 6  it was sent to training and training probably used it
 7  for training purposes. So I then called Steve Collins
 8  and told him that they were doing it and I talked to him
 9  about it. And I think I may have made the same
10  statement to Steve that I hadn't seen it. Well, some
11  time I think in September, I went to -- well, when I
12  came back -- let me go back.
13         When I came back to work, I know I saw Chris
14  Bowman, who was the firearms guy. And I told Chris
15  Bowman, I was like, look, man, you know those guys in
16  the firearms unit, why are they showing this video down
17  there, making light of it and making fun of it and
18  laughing about it and showing it to everybody. And he
19  was like, Lee, I don't know why they're doing it. I
20  said, well, you ought to call them and ask them, man. I
21  mean -- I says, you know me. And he says, yeah, man, I
22  do. And he talked to him and he told me that he did
23  talk to them.
24         And I know he talked to them because when I
25  went to remedial training, I was ordered to go to
```

Page 116

```
 1  remedial training to be retrained or certified after
 2  having an accidental discharge. I wanted to go to
 3  remedial training here in Orlando and just have Chris
 4  Bowman and Chris Trasigney (phonetic), the firearms
 5  units guys retrain me. And I asked Mr. Collins why I
 6  had to go to Miami. And they said, well, it's a
 7  divisional order. It's an order. I'm not sure if it's
 8  divisional. But I -- he says it was an order that I was
 9  to go to the field division office and have the field
10  division primary firearms guys do it.
11         And one of the reasons I didn't want to go to
12  Miami that I remember in my mind is because here were
13  the same guys that was laughing and making fun of me and
14  showing this video, making light of it, to other agents.
15  So I expressed that. I'm not sure who I expressed it to
16  whether it was Mr. Collins or Mr. Borah. But I, in
17  fact, did go. And when I went, Kevin Naughton was --
18  talked to me about the video. And he was like, hey, man
19  I didn't -- you know, I didn't mean this in a bad way.
20  And, you know, someone had told me that they were
21  laughing. He was like, I wasn't laughing at you or
22  whatever. I just said, you know, hey, man, these guys
23  don't know me. You know, I had heard all kind of rumors
24  that there were people looking at it on the computer.
25  I'm not sure if it was on a disc or if it was on
```

Page 117

```
 1  Firebird. I just know that they were looking at it in
 2  Miami around that time.
 3         And, you know, I had just done it in April. I
 4  went to firearms training I think in September. So we
 5  went through our training. And, you know, I was
 6  professional and went through my training, breezed
 7  through it. I'm sure if you get the records, you'll see
 8  that I qualified without a problem with my machine gun
 9  and my handgun, all my DEA assigned guns, and I think as
10  well as, yeah, my own personal owned gun.
11         I -- after the completion of it, I had to go
12  back and take -- sign forms and -- reinstatement forms
13  and sign some qualification forms. And during the
14  course of it, there was another young agent who had had
15  an accidental discharge that was there with me. I can't
16  remember his first name. I think his last name is Weiss
17  or something like that. But we were there together.
18  And we went through the training together. When we got
19  back to the firearms office in the Miami field division,
20  we went in and was filling out the necessary papers and
21  what have you. And they talked to me more about the
22  video at that point in time, not really sure which one
23  of 'em it was. Specifically, I remember Kevin Naughton
24  talking to me about it.
25         And then I said, you know, and I expressed to
```

**Page 162**

1  elements that would apply to you?
2    A. In certain respects, yes.
3    Q. Okay. And has your ability to meet any of
4  these job elements been reduced by the release of a
5  video-recording of your accidental discharge?
6    A. I would say yes. To go out in the public and
7  conduct constructive working relationships because in
8  going out and dealing with local law enforcement, like
9  we mentioned before, some people have reservations about
10 working with me and have opinions about working for
11 me -- working with me. There's people in the office who
12 treat me different since it took place.
13   Q. Since what took place, the accidental
14 discharge?
15   A. Yes. And the investigation started. Yes.
16   Q. Now, turning -- turning through to the end of
17 this document. These documents are dated August 19th,
18 2004. Is that when you understand these to have been
19 finalized?
20   A. I assume -- that's the date that is printed on
21 there. I'm not sure exactly when it was done.
22   Q. Okay. Now, the last page of -- the last page
23 of this exhibit says, last line, says, quote, as a
24 result of the above appraisal, GS Gruden signed an
25 overall rating of unacceptable for the interim period

**Page 163**

1  ending on July 10th, 2004, end quote. Do you see that?
2    A. Yes, I do.
3    Q. Do you think that that -- did you actually
4  receive that as your interim rating?
5    A. Initially, I did.
6    Q. And then what happened?
7    A. It was changed.
8    Q. And what was it changed to?
9    A. Acceptable. I'm not really sure exactly, but
10 it was above unacceptable.
11   Q. Do you think that the rating, whatever it was
12 changed to, affected your ability to advance within DEA?
13   A. I'm not really sure. I know that this rating
14 that's depicted here was going to affect me. That's the
15 first time I ever received an unacceptable rating, but
16 -- and I just felt that it was unfair because I wasn't
17 even in the office long enough for GS Gruden, in the
18 rules and under the scope of appraising someone, I was
19 only in the office less than 30 days, approximately 30
20 days, where I was supervised by GS Gruden. And if I'm
21 not mistaken, in order to have a supervisor evaluate
22 you, you have to be under his supervision, direct
23 supervision, for 90 -- a 90-day period.
24   Q. But, I guess, you understood then that if this
25 rating became final, that would adversely affect your

**Page 164**

1  job performance?
2    MR. MEYTHALER: Which?
3  BY MR. PHIPPS:
4    Q. The unacceptable rating. If it became
5  finalized, that would affect your opportunities for
6  advancement in DEA?
7    A. Yes. It probably would -- I would have been
8  subject to a PEP, which is considered a performance
9  enhancement program. And if I would have been put on a
10 PEP, being a special agent of 14 years of experience, it
11 would probably indicate to anybody because when I would
12 apply for advancement, part of applying to be a GS-14,
13 you have to put down your past evaluation rating. So
14 had I -- I had gone and received a SAP score when I was
15 in the Bahamas, had a group supervisor's position opened
16 that I wanted to apply for, at that point in time, after
17 I received unacceptable, it would have directly affected
18 my ability in someway to not get the job. Because a
19 person that's unacceptable, would definitely not be
20 considered to be selected as a 14, especially if it was
21 looked at, if I received that rating after 14 years of
22 experience on the job. So I think it would have
23 affected me directly.
24   Q. You also, as I understand, are claiming loss of
25 reputation in this lawsuit. Is that right?

**Page 165**

1    A. Yes.
2    Q. Okay. And do you believe that you had a
3  positive reputation before the accidental discharge -- a
4  video of your accidental discharge appeared on the
5  Internet?
6    A. I think so.
7    Q. Do you think that the fact that you had an
8  accidental discharge, just that fact alone, affected
9  your reputation?
10   A. I think placing it on the Internet affected my
11 reputation.
12   Q. But do you think just having it affected your
13 reputation? People hearing about it just through the
14 normal channels of conversation?
15   A. I'm not sure to say to what degree. I'm not
16 sure.
17   Q. So you don't -- but regardless of the degree,
18 do you think it had any affect?
19   A. I assume it has some affect. I don't know
20 exactly. I know that it affected me with certain people
21 here in this office before it reached the Internet.
22 People treated me different. People laughed at me and
23 made fun of me. And that's not positive for my
24 reputation.
25   Q. And did they laugh and make fun of you based on

Page 170

1   We had a -- a -- there was an army boat there and there
2   was other boats. And whenever we used a boat or we
3   borrowed one, we borrowed gas and we used it.
4       Q. And why would you be using those boats?
5       A. To go fishing and for -- go snorkeling or
6   diving or go over to Stocking Island, which was an
7   island adjacent to Great Exuma, to Volleyball Beach and
8   to other places like that.
9       Q. Was that on official duty?
10      A. Well, I was TDY during that period of time, so
11  I was -- I guess I was -- the entire time I was down
12  there, I was on duty. So, I mean, you know, we were off
13  -- we had some off days, but we could have been called
14  at any time because we were there to fly.
15      Q. Did you -- do you know if you had a reputation
16  for being tardy or late to briefings before your
17  accidental discharge?
18      A. I had been late before, I mean, to a briefing
19  before, yeah, I think I had been. I can't say that I
20  haven't been late all the time. I mean, it's according
21  to who made that assessment.
22      Q. I'm going to let you talk about some
23  assessments of you in a second here with Exhibit 9.
24      A. Are we done with this one?
25      Q. I think so, yeah. We can at least set it

Page 171

1   aside.
2           I'm going to ask you if you've had a chance to
3   read this, if you recognize this exhibit. Tell me when
4   you're done and if you do.
5       A. (Nods head.)
6       Q. Just to give you a preview of coming
7   attractions, so to speak, my questions are going to
8   begin with the behavioral issue section of Exhibit 9.
9           MR. MEYTHALER: Which page is that, Peter?
10          MR. PHIPPS: It's DEA-002135.
11  BY MR. PHIPPS:
12      Q. But, first of all, do you recognize this
13  exhibit?
14      A. Yeah, I remember it from when I was in the --
15  in Washington, yes.
16      Q. Had you seen it before then?
17      A. I think I was given it. It was given to me
18  after I was given the other bad evaluation, this was
19  another one that was given to me.
20      Q. Do you know if Peter Gruden gave this one to
21  you first?
22      A. Peter Gruden never gave me any of my
23  evaluations. They were given to the ASAC. Normal
24  procedures the -- from what I recall, normal procedures
25  was the GS would give you your evaluation. But I was

Page 172

1   given my evaluations by ASAC Collins after I came back.
2       Q. Do you know why that was the case?
3       A. I don't think Pete Gruden liked me. And it's
4   indicated from his assessment.
5       Q. Is it still the case that you're given your
6   evaluations by ASAC Collins?
7       A. No, sir, it isn't.
8       Q. Now, on these behavioral issues, as they're
9   labeled, this first one with number one, talks about
10  parking ticket and OGV to a funeral.
11      A. Yes.
12      Q. Could you just explain to me kind of the
13  circumstances of what happened there in your own words?
14      A. Yes. I became aware that a federal -- a fellow
15  agent's wife had passed away from cancer. This is a
16  young lady who was a state prosecutor that I involved
17  myself with in cases prior to her husband becoming a
18  special agent. He was a task force agent. Then he
19  became a special agent. We, in fact, worked together,
20  did a few things together. I think he came TDY down to
21  the Bahamas when I was there. His wife, in fact, passed
22  away. I was called. I talked to ASAC Collins about it.
23  I was called by -- he actually -- most of the people
24  knew this young man. And I knew his wife because I had
25  worked with her.

Page 173

1           Talked to ASAC Collins about going over to the
2   funeral. I, in fact, think I talked with Mr. Gruden
3   about going over. I went over. I drove my government
4   car which is my official government vehicle. That's
5   what OGV stands for. I drove it over there. And in the
6   course of being there, I didn't have a placard that
7   said, official government business. And I received a
8   ticket. In the past, when I was in Tampa, if -- prior
9   to me leaving Tampa, if we received a ticket from the
10  city of Tampa, we would submit the ticket to the admin
11  office or someone there that took care of it. They
12  would in turn put a letter on the ticket and say that we
13  were on official business. I, in fact, sent the ticket
14  over. The rules changed during my absence. And they
15  sent the ticket back. But, ultimately, if I'm not
16  mistaken, I paid the ticket from my own pocket.
17      Q. All right. But are you aware that -- that I
18  guess that the fine and nonpayment generated a certain
19  amount of activity. I guess it got ASAC Collins
20  involved. Is that what happened?
21      A. Well, I think the ticket was just returned
22  here. And no one -- the ticket was returned here. And
23  I'm not sure if ASAC Collins got it or GS Gruden got it.
24  But during the course of the time period, I didn't even
25  know about it. And then at some point, I was made aware

44 (Pages 170 to 173)

Page 174

1  of it and --
2  Q. Let me just interrupt you. You said you didn't
3  know about it. Is that because you had submitted it
4  pursuant to the prior policy or something else?
5  A. I had submitted it over to Tampa. I'm not mis
6  -- I'm almost certain -- I want to say that it was sent
7  to Tampa by some means and then during the course of
8  time period, I guess it -- I never even thought about it
9  any more after that. And it came to my attention some
10 time later. As a matter of fact, I was surprised to see
11 this documented in that respect the way it was. But I
12 think I ultimately paid the ticket. Because I didn't --
13 it didn't go against me, per se, or my license or
14 whatever.
15 Q. Okay. Let's look at behavior -- or, what's
16 labeled as behavioral issue two. The next page. Is it
17 true that you accumulated 2,100 minutes on your DEA
18 assigned cell phone in the month of April 2004?
19 A. I'm -- I don't know specifically if it was that
20 amount. But I was informed by GS Gruden that I had a
21 large amount of time on my cell phone. And we had a
22 discussion about it.
23 Q. And why -- why did you have a large amount of
24 time on your cell phone?
25 A. 'Cause I was getting calls from individuals

Page 175

1  from inside of DEA. Most of the calls that I got were
2  incoming calls from individuals that called here and got
3  my cell phone number, well wishers, people concerned
4  about me. And so I was talking to ASAC, associate SACs,
5  people all over the country that knew me, called to
6  check on me and see how I was doing as well as I was in
7  temporary housing at the time. And I used my cell phone
8  to talk to workman's compensation and to talk to the
9  doctors that I was associated with. And the minutes
10 added up. And I wasn't aware. And Pete Gruden called
11 me one day during my rehabilitation and informed me.
12 Q. And I take it you guys had a pretty heated
13 discussion at some point in time about this?
14 A. I would say we had escalated tones in our voice
15 because he started to yell at me and started screaming
16 about that I needed to bring the phone in right away,
17 right then. And I, in fact, told him that I was hurt.
18 I was injured. I couldn't get to the office to bring
19 the phone in. And I told him that he had my address.
20 He could come get it. I asked him if he wanted me to
21 turn the phone off, I would. And so I, in fact, did
22 turn the phone off and I didn't use it. And at some
23 point in time I did bring the phone back here to the
24 Orlando district office.
25 Q. What's this business about a SIM card? There's

Page 176

1  some reference in this to a SIM card. What's that
2  about?
3  A. Well, the SIM card is basically a chip for the
4  phone. It's a memory chip for the phone and the phone
5  service. And so I brought the DEA phone back but I took
6  the SIM card out of it. And I put it in one of my own
7  personal phones because all of workman's comp, the
8  doctors, the hospital, and everybody would be calling me
9  and leaving me messages because I couldn't answer the
10 phone, they would leave messages on the phone. So what
11 I did do was I answered the messages, but I was careful
12 not to make any phone calls or receive any phone calls.
13 I just let the phone go to messages. And if you look at
14 the records during that time, I can say that I was
15 specifically careful not to make phone calls, but the
16 phone did make calls to the voice mail. I retrieved
17 those messages from my voice mail. And I in turn used
18 someone else's phone to make my phone calls. So that's
19 why. And he started screaming at me and yelling at me
20 and telling me to get the phone in right then.
21 Q. Was that over the phone?
22 A. Yes, it was.
23 Q. And -- okay. Did you yell back at all?
24 A. Yes, sir, I did. I told him if he wanted the
25 phone, to come and get it.

Page 177

1  Q. Okay. What's -- the third item on here is,
2  talks about an incident with the Windermere Police
3  Department on or around June 12th, 2004. Are you
4  familiar with this?
5  A. Yes, I'm familiar with it.
6  Q. This suggests that you became belligerent and
7  confrontational with a Windermere Police patrolman?
8  A. I recall the incident that took place. I mean,
9  I'm not sure if he deemed in his assessment that I was
10 belligerent. I became extremely concerned when the
11 Windermere police officer accused me of not having my
12 young children seat belted in the car and he yelled that
13 your children are not belted in. I should write you a
14 ticket for that. And both my son and daughter at that
15 point in time started crying. I informed him, sir,
16 don't frighten my children. Both my children are
17 belted. If you look and see, they have their seat belts
18 on. I don't think it's fair for you to yell at my kids.
19 If you want to write me a ticket for what you're
20 accusing me of, then go ahead and give me a ticket. But
21 don't frighten my children. I in turn identified myself
22 as being in law enforcement. And I thought that it was
23 over with. But, evidently, it wasn't. They called my
24 office. Maybe if I had not identified myself, they
25 never would have called the office.

45 (Pages 174 to 177)

Page 178

```
 1    Q.  Do you think that you were belligerent and
 2  confrontational with respect to this patrolman?
 3    A.  I don't think I was belligerent at all.  I
 4  think that I have been -- it has been recognized -- I
 5  think that he may have been intimidated with my size or
 6  what have you.  But, necessarily, I don't think I was
 7  belligerent with him at all.  I just think that I was
 8  stern and firm with telling him not to accuse me of
 9  doing something that I didn't do and not to upset my
10  children because my children are my pride and joy.  And
11  he scared my children.  And it was wrong.
12    Q.  Okay.  I want to change gears and go back to
13  what's been marked as Exhibit 7.  I'm on page 16.  The
14  first and second lines of this.  There's a sentence that
15  reads, quote, it is thought that a video-recording of
16  the accidental discharge first started appearing on
17  Firebird in approximately May or June 2004, quote.  Do
18  you believe this to be true?
19    A.  I -- from -- I recall talking to Whitey
20  Crawford and I vaguely remember him indicating that
21  there was some young individual in his group watching
22  it, but he didn't specifically identify who it was.  I
23  just know that early on, I was told that people were
24  watching it on Firebird.
25    Q.  Whitey told you that people were watching it on
```

Page 179

```
 1  Firebird in May or June of 2004?
 2    A.  It may have been Whitey.  I don't specifically
 3  recall.  It may have been.  Or someone out of the Miami
 4  field division that called me.  But I know that I may
 5  have made reference to it before.  And that was my first
 6  recollection at that time that --
 7    Q.  Are you sure it wasn't May or June 2005?
 8    A.  I want to say that it was during 2004.
 9    Q.  And so Whitey called you in 2004 and told you
10  that it was on Firebird in 2004?
11    A.  I spoke with somebody.  I mean, I know I spoke
12  with Whitey Crawford in 2004 about it.  Because he
13  talked to me about it being at the gun range.  He told
14  me that Keith Barker -- and I'm -- I'm not really sure,
15  specifically, but I know that I had mentioned that in
16  the past.
17    Q.  So you knew -- so your testimony is that you
18  had heard in 2004 that it was on Firebird in May or June
19  of 2004?
20    A.  I think so, yes.
21    Q.  If you knew it was on Firebird in 2004, did you
22  make any efforts in 2004 to talk to anybody to take it
23  off Firebird?
24    A.  I talked to Mr. Collins.  I talked to
25  individuals --
```

Page 180

```
 1    Q.  In 2004?
 2    A.  I'm not really sure.  I'm not sure when I --
 3  I'm not really sure.  I don't recall right now at this
 4  time.
 5    Q.  Okay.  When you were out on injury, that ended
 6  in July 2004?
 7    A.  Right.
 8    Q.  Do you recall talking to anyone about a video
 9  being on Firebird in -- while you were out on injury?
10    A.  I don't recall right now.
11    Q.  Not even Whitey Crawford?
12    A.  I may have talked to Whitey.
13    Q.  Do you have any other evidence that a video was
14  on Firebird in May or June 2004 other than this
15  conversation with Whitey --
16    A.  May have been Whitey --
17    Q.  -- that you can't place in time?
18    A.  It might have been Whitey.  I'm not really --
19  I'm not sure.  I -- like I said, I talked to Mark
20  Martolewski, but I'm not sure if it was on Firebird.  I
21  don't recall if he told me it was on Firebird or how he
22  saw it.
23    Q.  So I just want to clarify your source for
24  saying that you think it was on Firebird in
25  approximately May or June of 2004, is that Whitey?
```

Page 181

```
 1    A.  Could have been Whitey.  Could have been Mark.
 2  I'm not sure --
 3    Q.  Whitey or Mark?
 4    A.  -- specifically.  I'm not sure specifically.
 5  Him or somebody else.  I'm not sure specifically.  It
 6  was a while ago, lot of things.
 7    Q.  I know it was a while ago.  I just -- I'm
 8  surprised that you say it was May or June 2004.
 9    A.  I mean for some reason, if -- I recall it being
10  then for some reason back then.
11    Q.  But you can't tell me how you recall that?
12    A.  No, I can't specifically tell you right now.
13    Q.  Okay.  There's some bounties I've heard in the
14  course of this litigation.  Do you believe that there's
15  a bounty on your head in any way?
16    A.  I'm not sure.  I know that in the past I was
17  threatened by individuals of a Columbian sect where I
18  had made cases and individuals made threats toward me
19  regarding me, where I seized somewhere up to around
20  40,000 pounds.  And an informant that I had went back to
21  Columbia and was kidnapped and she gave them my phone
22  number when she was being tortured.  We haven't seen her
23  since.  But in the course of that, they called me when I
24  was at home at my house on my cell phone and told me to
25  put -- have $6,000,000 at a certain location or she
```

190

1  I worked with retired DEA agents and prosecutors on
2  putting on courses and stuff. I was informed that I had
3  a future if I wanted to in doing lectures and being a
4  lecturer and what have you.
5      Prior to this hitting the Internet, on one
6  occasion, American Airlines had a convention in Miami
7  and I was requested by a high level executive from
8  American Airlines to come down and to speak to their
9  annual convention crowd or group at their annual
10 convention, things of that nature. Surely, had I did a
11 good job and I retired, I was under the impression that
12 if I retired and I made an impression on somebody that
13 worked at American Airlines that was in that crowd and
14 if I did a good job and I came to them like most DEA
15 agents do when they retire, go and work in some capacity
16 with corporate America, I probably would have been
17 considered or I assume I could have been considered for
18 a position related to --
19     Q. And are you sure that you -- there's no
20 position waiting -- that you could get in corporate
21 America right now?
22     A. Well, I'm not sure. I don't know. I can't
23 say. I haven't applied for a position in corporate
24 America. But I know that nobody knows me in corporate
25 America for the fine job that I did as an undercover or

191

1  special agent in doing my job. But I would probably
2  think that some people in corporate America have seen
3  the negative publicity associated with me having the
4  accidental discharge and shooting myself and it being
5  put on the Internet and on network television.
6      Q. You mentioned some other things in the course
7  of this deposition, you said marital problems and -- I
8  don't know if you said strife or anguish in your family.
9  Are you seeking some sort of recovery for those?
10     A. I think that that caused me pain and suffering
11 so it caused me pain and suffering not to get along with
12 my wife, caused me pain and suffering for my brother to
13 call me up and tell me that on the hard drive -- on
14 their computer hard drive for the Florida Highway
15 Patrol, they have a caption of me shooting myself for
16 entertainment purposes.
17     My sister being called constantly at her home
18 in Winter Haven from television shows, like Jimmy Kimmel
19 and magazines that I can't even remember, newspapers and
20 television stations. And it was, what I considered,
21 irritating and harassing because I don't think my family
22 deserved that nor did I with my -- to have to deal with
23 that anguish and to go through that ridicule and to
24 bother us because prior to that, none of that was
25 happening. So it changed my life completely. And I

192

1  don't think it will never be the same.
2      Q. Now, with respect to any marital problems with
3  you and your wife, did those happen -- were any existing
4  before your accidental discharge?
5      A. I'm not really sure. I know that, you know, we
6  -- you know, we both became on edge and what have you
7  and there were issues related to my wife and I, we got
8  along very well, very well prior to that. We were
9  buddies. We were partners.
10     Q. Prior to the accidental discharge?
11     A. Yeah, I mean, yes, and some time after that, we
12 emotionally, you know, whether it was me emotionally
13 dealing with what was going on or her, I'm not a
14 psychiatrist, I don't know. I just know that some -- we
15 had personal problems that arose.
16     Q. And did those problems arise before a
17 video-recording of the accidental discharge hit the
18 Internet?
19     A. I can't say. I know that not to the degree
20 that they did after it hit the Internet.
21     Q. But they were there, some of them?
22     A. I'm married. I mean, I'm not going to say that
23 I had a perfect marriage prior to that. But, I mean, I
24 can't relate it to the accidental discharge.
25     Q. And so is there anything in particular after

193

1  the accidental discharge hit the Internet with respect
2  to your marriage that you're seeking recovery for?
3      A. The stress that it put on my wife, the anguish
4  that it put on me which in turn caused me a great deal
5  of stress and anguish and suffering. My kids suffered.
6  And when they suffer, I suffer. When my mom suffers,
7  you know, when my mom had to walk in church and have the
8  church -- ladies in the church talk to her about --
9  question her why her son, what happened and what have
10 you, and she shouldn't have had to explain anything. No
11 one had ever asked her to explain anything related to my
12 job that I can recall she made me aware of before this
13 video hit the Internet.
14     Q. So it's the stress and the affect on the family
15 members --
16     A. -- which in turn caused me a great deal of
17 stress and anguish and caused me and all of us to
18 suffer.
19     Q. Did you ever make any voluntary appearances on
20 television, radio or other media outlets to address your
21 accidental discharge?
22     A. I, in fact, did go on TV and I did talk to one
23 person on the radio out of Tampa. And I did go on a
24 number of TV shows to set the record straight in my mind
25 of what happened. People were making -- I was informed

49 (Pages 190 to 193)

**Page 194**

1  that -- it was indicated that I was an idiot that shot
2  his self in the foot. So I wanted to let people realize
3  that I was an agent and not hear all the negative stuff.
4  I wanted to give them some positive perspective on who I
5  was and things that I've done like when I went on Bill
6  O'Reilly from Fox News and he told me that I was a
7  patriot and he considered me a patriot and that whoever
8  leaked the video was -- he didn't say anything positive
9  about them. He made -- and I can't quote him, but I
10 know that he did say that I was a patriot because, you
11 know, most people realize that I put my life on the line
12 every day in the war against drugs.
13     And my children since they can remember have
14 seen me strap on a gun every day and go to work like
15 attorneys put on their ties and carry their briefcase.
16 Mechanics take their tools to work.
17     Q. Did Bill O'Reilly, do you remember if he said
18 he thought you would be successful in your lawsuit or
19 not?
20     A. No, I don't recall him saying whether or not I
21 would be successful.
22     Q. About how many appearances on media, television
23 radio, other media did you make?
24     A. I can't specifically -- I don't recall unless I
25 was given a specific note. I know the initial one I

**Page 195**

1  went on was with Rita Crosby. And I did a few more.
2      Q. Just tell me all the ones you remember.
3      A. I remember Rita Crosby. I remember the Today
4  Show with Matt Lauer.
5      I think I remember, of course, Fox.
6      Q. Fox with O'Reilly?
7      A. Yes. And I think there was a show called -- I
8  think -- I think it was on CNN or Ted Turner affiliate;
9  Access Hollywood, something like that. And, of course,
10 the MJ show on the radio on 93.3FLZ out of Tampa.
11 That's a Clear Channel company.
12     Q. These are national. Other than that MJ Show, a
13 lot of these are national. Were there regional ones?
14 Anything in Orlando specifically?
15     A. They were national/international type, you
16 know, cable. But when I was -- the morning that I was
17 at the Today Show, I spoke with a lady by the name of
18 Schulze at Channel 2, WESH, Channel 2. I can't remember
19 her first name but I know her last name was like
20 Schulze.
21     Q. Okay. But that wasn't on -- that wasn't
22 broadcast, was it?
23     A. I think it was maybe -- I'm not sure. I think
24 it was --
25     Q. Oh, it was broadcast?

**Page 196**

1      A. I'm not sure. I think clips may have been
2  broadcasted.
3      Q. Oh, so -- so, I think I'm putting the pieces
4  together. The day you went to speak with the Today
5  Show, you spoke on the national syndicate, the Today
6  Show --
7      A. Yeah, I was sitting there and there were people
8  that --
9      Q. -- and you also spoke on kind of a more local
10 version of it in the studio or something like that?
11     A. In the studio, the lady asked me questions.
12 And I, you know, she asked me -- I don't even remember
13 seeing what it was, but I think I told her things along
14 the lines like I just told you. You know, why did I go.
15 She may have asked me why I was on TV. And I said
16 because I wanted to show people that I was a real person
17 and I wasn't just a bumbling buffoon who shot his self
18 in the foot. That more than anything I wanted to
19 indicate that I almost died. It wasn't like I was out
20 playing around and I did something that was a joke. It
21 was an accident which almost cost me my life.
22
23          CONTINUED IN VOLUME II
24
25

**Page 197**

1    DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS
2         The original of the Errata Sheet has been
3    delivered to MR. MEYTHALER, Counsel for the Plaintiff.
4
5         When the Errata Sheet has been completed by
6    the deponent and signed, a copy thereof should be
7    delivered to each party of record and the ORIGINAL
8    delivered to MR. PHIPPS, Counsel for the Defendant, to
9    whom the original deposition transcript was delivered.
10
11
12          INSTRUCTIONS TO DEPONENT
13
14         After reading this volume of your deposition,
15   indicate any corrections or changes to your testimony
16   and the reasons therefore on the Errata Sheet supplied
17   to you and sign it. DO NOT make marks or notations on
18   the transcript volume itself.
19
20
21   *** REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
22   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

## Page 202

APPEARANCES:

Counsel for Plaintiff:
    WARD A. MEYTHALER, ESQUIRE
    Merkle & Magri, P.A.
    5415 Mariner Street, Suite 103
    Tampa, FL 33609

Counsel for Defendant:
    PETER J. PHIPPS, ESQUIRE
    U. S. Department of Justice
    Civil Division
    Trial Attorney
    Federal Programs Branch
    20 Massachusetts Avenue, N.W., Room 7134
    Washington, DC 20001

## Page 203

### INDEX

| WITNESS | PAGE |
|---|---|
| Called by the Plaintiff: | |
| LEE PAIGE | |
| DIRECT EXAMINATION BY MR. PHIPPS | 4 |
| VOLUME II | |
| DIRECT EXAMINATION (CONTINUED) | 204 |
| CROSS-EXAMINATION BY MR. MEYTHALER | 216 |
| ERRATA SHEET INSTRUCTIONS | 220 |
| ERRATA SHEET | 221 |
| CERTIFICATE OF REPORTER OATH | 222 |
| REPORTER'S DEPOSITION CERTIFICATE | 223 |

### INDEX OF EXHIBITS

| | |
|---|---|
| DEFENDANT'S EXHIBIT 1 (mid-year progress review) | 21 |
| DEFENDANTS' EXHIBIT 2 (article "Hall of Shame") | 60 |
| DEFENDANT'S EXHIBIT 3 (letter from cub scout pack) | 68 |
| DEFENDANT'S EXHIBIT 4 (firearms/tactical qualifications) | 85 |
| DEFENDANT'S EXHIBIT 5 (Orlando Sentinel article) | 98 |
| DEFENDANT'S EXHIBIT 6 (September 28, 2004 memo) | 128 |
| DEFENDANT'S EXHIBIT 7 (Answers to interrogatories) | 144 |
| DEFENDANT'S EXHIBIT 8 (August 19, 2004 memo) | 160 |
| DEFENDANT'S EXHIBIT 9 (July 9, 2004 memo) | 170 |
| DEFENDANT'S EXHIBIT 10 (May 21, 2004 e-mail) | 215 |

## Page 204

CONTINUED FROM VOLUME I
DIRECT EXAMINATION (CONTINUED)
BY MR. PHIPPS:

Q. And so on each appearance did you appear with Mr. Meythaler?

A. To the best of my recollection, I did. And the only other one that I appeared on that may not have had Mr. Meythaler or depicted Mr. Meythaler on it was the new I-caught Internet show that it was the first edition on ABC news and a spin-off of I think 20/20. And -- but I don't think Mr. Meythaler was actually shown. He actually was filmed with me at that interview. But I don't think -- I think he ended up on the edited floor. He was cut out.

Q. So you say the purpose of all these was to set the record straight?

A. Well, to let people know that I was a -- truly had the ability to be articulate, that I was a professional, to tell a positive side of it opposed to -- prior to me going on TV, neither DEA nor anyone else tried to portray me in a positive manner. So I felt at that time after conferring with my counsel, that I needed to, after long arduous consideration, we -- Mr. Meythaler and I agreed that it probably would be the right thing to do because DEA hadn't tried to do

## Page 205

anything in the two years nor did anyone else. It was all negative publicity. And even after the lawsuit was filed, it was all negative until I came on TV and --

Q. When you -- so you're saying that all the publicity about your accidental discharge was negative up until that point in time?

A. The publicity that I was told about during the course of the time I -- DEA basically didn't have any concern at the time that I received my five-day suspension, actually Mr. Collins said that he thought that I would get more time. And when I asked him why, he says, because it embarrassed DEA. Nobody considered whether or not I was embarrassed and the fact that I -- probably DEA wouldn't be embarrassed nor would I be embarrassed if the tape hadn't made its way to the Internet. And so I was definitely embarrassed. But just like the agents testified in Washington, that it was an embarrassment to DEA. But they didn't have any concern about my well-being or care or whether it happened to me. So I had to go on TV and at least let at that point in time the world know that Lee Paige was a real person, a father, a husband, a son, and a well recognized DEA agent by the majority of the people that know the job that I had done.

Q. Well, in fairness, your name wasn't associated