

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

LEE PAIGE,

   Plaintiff,

vs.                        Case No.:   1:06CV00644

UNITED STATES DRUG

ENFORCEMENT ADMINISTRATION

and UNITED STATES OF AMERICA,

   Defendants.

## DEPOSITION OF ROBBIN PAIGE

Taken on Behalf of the Defendant

| | |
|---|---|
| DATE TAKEN: | Monday, January 7, 2008 |
| TIME: | 1:58 p.m. - 4:34 p.m. |
| PLACE: | United States Attorney's Office |
| | 501 West Church Street |
| | Orlando, Florida |

STENOGRAPHICALLY REPORTED BY:

Sara Gittins



PLAINTIFF'S EXHIBIT 187

```
                                                              2                                                              4
 1   APPEARANCES:                                                  1              PROCEEDINGS
 2   Counsel for Plaintiff:                                        2       ROBBIN PAIGE, called as a witness by the
 3      Ward A. Meythaler, Esquire                                 3   Defendant, having been first duly sworn, testified as
        Law Offices of Merkle & Magri, P.A.                        4   follows:
 4      5415 Mariner Street                                        5       THE WITNESS: Yes.
        Suite 103                                                  6            DIRECT EXAMINATION
 5      Tampa, Florida 33609                                       7   BY MR. DEAN:
        (813) 281-9000                                             8       Q. Robbin, can you please state your full name for
 6                                                                 9   the record?
 7                                                                10       A. Robbin Thelia Nelson Paige.
 8   Counsel for Defendants:                                      11       Q. Have you been deposed before?
 9      Paul A. Dean, Esquire                                     12       A. No.
        United States Department of Justice                       13       Q. Let me just go over some ground rules with you.
10      Civil Division, Federal Programs Branch                   14   It will make the experience a little easier. As you can
        20 Massachusetts Avenue, N.W.                             15   see, we have a court reporter here, and so it's
11      Washington, D.C. 20001                                    16   important to be as clear as possible. Try not to nod,
        (202) 616-8482                                            17   and instead answer yes or no as the case may be. Try to
12                                                                18   answer orally and audibly. Is that clear?
13                                                                19       A. Yes.
14                                                                20       Q. It's very important that you understand my
15   ALSO PRESENT:                                                21   question. If my question is unclear for any reason, let
16      Lee Paige                                                 22   me know, and I'll rephrase it. Is that clear?
17                                                                23       A. Yes.
18                                                                24       Q. Okay. If at any time you want to change an
19                                                                25   answer from what you gave me earlier during the
20
21
22
23
24
25
```

```
                                                              3                                                              5
 1              I N D E X                                          1   deposition, that's fine, just let me know what answer
 2   WITNESS:                         PAGE:                        2   you want to change, okay?
 3   ROBBIN PAIGE                                                  3       A. Okay.
 4   Called by the Defendant:                                      4       Q. Your attorney may object to some of my
 5     Direct Examination by Mr. Dean         4                    5   questions. You still need to answer the question that
 6     Cross-Examination by Mr. Meythaler   130                    6   I've asked you unless your attorney specifically
 7   STIPULATIONS                           133                    7   instructs you not to answer the question. Is that
 8   INSTRUCTIONS TO DEPONENT               134                    8   clear?
 9   ERRATA SHEET                           135                    9       A. Yes.
10   CERTIFICATE OF OATH                    136                   10       Q. Occasionally I may repeat myself for which I
11   REPORTER'S DEPOSITION CERTIFICATE      137                   11   apologize in advance, but you'll still need to answer
12                                                                12   the question unless you attorney instructs you not to,
13                                                                13   okay?
14                                                                14       A. Yes.
15             EXHIBITS                                           15       Q. Is there any reason you can think of why you
16       (No exhibits were marked.)                               16   would not be able to answer my questions fully and
17                                                                17   truthfully today?
18                                                                18       A. No.
19                                                                19       Q. Robbin, how long have you known Lee Paige?
20                                                                20       A. Since 1985.
21                                                                21       Q. How long have you been married to him?
22                                                                22       A. Eighteen years.
23                                                                23       Q. Okay. So you were married -- when were you
24                                                                24   married?
25                                                                25       A. June 10, 1989.
```

Page 22

1  ask you to help him with presentation, if I understand
2  correctly?
3    A. Right. That's why --
4    Q. But you're usually at his presentations?
5    A. Yes.
6    Q. So you usually will assist if he needs help?
7    A. Absolutely.
8       MR. MEYTHALER: Which presentation are you
9  referring to? Nassau?
10      MR. DEAN: I'm talking about presentations in
11  general. I'm talking about in general right now.
12      MR. MEYTHALER: Well -- I think you may be
13  misquoting prior testimony as to when you use the
14  word usually at presentations. I'm not so sure that
15  what her testimony was.
16  BY MR. DEAN:
17    Q. Okay. Do you recall what I was just asking
18  you?
19    A. No.
20      MR. DEAN: Could you read it back, please.
21      (Question read.)
22  BY MR. DEAN:
23    Q. Is that correct?
24    A. Yes.
25    Q. And do you usually attend his presentations?

Page 23

1    A. I try to attend every presentation he asks.
2    Q. Okay. Just so I understand how it normally
3  works with you assisting Lee when he's in a
4  presentation, are you, as a general matter, standing up
5  front with Lee during the presentation?
6    A. No.
7    Q. Okay. Would you be seated in the audience?
8    A. I'd be seated in the audience, or I'd be
9  standing up front. Not necessarily sitting it all,
10  depends on what the room looks like.
11    Q. Okay. You would be in a position to assist if
12  Lee needed your assistance?
13    A. Yes.
14    Q. Okay. On April 9th, did you arrive separately
15  for the presentation?
16    A. Yes.
17    Q. Was that normal?
18    A. Yes.
19    Q. Okay. But you were at home together before the
20  presentation; is that correct?
21    A. Uh-huh.
22    Q. Why did you arrive separately?
23    A. Because I have a tendency to run late.
24    Q. Okay. Were you late on the night of April 9,
25  2004?

Page 24

1    A. No. I think I got there in time. I don't
2  recall. The presentation hadn't started.
3    Q. When you arrived?
4    A. Right.
5    Q. Okay. Do you recall what time it was when you
6  arrived?
7    A. No. I just grabbed the kids, and we left.
8    Q. So you brought the kids with you?
9    A. Uh-huh.
10      MR. MEYTHALER: You have to say yes or no.
11      THE WITNESS: Yes.
12  BY MR. DEAN:
13    Q. Do you recall when Lee arrived on April 9,
14  2004?
15    A. No.
16    Q. Do you recall if he was there before you
17  arrived?
18    A. I assumed he was there before me.
19    Q. Okay. Did you see him when you arrived?
20    A. Yes.
21    Q. Okay. Was anybody with him when you saw him?
22    A. I don't recall. There was people, like, all --
23  all around.
24    Q. Okay. Can you describe the audience on the
25  night of April 9, 2004?

Page 25

1    A. It was people that were members -- not really
2  members, but people whose kids played with OMGYA [sic].
3    Q. Okay. Were there children in the audience?
4    A. Yes.
5    Q. Okay. Would you say the audience was mainly
6  adults?
7    A. I don't know. I didn't note if it was mainly
8  adults or mainly children. I know it was parents there
9  with their kids.
10    Q. Do you recall about the size of the audience?
11    A. Yeah. I guess around 30.
12    Q. Okay. When you arrived, did you see that the
13  presentation was going to be video recorded?
14    A. No.
15    Q. Did that become apparent to you later?
16    A. Yes.
17    Q. Did you point that out to Lee?
18    A. No. He told me.
19    Q. Sorry?
20    A. He told me.
21    Q. Oh, Lee told you the presentation was going to
22  be video recorded?
23    A. Yes.
24    Q. Was that unusual?
25    A. No. He didn't tell me, like, before it

Page 26

1  A. No.
2     MR. DEAN: I don't have anymore questions.
3  Mr. Meythaler may have some questions for you.
4              CROSS-EXAMINATION
5  BY MR. MEYTHALER:
6  Q. How old are you, Mr. Dorsey?
7  A. How old am I?
8  Q. Yes.
9  A. Sixty-four.
10 Q. Where did you attend college?
11 A. Fisk University in Nashville, Tennessee, and
12 Meharry Medical College, Nashville, Tennessee.
13 Q. That's where you obtained your dental degree?
14 A. Uh-huh. Right.
15 Q. What is your present position with the OMYGA?
16 A. I'm the founder. I'm the executive director.
17 Q. What is the mission of the OMYGA?
18 A. To introduce disadvantaged kids to the great
19 sport of golf.
20    MR. MEYTHALER: Do you have any evidence
21 labels?
22    THE REPORTER: I have exhibit stickers right
23 here.
24    THE WITNESS: I brought some evidence?
25    (Exhibit No. 1 marked for identification.)

Page 27

1  BY MR. MEYTHALER:
2  Q. I've marked this document Exhibit 1, which I'm
3  handing to you. Can you identify that for me?
4  A. Uh-huh. That's our flier. That's our
5  information pamphlet that talks about us and what we do.
6  Q. Now, who are the members of the OMYGA?
7  A. Who are the members? Members are parents, kids
8  who wish to learn to play the great sport of golf.
9  Q. How many members are there presently in the
10 OMYGA?
11 A. Varies. It varies. Now, we just concluded a
12 year, so it may be -- it averages 75, has been 125, and
13 it may vary. I'll know in February how many new ones we
14 have, and I'll know in March how many returnees we have.
15 Q. When you have your Friday meetings, is there
16 any announcement that goes out that there's a Friday
17 meeting, or is it something that everyone just knows to
18 attend?
19 A. We'll have a schedule beginning when everybody
20 comes. We have a schedule of events that's going to
21 happen. Everybody knows Friday night. Everybody knows
22 we're off on the last Friday of the month. Everybody
23 knows at 6:45 you need to be there because we stress
24 punctuality. We don't play absenteeism. We don't do
25 that kind of stuff. So everybody knows.

Page 28

1  Q. Where are the meetings held?
2  A. Callahan Center.
3  Q. What is the Callahan Center?
4  A. Neighborhood -- neighborhood center for the
5  community. Community neighborhood center.
6  Q. Who owns it?
7  A. City. City of Orlando.
8  Q. Now, during the presentation that Mr. Paige
9  gave, did you feel that the youth who were present were
10 impressed by Mr. Paige?
11 A. Yes, of course.
12 Q. Can you characterize the type of youth who were
13 present that the night?
14 A. Characterize in what regard?
15 Q. What would be the age?
16 A. Six to eighteen.
17 Q. And what race, generally, was it?
18 A. Mainly minority, black.
19 Q. And were these kids -- were they mainly
20 disadvantaged or not?
21 A. First of all, I believe most blacks are
22 disadvantaged, so I'm going to say, yes, disadvantaged.
23 Q. Did Mr. Bronson tell you why the DEA wanted the
24 tape?
25 A. No, I don't know. No.

Page 29

1  Q. When you received whatever copy you received
2  from the DEA, do you recall where you put it?
3  A. No. I just laid it down. I think I just put
4  it down.
5  Q. Do you recall seeing it since then?
6  A. No.
7  Q. You never gave it to anyone; is that correct?
8  A. Uh-uh.
9  Q. And you never showed it to anyone; is that
10 correct?
11 A. (No response.)
12    MR. MEYTHALER: I have nothing further.
13            REDIRECT EXAMINATION
14 BY MR. DEAN:
15 Q. One other question, Dr. Dorsey. Was Mr. Paige
16 on time for his presentation?
17 A. Uh-huh. Oh, you have to be on time. I know
18 you don't understand. I would move right on.
19    MR. DEAN: Thank you very much for your time.
20 The government has no further questions.
21    (Deposition concluded at 4:43 p.m.)

**Page 46**

1  Q. Do you recall who did?
2  A. Yes, my girlfriend.
3  Q. Who is that?
4  A. Marilyn Nassieff.
5  Q. Nassieff?
6  A. N-a-s-s-i-e-f-f.
7  Q. Anybody else?
8  A. Ramkinson (phonetic) but he's not with the
9  department anymore.
10 Q. Ramkinson?
11 A. Yes.
12 Q. Anyone else that you can recall?
13 A. I'm sure there were others that made mention to
14 me but those were the --
15 Q. What did Marilyn Nassieff say to you?
16 A. Marilyn called me and asked me if I saw the
17 video, and I said, "What video are you talking about?"
18 Q. Do you remember when this was?
19 A. This was the beginning of March '05. End of
20 February, beginning of March.
21 Q. Do you know where Marilyn saw the video?
22 A. Sheriff's office site.
23 Q. Do you know if it was on the internet or --
24 A. It was on the internet.
25 Q. Okay. I'm sorry. When you say, "sheriff's

**Page 47**

1  office site," what do you mean?
2  A. It's a work site. I don't know the name of it,
3  but she told me what it was, and I pulled it up.
4  Q. Okay. You pulled up the video on the internet
5  from what Marilyn had said to you; is that correct?
6  A. Yes. Yes.
7  Q. All right. And did you tell Lee about it?
8  A. Yes. I called him in and I said, you know,
9  Lee, Marilyn just called me, said that the video is on
10 the internet.
11 Q. Okay. Was, like, there, like, any comments on
12 the video, or is it just the video itself --
13 A. Oh, there was plenty of comments.
14 Q. Okay. Could you give me some examples.
15 A. This is what happens when you give a nigger a
16 gun.
17 Q. I'm sorry. Just so I'm clear here. I don't
18 mean to interrupt you, but this is on the website that
19 Marilyn told you about, correct?
20 A. Uh-huh.
21    MR. MEYTHALER: You have to say yes or no.
22    THE WITNESS: Yes.
23 BY MR. DEAN:
24 Q. Go ahead.
25 A. And something about they knew me, and they were

**Page 48**

1  saying just not nice things about me.
2  Q. People? Do you know --
3  A. Of people that said that they knew me --
4  Q. Oh, okay. People on the site said they knew
5  you?
6  A. On the site they said they knew me. I know who
7  this is. This is Lee Paige. I know him. I know his
8  wife.
9  Q. Okay. Did --
10 A. I didn't care to read anymore.
11 Q. I understand. And Ramkinson, was that a he or
12 a she?
13 A. It's a he.
14 Q. And did he called you or contact you or --
15 A. We were just talking one day because I heard he
16 had gout, so I called to see how he was doing. And he
17 said, "Yeah, I heard about what happened with Lee. I'm
18 really sorry for you guys."
19 Q. Okay. But --
20 A. That was the extent of that.
21 Q. Okay. He didn't --
22 A. He said he saw it, and he clicked it off
23 because he didn't want to view it.
24 Q. He also saw it on the internet?
25 A. I believe so. He didn't really tell me where.

**Page 49**

1  Q. Where he saw it but he saw it somewhere?
2  A. Yes.
3  Q. Okay. And was that after Marilyn had seen it?
4  A. Oh, yeah. It was way after Marilyn had seen
5  it.
6  Q. Like months after?
7  A. I don't remember when, but Marilyn and I had
8  gone to see him and talk to him, and it was around that
9  time.
10 Q. Okay. Okay. Do you know if -- I apologize if
11 I asked you this already. But did Marilyn just find the
12 site with the video, or do you know if it was e-mailed
13 to her, how she found it?
14 A. I have no idea. You'd have to talk with
15 Marilyn. I think she said it was a training or
16 something. I don't know. I'm not really sure how she
17 initially found out about it.
18 Q. Well, you think it was a training --
19 A. I think she was -- it was in a training -- I
20 don't know.
21 Q. You think it was -- oh, the shooting was on a
22 training video?
23 A. From the sheriff's office. This was definitely
24 a sheriff's office site.
25 Q. Okay. And I'm just trying to be clear here.

13 (Pages 46 to 49)

Sclafani Williams Court Reporters, Inc.
1-(866) SET-DEPO (738-3376)

**54**

1 that you saw was?
2 A. No.
3 Q. Do you recall if it showed the entire
4 presentation?
5 A. No, I don't recall.
6 Q. Do you recall if it showed Lee with the
7 shackles?
8 A. I don't recall.
9 Q. Okay.
10 A. This is three years ago.
11 Q. I understand.
12 A. I --
13 Q. No. I understand. It's okay.
14 A. Okay.
15 Q. It's okay. I just need to ask you these
16 questions. Do you recall if the video continued after
17 the shooting?
18 A. I don't know.
19 Q. Okay. Do you recall what type of format the
20 video was in on the internet to make it play?
21     MR. MEYTHALER: I don't understand the
22     question.
23     THE WITNESS: No.
24 BY MR. DEAN:
25 Q. Okay.

**55**

1 A. I'm not computer savvy, no.
2 Q. Okay. Do you know if you had to click on
3 something to make the video play?
4 A. I don't remember.
5 Q. Okay. I believe you testified that that was
6 the only time that you've seen the video; is that
7 correct?
8 A. Uh-huh. Uh-huh.
9     MR. MEYTHALER: You have to say yes or no.
10     THE WITNESS: Yes.
11 BY MR. DEAN:
12 Q. Do you have any idea how that video appeared on
13 the internet?
14 A. No, I don't.
15 Q. Okay. And Lee never showed you a copy of the
16 video?
17 A. No.
18 Q. Do you know of anyone who had the video before
19 you saw it on the internet?
20 A. No. Who I thought had the video?
21 Q. Well, who you knew had the video, let's do that
22 first.
23 A. DEA.
24 Q. Okay. Anyone else?
25 A. No.

**56**

1 Q. Okay. And who did you think had the video?
2 A. DEA.
3 Q. Okay. Anyone in particular at DEA?
4 A. No. Just whoever -- Walter --
5 Q. Walter?
6 A. The one I knew who picked -- Walter picked the
7 tape up. So he would be the one, as far as I know, that
8 would have had it.
9 Q. How do you know Walter picked up the video?
10 A. Because he told me he's going to do it, and
11 he's a man of his word.
12 Q. Okay. Did you talk to him after he said he was
13 going to pick up the video?
14 A. Nope. He told me he was going to take care of
15 it.
16 Q. Did Lee ever tell you a copy of the video was
17 given to him in December of 2005?
18 A. No.
19 Q. Are you aware of any media coverage of the
20 discharge that mentioned Lee by name in 2004?
21     MR. MEYTHALER: Object to the word "media" as
22     being vague and ambiguous.
23     THE WITNESS: I don't recall by name, but I
24     know they showed his face.
25

**57**

1 BY MR. DEAN:
2 Q. In 2004?
3 A. Uh-huh. Well, whenever it came out.
4 Q. Okay. Well, let's --
5 A. Is that 2004? No, that would have been 2005.
6 Q. Well, we'll just refresh your memory, okay?
7 The discharge happened on April 9, 2004.
8 A. Right.
9 Q. My question about media coverage, news
10 coverage, TV, newspapers, what have you, in 2004?
11 A. Four -- not that I know of.
12 Q. Okay.
13 A. No.
14 Q. Okay. In 2005?
15 A. Yes.
16 Q. Okay. And that's -- we're talking about where
17 it was covered, showed his face?
18 A. Right after Marilyn told me about that video
19 and we looked at it, maybe a week or two later, it was
20 on the news.
21 Q. Okay. When you say "on the news," can you be a
22 little more specific?
23 A. Local.
24 Q. Okay.
25 A. Every channel we can turn on, some of them

### Page 58

1  showed his face, some of them didn't.
2  Q. Okay. And when you say some didn't show his
3  face, is that because it was blurred?
4  A. They put the little, yeah.
5  Q. Just so we have —
6  A. Oh, they put the little bar — you know how
7  they fuzz your face out, that kind of thing. They
8  fuzzed his face out, and some of them didn't fuzz his
9  face out. That's the best way I can describe it. I'm
10 sorry.
11 Q. But to your recollection, the news where they
12 showed his face or not, they didn't use his name?
13 A. I don't recall.
14 Q. You don't recall. Okay.
15 A. I never stayed to watch. When I saw what it
16 was, I would leave.
17 Q. Okay. What about after 2005?
18 A. After Marilyn called me?
19 Q. Well, I think we have discussed that. Is there
20 something additional?
21 A. People calling the house.
22 Q. Okay. Media called the house —
23 A. Yes.
24 Q. When did that start?
25 A. Soon after the — soon after he was on — on —

### Page 59

1  they showed him on the news.
2  Q. Okay. Okay. If I'm understanding the timeline
3  correctly, Marilyn let you know about the video, a week
4  or two later it was on the news?
5  A. Yes.
6  Q. Some of the stations showed his face, some
7  didn't?
8  A. Right.
9  Q. And then shortly thereafter, you started
10 getting calls to the house?
11 A. Phone calls. Yes.
12 Q. Or there were calls to the house?
13 A. Yes.
14 Q. From the media?
15 A. And they even called me by my name.
16 Q. And when you say by your name —
17 A. Robbin.
18 Q. They —
19 A. Hello, Robbin. Who is this?
20 Q. And what would —
21 A. And they would say, we would like to know if we
22 could talk with Lee.
23    What do you need to talk with Lee about.
24    We want to talk about the incident.
25    No, you can't. Hang up the phone.

### Page 60

1  Q. Okay. Do you recall about how many calls there
2  were?
3  A. No, I can't.
4  Q. Okay. Would you say it was more than ten?
5  A. Yeah, easily.
6  Q. All right. More than 20?
7  A. I don't know if more than 20. We even received
8  letters too.
9  Q. Okay. So aside from the calls and letters, did
10 anyone come in person to the house?
11 A. Someone tried. My neighbor told me someone
12 tried to come, and they told them that they needed to
13 leave.
14 Q. Your neighbor told them that?
15 A. Uh-huh.
16 Q. Okay. But you had no contact with this person?
17 A. No. We kind of — unfortunately, my kids and I
18 kind of played let's pass by to see if anybody is there
19 before we go home. That's how we would come home
20 everyday.
21 Q. Okay.
22 A. If we —
23 Q. Once this started?
24 A. Right. If we see somebody is there, we would
25 just continue on. If nobody was there —

### Page 61

1  Q. And did you see people there?
2  A. No. We came at different times, odd times.
3  Stayed late over to my mom's and then come home and —
4  Q. And then —
5  A. Never set a pattern.
6  Q. Okay. And then come home late to your house?
7  A. Uh-huh.
8  Q. And where was Lee during this time?
9  A. He was at work or coming or —
10 Q. Okay. Did he stagger his times coming home as
11 well? Do you recall?
12 A. I don't know if he did, but that's something he
13 told us to do.
14 Q. I'm sorry. Who told you?
15 A. Lee, just to make sure.
16 Q. Okay. Okay. And how long did this last?
17 A. The calls or —
18 Q. Yes. The calls, the letters?
19 A. Let me see, we got a letter a month ago, so
20 it's still continuing on.
21 Q. Okay. All right. But let's think of it this
22 way, I guess. When you said you were initially getting
23 the calls when the video was on the internet —
24 A. Uh-huh.
25 Q. — at some time, did those calls subside?

16 (Pages 58 to 61)

Page 62

1  A. Yes.
2  Q. Do you recall when that was?
3  A. No. I can't recall. I just know it was
4  because we were like, you know, we don't want to talk.
5  Leave us alone. They finally got the message.
6  Q. Okay. Were you still getting calls in July of
7  2005?
8  A. I can't remember.
9  Q. Okay. Had the volume of calls decreased by
10 July of 2005?
11 A. I can't remember.
12 Q. Okay. Did the amount of calls increase after
13 Lee filed this lawsuit?
14 A. No.
15 Q. Okay. Did it go down?
16 A. No. It was about the same.
17 Q. About the same?
18 A. I know it was July 2005 -- no. Dominique went
19 to school in 2006 -- no. Something else. I'm thinking
20 about when my daughter was approached in -- well, an
21 incident happened in school.
22 Q. Okay. Well, we'll get to that in a moment. Do
23 you recall the date your husband filed this lawsuit?
24 A. No.
25 Q. Did you and your family take a vacation in

Page 63

1  March of 2005?
2  A. Yeah. That's around spring break?
3  Q. Uh-huh.
4  A. Uh-huh.
5     MR. MEYTHALER: You have to say yes or no.
6     THE WITNESS: Yes.
7  BY MR. DEAN:
8  Q. Do you recall where you went?
9  A. We went to a beach. I think we went to -- I
10 can't remember the beach we went to.
11 Q. Was it a beach in Florida?
12 A. Uh-huh.
13 Q. Okay.
14 A. It wasn't Daytona. It was that other one we go
15 to, Fort Lauderdale.
16 Q. Okay. Was that during your children's spring
17 break?
18 A. Yeah.
19 Q. Do you do that every year?
20 A. No.
21 Q. Was there a particular reason you did it in
22 2005?
23 A. Yes. Because Lee was told -- he relayed to me
24 that he was told for us to just leave the area for a
25 little bit.

Page 64

1  Q. Do you recall who told him that?
2  A. His supervisor. I'm not sure which one.
3  Q. Okay. Well, one of the supervisors at DEA told
4  him to leave the area?
5  A. Uh-huh.
6  Q. Okay. And is this when the media was calling
7  all of the time?
8  A. Uh-huh. Yeah.
9  Q. Okay. Do you recall when you planned the trip?
10 A. It was right off the cuff.
11 Q. But it was the DEA's idea?
12 A. Yes. Because we weren't planning on going
13 anywhere.
14 Q. Okay. So you weren't planning on going
15 anywhere for spring break, right?
16 A. No.
17 Q. Do you remember if you flew or drove?
18 A. We drove.
19 Q. Okay. Do you recall where you stayed?
20 A. In a hotel.
21 Q. Do you recall the name of the hotel?
22 A. No. Probably the Hilton.
23 Q. Do you recall at all? Are you okay?
24 A. I'm sorry. I was scratching my throat. I
25 apologize. Either the Hilton or Embassy or something.

Page 65

1  Q. Do you recall --
2  A. That is usually where we stay is those, either
3  Hilton or Embassy Suites. My kids like the Embassy
4  Suites.
5  Q. Okay. Do you recall the dates of your stay?
6  A. It was during that spring break. I know it was
7  that March, the second week in March or something --
8  started their spring break.
9  Q. Was it for the whole week?
10 A. Yes.
11 Q. Were you at the same hotel the whole week?
12 A. Uh-huh. We stayed there the whole time.
13 Q. Okay. Did you eat in the hotel, or did you go
14 out?
15 A. We went out.
16 Q. Did you rent a car?
17 A. No. We had our own vehicle.
18 Q. Okay. Were expecting to be reimbursed by DEA
19 for this?
20 A. Yes.
21 Q. And why were you expecting to be reimbursed by
22 DEA?
23 A. Because Lee said that they told him that they
24 would reimburse us. Because we didn't -- we weren't
25 going to plan to leave.

66

1  Q. Okay. And did Lee tell you who told him DEA
2  would reimburse?
3  A. He told me one of the supervisors. He did tell
4  me the name, but I can't recall.
5  Q. Okay.
6  A. Somebody that was higher than Steve Collins.
7  Q. Higher than Steve Collins?
8  A. Yes.
9  Q. Do you know if it was someone in Miami?
10  A. Yeah. Because the next person would be in
11  Miami.
12  Q. Okay. So you went on a trip expecting DEA to
13  pay for it; is that correct?
14  A. Yes.
15  Q. Did you keep receipts of your travel?
16  A. Yes.
17  Q. Do you know if Lee saved those receipts?
18  A. I'm sure he did. He's good at that.
19  MR. MEYTHALER: Let's take a break.
20  MR. DEAN: Sure.
21  (A short recess was taken.)
22  BY MR. DEAN:
23  Q. Did Lee use an assumed name on your vacation?
24  A. I don't remember.
25  Q. Okay. Have you ever known Lee to use an

67

1  assumed name?
2  A. Yes.
3  Q. Outside of work?
4  A. No.
5  Q. Did you tell Lee not to use his work credit
6  card to pay for the vacation, the spring break vacation
7  we've been discussing?
8  A. I didn't tell him what to use.
9  Q. Okay. When you went on that vacation, were you
10  worried about people recognizing Lee?
11  A. Yeah.
12  Q. Did anybody recognize him?
13  A. No.
14  Q. When you returned from the vacation, were the
15  contacts by the media still as bad as they were when you
16  left?
17  A. Yes.
18  Q. Did you take any later vacations to get away
19  from the media?
20  A. No.
21  Q. Do you think Lee's name is generally recognized
22  by the public now?
23  A. Yes.
24  Q. Okay. Do you ever use aliases on vacation now?
25  A. No.

68

1  Q. Do you think Lee is emotionally upset or
2  disturbed by the accidental discharge?
3  A. About the discharge itself?
4  Q. Uh-huh.
5  A. No.
6  Q. About the release of video?
7  A. Yes.
8  Q. Okay. How is he upset?
9  A. Well, his kids come to him on numerous
10  occasions upset, besides themselves, being approached at
11  school. His wife complains to him numerous times about
12  being approached about the same thing, and finding out
13  people that he thought that he worked with were his
14  friends and finding out differently.
15  Q. Can you give me an example of a person like
16  that?
17  A. People that he thought was his friends?
18  Obviously, the ones that chose to put the video out.
19  Q. Do you know who that was?
20  A. No. Wish I did.
21  Q. Okay. Aside from the unknown people who put
22  out the video, has anyone —
23  A. They were obviously people that worked with
24  him. So, you know, that sort of situation.
25  Q. Sure. Aside from these unknown people, has

69

1  anyone else at work treated your husband differently?
2  A. I don't know. He wouldn't tell me that.
3  Q. Okay. But you think that your kids going to
4  him and you going to him has upset him?
5  A. Yes.
6  Q. Okay. Do you think it's made it difficult for
7  him to do his job?
8  A. Us going to him?
9  Q. Uh-huh.
10  A. I don't know.
11  Q. Okay. You talked earlier about an incident
12  where one of your children was approached at school.
13  A. Yes.
14  Q. Could you give me the details of what happened.
15  A. This is one of the most recent ones. They were
16  approached -- when they initially came out, they were in
17  middle school.
18  Q. Okay. When it initially came out, we're
19  talking about in 2005; is that correct?
20  A. Yes. They were in middle school, and they were
21  approached several times by friends and not friends, and
22  this continued on until my daughter went to high school
23  which is this year. She's now a freshman.
24  Q. Freshman in high school?
25  A. Yes. And she was attending summer school.

18 (Pages 66 to 69)