Page 1

IN THE FEDERAL DISTRICT COURT

IN THE DISTRICT OF COLUMBIA

-------------------------------x

LEE PAIGE,                              :

        Plaintiff,    :

  v.                                    : CASE NO:

DOJ and DEA,                            : 1:06CV 00644-EGS

        Defendant.    :

-------------------------------x

                Washington, D.C.

                Tuesday, November 6, 2007

Deposition of:

           GREGORY A. WHITE

called for oral examination by counsel for Plaintiff, pursuant to Notice, at the US DOJ Civil Division, Federal Programs, 200 Massachusetts Avenue, Northwest, Washington, D.C., before Mary E. Warner of Capital Reporting, sworn by a Notary Public in and for the District of Columbia, beginning at 9:00 a.m.

PLAINTIFF'S EXHIBIT 197

Page 2

1  APPEARANCES
2
3  On Behalf of the Plaintiff:
4     WARD A. MEYTHALER, ESQUIRE
5     Law Offices of Merkle & Magri, P.A.
6     5415 Mariner Street, Suite 103
7     Tampa FL 33609
8     (813) 281-9000
9
10 On Behalf of the Defendants:
11    PETER J. PHIPPS, ESQUIRE
12    U.S. Department of Justice
13    20 Massachusetts Avenue, N.W.
14    Washington, D.C. 20530
15    (202) 514-1280
16
17 ALSO PRESENT:
18    Lee Paige
19
20
21
22

Page 3

1        CONTENTS
2  EXAMINATION BY              PAGE
3     Counsel for Plaintiff      4
4     Counsel for Defendants   161
5
   GREGORY WHITE DEPOSITION EXHIBITS *  PAGE
6   1  Redacted Form              47
7   2  Acquisition of Nondrug Property   112
8   3  Decision                  120
9   4  IN File                   124
10  5  Memo, 3/25/05             153
11  6  Handwritten Notes         153
12  7  DV, N-11                   52
13  8  VHS Tape, N-11             47
14  9  (not used during dep)
15 10  CD, N-8-1                 113
16 11  CD, N-8-2                 114
17 12  CD, N-8-3                 115
   13  VHS, N-10-1               155
18 14  VHS, N-10-2               155
   15  DV, N-12-A                156
19 16  DV, N-12-B                156
   17  DV, N-12-C                157
20 18  DV, N-12-D                157
   19  Audio Visual Services Request  102
21 20  Handwritten Notes         158
   21  Memo, 8/13/04              66
22    (*Exhibits attached to transcript.)

Page 4

1          PROCEEDINGS
2  WHEREUPON,
3     GREGORY A. WHITE
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6     EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. MEYTHALER:
8    Q  Good morning, Mr. White. How are you
9  doing? Could you state your name for the record?
10   A  Gregory A. White.
11   Q  Have you given a deposition before?
12   A  No.
13   Q  Let me tell you a couple rules. You have
14 to answer yes or no. You can't nod your head
15 because the court reporter can't take that down.
16 And if you have any questions at all about what
17 I'm asking or if you don't understand a question,
18 just say so and I'll rephrase it or explain
19 myself. That's about it. How old are you, sir?
20   A  45.
21   Q  Do you reside in the Washington, DC area?
22   A  No.

Page 5

1    Q  Do you reside in the Philadelphia area?
2    A  Yes.
3    Q  What is your marital status?
4    A  Single.
5    Q  What office are you with now?
6    A  Philadelphia.
7    Q  What's your position there?
8    A  Group supervisor.
9    Q  What type of group?
10   A  Financial investigations.
11   Q  And did you go to college?
12   A  Yes.
13   Q  Which college did you go to?
14   A  Shippensburg University.
15   Q  Graduate?
16   A  Yes.
17   Q  Could you give us a thumbnail sketch of
18 your career at the DEA including dates, where you
19 began, where you where, what your position was?
20   A  I began, hired on March of 1988, went to
21 Quantico. Graduated from Quantico in June of '88.
22 August of '88 went to Boston, spent 14 and a half

Page 6

1  years there.
2      From February of 2003 I went to
3  headquarters as a -- well, I got promoted in
4  Boston as a supervisor in 2000. 2002 to 2003, I
5  was a supervisor there.
6      And then 2003 reported to headquarters,
7  Office of Inspections. I did three years and
8  three months in inspections. And then I
9  transferred to Philly.
10     Q  And you're a group supervisor there now?
11     A  Yeah.
12     Q  In Boston what type of group were you the
13 supervisor of?
14     A  Task force.
15     Q  Now, did you do anything to prepare for
16 this deposition?
17     A  I was here last week. I had questions
18 and I was here with the attorney. He gave me an
19 idea about the format.
20     Q  You don't have to tell me what he told
21 you.
22     A  Yeah.

Page 7

1      Q  Did you review any documents to prepare
2  for the deposition?
3      MR. PHIPPS: I'm going to object to the
4  extent there's documents I showed him under the
5  fact that they're opinion work product. If there
6  are other documents I showed him, the witness can
7  answer.
8      MR. MEYTHALER: He can answer my question
9  no matter what because I said, "Did you review any
10 documents?"
11     MR. PHIPPS: That's right.
12 BY MR. MEYTHALER:
13     Q  What documents did you review? Which you
14 can be mindful of what your attorney which he's
15 objecting to any documents he prepared.
16     Let me put it this way, did you review
17 any documents to prepare for this deposition that
18 were not provided to you by your attorney, I mean,
19 the government's attorney?
20     A  Did I review documents that may have
21 been --
22     Q  That you had that was not given to you by

Page 8

1  Mr. Phipps?
2      A  I may have. I'm not for sure. I know I
3  had -- I'm not for sure.
4      Q  Did you have documents with you when you
5  went to see Mr. Phipps?
6      A  Yes.
7      Q  Which documents did you have with you?
8      A  I had my report.
9      Q  This is the IN report?
10     A  Yes, and the memo.
11     Q  Which memo was that?
12     A  The IN memo, the cover memo.
13     Q  Anything else?
14     A  What do you mean?
15     Q  Were there any other documents that you
16 took with you when you went to see Mr. Phipps that
17 related to the accidental discharge or your
18 investigation of it?
19     A  Yes.
20     Q  What else?
21     A  Photos of the scene, my interview notes.
22     Q  Okay. Anything else?

Page 9

1      A  That was probably it.
2      Q  What is the IN cover memo?
3      A  That's a memo after the investigation is
4  over that would go from the deputy chief inspector
5  to the inspector.
6      Q  Did you prepare that memo?
7      A  I prepared it in draft form and then --
8  yes.
9      Q  Is it part of the IN investigative file?
10     A  It's not an actual file until all the
11 information in there is reviewed and signed off by
12 the deputy chief inspector.
13     Q  But is the cover memo part of the
14 investigative file?
15     A  At the point when it would be -- when the
16 deputy chief inspector would sign off on it, it
17 would be included.
18     Q  I'm trying to get an idea what the IN
19 cover memo is, because I don't know.
20     MR. MEYTHALER: Do we have it? Was it
21 produced?
22     MR. PHIPPS: Yeah.

Page 10

1  THE WITNESS: It's a snapshot of what
2 happened.
3 BY MR. MEYTHALER:
4  Q  Is it a snapshot of something that
5 appears on the database?
6  A  No, it's a synopsis.
7   (White Exhibit No. 3
8   was marked for identification.)
9 BY MR. MEYTHALER:
10  Q  Let me hand you what I've marked as White
11 Exhibit 3. Is this the document you're talking
12 about?
13  A  No.
14  Q  All right.
15   (White Exhibit No. 4
16   was marked for identification.)
17 BY MR. MEYTHALER:
18  Q  Let me hand you White Exhibit 4. Is
19 something in there the IN cover memo?
20   MR. PHIPPS: Do you have a copy of that
21 for me?
22   MR. MEYTHALER: Oh, sure.

Page 11

1   MR. PHIPPS: Thanks.
2 BY MR. MEYTHALER:
3  Q  Is it in there?
4  A  No.
5  Q  You still have it, right?
6  A  I have a copy of it.
7  Q  Where is that located? Is it in
8 Mr. Phipps' office?
9  A  No.
10  Q  Where do you have it?
11  A  It would be with my other material.
12  Q  Where is that?
13  A  In my vehicle.
14  Q  Where's your vehicle?
15  A  It's outside.
16  Q  At the lunch hour, do you think you could
17 get that?
18  A  You don't have a copy of it?
19  Q  I don't know what it is, sir. I just
20 told you that. I may have a copy of it. Until
21 someone can tell me -- what does it say?
22  A  It's a synopsis. It's in memorandum form

Page 12

1 in which I have DEA memorandum written at the top
2 and it would have the document, the incident what
3 happened in a synopsis form.
4  Q  Did you prepare that document?
5  A  Yeah, in draft. And then the deputy
6 chief inspector reviews it, makes changes and
7 submits it.
8  Q  What's the purpose of the document?
9  A  What do you mean by --
10  Q  What is done with it?
11  A  That's a memo that the deputy chief
12 inspector sends with the entire package, once he
13 signs off on it, to the chief inspector.
14  Q  All right. And what is the purpose of
15 preparing the memorandum?
16  A  It goes into the incident report and then
17 that all describes all the things that were done
18 and what the results of some of the investigative
19 information is.
20  Q  And that ends up going into the
21 investigative file?
22  A  Only at the point when the deputy chief

Page 13

1 inspector signs off on the completed package,
2 because he may have changes or he may have issues
3 with it.
4  Q  So it does go into the investigative
5 report at some time, is that correct?
6  A  Yes.
7  Q  The answer to my question is yes, is that
8 correct?
9  A  It goes into what would be a completed
10 file or authorized file at that point.
11  Q  An authorized file?
12  A  Yes.
13  Q  And tell me, what is an authorized file?
14  A  That would just be all the components of
15 what's combined in there, because they make
16 changes to the memo. They may word this
17 differently. There may be connections.
18  Q  So does the DEA maintain an unauthorized
19 file of the investigation of Mr. Paige?
20  A  No.
21  Q  So the only file is an authorized file?
22  A  Yes.

Page 34

1  A  I'm uncertain.
2  Q  Was there more than one call?
3  A  I'm uncertain.
4  Q  Did you talk to Mr. Mathews about who you
5  would interview?
6  A  Yeah.
7  Q  And who did you decide to interview? I'm
8  talking about before you went to Orlando.
9  A  I mean, we knew we had to interview like
10 all the witnesses from the point of the incident,
11 all the way to -- we probably -- I would say we
12 probably mentally came up with a list of people
13 who would have been interviewed.
14 Q  And how did you probably come up with
15 that list?
16 A  Well, we knew from the video that there
17 were obviously witnesses.
18 Q  Good point.
19 A  You know, the witnesses of the
20 individuals that were on the tape scene, the agent
21 personnel that were there.
22 Q  Did there come a point in time that you

Page 35

1  learned the names of people you were going to
2  interview before you went out there?
3  A  Not -- a few of them. A few of them we
4  may have, yeah.
5  Q  Okay. How did you do that?
6  A  We knew we had to interview Lee Paige.
7  We knew we had to interview the ASAC, the group
8  supervisor. We kind of followed the trail of what
9  happened after the accidental discharge.
10 Q  Okay. And was there something provided
11 to you in the form of a trail that you could
12 follow before you went out there?
13 A  I'm uncertain. Not to me, I don't think.
14 Q  Did you receive any type of
15 correspondence or memorandum or report that you
16 could look at before you went to Orlando?
17 A  No.
18 Q  All right. Prior to Mr. Dearing calling
19 you to his office, had you heard about this
20 accidental discharge?
21 A  No.
22 Q  That was the first time you heard about

Page 36

1  it?
2  A  Yes.
3  Q  Did Mr. Dearing provide you with any type
4  of a memorandum or written instructions with
5  respect to the investigation?
6  A  We had like a checklist of things that we
7  should kind of do as part of what needed to be
8  accomplished.
9  Q  Was that a form checklist to use in
10 shooting cases in general or for this case in
11 particular?
12 A  A form for shooting cases in general.
13 Q  Did you have that or did Mr. Dearing give
14 it to you?
15 A  I think Elde may have had that.
16 Q  Did Mr. Dearing give you or Mr. Mathews
17 anything specifically related to this case other
18 than showing you the video?
19 A  To me, no.
20 Q  How about to Mr. Mathews?
21 A  He may have.
22 Q  You don't know?

Page 37

1  A  No.
2  Q  All right. Now, are you familiar with
3  how the Office of Investigations files are opened?
4     MR. PHIPPS: Objection, misleading.
5     MR. MEYTHALER: Actually, I suppose I
6  should have said Office of Inspections files.
7  BY MR. MEYTHALER:
8  Q  Are you familiar with how files are
9  opened?
10 A  Well, it's not a file until everything is
11 signed off and completed. There may be a
12 reference number.
13 Q  So there's a reference number but not a
14 file number, is that what you're saying?
15 A  There's a reference -- there may be
16 something that you could attribute all your
17 actions to but it's not an official file until the
18 deputy chief inspector signs off on that completed
19 memorandum.
20 Q  Who told you that?
21 A  Who told me that?
22 Q  Yes, who told you that?

Page 58

1  A  Yeah.
2  Q  All right. Did you keep it locked?
3  A  Yeah.
4  Q  Was the video cassette just placed
5  freestanding or was it put in some sort of
6  envelope or container at some point?
7      MR. PHIPPS: Objection, ambiguous.
8      THE WITNESS: Yes.
9  BY MR. MEYTHALER:
10  Q  Yes? What, I'm sorry?
11  A  Yeah, I put it in some type of little bag
12  or something.
13  Q  What type of bag?
14  A  I'm not certain but a bag or envelope.
15  Q  Did you make any marks on the bag or
16  envelope?
17  A  Yes, I would have probably wrote his name
18  on the outside of the envelope.
19  Q  Is that bag still available?
20  A  No, I don't think so.
21  Q  What happened to that bag?
22  A  I probably -- I got rid of it at the

Page 59

1  point of when all the -- all these components were
2  being put into the formal inspection file after
3  the deputy chief inspector signed off on that memo
4  we were talking about later.
5  Q  A formal inspection file?
6  A  No, no, I said after -- once the deputy
7  chief inspector signed off on that memo that we
8  were talking about earlier, that cover memo. Do
9  you remember that?
10  Q  Yes, sir.
11  A  Then that's when I was given the okay to
12  now we need to gather everything up and put it
13  together because it has to go from here to the
14  Board of Professional Conduct.
15  Q  And that's when it becomes a formal file,
16  is that what you're saying?
17  A  Yeah.
18  Q  And before that, it is an informal file?
19  A  No, it's not informal, that's when --
20  Q  What is it?
21  A  That's when all the stuff is compiled and
22  put together and then it's forwarded out of our

Page 60

1  office.
2  Q  So it's a formal file at all times, is
3  that correct?
4      MR. PHIPPS: Objection, foundation.
5      THE WITNESS: I mean, it's all the
6  information is together and then I prepared it in
7  like a book at that point.
8  BY MR. MEYTHALER:
9  Q  When you wrote Mr. Paige's name on this
10  bag, did you write the file number on it?
11  A  No, I don't think so.
12  Q  And you say you've got the file number
13  when you got back into Arlington?
14  A  Yes.
15  Q  Who gave you the file number?
16  A  That would have been either -- I'm not
17  certain.
18  Q  Who would it have been typically?
19  A  Either Elde would have told me what it
20  was or Jim Burns.
21  Q  What's the purpose of the file number?
22  A  It's like a reference for all the

Page 61

1  material.
2  Q  You placed the file number on your
3  reports with respect to this investigation?
4  A  Yes.
5  Q  Now, during your interview of Mr. Paige,
6  was there any other discussion about the
7  videotape?
8  A  You mean -- what do you mean by that?
9  Q  You indicated that he wanted to see the
10  video?
11  A  Yes.
12  Q  Was there any other discussion about the
13  video?
14  A  Uncertain.
15  Q  Let me put it this way, was there
16  anything said by Mr. Paige in which he expressed
17  concern that a videotape existed?
18  A  Yes.
19  Q  What did he say?
20  A  He said that the thing was embarrassing
21  and that he at least wanted to see what happened
22  on the tape.