## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEE PAIGE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00644 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| and UNITED STATES OF AMERICA, | ) | Hon. Emmet G. Sullivan |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO STRIKE DEFENSES

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    PLAINTIFF IS PRECLUDED FROM SUMMARY JUDGMENT AS A MATTER
      OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Plaintiff Cannot Prove the Elements of a Privacy Act Claim. . . . . . . . . . . . . . . . 3

      B.    Plaintiff Cannot Recover for the Tort of Publicity Given to a Private Fact. . . . . . . 8

II.   DISPUTES OF MATERIAL FACT UNDERMINE PLAINTIFF'S THEORY OF
      SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    The Exaggerated Count of the Number of Shooting Videos. . . . . . . . . . . . . . . . . 12

      B.    Misunderstandings and Misconstructions of IN procedures. . . . . . . . . . . . . . . . 14

            1.    Plaintiff's assertions about what constitutes DEA "evidence" are
                  immaterial and incorrect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            2.    Plaintiff misunderstands IN's policies regarding its files and the
                  copying of its files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            3.    Plaintiff's expert testimony is not reliable. . . . . . . . . . . . . . . . . . . . . . . 17

III.  AFFIRMATIVE DEFENSES BAR ANY RECOVERY BY PLAINTIFF. . . . . . . . . . . . 20

      A.    The Unclean Hands Defense Applies to Plaintiff's Action. . . . . . . . . . . . . . . . . 20

      B.    Plaintiff Cannot Recover Non-Pecuniary Damages Under The Privacy Act. . . . . . 24

      C.    Plaintiff Has Forfeited and Waived His Ability to Pursue a Civil Action
            Based On Any Privacy Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      D.    Plaintiff's Action Is Barred By The Federal Employees Compensation Act. . . . . . 31

      E.    The Alternatively Pleaded Negligence-Based Defenses Apply to Bar
            Plaintiff's Case, If Plaintiff Is Permitted to Import Negligence Methods of
            Proof into His Lawsuit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

i

**INTRODUCTION**

Summary judgment for plaintiff is not appropriate. Plaintiff fails to prove the legal elements of his Privacy Act and privacy tort claims, and his theory of summary judgment is premised on disputed facts. Moreover, his case is barred by several affirmative defenses.

With respect to the Privacy Act wrongful disclosure claim, plaintiff cannot demonstrate either the system of records element or the mental state requirement. He cannot prove that the copy of the shooting video that appeared on the internet and on DEA's Firebird email system was contained in or retrieved from a system of records. Nor can he show that any version of the video contained in a system of records was intentionally and willfully released by DEA. To overcome these shortcomings, plaintiff professes to rely on circumstantial evidence. Even that evidence is insufficient, and in any event, it fails at summary judgment because it is opposed by direct evidence.

Plaintiff's tort claim for publicity given to a private fact meets a similar fate. Plaintiff cannot sustain any of the four required elements. His shooting presentation, which was given to an audience of 50 and video-recorded without objection, was not a private fact. Nor does plaintiff have any evidence that anyone at DEA made the video-recording of his self-shooting public knowledge. Nor was plaintiff's presentation highly offensive; it did not involve sex or medical conditions, and eyewitness accounts complimented it. Furthermore, the public has a legitimate interest in the subject matter of plaintiff's shooting, including the video footage.

In addition, plaintiff's factual support for his summary judgment theory is often exaggerated, out of context, speculative, or mistaken. For instance, through double-counting, plaintiff inflates the number of copies of the shooting video that were made. He also misconstrues many aspects of DEA policy by asserting that the shooting video constituted "evidence," as that

1

term is used by DEA.  The shooting video was not "evidence" because, as used by DEA, "evidence" relates only to materials demonstrating a violation of the law.  Moreover, plaintiff's technical conclusions about the creation of the videos and DEA's computer system are based on an unreliable expert report and should be given no weight.

Plaintiff's case is also undermined by several defenses.  By endangering an audience of children and parents and then contributing to the media exposure that his shooting video received, plaintiff acted with unclean hands – a defense that applies to legal and equitable relief as a matter of federal law and Florida law.  Plaintiff is also barred from recovering emotional or other non-pecuniary damages under the Privacy Act, as mandated by sovereign immunity principles and reinforced by the Privacy Act's legislative history.  Also, plaintiff has forfeited and/or waived his privacy interests in his presentation by giving it in a public place without restriction and then by permitting others to watch the shooting video.  Due to these forfeitures and waivers, plaintiff cannot pursue his privacy tort claims or his Privacy Act claim, which requires an adverse effect for civil actions.  Moreover, because plaintiff's alleged injuries relate back to his on-the-job conduct, specifically what he said and did during his demand reduction presentation, plaintiff's claims are precluded by the Federal Employees Compensation Act, which bars lawsuits for all injuries arising out of the performance of duties.  Finally, if plaintiff is permitted to import negligence standards of proof into this lawsuit (he should not be), then negligence-based defenses, such as contributory negligence, assumption of the risk, and the fellow-servant rule, would apply to plaintiff's case.

In sum, plaintiff is not entitled to summary judgment, and defendants' defenses should not be stricken.  Rather, Defendants' Motion for Summary Judgment (Docket #45) should be granted.

## ARGUMENT

## I. PLAINTIFF IS PRECLUDED FROM SUMMARY JUDGMENT AS A MATTER OF LAW.

### A. Plaintiff Cannot Prove the Elements of a Privacy Act Claim.

Plaintiff fails to prove a number of elements of a Privacy Act claim, as set forth in detail in Defendants' Motion for Summary Judgment. (Defs' Mot. at 16-30). To avoid unnecessary duplication of prior briefing, this memorandum highlights the deficiencies in the system of records and mental state elements, as well as the errors associated with plaintiff's methods of proof.

As to the system of records element, plaintiff offers no proof that the relevant version of the shooting video was ever contained in, or retrieved from, the IN file. The Privacy Act unmistakably limits its disclosure protections to records contained in a system of records. See McCready v. Nicholson, 465 F.3d 1, 11 (D.C. Cir. 2006) ("An agency can only be held accountable under Privacy Act provisions tied to a system of records requirement for records it can easily retrieve consistent with its day-to-day practice of information management – records found within a 'system of records.'"); Manuel v. Veterans Admin. Hosp., 857 F.2d 1112, 1117 (6th Cir. 1988) ("[R]ecords not kept within a system of records are not protected under the Privacy Act"); Olberding v. U.S. Dep't of Def., Dep't of the Army, 709 F.2d 621, 622 (8th Cir. 1983) (affirming dismissal of Privacy Act complaint where there was no retrieval from a system of records); Chang v. Dep't of Navy, 314 F. Supp. 2d 35, 40 (D.D.C. 2004) ("Determining that a system of records exists from which the document at issue was retrieved is a prerequisite to a substantive Privacy Act claim."); Krieger v. Fadely, 199 F.R.D. 10, 13 (D.D.C. 2001) (explaining that the Privacy Act applies a "rule of retrieval, not a rule of coincidence"). Here, the versions of the shooting video that first appeared on the internet and the Firebird system in March 2005 were 4:09 in length. (Defendants' Statement of Material Facts ("Defs' SMF") ¶¶ 164-65 (Docket #45, Ex. 1)). Yet, the

3

only relevant DEA system of records, the IN file, never contained a 4:09 version of the video. (Defs' SMF ¶¶ 259-61). Nor is there any evidence indicating that the versions of the shooting video contained in IN (VHS, Mini-DV, and DVD) were ever made public or improperly disseminated. (Defs' SMF ¶¶ 168). Without proof of a retrieval from a system of records, plaintiff fails to prove a wrongful disclosure under the Privacy Act.

In addition, even if the 4:09 versions of the shooting video were somehow Privacy Act protected (they were not), the Privacy Act's need-to-know exception would apply in several instances. The Privacy Act exempts from its coverage any disclosures "to those officers and employees of the agency . . . who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). That need-to-know exception would apply to many of the 4:09 copies. For example, whenever a 4:09 version was used for firearms safety evaluation purposes, for firearms training purposes, or as a powerful gun safety lesson, the need-to-know exception would apply. (Defs' SMF, Ex. 14, Expert Report of Keith Santillo at 15 ("The totality of the circumstances surrounding this incident as depicted on the video would be extremely useful as a firearms safety training tool.")). Thus, even if the 4:09 versions were somehow protected by the Privacy Act, summary judgment would still elude plaintiff due to the need-to-know exception.

As to the intentional and willful mental element, plaintiff relies on a broad, incorrect statement. Plaintiff proclaims that "[t]here is no dispute that someone within the DEA must have been responsible for disclosing the video to unauthorized parties since the DEA had exclusive possession of the Mini-DV." (Pl's Mot. at 32). That is not true. Plaintiff has no evidence regarding how a 4:09 version of the shooting video appeared on the internet. Every one of plaintiff's depositions came up empty on this point – no deponent could explain how the shooting video appeared on the internet or was released. (Defs' SMF ¶ 261). Similarly, DEA-OPR's

investigation was unable to conclusively determine how the shooting video appeared on the internet.  (Defs' SMF ¶ 259).

Without evidence of the circumstances of how the shooting video became public, plaintiff cannot satisfy the intentional and willful requirement.  Under plaintiff's own formulation of this mental state standard, it requires a "flagrant[] disregard[] [for] other's rights under the Act."  Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984).  Yet, even assuming that plaintiff could satisfy all of the other Privacy Act elements, he still cannot show that the release was done with a flagrant disregard for his rights.  For example, even assuming proof of every other element, plaintiff still could not show that whoever made public a 4:09 version of the video did so knowing that the shooting video was Privacy Act protected.  Even under these assumptions, the hypothetical 'leaker' could have thought that the Privacy Act did not extend to matters already within the public domain – as courts have held.  See Tripp v. Dep't of Defense, 193 F. Supp. 2d 229, 236 (D.D.C. 2002); see also Wright v. Fed. Bureau of Investigation, 385 F. Supp. 2d 1038 (C.D. Cal. 2005), rev'd on other grounds, 241 Fed. Appx. 367 (9th Cir. 2007).  As this scenario makes clear, without knowing the identity and the circumstances, plaintiff cannot prove the mental state element.  See Edmonds v. U.S. Dep't of Justice, 323 F. Supp. 2d 65, 81 (D.D.C. 2004).  Because plaintiff has no such evidence, he cannot prove the mental state element, and his motion for summary judgment fails.

To circumvent his lack of proof, plaintiff implicitly attempts to import the negligence principle of *res ipsa loquitur*.  Plaintiff does so by arguing that because DEA allegedly had exclusive possession of the video recording, DEA must be responsible for its release.  (Pl's Mot. at 32 ("[S]omeone within the DEA must have been responsible for disclosing the video to unauthorized parties since the DEA had exclusive possession of the Mini-DV.")).  This is the

hallmark of *res ispa loquitur* reasoning – imported from negligence law.  See Barwick v. United States, 923 F.2d 885, 887 (D.C. Cir. 1991) (explaining that *res ipsa loquitur* applies to negligence actions when, among other things, the injury is caused by an "instrumentality within the exclusive control of the defendant").  Such an approach is not legally sound here because, unlike a negligence action, the Privacy Act requires "intentional and willful conduct."  See 5 U.S.C. § 552a(g)(4); see also Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1122 (D.C. Cir. 2007).  Put simply, the Privacy Act requires more than negligence (more than gross negligence), and therefore negligence-based methods of proof cannot suffice to prove a Privacy Act violation.

Moreover, even if *res ipsa loquitur* could apply to the Privacy Act, it offers plaintiff no assistance here.  As the D.C. Circuit has explained, "one cannot rely on *res ipsa loquitur* if causes other than the defendant's negligence might just as well have produced the accident."  Bell v. May Dep't Stores Co., 866 F.2d 452, 456 (D.C. Cir. 1989).  Here, plaintiff has not provided any evidence of any negligence, let alone of negligence most probably caused by DEA.  For example, plaintiff has not excluded the possibilities that a version of the shooting video was released by a government contractor, or by a state or local law enforcement officer, who might have inadvertently received the shooting video.  Thus, plaintiff's attempt to inject negligence principles into this case is both inappropriate as a matter of law and unsuccessful as a matter of proof.

Plaintiff also attempts to avoid proving these necessary Privacy Act elements simply by relying on general circumstantial evidence.  (Pl's Mot. at 34).  Broadly, no amount of circumstantial evidence can overcome the direct evidence that a 4:09 copy of the shooting video was not in the IN file.  (Defs' SMF ¶ 260).  Moreover, even plaintiff's best, hand-picked circumstantial evidence is deficient.  Plaintiff speculates, for example, that circumstantial evidence implicates DEA agents Peter Gruden, Kevin Scully, or Kevin Clark.  (Pl's Mot. at 33 n.26).  But,

plaintiff's circumstantial evidence is plainly contradicted by these witnesses' express statements that they did not release the video publicly.  For instance, when asked point blank by plaintiff's counsel at his deposition whether he released the video, Peter Gruden emphatically denied it:

> Q: Did you disclose this video to anyone outside of DEA?
> A: No.

(Gruden Dep. at 208 (copy attached as Ex. A)).  Agents Clark and Scully responded similarly. (Clark Dep. at 63-64 (explaining that he does not believe that the VHS videotape he had later appeared on the internet) (copy attached to Pl's SMF, Ex. 71)); (Scully Dep. at 54 (explaining that he had no reason to believe that the CD he had later appeared on the internet) (copy attached to Pl's SMF, Ex. 93)).  In addition, none of these agents had access to the IN system of records in Arlington, Virginia – the only relevant system of records in this case.  Rather, at all relevant times (between April 2004 and March 2005), they all worked in Florida.  (Clark Dep. at 5 (copy attached to Pl's SMF, Ex. 71)); (Gruden Dep. at 8 (copy attached as Ex. A)); (Scully Dep. at 4-5 (copy attached to Pl's SMF, Ex. 93)).  And, as plaintiff himself admits, the IN office and the IN files are not accessible without special clearance given to IN employees.  (Pl's SMF ¶¶ 122-25).  Thus, plaintiff's selective circumstantial evidence cannot demonstrate a Privacy Act violation.

Plaintiff also ignores circumstantial evidence favoring the conclusion that DEA did not intentionally or willfully release the video.  Specifically, plaintiff ignores the fact that DEA could have, consistent with the Privacy Act, released the video footage of plaintiff's shooting in the IN file for public information purposes, but DEA did not do so.  The Federal Register notice for the DEA system of records pertaining to IN shooting investigations, DEA-10, contains a routine use for the release of IN files, such as shooting investigation files, to the news media for public information purposes.  See Justice / DEA-10, 52 Fed. Reg. 47,182, 47,213 (Dec. 11, 1987).  Under this routine use, which constitutes an exception to the Privacy Act's disclosure protections, see

5 U.S.C. § 552a(b)(3), the versions of the shooting video that were contained within the IN file were subject to release at any time for public information purposes.  See DEA-10, 52 Fed. Reg. at 47,213.  Despite having the ability to do so, DEA did not release the shooting video pursuant to this routine use – again demonstrating that DEA had no intention of making the shooting video public.

**B.    Plaintiff Cannot Recover for the Tort of Publicity Given to a Private Fact.**

Plaintiff also moves for summary judgment on his FTCA claim for publicity given to a private fact.  (Pl's Mot. at 34-36).  As most completely explained in Defendants' Motion for Summary Judgment, plaintiff cannot satisfy any element of this cause of action.  (Defs' Mot. at 30-37).  Those four elements are the following: (1) a private fact; (2) that has been given publicity; (3) that is highly offensive to a reasonable person; and (4) for which there is no legitimate public concern.  See Restatement (Second) of Torts § 652D (1977).

In his effort to satisfy to the private fact element, plaintiff does not argue that his presentation in which he shot himself was a private fact.  Rather, he attempts to create a new distinction in privacy law – without any case law support.  He argues that the private fact is not the fact that he shot himself but rather the video-recording of that shooting.  (Pl's Mot. at 35).  The Restatement plainly rejects such an approach by emphasizing that it is the underlying information that controls: "[t]here is no liability when the defendant merely gives further publicity to **information** about the plaintiff that is already public."  Restatement (Second) of Torts § 652D, cmt. b (1977) (emphasis added); see also Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1149 (S.D. Fla. 1990) ("Republication of facts already publicized elsewhere cannot provide a basis for an invasion of privacy claim.").  Under this standard, because the underlying information (that plaintiff shot himself while giving an on-duty demand reduction presentation) is a public fact, any

additional publicity given to that fact does not create liability. In short, by complaining about only the video-recording of plaintiff's live presentation, plaintiff forecloses his ability to satisfy the private fact element.

As to the second element, that of giving publicity, plaintiff confuses it with the "publication" requirement for defamation cases. Yet, the Restatement clearly distinguishes the legal significance of "giving publicity" from that of "publication." See Restatement (Second) of Torts § 652D, cmt. a (1977). Unlike defamation law, where mere transmittal to another person constitutes a "publication," the privacy torts require "giving publicity," which necessitates "communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." See id.; see also Williams v. City of Minneola, 575 So.2d 683, 689 (Fla. Ct. App. 1991). Thus, even if the shooting video were somehow released by a DEA employee, that would not automatically constitute "giving publicity" since the circumstances of the release might not have made it substantially certain that the video would make its way to the public at large. See Lewis v. Snap-on Tools Corp., 708 F. Supp. 1260, 1262 (M.D. Fla. 1989) (holding that allegation of disclosure to "large number of persons" did not satisfy the giving publicity element). Most basically, however, plaintiff fails this element because he has no evidence of how the shooting video was made public. Nor can plaintiff identify any person who showed the video to as many persons as were in the audience when he gave his presentation. Without these essential facts, plaintiff fails this element.

Next, plaintiff argues that the video is highly offensive because its dissemination has subjected him to derision, destroyed his reputation, and revealed his undercover identity. (Pl's Mot. at 35-36). None of these reasons suffices to satisfy the "highly offensive" element. As stated in plaintiff's own statement of facts, not even the eye-witnesses to plaintiff's shooting found it

highly offensive.  (Pl's SMF ¶¶ 51-52).  Rather, they said that the presentation was "excellent" and "very appropriate."  (Id.).  If plaintiff's presentation was "very appropriate" to give to an audience of 50 children and parents, it cannot also at the same time be highly offensive.

Nor is the highly offensive element satisfied merely as the result of being subject to derision and loss of reputation.  As the Restatement explains, activities are not intrinsically "highly offensive," simply because they lead to annoyance or embarrassment.  Restatement (Second) of Torts § 652D, cmt. c (1977).  Instead, highly offensive materials tend to relate to sexual relations, nudity, and medical conditions.  See, e.g, Hill v. McKinley, 311 F.3d 899, 906 (8th Cir. 2002) (holding that the unnecessary restraining of a drunk, naked female prisoner in front of jailers was highly offensive under privacy law); French v. United States ex rel. Dep't of Health & Human Servs., 55 F. Supp. 2d 379,383  (W.D.N.C. 1999) (holding that wrongfully obtaining and using medical records was highly offensive under privacy law); Benz v. Washington Newspaper Publ'g Co., 2006 WL 2844896, at *6 (D.D.C. Sept. 29, 2006) (Sullivan, J.) (holding that articles implying that plaintiff used her job in the media to obtain sexual relationships were highly offensive under privacy law); see generally Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1229 (7th Cir. 1993) (explaining that the right to privacy protects the intimate details of life through examples of nudity, sexual relations, and defecation).  Needless to say, plaintiff's video does not involve any of those highly offensive topics.

Plaintiff similarly fails to gain any traction by his argument that the shooting video is highly offensive because it revealed his undercover identity.  (Pl's Mot. at 35-36).  Plaintiff ceased to protect his past status as an undercover agent before he shot himself on film: he served as the spokesman for the U.S. Ambassador in Bahamas (Pl's SMF ¶ 31); he publicly gave approximately 500 demand reduction presentations (Defs' SMF ¶ 9); his demand reduction presentations were

reported in newspaper articles (Defs' SMF ¶ 14); and his identity and location were published in
Sports Illustrated (Defs' SMF ¶ 7).  As would be expected, in conjunction with this increase in
publicity, plaintiff did minimal undercover work.  For instance, while he worked in Bahamas from
1999 to 2003, plaintiff admits that he did almost no undercover work.  (L. Paige Dep. at 23 ("I
think on very, very minimal occasions I worked undercover.") (copy attached as Ex. B)).  In 2003,
when plaintiff transferred to Orlando, his professional goals did not include a desire to do more
undercover work, but rather to do demand reduction full-time.  (Id. at 25-29).  While working in
Orlando before his shooting from July 2003 to April 2004, plaintiff recalls only one instance of
working undercover.  (Id. at 34-35).  Thus, long before his self-shooting, plaintiff allowed his
identity to become public knowledge, and he curtailed his undercover work on his own.

     As to the fourth element, a legitimate public concern, plaintiff does not contest that there is
a legitimate public interest in his presentation and self-shooting.  Rather, plaintiff attempts, without
case law support, to distinguish between his live presentation and the video-recording of his
presentation.  Essentially, he recognizes that there may be a legitimate public interest in his
shooting, but then he argues that there was no legitimate public interest in the video-recording of
his shooting.  (Pl's Mot. at 36).  This argument fails as well.  The legitimate public concern
analysis focuses on the subject matter and does not restrict the public's ability to learn about a
newsworthy topic.  See Restatement (Second) of Torts § 652D, cmt. d (1977) ("When **the subject-
matter of the publicity** is of legitimate public concern, there is no invasion of privacy." (emphasis
added)).  Here, both the news of the shooting and the shooting video address the same subject
matter – in which there is a legitimate public interest.  Therefore, plaintiff fails to satisfy this
element as well.

     Finally, for reasons set forth in Defendants' Motion for Summary Judgment, plaintiff

constitutes a public figure, and as such, he cannot recover under the privacy torts.  (Defs' Mot. at 37-38).

## II.    DISPUTES OF MATERIAL FACT UNDERMINE PLAINTIFF'S THEORY OF SUMMARY JUDGMENT.

In responding to plaintiff's motion, defendants have used plaintiff's separately submitted statement of material facts ("Pl's SMF") (Docket #50) as the relevant set of factual statements. Many of these facts contain errors or immaterial allegations, which defendants point out in their attached Response to Plaintiff's Statement of Material Facts.  Nonetheless, three categories of plaintiff's factual misunderstandings merit attention here: (a) plaintiff's exaggeration of the number of copies of the shooting video; (b) plaintiff's incorrect understanding of DEA policy relevant to files within the Office of Inspections ("IN"); and (c) plaintiff's unreliable expert testimony.

### A.    The Exaggerated Count of the Number of Shooting Videos.

Plaintiff wantonly exaggerates the number of shooting video copies.  Plaintiff assumes that any time that a person acknowledged receiving a copy of the shooting video, that must mean that another copy of the video existed.  For instance, the VHS that plaintiff labels as VHS-5, which Special Agent ("SA") Christopher Bowman watched as the Firearms Instructor for the Orlando District Office, could have been (and was likely) the same VHS that was eventually sent to Associate Special Agent in Charge ("SAC") Charles West in Miami, which plaintiff numbers distinctly as VHS-2.  (Pl's SMF ¶¶ 181, 212).  Similarly, VHS-6, which plaintiff claims existed as a distinct copy merely because two DEA agents in Orlando watched a VHS of plaintiff's shooting, could also have been VHS-5 (the video SA Bowman watched) and/or VHS-2 (the video sent to Associate SAC Charles West).  (Pl's SMF ¶¶ 181, 212, 218-19).  Nevertheless, from these facts plaintiff counts three distinct copies of the shooting video.

Plaintiff's approach is fundamentally flawed.  Under plaintiff's methods, a library could be said to have 15 copies of a book merely because 15 people acknowledge having checked that book out.  Standing alone, the amount of people checking a book out proves only that the library had at least one copy of the book.  Plaintiff's reasoning to inflate the count is inherently flawed and should be rejected.

Similarly, plaintiff relies on his own hunches to generate additional numbers of copies.  For instance, with respect to the hypothetical VHS tape that plaintiff numbers distinctly as VHS-8, plaintiff cannot point to any physical copy of that video, rather he just assumes that the presence of numbers or symbols on later DVD copies necessarily means that an additional VHS copy exists from which those DVDs were made.  (Pl's SMF ¶¶ 226-27).  That makes little sense.  Rather, as the testimony suggests, the DVDs were made from the original Mini-DV.  (Defs' SMF ¶ 125).  Thus, it is easily explainable that the symbols and markings were generated in the copying process based on symbols and markings from the source machine – not from a different, unknown videotape.

Plaintiff also repeatedly confuses testimony relating to the CDs and DVDs containing media coverage of plaintiff's shooting.  As part of its investigation, DEA's Office of Inspections ("IN") collected television media coverage of plaintiff's incident. (Burns Dep. at 127 (copy attached to Pl's SMF, Ex. 22); White Dep. at 82-83 (copy attached to Pl's SMF, Ex. 97)); Defs' SMF, Ex. 40, Media DVD).  When asked about the number of video copies they knew of, witnesses included the copies of the media coverage in their count.  (Burns Dep. at 127 (copy attached to Pl's SMF, Ex. 22); White Dep. at 82-83 (copy attached to Pl's SMF, Ex. 97)).  Thus, many of plaintiff's alleged copies of the shooting video are actually copies of the media coverage of plaintiff's shooting.  For instance, plaintiff claims that discs D-13 through D-22 were copies of

the shooting made by Inspector White after he returned from Orlando.  (Pl's SMF ¶ 299).  Contrary to plaintiff's assertion that half of those copies were on CD, the audio-visual specialist stated that she never made CDs for Inspector White.  (Queen Dep. at 14 (copy attached to Pl's SMF, Ex. 28)).  Moreover, Inspector White later clarified that at least half of those discs were of the media coverage and not of the shooting itself.  (White Dep. at 82-83 (copy attached to Pl's SMF, Ex. 71)).  As to the remainder of the amount (D-13 through D-22), plaintiff double-counts by not taking into account other previously accounted for DVDs, such as those that plaintiff denominates as D-10, D-11, and D-12.  (Pl's SMF ¶ 296).  Several other examples of such exaggeration exist, and are specifically refuted by Defendants' Response to Plaintiff's Statement of Material Facts.

In short, plaintiff does not present a reliable account of the shooting videos, and defendants' description of the copies of the shooting video provides a far more accurate understanding.

**B.    Misunderstandings and Misconstructions of IN procedures.**

Many of plaintiff's statements of facts are incorrect with respect to the operations, procedures, and policies of IN.

**1.    Plaintiff's assertions about what constitutes DEA "evidence" are immaterial and incorrect.**

Plaintiff mistakenly asserts that copies of the shooting video, or at least the original Mini-DV, constituted "evidence" as the term is used by DEA.  From the emphasis he gives this argument, plaintiff apparently believes that if somehow the shooting video constituted "evidence," that would improve his case.  (Pl's Mot. at 1 ("The video-recording was almost immediately taken into custody by the DEA as evidence . . . .")).  This approach fails for two reasons: materiality and correctness.

First, DEA's internal definition of "evidence" is immaterial.  The Privacy Act does not speak in terms of "evidence," but rather it focuses on "records" that are "contained in a system of

14

records." <u>See</u> 5 U.S.C. § 552a(b); <u>see also</u> <u>id.</u> § 552a(a)(4)-(5). Thus, DEA's process for handling "evidence" standing alone has no relevance to the elements of a Privacy Act claim. The same holds true for plaintiff's unwanted publicity tort, which speaks only of "private facts." <u>See</u> Restatement (Second) of Torts § 652D (1977). There, the relevant legal determination is whether the underlying facts were private or public – not whether they satisfied DEA's internal definitions of "evidence." <u>See</u> <u>id.</u> cmt. b. Accordingly, the Mini-DV's status as "evidence" is immaterial.

Second, the term "evidence" carries a specialized, specific meaning as used by DEA, which plaintiff misconstrues. As defined, "physical evidence" refers to "drugs, precursor chemicals, equipment, packaging, documents, fingerprints, money, or any other tangible property ***used to establish a violation of law***." DEA Agents Manual § 6661(A) (emphasis added) (copy attached to Pl's SMF, Ex. 58).[1] Put simply, tangible items are considered "evidence" only if they are "used to establish a violation of law."

Because there was no understanding that plaintiff would be criminally prosecuted for his shooting, nothing collected at the scene constituted "evidence." (Pl's SMF, Ex. 1, at p. 9 (explaining that neither the Florida State Attorney nor the United States Attorney intended to file charges against plaintiff); <u>id.</u> at pp. 35-36 (noting that the Orlando Police Department did not conduct an investigation)). Moreover, because IN does not engage in criminal investigations, it does not collect "evidence," and it does not have an evidence custodian. (Burns Dep. at 42 ("Q: Does the Office of Inspections have a non[-]drug evidence custodian? A: No, sir. We don't collect evidence.") (copy attached to Pl's SMF, Ex. 22)). For these reasons, the shooting video was not "evidence," nor was it stored as "evidence" at the relevant times.

_____

[1] DEA creates two systems for handling "evidence," one for drug evidence, and another for non-drug evidence. DEA Agents Manual § 6661(B) (copy attached to Pl's SMF, Ex. 58).

Plaintiff also argues that even if not evidence, DEA should have treated the shooting video as non-drug property. (Pl's Mot. at 14-15). Plaintiff goes on to contend that as non-drug property, the shooting video should have been processed as non-drug evidence. (Pl's Mot. at 15). Plaintiff is mistaken. The only non-drug property that is processed as non-drug evidence is that property "acquired in connection with enforcement activities." DEA Agents Manual § 6661(C) (copy attached to Pl's SMF, Ex. 58). But, here, plaintiff's demand reduction presentation was not an enforcement activity, and therefore it would have been inappropriate to process the shooting video as non-drug evidence.

### 2. Plaintiff misunderstands IN's policies regarding its files and the copying of its files.

Two of plaintiff's assertions regarding IN's file system are incorrect and merit discussion here: (i) when files are opened and (ii) the number of copies that can be made.

When IN seeks to create a new file, the program analyst creates the file. Contrary to plaintiff's assertion, the IN file is not opened "automatically." (Pl's Mot. at 1; Pl's SMF ¶ 97). As relevant here, the program analyst for IN did not create an IN shooting investigation file for plaintiff's shooting until April 16, 2004. (Pl's SMF, Ex. 72, Clifford Dep. at 18). Before the creation of that file, there was not even an IN database entry indexed by plaintiff's name or identifying symbol corresponding to his shooting on April 9, 2004 (thus, no record contained in a system of records). (Id.).

Plaintiff also asserts that IN was permitted to make only two copies of the shooting file. (Pl's Mot. at 1). That is not true. The Agents Manual never limits the total copies to two; rather, it specifies how copies will normally be transmitted to the IN Shooting Incident Team ("SIT"). DEA Agents Manual § 6114.63 (copy attached to Pl's SMF, Ex. 56). The Agents Manual likewise does not specify how copies should be made when a shooting file is copied for other components of

16

DEA, such as the Shooting Assault Incident Review Committee ("SAIRC"), the Board of Professional Conduct, the Deciding Official, or even the DEA employee subject to discipline.  (Id. § 6114.71 (explaining the need for review by the SAIRC, the Board of Professional Conduct, and the Deciding Official in certain situations)).  Thus, any attempt to make it appear as if IN was somehow violating its own copying procedures is baseless.

### 3.    Plaintiff's expert testimony is not reliable.

Plaintiff attempts to rely on a witness, Victor Wright, for expert testimony in support of his summary judgment motion.  Mr. Wright, who also does consulting work for plaintiff counsel's law firm, (Wright Dep. at 5-6 (copy attached as Ex. C)), offered two relevant opinions: (i) the timing of when certain of the shooting videos were made (Pl's SMF ¶¶ 244, 332; id., Ex. 100), and (ii) the conclusion that the disclosure was intentional and willful due to the steps necessary to release a copy of the shooting video from DEA (Pl's SMF ¶ 332; id., Ex. 100).  This testimony is not reliable and should not be admitted.

The Supreme Court has commissioned trial courts as gatekeepers to prevent unreliable or invalid expert opinions.  Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 147 (1999), Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 n.7, 592-93 (1993).  Toward that end, Federal Rule of Evidence 702 sets forth three requirements that must be considered in assessing reliability and validity:

(1)    [Whether] the testimony is based upon sufficient facts or data;
(2)    [Whether] the testimony is the product of reliable principles and methods; and
(3)    [Whether] the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Mr. Wright cannot satisfy any of those requirements.

First, Mr. Wright does not rely on sufficient facts or data.  His conclusions as to the time and date stamps for the videos (Pl's SMF ¶¶ 244, 332; see also id. ¶¶ 251, 270, 278, 298; id.,

Ex. 100), are all based on the copying computer's internal clock.  (Wright Dep. at 85 (copy attached as Ex. C)).  But, Mr. Wright did not take steps to verify the accuracy of those internal clocks; instead, he assumed that the internal clocks were correctly calibrated.  (Id.).  Similarly, he assumed that the copies of the shooting video would be made on computers connected to the DEA network, but he has no evidence of that.  (Id. at 38).  Indeed, Wright's assumption is contradicted by testimony that the shooting video was copied in tech rooms or audio-visual rooms, which were not connected to the DEA network.  (Shafer Dep. at 51 ("Q:  Now, the computer that you made the CDs for Mr. Gruden on was that a server?  A: Oh, no.") (copy attached to Pl's SMF, Ex. 94)).  Without being connected to DEA's network, there is no reason to believe that any of these computers' clocks were calibrated accurately, and Mr. Wright does not provide an explanation for why they would have been.  For that reason, his testimony regarding when the shooting video was copied is not reliable.

Mr. Wright also opined that due to the steps necessary to release a copy of the shooting video from DEA, its release had to be intentional.  (Pl's SMF ¶ 332).  In forming his opinions, however, Mr. Wright acknowledged that he does not know "anything about the Firebird software." (Wright Dep. at 109 (copy attached as Ex. C)).  Instead, he relied on plaintiff for an understanding of DEA's computing system.  (Wright Dep. at 26 (copy attached as Ex. C)).  Yet, by his own admission, plaintiff himself has a low degree of technical knowledge:  "I'm not technically savvy other than just from a layman perspective with Firebird.  If you want to ask me if I'm computer literate, I would say I would be deemed on the low scale when it came to knowing."  (L. Paige Dep. at 137-38 (copy attached as Ex. B)).  Mr. Wright also knew that plaintiff had an interest in the outcome of the litigation.  (Wright Dep. at 52 (copy attached as Ex. C)).  In short, by relying on plaintiff's minimal knowledge of DEA's computer system, Mr. Wright did not base his opinions

on reliable facts.

To satisfy the second Rule 702 requirement, Mr. Wright's testimony must be the product of reliable principles and methods. While this second requirement typically involves an evaluation of <u>Daubert</u> considerations, in this instance it suffices to realize that expert testimony lacking a supporting, sound methodology should not be admitted. As the Supreme Court has explained, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). Here, the conclusions as to the times that the videos were created are the result of nothing more than Mr. Wright's assumptions that the computer clocks were correctly calibrated. (Wright Dep. at 85 (copy attached as Ex. C)). Similarly, Mr. Wright provides no basis for his conclusions as to the steps necessary to transfer a shooting video file outside of DEA. For instance, he was not aware that any copies of the video were also made on VHS tapes, and obviously did not account for that in his opinions. (<u>Id.</u> at 54). Moreover, Mr. Wright acknowledged the possibility that the shooting video files could have been inadvertently transferred within or outside of DEA through email or on a portable 'thumb' drive. (<u>Id.</u> at 42, 48). Mr. Wright provides no reason to rule out these possibilities of unintentional transfers, other than his say so. As the Supreme Court made clear in <u>Joiner</u>, such *ipse dixit* opinion testimony is not admissible.

Regarding the third Rule 702 consideration, Mr. Wright fails to apply principles to facts. As to the computer clocks, he does not account for the fact that copies of the videos might not have been made on computers with calibrated internal clocks. (Wright Dep. at 85 (copy attached as Ex. C)). Nor can Mr. Wright opine that the steps needed to transfer the shooting video outside of DEA constituted "intentional and willful" conduct under the Privacy Act. First, Mr. Wright

testifies that he has no knowledge of the specific legal meaning given to the Privacy Act's intentional and willful mental state. (Id. at 21-22). Second, Mr. Wright's opinion that a transfer would have been voluntary (which is already problematic as a factual matter) has no relevance to the Privacy Act's mental state element, which is not a test of voluntary or volitional action, but rather requires conduct that is "patently egregious and unlawful." Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (quoting Wisdom v. Dep't of Hous. & Urban Dev., 713 F.2d 422, 425 (8th Cir. 1983)); see also Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984) (explaining that the Privacy Act "imposes liability only when the agency acts in violation of the Act in a willful or intentional manner, either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act"). Finally, even if Mr. Wright had a correct legal understanding of the Privacy Act's intentional and willful mental state element, his opinion would be an inadmissible legal conclusion. See Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This Circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); Hermitage Indus. v. Schwerman Trucking Co., 814 F. Supp. 484, 486 (D.S.C. 1993) (concluding that "testimony by a witness in the form of a legal conclusion is clearly inadmissible").

In short, because Mr. Wright's opinions do not meet the requirements of Rule 702, plaintiff should not be permitted to rely on them.

## III.    AFFIRMATIVE DEFENSES BAR ANY RECOVERY BY PLAINTIFF.

Plaintiff also attempts to strike several defenses pleaded by defendants. This effort fails as well, and the defenses apply to preclude plaintiff from recovering here.

### A.    The Unclean Hands Defense Applies to Plaintiff's Action.

Defendants moved for summary judgment because plaintiff's own wrongdoing bars

20

plaintiff's case under the doctrine of unclean hands.  (Defs' Mot. at 42-45).  Plaintiff raises two

arguments to strike the unclean hands defense; neither of which can succeed.  (Pl's Mot. at 38-39).

First, plaintiff contends that the unclean hands defense applies only to equitable relief under

federal and Florida law.  (Pl's Mot. at 38).  Plaintiff has no meaningful support for this proposition.

Of the two cases he cites, plaintiff represents that the first, First American Corp. v. Al-Nahyan,

17 F. Supp. 2d 10 (D.D.C. 1998), applies federal law.  That is not accurate.  First American

explicitly applied District of Columbia 'state' law to a claim for breach of fiduciary duties.  Id. at

29.  (Under D.C. 'state' law, unclean hands applies only to equitable relief, but that limitation does

not exist under federal common law or under Florida state law, as explained further below).  Next,

plaintiff cites a Florida state court decision, Pennington v. Pennington, 390 So.2d 809, 810 (Fla.

Ct. App. 1980), for the proposition that unclean hands applies only to equitable relief under Florida

law.  Again, the Pennington decision does not say what plaintiff represents.  In fact, Pennington

does not ever address the proposition for which plaintiff cites it – that unclean hands is limited to

equity actions.  See id.  Pennington did not involve damages; rather, it was a contempt action

relating to a marital dissolution judgment.  See id.  In short, plaintiff's two citations lend absolutely

no support to the notion that either federal law or Florida law apply the unclean hands defense only

to equitable relief.

Contrary to plaintiff's argument, both federal common law (applicable to the Privacy Act

claims) and Florida state law (applicable to the FTCA claims) recognize that the defense of

unclean hands applies equally to matters of law and equity.

Federal law treats the unclean hands defense as available to actions seeking damages.  As

Justice Brandeis explained:

> The governing principle has long been settled.  It is that a court will not redress a
> wrong when he who invokes its aid has unclean hands. The maxim of unclean hands

comes from courts of equity.  ***But the principle prevails also in courts of law.***  Its common application is in civil actions between private parties.

Olmstead v. United States, 277 U.S. 438, 483-84 (Brandeis, J., dissenting) (emphasis added), overruled in part on other grounds by Katz v. United States, 389 U.S. 347 (1967).  True to Justice Brandeis's reasoning, the Supreme Court and other federal courts have made clear that unclean hands is available as an affirmative defense to federal causes of action, including those for damages.  See U.S. Gypsum Co. v. Nat'l Gypsum Co., 352 U.S. 457, 495 (1957) (extending the equitable doctrine of unclean hands to the patent field); Tempo Music, Inc. v. Myers, 407 F.2d 503, 507 (4th Cir. 1969) (applying unclean hands to bar recovery of damages in a copyright infringement action); Kuehnert v. Texstar Corp., 412 F.2d 700, 704 (5th Cir. 1969) (applying unclean hands to a securities law case for damages and explaining that "[a]lthough [plaintiff] is not seeking equitable relief the doctrine remains applicable, since it expresses a general principle equally suited to damage actions"); Alpo Petfoods, Inc. v. Ralston Purina Co., 720 F. Supp. 194, 214 (D.D.C. 1989) ("The defense of unclean hands is available in an action brought under the Lanham Act seeking equitable and monetary relief."), aff'd in part rev'd in part, on other grounds, 913 F.2d 958 (D.C. Cir. 1990); Union Pac. R.R. Co. v. Chicago & N.W. Ry. Co., 226 F. Supp. 400, 410 (N.D. Ill. 1964) (explaining in the context of a federal securities lawsuit that "[t]he clean hands maxim is not peculiar to equity, but expresses a general principle equally applicable to damage actions.").  Accordingly, the unclean hands affirmative defense applies to causes of action under federal law, including those for damages.

Plaintiff also errs in his reference to Florida state law.  Florida law, which governs plaintiff's FTCA claims, applies the unclean hands principle equally to suits in law and equity.  See May v. Nygard Holdings Ltd, 2007 WL 2120269, at *3 (M.D. Fla. July 20, 2007)) (rejecting the argument that the unclean hands doctrine applies only to equitable relief and explaining that "[t]he

22

law in Florida, however, has long recognized application of the underlying principle to bar *all* relief . . .").  Thus, plaintiff's FTCA claims for invasion of privacy, which are founded on Florida substantive law, are also barred by the unclean hands affirmative defense.[2]

Plaintiff's second reason for not applying the unclean hands defense may also be summarily rejected.  Plaintiff asserts that unclean hands requires a nexus between the unconscionable wrongdoing and the cause of action, and that no such nexus exists here.  (Pl's Mot. at 38). Assuming for the moment that plaintiff fully and accurately expresses the law (which he does not), the unclean hands defense would still apply here.  Plaintiff's unconscionable actions – culminating in his reckless and needless endangering of children and other audience members – are inextricably linked to his cause of action because they are the subject of the video-recording about which plaintiff complains.  Put another way, plaintiff would have no complaint about the dissemination of the video if not for its depiction of his own unconscionable conduct.

Furthermore, as to plaintiff's expression of the unclean hands doctrine, he neglects to mention the public interest exception.  The Supreme Court has recognized that the nexus requirement does not apply where a plaintiff's conduct is contrary to the public interest.  Morton Salt v. G.S. Suppinger Co., 314 U.S. 488, 494 (1942) (holding that it was the adverse effect upon

---

[2]  Even if the Court were to apply the ancient distinction between actions at law and in equity, which has been abolished under the Federal Rules of Civil Procedure, see Fed. R. Civ. P. 2, the Court should construe the unclean hands defense as the analogous defense of *in pari delicto*. See Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice") (former rule, in effect at the time of defendants' answer).  As Judge Posner explained, "[e]ven before the merger [of law and equity] there was a counterpart legal doctrine to unclean hands – *in pari delicto* – which forbade a plaintiff to recover damages if his fault was equal to the defendant's."  Byron v. Clay, 867 F.2d 1049, 1052 (7th Cir. 1989).  In that same case, the Seventh Circuit stated that it "need not worry about the precise scope of that doctrine," and under the principles of both unclean hands and *in pari delicto*, affirmed the dismissal of the case.  Thus, regardless of the precise moniker given to this defense, the Court should negate plaintiff's ability to recover due to his wrongdoing and the inequity that would result if he were able to recover here.

23

the public interest that disqualified plaintiff from proceeding – "regardless of whether the

particular defendant has suffered"), abrogated on other grounds by Ill. Tool Works, Inc. v. Indep.

Ink, Inc., 547 U.S. 28 (2006) (rescinding a per se antitrust rule in the patent context); see also

Maltz v. Sax, 134 F.2d 2, 5 (7th Cir. 1943) ("Where plaintiff's action is condemned by statute, or

is against public policy, and the right sought to be vindicated is inimical to public welfare, the

defense of unclean hands is available even though there be no relation between the suitor's unclean

hands act and the relief sought."). Thus, through his needless and reckless exposure of children to

active gunfire while he was on-duty as a law enforcement officer, plaintiff acted contrary to the

public interest, and therefore, the nexus requirement for the unclean hands defense is relaxed.

     In sum, the unclean hands affirmative defense precludes plaintiff from recovering here.

     **B.    Plaintiff Cannot Recover Non-Pecuniary Damages Under The Privacy Act.**

     Defendants have explained that the Privacy Act's use of the term "actual damages" limits

civil damage recoveries to only out-of-pocket losses. (Defs' Mot. at 21-30). Plaintiff takes a

contrary position. (Pl's Mot. at 43-45). Plaintiff's argument may be reduced to the one-line

contention that there is a split in authority among courts, and plaintiff sides with those cases

permitting recovery of emotional damages.

     As to the status of the case law, the D.C. Circuit has not decided the issue. Albright v.

United States, 732 F.2d 181, 186 (D.C. Cir. 1984) (declining to address district court's holding that

there were no "actual damages" absent out-of-pocket expenses). But, as to the cases within this

District, plaintiff acknowledges only those in favor of his position, and he omits an equally strong

line of cases holding that only out-of-pocket losses are recoverable under the Privacy Act. See

Pope v. Bond, 641 F. Supp. 489, 501 (D.D.C. 1986) ("'[A]ctual damages' does not include

damages for emotional trauma, anger, fright, or fear."); Albright v. United States, 558 F. Supp.

260, 264 (D.D.C. 1982) ("Actual damages under the Privacy Act are limited to 'out-of-pocket' expenses and do not include damages for emotional trauma, anger, fright or fear"); Houston v. U.S. Dep't of Treas., 494 F. Supp. 24, 30 (D.D.C. 1979) (relying on legislative history to conclude that "Congress, concerned about the drain on the treasury created by a rash of Privacy Act suits, indicated its intention to limit 'actual damages' to 'out-of-pocket' expenses"). In contrast, defendants' summary judgment brief presents the cases on both sides, and then explains why the superior view is that emotional damages are not allowed under the Privacy Act. (Def's Mot. at 21-30). This is so for two reasons.

First, sovereign immunity principles require that any ambiguity in a statute exposing the sovereign to liability must be strictly construed in the sovereign's favor. See Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999) ("[A] waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign."); Galvan v. Fed. Prison Indus., Inc., 199 F.3d 461, 464 (D.C. Cir. 1999) ("If ambiguous, statutes must be construed in favor of immunity."). Thus, any ambiguity in the meaning of "actual damages" must be resolved in favor of the sovereign, meaning that the Privacy Act should be read to allow only out-of-pocket losses. Plaintiff makes no mention of sovereign immunity, which requires a strict construction of statutory ambiguities in favor of the sovereign. (Pl's Mot. at 43-45).

Lest there be any doubt as to the significance of sovereign immunity principles, the D.C. Circuit's most recent Privacy Act decision underscored that the civil remedy provisions of the Privacy Act are waivers of sovereign immunity, which must be narrowly construed in favor of the sovereign. See Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1123 (D.C. Cir. 2007). Notably, the two cases within this District that plaintiff cites for the proposition that emotional damages may be recovered under the Privacy Act, Alexander and Dong, were decided before Sussman's direct

25

application of sovereign immunity principles to the Privacy Act's civil remedy provisions. See Alexander v. Fed. Bureau of Investigation, 971 F. Supp. 603 (D.D.C. 1997); Dong v. Smithsonian Inst., 943 F. Supp. 69 (D.D.C. 1996), rev'd on other grounds, 125 F.3d 877 (D.C. Cir. 1997). Accordingly, those two prior district court decisions, which did not conduct a sovereign immunity analysis, merit little, if any, weight.

Similarly, the only circuit decision to construe "actual damages" broadly as plaintiff urges, Johnson v. Dep't of Treasury, Internal Revenue Serv., 700 F.2d 971 (5th Cir. 1983), did so based on a legislative history analysis and did not apply sovereign immunity principles.[3] Johnson was decided before the Supreme Court's unanimous decision in Blue Fox, 525 U.S. 255 (1999), which required that ambiguities in waivers of sovereign immunity be construed strictly in favor of the sovereign. Id. at 261. Also after Johnson, the Supreme Court made certain that legislative history cannot provide the basis for a waiver of sovereign immunity. See Lane v. Pena, 518 U.S. 187, 192 (1996); see also Blackmon-Malloy v. U.S. Capitol Police Bd., 338 F. Supp. 2d 97, 103 (D.D.C. 2004). Thus, because Johnson did not follow the analytical framework set forth by subsequent Supreme Court decisions, it is not a reliable source. In contrast, and not mentioned by plaintiff, the only Circuit to follow the sovereign immunity analysis concluded that "actual damages" refers only to out-of-pocket losses. See Hudson v. Reno, 130 F.3d 1193, 1207 n.11 (6th Cir. 1997), abrogated on other grounds by Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848 (2001). Instead, plaintiff cites Parks v. U.S. Internal Revenue Service, 618 F.2d 677 (10th Cir. 1990). But, that decision never interpreted the term "actual damages," nor did it evaluate whether "actual damages" would include non-pecuniary losses, nor did it apply sovereign immunity principles. In short, the

---

[3] Johnson's analysis is currently being re-examined by the Fifth Circuit in the context of another Privacy Act case, Jacobs v. Nat'l Drug Intelligence Ctr., No. 07-40776 (5th Cir.).

analytical trend is clear – sovereign immunity controls and limits Privacy Act recoveries to out-of-pocket losses.

Second, in the absence of sovereign immunity principles, the Privacy Act's legislative history is best read as limiting "actual damages" to only out-of-pocket losses. Again relying on the Fifth Circuit's decision in Johnson, plaintiff argues that the Privacy Act's legislative history favors a reading of "actual damages" that permits recovery for non-pecuniary losses. (Pl's Mot. at 44-45). Johnson's analysis is hardly dispositive even as to legislative history because it is contradicted by another circuit in Fitzpatrick v. Internal Revenue Serv., 665 F.2d 327 (11th Cir. 1982), which interpreted the Privacy Act's legislative history as limiting "actual damages" to only out-of-pocket losses. Id. at 329-31.

In light of these contrary circuit holdings, defendants' summary judgment brief examined each of the strands of legislative history in light of canons of statutory construction. (Def's Mot. at 26-30). The result was clear: the pieces of legislative history most worthy of deference all support restricting actual damages to out-of-pocket losses. Consequently, the superior interpretation of Privacy Act's legislative history is that the term "actual damages" refers to only out-of-pocket losses.

For these reasons, plaintiff's Privacy Act claims are limited to only out-of-pocket losses, and plaintiff has substantiated no such losses in this case.

### C. Plaintiff Has Forfeited and Waived His Ability to Pursue a Civil Action Based On Any Privacy Rights.

Plaintiff seeks to strike the forfeiture and waiver defenses. (Pl's Mot. at 39-40). These defenses, however, also preclude plaintiff's ability to recover.

As the Supreme Court has explained, forfeiture is distinct from waiver because it results from a failure to timely assert a right. United States v. Olano, 507 U.S. 725, 733 (1993). Here,

27

plaintiff forfeited whatever potential privacy rights he had in his presentation.  He appeared in front

of an audience of 50 children and parents at a public community center, and made no effort

beforehand to instruct the audience not to video-record him or to keep confidential his

presentation.  (Defs' SMF ¶¶ 13, 15-16, 29).  By these actions, plaintiff forfeited any privacy

interest he ***potentially*** had in the contents of his presentation or later publicity that it received.  See

Wright v. Fed. Bureau of Investigation, 385 F. Supp. 2d 1038, 1042 (C.D. Cal. 2005) (holding that

where a person makes matters public, he cannot later recover under the Privacy Act for a release of

such information), rev'd on other grounds, 241 Fed. Appx. 367 (9th Cir. 2007); see also Four Navy

Seals v. Associated Press, 413 F. Supp. 2d 1136, 1144-45 (S.D. Cal. 2005) (holding that soldiers

who were voluntarily photographed had no privacy interest in the photographs when they were

subsequently posted on the internet); Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1149 (S.D.

Fla. 1990) ("Republication of facts already publicized elsewhere cannot provide a basis for an

invasion of privacy claim."); Restatement (Second) of Torts § 652D, cmt. b (1977) ("There is no

liability when the defendant merely gives further publicity to information about the plaintiff that is

already public.").  Put simply, by forfeiting these potential privacy rights, plaintiff cannot recover

for later publicity that his presentation received.

Next, plaintiff took additional, deliberate actions to waive any conceivable remaining

privacy interest he had.  Waiver is generally defined as "an intentional relinquishment or

abandonment of a known right," and it may be express or implied from conduct.  See Johnson v.

Zerbst, 304 U.S. 458, 464 (1938); Dooley v. Weil (In re Garfinkle), 672 F.2d 1340, 1347 (11th Cir.

1982); Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp., 534 F. Supp. 2d 1290, 1315 (S.D.

Fla. 2008).  Florida law (applicable to plaintiff's FTCA claims) articulates this standard through

three elements: (i) a right or privilege; (ii) actual or constructive knowledge of that right or

28

privilege; and (iii) and intention to relinquish that right or privilege.  In re Garfinkle, 672 F.2d at 1347.  The first two elements are easily satisfied here.  Plaintiff cannot dispute the existence of a privacy right without undermining his entire case.  As to the second element, plaintiff demonstrated his knowledge of his right by threatening a lawsuit regarding the video in the summer of 2004.  (Pl's SMF, Ex. 1, p. 14 (explaining that on July 9, 2004, "SA Paige stated that he intended to contact his legal counsel to discuss his right to file a civil suit for defamation of character")).  If plaintiff did not believe he had some right or privilege in the video, he would not have expressed an interest in pursuing a lawsuit.

The third element, which requires an intentional relinquishment, is satisfied by at least two specific actions that plaintiff took.  The first involves a relatively limited waiver.  While at remedial firearms training in Miami in September 2004, plaintiff consented to let another DEA special agent, Jason Weiss, watch the shooting video.  (Defs' SMF ¶¶ 250-53).  This consent took place after the DEA Firearms Instructors had told SA Weiss to leave the room so that they could show the video only to plaintiff.  (Defs' SMF ¶ 252).  By overriding that instruction and permitting SA Weiss to watch the video, plaintiff intentionally relinquished his privacy interest in that specific version of the shooting video.  Through that intentional, unequivocal, and unrestricted consent, plaintiff cannot complain with respect to his privacy rights relating to either the Firearms Instructors' or SA Weiss's later use or circulation of that specific shooting video.

A second, far broader, waiver resulted from plaintiff's media appearances in April 2006.  Plaintiff voluntarily appeared on the largest media networks multiple times and each time permitted the shooting video to be shown in the background.  (Defs' SMF ¶¶ 169-70).  By such deliberate mass-media exposure, plaintiff waived his ability sue for subsequent alleged injuries relating to his privacy.  Accordingly, plaintiff cannot recover for any alleged injury, such as

embarrassment, humiliation, or reputational loss, resulting from any publicity resulting from his media appearance.

Finally, plaintiff argues (only with respect to his Privacy Act claim) that there can be no waiver or forfeiture because the Privacy Act requires written consent to disclose a protected record. (Pl's Mot. at 39). In one sense, plaintiff is correct – disclosure of a Privacy Act protected record requires written consent of the individual to whom the record pertains (or a court order). See 5 U.S.C. § 552a(b). But, plaintiff's argument misses the mark because defendants' waiver and forfeiture defenses are not directed at that substantive provision of the Privacy Act, but rather to the civil remedy provisions. See Alexander v. Sandoval, 532 U.S. 275, 286 (2001) (explaining that a civil action consists of "not just a private right but also a private remedy"). If a 4:09 version of the shooting video were a protected record (it was not), then these defenses apply to the additional elements required to pursue a civil action under the Privacy Act. See generally 5 U.S.C. § 552a(g). Specifically, to recover civil damages, a plaintiff must satisfy the "adverse effect" element. See 5 U.S.C. § 552a(g)(1)(D); Doe v. Chao, 540 U.S. 614, 624 (2004) (explaining that the adverse effect element has the "limited but specific function" of limiting who "has injury enough to open the courthouse door"). By appearing in public and consenting to be video-recorded as he gave his presentation, plaintiff forfeited and waived his ability to satisfy this adverse effect element. As explained above, a plaintiff cannot take actions in public and then later complain that he has been adversely affected by the public's reaction to his actions. See Wright, 385 F. Supp. 2d at 1042; see also Four Navy Seals, 413 F. Supp. 2d at 1144-45; Heath, 732 F. Supp. at 1149; Restatement (Second) of Torts § 652D, cmt. b (1977). Because he gave his presentation in public, without any restrictions, plaintiff lost his ability to contend that he was adversely affected by the public's reaction to his presentation. Plaintiff has similarly lost the ability to sue for any alleged injuries

resulting from his consent to allow another DEA special agent to view the shooting video at remedial training in Miami or from his media appearances in April 2006.

In sum, by his own actions, plaintiff has forfeited and waived his ability to pursue a civil action here.

**D.    Plaintiff's Action Is Barred By The Federal Employees Compensation Act.**

Plaintiff also moves to strike defendants' defense that the exclusivity provision in the Federal Employees Compensation Act ("FECA") precludes plaintiff's lawsuit.  (Pl's Mot. at 41-42).  FECA provides the exclusive means of redress for work-related injuries to federal employees. See 5 U.S.C. § 8116(c).  Because plaintiff's alleged injuries all stem from the contents of his on-duty demand reduction presentation (specifically the parts in which he displayed and then fired his duty weapon), they are all subject to the exclusivity provision of the FECA, and cannot be pursued here.  Plaintiff presents two arguments to strike this defense: (i) that "FECA does not and it was never intended to preempt the Privacy Act," and (ii) that courts have not applied FECA to Privacy Act claims.  (Pl's Mot. at 41-42).  These arguments mischaracterize the law and fail to recognize that the exclusivity provision of FECA preempts litigation under federal law.

Before addressing these arguments directly, it is significant to note their limited nature.  Plaintiff attempts to strike the FECA defense only with regard to his Privacy Act wrongful disclosure claim, and he makes no objection to its application to his FTCA claims.  (Pl's Mot. at 41-43).  By so limiting his argument, plaintiff apparently concedes that the exclusivity provision of FECA bars his FTCA claims.

Plaintiff's first argument, that FECA does not apply to the Privacy Act, completely ignores FECA's explicit preemptive language.  (Pl's Mot. at 41-42).  In providing a remedy for injuries sustained while in the performance of official duty, see 5 U.S.C. § 8102(a), FECA contains an

31

exclusivity provision that precludes all other litigation or claims by federal employees under other

federal law:

> ***The liability of the United States or an instrumentality thereof under this
> subchapter or any extension thereof with respect to the injury or death of an
> employee is exclusive and instead of all other liability of the United States or the
> instrumentality to the employee,*** his legal representative, spouse, dependents, next
> of kin, and any other person otherwise entitled to recover damages from the United
> States or the instrumentality because of the injury or death in a direct judicial
> proceeding, in a civil action, or in admiralty, or by an administrative or judicial
> proceeding under a workmen's compensation statute or under a Federal tort liability
> statute.

5 U.S.C. § 8116(c) (emphasis added).  In accord with that statutory text, the Supreme Court has

underscored that this exclusivity provision supersedes all other waivers of the government's

sovereign immunity: "[FECA] was designed to protect the Government from suits under statutes,

such as the Federal Tort Claims Act, that had been enacted to waive the Government's sovereign

immunity."  Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 193-94 (1983); see also

United States v. Lorenzetti, 467 U.S. 167, 169 (1984) ("Federal employees who are injured while

engaged in the performance of their official duties are entitled under FECA to compensation for

medical expenses, lost wages, and vocational rehabilitation.").  Accordingly, both the text of FECA

and Supreme Court decisions make clear that federal employees cannot sue for a work-related

injury.

Here, FECA bars plaintiff's claims under both the Privacy Act and the FTCA.  FECA

applies to injuries sustained while in the performance of duty.  See 5 U.S.C. § 8102(a). Under this

standard, "'[a]ll that is required is that the injury result from a risk incidental to the environment in

which the employment places the claimant.'"  Caesar v. United States, 258 F. Supp. 2d 1, 5

(D.D.C. 2003) (quoting Tredway v. District of Columbia, 403 A.2d 732, 736 (D.C. 1979)); see also

Smith v. Nicholson, 516 F. Supp. 2d 832, 838 (S.D. Tex. 2007) ("A claim is within FECA's scope

if there is a causal relationship between the employment itself, or the conditions under which it is to be performed, and the injury.").  In explaining the operation of FECA in the context of the FTCA, the D.C. Circuit quoted Judge Leonard Hand's reasoning that FECA was "a substitute for the whole of the claim that, but for it [FECA], would have arisen under the Tort Claims Act." 446 F.3d 159, 161 (D.C. Cir. 2006) (quoting Balancio v. United States, 267 F.2d 135, 137 (2d Cir. 1959) (Hand, J.)).  Under this rationale, as long as injuries to federal employees would be compensable under another federal statute, such as the Privacy Act or the FTCA, they are governed by FECA's exclusivity provision and cannot be the subject of litigation.

In addition, here, there is also a causal relationship between plaintiff's alleged injuries and his on-the-job conduct.  If not for his highly dangerous and reckless on-duty conduct – brandishing a loaded weapon and shooting himself with it – the circulation of the video would not be harmful to plaintiff.  Thus, plaintiff's injuries causally follow from his own reckless and dangerous conduct *in the performance of his official duties*.  (Defs' SMF ¶¶ 8, 15, 31-51).  For that reason, plaintiff's lawsuit is barred by FECA.

Plaintiff's brief also claims that courts in this Circuit and in this District have never relied on FECA's exclusive remedy provision to preclude Privacy Act claims.  (Pl's Mot. at 42 ("At no time has the district court or the court of appeals for D.C. ever hinted that a federal employee could not pursue a remedy under the Privacy Act.")).  Plaintiff inaccurately describes the law.  Indeed, courts in this District have held that FECA bars federal employees from suing under the Privacy Act.  Scott v. U.S. Postal Serv., 2006 WL 2787832, at *4 (D.D.C. Sept. 26, 2006); James v. Spencer, 1992 WL 167095, at *1 (D.D.C. June 16, 1992) (holding that the court lacked jurisdiction over Privacy Act claims because "FECA is a federal employee's exclusive remedy for obtaining damages for on-the-job injuries").

33

Plaintiff also overlooks other decisions applying FECA's exclusive remedy provision to Privacy Act claims.  In <u>Vogrin v. Bureau of Alcohol, Tobacco & Firearms</u>, a federal court held that FECA's exclusive remedy provision precluded a Privacy Act wrongful disclosure claim brought by a federal employee.  2001 WL 777427, at *8 (N.D. W.Va. Mar. 20, 2001).  In explaining the dismissal, the court reasoned that "plaintiff Vogrin has attempted to use the Privacy Act as a tort liability statute.  The FECA is intended to serve as a substitute rather than a supplement for a tort action."  <u>Id.</u>  The Fourth Circuit affirmed that decision.  <u>Vogrin v. Bureau of Alcohol, Tobacco & Firearms</u>, 15 Fed. Appx. 72 (4th Cir. July 3, 2001).

Similarly, in <u>Smith v. Nicholson</u>, another federal district court recognized that FECA preempts Privacy Act claims causally related to federal employees' on-the-job activities.  516 F. Supp. 2d 832, 837-41 (S.D. Tex. 2007).  In considering whether Privacy Act claims were precluded by FECA, the <u>Smith</u> court first noted that "[a] federal court lacks subject-matter jurisdiction over claims covered by FECA."  <u>Id.</u> at 837.  Then, finding a substantial question as to whether the injuries took place within the performance of job duties, the court abated the case pending an administrative determination by the Secretary of Labor as to whether the injury occurred "in the performance of his duty."  <u>Id.</u> at 841.

In light of <u>Smith</u>, if any doubt exists as to whether plaintiff's injury is causally related to his on-the-job performance, then this case should be abated pending administrative review by the Secretary of Labor.  If, however, there is no uncertainty as to the causal link between plaintiff's job performance and the injury, then the Court should simply dismiss plaintiff's case, as done in <u>Vogrin</u>.  The latter is the better course here, where a clear causal link exists between plaintiff's on-the-job performance and his injury – without plaintiff shooting himself during his presentation, the circulation of the video would not have allegedly injured him.

34

**E.    The Alternatively Pleaded Negligence-Based Defenses Apply to Bar Plaintiff's Case, If Plaintiff Is Permitted to Import Negligence Methods of Proof into His Lawsuit.**

Plaintiff moves to strike several of defendants' affirmative defenses that are grounded in negligence law: contributory negligence, assumption of the risk, and the fellow-servant rule.  (Pl's Mot. at 36-38, 40-41).  By way of context, defendants pleaded these negligence-based affirmative defenses in the hypothetical event that plaintiff would attempt to rely on negligence principles to prove his case (which he now does).  See Fed. R. Civ. P. 8(e)(2) (permitting the pleading of hypothetical defenses, in effect at the time of defendants' answer, revised version found at Fed. R. Civ. P. 8(d)(2)).

In his motion to strike these defenses, plaintiff finds it easy to declare that neither of the causes of action under which he proceeds (the Privacy Act or the invasion of privacy torts) are negligence actions.  However, in other parts of his motion, plaintiff implicitly invites the Court to apply principles of negligence law to his case.  He attempts to prove his claims on the twin facts that DEA allegedly had exclusive custody of the shooting video and that a copy of the shooting video later appeared on the internet.  (Pl's Mot. at 32 ("[S]omeone within the DEA must have been responsible for disclosing the video to unauthorized parties since the DEA had exclusive possession of the Mini-DV.")).  As explained above, such reliance on exclusive custody as conclusive proof is *res ispa loquitur* reasoning – imported from negligence law.  See Barwick v. United States, 923 F.2d 885, 887 (D.C. Cir. 1991).  By seeking to strike defendants' negligence-based defenses, yet attempting to rely on negligence law principles to prove his own case, plaintiff's desire to abandon negligence principles is inconsistent and one-sided.

It was precisely to account for such inconsistency on plaintiff's behalf that defendants pleaded the negligence-based defenses.  Plaintiff's claims are not based in negligence law, and

35

therefore plaintiff cannot rely on negligence-based methods of proof here.  Rather, he must come

forward with specific proof of each element of his claims instead of relying on the lesser *res ipsa*

*loquitur* method of proof.  Without plaintiff's reliance on negligence-based methods of proof,

defendants' negligence-based affirmative defenses would not apply.  However, to the extent that

plaintiff is permitted rely on negligence-based methods of proof, the defenses of contributory

negligence, assumption of the risk, and the fellow-servant rule, would apply to bar his case.

Contributory negligence would apply because plaintiff has taken a number of wrongful

actions that led to his own harm, such as displaying a loaded firearm at his presentation,

discharging that firearm to jeopardize innocent children and to injure himself, all while consenting

to being video-recorded.  (Defs' SMF ¶¶ 29, 31-51).  In addition, plaintiff drew further attention to

his folly by appearing in the mass media and permitting the shooting video to be shown on national

television.  (Defs' SMF ¶¶ 169-71).  Plaintiff apparently does not dispute his own contributory

wrongdoing; instead, he asserts that the contributory negligence defense does not apply due to the

remoteness of plaintiff's wrongdoing.  (Pl's Mot. at 36-37).  That attempted refutation fails.  It was

plaintiff's own wrongdoing that is the very subject of the video – if plaintiff did not shoot himself,

while jeopardizing the entire audience, plaintiff would not be adversely affected by the circulation

of the video.  Moreover, there is nothing remote about plaintiff's appearance on national television

in which he permitted the video to be shown in the background.  (Defs' SMF ¶¶ 169-71).  In

addition, plaintiff consented to let at least one other DEA agent watch the shooting video (while at

remedial training in Miami).  (Defs' SMF ¶¶ 250-53).  Due to his actions – being the subject of the

video, adding significantly to its post-release publicity, and consenting to let another DEA agent

watch it before its appearance on the internet – there is nothing remote about plaintiff's actions vis-

a-vis the video-recording and its contents.

Similarly, if plaintiff is permitted to rely on negligence principles to prove his Privacy Act claims, then assumption of the risk also applies to bar those claims. Plaintiff knew that he was presenting to an audience of 50 people in a public place and that he was being video-recorded by a private citizen. (Defs' SMF ¶¶ 15-16, 28). Plaintiff made no effort to instruct the audience not to record his presentation. (Defs' SMF ¶¶ 13, 29). Thus, when plaintiff displayed his duty weapon to the audience while being video-recorded, he assumed the risk that he would have no control over either the news of his shooting or the subsequent history of the shooting video.

Finally, the fellow-servant rule would bar plaintiff from recovering here if the shooting video were released through the negligence of one of plaintiff's co-employees. Although its relevance today has diminished almost entirely due to workers' compensation statutes, the fellow servant rule bars recovery by one employee for another employee's job-related negligence:

> The general rule is that those entering into the service of a common master become thereby engaged in a common service, and are fellow-servants; and prima facie, *the common master is not liable for the negligence of one of his servants which has resulted in an injury to a fellow servant.*

N. Pac. R. Co. v. Peterson, 162 U.S. 346, 353 (1896) (emphasis added). Plaintiff asserts that it would make no sense to apply the federal-servant doctrine to federal employees here. (Pl's Mot. at 40). At one level, plaintiff is correct – the FECA provides a remedy for workplace injuries, and negligence principles are not incorporated into either the Privacy Act or the invasion of privacy torts. But, plaintiff rejects this reasoning in support of his own argument by disputing the applicability of FECA and by attempting to import negligence principles into his proof. Nonetheless, plaintiff admits that the fellow-servant doctrine "remains a common law concept." (Pl's Mot. at 41). For that reason, if he is correct that FECA does not apply and if he is permitted to rely on negligence methods of proof, then plaintiff must also accept the application of the fellow-servant doctrine to bar his case, if the video was released by the negligence of another DEA

agent.

In sum, plaintiff cannot have it both ways. He either must forego any reliance on negligence methods of proof, such as *res ipsa loquitur*, or he must accept that his action is barred by negligence-based affirmative defenses. Under either scenario, plaintiff cannot recover – his proof is either deficient or his action is barred by these affirmative defenses.

## CONCLUSION

For the foregoing reasons, plaintiff should be denied summary judgment and defendants' defenses should apply to plaintiff's action.

Dated: June 20, 2008                          Respectfully submitted,


GREGORY G. KATSAS                   ___/s/  Peter J. Phipps_____
Acting Assistant Attorney General    PETER J. PHIPPS
                                     PAUL A. DEAN
JEFFREY A. TAYLOR                    United States Department of Justice
United States Attorney               Civil Division, Federal Programs Branch
                                     Tel: (202) 616-8482
ELIZABETH J. SHAPIRO                 Fax: (202) 616-8470
Assistant Branch Director            peter.phipps@usdoj.gov

Mailing Address:                     Courier Address:
Post Office Box 883                  20 Massachusetts Ave., N.W.
Washington, D.C.  20044              Washington, D.C. 20001

                                     Attorneys for Defendants