# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| LEE PAIGE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:06cv00644 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DRUG ) | |
| ENFORCEMENT ADMINISTRATION ) | |
| and UNITED STATES OF AMERICA, ) | Hon. Emmet G. Sullivan |
| ) | |
| Defendants. ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO D.D.C. CIVIL RULE 56.1

Pursuant to Local Civil Rules 7(h) and 56.1, Defendants submit this response to Plaintiff's Statement of Undisputed Material Facts submitted separately on June 4, 2008, ("SMF" or "Pl's SMF") (Docket # 49). Inasmuch as Plaintiff submitted his June 4, 2008 Statement of Undisputed Material Facts to resubmit, and not to supplement, the statement of undisputed material facts in Plaintiff's May 16, 2008 motion for partial summary judgment, Defendants' opposition addresses only Plaintiff's June 4, 2008 Statement.

This response is designed solely to respond to Plaintiff's SMF, by identifying which of the factual grounds for Plaintiff's motion are disputed. These disputes relate only to Plaintiff's material facts, and have no bearing on Defendant's summary judgment motion or the factual support for that motion. Defendants maintain their position that there are no genuine issues of material fact with respect to the grounds entitling Defendants to summary judgment.

The numbered paragraphs below contain Defendants' response corresponding to the similarly numbered paragraphs in Plaintiff's SMF. Abbreviations representing the parties' filings

and supporting materials have the meanings attributed to them in Defendants' earlier briefing.

As used in Defendants' responses, terms are defined as follows:

## DEFINITIONS

A.    "Immaterial" means that the fact has no relevance to any claims or defenses in the case and merits no consideration in the summary judgment analysis. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. ").

B.    "Disputed" means that Defendants disagree with this fact or the characterization of this fact. Such a factual dispute relates only to the material facts in support of Plaintiff's Motion for Summary Judgment and to Strike Defenses (Docket #43), and does not affect the integrity of the facts used in support of Defendants' Motion for Summary Judgment (Docket #45).

C.    "Undisputed subject to clarification" means that defendants do not dispute this fact for purposes of summary judgment *provided that* the indicated conditions or clarifications are included for a complete and/or accurate understanding.

D.    "Undisputed" means that defendants do not dispute this fact for purposes of summary judgment.

## RESPONSES

1.    Disputed. Plaintiff offers no support for his contention that the video "has been used in the public as entertainment and to ridicule Paige...." The first citation is ambiguous and each of the other citations provided by plaintiff reflect viewings of the video by DEA special agents and not by "the public." Nor do any of the citations reflect that the entertainment or

2

ridicule was a particular "result of the irony" of Paige's statement before his AD.  (Pl. Ex. 90, p.

10; Pl. Ex. 84, pp. 22-25; Pl. Ex. 73, pp. 119-120; Pl. Ex. 91, p. 207; Pl. Ex. 85, pp. 34-35, 37.)

   2.   Immaterial.  Disputed.  The Deputy Chief Inspector testified that he requested an

OPR investigation within days of discovering that the video of the shooting was on the internet in

March 2005.  (Def. Ex. D, pp. 55-56.)  In addition, Paige's attorney complained of a potential

Privacy Act violation and not of a Privacy Act violation.  (Pl. Ex. 48.)   "Disclosure" is a legal

term of art with a specific meaning in the context of the Privacy Act and its use transforms this

statement into a legal conclusion, which is inappropriate for a statement of facts.  Plaintiff has

provided no support for its use here.  (Pl. Ex. 48, 49, 50.)  Furthermore, the DEA has not

admitted that it "disclosed" the video of the shooting to the public.  (Pl. Ex. 2.)  In fact,

Plaintiff's presentation was public.  (Defs' SMF #s 16, 19.)  The Deputy Chief Inspector actually

stated that an investigation into "the matter" was warranted.  (Pl. Ex. 49.)

   3.   Immaterial.  Undisputed.

   4.   Immaterial.  Undisputed.

   5.   Immaterial.  Disputed as to the first sentence.  Discovery was postponed as a more

efficient way of proceeding in this case for the parties and the Court.  (Court Doc. 17, p. 3, ¶ 14.)

Undisputed as to the second sentence.

   6.   Immaterial.  Undisputed.

   7.   Immaterial.  Undisputed.

   8.   Immaterial.  Undisputed.

   9.   Immaterial.  Undisputed.

   10.   Immaterial.  Undisputed.

   11.   Immaterial.  Undisputed.

12.    Immaterial.  Undisputed.

13.    Immaterial.  Undisputed.

14.    Undisputed subject to the clarification that Rogelio Guevara was DEA's Chief Inspector during the time period from August 13, 2004, through November 15, 2005.  (Pl. Ex. 36, 37, and 49.)

15.    Disputed.  Neither cite states that IN investigates all, as in each and every, shooting involving injury to a DEA agent.  (Pl. Ex. 83, p.11, Pl. Ex. 82, p. 9.)  Since this paragraph does not include an accurate citation to the record as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  Furthermore, at least some shooting investigations are delegated to DEA field offices.  (Pl. Ex. 83, p. 10.)

16.    Undisputed subject to the clarification that the DCI in charge of IN was Gerard P. McAleer, not James McAleer.  (Pl. Ex. 83, p. 9.)

17.    Undisputed.  However, no citation is provided for the second sentence.  Since that sentence does not include a proper citation to the record before the Court on summary judgment as required by D.D.C. Civ. R. 56.1, no response is required for that sentence.

18.    Immaterial.  Undisputed subject to the clarification that there were five inspection teams within IN in April 2004.  (Pl. Ex. 82, p. 12.)

19.    Undisputed subject to the clarification that Paige was also out of the office for several months between July 2003 and April 2004, including for the months of December 2003 and January and February of 2004.  (Def. Ex. B, p. 34.)

20.    Undisputed subject to the clarification that Stephen Collins has been ASAC of the ODO from April 2003 to the present.  (Pl. Ex. 73, p. 7; Decl. of Stephen Collins.)

21.    Undisputed subject to the clarification that the citation provides support, as

4

required by D.D.C. Civ. R. 56.1, only for the proposition that Paige worked in a group at the

ODO led by Peter Gruden from sometime in 2003 until April 2004. (Pl. Ex. 78, pp. 35-36.)

22.    Immaterial. Undisputed.

23.    Undisputed.

24.    Undisputed.

25.    Disputed. This statement mischaracterizes the record citation. At most, this

citation stands for the proposition that a single non-supervisory co-worker in the 1990s thought

highly of Paige. Moreover, as the past tense used in the paragraph indicates, the record citation

provides no evidence of any undercover activity by Paige in Orlando. (Pl. Ex. 90, pp. 5-6.)

26.    Immaterial. Undisputed subject to the clarification that this paragraph is in the

past tense and that the citation is not reflective of the minimal undercover work Paige did while

assigned to the Bahamas and Orlando. (Pl. Ex. 64, ¶ 3; Def. Ex. B pp. 23, 34-35.)

27.    Immaterial. Undisputed.

28.    Immaterial. Undisputed.

29.    Undisputed.

30.    Undisputed.

31.    Undisputed.

32.    Disputed. Plaintiff exaggerates his reference to "many dozen commendations"; at

most, Plaintiff's cited sources provide less than two dozen "thank you" letters representing

plaintiff's eleven years of demand reduction presentations. None of the "commendations" in

question appear to have been official commendations from the DEA or any other governmental

organization for a demand reduction presentation. (Pl. Ex. 1, pp. 102-225.) In addition, many of

those two dozen letters are either duplicates, multiple letters for the same event, or letters

forwarding the thank you notes.  (Compare, for example, Pl. Ex. 1, pp. 111 and 202, 150-153,

154-156, 124 and 157, 190 and 192, and 203 and 204.)

33.    Undisputed subject to the clarification that Paige was not in the ODO for

December 2003, or January or February 2004.  (Def. Ex. B, p. 34.)

34.    Undisputed.

35.    Disputed.  OMYGA is not a private organization.  (Pl. Ex. 76, p. 7; Pl. Ex. 31.)

Undisputed as to the remainder of the paragraph.

36.    Disputed.  OMYGA's Friday meeting was not private.  (Pl. Ex. 76, p. 7; Code of

City of Orlando, Florida § 18A.02(4)(b), (Def. Ex. 7)).  The meeting took place at the Dr. J.B.

Callahan Community Center, a public place.  (Am. Compl. ¶ 6 (Def. Ex. 1); Pl's Answer to

Defs.' Req. for Admis. No. 3 (Def. Ex. 3)).  Also, Walter Walker and his children, none of whom

were members of OMYGA, attended the meeting.  (Def. Ex. 2, p. 101; Def. 10, pp. 23-25. )

Undisputed as to the mission of OMYGA.

37.    Undisputed.

38.    Immaterial.  Undisputed.

39.    Undisputed subject to two clarifications.  First, the video recording does not start

at the very beginning of the meeting but rather while children are being recognized for their golf

performance (Pl. Ex. 6).  Second, that the videographer's "tape" was a Mini-DV microcassette

tape. (Pl. Ex. 69, pp. 11-12.)

40.    Undisputed as to a Panasonic video camera, disputed as to the remainder because

the citation does not support the paragraph or the model number of the camera, thus no response

is required to negate it under D.D.C. Civ. R. 56.1.  (Note, however, the cite to Pl. Ex. 69, p. 7

does not support the paragraph.)

41.    Undisputed.  (Note, however, that the citation to Pl. Ex. 69, p. 7 does not support the paragraph.)

42.    Undisputed as to the first sentence.  (Note, however, that the citation to Pl. Ex. 69, p. 7 does not support the paragraph.)  Disputed as to the second sentence.  Since the second sentence does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  Plaintiff cites only "reason and logic" as support for that sentence, but neither suffices as a legitimate citation under D.D.C. Civ. R. 56.1, and therefore no response is required to negate that sentence.  Furthermore, simply because Brunson recorded the meeting only on a Mini-DV does not – by reason or logic – mean that no other recordings of the meeting exist.  Anyone in the audience could also have recorded or transmitted video or audio of plaintiff's presentation.

43.    Undisputed.

44.    Immaterial.  Undisputed subject to the clarification that Pl. Ex. 6 does not start at the beginning of the OMYGA meeting and therefore the times cited in this paragraph are from the beginning of the video, Pl. Ex. 6, and not the times that events actually occurred.  (Pl. Ex. 6.)

45.    Undisputed.

46.    Undisputed as to Paige's subjective sense that wearing raid gear and carrying an exposed weapon was "meaningful."  Undisputed that Paige wore a Glock 22 pistol on his hip with the clarification that the weapon was Glock Model 22 handgun, a 40-caliber firearm.  (Def. Ex. B, pp. 87-89.)  Disputed as to the characterization of the opinions of anyone else without the evidentiary support required by D.D.C. Civ. R. 56.1.

47.    Undisputed as to Paige's subjective sense that the DEA-owned weapons were unloaded and that he intended to use them as props.  Disputed as to the characterization that

weapons were in fact unloaded because Plaintiff's assessment of whether a firearm was unloaded at his April 9, 2004 presentation has no credibility. (Pl. Ex. 6.)

48.    Immaterial. Undisputed.

49.    Immaterial. Undisputed.

50.    Undisputed subject to the clarification that Dr. Dorsey did not expect Paige to bring any weapons with him. (Pl. Ex. 76, p. 15.)

51.    Undisputed.

52.    Undisputed subject to the clarification that Dr. Dorsey also stated that if he had Paige back for another presentation, he would tell him, "[m]aybe I'd have to say don't bring the gun." (Pl. Ex. 76, p. 18.)

53.    Undisputed subject to the clarification that Paige's weapon in this instance was a Glock Model 22 handgun, a 40-caliber firearm. (Def. Ex. B, pp. 87-89.) (Note, however, that the citation to Pl. Ex. 64, p. 22 does not support this paragraph. Pl. Ex. 64 has neither a page, nor a paragraph, 22.)

54.    Undisputed subject to two clarifications. First, the video labeled Pl. Ex. 6 does not start at the beginning of the OMYGA meeting and therefore the times cited in this paragraph are from the beginning of the video, Pl. Ex. 6, and not the times that events actually occurred. (Pl. Ex. 6.) Second, Paige pulled the trigger on his weapon shooting himself in his thigh. (Pl. Ex. 6.)

55.    Undisputed subject to two clarifications. First, Pl. Ex. 6 does not start at the beginning of the OMYGA meeting and therefore the times cited in this paragraph are from the beginning of the video, Pl. Ex. 6, and not the times that events actually occurred. Pl. Ex. 6. Second, before leaving the room, Paige attempted to continue his demonstration, left his weapon

unattended on a table (Pl. Ex. 6, Def. Ex. 14 at 14), tried to have a civilian show DEA-owned weapons, when the civilian refused, Paige instructed his wife, Robbin Paige, to bring him a rifle for further display.  (Pl. Ex. 6, Def. Ex. 14 at 14).  Robbin Paige displayed the rifle until children in the audience yelled at her to put it down.  (Pl. Ex. 6, Def. Ex. 14 at 14).

56.    Disputed as to the first sentence.  This sentence is refuted by the fact that Paige shot himself with a firearm during a presentation.  (Pl. Ex. 6.)  Undisputed as to the second sentence.

57.    Disputed as to the first sentence.  The action taken by Paige was not sufficient to ensure that the firearm was not loaded.  (Pl. Ex. 6, Def. Ex. 14 at 12-13.)  At a minimum, Paige should have removed the magazine of live ammunition from the firearm, visually and physically inspected the gun, and had a firearms-trained DEA Special Agent visually and physically inspect the firearm.  (Def. Ex. 14 at 10-13.)  Undisputed as to the second sentence.

58.    Disputed.  First, Plaintiff was not demonstrating gun safety, asking a member of the audience with unknown firearms experience to check his weapon contributed directly to Plaintiff shooting himself.   (Def. Ex. 14 at 11-12.)  Second, failing to abide by the first rule of gun safety – be aware of the source of ammunition – is hardly a demonstration of gun safety.  (Def. Ex. 14 at 15)  Third, safe handling rules required that Paige have a firearms-trained DEA Special Agent visually and physically inspect the handgun, instead of an untrained civilian audience member.  (Def. Ex. 14 at 10.)  Undisputed only as to the fact that Paige asked a member of the audience to inspect the chamber to confirm that there was no bullet in the chamber.

59.    Undisputed subject to the clarification that Paige's actions caused a bullet to enter the chamber of the gun.  (Def. Ex. 14 at 12-13.)

60.    Disputed.  The gun was pointed towards Paige's leg, when he pulled the trigger.

(Pl. Ex. 6, Def. Ex. 14 at 12-13.)  Undisputed with respect to the remainder of the paragraph.

61.    Immaterial.  Undisputed.

62.    Undisputed.

63.    Undisputed with respect to the first and third sentences subject to the clarification that an officer with the Orlando Police Department arrived and addressed the audience before being dismissed by Dr. Dorsey.  (Pl. Ex. 6.)  Undisputed with respect to the second sentence subject to the following clarifications.  First, that Pl. Ex. 6 does not start at the beginning of the OMYGA meeting and therefore the times cited in this paragraph are from the beginning of the video, Pl. Ex. 6, and not the times that events actually occurred.  (Pl. Ex. 6.)  Second, Paige had requested that Walker attempt to get the Mini-DV from the videographer.  (Pl. Ex. 86, p. 81-82.)  Third, Walker requested the Mini-DV, but noted that it would be returned to the videographer without the shooting on it.  (Pl. Ex. 6.)  Fourth, Walker did not use the words "demand" or "surrender" in his conversation with the videographer.  (Pl. Ex. 6.)

64.    Disputed.  First, Walker did not use the words "demand" or "surrender" in his attempts to convince the videographer to allow Walker to have the Mini-DV.  (Pl. Ex. 6.)  Second, at least one non-DEA agent participated in the conversation among Brunson and the DEA agents outside the room.  (Pl. Ex. 69, p. 21.)  Third, the videographer does not describe the individuals asking for the tape as DEA agents.  (Pl. Ex. 69, p. 21).  Fourth, the videographer's recollection of the number of individuals discussing the Mini-DV with him is contradicted by Walker's testimony. (Pl. Ex. 95, p. 18).  Undisputed that the videographer and Walker left the room.

65.    Disputed.  First, according to the videographer, only Walker asked for the Mini-DV "immediately."  (Pl. Ex. 69, 18, 20-21, 23-24.)  Second, Walker asked for the Mini-DV after

10

Paige, through his wife, requested that Walker get it.  (Def. Ex. 2, pp. 81-81; Def. Ex. 9 at 37-38.)  Third, at least one non-DEA agent participated in the conversation among Brunson and the DEA agents outside the room.  (Pl. Ex. 69, p. 21.)  Fourth, the videographer's recollection of the number of individuals discussing the Mini-DV with him is contradicted by Walker's testimony. (Pl. Ex. 95, p. 18).

66.    Disputed.  The videographer stated that he voluntarily gave the Mini-DV to DEA, that he still considered it his property, and that he received a verbal commitment that he would get the Mini-DV back.  (Pl. Ex. 69, pp. 24-25).

67.    Undisputed.

68.    Undisputed subject to the clarifications that Robbin Paige requested that Walker obtain the video before he approached the videographer, and that it was Robbin Paige's request that prompted Walker's actions.  (Def. Ex. 2, pp. 81-83; Def. Ex. 9, pp. 37-38; Def. Ex. 10, p. 10.)

69.    Undisputed.

70.    Undisputed.

71.    Undisputed.  (Note, however, the cite, Pl. Ex. 88, p. 15, was not provided in the record and therefore cannot support the paragraph.)

72.    Undisputed subject to the clarification that Patterson made the VHS copy of the Mini-DV to make the video more accessible for management.  (Def. Ex. 15 at 30.)

73.    Undisputed.

74.    Undisputed.

75.    Disputed.  This paragraph presents an incomplete picture and mischaracterizes Collins' testimony.  Collins states several times that, initially, he did not know that IN was

sending a team of investigators.  In fact, Collins thought the opposite.  (Pl. Ex. 73, pp. 67-69, 74-75.)  The citation does not support the paragraph's contention that an inspection team would need any particular video format.  (Pl. Ex. 73, p. 65.)  (Note, however, the cite, Pl. Ex. 73, p. 79 was not provided in the record and therefore cannot support the paragraph.)

76.    Disputed.  The word "maintained" has a specific meaning under the Privacy Act and none of plaintiff's citations indicate that Gruden kept any video as a record within a system of records that he "maintained" before providing either the Mini-DV or a VHS copy to IN.  (Pl. Ex. 78, pp. 29-31; Pl. Ex. 97, pp. 50-51; Pl. Ex. 2, p. 3.)   The use of the word "evidence" is not supported by any of plaintiff's citations; rather it has a specific DEA meaning, which the videos do not satisfy.  (Pl. Ex. 78, pp. 29-31; Pl. Ex. 97, pp. 50-51; Pl. Ex. 2, p. 3.)  As used by DEA, "evidence" refers only to materials "used to establish a violation of law."  (Pl. Ex. 58, § 6661(A).)  Since the use of these words in this paragraph does not include any citation to the record to support their use, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  Furthermore, Gruden provided the Mini-DV and a VHS to IN at different times.  (Pl. Ex. 78, pp. 30-31.)

77.    Disputed.  The citations offer no support for the proposition that the manuals provide any more than general guidelines for a shooting incident review.  (Pl. Ex. 56, 57.)

78.    Disputed.  The citation to the Agents Manual is incomplete, as it fails to note that a report is only required for discharge of a firearm during a joint investigation or DEA enforcement operation.  (Pl. Ex. 56, § 6114.41(A)).  Moreover, both the Agents Manual and the Planning Inspection Manual make exceptions to the requirements for any firearms safely discharged in a training or recreational setting.  (Pl. Ex. 56, § 6114.1(A); Pl. Ex. 57, § 8231.1 (C).)

79.    Immaterial.  Disputed.  Plaintiff mischaracterizes the cited portion of the Agents Manual.  The Agents Manual does not mandate, direct, or suggest that either supervisory or non-supervisory personnel on the scene of a shooting incident "take custody of evidence."  (Pl. Ex. 56, § 6114.3.)  The phrase "custody of evidence" is only used with regard to agents accompanying an injured suspect or an injured or deceased law personnel.  In those limited instances, agents are to collect or take custody of evidence only at the medical facility or medical examiner's office.  (Pl. Ex. 56, § 6114.3(B)(3).)  Moreover, the word "evidence" has a specific DEA meaning.  As used by DEA, "evidence" refers only to materials "used to establish a violation of law."  (Pl. Ex. 58, § 6661(A).)

80.    Disputed.  This citation is misleading.  The ASAC is to remain on the scene until all physical evidence has been collected and the investigative agency has departed the scene unless there are exigent circumstances.  (Pl. Ex. 56, §§ 6114.3(C) and 6114.31(A).)  Simply because the manual states that the ASAC should remain on the scene until evidence is collected does not mean that there is evidence to collect.  (Pl. Ex. 56, §§ 6114.3(C) and 6114.31(A).)  As used by DEA, "evidence" refers only to materials "used to establish a violation of law."  (Pl. Ex. 58, § 6661(A).)   As used by DEA, "evidence" refers only to materials "used to establish a violation of law."  (Pl. Ex. 58, § 6661(A).)

81.    Undisputed subject to the clarification that the Orlando District Office does not have a SAC and that the Orlando ASAC was on leave when Paige shot himself.  (Pl. Ex. 73, p. 27.)

82.    Disputed.  If an incident occurs after normal business hours, the Command Center notifies the DCI in charge of IN.  The DCI will then notify the Chief of Operations who will direct further notifications.  (Pl. Ex. 57, § 8231.3(B).)

13

83.    Immaterial.  Undisputed subject to the clarification that the video (Pl. Ex. 6) does not start at the beginning of the OMYGA meeting and therefore the time of the shooting cited in this paragraph is from the beginning of the video, (Pl. Ex. 6), and not the time that event actually occurred.  (Pl. Ex. 6.)   Consequently, any estimation of elapsed time is not reliable.

84.    Undisputed subject to the clarification that McAleer was the Deputy Chief Inspector in 2004 for the Office of Inspections.  (Pl. Ex. 83, p. 9.)

85.    Immaterial.  Disputed.  The Orlando District Office does not have a SAC and that the Orlando ASAC was on leave when Paige shot himself.  (Pl. Ex. 73, p. 27.)  The agents manual provides that a teletype will be sent in 24 hours from the incident.  (Pl. Ex. 56, § 6114.41(G).)  Neither citation provided by Plaintiff says that such a teletype "must" be sent.  (Pl. Ex. 57, § 8231.3(D); Pl. Ex. 56, § 6114.41(G).)

86.    Immaterial.  Undisputed subject to the following clarifications.  First, the shooting occurred after normal business hours on Friday evening.  (Pl. SMF # 34, 54.)  Second, Patterson verbally notified DEA Headquarters of the incident on the evening of the shooting.  (Pl. SMF # 83).  Third, the teletype was sent the next business day when the classified mechanism to send the teletype was available.  (Pl. Ex. 73, p. 39-40.)

87.    Immaterial.  Undisputed subject to the clarification that Collins did not state that "the classified mechanism to send it was reportedly not available."  Collins stated, "[o]ur crypto sent via classified mechanisms that wouldn't be available until Monday."  (Pl. Ex. 73, p. 40.)

88.    Immaterial.  Disputed.  First, IN investigates only DEA-related shootings.  (Pl. Ex. 56, § 6114.1(A).)  IN is the primary DEA component responsible for all shooting and assault incident investigations.  (Pl. Ex. 56, § 6114.61.)  However, at least some shooting investigations are delegated to DEA field offices for investigation.  (Pl. Ex. 83, p. 10; Pl. Ex. 56, § 6114.62.)  In

14

addition, the discharge of a firearm during a training or recreational situation that does not result in personal injury or property damage is not classified as a shooting incident. (Pl. Ex. 56, § 6114.1(A).) Consequently, post-shooting/assault procedures are not applicable in such a situation. (Pl. Ex. 56, § 6114.4(A).)

89.    Immaterial. Undisputed subject to the clarification that the shooting incidents are DEA-related. (Pl. Ex. 56, § 6114.1(A).)

90.    Immaterial. Undisputed.

91.    Undisputed.

92.    Undisputed.

93.    Disputed. The assertion that the SIT consists, in part, of "generally two IN inspectors designated by the ADCI," is incorrect. In addition to the persons named in this paragraph, the SIT consists of "designated inspectors." (Pl. Ex. 56, § 6114.61(B)(2); Ex. 57, § 8233.42(A).) Neither manual specifies the number of investigators for an investigation. (Pl. Ex. 56, § 6114.61(B)(2); Ex. 57, § 8233.42(A).) None of the testimony cited by the plaintiff supports his assertion that the SIT generally consists of two IN inspectors. (Pl. Ex. 82, p. 14; Pl. Ex. 70, p. 13, 15; Pl. Ex. 72, p. 8.) On the contrary, on the very pages of testimony cited by plaintiff to support his allegation, two witnesses, Mathews and Burns, testified that everybody or every inspector in IN is assigned to the SIT. (Pl. Ex. 82, p. 14, Pl. Ex. 70, p. 13.)

94.    Immaterial. Undisputed subject to the clarification that the DCI of IN makes the determination if cases are to be delegated to the field. (Pl. Ex. 56, § 6114.62.)

95.    Immaterial. Undisputed.

96.    Undisputed subject to the clarification that IN-SIT conducts on-site investigations in other situations as well. (Pl. Ex. 56, § 6114.61(B); Pl. 57 § 8233.42(B).)

15

97.    Disputed.  The cite to Pl. Ex. 82, p. 25 does not support the paragraph.  The IN file for the investigation of a shooting incident is not automatically opened.  The file is opened after IN receives the teletype and determines if an investigation is needed. (Pl. Ex. 56, § 6114.42(H); Pl. Ex. 57, § 8231.3(E).)

98.    Undisputed subject to the clarification that a third alternative exists, that is that an IN file is not opened in instances where IN does not investigate; such as instances when a shooting is not determined to be a shooting incident.  (Pl. Ex. 56, § 6114.1(A).)  (Note, however, the cite, Pl. Ex. 72, p. 100, was not provided in the record and therefore cannot support the paragraph.)

99.    Immaterial.  Undisputed.

100.    Undisputed.

101.    Disputed.  First, the file number and file title cannot be assigned until after the program analyst is notified that an investigation is going to be reviewed by IN.  (Pl. Ex. 72, p. 12.)  Second, in this instance the IN shooting file was opened on April 16, 2004.  (Pl. Ex. 72, p. 18).

102.    Disputed on vagueness and ambiguity grounds as to the term "IN file."  The "IN file" constitutes the final write-up of the shooting investigation and is stored in a binder that is distinct from the correspondence file – although both use the same file number.  (Pl. Ex. 1, 1A.)

103.    Undisputed subject to the clarification that the Mini-DV was not part of the IN file until after Inspector White returned to DEA Headquarters in Arlington, Virginia with the Mini-DV on or after April 21, 2004.  (Pl. SMF 111.)

104.    Disputed.  This is a legal conclusion, and therefore it is not proper subject in a statement of material facts.  Moreover, the legal conclusion is vague as to time period – the Mini-

DV was initially on loan to DEA and was not in the office of IN until after April 21, 2004.(Pl. Ex 69, pp. 24-25; Pl's SMF #103.)

105.    Disputed.  This is a legal conclusion, and therefore it is not proper in a statement of material facts.  In addition, the IN file was not open and therefore did not exist before April 16, 2004.  (Pl. Ex. 72, p. 18.)

106.    Undisputed subject to the clarification that all IN inspectors are assigned to SIT. (Pl. Ex. 82, p. 14; Pl. Ex. 70, p. 13.)  (Note, however, that the cite to Pl. Ex. 82, p. 7 does not support the paragraph.)

107.    Undisputed subject to the clarification that Mathews was the lead inspector only regarding the on-site investigation, once the inspectors returned to headquarters Mathews had almost no further involvement in the investigation.  (Pl. Ex. 82, pp. 63-64; Pl. Ex. 97, p.67.)

108.    Undisputed subject to the clarification that Ms. Clifford was the IN Program Analyst for shooting investigations.  (Pl. Ex. 72, p. 6.)

109.    Disputed with respect to the first sentence.  Ms. Clifford did assign the file number as the next number off a list of file numbers for shootings in 2004 after she was notified that IN would investigate.  (Pl. Ex. 72, p. 17.)  Ms. Clifford opened the file on April 16, 2004 (Pl. Ex. 72, p. 18.)  Plaintiff's citation for this paragraph does not support the assertion that Ms. Clifford assigned a file name to the shooting file.  Since this assertion does not include an accurate citation to the record as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate that assertion. However, Ms. Clifford did not assign a file title to the shooting file, she did assign a file title to the correspondence file, which is separate from the shooting file.  (Pl. Ex. 72, p. 14-15.)  Undisputed with respect to the second sentence.

110.    Undisputed subject to the clarification that White and Mathews returned to

Virginia on April 21, 2004, the citations provided by Plaintiff provide no support for the assertion that White and Mathews returned to the IN office on April 21, 2004. (Pl. Ex. 83, p. 15; Pl. Ex. 1, p. 7.) Since no citation provided by Plaintiff supports the assertion that the inspectors returned to IN on April 21, 2004, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.

111.    Undisputed.

112.    Undisputed.

113.    Immaterial. Disputed. IN only conducts an administrative review of accidental discharges, it does not collect "evidence." (Pl. Ex. 70, p. 42-43.) Moreover, the word "evidence" has a specific DEA meaning. As used by DEA, "evidence" refers only to materials "used to establish a violation of law." (Pl. Ex. 58, § 6661(A).) It is not clear that White understands that Plaintiff's counsel is using the term in any manner aside from its common meaning. (Pl. Ex. 97, p. 52.)

114.    Undisputed subject to the clarification that the Mini-DV is presently in the binder that is the IN shooting investigation file. (Pl. Ex 1, p. 78.)

115.    Disputed. Plaintiff's citation for this paragraph does not support the assertion that White either maintained evidence or maintained the Mini-DV as evidence. Since this assertion does not include an accurate citation to the record as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate that assertion. As explained above, the Mini-DV was not "evidence" because IN only conducts an administrative review of accidental discharges, it does not collect "evidence." (Pl. Ex. 70, p. 42-43.) Moreover, the word "evidence" has a specific DEA meaning. As used by DEA, "evidence" refers only to materials "used to establish a violation of law." (Pl. Ex. 58, § 6661(A).)

18

116.    Disputed.  The entire IN shooting investigation file was placed in the binder.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)  The correspondence file was separate from the IN file.  (Pl. Ex. 72, p. 15; Pl. Ex. 70, p. 23.)

117.    Undisputed subject to the clarification that the binder contained the complete IN shooting investigation file.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)

118.    Disputed with respect to the first sentence.  Plaintiff's citation for this sentence does not support the assertion that the IN shooting investigation file does not include certain correspondence, such as the Command Center notification and the initial teletype.  Since this assertion does not include an accurate citation to the record as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate that assertion.  In point of fact, the binder does contain the Command Center notification and the initial teletype.  (Pl. Ex. 1, p. 39-42.)  Undisputed as to the second sentence subject to the clarification that some correspondence is kept in a correspondence folder.  (Pl. Ex. 72, p. 15.)  Undisputed as to the third sentence subject to the clarification that the correspondence file is not part of the IN shooting investigation file.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71; Pl. Ex. 72, p. 15.)

119.    Undisputed subject to the clarification that the entire IN shooting investigation file was contained in the binder.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)

120.    Undisputed subject to two clarifications.  First, the entire IN shooting investigation file was contained in the binder.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)

121.    Undisputed subject to the clarification that the Paige file was complete when it was stored in the armory.  (Pl. Ex. 70, p. 31, 84.)

122.    Undisputed.

123.    Undisputed.

124.     Undisputed.

125.     Undisputed.

126.     Undisputed subject to the clarification that DEA rules, not regulations, provide that most shooting incidents, including Paige's, will also be reviewed by the SAIRC.  (Pl. Ex. 56, § 6114.71 (A),(B); Pl. Ex. 57, § 8234.1.)

127.     Undisputed.

128.     Undisputed.

129.     Undisputed subject to the clarification that the SAIRC is to review the IN investigation and render an opinion as the facts and circumstances surrounding each incident. (Pl. Ex. 56, § 6114.71(C)(1),(2) & (3).)

130.     Undisputed.  (Note, however, that the cite to Pl. Ex. 36 does not support the paragraph.)

131.     Undisputed.

132.     Disputed.  The SAIRC did not determine that the Office of Training should not examine the incident for lessons learned. (Def. Ex. 22, pp. 54, 110; Def. Ex. 32, pp. 8, 12; Pl. Ex. 56, § 6114.81.)

133.     Disputed.  Other copies may be made in the ordinary course of a shooting investigation, such as for SAIRC.  (Pl. Ex. 56, § 6114.63(C)(3).)  Nor do the manual citations prohibit the making of additional copies.  (Pl. Ex. 56, § 6114.63; Pl. Ex. 57, § 8233.62.)

134.      Disputed.  Ms. Clifford testified that Training did not want a copy of the video at that time, not that Training did not want a copy of the video.  (Pl. Ex. 72, p. 58.)  Ms. Clifford also testified that she did not know if a copy of the video was sent to Training.  (Pl. Ex. 72, p. 57.)  In addition, this accurate rendition of her testimony is supported by the testimony of both

Burns and Lutz.  (Def. Ex. 22, pp. 54, 109-110; Def. Ex. 32, pp. 8, 12.)

135.    Undisputed.

136.    Undisputed subject to the clarification that it was the IN shooting investigation file.  (Pl. Ex. 57, § 8233.63; Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)

137.    Undisputed subject to the clarification that BPC conducts a review of the SAIRC evaluative analysis of the file.  (Pl. Ex. 56, § 6114.71(F)(3).)

138.    Undisputed subject to the clarification for completeness that the letter explained in the penalty discussion that, "As a DEA Special Agent, you are held to a high standard of personal conduct in order to promote public confidence in the dependability and integrity of DEA and to ensure embarrassment is not brought upon DEA.  Consequently, you are expected to exercise prudence and good judgment in your actions.  Your conduct in taking and handling loaded firearms in a classroom full of civilians, the majority of which were youths, falls short of this expectation.  The consequences of your actions could have been tragic, and the publicity surrounding the incident reflected poorly on DEA.  Moreover, your unsafe handling of a firearm caused an injury to yourself that resulted in a significant loss of work time and productivity." (Pl. Ex. 42, p. 2.)

139.    Undisputed subject to the clarification that the IN shooting investigation file included a disc copy of the video.  (Def. Ex. 12, p. 136; Def. Ex. 2, pp. 122-123.)  (Note, however, the cite, Pl. Ex. 73, p. 133 was not provided in the record and therefore cannot support the paragraph.)

140.    Undisputed subject to the clarification that Paige was given a copy of the IN shooting investigation file for at least three to four days.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71; Def. Ex. 12, p. 136-137; Def. Ex. 2, pp. 122-123.)

141.    Undisputed subject to the clarification that while Paige was not supposed to copy anything in the IN shooting investigation file, he was not supervised while he had a copy of the IN shooting investigation file in his possession.  (Def. Ex. 12, p. 136-137; Def. Ex. 2, pp. 121-123.)

142.    Disputed.  It was a copy of the IN shooting investigation file that Paige received, and OPR investigators are not certain that Paige did not copy any materials in that file – including the disc.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71; Def. Ex. 12, p. 136-137; Def. Ex. 2, pp. 121-123; Pl. Ex. 91, p. 215.)

143.    Undisputed with respect to the first sentence subject to the clarification that it was a copy of the IN shooting investigation file.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)  Undisputed with respect to the second sentence subject to the clarification that the only evidentiary support for this sentence is plaintiff's declaration.

144.    Undisputed subject to the clarification that it was a copy of the IN shooting investigation file.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)

145.    Undisputed subject to the clarification that it was a copy of the IN shooting investigation file.  (Pl. Ex. 70, p. 30; Def. Ex. E, p. 71.)

146.    Undisputed subject to the clarification that the Deciding Official is responsible for reviewing the completed incident investigation, the recommendation of the BPC, and determining the administrative or disciplinary remedy.  (Pl. Ex. 56, § 6114.71(F)(3)(b); Pl. Ex. 57, § 8234.33.)

147.    Undisputed subject to the clarification for completeness that the Deciding Official explained his decision as follows: "The potential for serious injury to children and adults in the audience as a result of your displaying firearms displays a lack of judgment on your part; that

ultimately caused you to sustain a serious injury. Your actions overshadowed the purpose of

your presentation and reflected negatively on your professionalism and the [DEA] as an agency."

(Def. Ex. 36, DEA 001195-1196.)

148.    Disputed. The witness cited states that he does not know the Board's internal

procedures. (Pl. Ex. 70, p. 106). In addition, plaintiff's exhibit 56 does not have a section

8233.63 and, therefore, there is no support for this paragraph in the record. Since this paragraph

does not include an accurate citation to the record as required by D.D.C. Civ. R. 56.1, it is

facially deficient, and no response is required to negate it.

149.    Disputed. The manuals both state that IN then will forward the file to Training,

not that IN will shred the file. (Pl. Ex. 56, § 6114.81; Pl. Ex. 57, § 8233.63.)

150.    Undisputed subject to the clarification that she destroys only duplicative copies of

the IN shooting investigation file in the IN office at DEA headquarters. (Pl. Ex. 70, p. 30; Def.

Ex. E, p. 71; Pl. Ex. 72, pp. 62-63.)

151.    Undisputed subject to the clarification that it is after the IN shooting investigation

is closed. (Pl. Ex. 72, p. 23.)

152.    Immaterial. Undisputed subject to the clarification that the labels of other

individual's files were covered to accommodate plaintiff's counsel's travel schedule and his

limited availability to review the file. In addition, the labels of other individual's files were

covered to avoid the need for a Privacy Act Protective Order to preserve the rights of other

individuals and to avoid unnecessary delay.

153.    Disputed. The videographer stated that he voluntarily gave the Mini-DV to DEA,

that he still considered it his property, and that he received a verbal commitment that he would

get the Mini-DV back. (Pl. Ex. 69, pp. 24-25). IN only conducts an administrative review of

accidental discharges, it does not collect "evidence." (Pl. Ex. 70, p. 42-43.) Moreover, the word

"evidence" has a specific DEA meaning. As used by DEA, "evidence" refers only to materials

"used to establish a violation of law." (Pl. Ex. 58, § 6661(A).) Furthermore, plaintiff's cites to

his Exhibit 1, Exhibit 42, Exhibit 56, and to Exhibit 82, pp. 66-67, do not support his assertions

in this paragraph. In addition, the citation to Exhibit 82, pp. 86-87 is directly contradicted by the

testimony of McAleer. (Def. Ex. D, p. 49.)

154.    Disputed. The citations provided by plaintiff do not refer to any incident where

agents told a videographer they had to take a Mini-DV. Since paragraph does not include an

accurate citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no

response is required to negate it.

155.    Disputed. The Mini-DV was not "evidence." The word "evidence" has a specific

DEA meaning. As used by DEA, "evidence" refers only to materials "used to establish a

violation of law." (Pl. Ex. 58, § 6661(A).) The Orlando Police Department determined that the

event was an accidental discharge, collected no evidence, and did not start any formal

investigation into the matter. (Pl. Ex. 1, pp. 35-36.) Strangely, plaintiff cites to evidence that

there was no federal or state criminal investigation to support his assertion that the Mini-DV

would be evidence for such an investigation. (Pl. Ex. 1, pp. 9, 35-36.) Finally, IN only conducts

an administrative review of accidental discharges, it does not collect "evidence." (Pl. Ex. 70, p.

42-43.)

156.    Immaterial. Disputed. Immediately before stating the cited testimony, the witness

states that he does not recall any procedures in the Office of Inspections Manual. (Pl. Ex. 82, p.

71). The procedures for processing non-drug evidence do not apply to IN because an IN

investigation is an administrative matter and IN does not collect evidence. (Pl. Ex. 70, p. 42-43.)

24

157.    Immaterial.  Disputed.  The Agents Manual does not govern IN evidence policy.
The procedures for processing non-drug evidence do not apply to IN because an IN investigation
is an administrative matter and IN does not collect evidence.  (Pl. Ex. 70, p. 42-43.)

158.    Immaterial.  Disputed.  This paragraph misstates Ms. Clifford's testimony.  She
stated that it was the practice to fill out a DEA-12 and to place it in the correspondence file when
there was a request for a copy of a file.  She did not say that such practice was mandatory or that
is was required by DEA rules.  (Pl. Ex. 72, p. 29-30.)  In any event, plaintiff has provided no
support for this statement beyond Ms. Clifford's testimony of her own practice.  (Pl. Ex. 72, p.
29.)

159.    Immaterial.  Undisputed.

160.    Immaterial. Disputed.  Non-drug property in a civil or criminal investigation is
submitted to a non-drug evidence custodian.  (Pl. Ex. 58, § 6681.43.)    The procedures for
processing non-drug evidence do not apply to IN because an IN investigation is an administrative
matter and IN does not collect evidence.  (Pl. Ex. 70, p. 42-43.)  The Mini-DV does not fall
within any category of non-drug property.   (Pl. Ex. 58, § 6681.41(A).)

161.    Immaterial.  Disputed.  These provisions apply only to non-drug property in a civil
or criminal investigation.(Pl. Ex. 58, § 6681.41(A); Pl. Ex. 58, § 6661(C).)

162.    Immaterial.  Undisputed subject to the clarification that OPR has gathered
evidence kept as "N" exhibits for its internal investigation of the release of the video.  OPR has
not gathered evidence in the case of Paige v. DEA.  (Pl. Ex. 21.)

163.    Immaterial.  Disputed.  The Mini-DV cannot be evidence and "also personal
property."  Personal property is only property "that does not have evidentiary value."  (Pl. Ex. 58,
§ 6681.11(A)(5).)  The procedures for processing non-drug evidence do not apply to IN because

an IN investigation is an administrative matter and IN does not collect evidence.  (Pl. Ex. 70, p. 42-43.)

164.    Immaterial.  Disputed.  Personal property in a civil or criminal investigation is submitted to a non-drug evidence custodian.  (Pl. Ex. 58, § 6681.43.)  The procedures for processing non-drug evidence do not apply to IN because an IN investigation is an administrative matter and IN does not collect evidence.  (Pl. Ex. 70, p. 42-43.)

165.    Immaterial.  Disputed.  The procedures for processing non-drug evidence do not apply to IN because an IN investigation is an administrative matter and IN does not collect evidence.  (Pl. Ex. 70, p. 42-43.)  Moreover, the citation plaintiff has provided is impossibly broad, encompassing 225 pages of his record without pointing to any specific instance or action to support his broad assertions.  Since this assertion does not include a precise citation to the record as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate that assertion. Nor has plaintiff provided any citation for his assertion that the ODO has not employed the foregoing procedures or that the ODO should have applied those procedures in this particular instance.

166.    Immaterial.  Undisputed subject to the clarification that the procedures for processing non-drug evidence do not apply to IN because an IN investigation is an administrative matter and IN does not collect evidence.  (Pl. Ex. 70, p. 42-43.)  In addition, IN has no need for a non-drug evidence custodian because IN neither seizes nor maintains evidence.  (Pl. Ex. 70, p. 42-43.)  (Note, however, the cite, Pl. Ex. 70, p. 42, was not provided in the record and therefore cannot support the paragraph.)

167.    Immaterial.  Undisputed.

168.    Immaterial.  Undisputed.

26

169.    Undisputed subject to the clarification that Burns did not indicate that the personnel listed were the only ones authorized to look at the IN shooting investigation file.  (Def. Ex. E, p. 65 (clarifying that he is talking about the IN shooting investigation file); Pl. Ex. 70, pp. 67-68.)

170.    Immaterial.  Disputed. Other copies may be made in the ordinary course of a shooting investigation, such as for SAIRC.  (Pl. Ex. 56, § 6114.63(C)(3).)  Nor do the manual citations prohibit the making of additional copies.  (Pl. Ex. 56, § 6114.63; Pl. Ex. 57, § 8233.62.)

171.    Immaterial.  Disputed.  This paragraph is misleading regarding Mathews's testimony.  Mathews also testified that he knows at least one copy was made, but that he does not know how many other copies were decided to be made.  (Pl. Ex. 82, pp. 67.)  Also, Mathews was the lead inspector only regarding the on-site investigation, once the inspectors returned to headquarters Mathews had almost no further involvement in the investigation.  (Pl. Ex. 82, pp. 63-64; Pl. Ex. 97, p.67.)

172.    Immaterial.  Disputed.  This paragraph is misleading regarding Burns's testimony. Burns merely states that there would at least need to be a copy for each file and he stated that he knows of three files in this case.  (Pl. Ex. 70, pp. 49-50.)  Just before this statement, Burns explained that he has no idea as to how many copies would be needed to complete IN's investigation.  (Pl. Ex. 70, p. 49.)

173.    Immaterial.  Undisputed as to the first sentence.  Disputed as to the second sentence.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).

174.    Undisputed subject to the clarification that Patterson made a VHS copy of the Mini-DV to determine exactly what happened and to report to his chain of command.  (Def. Ex. 15, pp. 27, 33.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 1 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

175.    Undisputed as to the fact that Collins gave custody of both the Mini-DV and a VHS to Gruden.  Disputed as to the fact that Gruden would do the on-site investigation of the shooting if IN did not send a shooting team.  This assertion does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it. Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 1 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

176.    Undisputed.

177.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 1 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

178.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the

shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 1 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

179.     Disputed.  According to plaintiff, there are between 20 and 30 inspectors on the Shooting Incident Team.  (Pl. SMF #18.)  Plaintiff's citations indicate that a few other inspectors watched the video.  (Pl. Ex. 82, p. 32-34; Pl. Ex. 97, pp. 25, 29.)  This is well-short of all the inspectors, let alone "virtually everyone else at IN."  Moreover, personnel in the office would normally see footage of other shootings,  (Pl. Ex. 97, p. 26.), because every inspector in Inspections is a member of the shooting investigation team.  (Pl. Ex. 82, pp. 14, 33-34).  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 1 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

180.     Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 1 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  (Note, however, the cite, Pl. Ex. 2, p. 5, ¶ 14, was not provided in the record and therefore cannot support the paragraph.)

181.     Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 2 could also be VHS 5 or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

182.    Disputed.  Gruden did not testify that he purportedly asked a technician to provide him a VHS tape.  (Pl. Ex. 78, p. 123.)  Gruden testified that he was not sure whether he asked a technician to provide him a VHS tape.  (Pl. Ex. 78, p. 123.)

183.    Disputed.  Shafer stated that he did not recall making any VHS tapes.  (Pl. Ex. 94, pp. 29, 49.)

184.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 2 could also be VHS 5 or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

185.    Disputed.  This paragraph does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it. Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 2 could also be VHS 5 or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

186.    Disputed.  The government reported that the video was sent to Charles West.  (Pl. Ex. 2, pp. 5, ¶ 4.)  Plaintiff provides no support for the assertion that "no one in the ODO acknowledges making" a VHS copy.  Since this assertion does not include any citation to the record as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate that assertion.  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

Specifically, in this instance, VHS 2 could also be VHS 5 or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

187.    Immaterial.  Undisputed subject to the clarification that West no longer works for DEA.

188.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

189.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

190.    Undisputed.

191.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

192.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, subject to the clarification that Scully received the video from the tech unit.  (Pl. Ex. 93, p. 27.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

193.    Disputed.  Shafer stated that he did not recall making any VHS tapes.  (Pl. Ex. 94, pp. 29, 49.)

31

194. Undisputed.

195. Disputed. This paragraph does not include a citation to the record with any logical support. One cannot infer the length of an original recording from a copy, unless there is some assurance that the copy is a complete replica of the original. There is no such assurance here. Consequently, the tape used to create the copy may have only had the accidental discharge on it, but it could just as easily have been a substantially longer version of which only the accidental discharge was copied. Plaintiff has failed, then, to provide support from the record for this paragraph, as required by D.D.C. Civ. R. 56.1, and it is facially deficient, therefore, no response is required to negate it. Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.) Finally, the video self-evidently contains more than the simply the moment when Paige shoots himself. (Pl. Ex. 9.)

196. Undisputed with respect to the content of this paragraph, except for the numbering of the video. Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

197. Undisputed with respect to the content of this paragraph, except for the numbering of the video, subject to the clarification that the group Scully to whom showed the video consisted of five to ten people. (Pl. Ex. 93, p. 38.) Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

198.    Disputed.  This paragraph misstates the testimony of the witnesses.  Scully testified that those viewing the video were shocked and that he laughed at Paige's comment just before he shot himself, but not at Paige.  (Pl. Ex. 93, pp. 41-42.)  Scully also testified that he did not play the video again so that Paige's comment could be laughed at.  (Pl. Ex. 93, pp. 42-43.) Clark stated that people made light of the situation, but that there was also a discussion of how the shooting happened.  (Pl. Ex. 71, pp. 27-28.)

199.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

200.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

201.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

202.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

203.    Disputed.  Clark testified that he did not look for or think about the video until

33

OPR contacted him in 2006.  (Pl. Ex. 71, pp. 54, 56, 57, 59, 63.)  Clark also testified that he was confident that the video in his possession was not how the video got on the internet.  (Pl. Ex. 71, pp. 63-64.)  Nor did Clark testify that he "has purportedly never seen or even thought about" the tape.  (Pl. Ex. 78, p. 123.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

204.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

205.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

206.    Undisputed.

207.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, subject to the clarification that Clark supervised the entire copying operation and took both the original and the only copy with him.  (Pl. Ex. 71, pp. 47-48.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

208.    Disputed.  First, Baughman immediately watched the video himself and then later

34

showed the video to other agents.  (Pl. Ex. 66, p. 29.)  Second, Baughman thought that other
agents should see the video because it was good for training purposes.  (Pl. Ex. 66, p. 30.)  Third,
Baughman showed the video to approximately six agents.  (Pl. Ex. 66, p. 29.)  Fourth, the ASAC
told Baughman not to "show that too much," he did not direct him to stop showing the video.
(Pl. Ex. 66, p. 38.)  Defendants dispute this statement to the extent that the numbering of the
purported copies of the shooting video suggests that each numbered video is itself a separate
copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

209.    Disputed.  The Jacksonville agents thought the video was funny, they did not
make fun of Paige.  (Pl. Ex. 66, p. 44.)  Baughman also testified that the video portrayed the
agency poorly.  (Pl. Ex. 66, p. 46.)

210.    Undisputed with respect to the content of this paragraph, except for the numbering
of the video, and subject to the clarification that OPR requested the video from Baughman.  (Pl.
Ex. 66, p. 22.)  Defendants dispute this statement to the extent that the numbering of the
purported copies of the shooting video suggests that each numbered video is itself a separate
copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

211.    Undisputed with respect to the content of this paragraph, except for the numbering
of the video, and subject to the clarification that the video self-evidently contains more than
simply the moment when Paige shoots himself.  (Pl. Ex. 9.)  Defendants dispute this statement to
the extent that the numbering of the purported copies of the shooting video suggests that each
numbered video is itself a separate copy of the shooting video that actually exists or did exist.
(Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

212.    Undisputed with respect to the content of this paragraph, except for the numbering
of the video.  Defendants dispute this statement to the extent that the numbering of the purported

copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 5 could also be VHS 2 and/or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

213.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, and subject to the clarification that the video self-evidently contains more than simply the moment when Paige shoots himself, if it is "about 5 minutes long."  (Pl. Ex. 68, p. 19.) Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 5 could also be VHS 2 and/or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

214.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, subject to the clarification that Shafer stated that he did not recall making any VHS tapes. (Pl. Ex. 94, pp. 29, 49.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 5 could also be VHS 2 and/or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

215.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 5 could also be VHS 2 and/or VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

216.    Disputed.  Gruden testified that he did not remember if he gave Bowman a CD or

a VHS and did not know if Bowman gave the video back to him.  (Pl. Ex. 78, pp. 161, 167-170.)

Gruden did not testify that he purportedly did not remember if he gave Bowman a CD or a VHS

and did not know if Bowman gave the video back to him.  (Pl. Ex. 78, pp. 161, 167-170.)

217.     Disputed.  Defendants explained their knowledge of VHS 5 and acknowledged the

likelihood that this is the same VHS that Plaintiff separately labels VHS 2 and/or VHS 6.  (Pl.

Ex. 2, p. 6.)  Defendants dispute this statement to the extent that the numbering of the purported

copies of the shooting video suggests that each numbered video is itself a separate copy of the

shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this

instance, VHS 5 could also be VHS 6.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

218.     Undisputed with respect to the content of this paragraph, except for the numbering

of the video.  Defendants dispute this statement to the extent that the numbering of the purported

copies of the shooting video suggests that each numbered video is itself a separate copy of the

shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this

instance, VHS 6 could also be VHS 1, VHS 2, VHS 3, and/or VHS 5.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2,

4.)

219.     Undisputed with respect to the content of this paragraph, except for the numbering

of the video.  Defendants dispute this statement to the extent that the numbering of the purported

copies of the shooting video suggests that each numbered video is itself a separate copy of the

shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this

instance, VHS 6 could also be VHS 1, VHS 2, VHS 3, and/or VHS 5.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2,

4.)

220.     Disputed.  Defendants did explain that Ms. Morris had viewed a VHS of the

shooting and that Gruden showed a VHS of the shooting to various agents in the Orlando district

office.  (Pl. Ex. 2, p. 5.)  Defendants further acknowledged the likelihood that this is the same

VHS tape as VHS 1, VHS, 2, VHS 3, and/or VHS 5.  Defendants dispute this statement to the

extent that the numbering of the purported copies of the shooting video suggests that each

numbered video is itself a separate copy of the shooting video that actually exists or did exist.

(Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, VHS 6 could also be VHS 1, VHS 2,

VHS 3, and/or VHS 5.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

      221.    Undisputed with respect to the contents of the paragraph, except for the use of the

term "improper disclosure."  Disputed as to the term "improper disclosure," because it is a legal

term of art with a specific meaning in the context of the Privacy Act and its use transforms this

statement into a legal conclusion, which is inappropriate for a statement of facts.  Plaintiff has

provided no support for its use here.  Furthermore, the DEA has not admitted that it even

"disclosed" the video of the shooting to the public.  (Pl. Ex. 2.)  In fact, Plaintiff's presentation

was public.  (Defs' SMF #s 16, 19.)  The Senior Inspector actually stated that he could not

determine who "released" the video.  (Pl. Ex. 47.)

      222.    Disputed.  Burns later explained that he may have made a mistake and "probably

just miscounted" because there are two VHS tapes in the investigative file, and one of those is a

tape of media coverage.  (Pl. Ex. 70, p. 127.)

      223.    Undisputed.

      224.    Disputed.  The IN shooting investigation file contains a VHS and the Mini-DV;

copies of one IN shooting investigation file are believed to have contained a DVD of the shooting

video.  (Def. Ex. 2, pp. 122-123.)  The second sentence does not include any citation to the

record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to

negate it.  In addition, Burns testified that he thought the reason for the discrepancy is that he

miscounted which can be expected due to the second media coverage VHS in the file.  (Pl. Ex. 70, p. 127.)  Defendants also dispute both sentences to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

225.    Undisputed only as to the fact that Burns testified that he never saw any CDs or DVDs.  Disputed as to the remainder of the paragraph, which does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  In addition, Burns testified that he thought the reason for the discrepancy is that he miscounted, which can be expected due to the second VHS media coverage VHS in the file.  (Pl. Ex. 70, p. 127.)  Defendants also dispute the paragraph to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

226.    Disputed.  Nothing in Plaintiff's cited sources indicated that the letters, numbers, and symbols came from a separate video as opposed to the copy source machine.  (Pl. Ex. 15, 18, 19.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

227.    Disputed.  The paragraph does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

228.    Disputed.  Defendants have provided their explanations, which do not include any

possibility that such a VHS existed.  (Pl. Ex. 2.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

229.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

230.    Disputed as to the statement Gruden allowed agents access to the Mini DV. Plaintiff provides no citation to the record that demonstrates Gruden "allowed agents access to the Mini-DV. . . ."  (Pl. Ex. 78, pp. 91-92, 95-96.)  As the statement does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  Undisputed as to the remainder of the paragraph with the exception of the numbering of the videos.  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

231.    Undisputed.

232.    Undisputed.

233.    Disputed.  The videos self-evidently contain more than simply the moment when Paige shoots himself.  (Pl. Ex. 10, 11.)

234.    Disputed.  The videos self-evidently contain more than simply the moment when Paige shoots himself.  (Pl. Ex. 10, 11.)  In addition, Shafer testified that he did not recall what he put on the discs.  (Pl. Ex. 94, p. 23.)

235.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

236.    Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

237.    Undisputed.

238.    Undisputed.

239.    Undisputed.

240.    Undisputed.

241.    Undisputed subject to the clarification that the disc was not evidence.  The word "evidence" has a specific DEA meaning.  As used by DEA, "evidence" refers only to materials "used to establish a violation of law."  (Pl. Ex. 58, § 6661(A).)

242.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

243.    Disputed.    At 4 minutes and 9 seconds in length, the video self-evidently

41

contains more than simply Paige's comments and the moment when Paige shoots himself. (Pl. Ex. 10.) Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

244.    Disputed. Defendants object to plaintiff's expert testimony on Rule 702 and *Daubert* grounds, because it is not reliable as explained in Defendant's Memorandum in Opposition. Since Pl. Ex. 100 is inadmissible, plaintiff must rely on Pl. Ex. 10 to support this paragraph. However, Pl. Ex. 10 cannot be credited because plaintiff did not calibrate computer clock times to demonstrate that the computer time listed on the video is the actual time. (Pl. Ex. 100.) Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

245.    Undisputed with respect to the content of this paragraph, except for the numbering of the video. Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

246.    Undisputed with respect to the content of this paragraph, except for the numbering of the video. Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

247.    Disputed. The AP wire report, which represents national news coverage, was dated April 30, 2004, which is not necessarily after Gruden remembers destroying the CDs in his possession sometime in April. (Def. Ex. 38, p. 2; Pl. Ex. 78, pp. 193-194.)

248.    Disputed.  Bendekovic testified that after receiving the disk, he did not recall speaking to Gruden until after the video was on the internet.  (Pl. Ex. 68, p. 30.)  In addition, Bendekovic testified that he not made derogatory remarks about Paige in any discussions with other DEA agents.  (Pl. Ex. 68, p. 34.)  Bendekovic also testified that he had never had a conversation with anyone in which he poked fun at Paige because of what happened.  (Pl. Ex. 68, p. 34.)

249.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

250.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, subject to the clarification that the video was turned over at OPR's request.  (Pl. Ex. 26.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

251.    Undisputed subject to the clarification that Pl. Ex. 11 cannot be credited because plaintiff did not calibrate computer clock times to demonstrate that the computer time listed on the video is the actual time.  (Pl. Ex. 100.)  Additionally, Plaintiff provides no basis for his assertion that items copier of created at the same time have identical content.  (Pl. Ex. 11.)  Since the assertion does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.

43

(Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

252.    Undisputed with respect to the content of this paragraph, except for the numbering of the video and the assertion that the paragraph is contrary to Gruden's testimony.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

253.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Defendants also dispute this statement to the extent that it asserts that the paragraph is contrary to Gruden's testimony without providing any citation to that testimony.  Since the assertion does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.

254.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

255.    Disputed.  Scully answered questions regarding this video and Defendants provided interrogatory responses regarding the video.  (Pl. Ex. 93, p. 54; Pl. Ex. 2.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

256.    Disputed.  This paragraph is best understood in terms of the fact that Gruden provided a copy of the video to Miami – and the evidence shows that this took place in June and was likely a VHS.  (Def. Ex. 12, pp. 54, 67, 78; Def. Ex. 11, p. 186; Def. Ex. 48.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

257.    Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

258.    Since this paragraph was blank and does not include any citation to the record, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.

259.    Disputed.  Defendants explained that there may or may not have been a spare CD that may have been destroyed by Gruden.  (Pl. Ex. 2, p. 6.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

260.    Disputed.  Gruden also testified that he destroyed leftover disks.  (Pl. Ex. 78, pp. 192-193.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate

copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

261.    Disputed.  Gruden also testified that he destroyed leftover disks sometime in April 2004.  (Pl. Ex. 78, pp. 193.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

262.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

263.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

264.    Disputed.  Maltz explained what he knew with respect to the disk.  (Pl. Ex. 81, p. 20.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

265.    Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each

numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

266.    Undisputed with respect to the content of this paragraph, except for the numbering of the video and subject to the clarification that Maltz downloaded a CD.  (Pl. SMF #263.) Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

267.    Undisputed with respect to the content of this paragraph, except for the numbering of the video and subject to the clarification that the video was transferred between laptops as Maltz's laptops were replaced.  (Pl. Ex. 81, pp. 27, 39.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  (Note, however, the cite, Pl. Ex. 81, pp. 36-37, was not provided in the record and therefore cannot support the paragraph.)

268.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

269.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, and subject to the clarifications that OPR asked for the video, that the video on the third laptop was also deleted, that it was the video not the laptop that Maltz provided to OPR. (Pl. Ex. 81, p. 41-42, 47.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate

copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

270.    Disputed.  The videos are not identical files (Pl. Ex. 11, 12), but they appear to contain the same video content.  (Pl. Ex. 11, 12.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

271.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

272.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

273.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, and subject to the clarification that Naughton showed the video to other agents for training purposes and for learning points.  (Pl. Ex. 85, pp. 20-21, 38.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

274.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, and subject to the clarifications that Naughton showed the video for training purposes and learning points and not for entertainment purposes.  (Pl. Ex. 85, pp. 20-21, 38, 35.)

Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

275.    Disputed.  Plaintiff's description of this paragraph mischaracertizes Naughton's testimony.  (Pl. Ex. 85, pp. 25-30, 36.)  Naughton states that he thought it was a training video, that he thought it was safer at his home, and that he was willing to return the video to the DEA office.  (Pl. Ex. 85, pp. 26-28.)  Plaintiff presents no evidence from his citation for his assertions of either evasiveness or that Naughton intended to keep the video for personal use.  (Pl. Ex. 85, pp. 25-30, 36.)  Since this paragraph does not include any accurate citation to the record in support of its assertions, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.

276.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, and subject to the clarification that Naughton turned over the video to OPR at OPR's request.  (Pl. Ex. 85, pp. 36.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

277.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

278.    Disputed.  Pl. Ex. 13 cannot be credited because plaintiff did not calibrate computer clock times to demonstrate that the computer time listed on the video is the actual time.

49

(Pl. Ex. 100.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

279.    Undisputed with respect to the content of this paragraph, except for the numbering of the video, and subject to the clarification that Santillo's report covers other topics as well. (Def. Ex. 14.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

280.    Immaterial.  Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2). Defendants also specifically noted in its interrogatory response that other personnel in the Firearms Training Unit may have viewed the video.  (Pl. Ex. 2, p. 6.)

281.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Plaintiff provides no reason to believe that D-9 is distinct from other copies of the shooting video.  (Pl. Ex. 92, pp. 33, 34-35; Pl. Ex. 2.)

282.    Undisputed with respect to the content of this paragraph, except for the numbering of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the

shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

283.    Immaterial. Disputed. Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired. Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification. (Pl. Ex. 2). Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

284.    Undisputed with respect to the content of this paragraph, except for the numbering of the video. Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

285.    Immaterial. Disputed. Since this paragraph does not include any citation to the record in support of its assertions, as required by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.

286.    Immaterial. Disputed. Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired. Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification. (Pl. Ex. 2). Defendants specifically noted in their interrogatory response that other personnel in the Firearms Training Unit may have viewed the video. (Pl. Ex. 2, p. 6.)

287.    Undisputed.

288.    Undisputed subject to the clarification that White had the copies made after his

return.  (Pl. Ex. 97, pp. 73-74.)

289.    Undisputed.

290.    Undisputed subject to the clarification that Queen testified that she never created CDs for White.  (Pl. Ex. 89, p. 14.)

291.    Disputed with respect to the characterization of White's testimony as "conflicting and confusing."  White's answers reflect the questions asked of him.  (Pl. Ex. 97, pp. 74-76, 79, 80.)  Inspector White testifies that he had five DVDs made, and he acknowledges that there were also discs containing media coverage as well.  (Pl. Ex. 97, p. 73.)  The DVDs contained the shooting video of length approximately 23 minutes and 34 seconds.  Plaintiff attempts to conclude that Inspector White also made five additional CD copies of the shooting video, but White's testimony in that area is speculative and conditional at best (Pl. Ex. 97, p. 78), and White later clarified that one set of copies was of the news coverage of plaintiff's shooting.  (Pl. Ex. 97, pp. 82-83.) (Id. at 84.)  Moreover, in the course of the OPR investigation there have not been any CD copies of the shooting video in the IN file, rather just the DVD, 23:34 in duration.  (Gregg Decl. ¶ 6 (Defs' SMF Ex. 41)); (Reinke Decl. ¶ 8 (Defs' SMF Ex. 42)).  Nor had OPR found any physical evidentiary support for the proposition that Marquita Queen actually *copied to DVD* a complete copy of the Mini-DV; rather, the physical evidence suggests that Marquita Queen made copies of the shooting video and of the media coverage at Mr. White's request.  (Def. Ex. F, p.129; Pl. Ex. 2, pp. 5-7.)  Thus, this evidence is most easily clarified by White's initial statement that there were five DVD copies of the shooting video (which from physical evidence we know were 23:24 in length).

292.    Disputed.  White immediately clarified this statement to note that he maintained some videos himself.  (Pl. Ex. 97, p. 80.)

293.    Disputed as to the assertion that White's statement was contrary to his testimony. First, this paragraph does not include any citation to the record in support of its assertion of contrary testimony, as required by D.D.C. Civ. R. 56.1, it is therefore facially deficient, and no response is required to negate it.  Inspector White testifies that he had five DVDs made, and he acknowledges that there were also discs containing media coverage as well.  (Pl. Ex. 97, p. 73.) The DVDs contained the shooting video of length approximately 23 minutes and 34 seconds. Plaintiff attempts to conclude that Inspector White also made five additional CD copies of the shooting video, but White's testimony in that area is speculative and conditional at best (Pl. Ex. 97, p. 78), and White later clarified that one set of copies was of the news coverage of plaintiff's shooting (Pl. Ex. 97, pp. 82-83.) (Id. at 84.)  Moreover, in the course of the OPR investigation there have not been any CD copies of the shooting video in the IN file, rather just the DVD, 23:34 in duration.  (Gregg Decl. ¶ 6 (Defs' SMF Ex. 41)); (Reinke Decl. ¶ 8 (Defs' SMF Ex. 42)).  Nor had OPR found any physical evidentiary support for the proposition that Marquita Queen actually *copied to DVD* a complete copy of the Mini-DV; rather, the physical evidence suggests that Marquita Queen made copies of the shooting video and of the media coverage at Mr. White's request.  (Def. Ex. F, p. 129; Pl. Ex. 2, pp. 5-7.)  Thus, this evidence is most easily clarified by White's initial statement that there were five DVD copies of the shooting video (which from physical evidence we know were 23:24 in length).

294.    Undisputed subject to the clarification that OPR requested the videos from White, and that only three of these were shooting videos, the rest were media videos.  (Pl. Ex. 97, pp. 106-107; Pl's SMF #295.)

295.    Undisputed.

296.    Undisputed with respect to the content of this paragraph, except for the numbering

of the video.  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

297.    Undisputed subject to the clarification that Burns never saw any CDs or DVDs in the IN file.  (Pl. Ex. 70, pp. 46-48, 88-90.)

298.    Immaterial.  Disputed.  Pl. Ex. 15, 18, and 19 cannot be credited because plaintiff did not calibrate computer clock times to demonstrate that the computer time listed on the video is the actual time. (Pl. Ex. 100.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

299.    Disputed.  The audio-visual specialist stated that she never made any CDs for Inspector White.  (Pl. Ex. 89, p. 14.)  Inspector White clarified that at least half of those discs were of media coverage and not of the shooting itself.  (Pl. Ex. 97, p. 82-83.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, D-13 through D-22 could also be D-10, D-11, or D-12.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

300.    Undisputed subject to the clarification that his statement was before his recollection was refreshed.  (Pl. Ex. 97, p. 104.)

301.    Disputed.  It is not clear whether the DVD was of the shooting or of media coverage.  (Pl. Ex. 97, pp. 103-104; Pl. Ex. 89, p. 23.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each

numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  The witness's name is spelled Marquita. (Pl. Ex. 89, p. 4.)

302.   Disputed.  First, White's original statement was before his recollection was refreshed.  (Pl. Ex. 97, p. 104.)  Second, it is not clear whether the DVD was of the shooting or of media coverage.  (Pl. Ex. 97, p. 103-104; Pl. Ex. 89, p. 23)  Third, White did not recall whether he received the video or what he did with it.  (Pl. Ex. 97, pp. 103-104.)

303.   Undisputed.

304.   Undisputed.

305.   Disputed.  OPR did not find any physical evidentiary support for the proposition that Marquita Queen actually *copied to DVD* a complete copy of the Mini-DV; rather, the physical evidence suggests that Marquita Queen made copies of the shooting video and of the media coverage at Mr. White's request.  (Def. Ex. F, p. 129.)  Defendants dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist. (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, D-24 or D-25 could also be D-13 through D-22.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)

306.   Undisputed subject to the clarification that exhibit refers to the video as a "cassette tape."  (Pl. Ex. 35.)

307.   Immaterial.  Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).  In addition, OPR did not find any physical evidentiary support for the proposition that Marquita

Queen actually *copied to DVD* a complete copy of the Mini-DV; rather, the physical evidence suggests that Marquita Queen made copies of the shooting video and of the media coverage at Mr. White's request.  (Def. Ex. F, p. 129.)

308.    Immaterial.  Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Defendants note that this paragraph in part repeats paragraph 307.

309.    Disputed.  Vague and ambiguous as to the term "IN file."  The "IN file" constitutes the final write-up of the shooting investigation and is stored in a binder that is distinct from the correspondence file – although both use the same file number.  (Pl. Ex. 1, 1A.) Paige's disciplinary file did contain a disc.  (Def. Ex. 2, p. 121.)

310.    Disputed.  OPR did not find any physical evidentiary support for the proposition that Marquita Queen actually *copied to DVD* a complete copy of the Mini-DV; rather, the physical evidence suggests that Marquita Queen made copies of the shooting video and of the media coverage at Mr. White's request.  (Def. Ex. F, p. 129.)

311.    Disputed.  OPR did not find any physical evidentiary support for the proposition that Marquita Queen actually *copied to DVD* a complete copy of the Mini-DV; rather, the physical evidence suggests that Marquita Queen made copies of the shooting video and of the media coverage at Mr. White's request.  (Def. Ex. F, p. 129.)

312. Immaterial.  Disputed.  Defendants' responses to plaintiff's objectionable interrogatory requests reflected defendants' knowledge of the topics about which plaintiff inquired.  Plaintiff's characterization of these responses is misleading and unfounded, and the Court is referred to the full text of defendants' responses for clarification.  (Pl. Ex. 2).  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Specifically, in this instance, D-24 or D-25 could also be D-13 through D-22.  (Pl. Ex. 2, pp. 3-7, ¶¶ 2, 4.)  Further, plaintiff offered no citation to the record in support of its assertion that various DVD copies are not in the custody of IN or OPR, as required by D.D.C. Civ. R. 56.1, that assertion is therefore facially deficient, and no response is required to negate it.

313. Disputed.  Reinke's testimony was given without the benefit of his interrogatory responses that indicate that Peter Gruden sent a version, either VHS or disc, of the video to IN, which Reinke later admitted were needed for him to testify accurately.  (Pl. Ex. 2, p. 5, ¶ 4; Pl. Ex. 91, pp. 251-252.)  The testimony of Collins and Gruden confirms that version of the video sent to IN was VHS.  (Def. Ex. 12, pp. 54, 67, 69, 105-106; Def. Ex. 11, pp. 101–102, 105-106.)

314. Immaterial.  Undisputed subject to the clarification that Defendants believe no such disc exists.  (Def. Ex. 12, pp. 54, 67, 69, 105-106; Def. Ex. 11, pp. 101–102, 105-106.)

315. Undisputed.

316. Immaterial.  Disputed.  When asked, Defendants' witnesses provided testimony about the electronic files.  (Pl. SMF # 315.)  Defendants also dispute this statement to the extent that the numbering of the purported copies of the shooting video suggests that each numbered video is itself a separate copy of the shooting video that actually exists or did exist.  (Pl. Ex. 2,

pp. 3-7, ¶¶ 2, 4.)

317.    Undisputed.

318.    Undisputed subject to the clarification that plaintiff's statement and supporting citation fails to acknowledge any file size limitations and other limitations of the Firebird system, and therefore, it should not be assumed that any email or email attachment of any size could be sent over Firebird.

319.    Disputed.  Walker did not "seize" the original Mini-DV.  The videographer stated that he voluntarily gave the Mini-DV to DEA, that he still considered it his property, and that he received a verbal commitment that he would get the Mini-DV back.  (Pl. Ex. 69, pp. 24-25). Walker testified that he wasn't sure of the time frame for the video's appearance, but that it could have been from two weeks to two months or more.  (Pl. Ex. 95, p. 21-24.)  Walker's admittedly imprecise memory is flatly contradicted by DEA IT Security Specialist Gregg, who found that the earliest internet appearance of video footage of Paige shooting himself was in March 2005.  (Pl. Ex. 95, p. 21-24; Def. Ex. 41.)

320.    Disputed.  DEA IT Security Specialist Gregg found that the earliest internet appearance of video footage of Paige shooting himself was in March 2005.  (Def. Ex. 41.)

321.    Disputed.  The Government executed a strategic search by the Agency's computing specialists.  This search included the internet, emails on firebird, and agency computers.  (Def. Ex. 41.)

322.    Immaterial. Undisputed.

323.    Immaterial.  Undisputed subject to the clarification that the chain consists of 36 people, not 38.  (Pl. Ex. 45.)

324.    Immaterial.  Undisputed.

325.    Immaterial.  Undisputed.

326.    Immaterial.  Undisputed subject to the clarification that there need not have been additional email activity prior to the first person or subsequent to the last person.

327.    Immaterial.  Undisputed subject to the clarification that the chains do show forwarding by some of the recipients, that is the nature of the chain.  (Pl. Ex. 44, 45.)

328.    Undisputed subject to the clarifications that the videos had the exact same video content, not the same file content and that Gruden's video may or may not have been made on or about April 15, 2004.  Pl. Ex. 10 and 11 cannot be credited because plaintiff did not calibrate computer clock times to demonstrate that the computer time listed on the video is the actual time. (Pl. Ex. 100.)

329.    Disputed.  It is not clear what plaintiff means by "widely noticed," given that the record cited refers to simply several internet sites.  (Pl. Ex. 46, 47.)  Defendant does not dispute that the video of the shooting appeared on the internet in March 2005.  (Def. Ex. 41.)

330.    Disputed.  Plaintiff has produced no documentary evidence in support of this paragraph and than imprecise memory is contradicted by DEA IT Security Specialist Gregg, who found that the earliest internet appearance of video footage of Paige shooting himself was in March 2005.  (Def. Ex. 41.)

331.    Disputed.  Plaintiff has produced no documentary evidence in support of this paragraph and than imprecise memory is contradicted by DEA IT Security Specialist Gregg, who found that the earliest internet appearance of video footage of Paige shooting himself was in March 2005.  (Def. Ex. 41.)

332.    Disputed.  Plaintiff's "expert" is not qualified to testify under Federal Rules of Evidence Rule 702 or *Daubert*.  (Defendant's Memorandum in Opposition.)  As the terms

intentional and willful have specific legal meaning in the Privacy Act context which plaintiff's

expert has no familiarity with, it is impossible for him to testify to them here.  (Def. Ex. C, pp.

21-22.)

333.    Disputed.  There is no p. 137 in the plaintiff's record exhibit 77, as a result this

paragraph does not include any citation to the attached record in support of its assertion of

contrary testimony, as required by D.D.C. Civ. R. 56.1, it is therefore facially deficient, and no

response is required to negate it.  "Disclosure" is a legal term of art with a specific meaning in

the context of the Privacy Act and its use transforms this statement into a legal conclusion, which

is inappropriate for a statement of facts.  Plaintiff has provided no support for its use here.

Furthermore, the DEA has not admitted that it "disclosed" the video of the shooting to the public.

(Pl. Ex. 2.)  In fact, Plaintiff's presentation was public.  (Defs' SMF #s 16, 19.)

334.    Disputed.  "Disclosure" and "assumption of risk" are legal terms of art with a

specific meaning in the context of the Privacy Act and tort law, and its use is not appropriate in a

statement of material fact.  Plaintiff has provided no support for the use of either term and the

DEA has not admitted that it disclosed the video of the shooting.  (Pl. Ex. 64, ¶ 16.)  In fact,

Plaintiff's presentation was public.  (Defs' SMF #s 16, 19.)

335.    Immaterial.  Undisputed subject to two clarifications.  First, DEA did not release

Plaintiff's name publicly, Plaintiff did by filing this suit.  (Pl's Am. Compl.)  Second,  no DEA

employee involved in shooting incident may participate in an interview with members of the

media regarding the incident without the permission of the Inspector General and that the

shooting took place in public where Paige allowed himself to be videotaped.  (Pl. Ex. 56, ¶

6114.4(B); Def. Ex. 2, pp. 78, 80; Defendants' SMF #'s 16, 19.)

336.    Immaterial.  Disputed.  This mischaracertizes the witness's testimony.  The

witness stated that it the video should not be shown if it would jeopardize Paige's safety as an undercover DEA agent, as explained in Defendant's Memorandum in Opposition, Plaintiff had already compromised his undercover role. The witness also noted that the video is a classic example of how not to conduct a firearms safety demonstration and that it is an extremely valuable training aid. Pl. Ex. 92, p. 113.) Furthermore, this opinion from Defendants' expert is not within the scope of his proffered expertise. (Def. Ex. 14.)

337. Immaterial. Disputed. "Disclosure" is a legal term of art with a specific meaning in the context of the Privacy Act and its use is not appropriate in a statement of material fact. Plaintiff has provided no support for the use of the term and the DEA has not admitted that it disclosed the video of the shooting. (Pl. Ex. 64, ¶ 14.) In fact, Plaintiff's presentation was public. (Defs' SMF #s 16, 19.) Paige extinguished his privacy rights through waivers and forfeitures, and those, as explained in Defendants' Memorandum in Opposition, prevent Plaintiff from pursuing a civil action here.

338. Disputed. A DEA OPR Inspector acknowledged that Paige could have improperly released the video to the internet. (Pl. Ex. 91, p. 215.)

339. Undisputed subject to the clarification that it is unclear from Plaintiff's citations how much time elapsed between when Paige learned of the video and these conversations. (Pl. Ex. 1, p. 14; Pl. Ex. 73, p. 115.)

340. Undisputed subject to the clarification that it is unclear from Plaintiff's citations how much time elapsed between when Paige learned of the video and these conversations. (Pl. Ex. 73, pp. 50-51.)

341. Undisputed as to the first sentence subject to the clarification that it is unclear from Plaintiff's citations how much time elapsed between when Paige learned of the video and

these conversations.  (Pl. Ex. 73, pp. 51-52.)  Disputed as to the second sentence.  The video was

being shown for training purposes.  (Pl. Ex. 73, pp. 116.)  The PFIs never incorporated the video

of the shooting into official, formal DEA training.  (Def. Ex. 49, p. 45; Def. Ex. 50, p. 20.)

342.    Disputed.  The record does not support this paragraph.  The letter represents that

Paige has not agreed to appear for any media interviews, only that he was willing to do so.  (Pl.

Ex. 61.)  Nor does the record offer any evidence of the alleged damages suffered by Paige or that

Plaintiff's efforts were purportedly for "mitigation."  (Pl. Ex. 61.)   "Disclosure" and

"mitigation" are legal terms of art with a specific meaning in the context of the Privacy Act and

tort law and their use transforms this statement into a legal conclusion, which is inappropriate for

a statement of facts.  Furthermore, the DEA has not admitted that it "disclosed" the video of the

shooting to the public.  (Pl. Ex. 61.)  In fact, Plaintiff's presentation was public.  (Defs' SMF #s

16, 19.)

343.    Immaterial.  Disputed as to the assertion that Paige complied with the conditions

for media appearances.  The record does not support the assertion that the conditions were

observed by Paige.  (Pl. Ex. 61, 62.)  As a result this assertion fails to meet the requirements set

forth by D.D.C. Civ. R. 56.1, it is facially deficient, and no response is required to negate it.

344.    Immaterial.  Undisputed subject to the clarification that the request "to help his

[Paige's] reputation," was made by Paige's attorney, who also represents him in this matter.

345.    Immaterial.  Disputed as to the assertion that Paige was attempting to mitigate

damages caused by the disclosure of the video.  The record does not support the assertion that

this was the reason Paige sought the release of the video.  (Pl. Ex. 53.)  As a result this assertion

fails to meet the requirements set forth by D.D.C. Civ. R. 56.1, it is facially deficient, and no

response is required to negate it.  "Disclosure" and "mitigation" are legal terms of art with a

specific meaning in the context of the Privacy Act and tort law and their use transforms this statement into a legal conclusion, which is inappropriate for a statement of facts. Furthermore, the DEA has not admitted that it "disclosed" the video of the shooting to the public. (Pl. Ex. 53.) In fact, Plaintiff's presentation was public. (Defs' SMF #s 16, 19.)

  346. Immaterial. Undisputed.