# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LEE PAIGE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00644 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| and UNITED STATES OF AMERICA, | ) | Hon. Emmet G. Sullivan |
| | ) | |
| Defendants. | ) | |
| | ) | |

## EXHIBITS TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO STRIKE DEFENSES

**EXHIBIT**                                                       **Ltr.**

Deposition of Peter Gruden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A
Deposition of Lee Paige . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  B
Deposition of Victor Wright  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  C
Deposition of Gerard McAleer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  D
Deposition of Jim Burns  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  E
Deposition of Kent Reinke  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  F

# EXHIBIT A

# Capital Reporting Company

Page 1

```
        IN THE FEDERAL DISTRICT COURT
          IN THE DISTRICT OF COLUMBIA
------------------------------:
LEE PAIGE,                     :
                              :
              Plaintiff,     :
          v                   : CASE NO:
                              : 1:06CV 00644-EGS
DOJ and DEA,                   :
                              :
              Defendant.:
------------------------------:
```

                            Washington, D.C.

                    Monday, November 5, 2007

Deposition of:

              PETER GRUDEN

called for oral examination by counsel for

Plaintiff, pursuant to Notice, at the US DOJ Civil

Division, Federal Programs, 200 Massachusetts

Avenue, Northwest, Washington, D.C., before Mary

E. Warner of Capital Reporting, sworn by a Notary

Public in and for the District of Columbia,

beginning at 9:05 a.m.

Capital Reporting Company

Page 8

1    A    I was a group supervisor for enforcement,

2    group one.  Basically I was in charge of anywhere

3    from 10 to 14 special agents and task force

4    officers as well as two administrative staff.

5    Q    How long did you spend in the Orlando

6    office?

7    A    I was there from April of 2002 until

8    August of 2006.

9    Q    What happened in August 2006?

10    A    I was transferred to DEA headquarters.

11    Q    And were you given the same position you

12    have now?

13    A    No, there is no group -- there are no

14    group supervisors, per se, in DEA headquarters.

15    It was a lateral transfer to the position of staff

16    coordinator.

17    Q    Why did you move from Orlando to

18    headquarters?

19    A    It is a normal rotation for GS-14 special

20    agents in DEA to rotate and fulfill their

21    headquarters time, if you will.

22    Q    Is this a position you requested?

Capital Reporting Company

Page 208

1    downloaded the video off the Internet?

2            MR. MEYTHALER:  Can I have one second

3    here?

4            (Short break taken.)

5    BY MR. MEYTHALER:

6        Q    Now, has anyone ever suggested to you who

7    disclosed the video as such that it appeared on

8    the Internet?

9        A    No.

10       Q    Are you aware of any evidence that

11   Mr. Paige disclosed this video to anybody?

12       A    No.

13       Q    Did you disclose this video to anyone

14   outside the DEA?

15       A    No.

16       Q    Has anyone who doesn't work for the DEA

17   told you that they received a copy of the video

18   from someone inside the DEA?

19       A    No.

20       Q    Are you aware of any instances in which

21   the video has been transmitted over Firebird?

22       A    No.

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
CASE NO.:  1:06-cv-00644-EGS

LEE PAIGE,

    Plaintiff,

vs.

UNITED STATES DEPARTMENT OF JUSTICE,
DRUG ENFORCEMENT ADMINISTRATION, ET AL.,

    Defendant.


DEPOSITION OF LEE PAIGE

Taken on Behalf of the Defendant

VOLUME I


DATE TAKEN:      December 14, 2007

TIME:            9:03 a.m. - 11:46 a.m.

                12:58 p.m. - 4:17 p.m.

PLACE:          300 International Parkway
                Suite 424
                Heathrow, Florida


Stenographically Reported by:

Delina M. Valentik,
Registered Professional Reporter
Florida Professional Reporter

cad23d55-aa12-4730-a5ee-11ab086b7047

1   a very dangerous Bahamian drug trafficker out of

2   Freeport who traveled from Freeport to the Bahamas to

3   meet with myself and a confidential source at the time.

4           So the record will reflect that I did work

5   undercover in the Bahamas.  And I was allowed to.  And

6   during the course of the time that I worked undercover,

7   Adolphus Wright was the group supervisor and the contact

8   group, the support group that I worked under when I was

9   in Tampa and I came down to work undercover and -- in

10  the Bahamas.

11         Q.   Now, when you were assigned to the Bahamas, did

12  you do undercover work?  I mean, when you were stationed

13  there as opposed to going to Bahamas for --

14         A.   I think on very, very minimal occasions I

15  worked undercover.  Not really sure.  But I did some

16  things where I worked undercover.  I wouldn't

17  necessarily say that I was a primary undercover on

18  these.  I may have worked undercover where I walked

19  around and pretended to be a tourist taking photographs

20  and things of that nature.  But it was still in an

21  undercover capacity.  I was there as a police officer or

22  a law enforcement officer in a law enforcement capacity

23  doing things such that I wasn't -- may not have been

24  necessarily the primary undercover.

25         Q.   The fact that you worked undercover in Bahamas

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 25

1  pleasant for me, but I think that happens in all

2  perspectives relative to work.

3      Q.  So how long were you in the Bahamas?

4      A.  For -- right at four years exactly. I left. I

5  went -- I arrived there July 1999 and I left July 2003.

6      Q.  And why did you change jobs?

7      A.  I didn't change. I just transferred back here

8  because my wife.

9      Q.  Changed locations. I didn't mean jobs.

10     A.  That's okay. My wife was somewhat ready to go.

11  She was kind of homesick for the most part. An

12  opportunity came for me to return back to central

13  Florida. There was openings in central Florida. I like

14  central Florida. I don't really have a desire to live

15  north of Orlando, Florida for weather purposes. So it

16  came available and I seized the opportunity to return.

17     Q.  Were there any professional job opportunities

18  that you were looking forward to doing in Orlando?

19     A.  Yes. When I left the Bahamas, I was informed

20  or I was -- it was discussed by the SAC Tom Raffanello,

21  the present SAC at the time, that I would come back and

22  they were going to split Florida, the state of Florida

23  up into south and northern districts as far as demand

24  reduction. And I was under the impression when I first

25  came back that I would be the coordinator for the north

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 26

1    and central Florida for demand reduction.  I studied.  I

2    prepared.  Put together the things that I had from my

3    experiences and my times in the Bahamas as well as Tampa

4    and tried to prepare myself.

5         I was ready to come back and immerse myself

6    within the community here and try and do some things

7    positive.  I have a great deal of compassion for doing

8    things for kids.  I volunteered for different programs

9    when I was in Tampa related to kids, juveniles, kids at

10   risk; and was recognized and received commendations for

11   doing such.  So I thought it was something that I looked

12   forward to doing here and possibly when I retired from

13   DEA was kind of like setting the stage for things after

14   DEA, per se.

15        Q.   Like further community involvement sort of

16   things?

17        A.   Exactly, yes.

18        Q.   Okay.  And so what took place?  You wanted to

19   come and be the demand reduction coordinator for north

20   Florida, north and central Florida, as I understand?

21        A.   Right, yes.

22        Q.   What transpired?  Did you ever get that

23   position?

24        A.   No, I didn't.  As a matter of fact, when I came

25   back, the ASAC Steve Collins presently here, he says,

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 27

1   well, I want you to do casework.  You know, I want you

2   to do that as well.  I understood that some people

3   wasn't necessarily happy because -- here in the office,

4   no one specific, just from idle office gossip that they

5   didn't think it was fair that I was coming from the

6   Bahamas to come back here to just do demand reduction.

7   And so I'm not really sure if that was the case.  But my

8   ASAC Collins told me that he wanted me to go to the

9   enforcement group, help out in the enforcement group.

10         So I followed his orders.  But along that I

11  continued to do demand reduction when requested.  At the

12  time that I did demand reduction, I -- when I went out,

13  after I got here, I made a record of it, notated it, I

14  forwarded a copy of every event that I participated in

15  to my group supervisor, Pete Gruden.  I made a file for

16  my group supervisor as well as the ASAC because it's

17  mandated, it was mandated at the time that we report

18  everything to the coordinator in Miami because it

19  reflected upon the SAC's evaluation in the division and

20  whether or not he got a bonus if -- at the end of the

21  year, if those things took place.  So I reported

22  everything.

23         I thought that I would probably be at some

24  point moved in the position of permanent coordinator so

25  I wanted to keep a record of my performance and the

cad23d55-aa12-4730-a5ee-11ab086b7047

1    things that I was doing because I applied for the

2    position in Miami as well, but I didn't get it.  Someone

3    else got it.  Because the retire -- the present person

4    that was the demand reduction coordinator at that time,

5    Omar Alamon (phonetic), was retiring so I applied for

6    his position as well.

7         Q.   And so you were hoping to kind of get a

8    full-time job doing demand reduction in or, you know,

9    most your tasks being demand reduction for north and

10   central Florida when you came to Orlando?

11        A.   Yes.  It -- in other offices in other

12   divisions, they have -- I spoke with different people,

13   they have it as such.  And demand reduction was sort of

14   like the DARE program if I can compare it to something

15   from a local perspective.  And there are events planned

16   and there are things that from education purposes

17   because if we cut the demand down for drugs and educate

18   kids, the suppliers won't have anybody to, in essence,

19   send the drugs to.  So I mean it kind of seems far

20   fetched, but -- in today's society, relative to drug

21   trafficking, but that's the case.  If nobody is asking

22   for it, you can't sell it to anybody.  Kind of like the

23   economy.

24        Q.   And so did you say that you also applied to get

25   a full-time demand reduction as a coordinator job in

1  Miami?

2       A.   I applied for that position, but I was told

3  that there was someone else basically was going to be

4  the successor of Omar Alamon and that at the time I

5  talked to the SAC and the ASAC that was in charge of

6  that division or that section, and they told me that

7  they were possibly looking at splitting Florida up

8  because it's such a long haul from the Panhandle to

9  Miami.  And if there was somebody in the northern or

10 central Florida, they could do it.  They told me I was a

11 good candidate because my record was good as well as I

12 went to school at Florida State University.

13      Q.   Tallahassee?

14      A.   In Tallahassee.  I was familiar with the

15 panhandle and different people that I went to school

16 with were presently involved in businesses and involved

17 in the community in that area.

18      Q.   And so who was it that got the full-time demand

19 reduction job in Miami?

20      A.   I think it was Ricardo Ramos.

21      Q.   And was there ever created a full-time demand

22 reduction position in north and central Florida?

23      A.   No, sir, it didn't happen.

24      Q.   Okay.

25      A.   Not after -- well, I was doing -- I think after

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 34

1    the Bahamas, I had administrative leave.  And then I was

2    off.  I came back in July.  Then I was off the month of

3    December.  The month of January, I went TDY again back

4    to the Bahamas for 30 days.

5         Q.    Why?

6         A.    To do OPBAT, to support OPBAT.

7         Q.    After I came back from OPBAT, I was TDY again

8    because I was involved in a trial where I had to testify

9    as a witness in the Bahamas for the month of February.

10             Then after the month of February, my group

11   supervisor Pete Gruden detailed me to a wire tap which I

12   worked the entire month of March on that wire tap.  Then

13   after I did the wire tap, I went to go to a tactical

14   training school in Tampa and I didn't successfully

15   complete that.  So I came back out on a Thursday, the

16   8th of April.  Then April 9th, I was here in the office.

17   I left the office, went home.  Then I went to the

18   Callahan Community Center in Parramore at about 7:00.

19   Then at about 7:15 I had an accidental discharge.

20        Q.    Let me go back over some of the stuff that you

21   covered there about your time in Orlando.  From the time

22   that you were officially assigned to Orlando, I guess

23   that's July 2003 --

24        A.    Yes.

25        Q.    -- on a TDY, do you recall any other times that

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 35

1  you had done undercover other than at the -- is that the

2  new Mall of Millenia?

3      A.    Yeah.  Yeah.

4      Q.    Do you recall any other times?

5      A.    I don't recall.  I know I was requested to do

6  undercover on occasions, but I, you know, there was so

7  many things going on at that time.  I don't really

8  recall.  I do recall that time because it just sticks

9  out in my mind.

10     Q.    And correct me if I'm wrong, this is just my

11  instinct, your first year on the job you do it 89 times?

12     A.    No, I didn't say 80.  I said approximately 67

13  times.

14     Q.    Oh, boy, I don't know where that came from.

15  That's my memory.  I apologize.

16     A.    That's okay.  You got a good memory.

17     Q.    But your first year on the job you do it

18  approximately 67 times and then when you're in Orlando,

19  you do it once.  Is that because you were a more senior

20  agent or is there something else?

21     A.    Well, I was not here that long, basically, if

22  you think about it.  I just kind of gave you a time line

23  of what I was doing.  And during the course of that

24  time, I wasn't needed.  Basically, when I have

25  investigated cases where I'm the case agent, at times I

Sclafani Williams Court Reporters, Inc.
1-(866) SET-DEPO (738-3376)

cad23d55-aa12-4730-a5ee-11ab086b7047

1      Q.   And so during your presentation or at least

2    when you started your presentation, you didn't -- did

3    you know that the one on your side was loaded when you

4    started?

5      A.   I was not aware that it was loaded.  Usually, I

6    -- I made a mistake and I left the magazine in it and I

7    thought it was unloaded, yes.

8      Q.   Maybe it's appropriate to just have you

9    describe to me, in your own words, kind of your own

10   thoughts and perception how the AD happened that day.

11     A.   I started talking about the gun before I

12   presented it to the kids that I can remember, because

13   like I said, I haven't had the opportunity to view the

14   tape over and over.  And I definitely hadn't seen it in

15   some time.  So from my recollection, not specifically,

16   but in my mind that I've gone over it from time to time,

17   I took the gun from my holster.  I locked the slide

18   back.  I realized then that I had a round in the chamber

19   which it fell in my hand.  I took it and I put it in my

20   pocket.  At that point when I put it in my pocket, I put

21   the gun down and I let the slide forward.  And then, if

22   I can recall, I dropped the magazine and took the

23   magazine out.  But it already had seated another round

24   in the magazine -- in the chamber.  I was going to at

25   that point attempt to disassemble the weapon and show

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 88

1    the kids that really a weapon that's torn apart really

2    isn't a weapon until it's -- all the parts are put

3    together and that was part of my presentation in the

4    past. I had lead ins that would go along with it as far

5    as being professional and knowing how to do it and what

6    have you and being trained on how to take the gun apart

7    and put it back together. Those were my intentions to

8    do, but -- but, unfortunately, prior to dropping the

9    magazine, I let the slide forward.

10       Q.   Look, so you did not drop the magazine that --

11   during that presentation?

12       A.   I don't recall dropping the magazine. I know

13   that I didn't drop the magazine prior to letting it

14   slide forward because it seated another round in the

15   chamber. And that round, when I took the gun and

16   pointed it down away from everybody, because you always

17   treat a weapon as a loaded weapon. That's the safety

18   training that I got. I pointed the gun down away from

19   everybody. And I pointed it at myself. And in doing

20   so, when I pulled the trigger, I shot myself in the leg.

21   The round that I had previously taken out, I -- the

22   bullet that I discharged hit that round, lucky for me, a

23   blessing, it hit that round and it ricocheted out the

24   left side of my left thigh. And when I laid there on

25   the emergency room table, the attending physician

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 89

1    informed me that I was lucky and had I not had that

2    bullet in my pocket, that I probably would have bled to

3    death in front of my children and that audience in about

4    22 seconds.

5              So at that time I felt very lucky and I felt

6    very blessed to be alive.  Incident took place like this

7    last year where a police officer in New York shot his

8    self and hit his main artery and another agent trained

9    in first aid trauma treatment saved his life by applying

10   first aid to him.

11             And if you remember, just a week and a half

12   ago, the Sean Taylor incident, the Washington Redskin.

13        Q.   I thought of you actually when I heard that.

14        A.   I thought of that over and over again.  And I

15   realized, you asked me earlier about did I feel

16   fortunate --

17        Q.   Yeah.

18        A.   -- to be alive, to see my son turn 13 and my

19   daughter turn 15 this year, and to be able to help her

20   get her driver's license, I definitely feel blessed and

21   fortunate.  That's why I didn't think it was funny at

22   the time when most people made jokes about it and made

23   jokes that I was some -- related to me that I was a

24   Keystone Cop who shot myself in the foot.  But I knew

25   exactly how serious my injury was, but...

cad23d55-aa12-4730-a5ee-11ab086b7047

Page 137

1  any other showings or any other people with copies of a
2  video-recording of your accidental discharge?
3     A.   I don't remember at this point in time.  It's
4  kind of all going together.  I don't remember.
5     Q.   And when Steve Collins gave you a copy of the
6  file to review, did he tell you anything?  Did he give
7  any orders at that point in time?
8     A.   Just like I testified before, he told me that I
9  couldn't make copies.
10    Q.   Oh, did he tell you that right when he was
11  giving it to you?
12    A.   Yeah.  He asked me, you don't -- yeah, he says,
13  you can't make copies of this.  And you can only take
14  notes.
15    Q.   Did he tell you you couldn't take it out of the
16  office?
17    A.   I don't remember.  I don't remember.
18    Q.   Okay.  Do you know how to copy CDs or DVDs on a
19  computer?
20    A.   I have copied a CD.  I have copied something
21  from a computer to a CD.
22    Q.   Yeah.
23    A.   To a compact disc.
24    Q.   Yeah.
25    A.   But I'm not technically savvy other than just

Page 138

1    from a layman perspective with Firebird.  If you want to

2    ask me if I'm computer literate, I would say I would be

3    deemed on the low scale when it came to knowing.  On a

4    scale of one to ten, I would be definitely before --

5    below five.

6        Q.   At your house, is there any video-editing

7    software on any computers?

8        A.   Not that I'm aware of.  I mean, not that I can

9    specifically say where I would be able to -- no, not

10   that I recall.

11       Q.   Do you have a video-recorder at your own house

12   to take like home movies or anything like that?

13       A.   No, sir, I don't.

14       Q.   Have you ever put movies on a computer yourself

15   in any way?

16       A.   No, sir, I haven't, that I recall.

17       Q.   Okay.  Have you ever watched a movie on a

18   computer like a DVD or anything like that, plugged it in

19   and watched it through a computer?

20       A.   Not that I recall.  I watched little e-mails on

21   a computer, yeah, but...

22       Q.   Oh, like e-mail attachments?

23       A.   Yes, I opened up those.  That's about my extent

24   of literacy when it comes to dealing with stuff in that

25   regard.  That's why we have tech agents.  Although, I

cad23d55-aa12-4730-a5ee-11ab086b7047

# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA


LEE PAIGE,

        Plaintiff,

vs.               Case No. 1:06cv00644

UNITED STATES DRUG

ENFORCEMENT ADMINISTRATION

and UNITED STATES OF AMERICA,

        Defendants.


DEPOSITION OF VICTOR WRIGHT

Taken on Behalf of the Defendant


DATE TAKEN:     December 20, 2007

TIME:          9:00 a.m. to 12:03 p.m.

PLACE:         Law Offices of Merkle & Magri,

               P.A.

               5415 Mariner St., Ste. 103

               Tampa, Florida 33609


STENOGRAPHICALLY REPORTED BY:

KAREN ROMAN, FPR, CCR (WA)

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 5

1     A     No.

2     Q     Have you ever been retained before as an

3  expert in litigation?

4     A     No.

5     Q     Another rule of depositions is if at any

6  point in time you don't understand a question I ask,

7  please tell me and I'll try to rephrase it.

8     A     Okay.

9     Q     And, also, if you need to take a break at

10 anytime, let me know, and we'll arrange for a break

11 to be done.

12    A     Okay.

13    Q     I'd like to start with some questions about

14 your role in this case.  When were you first

15 contacted about this case, I mean Paige versus DEA?

16    A     I would say I was contacted about a couple

17 months ago.

18    Q     Okay.  And who contacted you?

19    A     Attorney Ward.

20    Q     Okay.  So that's Ward Meythaler?

21    A     Yes.

22    Q     And did he contact you by phone or in

23 person or --

24    A     Well, actually, I do -- I do consulting

25 work here also, so -- and we discussed it here while

1  I was actually working on the network here.

2      Q     Okay.  And so what was said in your

3  conversation with Mr. Meythaler in that initial

4  conversation?

5      A     I don't really quite remember, but we

6  basically was going over some information about IT on

7  the CDs, and then if I can interpret some information

8  about it.

9      Q     Okay.  And then did the conversation arise

10  to have you retained as an expert in this litigation

11  at some point during that conversation?

12      A     Yes.

13      Q     And how did that arise?

14      A     Well, I was asked if there's anytime that

15  we have any questions about any of the IT side of it,

16  would I be capable or able to be available to meet

17  with you or to meet with anyone to discuss anything

18  about this.  And I said, yes, I could.

19      Q     Okay.  And so once you were retained as an

20  expert or had that understanding that you might work

21  as an expert in the case, what did you understand

22  your assignment to be?

23      A     To get information that will -- for the

24  questions that were being asked, if I can get the

25  information for them to ensure that that information

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 21

1    terms "intentionally and willfully," are you aware

2    that those have specific legal meaning under the

3    Privacy Act?

4         A       Yes.

5         Q       Okay.  And are you aware of what that

6    specific legal meaning is?

7         A       Yes, I do.

8         Q       And what do you understand that meaning to

9    be?

10        A       Well, to actually do something and

11   willingly, do it on purpose is, you know, to

12   willfully -- to just do something outside of the

13   norm.  I mean, you intentionally can get something

14   and then willfully show it to everybody else.

15        So, I mean, legally, yes, I know what it means.

16   I'm just brain dead here all of a sudden.  But

17   basically, I do understand what it means.

18        Q       So I'm just curious.  Did you read the

19   Privacy Act to see what those terms meant or read

20   cases interpreting the Privacy Act to understand what

21   those terms meant to understand what intentionally

22   and willfully meant under the Privacy Act?

23        A       Only what I learned in school.

24        Q       So you gave them the meaning that you have

25   commonly associated with intentionally and willfully;

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 22

1    is that what you're saying?

2         A    Yes.

3         Q    Okay.  And you didn't -- did you at any

4    point in time check with any source, including a

5    person, to determine if that common understanding of

6    those terms that you had matched with the specific

7    legal definition?

8         A    No.

9         Q    That exists under the Privacy Act?

10        A    No.

11        Q    On sentence 2 of this paragraph, I know

12   that it says you conducted an interview with Lee

13   Paige.  Do you see that?

14        A    Yes, I do.

15        Q    So did you conduct an interview with Lee

16   Paige?

17        A    Yes, I did.

18        Q    And when was that?

19        A    A month ago, two months ago.  I don't

20   remember.  I don't know the specific dates, but it

21   was, I would say maybe a month and a half ago.

22        Q    Okay.  Now, I know just up top on this

23   document there is a stamp on this that says "filed

24   10/15/2007."  Does that -- does that date mean

25   anything to you?

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 26

1      So in other words, if I want to send something

2  to -- to Victor at my e-mail address, you can.  But

3  some clients that I have, you cannot.

4      Q    So from DEA, did Mr. Paige tell you if you

5  could or couldn't send outside?

6      A    Said you could.

7      Q    You could, okay.  I take it that you relied

8  on the answers that he gave you during this

9  interview?

10     A    Correct.

11     Q    For your understanding of DEA's computer

12 systems?

13     A    Yes.

14     Q    Did you ask Mr. Paige if he had any formal

15 technical training in DEA's computer systems?

16     A    In so many words, he told me that everyone

17 has to go through a -- as a matter of fact, one of

18 these here, a security class, what you can and cannot

19 transmit and make sure that everything is always

20 secure; that things -- if you have to send anything

21 outside, it has to be encrypted, pretty much.  But

22 other than that, that was about it.

23     Q    Okay.  You said another set of questions

24 that you spoke to Mr. Paige about was network

25 storage.

1   a video and store it on a laptop.  For instance,

2   normally, you can't do that unless you have a

3   high-end laptop with some sort of video- or

4   media-authoring tools, software installer, in which

5   normal laptops wouldn't have that.

6        Now, if you go to -- you take a video to an IT

7   room or someone with IT experience, then you can

8   store it that way.  For instance, myself, I can take

9   a video, store it, take the video, record it to my

10  server or my PC.  And at that point, I have a video

11  file.  Then at that point, I can do whatever I need

12  with it.  But you can't -- normally, most PCs don't

13  have that capabilities of doing that.

14       Q    So if I understand right, you've assumed

15  then, that in order to make this video a video file,

16  it had to involve a network computer?

17       A    It doesn't have to be a network computer,

18  but you want to -- I can't see an agency or any large

19  entity not being on a network.

20       Q    So you're assuming that it was stored on

21  DEA's network, but you don't have any physical or

22  electronic proof of that?

23       A    No, but it would have to be on the network.

24       Q    But you have no proof for that?

25       A    No.

a429f2a1-13c9-47dd-91bd-47354d86b232

1    A    To be quite honest with you, before I

2  attach a file, I make sure it's the right file I'm

3  trying to get, and if I inadvertently attach the

4  file, I can detach it and go back in and reattach the

5  file that I'm looking for before I submit it.

6    Q    But sometimes you have clicked on the wrong

7  file to be the attachment, but then you go ahead and

8  double check?

9    A    Correct.

10    Q    Are you aware of anybody that you know of,

11  or have encountered, who have either, or had problems

12  in attaching files; they either attached the wrong

13  file or they send an e-mail without the attachment?

14    A    Oh, yes, I know that.

15    Q    Is that a relatively frequent occurrence?

16    A    Well, the people I deal with, it's not that

17  frequent, but it has happened, yes.  And it's

18  possible.

19    Q    Okay.  Now, this method you describe of

20  attaching a file to a computer file -- and let me

21  just back up.  Whenever we're using term "file" so

22  far in this deposition, we're talking about computer

23  files, right?

24    A    File, documents, anything.

25    Q    Okay.  But we aren't talking about like a

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 48

1    thumb drive into a PC, they're going to see

2    everything else on there.

3         I mean, if I don't want you to see something,

4    I'm not going to copy a whole bunch of things to a

5    thumb drive and give it to you and say, hey, the file

6    you're looking for is this file itself, knowing that

7    the normal person is going to look through the whole

8    thumb drive and see what all the information you have

9    on there.

10        I mean, from my experience -- I mean, when

11   fellow techs give me their thumb drive and I say,

12   hey, where's the file at?  Well, it's on this file.

13   Well, naturally, when I stick it in, I'm going to see

14   everything that's on there.  And if I'm curious, I'm

15   going to browse what's there.

16        Q      Okay.

17        A      So if I don't want you to see something,

18   I'm not going to give you a thumb drive with

19   something on there I don't want you to see.

20        Q      But it's possible that somebody could have

21   given out a CD or a thumb drive with other

22   information on it with the intent that the recipient

23   only see that other information?

24        A      It's possible.

25        Q      Even though there might have been a copy of

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 52

1    here.  Do you see that?

2         A    Yes.

3         Q    And this is the same interview that you had

4    with Lee Paige, or was this a telephonic follow-up?

5         A    No, it's the same.

6         Q    Okay.  Have you ever had a telephonic

7    follow-up with him?

8         A    No, I haven't.  Just that one time.

9         Q    Okay.  And so, also, part of that

10   conversation, he told you that DEA agents are trained

11   to be careful with information?

12        A    Correct.

13        Q    Okay.  Now, when Lee Paige was telling you

14   this stuff in the interview, you realize in the back

15   of your mind, I assume -- correct me if I'm

16   wrong -- that he had an interest in how this

17   litigation turns out?

18        A    Well, naturally, yes.

19        Q    Okay.  Now, looking at this report, and

20   maybe it's safe to extend this to some of your

21   follow-up reports, but it appears that all your

22   opinions contemplate that a digitized version of the

23   video was released out of DEA's possession?

24        A    Yes.

25        Q    So that means you believe it wasn't a VHS

Page 54

1              MR. MEYTHALER:  For what?

2              MR. PHIPPS:  I just want to make sure.  All

3        right.  I'll back up.

4    BY MR. PHIPPS:

5         Q       Are you aware of any versions or have you

6    ever seen any versions of video of the incident that

7    were on VHS tapes?

8         A       On a VHS tape, no, I have not.

9         Q       Okay.  Okay.

10        A       You mean actually had a VHS tape and

11   watched it --

12        Q       (Nods.)

13        A       No.

14        Q       Okay.  Okay.  In reviewing your conclusions

15   here at point one, you don't -- if I understand, this

16   is kind of a general layout of how you think things

17   normally happen, but you don't have any distinct

18   evidence that affects your opinions one way or the

19   other on this, do you?

20             MR. MEYTHALER:  I object to the form of the

21        question.

22             THE WITNESS:  Ask that once again.  I want

23        to make sure I'm getting this right here.

24   BY MR. PHIPPS:

25        Q       Okay.  Well, I can break it down.  You talk

1    Q    And how are those dates and times put in

2    that directory?

3    A    The minute you store anything on the

4    computer, you store any information on the computer

5    whatsoever, you're automatically given a date and

6    time that it was stored.  So once it's stored, I can

7    go and burn a copy of that image and it will

8    automatically grab the date and time of the original

9    file.

10    Q    And that date and time comes from the

11    originating computer's internal clock?

12    A    Correct.

13    Q    Okay.  So if the originating computer had

14    an incorrect computer clock, this date and time would

15    be incorrect?

16    A    It would be incorrect, but I just don't see

17    the -- honestly, the federal government clock not

18    being on time and correct.  But I mean, it will be

19    your -- it would be the clock time that your PC, or

20    wherever this is stored, is coming from.

21    Q    But you've assumed the correctness of the

22    originating computer's computer clock?

23    A    Correct.

24    Q    Okay.  So just to clarify, let's say

25    there's a computer out there whose computer clock

a429f2a1-13c9-47dd-91bd-47354d86b232

Page 109

1    Nero, when they first came out, they were pretty

2    horrible, but now they're really user-friendly, and

3    when I deal with my client, they always ask me what

4    is the most user-friendliest software.  'Cause,

5    again, you have clients who don't really know

6    computers that much.

7        So I prefer to let them -- to have them use

8    Nero's.  It's really simple to use, simplistic,

9    simplicity.  Give your clients something simple,

10   they're happy with it.  But it's not something you

11   have to be proficient with.  They're all the same.

12   All the burning software, they do the same thing,

13   just different names, and they may have a feature

14   that's different here or there.

15       Q    And I also notice that you don't list the

16   Firebird computer system as an area of proficiency.

17   Is there a reason for that?

18       A    Well, yeah.  Firebird is a DEA software,

19   part of the Department of Justice.  And because I

20   don't work in that DOJ, I wouldn't know anything

21   about the Firebird software.  I mean, I believe

22   that's a software that was specifically designed for

23   the Department of Justice.  And so I'm not proficient

24   in that at all, just for what you read.

25            MR. PHIPPS:  If you would, just give me a

Sclafani Williams Court Reporters, Inc.
1-(866) SET-DEPO (738-3376)

a429f2a1-13c9-47dd-91bd-47354d86b232

# EXHIBIT D

COPY

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Civil Action No. 1:06cv00644
Hon. Emmet G. Sullivan

LEE PAIGE,                    )
                             )        DEPOSITION UPON
                             )        ORAL EXAMINATION
          Plaintiff,         )             OF
                             )
          vs.                )   .    GERARD MC ALEER
                             )
UNITED STATES DRUG           )
ENFORCEMENT                  )
ADMINISTRATION, et al.,)
                             )
          Defendants.        )

_____

     T R A N S C R I P T   of the deposition of
GERARD MC ALEER, called for Oral Examination
said deposition being taken pursuant to Rules
governing Civil Practice in the Courts of New
Jersey, by and before BARBARA DE VICO, a Certified
Court Reporter of the State of New Jersey, at the
offices of THE UNITED STATES DRUG ENFORCEMENT
ADMINISTRATION, 80 Mulberry Street, Newark, New
Jersey, on Friday, February 1, 2008, commencing
at 12:55 in the afternoon.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880 Fax (973) 353-9445

1          Q.      All right.  And you heard that the

2     video was on the Internet?

3     A.      Can we go back to clarify something?

4          Q.      To what?

5     A.      If you go back to number 41.

6          Q.      Okay.  On Exhibit 3?

7     A.      Yes.  So we're talking about 44 and you

8     asked about evidence identified, secured, and it

9     says secured by Walker, maintained by GS Gruden.

10    If you look at number 41, shooter's weapon turned

11    over to ASAC, and it says yes there and it says GS

12    Gruden.  The weapon may be the evidence that's

13    been identified and secured.

14         Q.      I see.  Thank you very much.

15    A.      Okay.

16         Q.      When you first learned that the

17    video was on the Internet, did you take any action

18    to find out how that happened?

19    A.      Yes, I did.

20         Q.      I'm sorry, did you hear me?

21    A.      Yes, I answered the question, yes, I did

22    take action.

23         Q.      Okay.  I guess you didn't hear me.

24    What did you do?

25    A.      Okay.  I called in, I think it may have

1    A.    Yes.

2         Q.    The date of the memo from Mr. Burns

3    was March 25, 2005?

4    A.    Correct.

5         Q.    Exhibit 15 is dated November 15,

6    2005.  That's about eight or nine months

7    difference.  Do you see that?

8    A.    Yes.

9         Q.    Now, is this the request that you

10   made from the OPR investigation?

11   A.    Well, again, this is a copy with a stamped

12   signature, so I don't recall.  I'm sorry, what's

13   the next question?

14        Q.    I was waiting for you to finish.

15   If you're all done, then I'll go on to the next

16   question.

17   A.    Okay.

18        Q.    You had indicated that you

19   requested an OPR investigation within days of

20   March 25, 2005; is that correct?

21   A.    I believe I did.

22        Q.    Now, this memorandum seems to

23   indicate that you did not request an OPR

24   investigation for eight or nine months.  Can you

25   explain that discrepancy?

Page 56

1    A.        Well, if these dates are correct and if

2    this document is accurate, there appears to be a

3    discrepancy.

4              Q.      Is there any reason of why you

5    would not request an OPR investigation between

6    March and November, 2005?

7    A.        My recollection is that I requested one

8    after I learned it was on the Internet.

9              Q.      On Exhibit 15 on the second to the

10   last paragraph, there's a reference to a copy of

11   the letter addressed to the administrator from

12   Mr. Paige's attorney.  Do you see that?

13   A.        On 15?

14             Q.      Yes.

15   A.        Okay.  Yes, I do.

16             Q.      Do you remember seeing that letter?

17   A.        I don't recall seeing it.

18             Q.      Do you know if that's what prompted

19   you to request an OPR investigation rather than

20   Exhibit 14?

21   A.        My recollection is I requested an OPR

22   investigation when I learned that it made the

23   Internet.

24             Q.      Do you know what, if anything, OPR

25   did between March of 2005 and November of 2005?

# EXHIBIT E

# Capital Reporting Company

```
        IN THE FEDERAL DISTRICT COURT
          IN THE DISTRICT OF COLUMBIA
-----------------------------X
LEE PAIGE,                      :
                               :
              Plaintiff,  :
          v                    : CASE NO:
                               : 1:06CV 00644-EGS
DOJ and DEA,                   :
                               :
              Defendant.:
-----------------------------X
```

Washington, D.C.

Thursday, January 17, 2008

Deposition of:

JIM BURNS

called for oral examination by counsel for

Plaintiff, pursuant to Notice, at the US DOJ Civil

Division, Federal Programs, 200 Massachusetts

Avenue, Northwest, Washington, D.C., before Mary

E. Warner of Capital Reporting, sworn by a Notary

Public in and for the District of Columbia,

beginning at 1:00 p.m.

Capital Reporting Company

Page 42

1    Acquisition of Nondrug Property.

2        Q    And it's called a DEA 7-A?

3        A    That's correct.

4        Q    And what's the purpose of a DEA 7-A?

5        A    To submit evidence into the custody of

6    the evidence custodian.

7        Q    Who does OPR use as a nondrug evidence

8    custodian?

9        A    You would have to ask OPR, sir.  I do not

10   know.

11       Q    Does the Office of Inspections have a

12   nondrug evidence custodian?

13       A    No, sir.  We don't collect evidence.

14       Q    Well, who collects the evidence during

15   the investigation of an accidental shooting?

16       A    If it's --

17           MR. PHIPPS:  Objection, legal conclusion,

18   vague, ambiguous.  Go ahead.

19           THE WITNESS:  If it's an accidental

20   discharge and there are no apparent criminal

21   violations and that decision is made early on,

22   then it's an administrative review and the Office

Capital Reporting Company

Page 65

1    Mr. Burns, does this appear to be a copy of the

2    investigation file for Mr. Paige not including the

3    correspondence green folder that we talked about?

4         A    Yes, sir.

5         Q    Now, down at the bottom there's -- it

6    says, "DEA sensitive." What does that mean?

7         A    That means that it's the property of the

8    Office of Inspections and that it's to be

9    considered law enforcement sensitive. It

10   shouldn't be disseminated to just anybody.

11        Q    Well, does that mean just anybody within

12   the DEA or to anyone outside the DEA?

13        A    It shouldn't be disseminated outside of

14   DEA, outside of law enforcement.

15        Q    Someone outside of DEA in law enforcement

16   can look at DEA sensitive materials?

17        A    Yes, sir.

18        Q    So can any DEA agent make that decision

19   or does he have to get permission to do that?

20            MR. PHIPPS:  Objection, foundation.

21            THE WITNESS:  Are you talking about these

22   types of files, or are you talking about criminal

d9e2c8a0-6739-4ebf-9e6e-0762e15dfc74

Capital Reporting Company

1    And I mean -- by "it," I mean talking about this

2    final report.

3         A    No.  The final report, once it's approved

4    by the senior inspector, then, you know, it goes

5    into the binder.  It doesn't have to be -- that

6    single report doesn't have to be approved

7    separately by anybody else.

8         Q    All right.  If you want, and if it makes

9    it easier, you can remove tabs as we go along.

10   I'm not going to ask you about the next two tabs.

11        A    That would be the tab on page 10?

12        Q    Yes.  And 11.

13        A    All right.

14        Q    The next tab is a Report of

15   Investigation, that is a DEA 6, is that correct?

16        A    Let's see.  The next tab on mine, sir, is

17   the 485, the report of shooting.

18        Q    Okay.  I failed to give you one of the

19   tabs.  If you go to the document right before

20   that.

21        A    All right, sir.

22        Q    It's actually after tab 2 in the report.

Capital Reporting Company

Page 127

1    mistake or, you know, that I improperly worded

2    this.  I don't know, sir.

3        Q    You think that this was some sort of

4    mistake that there was only one copy in the

5    investigative file?

6        A    Well, there are two VHS tapes in the

7    investigative file.

8        Q    Oh, are there?  You mean including the

9    original videotape?

10       A    Well, the original videotape and then

11   there are two VHSs, and I may have mistaken the

12   one that has the media coverage in it for -- I

13   probably just miscounted.

14       Q    Well, those tapes that are in there are

15   clearly labeled, are they not?

16       A    Yes, sir.

17       Q    And the second one refers to the media

18   and not to the discharge?

19       A    That's correct.

20       Q    All right.  It says then that the -- an

21   additional copy was made for the duplicate

22   investigative file.  What was the duplicate

# EXHIBIT F

## Capital Reporting Company

Page 1

IN THE FEDERAL DISTRICT COURT

IN THE DISTRICT OF COLUMBIA

------------------------------x

LEE PAIGE,                        :

            Plaintiff, :

    v.                            : CASE NO:

DOJ and DEA,                      : 1:06CV 00644-EGS

            Defendant.: :

------------------------------x

                Washington, D.C.

        Wednesday, November 7, 2007

Deposition of:


            KENT REINKE


called for oral examination by counsel for

Plaintiff, pursuant to Notice, at the US DOJ Civil

Division, Federal Programs, 200 Massachusetts

Avenue, Northwest, Washington, D.C., before Mary

E. Warner of Capital Reporting, sworn by a Notary

Public in and for the District of Columbia,

beginning at 9:00 a.m.

## Capital Reporting Company

Page 129

1        Q    Do you know if that was a mini DV or a

2    disk?

3        A    At this time I cannot recall.

4        Q    All right.  Do you have an understanding

5    that Mr. White went to her and asked her to make a

6    disk of the entire presentation, a disk of the

7    entire presentation without the accidental

8    discharge and a disk of only the accidental

9    discharge?

10        MR. PHIPPS:  Objection, compound,

11    misleading.

12        THE WITNESS:  I have an understanding to

13    those approximates.  I believe she also copied

14    this DV, which is a news coverage of the accident.

15    BY MR. MEYTHALER:

16        Q    And you have an understanding that she

17    made those disks as requested by Mr. White?

18        A    Yes, sir.

19        Q    And you understand that Mr. White went

20    back the next day and said that he needed more

21    copies of these same disks?

22        A    Not quite sure of the day but I