**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**LEE PAIGE,**

      **Plaintiff,**

**v.**                               **CASE NO.: 01:06-cv-0644**

**UNITED STATES DRUG**
**ENFORCEMENT ADMINISTRATION, et al.**

      **Defendants.**
_____/

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION**
**FOR PARTIAL SUMMARY JUDGMENT AND TO STRIKE VARIOUS DEFENSES**

Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5415 Mariner Street, Suite 103
Tampa, Florida 33609
TEL: (813) 281-9000
FAX: (813) 281-2223
wamsecy@merklemagri.com

## SUMMARY

The Government admits that Gruden caused a 4 minute and 9 second ("4:09") video of the AD to be copied from the **Mini-DV**. The Government also admits that the **Mini-DV** was a record within a system of records (i.e. the IN file). The 4:09 video was therefore also a record from a system of records. The **Mini-DV** was physically retrieved from the IN file because Gruden was initially responsible for "file construction" of the IN file since IN initially decided that the IN investigation would be done at the local level, rather than at the headquarters level. *See* Paige's Response to Defendants' Motion for Summary Judgment ("MSJ"). Even if Gruden had not been initially responsible for construction of the IN file, he was, nonetheless, holding and maintaining the investigatory information or evidence for IN such that the **Mini-DV** was part of the IN file. In the alternative, if Gruden did not actually or constructively retrieve the **Mini-DV** from the IN file, the disclosure of the 4:09 copy still violated the Privacy Act under *Bartel v. F.A.A.,* 725 F.2d 1403 (D.C. Cir. 1984) where the court noted that the "retrieval standard" was a "**guideline**" (*Id.* at 1409; emphasis added; i.e. not a "rule") which was inapplicable when it "would make little sense in terms of [the Privacy Act's] underlying purpose" (*Id.* at 1409) and would "deprive the Act of all meaningful protection of privacy" (*Id.* at 1411).

The Government admits that the 4:09 copy was disclosed to other DEA agents on the DEA Firebird networking system and on the Internet. These disclosures must have been both intentional and willful. First, the disclosures must have been intentional or willful because of the security at the DEA and the number of distinct, physical acts required to put the 4:09 video on Firebird and the Internet. Next, the 4:09 video constituted investigatory information which is well known to everyone at the DEA to be DEA-Sensitive and cannot be disclosed to the public and not even to other DEA employees without a need-to-know. While not necessary to identify a particular person, it is now almost certain that Gruden disclosed the video to the Internet.

## MATERIAL FACTS

Contrary to the Government's claim, Paige has not exaggerated the number of potential copies of the video.  However, after re-examining Gruden's and Naughton's testimony and the time/date stamp on **D-8** in light of the Government's claim, it is clear that **D-5** (the disc Gruden sent to Miami) and **D-8** (the disc received by Naughton in Miami) are indeed the same.[1]  In addition, it is possible that **VHS-5** may actually have been the same as one of the other VHS copies.[2]  However, although **D-5** and **D-8** are the same and even if **VHS-5** is the same as another tape, the total number of copies does not change by more than one since **D-6** represents two or three discs.

The most significant discrepancy in the number of videos appears to be the disc copies made by or for White.  The Government misrepresents the number of White discs which contained news reports and the number which showed the AD by incorrectly claiming that half were DVD's of news reports.[3]  The Government also continues to ignore inconsistencies between White's and Queen's testimony and the clear evidence that White must have had **D-13** through **D-22** made by someone other than Queen since the number of copies and content of

---

[1]     Gruden personally sent a video to Miami, which he believed was a 4:09 CD. Ex.78,p.161.  Further, Gruden had heard that Naughton had received a video in Miami and had assumed that the video Naughton received was the one he (Gruden) had sent to Miami. Ex.78,pp.187-188.  The video Gruden sent to Miami could not have been **VHS-2**, which was sent to the Associate SAC in Miami (West), because that videotape was not a CD and Collins indicated that he personally sent **VHS-2** to Miami.  Ex.73,pp.106-108.  Moreover, since Collins was not aware of the existence of any CD's, he could not have sent **D-8** to Miami. Ex.73,pp.54,81-82.  In addition, there is no one else who sent a CD to Miami.  Since there were only two videos reportedly sent to Miami (i.e. **D-8** and **VHS-2**), Gruden must have sent **D-8** which is therefore also **D-5**.  The reason it was not previously clear that these were the same CD's is that the Government's answers to interrogatories did not refer to any CD that Gruden sent to the Miami firearms unit in Miami or explain from whom the firearms unit received the CD.  See Exhibit 2.  Moreover, Gruden falsely testified about the date on which he sent the CD by asserting it was the week of April 12 and falsely testified that he destroyed all his remaining CD's around April 21, 2004. Ex.78,pp.161-162,193-194.  The disc itself (Ex. 13), which contains embedded data showing it was created on May 10, 2004 or later, and Naughton's testimony (Ex.85,p.8) establish that the CD was sent to Miami after May 10, 2004, which, of course, is also after the time Gruden falsely testified he destroyed all his remaining CD's.

[2]     Any confusion concerning **VHS-5** is the result of the Government not including in its answers to interrogatories the individuals who possessed **VHS-5** in the chain-of-custody of the other tapes.  Based on the length and the chain-of-custody of the tapes, it still appears improbable that **VHS-6** was another tape.

[3]     See Ex.97,pp.72-93, especially pp.86-87 where White testified as follows:

> Q     And then as I understand it, you took - - you created five sets of DVD's which included in each set the news report, the DVD [of the **Mini-DV**] you could watch on Firebird and a DVD [of the **Mini-DV**] which you could not watch on Firebird?
> A     Yeah.

these copies are totally different than the content of and number of copies which Queen said she made. Moreover, White's **D-13** through **D-22** contain time/date stamps showing they were burned from a video file which was created on April 17, 2004, which was before Queen was ever provided the **Mini-DV** (i.e. April 21 or later) and asked to make copies.

The number and dispute over the number of copies made at Headquarters and Orlando further demonstrate the lack of safeguards, including record-keeping, concerning the video as well as its use as entertainment at the DEA. However, at this point the most important number of CD's is the number made by or for Gruden. The Government does not deny that Gruden had at least seven to eight CD's made (i.e. **D-1** through **D-5** and the two or three CD's Gruden claims to have destroyed), but apparently now disputes that Gruden told Reinke that he sent yet another CD to IN. Among other things discussed below, this means that in addition to the original four 4:09 CD's provided to him by Shafer at the Orlando office, Gruden, contrary to his testimony, made at least another three to four CD's himself or through someone else for him.

### IN's Record-Keeping

The Government asserts that IN is not subject to the DEA's record-keeping rules concerning "nondrug evidence" because it does not engage in "enforcement" activities.[4] However, Matthews, the Senior Investigator in this case, testified that the **Mini-DV** was "nondrug evidence" and that the procedures in the Agents Manual for processing nondrug evidence would also apply to IN.[5] Ex.82,pp.71,87. Further, OPR, which also does not engage

---

[4]    The Government also makes the startling claim that the **Mini-DV** is somehow not "evidence" here. This is contradicted by the DEA's Agents Manual (e.g. Ex.56,§§6114.3and6114.31: DEA personnel are to collect the "evidence" and to remain at the scene of the shooting until "all physical evidence [including "any weapon fired"] has been collected."); by the fact that the SAIRC is to review the IN investigation for "evidence of employee misconduct" (AgentsManual,§6114.71(C)(3)(d)(Ex.56)); IN forms (e.g. Ex.1,p.36,box44: Shooting Incident Checklist listing the **Mini-DV** as "evidence" maintained by Gruden); testimony that the **Mini-DV** was "seized" in the first place by the DEA precisely because it was "evidence" (Ex.69,pp.18,20-21,23-24;Ex.95,pp.13,16,22); and the testimony of other DEA agents, including both the IN investigators and the Deciding Official, that the **Mini-DV** was evidence (Ex.82,pp.86-87;Ex.97,pp.52,56;Ex.80,p.32;Ex.43). Whatever called, the **Mini-DV** is a DEA-Sensitive investigatory record.

[5]    Moreover, both Walker, who seized the **Mini-DV** as evidence, and Gruden, who maintained the evidence, were in an "enforcement" group. Further, the **Mini-DV** was seized as part of the investigation of the AD which

in "enforcement" activities, labels and documents nondrug evidence in the manner prescribed by the Agents Manual.

Whether or not IN is involved in "enforcement," it, like OPR, still collects investigatory information which is DEA-Sensitive and subject to the Privacy Act. The Government is basically arguing here, based on the word "enforcement," that it need not safeguard DEA-Sensitive investigatory information by the same record-keeping procedures that apply to everyone else in DEA, including OPR, concerning the collection of investigatory information. This in itself constitutes a reckless disregard for Paige's Privacy Act rights in at least two respects. The purposes of the DEA's record-keeping system are, *inter alia*, to safeguard the investigatory material and to provide evidence of the chain-of-custody of the material. If the appropriate record-keeping had been done or required in the first place, such accountability would have certainly chilled, if not eliminated, the making of the unnecessary and unauthorized extra copies of the **Mini-DV**, one of which was ultimately disclosed to the public. Second, if appropriate records had been kept, the DEA and Paige could more readily gather evidence and identify the actual person who disclosed the video to the public. Ironically, as a result of the DEA's record-keeping omissions, it is now arguing that Paige cannot prove who leaked the video.

## IN File

The Government argues that the IN file was not opened until April 16, 2004, because that is a date entered on the Program Analyst's database. As explained in Plaintiff's Response to the Government's MSJ, that is the date on which she opened her "correspondence file" in the case, not the date on which the IN file was opened. The head of IN testified that the IN file was opened automatically upon notification of the shooting (Ex.83,p.14):

---

included the issue of whether there would be a criminal prosecution or declination, and, in any event, the **Mini-DV** was private property subject to the nondrug record keeping rules applicable to the "enforcement" group at the Orlando office.

> Q.  Alright.  Did you have any involvement in administratively opening the file concerning Lee Paige?
> A. No.  It's an automatic event that occurs when a shooting, when IN is notified of a shooting.

Moreover, the name of the file is automatic because it is always the name of the shooter. Ex.57,P&IManual,§8234.31.

As also discussed in Paige's Response to the Government's SJM, the Program Analyst is to "immediately" assign a file title and file number.  *Id.*  Under the DEA rules and regulations, this should have been done on April 12, and no later than April 13.  The Program Analyst enters data on the shooting incident database on a continuing basis as she receives information.  It is unclear from her testimony when she first started entering information on her database, but, she should have opened the database and assigned a file number no later than April 13.[6]  In addition, the database reflects an entry on April 15 identifying the inspectors assigned for the on-site investigation.

To suggest that there was no IN file until April 16 because the Program Analyst was tardy in the formality of assigning a number to an automatically-opened file with an automatic title would be a hyper-technical exaltation of form over substance in defiance of the purposes of the Privacy Act.  Whether or not a number was technically assigned yet, there was a group of records, including the **Mini-DV**, being held from the very beginning by the DEA as part of a mandated, automatically-opened investigation identifiable by Lee Paige's name.  The Government's position is further contrary to the DEA's rules on protection of Privacy Act information. Those rules specifically provide that "[d]ocuments … containing personal data will be controlled and protected **immediately upon receipt** of the information" and that such "data

---

[6]      The Program Analyst did testify that it is not possible that she would have done the database before April 16, but it is unclear whether this meant it is not possible that she completed the database, which, of course, she could not have since it is continuously updated; or it is not possible that she first opened the database.

will not be verbally communicated nor allowed to be observed or read by unauthorized persons" (emphasis added). P&IManual,§8628.2(Ex.209,p.3.

The Government intimates that the number of copies it can make of the video is not limited. However, the P&I Manual provides that such DEA-Sensitive material can only be reproduced "at the minimum consistent with operational needs." Ex.209(p.2),§8627.1. The Agents Manual states that if the on-site investigation is done by the local office (i.e. Gruden here), the original file and only one copy (which is designated as being for the Office of Training) are to be sent to IN. AgentsManual,§6114.63(C). The P&I Manual sets forth the distribution of file copies after the IN file is received from the local office or if it is prepared at Headquarters by the IN shooting team. Under those rules, no more than two copies were required here: one copy which goes to the BPC (and then to the Deciding Official) and a second copy to the Office of Training.[7] Moreover, Matthews testified that he, the other investigator as well as the chief and the assistant chief of IN decided that only one or two copies of the video would be made. Ex.82,p.66. As pointed out in prior memoranda, it appears that at least 12 copies (not even counting the ones the Government apparently asserts are the same) of the video were made in Orlando and over 20 copies were apparently made at Headquarters (and four [1 CD and three laptop files] in New York).

### Paige's Expert

Victor Wright has provided an expert report and testimony concerning two straight-forward, uncontradicted matters involving the operation of a computer.

---

[7]     Burns, who made the presentation of the shooting incident to the SAIRC, testified that a copy is not made for the SAIRC, but the original file is made available. In this case, an extra copy was also needed to send to Paige's local office for him to review. Since the SAIRC decided not to refer the matter to the Office of Training, the file created for the Office of Training could have or should have been the copy sent to Paige's office.

First, Wright[8] described the distinct, physical steps that are necessary to e-mail a copy of the video or to copy the video to a storage device, such as another CD or thumbdrive, from a computer, whether it be free-standing or connected to the Firebird networking system.[9]  One does not need to have any knowledge of Firebird's software system to testify as to the steps involved in sending an e-mail with an attachment.  Paige himself can testify and has provided an affidavit as to the same steps he has to follow at the DEA that Wright testified to.  See Ex.198,p.3,¶11.

Next, Wright's report and testimony described another observable physical phenomenon which many routine computer users may not know.  When a CD is burned, the computer automatically embeds a time/date stamp on the CD.  Wright will testify that this automatic time/date stamp reflects the time and date on which the item copied (here, the video of the AD) was stored in an electronic file which was ultimately burned (i.e. copied) to the CD.  For example, the automatic time/date stamp embedded in the original four Gruden 4:09 CD's shows that those four CD's were copied from an electronic video file (such as a file in the hard drive of a computer) which was created at 3:12 p.m. on April 15, 2004.  In other words, the CD's themselves were created some time after 3:12 p.m., April 15.  This automatic time/date stamp can be found on the CD by simply typing in the proper commands to the computer to locate it in the CD's directory.  This basic fact of the way a computer functions was confirmed by both the DEA technician who burned the original four 4:09 CD's and OPR's computer forensic analyst.  Ex.93,pp.40-41;Ex.277,pp.88-90.

The Government does not deny that Wright's testimony is accurate.  The Government merely asserts that Wright has not demonstrated that the Government's internal computer clocks,

---

[8]    Wright graduated from St. Leo University in Tampa, Florida with a BS in computer information systems, management information systems and has more than 10 years experience in system analysis and programming on computers, user training and support documentation for computers as well as experience in major network design, operating hardware and software for computers.  Ex.100,p.4.

[9]    Such information is probably well-known to many computer users who send e-mails with video attachments, but an expert is being used in an abundance of caution and to be available to rule out hypothetical possibilities should the Government raise them.

which provide the information for the time/date stamp, were accurate. This does not affect Wright's basic testimony regarding the time/date stamp. Ordinarily, the issue of the accuracy of the clock would only go to the weight of the evidence. Here, it does not even do that because there is a presumption of regularity and accuracy with respect to government records, including a time/date stamp clock, especially when the Government has exclusive possession of its computers and has offered no evidence that the Government's computer clocks were inaccurate here.[10] *See Riggs Nat. Corp. v. C.I.R.,* 295 F.3d 16, 20 (D.C. Cir. 2002) ("Common law has long recognized a presumption of regularity for actions and records of public officials."); *Washington Mechanical Cont. v. U. S. Dept. of* Navy, 612 F.Supp. 1243, 1247 (N.D. Cal. 1984) (Government's bid clock presumed correct unless "clearly" shown to be inaccurate); *Bufco Corp v. N.L.R.B.*, 147 F.3d 964, 971 (D.C. Cir. 1998) ("if a person having important evidence and peculiarly within the power of one of the parties to produce is not called, the factfinder may draw an inference that the 'missing witness would have given testimony damaging to that party.'"). It is the Government's obligation at this point to contest the accuracy of its own time/date stamps and documents (i.e. the CD's) especially since it has exclusive control over its computer clocks.[11]

## **PRIVACY ACT**

### **The Video Was Retrieved from a System of Records or Covered by *Bartel***

The fact that the video here was physically retrieved, either actually or constructively, from a file is discussed in Plaintiff's MSJ and, especially with respect to Gruden's initial

---

[10]     The Government's computer forensic analyst said his computer clock was off by only 40 minutes, but that's only forty minutes and not the same computer as those used by Queen, Shafer, or Gruden.

[11]     Further, Wright was in the military for nine years and testified that the computer clocks in Government agencies are required to be accurate because the Government agencies rely on accurate clocks and that the computer clock on the Government computer he used was always right. Ex.299,pp.110-111. Moreover, the DEA agents in the Orlando DEA office rely on their computer clocks and in Paige's experience, the computer clocks at the Orlando DEA office have always been accurate. Ex.198,p.4,¶12. Also, the DEA here has certainly relied on its own computer clocks in attempting to determine the dates on which e-mails began to circulate on the Firebird computer system in connection with this case.

responsibility for "construction" of IN's file, in Plaintiff's Response to the Government's MSJ. In the alternative, this case is covered by the principles set forth in *Bartel v. F.A.A.,* 725 F.2d 1403 (D.C. Cir. 1984).[12]

## Scienter

The Government argues that Paige is improperly relying on the principle of *res ipsa loquitur* for the proposition that the DEA must have been responsible for disclosing the video outside the DEA since the DEA had exclusive possession of the **Mini-DV.** *Res Ipsa* is a concept applied in negligence cases in order to prove that a particular result must have occurred as a result of negligence. Paige has never even mentioned *res ipsa* in this case. Rather, Paige is relying on a most fundamental logical syllogism: 1) the DEA was the only person who had the video before it was disclosed to someone outside the DEA; 2) the video was disclosed outside the DEA; 3) therefore, the video must have been disclosed by the DEA.

The issue, however, is not just whether the DEA disclosed the video, but whether it did so intentionally or willfully. Paige has shown that the disclosure was intentional or willful because, as shown by Paige's expert and Paige's affidavit, the steps necessary to provide the 4:09 copy to somebody required so many distinct, physical acts that it must have been intentional, especially in light of DEA's security requirements. The Government has not contested this.

---

[12]     *Bartel* is discussed in Paige's Response to the Government's MSJ. The Government did not mention *Bartel* in the brief to which this brief is responding, but will doubtlessly discuss *Bartel* in its reply brief concerning its MSJ to which Paige cannot reply. Judging from the summary judgment memorandum that it filed in the *Hatfill* case, the Government will argue, perhaps repeatedly, that *Bartel* only applies to the specific facts of that case; will use strategically placed quotation marks around partial quotes from cases in a problematic way; will fail (unless it reads this brief first) to note that the D.C. Circuit in *Bartel* stated that the "retrieval standard" is a "guideline" (i.e. not a "rule") (*Id.* at 1409); and will fail to discuss the purposes of the Privacy Act and the fact that *Bartel* found the retrieval "guideline" inapposite where it made "little sense in terms of the [Act's] underlying purpose" and where the retrieval "guideline" "would deprive the Act of all meaningful protection of privacy." *Bartel,* 725 at 1409, 1411. Exactly as in footnote 15 at page 1411 of *Bartel,* there was a disclosure by an agency official of a record (i.e. the video) that the investigator (i.e. Gruden, who, at the least, wrote the DEA-6 Report of Investigation of the AD) was maintaining for the shooting investigation (whether he or IN did the on-site investigation) and as part of his role in preparing his Report of Investigation and the related DEA-485 Report of Shooting. If anything, the instant case is even more deserving of the principle set forth in *Bartel* than the situation in *Bartel* itself.

9

The Government argues at page 5 of its brief that Paige "could not show that whoever made public a 4:09 version of the video did so **knowing** that the shooting video was privacy protected." (Emphasis added). In light of the extreme security precautions required at the DEA, it is most remarkable that the Government would make such an argument. In fact, as discussed below, the well-known security requirements at the DEA all by themselves conclusively prove intentional or willful conduct here.

The Government appears to be arguing that Paige must prove that agency employees acted with specific or actual intent to violate the Privacy Act. This Circuit specifically rejected such a standard in *Tijernia v. Walters,* 821 F.2d 789, 799 (D.C. Cir. 1987) (Standard does not require an "actual intent to violate the Privacy Act" or that the official "set out purposely to violate the Act"). This Circuit has construed the statutory provision to require one of two alternatives: conduct "'somewhat greater than gross negligence,' [citations omitted] or, an act committed 'without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.' *Albright [v. United States],* 732 F.2d [181,] 189 [D.C. Cir. 1984)]." *Waters v. Thornburgh,* 888 F.2 870, 875 (D.C. Cir. 1989) (emphasis added), *overruled on other grounds, Doe v. Chao*, 540 U.S. 614 (2004). Here, as in *Waters,* the uncontradicted material facts are sufficient to prove the requisite intent under any alternative of the formulation.

The disclosure of the video violated probably the most important, most emphasized and best known rule by all personnel at the DEA. All investigatory reports (such as the DEA-6 Report of Investigation written by Gruden) and investigatory information or records (such at the **Mini-DV**) are designated by DEA rules as "DEA-Sensitive" and no DEA employee may disclose such information or records to anyone, even in the DEA, without "first determining that the person has appropriate status, position and need-to-know." P&IManual,§8625 (Ex.209,p.1); AgentsManual,§6321(A)(1)and(A)(2)(b),§6322.1(Ex.208,pp.1,3)Ex.198,pp.1-3,¶¶27;Ex.204,p.3; Ex.205, pp.8-9. Further, DEA-Sensitive information and material cannot be "distributed outside

the DEA except where there is a specific need for the information to be referred to other agencies for their information or action."    P&IManual,§8625(Ex.209,p.1);AgentsManual,§6322.2 (Ex.208,p.4).  All disclosures of records to persons outside the DEA must be reported on a DEA Form 381.  AgentsManual§6327.1(Ex.208,p.15).  Sanctions for violation of such rules include reprimand to removal.  Ex.207,pp.5-6.

Upon starting duty, DEA employees must read and certify that they have read and understand the DEA's Standards of Conduct and must re-certify every year that they have read and understand the Standards of Conduct.[13]    AgentsManual,AppendixA(Ex.206,p.3).  All DEA employees understand, and must certify that they understand, from the Standards of Conduct that they, "as members of the law enforcement community, occupy positions of trust" (*Id.*at4); that they are required to "comply with all applicable regulations, guidance and policy regarding the safe-guarding, review and removal of documents by DEA personnel... and the security and integrity of official records" (*Id.*at11); that they are prohibited from making "an unauthorized copy of any Government record for his or her own purposes," using information obtained through DEA employment for any "improper use" and divulging "administratively controlled" (i.e. DEA-Sensitive) "information to an unauthorized person" (*Id.*at11); that they may not remove any seized evidence or obtain and use "information not commonly available to the general public ... for nonofficial purposes" (*Id.*at14); and that they are prohibited from acting in a manner that "will cause the general public to . . . ridicule . . . the efforts of [the DEA] or its personnel" (*Id.*at15).

In addition, memoranda are sent from managing officials to all DEA employees from time to time reminding them of their obligations.  For example, in a June 2, 1999 memorandum to all DEA personnel, DEA management reminded and directed all DEA personnel that all

---

[13]    Supervisors, such as Gruden and Scully, are "held to a higher standard of conduct given their status as managers" and in fact are responsible for insuring that employees are informed of the foregoing DEA Standards of Conduct. *Id.*at3.

information or material that is investigative in nature is DEA-Sensitive; that a DEA employee must be approved, authorized and have a need-to-know to obtain access to DEA-Sensitive information; and that DEA-Sensitive information may only be provided to someone outside the DEA when there is supervisory concurrence, a need-to-know, and the non-employee is made aware of the safeguarding procedures for DEA-Sensitive information. Ex.205,pp.8-9. See also Ex.204,p.3 (September 15, 1998 memorandum to all DEA employees reminding them that "disclosure of information covered by the Privacy Act is a serious violation" and that "DEA employees will not disclose DEA information except as required by their duties and only to approved recipients with a need to know.").

DEA investigatory information, such as the **Mini-DV** here, must be kept under lock and key and may not be removed from a DEA facility unless "it is necessary to meet an operational or functional requirement." Ex.205,p.9. DEA-Sensitive processing is only permitted on computers which have been safe-guarded with, *inter alia,* user identification and password systems, automatic "time-out" protection for a period of inactivity and a limited number of log-in attempts. *Id.*at11.

The foregoing rules are so thoroughly emphasized by the DEA in training and day-to-day work that they are well-known to all DEA employees. Ex.198,p.1,¶¶2-7. In addition, non-DEA employees, such as government contractors and task force members, who have a need-to-know DEA-Sensitive material are made aware of the safeguarding procedures for DEA-Sensitive information. *Id.;*Ex.204,p.3. Government contractors and task force agents are trained as to DEA rules for not disclosing DEA-Sensitive information and are required to abide by the DEA Standards of Conduct. Ex.198,p.1,¶2;AgentsManual,§6334.4(C)(Ex.208,pp.21-22).

Consequently, the DEA in this case, no matter which employee, necessarily disclosed the video here "without grounds for believing it to be lawful." The Government speculates that "the hypothetical 'leaker' could have thought the Privacy Act did not extend to matters already within

the public domain."[14]   First, Paige need not exclude every speculative theory here.  *Washington*

*Hospital Center v. Butler,* 384 F.2d 331, 338n26 (D.C. Cir. 1967) ("the law is not so exacting

that it requires proof of negligence or causation by testimony so clear that it excludes every other

speculative theory.").  Next, there is no evidence whatsoever that any such person thought that in

this case.  In fact, since the "leaker" is obviously concealing his identity and falsely denying that

he disclosed the video, he certainly did not think that or otherwise believe it was lawful to

disclose the video.  Further, he could not have thought the video was already in the public

domain because the video was not in the public domain until he put it there.  Moreover, in light

of the foregoing DEA-Sensitive security rules, which are well known by all DEA employees, any

employee well knew that DEA records are DEA-Sensitive and are not to be disclosed to the

public whether or not they are already in the public domain.

The Government also suggests the possibility that the video was released by a

"government contractor, or by a state or local law enforcement officer, who might have

inadvertently received the video."   First, the Government's answers to interrogatories

specifically state that it did not contend that anyone outside the DEA, except the videographer,

could have been originally responsible for the disclosure of the video to someone outside the

DEA.  Ex.4,p.2,¶16.  Moreover, there is no evidence that any such person inadvertently received

the video.  Next, as pointed out above, since such people are well-trained not to disclose such

information, it is not a probable proposition.  Finally, the only way in which such a person could

have obtained such a video is through the intentional or willful violation by the DEA of its own

rules and Privacy Act requirements through the improper reproduction of an excessive number of

copies of the video and the failure to keep the video kept under lock and key.  *See*

P&IManual,§8627.1 (only "minimum" reproduction permitted of DEA-Sensitive information); 5

U.S.C. § 552a(e)(1) (agency is to maintain only information as necessary (e.g. minimum copies)

---

[14]   The fact that there was a "leaker" is obviously not "hypothetical."  Someone at the DEA disclosed the video.

to accomplish agency's purpose); P&IManual,§§8628.2and8628.4 (Privacy Act records "must not be left unattended outside the authorized storage area," which is a "locked filing cabinet."); Ex.205,p.9 (investigatory information must be kept under lock and key).

It is not necessary to identify a particular person in this case because whoever disclosed the video must have necessarily done so intentionally or willfully. However, it is now clear that it is more probable than not that Gruden disclosed the video to the Internet. In addition to the already extensive evidence discussed in Paige's prior briefs,[15] it is now clear that Gruden anonymously sent a copy of his 4:09 CD (**D-8**) to the Miami Division firearms training office, which is responsible for conducting firearms training for the DEA agents in all of Florida and the Bahamas. *See* footnote1,*supra;*Ex.85,pp.4-5,9-10;Ex.198,p.5,¶19. This CD contains a time/date stamp which reflects that the CD was created on May 10, 2004 or later which means that this CD is not one of the four CD's originally burned for Gruden in the Orlando technical office by Shafer on or about April 15, 2004. Ex.13. Further, **D-8** is a different brand of CD (i.e. "Imation") than the brand of CD's (i.e. "TDK") which were used by Shafer to make the original four 4:09 copies of the **Mini-DV** in Orlando. Ex's. 210-212. The foregoing further shows that Gruden's testimony that he destroyed his remaining CD's around April 21, 2004 (Ex.78,pp.193-194) and that he was not aware of any CD's other than the ones originally provided him by the Orlando technical office (Ex.78,p.186) were deliberate falsehoods. This and other false

---

[15] This includes the following: the fact that it was the 4:09 copy that Gruden originated that ended up on Firebird and the Internet; his animus toward Paige; pointing a gun at Paige; yelling at Paige in front of other agents and giving Paige an unwarranted and unheard of punishment for being late to a meeting; improperly giving Paige a career-wrecking evaluation which had to be withdrawn because it was unauthorized; telling Paige that he should not be a DEA special agent; distributing 4:09 copies to friends, even one who did not ask for it; improperly showing the video to other agents; improperly providing the video to other agents for viewing and copying; causing the original four unnecessary and unauthorized CD copies to be made by the Orlando technical office (Shafer), which were of the AD only; having at least 7-9 CD's which means he had additional unnecessary and unauthorized copies made which he has since falsely testified about; having a motive to conceal his disclosure of the video because of well-known prior misconduct which could be investigated by OPR in addition to the existing OPR investigation of him for the illegal disclosure here; a lack of respect for the DEA rules because of an ability to avoid punishment for alleged wrong-doing as a result of his father's former position at the DEA; improbable failures of recollection (i.e. claiming not to know why he had any copies made or why he had only the 4:09 portion of the AD made); false testimony (see next footnote); and another instance of false statement in which he lied to the police when he helped an acquaintance elude police surveillance and a police chase.

testimony[16] by Gruden raises the inference that he is the one who also disclosed the video to the public. *See U.S. v. Philatelic Leasing,* 601 F.Supp. 1554, 1555-1556n10 (S.D. N.Y.) (When a litigating party resorts to "falsehood or other fraud" in trying to establish a position, it may be inferred that his cause lacks truth, and the inference operates not just as to any specific fact, but "indefinitely though strongly against the whole mass of alleged facts constituting his cause.").

Gruden also sent the CD (**D-8**) to the Miami firearms training unit anonymously and with the word "**Training**" written on the CD itself with no cover letter. Ex.212;Ex.85,pp.11-12,15-16. This caused Naughton to believe that the CD was to be used for training purposes by the Miami firearms training office. Ex.85,p.27. In other words, this was a calculated effort by Gruden to anonymously manipulate the Miami firearms training office into using his 4:09 CD (**D-8**) as a firearms training film in the Miami Field Division for the approximately 400 agents in Florida and the Bahamas. Ex.198,p.5,¶19. This is consistent with Gruden's prior efforts to embarrass Paige and to destroy his career and, in doing so, also serves the purpose of destroying Paige's credibility in the event that someone attempts to criticize Gruden for allowing Paige to display weapons at the DRP. Gruden's maliciousness here also adds to the evidence of intentional or willful conduct.[17]

---

[16]     Gruden falsely testified, *inter alia,* as to when he sent the 4:09 CD (**D-8**) to Miami (*cf.* Ex.78,pp.161-162;Ex.85,pp.8-9); whether Collins asked him to send the CD to Miami (*cf.* Ex.178,p.162;Ex.73,pp.67,77-78,108); when he sent a 4:09 CD (**D-2**) to Derr (*cf.* Ex.78,p.123;Ex.75,pp.9-10,14-15); when he sent a 4:09 CD (**D-3**) to Bendekovic (*cf.* Ex.78,pp.145-148;Ex.67,pp.7,14;Ex.1,pp.13-14); that he did not tell Paige he should only be doing DRP's (*cf.* Ex.78,p228;Ex.110,¶9); and that he did not point a gun at Paige (*cf.* Ex.78,p.228;Ex.110,¶9). Gruden also testified falsely that he was not aware that Paige would display weapons at the DRP. Ex.278,pp.240-241;Ex.198,¶17. Similarly, as Paige's supervisor and concerned about being criticized for allowing Paige to display weapons, Gruden made gratuitous, false exculpatory statements in his DEA-6 Report of Investigation that Paige got authorization from him to give a DRP and requested authorization to take a shield and battering ram as props for the presentation. The purpose of these false statements was to imply that Paige did not have authorization to take weapons and that he (Gruden) did not know that Paige would take weapons. Paige did not seek "authorization" to give the DRP or to take props. Ex.198,pp.4-5,¶17. In fact, Gruden admitted that his assertion in his Report of Investigation that Paige requested authorization to take props was false. Ex.286,pp.216-217. Moreover, Paige told Gruden that he would also be taking weapons to use at the DRP. Ex.286,p.76; Ex.197,pp.4-5,¶17.

[17]     The evidence that Gruden disclosed the 4:09 CD also includes the absence of others who had the opportunity or motive to disclose the 4:09 CD. Other agents who received and could have disclosed the 4:09 Gruden copy include Derr, Bendekovic, Maltz, Lutz, Gagliotta, Naughton and Scully. Except for Gruden and Bendekovic, all agents who had the 4:09 copy have denied providing the video to anyone else. Bendekovic claims he only provided the video to Maltz. Lutz, Derr, Bendekovic, Maltz and Gagliotta are less probable suspects because of their sworn denials, credibility and lack of motive. Although Maltz's CD copy (**D-7**) remains

## Purported 552a(b)(1) Justification

The Government attempts to justify the distribution of the 4:09 copies under § 552a(b)(1) which permits disclosures "to those officials and employees who have a need for the record in the performance of their duties." The Government basically argues that because the video was a "powerful gun safety lesson," it could be freely distributed to virtually anyone in the DEA. Under this theory, which is meritless, any record of misconduct could be distributed around the DEA to teach lessons. Consistent with the P&I Manual, Burns testified that the only personnel authorized to look at the DEA-Sensitive IN file (which included the video) were the inspectors involved in the investigation, the BPC, the Deciding Official, the Office of Training, OPR, and Paige. Ex.70,pp.67-68. IN kept and still keeps the video under lock and key and destroyed copies at the close of the investigation. The SAIRC declined to send the file to the Office of Training for lessons learned. When the Office Training did receive copies of the video, the head of the Firearms Unit at the Office of Training (Lutz) locked up the video to avoid "improper dissemination" and finally destroyed it because it was "evidence."[18, 19] Ex.80,pp.27-28,32. Even

---

unaccounted for, there is no evidence it was not kept in a DEA secure building. Naughton would be next less probable as a result of his denial and lack of motive. Scully would also be less probable than Gruden since, *inter alia*, he still had his 4:09 copy when he was transferred to Tampa in May, 2004. Contrary to the Government's assertion that the video did not appear on the Internet until March, 2005, the videographer testified that he saw the video on the Internet "less than three weeks" after the **Mini-DV** was taken from him by the DEA. Ex.69,p.28. While the videographer also said it was six weeks at the most when he saw the video on the Internet, his stronger impression was that it was less than three weeks. This means that the video was disclosed to the public while Scully still had his copy (i.e. he had not given his copy to someone else or misplaced it) and also before Bendekovic, Maltz and Naughton received their copies. Scully cannot account for his copy which might otherwise also implicate him, especially in light of his testimony which is replete with failures of recollection. Even if Scully had somehow misplaced his copy and that copy appeared on the Internet, his conduct concerning the loss of the video would have been more than gross negligence and a flagrant disregard of Paige's rights since Scully was a supervisor subject to higher standards and well knew that he was not to have a copy of the video, that it was not to be removed from the Orlando office and that it was to be kept locked up. Scully violated all these rules. Moreover, in any event, Gruden intentionally and willfully gave this copy to Scully in violation of the Privacy Act in the first place.

[18]    Even Santillo, the Government's firearms expert witness from the Firearms Unit, did not use the video he received to teach lessons, but deleted it because it was not something he was "going to need in the future."[18] Ex.92,p.46. The Miami Field Division's firearms training office also did not use the video for any type of formal training, but showed it for the amusement of anyone who happened to wander into their office and asked to see it. The agents in Miami and Jacksonville who claimed they were showing it to other agents for the purported purpose of learning lessons were directed by their superiors not to show the video.

[19]    The DEA also suggests that it could have released the video to the press under the "routine use" exception in 5 U.S.C. § 552a(7) and 52 Fed. Reg. 47,213. Actually, it could not have. Routine use of investigative information for the "news media" is governed by § 6326 of the Agents Manual. *See* AgentsManual, §6327.2(C)(4)(Ex.208, p.5. Section 6326.3 of the Agents Manual narrowly limits such disclosures to situations not

Gruden said he purportedly sent the CD to Derr because it was "something you didn't see every day," not to learn lessons.  Ex.78,p.128.

## FTCA CLAIM: PUBLIC DISCLOSURE OF PUBLIC FACTS

Most of the issues concerning the FTCA claim are addressed in Paige's Response to the Government's MSJ.  However, a couple of matters should be noted.  First, as discussed above, there is additional evidence that the DEA (i.e. Gruden) attempted to give publicity to the 4:09 video by anonymously sending it to the Miami firearms training unit in a calculated effort to have the video used in firearms training for 400 agents throughout Florida and the Bahamas.

Next, the Government asserts that Paige's argument that the private fact here is the video itself, and not the AD, is a purported attempt to create a new distinction in privacy law.  This is not a new distinction in privacy law, but common sense.[20]  Even the authorities cited by the Government support this common sense difference.  The Government notes that comment b Restatement (second) of Torts §652D, states that "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public."  However, the video itself and most of the information in the video, including Paige's identity, had not been made public.  Indeed, the Government's position here is specifically rejected by one of the illustrations to the very comment that the Government relies on.  Illustration 7 to comment b states the following;

> A gives birth to a child with two heads, which immediately dies.  A reporter from B Newspaper asks A's permission to photograph the body of the child, which is refused.  The reporter then bribes hospital attendants to permit him, against A's orders, to take the photograph, which is published in B Newspaper with an account of the facts, naming A.  B has invaded A's privacy.

---

relevant here and, further, specifically requires that an agent's identity and evidence not be released.  Ex.208,pp.12-14.  Moreover, 52 C.F.R. 47,213 prohibits release of information that "would constitute an unwarranted invasion of personal privacy."  In any event, the video was not disclosed to the "news media."  In fact, the DEA made efforts to keep the news media from obtaining the video.

[20]    As pointed out in Paige's Response to the Government's MSJ, the DEA itself recognized this distinction when it would not permit Paige to try to rehabilitate his reputation by showing a surveillance film of his dangerous undercover work because it was covered by the Privacy Act even though the events depicted in the video were described at a public trial.

In that illustration, although the information that the baby had two heads was known to the reporter (i.e. the public), publication of the illegally obtained photograph was a violation of privacy.  Similarly, Paige's AD was known to the public, and the publication of the illegally disclosed video was a violation of privacy.  *Cf. Com. v. Kean,* 556 A.2d 374, 382 (Pa. Supr., 1989) (Distinguishing between the "uniquely invasive nature" of a video of sexual activity compared to bragging about the conduct depicted in the video and stating "[o]ne does not need a law degree in order to understand that a picture is worth a thousand words").  The Government's cases also do not support its position.  In *Four Navy Seals v. Associated Press*, 413 F.Supp. 2d 1136, 1144-1145 (S.D. Cal. 2005), the court found that the plaintiffs depicted in photos had no privacy rights regarding the photos because they published them on the Internet.  Moreover, by implication, although the photos showed public conduct by the plaintiffs (i.e. military operations in Iraq), the photos themselves would have been private facts had the plaintiffs themselves not published them.  *See also Heath v. Playboy Enter's, Inc.,* 732 F.Supp. 1145, 1149 (S.D. Fla. 1990) (publication of photograph did not violate the plaintiff's privacy because it was taken in public and "obtained by legitimate means.").

The Government misstates the Restatement (Second) of Torts § 652D by referring to comment c and stating that matters are not highly offensive simply "because they lead to annoyance or embarrassment."  Comment c does not make any reference to embarrassment and states that only "minor and moderate annoyance … is not sufficient to state a cause of action."  Being subject to "derision and loss of reputation" is far greater than even embarrassment, to say nothing of "moderate annoyance."

The Government argues that disclosure of the tape was not highly offensive because Paige was no longer doing undercover work and had given many DRP's.  Paige gave many DRP's in Tampa while he was working undercover.  Just like testifying in court, it is not thought by the DEA that giving DRP's endangers the safety of an undercover agent.  Paige was not told

18

that he could not work undercover until after the video was disclosed on the Internet.  Moreover, Paige had worked undercover before and was subject to retribution by drug dealers in previous cases, including the dealers who made the $6 million threat in his life.

Although Paige applied for a full-time DRP coordinator position when he returned to Orlando, he did not receive the position and was directed to do enforcement work.[21] Ex.286,pp.25-31.  Paige was available and in fact was requested by his group supervisor to be the undercover agent on several cases, but the cases did not materialize and he was not needed. Ex.198,p.4,¶14.

## GOVERNMENT'S DEFENSES

### Non-Pecuniary Damages

The issue of non-pecuniary damages is discussed in Paige's Response to the Government's MSJ and Paige's MSJ.  As pointed out in those briefs, every case decided by this District on the issue since 1986 has allowed non-pecuniary damages under the Privacy Act including the six cases cited there.  In addition, Plaintiff forgot to include *Boyd v. Snow,* 335 F.Supp.2d 28, 39 (D.D.C.2004).  As a result of recent news about the $5.8 million settlement in the anthrax Privacy Act case, another D.C. district case has come to the attention of the Plaintiff. In *Hatfill v. Ashcroft,* Civ. A. No. 1793 (RBW), the issue of non-pecuniary damages was far more extensively briefed there than was done in this case due to page limitations.  The relevant briefs and oral argument in *Hatfill* are included here as exhibits 199-202.  Notably, the Government included the same arguments in that case as it did here, including the argument based on sovereign immunity.  After considering the extensive briefs and oral argument, Judge Walton denied the Government's motion to preclude non-pecuniary damages.  Ex.202 (oral ruling) and Ex.202a (written order).

---

[21]    Paige could not work undercover in the Bahamas since he was "assigned to a foreign environment" and therefore was not working undercover at the time one local paper in the Bahamas published one picture of him." Ex.203,p.4.  Although Paige's name was put in a Sport Illustrated article by the DEA (not by Paige), his facial identity was not revealed.

### Unclean Hands

First, the undersigned is chagrined to acknowledge that he cited the D.C. District case,

*First American Corp. v. Al Nahyan,* 17 F.Supp.2d 10 (D. D.C. 1998) under the mistaken belief

that it was applying federal law in the D.C. District (as opposed to D.C. "state" law).  On the

other hand, the Government has cited to no cases in which any court has applied the "unclean

hands" doctrine to a Privacy Act case.  *Cf. EEOC v. Recruit U.S.A., Inc.,* 939 F.2d 746, 753-55

(9th Cir. 1991) (Defense of unclean hands unavailable to prevent plaintiff's recovery under Title

VII because its exercise would be contrary to the great public interest).[22]  In addition, even if the

doctrine were factually and legally applicable to a case, the court still has discretion not to apply

the doctrine. *Id.* at 754

The type of conduct constituting unclean hands is an "unconscionable act."[23]  *Keystone*

*Driller Co.,* 290 US 240,245 (1933); s*ee Matter of Garfinkle,* 672 F.2d 1340, 1346n7 (11th Cir.

1982) ("Bad faith… trickery and deception…fraud, injustice or unfairness").  Paige was giving a

DRP at which the goal was to convince disadvantaged children not to use drugs or to touch

weapons.  Paige had given hundreds of DRP's and had received many commendations for his

work.  The DEA and both Paige's supervisor and ASAC knew that he used weapons at his DRP.

Paige never previously displayed a loaded weapon and he had no intention of doing so in this

case.[24]  The head of the group who invited Paige spoke highly of Paige's DRP, including the

---

[22]    The great public interest here, as is repeatedly pointed out in the history of the Privacy Act, is to safeguard the public from unwarranted dissemination of information in light of the Government's vast power to collect investigatory information.  Further, as pointed out in *Johnson v. Dep't. of Treasury, I.R.S.,* 700 F.2d 971, 976n9 (5th Cir. 1983), the legislative history shows that the Privacy Act was "designed to encourage the widest possible citizen enforcement through the judicial process." Application of the unclean hands doctrine would chill these objectives and is also particularly questionable in the context of privacy rights since the very reason for the need for privacy is that the conduct sought to be kept private may involve conduct which the Government would be quick to characterize as unclean hands.

[23]    The Government seriously miscites *May v. Nygard Holdings, Ltd.,* 2007 WL 2120269 at *3 (N.D. Fla. July 20, 2007) by quoting from that case that unclean hands "bars *all* relief …" but left out the words "based on a plaintiff's own involvement in fraud…"

[24]    Even after he had his AD, Paige immediately instructed the youths that his AD was an example of why they should never touch a gun.

weapons demonstration. The fact that Paige had an unfortunate, unintended accident while attempting to help children, could not be further from an "unconscionable act."

Next, the courts require that there be an "immediate and necessary relation" between the unconscionable act and the transaction at issue in litigation.[25]  *Keystone Driller Co., Id.* at 245; *Shondel v. McDermott*, 775 F.2d 859, 869 (7th Cir. 1995) (Posner, J.) ("direct nexus"). Here, there is no "immediate and necessary relation" between the AD and the conduct (i.e. disclosure of the video) for which damages are sought in this lawsuit.  Paige did absolutely nothing that contributed in any respect to the improper disclosure of the video and the Government took no "action in reliance on [Paige's] conduct."  *See McIntosh v. Hough,* 601 So.2d 1170, 1172-1173 (Fla. 1992) (Party asserting unclean hands must have taken "action in reliance on that conduct."). Under the Government's theory, the Privacy Act would lose much of its vitality since many things intended to be kept private under the Act will necessarily involve some type of misconduct[26] which the Government would attempt to characterize as "unclean hands." Under the Government's theory here, the IRS could leak anyone's tax return as long as it contained an error.

All the cases relied on by the Government involve intentional bad faith that is directly and necessarily related to the transaction or conduct at issue in the lawsuit, including such things as a case alleging copyright infringement caused by the dereliction of the plaintiff's own agent and other cases involving fraudulent conduct by the plaintiff with respect to the same product or securities at issue in the case.

---

[25]     The Government refers to an exception to the immediate and necessary relation rule where a plaintiff's action is condemned by statute, or is against public policy, and the right sought to be vindicated is inimical to public welfare."  *Maltz v. Sax,* 134 F.2d 2, 5 (7th Cir. 1943).  Of course, Paige's DRP and this case involves none of these.
[26]     *See e.g. Tripp v. Dep't. of Defense,* 19 F.Supp.2d 85 (D.C. 2002) (Disclosure of Tripp's false answer to a question concerning her arrest record on a security clearance form).

## **Waiver and Forfeiture**

The Government's arguments on forfeiture and waiver are illogical and continue to ignore the difference between Paige's DRP and the video and Paige's rights concerning disclosure of the video after its seizure by the DEA.[27]  The Government argues that Paige forfeited any privacy rights he had in his "presentation" because he gave his DRP and allowed it to be recorded.[28]  However, by initially allowing the recording of his DRP, Paige did not forfeit any privacy rights he had with respect to the video after it was seized by the DEA for a DEA-Sensitive investigation.

Next, the Government argues that Paige cannot complain about the "later use or circulation" of the video sent to Miami (**D-8**) because he did not object to one person watching it with him during his remedial training.  Paige only allowed the other remedial trainee (who also had an AD) to watch it because the instructors had already shown it to so many other people.  Gov't.Ex.2,p.188.  Nonetheless, Paige complained to the instructors about showing the video to other agents and asked them not to do it, and they agreed not to show it.[29]  Ex.85,pp.50-59;Gov't.Ex.2,p.118.  Moreover, the instructors were ordered by their superior not to show the video.  Ex.85,pp.24-25.  Consequently, Paige has not waived any privacy rights regarding any later use or circulation of that video.

Next, the Government asserts that there was a broader waiver barring any recovery because Paige voluntarily appeared on several media shows in which the video was also shown.  As set forth in Paige's MSJ, and not addressed by the Government, the only reason Paige agreed

---

[27]    As pointed out by the Supreme Court in *U.S. v. Olano,* 113 S.Ct. 1770, 1777 (1993), whether there has been a waiver depends "on the right at stake."  The right at stake here concerns the right under the Privacy Act and Florida common law that the video not be disclosed, not any right to prevent anyone from discussing or describing the DRP.

[28]    Similarly, the Government argues that Paige waived or forfeited any right to claim that he was "adversely affected by the public's reaction to his presentation" because he gave his DRP.  Paige gave his DRP to a private group at a private meeting, not to the public.  Moreover, Paige is not claiming that he was adversely affected by the "public's reaction to his presentation," but that he was adversely affected by the public's reaction to the video after it was improperly disclosed by the DEA.

[29]    Paige had also previously complained to his ASAC, the Tampa firearms instructor, and one of the IN inspectors that the video was being shown in Miami, including by the firearms office.  Ex.1,p.14;Ex.73,p.115;Ex.286,p.115.

to give media interviews after his lawsuit was filed was to attempt to mitigate the damage to him which was caused by the improper disclosure by the DEA.  Paige even obtained permission from the DEA to make the media appearances.  *See* Ex's.61,62,52,53.  Paige not only had the right, but had the obligation to attempt to mitigate the damages which had been done to him by the previous disclosure of the video.  Further, even if Paige's efforts turned out to be unsuccessful and he actually increased the loss, he can still recover the loss incurred in the process as long as he acted reasonably.  *Tennessee Valley Sand & Gravel Co., v. M/V Delta,* 598 F.2d. 930, 933 (5th Cir. 1979).  Further, the issue of Paige's media appearances is an issue to be considered with respect to mitigation damages or the doctrine of "avoidable consequences," not liability.  See *Federal Ins. Co. v. Sabine Towing & Transp. Co.,* 783 F.2d 347, 350 (2nd Cir. 1986) ("… the rule of avoidable consequences is not a defense; it applies 'only to the diminution of damages and not to the existence of a cause of action.'").

### Negligence-based Defenses

The Government concedes that the negligence-based defenses (contributory negligence, assumption of the risk and the fellow servant rule) are inapplicable.  However, the Government suggests that such defenses are valid since Paige is relying on a negligence principle, *res ipsa loquitur*, to prove his case.  As pointed out above, Paige is not relying on that principle.

### FECA

FECA does not apply here and is therefore not a bar to either count in this case for several independently sufficient reasons.[30]  The Government correctly points out at page 22 of its MSJ that this case only involves "such alleged injuries as embarrassment, humiliation, anxiety, emotional pain, loss of reputation and loss of enjoyment of life" from the disclosure of the video.  These injuries did not occur as a result of an accident during Paige's performance of his job

---

[30]     For a federal employee, FECA is the exclusive remedy "for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty."  "Injury" "includes in addition to injury by accident, a disease proximately caused by the employment and …"  5 U.S.C. § 8101.

duties, but because of the conduct of another DEA employee intentionally disclosing the video. The Government tries to get around this by asserting that Paige's injuries are causally related to Paige's improper handling of his firearm and AD at the DRP.  As pointed out in Paige's MSJ with respect to the contributory negligence defense, and uncontested by the Government, this type of argument has been repeatedly rejected on the grounds that the plaintiff's conduct was not a legal or proximate cause of the injury.  *See Matthews v. Williford,* 318 So.2d 480, 481, 483 (Fla. 2nd DCA 1975) ("a remote condition or conduct which furnishes only the occasion for someone else's supervening negligence is not a proximate cause of the result of the subsequent negligence."); *Kroon v. Beech Aircraft Corp.,* 628 F.2d 891, 894 (5th Cir. 1980); *Lamoree v. Binghamption General Hospital,* 68 Misc.2d 1051, 329 N.Y.S.2d 85 (1972) (Plaintiff's negligent gunshot wound to his thigh no defense to subsequent negligent treatment of wound).  Similarly, the injuries here were proximately caused by the disclosure of the video, not Paige's conduct.[31] The Government relies on cases involving the foreseeable "aggravation" of a prior FECA covered injury. [32]  Paige is not claiming an aggravation of injuries from his gunshot wound, which was covered by FECA, but injuries from totally different, causally unrelated conduct (i.e. an intentional violation of the Privacy Act).

Next, FECA is also inapplicable because the type of injury here does not constitute an "injury" under FECA.  *Mason v. District of Columbia,* 395 A.2d 399 (D.C. Cir. 1978) is in point. There,  a District employee sued the District on the common law claims of unlawful arrest and false imprisonment and asserted injuries involving "humiliation," "embarrassment," and "mental suffering."  The District argued that the case should be dismissed because FECA was the plaintiff's exclusive remedy since the incident occurred while the plaintiff was on duty. The D.C.

---

[31]     The Government's position would permit it, for example, to disclose medical reports of an employee who had negligently injured himself in an accident at work.  Under the Government's theory here, there would be little Privacy Act protection for federal employees since FECA would rarely cover the types of injuries that result from Privacy Act violations.

[32]     *See Balancio v. U.S.,* 267 F.2d 135 (2nd Cir. 1959); *Spinelli v. Goss,* 446 F.3d 159 (D.C. Cir. 2006).

Circuit held that FECA was "plainly inapplicable" because the plaintiff's non-physical injuries for mental suffering type damage were not within the ambit of FECA and that her common law claims were therefore not barred by FECA's exclusivity provision. *Id.* at 403. Similarly, since the only injuries here involve similar mental suffering type injuries, they do not constitute an "injury" under FECA and FECA is inapplicable. Further, the D.C. Circuit in *Mason* held that FECA did not apply there because there was no "disability or death." *Mason*, 395 A.2d at 403-404. Similarly, there is no FECA "disability" here, and FECA is inapplicable for that reason as well. The cases relied on by the Government are inapplicable because, *inter alia,* they concern injuries involving a FECA injury and disability.[33]

Since FECA is inapplicable here, it is not a bar to either Paige's Privacy Act or FTCA common law claims.[34]

Respectfully submitted,

S/Ward A. Meythaler
Ward A. Meythaler

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 14, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

---

[33]     *See Scott v. U.S. Postal Service,* 2006 WL 2787832 at *4 (D.D.C. Sept. 26, 2006) (Plaintiff also filed FECA claim for FECA injury and disability); *James v. Spencer,* 1992 WL 167095, at *1 (D.D.C. June 16, 1992) (complaint construed to indicate injuries covered by both FECA and the Privacy Act); *Vogrin v. B.A.T.F.,* 2001 WL 777427, at *8 (N.D. W.Va March 20, 2001) (Plaintiff also filed FECA claim for FECA injury and disability); *Smith v. Nicholson,* 516 F.Supp.2d 832 (S.D. Tex. 2007) (Plaintiff alleged a FECA physical injury and filed a FECA claim.). In addition, *Smith* involved disclosures and malicious rumors at work, not disclosures to the public. Finally, *Smith,* including its reliance on *Trippets v. U.S.,* 308 F.3d 1091 (10th Cir. 2002), would be contrary to the D.C. Circuit's decision in *Mason v. D.C., supra,* if it only involved mental suffering type injuries.

[34]     A very strong argument can be made that FECA does not provide the exclusive remedy in cases involving the Privacy Act and a fundamentally linked common law claim just as FECA does not provide the exclusive remedy in Title VII cases. *See Webb v. Hyman,* 861 F.Supp. 1094, 1101-1102 (D. D.C. 1994); *Nichols v. Frank,* 42 F.3d 503, 514-515 (9th Cir. 1994), abrogated on other grounds, *Burlington v. Ellerth,* 524 U.S. 742 (1998); *Miller v. Bolger,* 802 F.2d 660, 664-666 (3rd Cir. 1986). However, since there is no proximate causation here between the DRP and Paiges' injury and since *Mason* is dispositive in any event that FECA is inapplicable because there is no FECA injury and disability here, it is not necessary to resolve that issue.

Peter J. Phipps
United States Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044

s/Ward A. Meythaler
Ward A. Meythaler
Florida Bar No.: 0832723
Merkle & Magri, P.A.
5415 Mariner Street, Suite 103
Tampa, Florida 33609
TEL: (813) 281-9000
FAX: (813) 281-2223
wamsecy@merklemagri.com