UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

LEE PAIGE,

    Plaintiff,

v.                                    CASE NO.: 01:06-cv-0644

UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION, et al.

    Defendants.
_____/

## THIRD AFFIDAVIT OF LEE PAIGE

I, Lee Paige, the Plaintiff in this case, state as follows:

1. The following statements, unless otherwise indicated by the context, are applicable to the times relevant to this lawsuit, including since my accidental discharge on April 9, 2004.

2. DEA personnel are trained and have been so trained since before my accidental discharge to be careful not to disclose DEA-Sensitive information, including investigatory reports and records, to unauthorized people. In fact, one of the most important concepts learned at training for DEA personnel and employed in day-to-day work is that DEA investigatory information is DEA-Sensitive and must be secured, protected and not disclosed except as set forth in the Agents Manual and various memoranda that DEA personnel receive concerning the security of DEA-Sensitive information. Moreover, DEA employees are required to be certified annually that they have read and understand the DEA's Standards of Conduct that also prohibit the making of an unauthorized copy of any Government record for his or her own purposes and divulging any administratively controlled information, such as DEA-Sensitive material, to an unauthorized person. Government contractors and DEA task force members from state, county and local law enforcement agencies are also trained as to the DEA rules for not disclosing DEA-Sensitive information. In addition, Government contractors and task force members from state, county and local law enforcement agencies agree to and are required to abide by the DEA Standards of Conduct.


PLAINTIFF'S EXHIBIT 198

3. All DEA agents are provided an Agents Manual that contains rules and regulations concerning, among other things, document security and the dissemination of information. In addition, all DEA agents are trained in these matters.

4. From the information in the Agents Manual, memoranda provided by managing officials and the training provided to DEA agents, it is well known to all DEA agents, especially group supervisors, that all DEA investigative reports and records are designated "DEA-Sensitive," whether or not the material is so marked; that such information is to be secured under lock and key in a secure DEA facility when unattended; that access to such materials by DEA and other Department of Justice personnel is limited to a need-to-know basis; and that such materials are not to be removed from a DEA office unless necessary for some DEA requirement.

5. From the information in the Agents Manual, memoranda provided by managing officials at the DEA and the training provided to all DEA agents, it is well known to all DEA agents, especially group supervisors, that dissemination of investigative information within the Department of Justice is limited to recipients with a need for the information to perform their duties or functions. Similarly, it is well known to all DEA agents, especially group supervisors, that release of investigative information to someone outside the Department of Justice is generally only authorized on a need-to-know basis to certain agencies and persons, such as various federal, state and local law enforcement and regulatory agencies and various other governmental agencies, for use in the discharge of DEA law enforcement or regulatory responsibilities.

6. From the information in the Agents Manual and the training provided to DEA agents, it is well known to all DEA agents, especially group supervisors, that all disclosures made to persons outside the Department of Justice, except disclosures made pursuant to the Freedom of Information Act (and

certain other circumstances not relevant here), are accountable in that such disclosures must be reported on a DEA form 381.

7. From the information in the Agents Manual and the training provided to DEA personnel, it is well known to all DEA personnel that information that is part of an investigation is virtually never to be disclosed to persons in the general public.

8. From information in the Agents Manual and the training provided to DEA agents, it is well known to all DEA agents, especially group supervisors, that all shootings involving an injury to a DEA agent will be investigated and reviewed by the Office of Inspections ("IN") (or IN will oversee an on-site investigation by the local office for IN) and that reports and records obtained for or in connection with such shooting investigations are DEA-Sensitive investigatory information. Specifically, the Mini-DV obtained in this case was such a DEA-Sensitive investigatory record and it would be well known to all DEA agents, especially group supervisors, that it was.

9. I have been trained with respect to the use of the Firebird computer network system and have been using the Firebird computer system most days I have been in the office since 1996. I am familiar with how to use DEA computers, including the sending of e-mails and attachments to the e-mails, including a video file.

10. In order to use a DEA Firebird computer, one must first use a username and a password to obtain access to the Firebird system. A banner appears on the DEA computers that information on the computer is DEA-Sensitive.

11. In order for someone to electronically transmit a video file, such as the 4:09 CD of my accidental discharge, whether over the Firebird system or from a freestanding computer at DEA, a person would have to engage in several distinct, intentional physical steps. The person would have to locate and obtain the 4:09 CD. The person would have to log in to the computer using a password and a username to obtain access to an e-mail system and open the outlook e-mail software. The person would have to type in the e-mail address of the recipient and possibly the subject matter as well.

3

The person would then typically type a message to alert the recipient as to the contents of the attachment to provide a reason to open it. The person would have to put the CD in the computer and locate the CD on the computer. Then, typically, the person would download the CD to the computer by opening the CD, highlighting the information to be downloaded, and pasting it on the computer's hard drive. Then the person would have to click the "insert" or "attach" file functions and then search for and identify the file (containing the video) to be sent as an attachment to the email. After the file had been located, the person would have to click on the file to be sent. An attachment symbol would then appear on the attach box of the e-mail to be sent. Then the sender would need to click "send" to send the e-mail with the attached video file.

12. Since before my accidental discharge, I and other agents have relied on the clocks in our DEA computers not only for the documentation of reports, but to actually know what time it is. In my experience, the clocks in DEA's computers that I have used have never been inaccurate.

13. The Orlando District Office is located on the fourth floor of an office building. The office is secured by card access. Without a card unlocking the door to the office, no one may enter the office.

14. When I was transferred to the Orlando District Office from the Bahamas, I was assigned to an enforcement group. I was prepared to and on several occasions requested by my group supervisor to work undercover on a case. However, the cases in which the group supervisor requested my assistance did not materialize to the point that an undercover agent was actually used.

15. During the entire time that I have been at the Orlando District Office, I have not heard of and am not aware of any instances in which non-DEA personnel such as a government contractor or a state, county of local law enforcement officer has without authorization physically taken or removed DEA investigatory information, including the Mini-DV in this case, from the Orlando District Office. In light of my position as the drug evidence custodian as well as the nature of the way in which rumors and gossip circulate in the Orlando District Office, I am reasonably certain that I would have heard about or been advised of any such alleged occurrence.

16. When I was in Peter Gruden's group at the Orlando District Office, the group consisted only of DEA special agents.

17. Several days before I had my accidental discharge, I advised Peter Gruden that I was giving the April 9, 2004, Demand Reduction Presentation ("DRP"). I also advised Mr. Gruden that I would be taking weapons to use as part of the DRP. Mr. Gruden did not indicate any disapproval or object to my taking and using weapons at the DRP. Further, I did not request "authorization" to conduct the DRP or to use a shield and a battering ram as props at the DRP. Here, as is typical, I simply notified Mr. Gruden that I was doing the DRP. I also simply notified Mr. Gruden that I was taking the shield and the battering ram to the DRP here so he would know where they were.

18. When a five-day suspension was proposed for me following my accidental discharge, the ASAC in my office indicated that he thought I would have received more time suspended.

19. The Miami Field Division includes all DEA offices in Florida and the Bahamas. There are approximately 400 special agents in the Division.

FURTHER AFFIANT SAYETH NAUGHT

LEE PAIGE
Affiant

Sworn to and subscribed before me on this 14th day of July, 2008, by LEE PAIGE, who is personally known to me or who has produced _____ as identification and who did/did not take an oath, states that he has read the foregoing Affidavit and asserts that all the information contained therein is true and correct to the best of his knowledge and belief.

Angela S. Merkle
Notary Public
State of Florida at Large
Printed Name: ANGELA S. MERKLE
My Commission Expires: 3/14/2009



ANGELA S. MERKLE
MY COMMISSION # DD 406857
EXPIRES: March 14, 2009
Bonded Thru Notary Public Underwriters