IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Steven J. HATFILL, M.D.,                    )
                                            )
            *Plaintiff*                     )
                                            )
       v.                                   )        Civil No. 1:03-CV-01793 (RBW)
                                            )        (Judge Walton)
Attorney General John ASHCROFT, *et al.*,   )
                                            )
            *Defendants.*                   )
                                            )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE NON-PECUNIARY DAMAGES OR TO COMPEL AN INDEPENDENT MENTAL EXAMINATION

As we approach the May 31, 2006 discovery cut-off date set by this Court, there is no

longer any question that the Department of Justice and the Federal Bureau of Investigation

violated the Privacy Act by revealing to the news media sensitive investigative information –

information that pertained to Dr. Steven J. Hatfill and the anthrax investigation. Defendants'

disclosures not only resulted in the loss of Dr. Hatfill's job, but also subjected him to

humiliation, anguish, emotional distress, and public opprobrium. Thanks to the defendants, Dr.

Hatfill has been forced to endure baseless speculation that he masterminded one of the most vile

terrorist attacks on American soil.

Numerous witnesses have testified under oath that many of the most damaging leaks

about Dr. Hatfill came from employees of the Department of Justice and the Federal Bureau of

Investigation. Over 100 such disclosures have already been laid to the defendants' account by

uncontradicted testimony. The evidence also establishes that for over two years the defendants

took no action either to stop these leaks or to mitigate the destruction they rained down upon Dr.



Hatfill's life. Faced with incontrovertible evidence of their own wrongdoing, the defendants are now reduced to caviling about whether they must pay Dr. Hatfill for *all* of the actual damage they caused him, or only some. The last five Privacy Act decisions from this Court that have addressed this issue have all recognized that a plaintiff may receive emotional distress and reputation damages for a violation of the Privacy Act, but the defendants ask this Court to revisit the matter yet again.

Dr. Hatfill hereby opposes the defendants' motion to preclude recovery for Dr. Hatfill's non-pecuniary injuries, for five main reasons. *First,* there is no plausible construction of the phrase "actual damages" that does not embrace damages for emotional or psychological anguish, provided that those non-pecuniary injuries can be proven actually to have occurred. *Second,* the legislative purpose that animates the Privacy Act – a purpose bespoken by the statutory text itself – makes clear that Congress intended to encourage private enforcement and the Act should be read broadly in service of that purpose. *Third,* analogous federal statutes that provided for recovery of "actual damages" at the time the Privacy Act was passed have been construed to permit recovery of damages for non-pecuniary injuries. *Fourth,* the legislative history of the Privacy Act tends strongly to support the natural, common-sense construction of the phrase "actual damages" to mean "all damages that are actual," as opposed to punitive damages or liquidated damages. *Fifth,* the defendants' reliance upon the doctrine of sovereign immunity is unavailing here, where Congress provided so explicitly for civil actions against the United States for actual damages. For these reasons, the motion to preclude recovery of non-pecuniary damages must be denied.

As an alternative to complete preclusion of non-pecuniary damages, the defendants ask the Court to order an independent mental examination of Dr. Hatfill. Because Dr. Hatfill is

2

asking the Court to award damages under the Privacy Act for the mental anguish the defendants inflicted (in addition to the pecuniary damage they caused him), Dr. Hatfill's emotional condition is obviously relevant under Rule 26. However, the standards for ordering an independent mental examination under Rule 35 require much more than mere relevance, and in this case the defendants have simply failed to carry their burden of showing that the plaintiff's mental condition is genuinely "in controversy" or that "good cause" exists for compelling him to submit to an involuntary psychiatric examination. Denial of the defendants' motion is particularly appropriate in this case, because a number of circumstances fairly suggest that the defendants might wish to conduct the examination in such a way as to wander into subject areas not covered by Rule 35. Accordingly, the defendants' request for an independent medical examination of Dr. Hatfill should be denied, or alternatively, conditioned upon the presence of Dr. Hatfill's counsel during the requested examination.

## I.    The Privacy Act Permits Recovery of All "Actual Damages," Not Just Out-of-Pocket Expenses.

The defendants assert that "[t]he D.C. district courts are divided on the question of whether the Privacy Act allows for non-pecuniary damages." Memorandum in Support of Motion to Preclude Non-Pecuniary Damages, *etc.* (filed May 4, 2006) (hereafter "Def. Mem."), at 8. Although there is not yet binding authority on this question from the Court of Appeals or the Supreme Court, it is somewhat misleading to suggest that judges of this Court "are divided" any longer on the question. The last time any judge of this Court intimated that non-pecuniary damages might not be available under the Privacy Act was twenty years ago. *Pope v. Bond*, 641 F. Supp. 489, 501 (D.D.C. 1986); *Houston v. United States Dep't of Treasury*, 494 F. Supp. 24, 30 (D.D.C. 1979). Since that time, this Court has held without exception that non-pecuniary

3

damages (such as damages for emotional distress) can be recovered as "actual damages" under
the Act. And in doing so, its analysis reflects the standard suggested by the statutory text: can
such damages be shown to have actually occurred?

In *Dong v. Smithsonian Institution*, 943 F. Supp. 69 (D.D.C. 1996), the plaintiff sued the
defendant Smithsonian under the Act for damages suffered by defendant's collection of
information potentially adverse to her from other sources, contrary to section 552a(e)(2) of the
Act. *Id.* at 72. The damages alleged by plaintiffs consisted of "emotional trauma and distress
and harm to her reputation. No claims were submitted for any out-of-pocket expenses." *Id.* at
74. In its Conclusions of Law, the court squarely addressed the availability of emotional distress
and reputation damages as "actual damages" under the Act. *Id.* The court adopted the holding
of *Johnson v. Department of Treasury*, 700 F.2d 971 (5th Cir. 1983), and concluded that such
non-pecuniary damages fell within the definition of "actual damages." 943 F. Supp. at 74. It
held:

> Actual damages under this provision of the statute encompass not
> only pecuniary losses, but also the ordinary elements of
> compensatory damages, such as mental depression and physical
> injury when these elements are supported by evidence in the
> record.

*Id.* The court ultimately concluded that the emotional damages alleged by the plaintiff did not
warrant recovery under the Act, but it awarded the plaintiff $2500 for damage to her reputation.

The adoption of the *Johnson* analysis was reaffirmed in *Alexander v. Federal Bureau of
Investigation*, 971 F. Supp. 603 (D.D.C. 1997). There, the court reviewed plaintiffs' claims
under the Act arising from what was known as "Filegate" – allegations that the FBI improperly
handed over certain of its files to the White House. *Id.* at 605. The defendants moved the court
to limit damages to economic losses and argued that the Act did not permit recovery for non-

4

pecuniary injuries. *Id.* at 607. The court denied the defendants' motion, citing the fact that, in *Dong*, the court had adopted the Fifth Circuit's analysis in *Johnson* and permitted recovery for non-pecuniary damages under the Act. *Id.*

In *Boyd v. Snow*, 335 F. Supp. 2d 28 (D.D.C. 2004), the court denied the defendant's motion for summary judgment on plaintiff's Privacy Act claim for emotional distress damages. There, the plaintiff had alleged sexual harassment by a supervisor in a written rebuttal to her employment evaluation, and the supervisor allegedly disclosed the rebuttal to others in violation of the Privacy Act. Although the Court expressed some skepticism as to "how this disclosure caused [plaintiff] 'severe emotional and physical harm, stress, sleeplessness and nightmares' above and beyond any injuries sustained from the alleged sexual harassment," it rejected defendant's motion, stating that it would "allow [plaintiff] to prove such 'actual damages' at trial." *Id.* at 39.

In *Montmayor v. Federal Bureau of Prisons*, No. Civ. A 02-1283 GK, 2005 WL 3274508 (D.D.C. 2005), the plaintiff, a prisoner, brought suit under the Act because the Bureau's misclassification of him as a gang member had caused him to be isolated, confined in a small cell, and restricted in his activities and access to personal property. *Id.* at *1, *5. Plaintiff alleged that he suffered physical injury and emotional distress due to BOP's error. *Id.* at *5. BOP urged the Court to enter judgment against the plaintiff on the ground that "actual damages" as defined in the Act precluded recovery for mental or emotional injury. *Id.* at *4. In so doing, BOP relied (as defendants do here) on the restrictive interpretation of "actual damages" adopted by the Sixth Circuit in *Hudson v. Reno*, 130 F.3d 1193 (6th Cir. 1997), *overruled in part on other grounds in Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001). *Id.* at *5. The court rejected the defendant's entreaties. It found the *Hudson* rationale "not ... persuasive" and

5

inconsistent with current precedent in this district. *Id. See also Rice v. United States,* 211 F.R.D. 10, 13-14 (D.D.C. 2002) (denying defendant's motion for judgment on the pleadings where plaintiff claimed no damages other than emotional distress).

Here, the defendants naturally try to minimize the persuasiveness of these prior decisions. *See* Def. Mem. at 8, 9 n.4. The Court, however, would be well-justified in considering the matter settled, at least until the Court of Appeals for this circuit issues a contrary opinion. As Judge Kessler observed last year in *Montmayor,* even though the issue remains undecided in this Circuit "it is clear that the recent trend at the District Court level has been to allow Privacy Act suits seeking general compensatory damages, such as pain and suffering and non-pecuniary losses, to proceed." 2005 WL 3274508 at *5. Furthermore, the Fifth Circuit's analysis in *Johnson,* which judges of this Court have found persuasive ever since *Dong,* has been bolstered by the analysis of the First Circuit in *Orekoya v. Mooney,* 330 F.3d 1, 3 (1st Cir. 2003), which held that "the Act permits an award of emotional distress damages," even though the plaintiff's proof of such damages was insufficient in that case.

However, even if the Court is inclined to approach this question as a matter of first impression, as we do in the discussion that follows, sound reasoning from first principles will compel the same conclusion that soundly reasoned opinions have already reached. The text of the statute, contemporaneous usage, its purpose, its legislative history, and plain common sense should all lead this Court to the same conclusion as its predecessors.

### A.   The Text of the Privacy Act Plainly Indicates that All "Actual Damages" May Be Recovered, Whether Pecuniary or Not

The civil remedies provision of the Privacy Act is found at 5 U.S.C. § 552a(g), which states in pertinent part:

6

> (4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—
>
> > (A) *actual damages sustained by the individual* as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and
> > (B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4) (emphasis added).

This very straightforward remedies provision is simply not the interpretive riddle the defendants would like to pretend it is. If one wants to know what kind of damages are permitted, all one has to do is read the statute to find the answer: "actual damages." If one wonders whether emotional distress damages are permitted, that answer is just as obvious: Yes, as long as the damages are "actual." Provided that the emotional distress is proven – that is, proven to be "actual" – then recovery is permitted by the plain language of the statute.

Furthermore, section 2(b) of the Act states – in language that Congress actually passed and the President actually signed – that the purpose of the Act was to protect personal privacy by making federal agencies "subject to civil suit for *any damages which occur* as a result of willful or intentional action which violates any individual's rights under this Act." Pub. L. 93-579 § 2(b)(6), 88 Stat. 1896 §2(b)(6) (1974) (emphasis added). This expression of Congressional purpose makes plain *right in the Act itself* that Congress was not using the phrase "actual damages" to mean anything fancier than "any damages which occur." [1]

---

[1]    Defendants relegate their treatment of this actually enacted expression of Congressional purpose to a single footnote in their brief. *See* Def. Mem at 13 n.7 (citing *Yazoo & Miss. Valley R.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889)). This appeal to a venerable authority from the Harrison administration misses the point. The importance of the statutory expression of intent in section 2(b) of the Act is not that it supplements or clarifies a vague or incomplete waiver of

The most striking thing about the defendants' attempt to avoid this construction is that they never actually identify anything about the phrase "actual damages" that suggests any reason why actual *non-pecuniary* damages would be excluded while actual *pecuniary* damages would be permitted. It is, of course, possible to distinguish between pecuniary and non-pecuniary damages, but nothing about the word "actual" suggests that it has anything to do with whether something is pecuniary or non-pecuniary.[2] The Oxford American Dictionary defines "actual" primarily as "existing in fact; typically as contrasted with what was intended, expected, or believed," and secondarily as "existing now; current." THE NEW OXFORD AMERICAN DICTIONARY (2001). Neither definition contains even a single element to suggest that pecuniary things are more "actual" than non-pecuniary things. Similarly, if we look at common synonyms for "actual," we find "real, true, factual, genuine, authentic, confirmed, veritable, existing." OXFORD AMERICAN THESAURUS OF CURRENT ENGLISH (1999). Emotional distress that has been proven to the satisfaction of the trier of fact in a federal courtroom is surely all of these.

An early decision by the Court of Appeals for the then-newly-created Eleventh Circuit seems to have muddied the water for later courts considering this question. In *Fitzpatrick v. Internal Revenue Service,* 665 F.2d 327 (11th Cir. 1982), the court found that the phrase "actual damages" had "no consistent legal interpretation." *Id.* at 329. The following year, in *Johnson v.*

---

sovereign immunity, but rather that it *confirms* the scope of the waiver that is expressly contained in the civil remedies provision of the Act. Such judicial recourse to Congressional intent to confirm plain meaning is routine. *Cf. Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 26, 28(1989) (finding that the statutory text "could not be clearer" but also determining that "[n]othing in the legislative history … militates against honoring the plain language").

[2] For example, in the preceding paragraph of this memorandum, we referred to "language that Congress *actually* passed and the President *actually* signed." We trust that no reader understood us to be implying that bribery of federal officials was in any way involved in the passage or the signing; the word "actually" does not imply any such thing because it has no financial connotation whatsoever.

*Department of Treasury,* 700 F.2d 971 (5th Cir. 1983), the Fifth Circuit similarly "conclude[d]

that the term 'actual damages' has no plain meaning or consistent legal interpretation." *Id.* at

974. For both courts, this conclusion seems to have been based on consideration not just of the

Privacy Act of 1974, but of the way the phrase "actual damages" had been used in earlier

decisions of courts within the Fifth Circuit. *See Fitzpatrick,* 665 F.2d at 329; *Johnson,* 700 F.2d

at 974. Both courts then undertook to analyze the legislative history of the Privacy Act, reaching

opposite conclusions as to whether non-pecuniary damages could be recovered.

     Following *Fitzpatrick* and *Johnson,* later courts considering this question have also

treated "actual damages" as a phrase in need of clarification. To the extent this Court is inclined

to approach the question as one of first impression, however, Dr. Hatfill urges the Court to find

that there is nothing ambiguous about the phrase in the context of this particular case. There may

well be some situations in which it is legitimately unclear whether some well-proven element of

non-pecuniary damages is or is not "actual" (though frankly we can think of none), but in any

event the damages claimed by Dr. Hatfill in this case do not lie in or near any such region of

ambiguity.

### B.    This Court Should Draw Substantial Guidance from the Stated Purpose of the Privacy Act

     Section 2(b) of the Privacy Act, which states that federal agencies are to be liable "for

any damages which occur" as a result of willful or intentional violations of the Act, was cited

above for what it tells us about Congress's own understanding of the phrase "actual damages."

But to the extent the Court finds any ambiguity in the phrase "actual damages," Congressional

purpose becomes even more important as an aid to construction. Both section 2 and the

remedies provision itself clearly bespeak a Congressional purpose to protect individual rights by

9

encouraging private enforcement. That purpose is flatly inconsistent with the notion that

Congress harbored some secret reservation about authorizing suits for non-pecuniary damages.

The Court of Appeals for the D.C. Circuit has expressly relied on the statement of

purpose set forth in section 2 of the Privacy Act, drawing "substantial guidance" from it in order

to inform judicial construction of the statute. *See, e.g., Pilon v. United States Department of

Justice,* 73 F.3d 1111, 1120-21 (D.C. Cir. 1996). In *Pilon,* the government argued that sending

protected records to a former employee who had left the agency did not constitute an unlawful

disclosure because the recipient already knew what was being disclosed. The court consulted

Congressional purpose before ultimately deciding upon a broader reading "that will give effect to

Congress' intent to protect the individual privacy of the subjects of protected records, except as

to those disclosures authorized by the Act." *Id.* at 1119. On the way to that conclusion,

however, the court offered more general guidance on how the Privacy Act should be construed:

> [I]n interpreting the terms of the Privacy Act *specifically,* we have
> in the past taken particular care not to undermine the Act's
> fundamental goals. Recognizing the Act's varied ambiguities we
> have consistently turned back "neat legal maneuvers," *Benavides v.
> U.S. Bureau of Prisons,* 995 F.2d 269, 272 (D.C. Cir. 1993),
> attempted by the government that, while literally consistent with
> the Act's terms, were not in keeping with the privacy-protection
> responsibilities that Congress intended to assign to agencies under
> the Act.

*Id.* at 1118 (emphasis in original). The court then proceeded to discuss various government

attempts to gut the Privacy Act, and how the court had turned them all back. *See, e.g., Bartel v.

FAA,* 725 F.2d 1403, 1409 (D.C. Cir. 1984) (holding that "an absolute policy of limiting the

Act's coverage to information physically retrieved from a record would make little sense in

terms of its underlying purpose."); *Tijerina v. Walters,* 821 F.2d 789, 797 (D.C. Cir. 1987)

(rejecting government argument that the Privacy Act permits agencies to exempt themselves

from the Act's liability provisions, which would "make[ ] the Act a foolishness"). And in *Pilon* itself, the court fended off yet another attempt by the Department of Justice to escape liability for the harm some private citizen had suffered as a result of the agency's chronic inability to maintain the confidentiality of its records.

This case is very much of a piece with *Bartel, Tijerina,* and *Pilon.* Just as the government tried to limit the definition of the violation in *Bartel* and *Pilon,* and just as the government tried to limit the applicability of the civil remedies provision in *Tijerina,* so the government in this case seeks to exclude one particular type of damages which, it just so happens, is the type of damages that victims of Privacy Act violations are overwhelmingly likely to suffer. *See Johnson,* 700 F.2d at 977 (precluding recovery for emotional distress or reputation damages would preclude recovery for the "normal and typical damage resulting from an invasion of privacy"). This Court must reject the government's argument, for the same reason the D.C. Circuit rejected the government's argument in *Bartel, Tijerina,* and *Pilon.*

As noted above, section 2(b) expresses a Congressional purpose to make agencies liable for "any damages which occur" as a result of a Privacy Act violation. This statement of purpose shows that the government's attempt to invent an unexpressed exception for certain kinds of damages is profoundly contrary to the purposes of the Act. In addition, the "actual damages" provision itself also evidences a Congressional purpose to encourage private enforcement. Specifically, Congress provided minimum damages of $1,000 regardless of whether the plaintiff could prove damages in that amount. *See* 5 U.S.C. § 552a(g)(4)(A). Furthermore, Congress provided that victims of intentional or willful violations of the Act should be awarded "the costs of the action together with reasonable attorney fees as determined by the court," 5 U.S.C. § 552a(g)(4)(B), a provision that is much more generous than is customary in other kinds of cases

11

and seems specifically calculated to encourage enforcement in situations where the pecuniary

stakes alone would not justify litigation. If damages for non-pecuniary injuries did not fit

comfortably within the phrase "actual damages," then these indicia of Congress's broad remedial

purpose might be of little import, but here they confirm the breadth of the statutory command

that victims of Privacy Act violations should be awarded "actual damages," without exception.

      **C.**      **Courts Have Construed the Phrase "Actual Damages" to Permit Recovery of Non-Pecuniary Damages Under Other Federal Statutes that Are Analogous to the Privacy Act**

At the time Congress was considering enactment of the Privacy Act, other federal statutes

had employed the phrase "actual damages" and it was understood that the phrase included

emotional and reputation damages within its purview. *See Orekoya*, 330 F.3d at 9 ; *Johnson*, 700

F.2d at 983. Because these statutes were either expressly used as models for the drafting of the

Privacy Act or were *in pari materia* with it, they provide important insight into the way Congress

likely intended the phrase "actual damages" to be construed in the Privacy Act.

The first of these three statutes is the Fair Housing Act. "Prior to the passage of the

Privacy Act, the term 'actual damages' in the Fair Housing Act, 42 U.S.C. § 3612(c), had been

interpreted by the courts to include damages for emotional distress and humiliation as well as

out-of-pocket loss." *Johnson*, 700 F.2d at 983 & n. 34 (collecting cases and noting that such

interpretation continued after passage of the Act); *Orekoya*, 330 F. 3d at 9 (same).

In addition, the Privacy Act "was based in part on the Fair Credit Reporting Act (FCRA),

15 U.S.C. §§ 1681-1681t (2000), which then and since has usually been interpreted to include

emotional distress damages within 'actual damages.'" *Id.* Although decisions interpreting the

FCRA post-dated enactment of the Privacy Act, the legislative history shows that Congress "had

the Fair Credit Reporting Act in mind when it was debating the Privacy Act legislation," and

both acts "were congressional responses to the need for the individual privacy guaranteed by the Constitution." *Johnson*, 700 F.2d at 984. The Senate Government Operations Committee specifically cited Congress's "experience with access and challenge provisions of the Fair Credit Reporting Act" in justifying the Privacy Act's provisions.[3]

In addition, the Crime Control and Safe Streets Act, 18 U.S.C. § 2520, enacted in 1968, permitted plaintiffs to recover for, among other things, actual damages. That act was subsequently held to entitle plaintiffs to recover actual damages if they suffered "grave emotional harm" as a result of a violation. *Gerrard v. Blackman*, 401 F. Supp. 1189, 1193 (N.D. Ill. 1975).

In their attempt to create ambiguity where clarity ought to reign, the defendants submit that there are other cases in which the phrase "actual damages" has been interpreted to exclude non-pecuniary damages. Def. Mem. at 3. But unlike the cases cited above, the three cases cited by the defendants have no apparent connection to the Privacy Act; indeed, two of the cases concern the interpretation of statutes with an obvious financial focus – the Bankruptcy Code and the securities laws. Moreover, one of the three cases even states that emotional damages "no doubt" *do* constitute "actual damages."

*Aiello v. Providian Fin. Corp.*, 239 F.3d 876 (7th Cir. 2001), illustrates how unhelpful the defendants' cases are to their argument. In *Aiello*, the court addressed whether emotional damages could be awarded for a violation of the automatic stay provision of the Bankruptcy

---

[3] *Protecting Individual Privacy in Federal Gathering, Use and Disclosure of Information*, Report of the Committee on Government Operations of the U.S. Senate to Accompany S.318, S. Rep. No. 93-1183, September 26, 1974, at59, *reprinted in* Committee on Senate Gov't Operations, Legislative History of the Privacy Act of 1974, 94th Cong., S. 3418 (Public Law 93-579), at 212 (1976), *available* at http://www.loc.gov/rr/frd/Military_Law/pdf/LH_privacy_act_1974.pdf (hereafter "Source Book").

Code of 1978. Section 362(h) of that Code, 11 U.S.C. 362(h), permitted any individual injured by a violation of the stay to recover "actual damages," and the question before the court was whether this term was "intended to include damages for *purely* emotional injury." *Id.* at 878 (emphasis added). Far from finding that the phrase "actual damages" was inherently ambiguous, the Seventh Circuit noted that the First Circuit had already "held that damages awarded for emotional injury caused by a willful violation of the automatic stay are 'actual damages.' *No doubt they are . . . .*" *Id.* (emphasis added). However, in a carefully reasoned opinion, the *Aiello* court held that the protection of the bankruptcy code "is financial in character; it is not protection of peace of mind." *Id.* at 879. Based on the particular purpose of the statute, and especially on its overwhelmingly financial focus, the court held that purely damages should not be recoverable under section 362(h) *in the absence of financial injury.* 239 F.3d at 880. The court then adverted to the "'clean-up' doctrine of equity," which it said might well permit bankruptcy courts to award damages for emotional distress under section 362(h) "if adequately proved," if there was some independent "financial loss to hitch it to." *Id.*

Thus, far from concluding that "actual damages" is "synonymous ... with pecuniary damages," Def. Mem. at 3, the *Aiello* court expressed "no doubt" that the phrase included emotional damages; the court then held that, for reasons related to the overwhelmingly financial purpose of the statute, such damages should only be awarded when financial injury was *also* present.[4] Because the Privacy Act has no such financial focus, and is in fact overwhelmingly concerned with rights of personal integrity that are not easily reduced to pecuniary terms, the

---

[4]    *See also In re Flynn*, 185 B.R. 89 (S.D. Ga. 1995), in which the court upheld the bankruptcy court's award of emotional distress damages to plaintiff *against the IRS* resulting from the IRS's violation of the automatic bankruptcy stay. *Id.* at 93. The court further held that medical testimony was not necessary to show that the plaintiff was entitled to an award of damages for emotional distress against the IRS. *Id.*

14

form of analysis used in *Aiello* would certainly lead to recovery of non-pecuniary damages under the Privacy Act. At the very least, *Aiello* provides no authority for the defendants' argument that "actual damages" should be understood to *exclude* those actual damages that happen to be based on emotional distress.

Defendants next cite *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460 (9th Cir. 1977), for the proposition that "[a]ctual damages mean some form of economic loss." Def. Mem. at 3. However, this question was of no consequence in *Ryan* because the court there *reinstated a jury verdict awarding a plaintiff damages for her mental suffering* on common-law grounds, where she also proved a financial loss resulting from the defendant's gross negligence. 556 F.2d at 465. Furthermore, *Ryan* was another case in which the statute itself (the Securities Exchange Act) bespoke a financial purpose that would support a construction focused on pecuniary damages.

The most tenuous of defendants' troika of cases on this point is *Guzman v. Western State Bank*, 540 F.2d 948 (8th Cir. 1976). There, the court did not review any statute using the term "actual damages" or engage in any analysis of the contours of that term. Instead, in a discussion in which it upheld the plaintiffs' right to recover emotional and mental distress damages as well as punitive damages under 42 U.S.C. § 1983, the court stated that compensatory damages "can be awarded for emotional and mental distress even though no actual damages are proven." *Id.* at 953. Defendants' suggestion that this Court should be influenced by such a casual, offhand reference to actual damages, in the absence of any pertinent statutory text, is completely meritless.[5]

---

5    Each of these three cases were decided after the Privacy Act was enacted. Defendants' attempt to impute a definition of "actual damages" to the Act based on decision decided years (or decades) after its passage should be rejected.

15

### D.    The Legislative History of the Privacy Act Confirms the Plain Meaning of "Actual Damages" – Not Punitive, and Not Presumed

In *Johnson*, the Fifth Circuit sought "illumination" in the legislative history of the

Privacy Act, 700 F.2d at 974-83, and proceeded to conduct an exemplary analysis of that

legislative history. We do not intend to repeat that entire analysis here, but two points should be

highlighted: First, Congress well knew what types of injuries were usually sustained by persons

who were injured by common-law invasions of privacy, and the Privacy Act deliberately

borrowed from that common-law tort. *Johnson,* 700 F.2d at 976-77 (quoting *Parks v. Internal

Revenue Service*, 618 F.2d 677, 682-83 (10th Cir. 1980)). As the *Johnson* court observed,

> If Congress borrowed from the common law in designing
> the remedy provision, surely Congress was not unmindful of the
> common law when it selected the words "actual damages" for the
> accompanying damage provision. *The Supreme Court has
> indicated that the primary damage in "right to privacy" cases is
> mental distress. . . .* Logically, then, Congress in choosing the term
> "actual damages" was tailoring the compensation to the nature of
> the privacy interest protected. *Obviously, mental distress is the
> normal and typical damage resulting from an invasion of privacy,*
> an invasion of "our respect for the inviolability of the human
> personality." *See* Senator Goldwater, *supra* at 9. *Interpreting
> "actual damages" to include only out-of-pocket losses would not
> only preclude recovery in large numbers of cases but also run
> counter to Congress' intent . . . .*

700 F.2d at 977 (emphasis added). *See also Orekoya*, 330 F.3d at 9 (recognizing "under

common law, damages for emotional distress were awardable for invasion of privacy or for

public disclosure of private facts"); *Parks*, 618 F.2d at 682-83 ("It appears from the Act that

Congress was borrowing from the common law tort of invasion of privacy. These are personal

wrongs which result in injury to the plaintiffs' feelings and are actionable even though the

plaintiff suffered no pecuniary loss nor physical harm." *Id.* at 683.). To interpret "actual

16

damages" in the manner advocated by Defendants would eliminate recovery for the very type of damages that Congress intended the Act to redress.

Congress's awareness of the wrongs likely to be suffered by Privacy Act plaintiffs is also relevant to the interpretation of certain remarks made during the enactment of the law. As other courts have noted, Congressional debate on the Privacy Act included the observation that "it is quite often difficult to prove actual damages, but that is not necessarily a reason to establish the extraordinary remedy of punitive damages." *Johnson v. Department of Treasury*, 700 F.2d 971, 980 (5th Cir. 1983) quoting remarks of Rep. McCloskey, Source Book at 923. *See also* H.R. Rep. No. 93-1416 at 38 (1974), *reprinted in* Source Book at 294-333 (additional statement of members accompanying House Report on Privacy Act, noting that "Actual damages resulting from an agency's misconduct will, in most cases, be difficult to prove and this will often effectively preclude an adequate remedy at law"). As the Fifth Circuit has noted, "if actual damages are hard to prove, they would appear not to be limited to out-of-pocket losses: these losses are 'quite easy' rather than 'quite ... difficult' to prove." *Johnson*, 700 F.2d at 980. This straightforward observation is powerful enough on its own, but it does not stand alone. The legislative history explains how and why the enacting Congress used the term "actual" damages.

The second fundamental point to highlight here is that the phrase "actual damages" was one of three general types of damages that dominated all legislative debate about the remedies that should be available under the Privacy Act. Quite simply, "actual damages" were damages that were "actual," as opposed to "liquidated damages" (which would be estimated rather than actual), and "punitive damages" (which would be awarded without reference to any actual harm). This tripartite division of possible remedies into actual, punitive, and liquidated damages seems

to originate with a 1973 report by the U.S. Department of Health, Education and Welfare (the

"HEW Report").[6] The Senate Government Operations Committee specifically quoted the HEW

Report's call for legislation to

> give individuals the right to bring suits for unfair information
> practices to recover <u>actual, liquidated,</u> and <u>punitive</u> damages, in
> individual or class actions. It should also provide for recovery of
> reasonable attorneys' fees and other costs of litigation incurred by
> individuals who bring successful suits.[7]

The original Senate bill, S. 3418, provided for actual damages, punitive damages, and attorney's

fees;[8] a later amendment deleted the provision for punitive damages but added a $1,000

liquidated damages provision.[9]

Defendants are thus mistaken in their belief that the Senate's "initial version of the

Privacy Act" contained the actual and general formula. Def. Mem. at 11. It appeared, with

virtually no explanation, in the Committee Amendment offered on the Senate floor. And it

---

[6]     *See Records, Computers and the Right of Citizens,* Report of the Secretary's Advisory
Committee on Automated Personal Data Systems, U.S. Department of Health, Education and
Welfare, 1973, *available at* http://aspe.hhs.gov/datacncl/1973privacy/tocprefacemembers.htm
(hereinafter "HEW Report").

[7]     S. Rep. No. 93-1183, at 9 (1974), *reprinted in* Source Book at 162 (emphasis added).
Other contemporary privacy legislation also reflects Congress's consideration of all three
basic categories of damages suggested by the HEW report: actual, liquidated and punitive. A
bill introduced by Senator Goldwater provided recovery of
> (1) any <u>actual</u> damages sustained by the individual aggrieved as a result of the unfair
> practice or violation, but not less than <u>liquidated</u> damages of $100; and
> (2) not more than $1,000 <u>punitive</u> damages.
Right to Privacy Act of 1973, S. 2810, 93d Cong. § 7(c) (1973) (emphasis added), *reprinted in*
Source Book at 612.
[8]     S. 3418, 93d Cong. § 303(c) (1974), *reprinted in* Source Book at 149.

[9]     S. 3418, 93d Cong. § 303(c) (as passed by the Senate Nov. 21, 1974), *reprinted in* Source
Book at 334, 371. *See also* H.R. 16373, 93d Cong. § 303(c)(as passed by the Senate Nov. 22,
1974), *reprinted in* Source Book at 375, 433. An accompanying memorandum explained the
$1000 provision as providing "liquidated damages." Memorandum Entitled Amendments to the
Federal Privacy Act, Senate Floor Debate, Nov. 21, 1974, *reprinted in* Source Book at 768.

disappeared, again without explanation, in the final version of the bill produced by House-Senate negotiators. There is, therefore, no support in the legislative history for defendants' strained argument that the brief and utterly unexplained appearance and then disappearance of the words "and general" in the bill's history evidences a considered Congressional decision to use "actual damages" to exclude nonpecuniary damages rather than simply to distinguish such damages from punitive or liquidated damages.

Adopting a now-discredited interpretation of legislative history from the *Fitzpatrick* decision, *see* 665 F.2d at 330 (erroneously characterizing recovery of non-pecuniary actual damages as "synonymous" with common law general damages), defendants argue that the deletion of "and general" was intended to eliminate recovery for non-pecuniary actual damages. *See* Def. Mem. at 10-12. The Supreme Court, in its recent review of the Act's legislative history, pointed out the fallacy of defendants' proposed interpretation. The Court reasoned:

> Although the provision for general damages would have covered presumed damages ... this language was trimmed from the final statute, subject to any later revision that might be recommended by the Commissions. *The deletion of "general damages" from the bill is fairly seen, then, as a deliberate elimination of any possibility of imputing harm and awarding presumed damages.* The deletion thus precludes any hope of a sound interpretation of entitlement to recovery without reference to actual damages.

*Id.* at 623 (emphasis added). The Court recognized that, by deleting "general damages," Congress was rejecting the notion that a claimant under the Act could recover "a monetary award without reference to a specific harm," i.e., "presumed" damages. *Id.* at 621. Because the term "general damages" includes and subsumes "presumed damages" it is not "synonymous" with "actual damages," and its deletion is not indicative of any legislative intent to preclude recovery of actual non-pecuniary damages.

19

The trichotomy of potential damage remedies appears in the House legislative history, too. For willful violations, the original House bill provided for 1) "<u>actual</u> damages sustained by the individual," "<u>punitive</u> damages allowed by the court," plus costs and attorneys' fees.[10] After the House Government Operations Committee deleted the punitive-damages provision,[11] a committee report described "the failure to provide either <u>liquidated</u> or <u>punitive</u> damages" as one of the "basic weaknesses of the bill" in Committee.[12] The Congressional critics explained that:

> The bill in its present form contains provisions for the assessment of <u>actual</u> damages, court costs, and attorneys' fees in cases where an agency is found to be in violation of the law. A provision allowing court assessment of <u>punitive</u> damages, which is contained in the Senate bill (S. 3418), was stricken in full committee. We feel strongly that this provision should be restored to the bill. <u>Actual</u> damages resulting from an agency's misconduct will, in most cases, be difficult to prove and this will often effectively preclude an adequate remedy at law. Moreover, if we are concerned with effectively deterring the willful, arbitrary, or capricious disclosure or transfer of protected records, a provision permitting a court to assess <u>punitive</u> damages or, at the very least, <u>liquidated</u> damages is essential.[13]

In floor debate, the House bill was again criticized for "the failure to provide either <u>liquidated</u> or <u>punitive</u> damages...."[14] Rep. Abzug therefore argued for

> an amendment to provide for the assessment of <u>punitive</u> damages in cases of willful, arbitrary, or capricious violation of the bill and for <u>actual</u> damages in cases of negligent violations. These

---

[10]    H.R. 16373, 93d Cong. § (f) (as introduced Aug. 12, 1974), *reprinted in* Source Book at 250-51 (emphasis added).

[11]    *See* H.R. Rep. 93-1416, at 32 (1974) (amended bill text), *reprinted in* Source Book at 294, 325.

[12]    *Id.* at 37, *reprinted in* Source Book at 294, 329 (emphasis added).
[13]    *Id.* at 38, *reprinted in* Source Book at 330.

[14]    House Considers H.R. 16373, Remarks of Rep. Abzug (Nov. 20, 1974), Source Book at 886 (emphasis added).

> provisions were stricken in the full committee, and, as a result, an
> individual who may have suffered by violation of the act must now
> prove not only actual damages but that such damages were caused
> by willful, arbitrary, or capricious agency action. I believe that
> these two stricken-out provisions must be restored to the bill to
> provide, as the bill in the other body does, for <u>actual</u> damages to
> compensate for any violation of the act and for <u>punitive</u> damages
> to compensate for any willful, arbitrary, or capricious violation. [15]

In debating the amendment, the members consistently contrasted punitive damages with actual

ones:

> [W]hat we do in those cases where we have willful, arbitrary or
> capricious action by an agency is to allow recovery for <u>actual</u>
> damages or <u>punitive</u> damage. . . . My amendment would give the
> person the right to recover <u>actual</u> damages in cases where there is a
> failure to comply with the law. It would also give him <u>punitive</u>
> damages in those cases where there is willful, arbitrary or
> capricious action by the agency. [16]
>
> . . .
>
> If we enact this amendment... we will, in effect, be placing
> upon the Government bureaucrat the choice that if he reveals
> information improperly, he may subject his agency to <u>punitive</u>
> damages. If he withholds the information, on the other hand, he is
> subject only to <u>ordinary</u> damages, attorneys' fees, and costs. [17]

Rep. McCloskey went on to argue, "I do not believe that the individual is denied <u>actual</u> damages

if he can prove them. In cases of this kind, of course, it is quite often difficult to prove <u>actual</u>

damages, but that is not necessarily a reason to establish the extraordinary remedy of <u>punitive</u>

damages." *Id.* at 923 (emphasis added).

The final Privacy Act legislation omitted the punitive-damages clause that had been

rejected in both chambers but retained the "actual damages" provision that had been in every

---

[15] *Id.* at 886-87 (emphasis added). *See also* Source Book at 924 (Rep. Moorhead, floor manager
of the bill, explaining that the punitive-damages provision was stricken in committee in an 18-14
vote).

[16] Remarks of Rep. Fascell, Source Book at 920 (emphasis added).

[17] Remarks of Rep. McCloskey, Source Book at 921 (emphasis added).

version since the outset of the debate and kept the Senate's $1000 liquidated-damages clause. Pub. L. 93-579, § 3, 88 Stat. 1902 (1974). Any ambiguity that might be conjured out of the adjective "actual" thirty years after enactment is thus dispelled by the history of how that word actually got into the law. It simply distinguished damages actually suffered from the $1000 liquidated damages Congress approved and the punitive damages it rejected.[18]

### E.    The Privacy Act's Waiver of Sovereign Immunity Is Not Confined to Any Particular Kind of Damages

By every general criterion that judges and lawyers use to wring meaning from statutes, the availability of both pecuniary and non-pecuniary damages under the "actual damages" provision of the Privacy Act is clear. The plain and natural meaning of the phrase "actual damages" comfortably includes non-pecuniary damages as long as they are "actual." The clearly expressed purpose and intent of Congress make this straightforward, common-sense construction of the phrase "actual damages" far superior to the cramped and arbitrary interpretation suggested by the defendants. Furthermore, Congress modeled the Privacy Act on other federal statutes which provide for recovery of "actual damages" and which have been construed to permit recovery of such damages regardless of whether they are pecuniary or non-pecuniary. The fact that all these indicia of statutory meaning agree with each other goes far toward explaining why

---

[18]    The only passage in the entire legislative history of the Privacy Act which appears to support Defendants' view that "actual damages" was intended to be limited to "out of pocket" damages, see Def. Mem. at 12, is the lone statement of Rep. Eckhardt. Eckhardt was not an original sponsor of the legislation, see Source Book at 239 (original version of H.R. 16373, listing sponsors), and his only role in its passage appears to have been speaking in support of a rejected amendment on the House floor. See Source Book at 880-953 (House floor debate) and 925-26 (Eckhardt statement). Moreover, the context of the remarks at issue make clear that the Congressman was merely emphasizing that he was not attempting to revive the punitive-damages clause that had previously been rejected – not analyzing the effect of the "actual damages" clause. Id.

the judges of this Court have for two decades construed the Privacy Act to permit recovery of all "actual damages," pecuniary as well as non-pecuniary.

Unable to rely on generally applicable principles of statutory construction for the arbitrarily narrow reading they propose, the defendants resort to a canon of construction available only to the government – the argument that the alleged ambiguity of the phrase "actual damages" should be resolved in the government's favor because waivers of sovereign immunity must be strictly construed. *See* Def. Mem. at 4-7. There are, however, three problems with the defendants' reliance on this canon of construction here.

First, if one looks specifically at the use of the phrase "actual damages" *in the Privacy Act,* as opposed to looking across the broad landscape of Anglo-American law, there is not in fact any ambiguity in the way that phrase applies to Dr. Hatfill's case. Nothing in the Privacy Act itself, nor in its legislative history, suggests that the consent of the United States to be sued for violations of the Act was intended to be limited to suits for pecuniary damages. Importantly, this is a different question from whether the phrase "actual damages" has a "plain meaning," for the Supreme Court cases cited by the defendants demonstrate that courts, in weighing the plausibility of "waiver" and "non-waiver" constructions of a statute, must look not only at the language of the statute but at its structure, *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 623 (1992), its purpose, *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999); *Galvan v. Federal Prison Industries*, 199 F.3d 461, 468-69 (D.C. Cir. 1999), its similarity to other contemporaneous statutes, *Lane v. Pena*, 518 U.S. 187, 194-96 (1996); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684-85 (1983), and for at least some Justices, its legislative intent, *Ruckelshaus*, 463 U.S. at 686-88; *Trout v. Secretary of the Navy*, 317 F.3d 286, 287-88 (D.C. Cir. 2003). Looking at all of these factors in this case, there simply is no plausible argument that

23

Congress would be surprised to find courts permitting suits against the sovereign for non-pecuniary damages. "Actual damages" means "actual damages," and this common-sense reading cannot be dislodged by so forced an alleged ambiguity as we have here.

Second, the defendants overstate the importance of their sovereign-immunity canon to the holdings of the cases they cite. In most of the cases cited by the defendants, it was reasonably clear even without any canon of construction that the far better reading of the statute in question was the reading that no waiver of sovereign immunity had been intended. Thus, in *Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983), the Court held that language of the Clean Air Act permitting a court to award costs and attorneys' fees whenever "appropriate" did not allow for an award of attorneys' fees to a party "who achieved no success on the merits of its claims." *Id.* at 682-83. The Court reasoned that to require "a defendant, completely successful on all issues, to pay the unsuccessful plaintiff's legal fees would be a radical departure from long-standing fee-shifting principles adhered to in a wide range of contexts." 463 U.S. at 683. Likewise, in *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999), the Court held that a provision of the Administrative Procedures Act which permits actions against the United States "seeking relief *other than money damages*" could not be used by a plaintiff subcontractor to place liens on government funds to collect moneys that a prime contractor failed to pay. 525 U.S. at 260. The Court held that, because the purpose of the liens was to seize or attach money in the hands of the government as compensation for a loss, it simply made no sense to believe that Congress intended to authorize such a collection tactic under a statute that was specifically focused on relief "other than money damages." *See* 525 U.S. at 263.

In like manner, many of the other cases the defendants cite for their sovereign immunity argument serve only to show how straightforward the Privacy Act is by comparison. In *Lane*

24

and *Nordic Village*, the obvious problem was that the statutes in question were at war with themselves. Certain provisions were narrowly tailored to grant a certain type of relief in certain specified situations, while other provisions purported to grant different or additional types of relief across a broader range of circumstances such that the exception would swallow the rule. *See Lane*, 518 U.S. at 193; *Nordic Village*, 503 U.S. at 35-36. In *United States Department of Energy v. Ohio*, featured prominently by the defendants, the same problem arose, albeit from multiple overlapping sections of two different environmental statutes. 503 U.S. 607, 622-23 (1992). In each of these cases, the non-waiver interpretation advanced by the plaintiff was in some way strained, unexpected, or incompatible with the statute's overall structure, even if it had a purely linguistic plausibility. Taken together, these cases teach that while the sovereign-immunity canon can sometimes bolster an otherwise sound construction, it cannot be used to insert unexpressed and arbitrary exceptions into a statute whose language contains no trace of any such thing. *See also Trout*, 317 F.3d at 287-88, 289 (rejecting claim for prejudgment interest because there was "no evidence in the text or the legislative history of the Civil Rights Act of 1991 that Congress intended its provisions to operate retroactively," and because the "rule of no-interest against the sovereign" provided further reason against retroactive application of that act); *Galvan*, 199 F.3d at 463 (rejecting prison inmate's attempt to bring a *qui tam* action that would have "pitted the United States executive branch against itself"). None of these cases involve anything as simple as the construction of a single two-word phrase in isolation, and none of them justify defendants' argument that a strict interpretation requires that non-pecuniary damages be excluded from "actual damages" under the Privacy Act.

The third and, in some ways, most serious problem with the defendants' resort to sovereign immunity in this particular case is that if it could validly be used to preclude recovery

of non-pecuniary damages, it could just as easily be used to preclude recovery of *any* specific kind of damages. The only "ambiguity" here, after all, is whether a phrase that covers *all* damages, without exception or enumeration, can be rendered indeterminate by pointing out that it does not *expressly* include one particular kind of damages. According to the defendants' argument, if non-pecuniary damages are not unambiguously included, then they must be excluded because of sovereign immunity. But the very same logic could be used to exclude, say, medical expenses for treatment of physical injuries (as opposed to injuries that are more directly pecuniary, such as job loss). The government could argue that since the statute did not specifically provide for recovery of medical expenses, the waiver of sovereign immunity was not sufficiently clear and the statute had to be narrowly construed. Indeed, perhaps the most telling strike against the defendants' request for preclusion of non-pecuniary damages is that, without changing a word of the statute, they could make a logically indistinguishable argument that the phrase "actual damages" *only* includes non-pecuniary damages, and that because *pecuniary* damages are not unambiguously included, *they* must be excluded.

The way to escape this absurdity is simply to recognize that "actual damages" means "actual damages." If emotional damages are "actual," they are recoverable. If damages from physical injury are "actual," they are recoverable. If reputational damages are "actual," they are recoverable. If pecuniary damages are "actual," they are recoverable. There is simply no warrant in the Privacy Act, its history, or the cases interpreting it, for excluding any particular kind of "actual damages" from the operation of the civil remedies provision of the Act.

26

## II.    Despite the Availability of Non-Pecuniary Damages, the Defendants Have Failed to Justify a Compelled Mental Examination

Because *some* of the "actual damages" that Dr. Hatfill seeks are for emotional distress

and mental anguish, evidence about his emotional response to the defendants' misconduct

(particularly his emotional response in 2002) is certainly discoverable under the generous

standards of Rule 26 of the Federal Rules of Civil Procedure. It is for that reason that Dr. Hatfill

has responded without objection to all previous discovery requests concerning his psychological

well-being. He has answered interrogatories about the emotional distress he quite

understandably suffered, he has testified about his emotional distress under oath, and he has

produced for inspection the notes of his treating psychiatrist, Dr. Catherine May.

Mere relevance under Rule 26, however, is not enough to justify a court-ordered mental

examination under Rule 35. Rule 35 – alone among all the discovery rules – requires a showing

by the moving party that a person's "mental . . . condition" be "in controversy"; and even then,

an order for a compulsory mental examination "may only be made on motion *for good cause

shown.*" Fed. R. Civ. P. 35(a) (emphasis added). In *Schlagenhauf v. Holder,* 379 U.S. 104

(1964), the Supreme Court emphasized the limiting effect of these "in controversy" and "good

cause" requirements, which the Court described as "necessarily related." 379 U.S. at 119. The

"in controversy" and "good cause" requirements

> are not met by mere conclusory allegations of the pleadings – nor
> by mere relevance to the case – but require an affirmative showing
> by the movant that each condition as to which the examination is
> sought is really and genuinely in controversy and that good cause
> exists for ordering each particular examination. Obviously, what
> may be good cause for one type of examination may not be so for
> another. The ability of the movant to obtain the desired
> information by other means is also relevant.

27

379 U.S. at 118. Rule 35, therefore, requires "discriminating application by the district judge of the limitations prescribed by the Rule." 379 U.S. at 121. *Schlagenhauf* itself, for example, involved a bus accident, and the parties requesting the medical examination in that case claimed that Mr. Schlagenhauf had "impaired and deficient" eyesight and "was not mentally or physically capable of operating" the bus at the time of the accident. 379 U.S. at 120. These contentions clearly made Mr. Schlagenhauf's mental and physical condition *relevant,* but the Supreme Court held they did not justify a compulsory examination under Rule 35. "To hold otherwise would mean that such examinations could be ordered routinely in automobile accident cases. The plain language of Rule 35 precludes such an untoward result." 379 U.S. at 121-22.

### A.    Dr. Hatfill's Mental Condition Is Not "in Controversy"

The distinction between instances of "mere relevance" and instances in which mental condition "is really and genuinely in controversy" has been drawn in the cases following *Schlagenhauf.* Broadly speaking, mental examinations under Rule 35 have been ordered where the plaintiff alleges that he or she is suffering from an ongoing, diagnosable mental injury, particularly where the plaintiff expects to offer a scientific diagnosis and prove the existence of the condition by calling the plaintiff's own expert. *E.g., Doe v. District of Columbia,* 229 F.R.D. 24, 25, 26-27 (D. D.C. 2005) (Facciola, M.J.); *Smith v. Koplan,* 215 F.R.D. 11, 13-14 (D. D.C. 2003) (Facciola, M.J.); *Chiperas v. Rubin,* 1998 WL 765126 (D. D.C. 1998) (Facciola, M.J.); *Shepherd v. American Broadcasting Cos.,* 151 F.R.D. 194, 213 (D. D.C. 1993) (Lamberth, J.), *rev'd on other grounds,* 62 F.3d 1469 (D.C. Cir. 1995). However, independent medical examinations are not justified unless the moving party can demonstrate that the case involves something more than "garden variety" emotional distress. *Turner v. Imperial Stores,* 161 F.R.D.

89, 97 (S.D. Cal. 1995) (collecting and analyzing cases and finding the "weight of the authority" to support this distinction).

In *Turner,* for example – an employment discrimination case – the plaintiff sought "compensatory damages for 'humiliation, mental anguish, and emotional distress in an amount exceeding one million dollars.'" 161 F.R.D. at 90. The court nonetheless denied the motion for an independent mental examination of Ms. Turner because she "ha[d] not placed her mental condition 'in controversy' within the meaning of Rule 35(a)." 161 F.R.D. at 98. *See also Bowen v. Parking Authority of the City of Camden,* 214 F.R.D. 188, 193-194 (D. N.J. 2003) (updating *Turner*'s analysis of the case law and following *Turner*); *Ricks v. Abbott Labs.,* 198 F.R.D. 647, 650 (D. Md. 2001) (plaintiff's mental condition not "in controversy" where emotional distress was merely an element of damages rather than an element of the cause of action, and where plaintiff had not alleged any specific mental injury and did not seek to introduce expert psychiatric evidence); *Ford v. Contra Costa County,* 179 F.R.D. 579, 579-80 (N.D. Cal. 1998) ("the bulk of the reported case law demonstrates that a claim for emotional distress damages, by itself, is not sufficient to place the plaintiff's mental condition in controversy for purposes of FRCP 35(a)"); *O'Sullivan v. State of Minnesota,* 176 F.R.D. 325, 327 (D. Minn. 1997); *Equal Employment Opportunity Comm'n v. Old Western Furniture Corp.,* 173 F.R.D. 444, 446 (W.D. Tex. 1996); *Bridges v. Eastman Kodak Co.,* 850 F. Supp. 216, 222 (S.D.N.Y. 1994) =.

There is a great deal of common sense in the distinction between "garden variety" emotional distress claims and the types of claims that might justify a compulsory psychiatric examination. As the court noted in *Ricks v. Abbott Labs*, "there is a difference between more serious emotional distress that might be diagnosed and treated as a disorder by a psychiatrist and the less serious grief, anxiety, anger, and frustration that everyone experiences when bad things

happen." 198 F.R.D. at 649. Furthermore, as the *Ricks* court also noted, this common-sense

distinction dovetails with the standard for admissibility of expert testimony:

> Rule 702 of the Federal Rules of Evidence permits expert
> testimony if the expert's "scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand the evidence or
> to determine a fact in issue." Fed. R. Evid. 702. When emotional
> distress is unusually severe or alleged in clinical terms, or when
> another party intends to offer expert testimony about the distress,
> the testimony of an expert would help the trier of fact understand
> the nature, severity, and characteristics of the emotional distress.
> A trier of fact, however, does not need help understanding the
> ordinary grief, anxiety, anger, and frustration that any person feels
> when something bad occurs. Most triers of fact are already experts
> in that.

198 F.R.D. at 649.

The facts of the cases cited by the defendants readily fall into the same pattern. In

*Shepherd v. ABC,* one plaintiff had retained a doctor to testify in support of her claim that she

suffered from Post-Traumatic Stress Disorder, and under those circumstances "[t]he court

[could] not fault ABC for wishing to have its own expert evaluate Ms. Shepherd." 151 F.R.D. at

212-213. The second plaintiff in the same case testified that after many discussions with the first

plaintiff he believed he had all the same symptoms that she had. 151 F.R.D. at 213. As to this

second plaintiff, Judge Lamberth observed that "ABC understandably has some questions about

Mr. Graves' emotional injuries. Mr. Graves' attempt at piggy-backing his claims of emotional

injury onto those of Ms. Shepherd provides good cause for a court-ordered mental examination

of Mr. Graves." 151 F.R.D. at 213.

The three decisions by Magistrate Judge Facciola arrange themselves just as neatly within

the *Turner-Ricks* framework. In *Chipperas v. Rubin,* the Title VII plaintiff intended to call a

doctor who had conducted a psychological evaluation of him and would testify that he "suffered

from Major Depressive Disorder that resulted from incidents that are described in this

complaint." Magistrate Judge Facciola distinguished cases like *Bridges* and *Turner* and then concluded that "one is hard pressed to understand why a court would not permit an independent mental examination when the party to be examined contemplates use of an expert to substantiate her claim that she had endured psychological harm at the hands of the other party." 1998 WL 765126 at *4. *Smith v. Koplan* was indistinguishable from *Chiperas,* for even though the plaintiff had not *yet* retained an expert to substantiate her self-diagnosis of clinical depression, she admitted that she was in the process of doing so. 215 F.R.D. at 13-14. Similarly, *Doe v. District of Columbia* involved not one but two factors to take it out of the "garden variety emotional distress" category: the fact that the alleged psychological injury was *ongoing,* and the fact that the plaintiff was a ten-year-old boy whose last psychiatric assessment had been three years earlier. 229 F.R.D. at 26-27. Clearly, none of these cases can stand for the proposition that a compulsory mental examination should be ordered whenever a plaintiff seeks emotional distress damages.

The basic common-sense distinction that has developed under Rule 35 in the forty years since *Schlagenhauf* makes it easy to see why an order compelling Dr. Hatfill to submit to an involuntary mental examination would be inappropriate. Dr. Hatfill's claim for non-pecuniary damages is not characterized by any of the factors that courts generally cite when they order independent mental examinations under Rule 35. Dr. Hatfill is not alleging that the defendants' unlawful conduct caused him any specific psychological "injury" that could be diagnosed today, such as chronic clinical depression or the development of multiple personalities. He has not designated any expert witness to testify about the emotional distress he suffered, nor does he intend to do so. The anguish he has suffered has been "severe," to be sure, but no more severe than the average layman would expect under the circumstances. His claim is simply that the

31

defendants should be required to compensate him monetarily for the emotional distress he has been forced to endure as a consequence of their unlawful disclosures, the torrent of extremely negative publicity those disclosures generated, the dismissal from LSU that the defendants themselves engineered after they saw the negative publicity, and his continuing unemployability since that time. That is concededly a lot of emotional distress, but it is nothing that requires a compulsory psychiatric examination.

## B.   Defendants Have Failed to Show "Good Cause"

Quite apart from whether Dr. Hatfill's claim for emotional distress damages can be said to place his mental condition "in controversy," the defendants simply have not shown any "good cause" for an order compelling an involuntary mental examination. There are five basic problems with their half-hearted attempt to make this showing.

*First,* and at the most basic level, the defendants do not explain what material question they believe an independent mental examination of Dr. Hatfill will answer. Their request makes no sense unless a 2006 examination will be able to show whether or not Dr. Hatfill experienced emotional distress in 2002, 2003, or 2004. However, they never actually say in so many words that this is possible, and so startling a claim should not be lightly inferred. *Cf. Winters v. Travia,* 495 F.2d 839, 841 (2d Cir. 1974) (where plaintiff sued for emotional distress caused when she was medicated against her religious beliefs but conceded that her only present mental problem was her memory of the incident, a Rule 35 examination some years later would serve no purpose); *Coca-Cola Bottling co. of Puerto Rico v. Negron Torres,* 255 F.2d 149, 153 (1st Cir. 1958) (Rule 35 examination denied where plaintiff who found a mouse in his soft drink bottle sought damages "only for past physical injury and emotional disturbance, and hence a physical examination would be useless"). The defendants' principal expert, Dr. Phillips, is

32

unquestionably a man of great skill and learning, but his qualifications seem to be in the field of science – not the occult. Under Rule 35, the defendants had the burden of showing that all their experts' skill and learning could make some identifiable contribution to the case at bar. No such showing appears from the defendants' papers.

*Second,* and along much the same lines, the recycled[19] affidavit submitted by Dr. Phillips consists largely of sweeping generalizations about mental examinations in the abstract; *not one word of his affidavit has anything to do with Dr. Hatfill or his claims.* Dr. Phillips tells the Court his "standard protocol" (¶¶ 7, 10), describes "a wide variety of records" that he "*may* be called upon to review," "*typically* prior to the clinical interview" (¶ 8 (emphasis added)), and reviews what "a competent and reliable independent forensic investigation must assess" (¶ 6). Nowhere does he state what *this case* demands with regard to *this plaintiff.* The affidavit states that "[c]ertain cases may require neuropsychological testing" (¶ 9), but gives no hint whether this is such a case, or is expected to be such a case. Perhaps this is because, according to paragraph 5 of his affidavit, Dr. Phillips apparently believes it "necessary" to conduct an independent mental examination *whenever* a plaintiff "complains of mental or emotional injury." As we have seen, that assertion is simply at odds both with the text of Rule 35 and with the reported decisions construing it.

*Third,* to the extent that Dr. Phillips actually can detect either the existence or the severity of the emotional distress the defendants caused Dr. Hatfill, merely by listening to Dr. Hatfill talk in three sessions of three hours each, it is a fair question whether he is doing anything outside the ken of the ordinary trier of fact. Indeed, to the extent that Dr. Phillips's conclusions departed

---

[19]     Dr. Phillips's statement appears to be the latest version of a form he has been using since at least 2002. *See Declaration of Robert T.M. Phillips, Cardenas v. Prudential Ins. Co. of America,* July 29, 2002 (D.Minn., No. 99-CV-1421), *available on Westlaw at* 2002 WL 32984206.

33

from common sense on this matter (for example, to the extent he opined that it did *not* cause Dr.

Hatfill any emotional distress when he was publicly named as a "person of interest," or when he

lost his career and many of his friends, or when CBS News reported that the FBI was considering

giving him the "Al Capone" treatment), one suspects that most triers of fact would disregard Dr.

Phillips's testimony and follow their common sense anyway. If so, then there is little value to

ordering this highly intrusive examination. *Cf. Ricks,* 198 F.R.D. at 649 ("Because laypersons

can understand this kind of ordinary emotional distress without the help of an expert, there is no

need for an expert to conduct a mental examination of the plaintiff who claims only ordinary and

uncomplicated emotional distress").

   *Fourth,* while some reported cases use the *plaintiff's* retention of an expert as a reason for

granting a *defendant's* motion under Rule 35, the Court should be alert to the fact that the same

chain of causation can just as easily work in reverse. Right now, Dr. Hatfill has not designated

any expert witness to testify about his emotional distress because the anguish he suffered can be

readily understood and appreciated by anyone of normal sensibilities; the same might be true of

any ordinary layperson if he or she were in Dr. Hatfill's shoes. The defendants have not

designated an expert psychologist either, which leaves the entire matter of emotional distress

exactly where it should be for exposition at trial. However, if the Court orders Dr. Hatfill to

submit to an independent examination by Dr. Phillips, then Dr. Hatfill will be virtually forced to

hire his own psychiatric expert to counter Dr. Phillips's testimony about the examination. What

should be a relatively straightforward matter developed through lay testimony on emotional

distress will instead become a battle of experts whose testimony will be of dubious incremental

value to the trier of fact.

*Fifth,* as the *Schlagenhauf* Court noted, "The ability of the movant to obtain the desired information by other means is also relevant." 379 U.S. at 118. In this case, Dr. Hatfill has answered interrogatories about his emotional distress. He has produced the notes of his treating doctor from 2003-2004, Dr. Catherine May. His close friend Peck Chegne has already testified at length about the emotional toll the defendants' misconduct took on him, and defendants make clear that if non-pecuniary damages are allowed but no independent mental examination is ordered, they will re-depose Dr. Hatfill about his emotional distress, in addition to deposing his father and his treating doctor. *See* Def. Mem. at 18.[20] In light of the significant uncertainty whether the defendants' experts can learn *anything* useful from a compulsory mental examination at this point, it is certainly a fair question whether the *difference* between what they can learn from an examination and what they can learn from other sources is sufficient to constitute "good cause" for a compulsory psychiatric evaluation.

*Sixth,* and finally, Dr. Hatfill urges the Court to consider well the defendants' abysmal record of leaking sensitive information about him before the Court orders him to submit to three tape-recorded three-hour interviews with a government-paid psychiatrist. The deposition testimony in this case, which we will soon place comprehensively before the Court, establishes well over 100 discrete disclosures by at least a dozen and perhaps as many as twenty different employees within the FBI and DOJ. The facts revealed included some information the disclosure of which was calculated to stigmatize, and other information the disclosure of which

---

[20]     Defendants also express a desire to "preserve their right to submit an expert report." Def. Mem. at 18. Although counsel for Dr. Hatfill agreed to a partial stay of the May 31, 2006 discovery cut-off date pending resolution of this motion, counsel did not understand that defendants might wish to re-open the expert designation deadline unless a Rule 35 examination were ordered. If the Court does order such an exam, and is inclined to permit designation of a psychological or psychiatric expert by the defendants, Dr. Hatfill asks that he be given 30 days following the disclosure of the new expert's report, so that Dr. Hatfill my scrutinize the report, hire his own expert if necessary, and depose the plaintiff's expert.

35

was calculated to embarrass. Officials at the very highest levels made no effort whatsoever to stop or punish the leaks even after it was confidently supposed that the leaks were originating within the FBI and DOJ. Given this unparalleled level of disregard for Dr. Hatfill's privacy, it is difficult to understand why the defendants should be entrusted with nine-hours of audiotaped conversations that are supposed to be candid. Indeed, the FBI/DOJ track record on unlawful disclosures might inhibit Dr. Hatfill's candor with his examiner – which if it occurred would presumably *also* be leaked. An order compelling Dr. Hatfill to submit to a compulsory mental examination would therefore subject him to a much greater risk of further injury.

### C.    If the Court Orders an Examination, Dr. Hatfill's Counsel Should Be Permitted to Attend

If, contrary to the arguments above, the Court should find good cause for an independent mental examination of Dr. Hatfill, then Dr. Hatfill respectfully requests that the Court permit Dr. Hatfill's counsel, Thomas G. Connolly, to be present during all such testing, at the defendants' expense. The primary reason for this request is that there appear to be reasonable grounds for concern that the requested examination would go beyond the evaluation of Dr. Hatfill's claim for damages.

The defendants have already indicated that they intend to argue, ludicrously, that Dr. Hatfill could have returned to full-time employment the month after they got him fired. Because neither the defendants nor Dr. Phillips have provided any information about the questions they *do* intend to ask Dr. Hatfill, it is reasonable to suspect that the questions may go to this subject or others like it that are not within the scope of Rule 35. In *Acosta v. Tenneco,* 913 F.2d 205 (5th Cir. 1990), the district court had granted the defendant's request for an order compelling the plaintiff to meet with the defendant's vocational rehabilitation specialist. On interlocutory

appeal, the Fifth Circuit reversed and vacated the order, holding that Rule 35 did not authorize the district court to compel such an interview outside the presence of counsel. 913 F.2d at 210.

The presence of dangers like these has led other courts to permit a Rule 35 examinee to have his attorney present during the examination. *E.g., Marsch v. Rensselaer County,* 218 F.R.D. 367, 371 (N.D.N.Y. 2003). The presence of Dr. Hatfill's counsel as a silent auditor will fully allay these concerns.

## CONCLUSION

Defendants cannot prevail in their attempt to invent an overly restrictive and unsupported exception to the phrase "actual damages." This Court should, like its immediate predecessors, recognize that a plaintiff may recover emotional and reputation damages under the Privacy Act as long as those damages are proven to be "actual." In addition, the Court should decline to order a compulsory psychiatric examination of Dr. Hatfill, or in the alternative permit his counsel to be present during the examination.

Dated: May 18, 2006                                   Respectfully Submitted,


                                                      /s/ Mark A. Grannis

                                                      _____
                                                      Thomas G. Connolly, D.C. Bar # 420416
                                                      Mark A. Grannis, D.C. Bar # 429268
                                                      Patrick O'Donnell, D.C. Bar # 459360
                                                      Harris, Wiltshire & Grannis, LLP
                                                      1200 18th Street, N.W., Suite 1200
                                                      Washington, D.C. 20036
                                                      Tel: (202) 730-1300
                                                      Fax: (202) 730-1301