IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN J. HATFILL, M.D.,                )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Civ. A. No. 03-1793 (RBW)
                                        )
JOHN ASHCROFT, et al.                   )
                                        )
            Defendants.                 )
_____)

## REPLY IN SUPPORT OF MOTION TO PRECLUDE NON-PECUNIARY DAMAGES OR, IN THE ALTERNATIVE, FOR AN INDEPENDENT MENTAL EXAMINATION



## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................. 1

ARGUMENT ..................................................................... 2

I.    NON-PECUNIARY DAMAGES ARE NOT COMPENSABLE
    UNDER THE PRIVACY ACT ................................................. 2

    A.    The Language of the Privacy Act Does Not Unambiguously Waive
        Sovereign Immunity for Non-Pecuniary Damages ......................... 2

    B.    Sovereign Immunity May Be Waived Only by Unambiguous Language
        In the Statutory Text ................................................. 7

    C.    Even If the Court Could Rely on the Statute's Purpose, Its Legislative
        History, or Other Statutes, None of These Indicates that Congress
        Intended "Actual Damages" to Encompass Non-Pecuniary Loss ........... 12

        1.    Legislative History .......................................... 12

        2.    Purpose of the Privacy Act .................................... 20

        3.    Other Statutes ............................................... 24

II.    THE COURT SHOULD COMPEL DR. HATFILL TO SUBMIT TO A
    MENTAL EXAMINATION TO VERIFY THE EMOTIONAL HARM
    THAT HE ALLEGES ..................................................... 27

    A.    By Asserting Damages for Emotional Harm, Plaintiff Has Placed His
        Mental Condition "In Controversy" and Provided "Good Cause"
        for Mental Examination ............................................... 28

    B.    Plaintiff's Objections to the Examination Are Without Merit ............... 31

    C.    Counsel Should Not Be Permitted to Attend the Examination .............. 34

CONCLUSION .................................................................. 35

# INTRODUCTION

In demonstrating that the Privacy Act does not permit compensation for non-pecuniary .1otional harm, the agency defendants' motion noted the well-established principle that waivers of sovereign immunity cannot be expanded beyond what the statutory language demands. If the statutory language is ambiguous, the statute must be read in favor of narrower government liability, regardless of the statute's underlying purpose or legislative history. Courts have found the term "actual damages" to be capable of more than one construction; accordingly, because the Privacy Act waives sovereign immunity, the Court must adopt the more limited construction, under which only pecuniary damages are compensable.

Plaintiff's response to this argument is essentially to wish it away. Although courts have uniformly ruled that the term "actual damages" is ambiguous, Plaintiff claims otherwise, based on nothing but the dictionary definition of the word "actual" divorced from the term of art in which it appears. Plaintiff alternatively asks the Court to derive the meaning of the term from Plaintiff's (flawed) assessment of the statute's purpose and legislative history, despite the fact that the Supreme Court has expressly forbidden such an approach in the sovereign immunity context. As discussed below, these attempts to dodge the application of settled case law are unavailing.

If the Court nonetheless entertains Plaintiff's claim for non-pecuniary damages, the Court should order Plaintiff to submit to an independent mental examination so that the agency defendants can defend against his claims of emotional harm and the damages he seeks. By claiming such harm and damages, he has squarely placed his mental condition "in controversy" for purposes of Rule 35, providing "good cause" for such an examination. The deposition testimony of both Dr. Hatfill and his companion, Peck Chegne, belie the contention in Plaintiff's

Opposition that the harm he has suffered is "garden variety." Moreover, although Dr. Hatfill has

chosen not rely upon expert testimony to support his own claim of emotional harm, this choice

does not preclude the agency defendants, under either Rule 35 or the case law interpreting it,

from conducting an examination to verify and defend against the harm and damages that Plaintiff

alleges. Finally, to permit the direct, one-on-one communication between Dr. Phillips and

Plaintiff that is necessary for an effective examination, the examination must be immune from

the adversarial process and free from the presence of counsel.

### ARGUMENT

## I.   NON-PECUNIARY DAMAGES ARE NOT COMPENSABLE UNDER THE PRIVACY ACT

### A.    The Language of the Privacy Act Does Not Unambiguously Waive Sovereign Immunity for Non-Pecuniary Damages

As the agency defendants noted in their opening brief, all three courts of appeal to rule on

the question of whether the Privacy Act permits non-pecuniary damages have agreed that the

term "actual damages" is facially ambiguous. Plaintiff attempts to characterize this finding of

ambiguity as an aberration perpetuated by the Eleventh Circuit's decision in Fitzpatrick v.

Internal Revenue Service, 665 F.2d 327 (11th Cir. 1982). See Opp. at 8-9. Plaintiff is incorrect.

Courts have consistently and uniformly acknowledged the ambiguity of this term, not just as it

appears in the Privacy Act, but in all contexts. See, e.g., In re Rivera Torres, 432 F.3d 20, 28 (1st

Cir. 2005) ("[W]hile it is true that the text of § 362(h) does provide for 'actual damages,' there

was no consensus in the background law that emotional distress damages are encompassed

within 'actual damages' at the time of the amendment . . . . Even today the question . . . has not

been conclusively determined."); In re Dawson, 390 F.3d 1139, 1146 (9th Cir. 2004), cert.

denied, 126 S. Ct. 397 (2005) (examining legislative history of bankruptcy law to determine

meaning of "actual damages" after concluding that "[e]ven after examining the text and context

. . . its meaning remains ambiguous"); Orekoya v. Mooney, 330 F.3d 1, 9 (1st Cir. 2003) (Privacy

Act case) ("[T]he term 'actual damages' does not have a generally accepted meaning of

including emotional distress damages.  Such emotional distress damages are hard to police and

may lead to broader waivers of immunity than Congress intended when it used the phrase 'actual

damages.'"); Hutchinson v. Delaware Savings Bank FSB, 410 F. Supp. 2d 374, 383 n.14 (D.N.J.

2006) ("It is unclear whether 'actual damages' under [the Real Estate Settlement Procedures

Act] encompasses emotional distress."); United States v. Harchar, 331 B.R. 720, 726 (N.D. Ohio

2005) ("[T]he circuit courts of appeals that have considered the issue agree that 'actual damages'

as used in § 362(h) is subject to different interpretations."); Hoai v. Sun Refining & Marketing

Co., 1991 WL 530756 at *2 (D.D.C. May 2, 1991) ("[T]he term actual damages does not appear

to have a plain meaning that is helpful in determining what damages may be recovered under the

[Petroleum Marketing Practices] Act."); Graham v. Holiday Inns, Inc., 1986 WL 15783 at *4

(W.D. Tenn. Mar. 31, 1986) ("A sweeping survey by this court of both federal and state case law

reveals that there is no generally accepted definition of 'actual damages' in American law.").  By

conspicuous contrast, Plaintiff fails to identify a single court that has proclaimed the term "actual

damages" to be facially unambiguous and to admit of only one meaning.

In keeping with the ambiguous nature of the term "actual damages," courts have

construed it in more than one way.  The agency defendants' motion noted many cases, both

within and outside of the Privacy Act context, that have construed the term to exclude damages

for non-pecuniary harm.  See Mot. at 3, 6, 8.  Plaintiff largely ignores the cases construing the

-3-

Privacy Act[1] and focuses instead on the agency defendants' citation to three cases in which

courts have construed the term "actual damages" in other statutes. See Opp at 13-15. Although

Plaintiff attempts to downplay the significance of two of these cases, Plaintiff does not deny that

the courts in those cases interpreted "actual damages" as the government does here.[2] With

respect to the third case, Plaintiff simply misreads it.[3] But in any event, these three cases are

---

[1] Plaintiff does address the district court cases in the D.C. Circuit. With respect to these, Plaintiff notes that the more recent cases have allowed Privacy Act plaintiffs to claim non-pecuniary damages, and asserts that "[t]he Court . . . would be well-justified in considering the matter settled." Opp. at 6. The matter, however, is far from settled. None of these more recent decisions even addressed the issue of sovereign immunity, let alone "settled" its proper application here. Moreover, Plaintiff's implication that the courts' holdings were based on an "analysis [that] reflects the standard suggested by the statutory text" ignores the fact that none of these decisions engaged in a substantive "analysis." See Def. Motion to Preclude at 8-9, nn.3-4.

[2] Plaintiff's description of Ryan v. Foster & Marshall, Inc., 556 F.2d 460 (9th Cir. 1977), however, is somewhat confusing. To clarify, the court in Ryan held that the Securities Act, which provides for "actual damages," does not permit purely emotional damages because "[a]ctual damages mean some form of economic loss"; the court then found that the plaintiff could recover for emotional harm under separate common law claims. Ryan, 556 F.2d at 464.

[3] Plaintiff contends that in Aiello v. Providian Financial Corporation, 239 F.3d 876 (7th Cir. 2001), Judge Posner recognized that "actual damages" generally include purely emotional injury, but held that the term would require an additional showing of financial harm when used in a financial statute. See Opp. at 14. In fact, in distinguishing between whether damages for emotional harm are "actual damages" ("[n]o doubt they are") and whether a statute that provides for "actual damages" authorizes recovery for emotional harm – which would appear, on its face, to be a distinction without a difference – it appears that Judge Posner, known for his rhetorical flourish, was distinguishing between the literal meaning of "actual" and the meaning accorded to the term "actual damages" in the law. Aiello, 239 F.3d at 878. Moreover, the court did not hold that "actual damages" would include emotional damages as long as financial damages also were alleged. Rather, the court held that the term "actual damages," as used in the statute, included only financial damages, but that a plaintiff could bring a suit under state tort law to recover for emotional harm. The court then noted that "[t]he interest in judicial economy, as embodied in the 'clean-up' doctrine of equity, might allow the court to 'top off' relief designed to redress any financial injury . . . with an award of damages for incidental harms, perhaps including emotional distress . . . to spare the debtor from having to bring two suits." Id. at 880; see also In re Rivera Torres, 432 F.3d 20, 28 (1st Cir. 2005) (noting that the Seventh Circuit in Aiello "held that 'actual damages' in § 362(h) contemplated a financial loss, not emotional distress damages").

merely examples. Plaintiff cannot legitimately deny that there are many cases in which courts

have interpreted "actual damages" as pecuniary damages. See, e.g., Mackie v. Rieser, 296 F.3d

909, 917 (9th Cir. 2002) (construing "actual damages," as used in the Copyright Act, to

encompass only the diminution in the "market value" of the artist's work and to exclude relief

for emotional harm); Pelletier v. Stuart-James Co., 863 F.2d 1550, 1557 (11th Cir. 1989)

("'Actual damages' has been interpreted to mean some form of economic loss . . . . ");

Richardson v. MacArthur, 451 F.2d 35, 43 (10th Cir. 1971) ("'Actual damages' under the Federal

rule of damages for fraud is the 'out-of-pocket rule.'"); Harchar, 331 B.R. at 732 ("[I]t is clear

that Congress did not intend to authorize the award of emotional damages under [the 'actual

damages' provision of] § 362(h)."); In re Tomasevic, 273 B.R. 682, 687 (M.D. Fla. 2002)

("Actual damages are limited to economic pecuniary injury.").

        Despite the courts' consensus regarding the ambiguity of the term "actual damages" and

the fact that many courts have construed it to exclude non-pecuniary damages, Plaintiff argues

that the term "actual damages" unambiguously and necessarily includes compensation for

emotional distress. His sole support for this contention is the unenlightening point that "actual"

means "actual." See Opp. at 7-9. But of course, the Court is not being asked to construe a single

word; it is being asked to construe the term "actual damages," which is a term of art in the law.

See, e.g., Barnette v. Brook Road, Inc., – F.Supp.2d –, 2006 WL 1195913 at *8 (E.D. Va. 2006)

(noting that "actual damages" is a "term of art"); Eclipse Medical Inc., v. American Hydro-

Surgical Instruments, Inc., 262 F.Supp.2d 1334, 1357 (S.D. Fla. 1999) (same). As such, recourse

to the dictionary definition of the word "actual" is of little use in interpreting the term. See Blitz

v. Donovan, 740 F.2d 1241, 1245 (D.C. Cir. 1984) (noting that, in Yates v. United States, 354

-5-

U.S. 298, 319 (1957), the "Court did not assume that Congress . . . used the words 'advocate' and 'teach' in their ordinary dictionary meanings when they had already been construed as terms of art carrying a special and limited connotation," and holding that "the Secretary had firm support for not attributing to the text of section 514 its strictly literal meaning" where "the pivotal word in section 514 had been construed . . . as a term of art").

Moreover, even taking Plaintiff's argument on its own terms, the dictionary definition of "actual" would not assist Plaintiff here. Although Plaintiff correctly points out that a person may suffer actual emotional harm, the word "actual" in the term "actual damages" does not describe the harm inflicted, but rather the compensation available. See Black's Law Dictionary at 389 (6th ed. 1990) (distinguishing between the term "damage," which means "harm, detriment, or loss," and the term "damages," which means "[a] pecuniary compensation or indemnity"). The term "punitive damages," for example, does not mean that the victim has suffered a harm that is punitive in nature; it is the payment, not the harm, that punishes. Accordingly, the question posed is not whether emotional harm is "actual" harm, but whether monetary payment constitutes "actual" compensation for a non-monetary injury. It requires no deviation from the dictionary definition of "actual" to hold that $100,000 is not "actual" compensation where a person has not "actually" suffered a $100,000 loss. Indeed, a specific sum of money cannot be "actual damages" for emotional harm because the harm is, by definition, non-quantifiable. See, e.g., Doe v. Chao, 306 F.3d 170, 179 n.4 (4th Cir. 2002) (describing emotional distress and similar injuries as "non-quantifiable"); Rorex v. Traynor, 771 F.2d 383, 387 (8th Cir. 1985) (same). Although juries are frequently asked to put dollar amounts on emotional harm, it is understood that these payments are a proxy for what the plaintiff has lost, not "actual"

-6-

compensation. See Dan B. Dobbs, Law of Remedies § 3.1, at 136 (1st ed. 1973) (noting that it is

"misleading" to refer to damages for non-pecuniary harm as "compensatory," and that "[t]he real

purpose in such cases is to vindicate a right that is deemed important").

Nor is there any *other* statutory text in the Privacy Act that unambiguously waives the

government's sovereign immunity for non-pecuniary damages. Plaintiff directs the Court to the

Privacy Act's preamble, which states that the act is intended to subject federal agencies "to civil

suit for *any damages* which occur as a result of willful or intentional action which violates any

individual's rights under the Act." 5 U.S.C. § 552a note § 2(b) (emphasis added). Of course,

because a preamble is "not an operative part of the statute," National Wildlife Federation v.

EPA, 286 F.3d 554, 569 (D.C. Cir. 2002) (quotation marks and citations omitted), it cannot itself

supply the clarity required for a waiver of sovereign immunity. Plaintiff does not dispute this

truism; indeed, Plaintiff implicitly concedes that a statute's preamble cannot "supplement[] or

clarif[y] an incomplete waiver of sovereign immunity." Opp. at 7-8 n.1. Plaintiff thus

acknowledges that the preamble is relevant only insofar as it "confirms the scope of the waiver

that is expressly contained in the civil remedies provision of the Act." Id. at 8 n.1. As the courts

of appeals consistently have recognized, however, the Privacy Act's civil remedies provision

does *not* "expressly" provide for non-pecuniary losses. Accordingly, the preamble is of no

assistance to Plaintiff, and cannot supply the clear waiver that is missing from the term "actual

damages."

    **B.**    **Sovereign Immunity May Be Waived Only by Unambiguous Language In the Statutory Text**

The bulk of Plaintiff's response is devoted to arguing that, if the Court finds the term

"actual damages" to be facially ambiguous, the Court should infer its meaning from the Act's

purpose, its legislative history, and the construction that courts have given the term in other statutes. See Opp. at 9-22. The Supreme Court has flatly prohibited such an approach when construing a waiver of sovereign immunity. One cannot imagine a clearer direction than the one given in Lane v. Pena: "A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text; *the 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text*." Lane v. Pena, 518 U.S. 187, 192 (1996) (emphasis added; internal quotation marks and citation omitted).

In the face of this clear statement, Plaintiff inexplicably maintains that courts may find waivers of sovereign immunity in a statute's structure, its purpose, its similarity to other contemporaneous statutes, and its legislative intent. See Opp. at 23. As support for this proposition, Plaintiff cites several Supreme Court cases which, to the extent they examined these non-textual aspects of a statute at all,[4] did so in the context of holding that the statute in question *did not* waive sovereign immunity. See id. Leaving aside the flaws in Plaintiff's descriptions of these cases, they can have no bearing here. As a matter of logic, the requirement of an unequivocal waiver in the statutory text does not preclude reference to extra-textual sources to confirm the *absence* of a waiver; however, it most certainly precludes reference to extra-textual sources to find a waiver's *existence*. Plaintiff notably fails to cite a single case in which the

---

[4] Plaintiff appears to have read too much into certain cases. For example, with regard to Department of the Navy v. Blue Fox, 525 U.S. 255 (1999) – in which the Court addressed whether the APA waives sovereign immunity for claims seeking equitable liens – Plaintiff indicates that the Court examined the purpose of the statute. See Opp. at 23. In fact, on the page of Blue Fox that Plaintiff cites, the Court noted the purpose of *equitable liens*. Similarly, Plaintiff's description of Trout v. Secretary of the Navy, 317 F.3d 286 (D.C. Cir. 2003) (see Opp. at 25) is in fact a quote from the Trout court describing *another* case, i.e., Brown v. Secretary of the Army, 78 F.3d 645 (D.C. Cir. 1996), in which the court's reference to legislative history was not in the context of its sovereign immunity analysis. See Brown, 78 F.3d at 648.

-8-

Supreme Court or any other court derived a waiver of sovereign immunity, either in whole or in part, from non-textual aspects of a statute.

In any event, Plaintiff badly mischaracterizes the cases in question. Plaintiff claims that, "[t]aken together, these cases teach that while the sovereign-immunity canon can sometimes bolster an otherwise sound construction, it cannot be used to insert unexpressed and arbitrary exceptions into a statute whose language contains no trace of any such thing." Opp at 25. In fact, none of the cases in question contains a single word on the subject of when the sovereign immunity canon "cannot be used." Moreover, none of these cases remotely suggests that the canon of sovereign immunity is relevant only as a secondary consideration after other canons have been applied. To the contrary, most of these cases cite the canon of sovereign immunity as the primary factor in their analysis. See, e.g., United States Dep't of Energy v Ohio, 503 U.S. 607, 615 (1992) ("We start with a common rule . . . that any waiver of the National Government's sovereign immunity must be unequivocal . . . and not enlarged beyond . . . what the language requires.") (internal quotation marks and citation omitted); Lane, 518 U.S. at 192 ("While Lane's analysis has superficial appeal, it overlooks one critical requirement firmly grounded in our precedents: A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . ."); Trout v. Secretary of the Navy, 317 F.3d 286, 287 (D.C. Cir. 2003) ("Because the holding in Brown rested on considerations of sovereign immunity *as enhanced by* the rule of no-interest against the sovereign, it is dispositive . . . .").

Plaintiff is similarly incorrect in claiming that, in the cases the government has cited, "it was reasonably clear even without any canon of construction that the far better reading of the statute in question was the reading that no waiver of sovereign immunity had been intended."

-9-

Opp. at 24. In <u>Lane</u>, for example, the Court noted that, while the Rehabilitation Act's

"equalization" provision could be read to waive sovereign immunity, there were two possible

non-waiver interpretations. The Court ruled that no waiver had occurred *despite* the fact that

"neither of these conceivable [non-waiver] readings . . . is entirely satisfactory." <u>Lane</u>, 518 U.S.

at 200. In construing another provision of the Rehabilitation Act, the Court also found no

waiver, despite the fact that its non-waiver reading implied a "somewhat bewildering" statutory

scheme.[5] <u>Id.</u> at 196. In <u>United States Department of Energy v. Ohio</u>, the Court was faced with

"an unresolved tension" between a provision that appeared to waive sovereign immunity for

punitive damages and one that did not. <u>Dep't of Energy</u>, 503 U.S. at 626. Far from determining

"without any canon of construction" which was "the far better reading" (Opp. at 24), the Court

held that the "tension is resolved by the requirement that any statement of waiver be

---

[5] Plaintiff asserts that, in <u>Lane</u>, "the obvious problem was that the statute[] in question [was] at war with [itself]," in that "[c]ertain provisions were narrowly tailored to grant a certain type of relief in certain specified situations, while other provisions purported to grant different or additional types of relief across a broader range of circumstances such that the exception would swallow the rule." Opp. at 25. This assertion is baffling. To the extent the Court found any tension among provisions, the tension was caused by, not a reason for, the Court's non-waiver interpretation. <u>See Lane</u>, 518 U.S. at 196 (noting "lack of perfect correlation in the various provisions" created by the non-waiver reading). On the particular page that Plaintiff cites, moreover, the Court did not reference any tension between provisions, but simply cited the broader remedy provisions of the Rehabilitation Act to show that Congress was capable of specifically crafting broader waivers of sovereign immunity when it wished to do so. <u>See Lane</u>, 518 U.S. at 193-194.

Plaintiff applies the same description to <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30 (1992). <u>See</u> Opp. at 25. It is true that, in <u>Nordic Village</u>, one of the two possible non-waiver readings had the advantage of harmonizing two provisions of the statute that otherwise would be in some tension. But far from concluding that this made a non-waiver interpretation the clear choice, the Court concluded that "[t]he foregoing [non-waiver interpretations] are assuredly not the only readings of subsection (c), but they are plausible ones – which is enough to establish that a reading imposing monetary liability on the Government is not 'unambiguous' and therefore should not be adopted." <u>Nordic Village</u>, 503 U.S. at 37.

unequivocal." Id. at 627. With regard to other cases in which the Court found no waiver,

Plaintiff attempts to downplay the importance that the strict construction doctrine played in the

courts' decisions by identifying problems with the waiver readings that the courts themselves

never identified.[6]

Plaintiff also challenges the agency defendants' application of the "strict construction"

rule, asserting that "a phrase that covers *all* damages, without exception or enumeration," should

not be "rendered indeterminate by pointing out that it does not *expressly* include one particular

kind of damages." Opp. at 26 (emphasis in original). The obvious flaw in this argument is its

premise. Although some courts have interpreted the term "actual damages" to include non-

pecuniary damages, *no* court has found that the term "actual damages" encompasses "all

damages, without enumeration or exception." (It is particularly disingenuous for Plaintiff to

suggest that "actual damages" encompasses any and all types of damages after elaborating at

length on the distinction between "actual damages," "liquidated damages," and "punitive

---

[6] For example, Plaintiff suggests that the Court of Appeals in Galvan v. Federal Prison Industries, 199 F.3d 461 (D.C. Cir. 1999), found the waiver construction to be implausible because it "pitted the United States executive branch against itself." Opp at 25. Plaintiff takes this quote entirely out of context. The government had claimed that the intra-governmental conflict deprived the court of jurisdiction for reasons unrelated to sovereign immunity; the court simply mentioned this claim in passing but did not address it in its decision. See Galvan, 199 F.3d at 462.

In a similar vein, Plaintiff's characterization of the holding in Blue Fox – "it simply made no sense to believe that Congress intended to authorize such a collection tactic [i.e., equitable liens] under a statute [the APA] that was specifically focused on relief 'other than money damages'" (Opp. at 24) – wrongly implies that the Court had the easy task of applying a statute that does not allow monetary recovery to a claim for monetary relief. In fact, the APA *does* allow for the recovery of monetary payments, but only as specific relief. The Court was thus faced with the less obvious question of whether equitable liens are considered substitute relief or specific relief. See Blue Fox, 525 U.S. at 261-63. In other words, the waiver reading was not as facially implausible as Plaintiff's portrayal of it.

damages." See Opp. at 17-18, 20-22.) As the agency defendants have shown, the term "actual damages" has been construed to have two plausible meanings that theoretically could be applied in this case: compensatory damages (the broader reading) and pecuniary damages (the narrower one).[7] The only question for this Court is which of these two meanings to apply; the context in which the term is used – i.e., a waiver of sovereign immunity – supplies the answer.

> **C.    Even If the Court Could Rely on the Statute's Purpose, Its Legislative History, or Other Statutes, None of These Indicates that Congress Intended "Actual Damages" to Encompass Non-Pecuniary Loss**
>
> **1.    Legislative History**

The Supreme Court has firmly rejected any effort to bolster a claim of waiver of sovereign immunity through reference to legislative history. See Lane, 518 U.S. at 192 ("A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text . . . ."); United States v. Nordic Village, Inc., 503 U.S. 30, 37 (1992) (because textual ambiguity must be resolved in favor of the sovereign, "legislative history [can have] no bearing on the ambiguity point"); id. (where statutory language does not provide an "'unequivocal expression'" of a waiver of sovereign immunity, the requisite clarity "cannot be supplied by a committee report"). Plaintiff nonetheless claims that "at least some Justices" find legislative history to be relevant. See Opp. at 23. In the single Supreme Court case they cite, however, the Court found that the legislative history confirmed the *lack* of a waiver. See Ruckelshaus v. Sierra Club, 463 U.S. 680, 686-88 (1983). This case does not undermine the clear directive of

---

[7] Both of these readings would encompass "recovery of medical expenses," and neither of these readings would encompass "*only* non-pecuniary damages." Plaintiff is thus incorrect in suggesting that the government's approach could lead to the exclusion of recovery for medical expenses or pecuniary damages generally. See Opp. at 26 (emphasis in original).

Lane v. Pena and Nordic Village: if the Privacy Act does not itself clearly waive sovereign

immunity, the Act's legislative history cannot change the outcome.

In any event, as discussed in the agency defendants' motion, the legislative history

indicates that Congress did not intend to provide compensation for non-pecuniary harm. This is

evidenced primarily in Congress's rejection of a provision for "general damages." A Senate

version of the bill provided for "actual and general damages sustained." S. 3418, 93d Cong. §

303(c) (Nov. 21, 1974), reprinted in Staff of Senate and House Comms. on Gov't Operations,

94th Cong., Legislative History of the Privacy Act of 1974: Source Book on Privacy 334, 371

(Comm. Print 1976). The bill also made the government liable for any violation of the Act

(including a negligent violation) and provided a $1,000 minimum recovery. See id.; see also 120

Cong. Rec. 39,200, 39,204 (1974). When the House received the bill, however, it struck the

bill's substantive provisions and replaced them with its own version, which awarded only "actual

damages" and only for "willful, arbitrary, or capricious" violations, without any provision for a

minimum recovery. See id. at 40,397-400.

Because the congressional term was coming to a close, the committee members who had

reported the House and Senate bills determined that there was not enough time to "resolve the

complex differences between the two bills in a conference committee," and agreed to

compromise amendments. See 120 Cong. Rec. at 40,880. The final compromise, which was

-13-

largely built on the House version,[8] adopted the House bill's award of "actual damages" and the

Senate bill's provision for a minimum recovery of $1,000, and specified that damages were

available for "intentional and willful" violations. With regard to the Senate's provision for

"general damages," the final bill omitted this provision, but created a Privacy Protection Study

Commission and instructed it to study "whether the Federal Government should be liable for

general damages" under the Act. See Privacy Act, Pub. L. No. 93-579, § 5(c)(2)(B)(iii), 88 Stat.

1896, 1907; 120 Cong. Rec. at 40,405, 40,881.

     Although there was no debate on the inclusion and ultimate exclusion of the provision for

"general damages," Plaintiff correctly notes that Congress was well aware of how the common

law dealt with invasions of privacy. See Opp. at 16; see also Johnson v. Dep't of Treasury, 700

F.2d 971, 977 (5th Cir. 1983) (noting that "surely Congress was not unmindful of the common

law" in selecting terminology). At common law, "general damages" are "compensatory damages

for a harm which so frequently results from the tort . . . that its existence is reasonably to be

anticipated and hence need not be alleged in order to be proved." Restatement (Second) of Torts

§ 904 (1979); see also Dan B. Dobbs, Law of Remedies § 3.2, at 138 (1st ed. 1973) ("General

damages . . . are damages that courts believe 'generally' flow from the kind of substantive wrong

done by the defendant."). For privacy violations, as Plaintiff notes, the harm that naturally flows

---

    [8] One of the many problems with the court's analysis in Johnson v. Department of
Treasury, 700 F.2d 971 (5th Cir. 1983), is its heavy reliance on legislative history reflecting the
Senate's initial intent to create a broad remedial bill. See Johnson, 700 F.2d at 975-78. Because
the "statute's substance is principally that of the House Bill (H.R. 16373)" that Congress passed
under a Senate bill number (S. 3418), courts have recognized that the Privacy Act is "essentially
a House carcass under a Senate hide." Perry v. FBI, 759 F.2d 1271, 1275 n.4 (7th Cir. 1985)
(quotation marks and citation omitted). The legislative history that the Johnson court cites thus
sheds little light on the much more limited damages provision that derived from the House bill.

from the tort is emotional harm. See Opp. at 16; see also Johnson, 700 F.2d at 977.

Accordingly, in the context of "dignitary invasions, such as . . . invasions of privacy," the "term 'general damages' . . . refers to damages awarded for the affront to the plaintiff's dignity and the emotional harm done," as opposed to either "actual economic harm" or punitive damages. Law of Remedies § 3.2 at 139. "Special damages," by contrast, are "compensatory damages for a harm other than one for which general damages are given." Restatement § 904. In the case of dignitary invasions, "special damages" involve the "loss of something having economic or pecuniary value," Restatement § 621 cmt. a (regarding defamation), and may be distinguished from "harm to [the individual's] interest in privacy" and "mental distress." Id. § 652H(a)-(c). Accordingly, assuming that Congress was aware of and adopted the common law's usage of these terms, Congress's decision to reject a provision for "general damages" indicates its intent to provide for pecuniary damages only. See Fitzpatrick, 665 F.2d at 330 (discussing Congress's rejection of a "general damages" remedy and concluding that "'actual damages' as used in the Act cannot be synonymous with common law general damages, and must refer to pecuniary loss").

Plaintiff's primary response to the above history is to suggest that "general damages" is synonymous with "presumed damages" and carries no connotation regarding the type of harm encompassed. See Opp. at 19. Plaintiff is incorrect. Because "general damages" are those that flow naturally from the tort, they may sometimes (although not always) be "presumed" rather than proven. See Restatement § 904, cmt. a ("In many cases in which there can be recovery for general damages . . . the existence of the harm may be assumed and its extent is inferred . . . . In other cases, however, the existence of a particular harm must be proved, although it need not be

-15-

specifically alleged."). In the case of common law privacy invasions, general damages generally *are* presumed. See Doe v. Chao, 540 U.S. 614, 621 (2004). But this does not change the term's fundamental definition, which relates to the nature of the harm and not whether proof is required.

Plaintiff's statement that the Supreme Court in Doe v. Chao "pointed out the fallacy of defendants' proposed interpretation" is simply false. Opp. at 19. The Court was not presented with the issue of whether the Privacy Act allowed for non-pecuniary damages, and therefore declined to address that issue. See Doe, 540 U.S. at 627 n.12. The Court was instead presented with the issue of whether the Privacy Act allowed for presumed (unproven) damages. Noting that general damages are presumed in common law privacy torts, the Court found that the deletion of the term "general damages" indicated that Congress expected damages to be proven. See id. at 621-22. But far from "discredit[ing]" or "point[ing] out the fallacy of" defendants' interpretation, Opp. at 19, the Court's analysis strongly supported it. In particular, the Court cited the Restatement of Torts for the proposition that "general damages" are awarded "without proof of pecuniary loss [or] physical harm." Doe, 540 U.S. at 621 n.3 (internal quotation marks and citation omitted). By contrast, the Court noted that "special damages" in privacy cases involved "harm of a material and generally of a pecuniary nature," and that a privacy plaintiff pleading special damages had to "demonstrate some actual, quantifiable pecuniary loss." Id. at 625. The Court thus indicated its understanding that, in the particular context of privacy invasions, the general versus special damages dichotomy portends not only a dichotomy between presumed and proven damages, but a dichotomy between non-pecuniary and pecuniary damages as well.

-16-

Plaintiff adopts the Johnson court's skepticism that Congress would have provided a remedy for privacy violations, for which the primary injury is emotional, without also providing damages for purely emotional injury (untethered to any accompanying pecuniary loss). See Opp. at 16. The critical backdrop that is missing from both Plaintiff's analysis and that of the Johnson court is the suspicion with which the law viewed non-pecuniary emotional damages at the time Congress passed the Privacy Act. As stated by Judge Posner in Aiello v. Providian Financial Corporation:

> The law has always been wary of claims of emotional distress, because they are so easy to manufacture. For a long time damages for such distress were generally limited to cases in which the plaintiff was able to prove some other injury. The courts have grown more confident of their ability to sift and value claims of emotional distress, and the old limitations have largely been abandoned; but suspicion lingers . . . .

Aiello v. Providian Financial Corp., 239 F.3d 876, 880 (7th Cir. 2001); see also Carlisle v. Consolidated Rail Corp., 990 F.2d 90, 94 (3d Cir. 1993), rev'd on other grounds, Consolidated Rail Corp. v. Gottschall, 512 U.S. 532 (1994) (noting various limitations placed upon recovery of emotional damages in response to "the courts' suspicion that emotional distress claims are often subject to fraud and exaggeration"). Accordingly, under the common law, despite the fact that emotional harm was recognized as the typical harm that resulted from dignitary invasions, plaintiffs generally were allowed to recover such damages only if they could first prove "some actual, quantifiable pecuniary loss." Doe, 540 U.S. at 625.

Plaintiff also ignores Congress's concern with the fiscal impact of the Privacy Act, legislation that could in theory impose unprecedented liability on the federal government. See Def. Mot. at 14; Houston v. United States Dep't of the Treasury, 494 F. Supp. 24, 29 & n.13 (D.D.C. 1979). As the Eleventh Circuit noted in Fitzpatrick, "Throughout the Privacy Act

-17-

debate, a central concern was the scope of potential government liability for damages."

Fitzpatrick, 665 F.2d at 330. It is true that this concern was manifested in discussions about the

possible effects of adding punitive damages or attaching liability to negligent violations. But it

is also undeniably true that these same concerns would be implicated by allowing for the

recovery of non-pecuniary damages.

In support of his interpretation, Plaintiff relies on comments in the legislative history to

the effect that "it is quite often difficult to prove actual damages." Opp at 17 (quoting Johnson,

700 F.2d at 980, in turn quoting remarks of Rep. McCloskey, Source Book at 923). Plaintiff

notes the response of the Johnson court that, "if actual damages are hard to prove, they would

appear not to be limited to out-of-pocket losses: these losses are 'quite easy' rather than 'quite

... difficult' to prove." Opp. at 17 (quoting Johnson, 700 F.2d at 980). In fact, however, actual

damages may be difficult to prove, not because they involve non-pecuniary loss, but because the

plaintiff must prove causation (i.e., that the damages were caused by the violation of the Act) – a

burden that would be equally difficult for pecuniary and non-pecuniary damages. Even the

Johnson court acknowledged this fundamental problem with its analysis. See 700 F.2d at 980

n.22.

In this regard, Plaintiff neglects to mention a crucial aspect of the Johnson court's

decision. While the Johnson court incorrectly concluded that the legislative history favored

allowing Privacy Act plaintiffs to claim non-pecuniary losses, the court did *not* conclude (as

Plaintiff does) that "there is simply no plausible argument" to the contrary. Opp. at 23. Rather,

in rejecting the government's interpretation, the court noted the existence of "equally plausible"

interpretations, including the one it adopted. Johnson, 700 F.2d at 982. The Johnson court failed

-18-

to address the question of sovereign immunity; had it done so, however, the existence of an admittedly "plausible" non-waiver reading would have required it to adopt the government's position. See Nordic Village, 503 U.S. at 37.

The bulk of Plaintiff's analysis of the legislative history focuses on Congress's decision to reject punitive and liquidated damages in favor of actual damages. Opp at 17-18, 20-22. This analysis is totally unhelpful. The government acknowledges that punitive and liquidated damages are different from actual damages, and that Congress debated and rejected the inclusion of the former types of damages in the Act. This fact sheds no light on the question of whether Congress viewed "actual damages" as including or excluding non-pecuniary loss. What *does* shed light on that question is Congress's rejection of the provision for "general damages," discussed above.

Finally, Plaintiff's analysis offers no response to the findings of the Privacy Protection Study Commission, which Congress established to study the Act and to make recommendations. The Commission, which included two members of Congress who were key players in the Act's passage, concluded that "Congress meant to restrict recovery to specific pecuniary losses until the Privacy Commission could weigh the propriety of extending the standard of recovery." Personal Privacy in an Information Society: The Report of the Privacy Protection Study Commission at 530 (July 1977). Although the Commission recommended amending the Act to provide for the inclusion of non-pecuniary emotional damages, see id. at 531, Congress did not make any such amendment. Regardless of how much weight one ascribes to the Commission's conclusions, the Commission's report certainly put Congress on notice that the Act *could* be construed to exclude non-pecuniary emotional damages; Congress's decision not to amend the

-19-

Act in response to the Commission's suggestion thus strongly suggests that Congress did not intend for such damages to be recovered.[9]

## 2.    Purpose of the Privacy Act

Plaintiff asserts that, "to the extent the Court finds any ambiguity in the phrase 'actual damages,' Congressional purpose becomes even more important as an aid to construction." Opp. at 9. In fact, for statutes that waive sovereign immunity, congressional purpose is irrelevant if it is not reflected in unambiguous text. See Library of Congress v. Shaw, 478 U.S. 310, 318 (1986) ("Nor can an intent on the part of the framers of a statute . . . suffice [to waive sovereign immunity] where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.") (quotation marks and citation omitted). Similarly, this Court may not base a finding of waiver on the policy underlying the Privacy Act. See id. at 321 ("[T]he immunity of the United States from liability . . . is not to be waived by policy arguments of this nature.") (alterations in original; quotation marks and citation omitted). That the Court of Appeals in Pilon v. United States Department of Justice, 73 F.3d 1111 (D.C. Cir. 1996) drew "substantial guidance" from the statement of purpose contained in the Act's preamble (see Opp. at 10[10]) does

---

[9] Similarly, regardless of whether Rep. Eckhardt spoke for the majority of Congress when he equated "actual damages" with "out-of-pocket expenses," see 120 Cong. Rec. at 36,956 (addressed by Plaintiff at Opp. at 22 n.18), it is surely significant that no member of Congress took issue with his characterization. See Houston, 494 F. Supp. at 30 n.13 (noting that "Eckhardt's 'out-of-pocket' characterization went unchallenged").

[10] Plaintiff suggests that the Pilon court relied on the statement of purpose to conclude that the Act should be construed in a manner that would give effect to the statute's privacy protection goals. See Opp. at 10. This is not quite accurate. The court in Pilon cited the preamble primarily for its use of the word "disseminate," which the court used to assist it in interpreting the word "disclose" that appears in the statutory text. See Pilon, 73 F.3d at 1120-21.

not suggest otherwise, given that the Pilon court was construing a substantive provision of the Act, not a waiver of sovereign immunity. See Pilon, 73 F.3d at 1112 (construing the term "disclose" in 5 U.S.C. § 552a(b), which prohibits agencies from disclosing certain records without authorization).[11]  But even if the Court could consider Plaintiff's "congressional purpose" argument, it would not lead the Court to the interpretation that Plaintiff urges.

The first indication of congressional purpose Plaintiff cites is the preamble to the Act. As noted above, the preamble states that the Act is intended to subject federal agencies "to civil suit for *any* damages which occur as a result of willful or intentional action which violates any individual's rights under the Act."  5 U.S.C. § 552a note § 2(b) (emphasis added).  Plaintiff's citation to the preamble proves too much.  Plaintiff spends several pages of his brief pointing out that Congress did *not* intend to allow recovery for punitive or liquidated damages (see Opp. at 17-18, 20-22); it is thus quite clear that the term "any damages" cannot be taken as a literal statement of Congress's intent.  That the preamble engaged in rhetorical hyperbole is confirmed by the second part of section 2(b), which asserts that damages are available for willful and intentional agency action "which violates *any* individual's rights under the Act" (emphasis added).  In fact, the Act clearly does *not* make damages available for the violation of certain rights, namely, those set forth in the access and amendment provisions. See 5 U.S.C. §

_____

[11] The same is true for the other two cases Plaintiff cites as examples of the court relying on the Privacy Act's underlying purpose. In Tijerina v. Walters, 821 F.2d 789 (D.C. Cir. 1987), the court was construing the term "disclose" in 5 U.S.C. § 552a(b), which prohibits agencies from disclosing certain records without authorizations. In Bartel v. Federal Aviation Admin. v. United States, 725 F.2d 1403 (D.C. Cir. 1984), the court was construing the term "records" in 5 U.S.C. § 552a(b), which prohibits agencies from disclosing certain records without authorization. Because these are substantive provisions of the Act that do not waive sovereign immunity, the Court of Appeals in those cases was not required to limit its analysis to the plain language of the statutory text, as the Court is here.

552a(g)(1)(A)-(B) and (2)-(3) (providing injunctive relief without damages). Simply put, the preamble cannot sustain the literal reading Plaintiff attempts to give it.

Plaintiff next cites three cases in which the Court of Appeals for the District of Columbia declined to interpret the Privacy Act in a manner that would utterly gut its protections. In Pilon v. United States Department of Justice, 73 F.3d 1111 (D.C. Cir. 1996), the government argued that release of a record did not constitute "disclosure" if an agency employee had already seen it in a permissible context; the court found that this interpretation "converts a limited exception under the Privacy Act, which makes certain disclosures within the agency permissible, into virtually an absolute shield from liability." Pilon, 73 F.3d at 1123.[12] In Tijerina v. Walters, 821 F.2d 789 (D.C. Cir. 1987), the court rejected an interpretation of the Act that would have allowed federal agencies to exempt themselves from liability for unauthorized disclosures, finding that this interpretation "would give agencies license to defang completely the strict limitations on disclosure that Congress intended to impose." Tijerina, 821 F.2d at 797. In Bartel v. Federal Aviation Admin. v. United States, 725 F.2d 1403 (D.C. Cir. 1984), the court found that the Privacy Act must be interpreted to protect information gathered for inclusion in protected records, regardless of whether the information was physically retrieved from those records; the court noted that "a different interpretation would deprive the Act of all meaningful protection of privacy." Bartel, 725 F.2d at 1411.

---

[12] Plaintiff claims that the Pilon court relied on the statement of purpose in the Privacy Act's preamble to conclude that the Act should be construed in a manner that would give effect to the statute's privacy protection goals. See Opp. at 10. This is not quite accurate. The court in Pilon cited the preamble primarily for its use of the word "disseminate," which the court used to assist it in interpreting the word "disclose" that appears in the statutory text. See Pilon, 73 F.3d at 1120-21.

-22-

In contrast to these cases, Plaintiff offers no reason to believe that interpreting "actual damages" to mean "pecuniary damages" would create "an absolute shield from liability," Pilon, 73 F.3d at 1123, would "defang completely the strict limitations on disclosure," Tijerina, 821 F.2d at 309, or would "deprive the Act of all meaningful protection of privacy." Bartel, 725 F.2d at 1411. In this case, for example, Dr. Hatfill has claimed millions of dollars in purely pecuniary loss. While such claims may be the exception, so, presumably, are the cases in which the violation would not generate a single dollar of monetary impact. Indeed, as the Supreme Court has noted, see Doe, 540 U.S. at 625, many common law defamation actions require plaintiffs to show *some* pecuniary loss before they can claim "presumed" damages; such a requirement would be self-defeating if total absence of pecuniary loss were the norm. Nor is there any reason to worry that the pecuniary damages awarded would be too trivial to constitute an effective deterrent. Under the Act, as long as a plaintiff can show some pecuniary loss, the statutory minimum is triggered, and the agency is automatically liable for $1,000. See 5 U.S.C. § 552a(g)(4)(A).

Plaintiff notes that Congress provided for a minimum recovery of $1,000 and reasonable attorneys' fees and costs, see Opp. at 11-12, but this observation does not make a convincing case for the broader reading of "actual damages." While it may be true that these provisions signal "a Congressional purpose to encourage private enforcement," id. at 11, it is quite clear that there were limits to how far Congress was willing to go to effectuate this purpose. For example, Congress denied to Privacy Act plaintiffs both presumed damages and punitive damages, despite the fact that allowing such recoveries would naturally encourage broader private enforcement. See Fitzpatrick, 665 F.2d at 330 (observing that "the evolution and structure of the damage

-23-

provisions indicate Congressional intent to restrict damage liability to a maximum consistent with private enforcement of the Act"). Indeed, the Supreme Court has interpreted the statute's minimum recovery provision to apply only in cases where the aggrieved party can first prove damages, despite the fact that this interpretation would preclude private enforcement in an entire category of cases (i.e., those in which the plaintiff cannot prove actual damages). See Doe, 540 U.S. at 614. The existence of a purpose to encourage private enforcement, therefore, is not a basis on which to infer Congress's understanding of the term "actual damages."

### 3.    Other Statutes

Plaintiff asks the Court to deem the government's sovereign immunity waived on the ground that some courts have construed other statutes, enacted before the Privacy Act, to provide for non-pecuniary damages. In particular, "the term 'actual damages' in the Fair Housing Act has been interpreted by some courts, before enactment of the Privacy Act and since, to include damages for emotional distress as well as out-of-pocket loss." Orekoya, 330 F.3d at 9 n.6 (cited in Opp. at 12). In addition, "the Fair Credit Reporting Act . . . has usually been interpreted to include emotional distress within 'actual damages.'" Id. at 9. Plaintiff also notes that a single district court allowed a plaintiff to recover damages for "grave emotional harm" under the Crime Control and Safe Streets Act, which provides for "actual damages." Opp. at 13 (citing Gerrard v. Blackman, 401 F. Supp. 1189, 1193 (N.D. Ill. 1975)).

It goes without saying that a court's interpretation of a different statute cannot be used to resolve doubts about whether the statutory text of the Privacy Act unambiguously waived sovereign immunity for non-pecuniary damages. Plaintiff claims otherwise, citing Lane v. Pena and Ruckelshaus v. Sierra Club. See Opp at 23 (citing these cases for the proposition that courts

-24-

"must look not only at the language of the statute but at . . . its similarity to other
contemporaneous statutes"). These cases do not remotely establish the proposition for which
Plaintiff cites them. The Court in Lane, after noting that section 504 of the Rehabilitation Act
lacked a clear waiver of sovereign immunity for monetary damages against the federal
government, contrasted this ambiguity with the clear waiver of sovereign immunity contained in
certain other statutory provisions, and concluded that "[t]he clarity of these provisions is in sharp
contrast to the waiver Lane seeks to tease out of §§ 504 and 502(a)(2) of the Act." Lane, 518
U.S. at 194; see also id. at 193 (noting that "[t]he lack of clarity in § 505(a)(2)'s 'Federal
provider' provision is underscored by the precision with which Congress has waived the Federal
Government's sovereign immunity" in a different provision). In Ruckelshaus, the Court
referenced the legislative history of the Equal Access to Justice Act in construing the term
"appropriate" in the Clean Air Act's attorney fee provision; far from using this history to infer a
waiver of sovereign immunity, the Court cited it as confirmation that Congress did *not* intend to
waive sovereign immunity in the Clean Air Act. See Ruckelshaus, 463 U.S. at 684.

It is particularly inappropriate to infer a waiver of sovereign immunity from the statutes
that Plaintiff has cited. Although Plaintiff characterizes the Fair Housing Act ("FHA"), the Fair
Credit Reporting Act ("FCRA"), and the Crime Control and Safe Streets Act ("CCSSA") as
"analogous to the Privacy Act," Opp. at 12, Plaintiff ignores the critical respect in which they are
*not* analogous: each of these statutes was primarily or entirely directed at the conduct of private
parties, not the federal government, and so courts did not address the sovereign immunity
question in resolving the interpretation of "actual damages." See Orekoya, 330 F.3d at 9
("Admittedly, the government is not the usual defendant in FCRA cases and so no issue of

-25-

sovereign immunity is necessarily involved in those cases."). Congress's understanding that courts would take a different approach (i.e., one of "strict construction") when interpreting a provision for damages against the United States must be presumed. See Brown v. Secretary of Army, 78 F.3d 645, 650 (D.C. Cir. 1996) ("[W]e must presume that a Congress that intends to waive sovereign immunity is aware of the principles that will govern our reading of the waiver.").

Equally important, there is no reason to think that Congress was influenced by the courts' interpretation of the FHA, the FCRA, or the CCSSA in crafting the Privacy Act. Although Congress did borrow some aspects of the Privacy Act from the FCRA (which, like the Privacy Act, addressed some concerns relating to personal privacy), the bulk of the decisions interpreting the FCRA to provide for non-pecuniary damages were not issued until after the Privacy Act was enacted; as the Johnson court admitted, "it would not be fair to charge Congress with knowledge of the case law construing 'actual damages' under the Fair Credit Reporting Act." Johnson, 700 F.2d at 984. This also is true for the single case addressing the CCSSA that Plaintiff cites, which was decided in 1975. Moreover, with regard to both the CCSSA and the FHA, these statutes dealt with entirely different types of misconduct and were enacted by a different Congress; nothing in the legislative history of the Privacy Act indicates that Congress considered them or the case law interpreting them to be relevant.

In sum, there can be no serious question that the language of the Privacy Act's civil remedies provision may be read the way two out of three courts of appeals have read it: to exclude non-pecuniary damages. The doctrine of sovereign immunity thus requires the Court to read it in this narrower way. But even if the Court looks outside the language of the Act, the

-26-

legislative history confirms that Congress intended to exclude non-pecuniary damages, and

nothing in the purpose of the statute or in any other statute suggests a different conclusion.

## II.    THE COURT SHOULD COMPEL DR. HATFILL TO SUBMIT TO A MENTAL EXAMINATION TO VERIFY THE EMOTIONAL HARM THAT HE ALLEGES

If Plaintiff's claim for non-pecuniary damages is permitted to proceed, the Court should

grant the agency defendants' request that he submit to independent mental examination (IME).

By asserting emotional harm, Plaintiff has put his mental state directly at issue. Plaintiff's

repeated assertion that there is no need for an IME because his emotional harm is simply "garden

variety" cannot be reconciled with his deposition testimony, and that of his companion, Peck

Chegne, who is likely to testify at trial.

Upon deposition, Plaintiff repeatedly cited the "unbelievable anguish and stress"

stemming from the alleged disclosures in this case for, among other things, his apparent lack of

memory regarding the specifics of conversations that he and his spokesperson had with reporters.

See e.g., Deposition Transcript of Steven J. Hatfill, Attachment A, at 59-60 (citing lack of

memory as to communications public spokesperson had with members of the press); 85-92

(citing lack of memory for many of the details of conversations he had with ABC News prior to

the alleged disclosures in this case). He also testified that the emotional harm purportedly

stemming from the alleged disclosures has caused a "complete destruction of his personality."

Id. at 308:20-22. Ms. Chegne similarly testified that Dr. Hatfill's  emotional harm has resulted

in, among other things, depression and chronic drinking. See Deposition Transcript of Peck

Chegne, Attachment B at 166-67.

Plaintiff cannot have it both ways. Either he must admit that his sworn testimony at

deposition is false, and forego any damages for the severe emotional harm he claimed at his

-27-

deposition. Or, he must stand by such sworn testimony, and submit to a Rule 35 examination so that the government can defend against these claims of severe emotional harm.

### A.  By Asserting Damages for Emotional Harm, Plaintiff Has Placed His Mental Condition "In Controversy" and Provided "Good Cause" for Mental Examination

To be sure, Rule 35 requires more than a showing of relevancy. <u>See</u> Opp. at 28. A party, however, who "asserts mental or physical injury places that mental or physical injury in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." <u>Schlagenhauf v. Holder</u>, 379 U.S. 104, 119 (1964).

There is nothing ambiguous in the <u>Schlagenhauf</u> standard. Plaintiff nonetheless points to the facts of <u>Schlagenhauf</u> in a purported attempt show that an independent mental examination is not required here. <u>See</u> Opp. at 28. In <u>Schlagenhauf</u>, the plaintiff "did not assert his mental or physical condition either in support of or in defense of a claim. His condition was sought to be placed in issue by other parties." <u>Id.</u> Here, by contrast, Plaintiff has affirmatively interjected this issue by claiming severe emotional harm that has allegedly resulted in the maladies that he and Ms. Chegne testified about upon deposition, and by claiming that these damages are ongoing.

Plaintiff also attempts to minimize the other cases from this Circuit requiring an IME under these circumstances, claiming that an IME is only permitted "where plaintiff alleges that he or she is suffering from an ongoing, diagnosable mental injury, particularly where the plaintiff expects to offer a scientific diagnosis and provide the existence of the condition by calling the plaintiff's own expert." Opp. at 28. As demonstrated, both Dr. Hatfill and Ms. Chegne testified

at deposition that the purported disclosures in this case have caused multiple ongoing maladies, including lack of memory, depression, chronic drinking, and the complete loss of personality.

Plaintiff's real argument thus appears to be that he must first choose to hire an expert before Dr. Phillips is permitted the opportunity to examine him and before the government can defend against his claims. This is not the law. In Doe v. District of Columbia, 229 F.R.D. 24 (D.D.C. 2005), plaintiff did not hire an expert. The court nonetheless found that an IME was required because plaintiff placed his mental condition "clearly in controversy" by alleging that the city's alleged negligent care was the direct and proximate causes of his emotional and mental pain. Doe, 229 F.R.D. at 26.

Similarly, in Smith v. Kaplan, 215 F.R.D.11 (D.D.C. 2003), the court found that plaintiff had placed his mental condition "in controversy" and that "good cause" existed for an examination where plaintiff asserted that defendant's discriminatory actions left her "'hopeless about the future' and that her 'life [has] been a failure.'" Smith, 215 F.R.D. at 13. Dr. Hatfill's and Ms. Chegne's deposition testimony go well beyond the assertions made in Doe and Smith and, thus, provide even more of a basis for an IME. It is true that in Smith, plaintiff asserted that she was in the process of finding an expert to substantiate her damages. See id. at 14. That, however, was not the reason for ordering the IME. The court instead found "good cause" for the IME in plaintiff's statement of purported harm and her self-diagnosis of her mental condition. Id. The court recognized that "[w]ithout the opportunity for an independent medical examination, it will be simply impossible for defendant to counter plaintiff's opinion of her mental state." Id.

Shepherd v. American Broadcasting Cos., 151 F.R.D. 194, 213 (D.D.C. 1993) and

Chiperas v. Rubin, 1998 WL 765126 (D.D.C. 1998) both involved circumstances in which the

plaintiff had retained an expert to testify about their emotional harm. Neither court, however,

ruled that this is a precondition for an IME. The court in Shepherd instead found that plaintiffs

"ha[d] placed their mental conditions in controversy by demanding damages to compensate them

for emotional distress." Shepherd, 151 F.R.D. at 212, rev'd on other grounds and vacated in

part, 62 F.3d 1469 (D.C. Cir. 1995). The Shepherd court also recognized that "good cause" for

such an examination existed where one of the plaintiffs had "strongly emphasized the severity of

her emotional problems." Id. at 213. Chiperas similarly recognized that "[t]he federal courts

have invariably ordered [an examination] when a plaintiff predicates her damage claim in whole

or in part on specific psychic harm done by the defendant's actions or anticipates that she will

call an expert witness in support of that claim." Chiperas, 1998 WL 765126, at *3 (emphasis

added).

Plaintiff also cannot avoid an independent mental examination by simply labeling his

claimed emotional harm as "garden variety." Opp. at 28. His testimony and that of Ms. Chegne

reveal claims of emotional harm that are anything but "garden variety." The cases that plaintiff

relies upon in this regard do not alter the standard set forth in Schlagenhauf nor the law of this

Circuit in Doe and Smith. Turner v. Imperial Stores, 161 F.R.D. 89 (S.D. Cal. 1995) and Ricks

v. Abbott Labs, 198 F.R.D. 647 (D. Md. 2001), upon which plaintiff relies, echo the central

holdings of each of these cases in recognizing that an examination is necessary where plaintiff

alleges "a specific mental or psychiatric injury" or makes "a claim of unusually severe emotional

distress." See Turner, 161 F.R.D. at 95; Ricks, 98 F.R.D. at 649 (recognizing these factors).

-30-

Because both claims are present here, the Court should compel the requested mental examination.

**B.    Plaintiff's Objections to the Examination Are Without Merit**

While Plaintiff points to five purported problems with the agency defendants' request for an independent examination, each is unavailing. First, Plaintiff alleges that, because the effects of his emotional harm are ongoing and diagnosable, a request for an IME "makes no sense unless a 2006 examination will be able to show whether or not Dr. Hatfill experienced emotional distress in 2002, 2003, or 2004." Opp. at 32. This argument, however, simply cannot be squared with Dr. Hatfill's and Ms. Chegne's deposition testimony alleging that Dr. Hatfill *continues* to suffer emotional damage in 2006 from the alleged disclosures in 2002, 2003, and 2004.

Second, Plaintiff claims that the affidavit of Dr. Phillips must specifically state what the government expects to find in an examination of Dr. Hatfill. Opp. at 33. This argument fares no better. Defendants do not have the burden "to prove [their] case on the merits in order to meet the requirements for a mental . . . examination." Schlagenhauf, 379 U.S. at 119. The sole burden under Schlagenhauf is to prove that plaintiff's mental condition is "in controversy" and that "good cause" exists for such an examination under Rule 35. Defendants have made that showing.

Third, Plaintiff claims that expert testimony as to his mental condition is not necessary because "laypersons can understand this kind of ordinary emotional distress without the help of an expert." Opp. at 34. This argument, however, is merely a restatement of his claim that his harm is "garden variety." Dr. Hatfill's and Ms. Chegne's deposition testimony detail emotional harm that is anything but "garden variety," but instead allege wholesale personality disorders.

-31-

Again, Turner and Ricks, upon which plaintiff relies upon for his argument in this regard, recognize that an IME is necessary where a party claims either "a specific mental or psychiatric injury" or "unusually severe emotional distress." Turner, 161 F.R.D. at 95; Ricks, 198 F.R.D. at 649 (recognizing these factors). Both claims are present here.

Fourth, Plaintiff claims that granting our motion will force Plaintiff to "hire his own psychiatric expert to counter Dr. Phillips testimony about the examination." Opp. at 34. Plaintiff's counsel, however, has been on notice for months that defendants had retained Dr. Phillips to speak to the issue of emotional harm should such damages be permitted. Counsel has nonetheless been steadfast in insisting that Plaintiff will rely upon fact witnesses to support his claimed emotional harm. Indeed, Plaintiff's counsel has represented that he does not intend to call Plaintiff's psychiatrist, Dr. May, at trial. Plaintiff's reversal in position regarding the need for expert testimony appears to be a begrudging admission that Dr. Phillips will in fact have something very valuable to say and that the only way to respond is for Plaintiff to hire an expert of his own to respond to Dr. Phillips's findings. Such an admission proves why the IME that defendants request is so critical to the Court's understanding.

Fifth, Plaintiff alleges that other means exist to obtain information regarding his claimed emotional harm. See Opp. at 35. He points to the notes of Dr. May and to Ms. Chegne's testimony. But, as noted in the government's opening memorandum, defendants cannot rely upon a scattered set of records in evaluating Plaintiff's alleged emotional harm. See Smith, 215 F.R.D. at 14 (lack of available information warrants ordering plaintiff to submit to mental examination by defendant's proposed psychiatrist). Given the ongoing harm Dr. Hatfill and Ms. Chegne allege, moreover, good cause exists for a new examination since the nature of his

Case 1:03-cv-00644-EGS    Document 55-6    Filed 07/14/2008    Page 35 of 37

condition may have changed since Dr. May's examination.  See Ziemann v. Burlington County

Bridge Comm'n, 155 F.R.D. 497, 501-02 (D.N.J. 1994) (good cause established for psychiatric

examination because plaintiff's mental condition had changed significantly since plaintiff's prior

examination); Galieti v. State Farm Mut. Auto. Ins. Co.,154 F.R.D. 262, 263 (D. Colo. 1994)

(although defendant's mental health experts had previously evaluated plaintiff in action for

severe emotional distress, new examination ordered because plaintiff alleged ongoing injury and

more than two years had elapsed since prior examination).  Given the prospect that Dr. May

could be called at trial, defendants must be afforded the opportunity to conduct their own

analysis of Dr. Hatfill's condition.  This is particularly the case here, where Dr. May's

examinations were initiated after the filing of this lawsuit and appear to be prompted more by

Plaintiff's attempt to build a record to substantiate his damages than to assess the emotional

harm he and Ms. Chegne can be expected to testify about at trial.

Ms. Chegne's deposition testimony also is no substitute for a thorough examination

conducted by Dr. Phillips.  As already demonstrated, the ongoing harm to which Ms. Chegne

testified by itself places Plaintiff's mental condition "in controversy" and provides good cause

for an IME.

Plaintiff's final allegation is that defendants cannot be entrusted with a videotape of the

examination since that videotape may be leaked.  Opp. at 36.  A protective order has already

been issued in this case protecting this very information.  The government would consent in

advance to designating this videotape as protected information under that protective order to

guard against Plaintiff's concern.  This is the same mechanism that the parties have used during

discovery to ensure the confidentiality of sensitive medical and financial information.

-33-

## C.    Counsel Should Not Be Permitted to Attend the Examination

Lastly, Plaintiff insists, in the alternative, that his counsel be present for the IME. See

Opp. at 36. He alleges that there is reason to "suspect that the questions [in the examination]

may go [to subjects] that are not within in the scope of Rule 35." Id. Plaintiff provides no basis

for this assertion, and there is none. There is, accordingly no reason to "suspect" that Dr.

Phillips will do anything but conduct a professional and medically appropriate examination.

The law, moreover, generally prohibits counsel from being present at a court ordered

IME. Although some courts have permitted the presence of counsel at an IME, the "greater

weight of authority favors the exclusion of Plaintiff's attorney from the conduct of a Rule 35

examination." Abdulwali v. Washington Metro Area Transit Auth., 193 F.R.D. 10, 13 (D.D.C.

2000) (surveying applicable law). Courts have emphasized that the following factors weigh

against the presence of an attorney at a psychiatric examination: (1) the special nature of a

psychiatric examination requires direct and unimpeded one-on-one communication without

external interference or intrusion; (2) Rule 35 examinations are not intended to be adversarial;

and (3) any concerns about distortions or inaccuracies by the examining psychiatrist can be

addressed through cross-examination and impeachment. Caban v. Forcier, 200 F.R.D. 9, 12 (D.

Mass. 2001).

"In the instances in which the presence of a third party has been allowed, '[e]ach of these

rulings has been grounded in the particular facts of the case. None has found an absolute right to

-34-

have an attorney present during a psychiatric examination.'" <u>Abdulwali</u>, 193 F.R.D. at 13.[13]  No

extraordinary circumstances exist here.  While Dr. Hatfill suggests that Fifth Amendment

concerns such as those presented in <u>Marsch v. Rennsselaer Cty.</u>, 218 F.R.D. 367, 371 (N.D.N.Y.

2003) justify the presence of counsel, he has failed to make any showing that such a danger

exists.  Counsel should thus not be permitted to attend the Court ordered IME.

<u>CONCLUSION</u>

For the reasons set forth and in the agency defendants' motion, the agency defendants

respectfully request that their motion be granted.


Dated: June 6, 2006                     Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        JEFFREY S. BUCHOLTZ
                                        Deputy Assistant Attorney General

                                         /s/ Elizabeth Goitein
                                        ELIZABETH J. SHAPIRO, D.C. Bar # 418925
                                        PAUL G. FREEBORNE
                                        ELIZABETH GOITEIN
                                        Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., NW,
                                        Washington, D.C. 20530
                                        Tel: (202) 514-5302
                                        Fax: (202) 616-8470

---

[13] <u>Acosta v. Tenneco Oil Co.</u>, 913 F.2d 205 (5th Cir. 1990), upon which plaintiff relies, does not address whether counsel may be presented at a Rule 35 examination.  The examination at issue there was one conducted by a vocational rehabilitation specialist, not a physician or psychiatrist, and thus not one governed by Rule 35.  <u>Id.</u> at 209.  "The federal rules are clear that, *except for interviews permitted under Rule 35*, interviews are allowed only in the presence of counsel."  <u>Id.</u> at 210 (emphasis added).

-35-