UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

CASE NO.: 1:06-cv-00644-EGS

LEE PAIGE,

    Plaintiff,

vs.

UNITED STATES DEPARTMENT OF JUSTICE,

DRUG ENFORCEMENT ADMINISTRATION, ET AL.,

    Defendant.

DEPOSITION OF LEE PAIGE

Taken on Behalf of the Defendant

VOLUME I

| | |
|---|---|
| DATE TAKEN: | December 14, 2007 |
| TIME: | 9:03 a.m. - 11:46 a.m. |
| | 12:58 p.m. - 4:17 p.m. |
| PLACE: | 300 International Parkway |
| | Suite 424 |
| | Heathrow, Florida |

Stenographically Reported by:

Delina M. Valentik,

Registered Professional Reporter

Florida Professional Reporter

Sclafani Williams Court Reporters, Inc.

1-(866) SET-DEPO (738-3376)


PLAINTIFF'S EXHIBIT 286

## Page 2

APPEARANCES:

Counsel for Plaintiff:
 WARD A. MEYTHALER, ESQUIRE
 Merkle & Magri, P.A.
 5415 Mariner Street, Suite 103
 Tampa, FL 33609

Counsel for Defendant:
 PETER J. PHIPPS, ESQUIRE
 U. S. Department of Justice
 Civil Division
 Trial Attorney
 Federal Programs Branch
 20 Massachusetts Avenue, N.W., Room 7134
 Washington, DC 20001

## Page 3

INDEX

WITNESS                                           PAGE
Called by the Plaintiff:
LEE PAIGE
 DIRECT EXAMINATION BY MR. PHIPPS        4
VOLUME II
 DIRECT EXAMINATION (CONTINUED)         204
 CROSS-EXAMINATION BY MR. MEYTHALER     216
ERRATA SHEET INSTRUCTIONS                197
ERRATA SHEET                             198
CERTIFICATE OF REPORTER OATH             199
REPORTER'S DEPOSITION CERTIFICATE        200

INDEX OF EXHIBITS
DEFENDANT'S EXHIBIT 1                     21
  (mid-year progress review)
DEFENDANTS' EXHIBIT 2                     60
  (article "Hall of Shame")
DEFENDANT'S EXHIBIT 3                     68
  (letter from cub scout pack)
DEFENDANT'S EXHIBIT 4                     85
  (firearms/tactical qualifications)
DEFENDANT'S EXHIBIT 5                     98
  (Orlando Sentinel article)
DEFENDANT'S EXHIBIT 6                    128
  (September 28, 2004 memo)
DEFENDANT'S EXHIBIT 7                    144
  (Answers to interrogatories)
DEFENDANT'S EXHIBIT 8                    160
  (August 19, 2004 memo)
DEFENDANT'S EXHIBIT 9                    170
  (July 9, 2004 memo)
DEFENDANT'S EXHIBIT 10                   215

## Page 4

PROCEEDINGS

WHEREUPON

LEE PAIGE

acknowledged having duly affirmed to tell the truth upon his oath as follows:

THE WITNESS: I affirm.

DIRECT EXAMINATION

BY MR. PHIPPS:

Q. Well, we've met before, but let me formally introduce myself on the record. My name is Peter Phipps. I'm with the Department of Justice. And I represent the defendants in this matter. I know because you've sat in on other depositions in this case that you're familiar with depositions. Let me just go over a few of the ground rules here. You have to answer orally and audibly. Do you understand that?

A. Yes, sir, I do.

Q. And, also, if you don't understand a question at any point in time, please let me know and I'll rephrase it. Can you agree to that?

A. Yes, sir. I do.

Q. Okay. Is there any reason why you can't testify truthfully and accurately today?

A. No, sir.

Q. Let me start with some questions about

## Page 5

perspective after your accidental discharge. After your accidental discharge do you consider yourself fortunate to be alive?

A. Yes, sir, I do.

Q. Are you thankful to be alive?

A. Yes, sir, I am.

Q. Do you have any new appreciation of each day after the accidental discharge because you're still alive?

A. No different than my convictions any other day. Just my convictions basically.

Q. That existed beforehand?

A. Yes.

Q. Have you ever thought about how amazing it is that you survived the accidental discharge?

A. I'm aware of the fact that the circumstances surrounding why I survived, yes. It's amazing.

Q. Yeah. Do you think that you're lucky to have survived?

A. Absolutely.

Q. I don't know if you're religious at all, but if you are, do you think that God is keeping you alive for some reason?

A. I think I was spared for a reason.

Q. And what do you think that reason is?

**Page 22**

1  Q. That's what I read it as.
2  A. Suspects.
3  Q. Search?
4  A. Search, work, undercover, et cetera, nor has he
5  yet had the opportunity to false —
6  Q. Testify.
7  A. Oh, yeah, testify in court related to his
8  foreign assignment.
9  Q. So I guess my question is, from this, it made
10 me think that you weren't allowed to work undercover in
11 the Bahamas.
12 A. Well, I had not worked undercover possibly
13 during this point in time but just prior to being
14 assigned to the Bahamas, I worked a case where Steve
15 Collins, the ASAC here was the group supervisor here and
16 I was detailed from Tampa to assist Special Agent Gerald
17 Lucas and Task Force Agent Tony Brown, where I went down
18 and I did a 75 kilo cocaine reverse, which resulted in
19 arrest in — back here in Orlando where I worked
20 undercover. So I hadn't worked under cover probably
21 from the time I got there and this evaluation was done.
22 But prior to that, I had come to the Bahamas
23 and worked undercover extensively on two occasions. I
24 think in 1999, I came to the Bahamas and I worked
25 undercover. As a matter of fact, I worked undercover on

**Page 23**

1  a very dangerous Bahamian drug trafficker out of
2  Freeport who traveled from Freeport to the Bahamas to
3  meet with myself and a confidential source at the time.
4  So the record will reflect that I did work
5  undercover in the Bahamas. And I was allowed to. And
6  during the course of the time that I worked undercover,
7  Adolphus Wright was the group supervisor and the contact
8  group, the support group that I worked under when I was
9  in Tampa and I came down to work undercover and — in
10 the Bahamas.
11 Q. Now, when you were assigned to the Bahamas, did
12 you do undercover work? I mean, when you were stationed
13 there as opposed to going to Bahamas for —
14 A. I think on very, very minimal occasions I
15 worked undercover. Not really sure. But I did some
16 things where I worked undercover. I wouldn't
17 necessarily say that I was a primary undercover on
18 these. I may have worked undercover where I walked
19 around and pretended to be a tourist taking photographs
20 and things of that nature. But it was still in an
21 undercover capacity. I was there as a police officer or
22 a law enforcement officer in a law enforcement capacity
23 doing things such that I wasn't — may not have been
24 necessarily the primary undercover.
25 Q. The fact that you worked undercover in Bahamas

**Page 24**

1  on very minimal occasions, did that affect your job
2  satisfaction while you were in the Bahamas?
3  A. From a security perspective, I was pretty happy
4  in the Bahamas, as far as my job was concerned, but —
5  because Nassau, the island of New Providence, is a
6  capital city, and it was 22 miles long and seven miles
7  wide and I was an American there, very well known in the
8  community, it somewhat limited my ability to work
9  undercover.
10 I was actively involved in demand reduction,
11 helped create a coalition for a drug free Bahamas, was
12 often written about in the newspapers. So, therefore,
13 it somewhat curtailed it so from a perspective of safety
14 and for my family, it probably curtailed my ability to
15 work as a primary undercover.
16 Q. But did that — did that affect your job
17 satisfaction while in the Bahamas?
18 A. I can't say right now. I don't remember.
19 Q. Well, you were doing other things that kept you
20 happy with your job in the Bahamas?
21 A. Absolutely. I worked at the airport and flew.
22 Worked TDY. I did some very interesting and dangerous
23 things. So I was — I was — I would say for the most
24 part I was somewhat happy there. There was some
25 individuals there that probably didn't make life

**Page 25**

1  pleasant for me, but I think that happens in all
2  perspectives relative to work.
3  Q. So how long were you in the Bahamas?
4  A. For — right at four years exactly. I left. I
5  went — I arrived there July 1999 and I left July 2003.
6  Q. And why did you change jobs?
7  A. I didn't change. I just transferred back here
8  because my wife.
9  Q. Changed locations. I didn't mean jobs.
10 A. That's okay. My wife was somewhat ready to go.
11 She was kind of homesick for the most part. An
12 opportunity came for me to return back to central
13 Florida. There was openings in central Florida. I like
14 central Florida. I don't really have a desire to live
15 north of Orlando, Florida for weather purposes. So it
16 came available and I seized the opportunity to return.
17 Q. Were there any professional job opportunities
18 that you were looking forward to doing in Orlando?
19 A. Yes. When I left the Bahamas, I was informed
20 or I was — it was discussed by the SAC Tom Raffanello,
21 the present SAC at the time, that I would come back and
22 they were going to split Florida, the state of Florida
23 up into south and northern districts as far as demand
24 reduction. And I was under the impression when I first
25 came back that I would be the coordinator for the north

26

1  and central Florida for demand reduction. I studied. I
2  prepared. Put together the things that I had from my
3  experiences and my times in the Bahamas as well as Tampa
4  and tried to prepare myself.
5      I was ready to come back and immerse myself
6  within the community here and try and do some things
7  positive. I have a great deal of compassion for doing
8  things for kids. I volunteered for different programs
9  when I was in Tampa related to kids, juveniles, kids at
10 risk; and was recognized and received commendations for
11 doing such. So I thought it was something that I looked
12 forward to doing here and possibly when I retired from
13 DEA was kind of like setting the stage for things after
14 DEA, per se.
15     Q. Like further community involvement sort of
16 things?
17     A. Exactly, yes.
18     Q. Okay. And so what took place? You wanted to
19 come and be the demand reduction coordinator for north
20 Florida, north and central Florida, as I understand?
21     A. Right, yes.
22     Q. What transpired? Did you ever get that
23 position?
24     A. No, I didn't. As a matter of fact, when I came
25 back, the ASAC Steve Collins presently here, he says,

27

1  well, I want you to do casework. You know, I want you
2  to do that as well. I understood that some people
3  wasn't necessarily happy because -- here in the office,
4  no one specific, just from idle office gossip that they
5  didn't think it was fair that I was coming from the
6  Bahamas to come back here to just do demand reduction.
7  And so I'm not really sure if that was the case. But my
8  ASAC Collins told me that he wanted me to go to the
9  enforcement group, help out in the enforcement group.
10     So I followed his orders. But along that I
11 continued to do demand reduction when requested. At the
12 time that I did demand reduction, I -- when I went out,
13 after I got here, I made a record of it, notated it, I
14 forwarded a copy of every event that I participated in
15 to my group supervisor, Pete Gruden. I made a file for
16 my group supervisor as well as the ASAC because it's
17 mandated, it was mandated at the time that we report
18 everything to the coordinator in Miami because it
19 reflected upon the SAC's evaluation in the division and
20 whether or not he got a bonus if -- at the end of the
21 year, if those things took place. So I reported
22 everything.
23     I thought that I would probably be at some
24 point moved in the position of permanent coordinator so
25 I wanted to keep a record of my performance and the

28

1  things that I was doing because I applied for the
2  position in Miami as well, but I didn't get it. Someone
3  else got it. Because the retire -- the present person
4  that was the demand reduction coordinator at that time,
5  Omar Alamon (phonetic), was retiring so I applied for
6  his position as well.
7      Q. And so you were hoping to kind of get a
8  full-time job doing demand reduction in or, you know,
9  most your tasks being demand reduction for north and
10 central Florida when you came to Orlando?
11     A. Yes. It -- in other offices in other
12 divisions, they have -- I spoke with different people,
13 they have it as such. And demand reduction was sort of
14 like the DARE program if I can compare it to something
15 from a local perspective. And there are events planned
16 and there are things that from education purposes
17 because if we cut the demand down for drugs and educate
18 kids, the suppliers won't have anybody to, in essence,
19 send the drugs to. So I mean it kind of seems far
20 fetched, but -- in today's society, relative to drug
21 trafficking, but that's the case. If nobody is asking
22 for it, you can't sell it to anybody. Kind of like the
23 economy.
24     Q. And so did you say that you also applied to get
25 a full-time demand reduction as a coordinator job in

29

1  Miami?
2      A. I applied for that position, but I was told
3  that there was someone else basically was going to be
4  the successor of Omar Alamon and that at the time I
5  talked to the SAC and the ASAC that was in charge of
6  that division or that section, and they told me that
7  they were possibly looking at splitting Florida up
8  because it's such a long haul from the Panhandle to
9  Miami. And if there was somebody in the northern or
10 central Florida, they could do it. They told me I was a
11 good candidate because my record was good as well as I
12 went to school at Florida State University.
13     Q. Tallahassee?
14     A. In Tallahassee. I was familiar with the
15 panhandle and different people that I went to school
16 with were presently involved in businesses and involved
17 in the community in that area.
18     Q. And so who was it that got the full-time demand
19 reduction job in Miami?
20     A. I think it was Ricardo Ramos.
21     Q. And was there ever created a full-time demand
22 reduction position in north and central Florida?
23     A. No, sir, it didn't happen.
24     Q. Okay.
25     A. Not after -- well, I was doing -- I think after

30

1  the accident that I had, I'm not really sure. I know
2  that I was told that I couldn't do demand reduction any
3  more after that. So because of the interests in the
4  fact that I shot myself and -- and that I was -- it was
5  somewhat embarrassing the DEA, what happened, since the
6  tape got leaked.
7      Q. And so -- so you think -- so you were putting
8  the pieces in place before you shot yourself to kind of
9  get that full-time position, do you think?
10     A. Well, I was keeping the record of what I was
11 doing of my duties and my responsibilities as well as
12 participating and supporting the group from an
13 enforcement perspective.
14     Q. And then after the accidental discharge, you
15 didn't -- you weren't pursuing that any more, were you?
16     A. Well, I wasn't -- I mean, I had a desire to,
17 but the ASAC told me that I couldn't do demand reduction
18 any more. As a matter of fact, he --
19     Q. And this is Steve Collins?
20     A. Yes. Yes.
21     Q. Okay.
22     A. I asked him why. But he really didn't have an
23 answer. He just said right now it would probably be
24 good to have somebody else do it. And I informed him
25 how much of a love I had for it. But he said that it

31

1  would probably be wise that somebody else would do it
2  because of the interest in --
3      Q. Did you tell him that your main professional
4  reason for coming back to central Florida was to do
5  demand reduction?
6      A. No, I don't think so. We did have a discussion
7  about it. Because I asked him am I going to -- well, in
8  other words, I had to make plans if I was going to be
9  doing it. I had to make sure that I knew what I was
10 doing. I mean, I had to have somewhat of a game plan.
11 So along with my other duties, which demand reduction is
12 a collateral duty, along with my other duties unless I
13 would have been designated as the coordinator, I had to
14 be ready when the time came. So I had to have, I guess,
15 somewhat of an operational plan to do it within my own
16 setting, I guess.
17     Q. Now, when you arrived in Orlando, what group
18 were you in?
19     A. I was assigned to enforcement group one, group
20 supervisor Peter F. Gruden.
21     Q. Did you and Mr. Gruden get along?
22     A. I don't think Mr. Grud -- I don't think
23 Mr. Gruden was a fan of mine. I mean, I didn't know
24 Mr. Gruden but from the point when I got there, I don't
25 think that he was a fan of mine. I mean, I didn't have

32

1  a social relationship with him. I just came to work
2  every day and did my job, you know. I basically, for
3  the most part, I was one of the senior guys in the
4  group. There was a few other guys in the group. But I
5  didn't really know anybody. So I just kind of came here
6  and came to work and did what I was supposed to do and
7  went home.
8      Q. And you say you were one of the more senior
9  guys in the group, are there certain expectations or
10 responsibilities that attach to the more senior people
11 in the group?
12     A. Well, if there is someone in there that needs
13 help or what have you -- as an example, when I first got
14 back, one of the other senior agents in the group had a
15 death in the family, so I didn't have any cases. I had
16 just got back. I was on temporary housing, trying to
17 take care of all the details in that regard. And Lenora
18 Morris had -- we were getting ready to have an
19 inspection, so I took over the case, the duties and some
20 of the things in her cases and detailed them, took care
21 of them, wrote the letters and the specific reports in
22 order to bring everything up to speed and up to
23 standards because she was -- had initially an illness,
24 then a death where she had to travel out of the office.
25 So I stepped up to the plate and I took care of that for

33

1  her.
2         And also assisted in other perspectives where
3  if junior guys were out on the street and a decision was
4  made, needed to be made, where it came down to safety or
5  what, I was there to fill in and to make that decision
6  and make that call.
7      Q. So you were advising junior guys who were out
8  on the street?
9      A. Yeah. Well, we talked. One specific case,
10 there was a junior agent, junior to me, Frank Thomas.
11 We were buying crack. They continued to try to send the
12 CS in and the CS --
13     Q. By CS you mean --
14     A. Confidential source.
15     Q. Okay.
16     A. Was having some problems so at that time, I
17 made the decision to call the deal because I thought her
18 safety was -- her -- she was -- her safety was
19 compromised. So we did it. And that's one incident
20 that I remember. I mean, I worked undercover, assisted
21 -- I was requested to do undercover. I assisted in
22 minimal undercover. When I came back to Orlando, I
23 recall one specific time where I worked undercover at
24 the Mall of Millennia -- not really -- I don't remember
25 the case that I worked on. But when I came back from

Page 34

1  the Bahamas, I had administrative leave. And then I was
2  off. I came back in July. Then I was off the month of
3  December. The month of January, I went TDY again back
4  to the Bahamas for 30 days.
5     Q. Why?
6     A. To do OPBAT, to support OPBAT.
7     Q. After I came back from OPBAT, I was TDY again
8  because I was involved in a trial where I had to testify
9  as a witness in the Bahamas for the month of February.
10     Then after the month of February, my group
11  supervisor Pete Gruden detailed me to a wire tap which I
12  worked the entire month of March on that wire tap. Then
13  after I did the wire tap, I went to go to a tactical
14  training school in Tampa and I didn't successfully
15  complete that. So I came back out on a Thursday, the
16  8th of April. Then April 9th, I was here in the office.
17  I left the office, went home. Then I went to the
18  Callahan Community Center in Parramore at about 7:00.
19  Then at about 7:15 I had an accidental discharge.
20     Q. Let me go back over some of the stuff that you
21  covered there about your time in Orlando. From the time
22  that you were officially assigned to Orlando, I guess
23  that's July 2003 --
24     A. Yes.
25     Q. -- on a TDY, do you recall any other times that

Page 35

1  you had done undercover other than at the -- is that the
2  new Mall of Millenia?
3     A. Yeah. Yeah.
4     Q. Do you recall any other times?
5     A. I don't recall. I know I was requested to do
6  undercover on occasions, but I, you know, there was so
7  many things going on at that time. I don't really
8  recall. I do recall that time because it just sticks
9  out in my mind.
10     Q. And correct me if I'm wrong, this is just my
11  instinct, your first year on the job you do it 89 times?
12     A. No, I didn't say 80. I said approximately 67
13  times.
14     Q. Oh, boy, I don't know where that came from.
15  That's my memory. I apologize.
16     A. That's okay. You got a good memory.
17     Q. But your first year on the job you do it
18  approximately 67 times and then when you're in Orlando,
19  you do it once. Is that because you were a more senior
20  agent or is there something else?
21     A. Well, I was not here that long, basically, if
22  you think about it. I just kind of gave you a time line
23  of what I was doing. And during the course of that
24  time, I wasn't needed. Basically, when I have
25  investigated cases where I'm the case agent, at times I

Page 36

1  choose to be the undercover. But it just so happened, I
2  was requested on a few cases by GS Gruden to do it and
3  other people in the office and I met people and it just
4  didn't work out during that time frame. I very well
5  could have been placed in a position where I had to do
6  undercover. But the situation just didn't call for it.
7     Q. That didn't bother you, did it, because you
8  were doing other things?
9     A. Well, it's just part of my duty and
10  responsibility. If I'm called upon to do it and I feel
11  that I can be successful and I can put my input in it
12  and the individuals do a background study, the
13  individuals that I'm going to be involved with, kind of
14  get a feel for who they are and what's going on and I'll
15  do it. I mean, I've been requested to do cold
16  undercovers and when I mean that, just spontaneous. And
17  I've gone to clandestine farms and spent weeks at a time
18  with individuals undercover.
19     Q. And that's prior to coming to Orlando. Right?
20     A. Yes.
21     Q. I asked you earlier if you -- about your
22  relationship with Peter Gruden. Did you like Peter
23  Gruden?
24     A. I didn't have any -- I didn't dislike him. I
25  basically don't dislike anybody. My convictions don't

Page 37

1  -- I mean -- allow me to have dislike. I wasn't raised
2  to be that way. I didn't think that Peter Gruden liked
3  me because of some of the comments he made to me. But I
4  didn't know him. So from a professional perspective, he
5  was my group supervisor. I had respect for him on the
6  job as a group supervisor because he was designated to
7  be the group supervisor. But beyond that I had
8  absolutely positively no interaction with him. So I
9  came to work. I saw him at work. We didn't talk to
10  each other outside of work. I really didn't spend that
11  much time with Pete Gruden.
12     Pete Gruden -- I heard a lot of different
13  things about Pete Gruden prior to coming to Orlando when
14  he was first assigned to Miami or when he was -- I know
15  when he was in Miami because he was -- his father was a
16  well-known noted SAC, special agent in charge. And, I
17  mean, I didn't know anything about him other than just
18  people said that he lost his badge, he lost his gun, he
19  lost case files and stuff like that. But -- and nothing
20  happened to him because his dad. But I didn't know Pete
21  Gruden. I didn't have any reason to dislike him.
22     Q. Did you guys ever get in verbal disagreements
23  at work?
24     A. On one occasion, when I showed up a few minutes
25  late to a briefing, I was actually stuck downstairs

**Page 74**

1  them. Doc and I talked about it. I think with his
2  scheduling, he probably didn't -- I think he didn't even
3  remember up to the time. And then I was like, well, we
4  talked about it. He was like, okay. So I came out.
5     Q. When you say you talked about it, did you tell
6  him -- did you talk about the substance of what you'd be
7  talking about?
8     A. Yes, I told him about it.
9     Q. Did you tell him that you would show up in raid
10 gear?
11    A. I don't recall.
12    Q. Did you tell him you would bring firearms?
13    A. I really don't recall.
14    Q. Did he ask you to show up in raid gear?
15    A. I don't recall.
16    Q. Did he ask you to bring firearms?
17    A. I don't think he did. I don't recall. But I
18 don't think specifically he did. I think he just kind
19 of left it up to me. I may have mentioned it, but I
20 don't remember specifically if I mentioned it.
21    Q. Now, you said that you had prior familiarity
22 with the --
23    A. OMY --
24    Q. OMYGA?
25    A. Yes.

**Page 75**

1     Q. Did you ever go to any prior meetings that they
2  had?
3     A. I've dropped my kids off and sat in some of the
4  meetings. But, basically, when I dropped my kids off,
5  we -- it's a real intense very serious golf instruction
6  program. Doc takes it very serious. It's very fruitful
7  for the kids. And it's very informative and it's
8  intense. So the kids are not distracted. Basically,
9  the parents -- unless you are a volunteer that was in --
10 excuse me. You sat outside or you left and you came
11 back to pick your kids up.
12    Q. Did you know that Dr. Dorsey records these
13 group meetings that he has on video-recorder prior to
14 appearing?
15    A. I -- I don't recall. I mean, it never was -- I
16 never even noticed. I never even -- it was never an
17 issue that came up or I noticed. I never discussed it
18 with anybody. I never knew.
19    Q. But -- but -- but today you know that he tends
20 to record the meetings or later in time, you learned
21 that he tends to record the meetings?
22    A. After the fact, I was made aware that he was,
23 yes, that he made a record of his meetings.
24    Q. Through video-recording?
25    A. After the fact, yes.

**Page 76**

1     Q. Okay. But you weren't certain if you knew that
2  beforehand or you didn't know?
3     A. I am not sure. I can't recall. I'm not sure.
4     Q. Now, did you receive permission from anyone at
5  DEA to show firearms at that demand reduction
6  presentation?
7     A. I have never been given permission or not. I
8  just go out -- I was the demand reduction person. I've
9  done my presentations. I never had a problem before.
10 I've told -- I told my GS, I told Pete Gruden --
11 although he told me, he indicated in Washington that he
12 didn't know. I let him know. I told Steve Collins I
13 was going because that's how I found out that he
14 couldn't come, that he was on his anniversary. I asked
15 a number of different agents, Henry Wilson, Tony Brown,
16 Gerald Lucas.
17    Q. You asked them to come along with you?
18    A. Yeah, to assist me. Yeah. And I even asked
19 Pete Gruden if he was available.
20    Q. Did you tell them at the time that you asked
21 them to come along that you wanted to show guns?
22    A. I don't recall. I don't think so.
23    Q. And no one was available that day or no one
24 wanted to come?
25    A. Yeah. Not many people feel comfortable

**Page 77**

1  standing up in front of an audience. And to be totally
2  honest with you, not many people wanted to spend Friday
3  evening talking to kids. I have a love for it. I fancy
4  talking to kids and then being involved with youth. I
5  got two kids of my own so I had no problem doing it.
6     Q. So -- so -- just to go back over where we were.
7  You don't recall receiving permission from Peter Gruden
8  to show firearms at the presentation that day?
9     A. I don't recall discussing it. I don't recall
10 requesting permission. It was never an issue. I just
11 don't recall discussing it. I know for a fact nobody
12 told me not to display firearms.
13    Q. That day?
14    A. I don't recall ever hearing anyone tell me not
15 to, you know, from a -- giving me a direct order, do not
16 show firearms. I don't recall that.
17    Q. Is it possible that somebody did?
18    A. I would remember. I would think I would
19 remember. Yeah, I don't think so. I don't recall
20 anybody telling me that or giving me a direct order
21 specifically, no.
22    Q. Do you remember a person by the name of John
23 Salanski (phonetic) telling you not to show firearms at
24 the demand reduction presentation?
25    A. I know who John Salanski was. But, no, I

20 (Pages 74 to 77)

114

1  Lenora Morris told you or is there some other reason?
2     A. Well, I think that prior to Lenora telling me
3  -- I think at some point in between the time right after
4  I saw it and in between some time before I came back to
5  work in July -- I mean a lot of people called me and
6  talked to me. Someone -- I don't remember who may have
7  told me that.
8     Q. Did anybody ever tell you they had seen a copy
9  before you came back to work did anybody ever call you
10 up and say, hey, I've seen a copy, want to let you know?
11    A. I don't recall.
12    Q. Did -- did you want to see a copy of the
13 video-recording?
14    A. I requested to see a copy of it.
15    Q. When?
16    A. Well, at some point in time I became aware that
17 they were watching it in Miami in 2004. So I came back
18 to work in July. I'm not sure if I was made aware
19 before I came back to work but I know that -- I know
20 that it was being watched. And I was told that -- I was
21 called by an agent that I know by the name of Mark
22 Martolewski who was a firearms guy in the Las Vegas
23 office. And I was told that by somebody that it was
24 being watched at the firearm -- at the range in south
25 Florida. So I in turn, when I came back to work, I know

115

1  I made -- I called -- well, prior to that, I called up
2  Greg White and I asked him how can somebody else see
3  this video and I have never seen it before. And I said
4  how did it get down to the firearms unit. And I know I
5  hadn't come back to work yet. And he told me that well,
6  it was sent to training and training probably used it
7  for training purposes. So I then called Steve Collins
8  and told him that they were doing it and I talked to him
9  about it. And I think I may have made the same
10 statement to Steve that I hadn't seen it. Well, some
11 time I think in September, I went to -- well, when I
12 came back -- let me go back.
13    When I came back to work, I know I saw Chris
14 Bowman, who was the firearms guy. And I told Chris
15 Bowman, I was like, look, man, you know those guys in
16 the firearms unit, why are they showing this video down
17 there, making light of it and making fun of it and
18 laughing about it and showing it to everybody. And he
19 was like, Lee, I don't know why they're doing it. I
20 said, well, you ought to call them and ask them, man. I
21 mean -- I says, you know me. And he says, yeah, man, I
22 do. And he talked to him and he told me that he did
23 talk to them.
24    And I know he talked to them because when I
25 went to remedial training, I was ordered to go to

116

1  remedial training to be retrained or certified after
2  having an accidental discharge. I wanted to go to
3  remedial training here in Orlando and just have Chris
4  Bowman and Chris Trasigney (phonetic), the firearms
5  units guys retrain me. And I asked Mr. Collins why I
6  had to go to Miami. And they said, well, it's a
7  divisional order. It's an order. I'm not sure if it's
8  divisional. But I -- he says it was an order that I was
9  to go to the field division office and have the field
10 division primary firearms guys do it.
11    And one of the reasons I didn't want to go to
12 Miami that I remember in my mind is because here were
13 the same guys that was laughing and making fun of me and
14 showing this video, making light of it, to other agents.
15 So I expressed that. I'm not sure who I expressed it to
16 whether it was Mr. Collins or Mr. Borah. But I, in
17 fact, did go. And when I went, Kevin Naughton was --
18 talked to me about the video. And he was like, hey, man
19 I didn't -- you know, I didn't mean this in a bad way.
20 And, you know, someone had told me that they were
21 laughing. He was like, I wasn't laughing at you or
22 whatever. I just said, you know, hey, man, these guys
23 don't know me. You know, I had heard all kind of rumors
24 that there were people looking at it on the computer.
25 I'm not sure if it was on a disc or if it was on

117

1  Firebird. I just know that they were looking at it in
2  Miami around that time.
3     And, you know, I had just done it in April. I
4  went to firearms training I think in September. So we
5  went through our training. And, you know, I was
6  professional and went through my training, breezed
7  through it. I'm sure if you get the records, you'll see
8  that I qualified without a problem with my machine gun
9  and my handgun, all my DEA assigned guns, and I think as
10 well as, yeah, my own personal owned gun.
11    I -- after the completion of it, I had to go
12 back and take -- sign forms and -- reinstatement forms
13 and sign some qualification forms. And during the
14 course of it, there was another young agent who had had
15 an accidental discharge that was there with me. I can't
16 remember his first name. I think his last name is Weiss
17 or something like that. But we were there together.
18 And we went through the training together. When we got
19 back to the firearms office in the Miami field division,
20 we went in and was filling out the necessary papers and
21 what have you. And they talked to me more about the
22 video at that point in time, not really sure which one
23 of 'em it was. Specifically, I remember Kevin Naughton
24 talking to me about it.
25    And then I said, you know, and I expressed to

30 (Pages 114 to 117)

1  Q. Yeah.
2  A. -- along with my attorney?
3  Q. Yeah.
4  A. No, I didn't make any requests. My face had
5  already been out there. It was on the Internet
6  unscrambled.
7     MR. PHIPPS: Give me a minute here, just to
8     look.
9     MR. MEYTHALER: Can we take maybe a couple
10    minute break while you're --
11    MR. PHIPPS: Yeah. Yeah. Yeah. By all
12    means. By all means.
13 (Thereupon a recess was taken after which the deposition
14 continued as follows:)
15 BY MR. PHIPPS:
16  Q. Are you aware of any family member getting or
17 watching a video-recording of your accidental discharge
18 before that video-recording appeared on the Internet?
19  A. I'm not aware.
20  Q. Are you aware of any friend of yours other than
21 persons you've already identified, getting or watching a
22 video-recording of your accidental discharge before it
23 appeared on the Internet?
24  A. Specifically, I don't recall. I just -- I
25 don't specifically recall.

1  Q. Are you aware of anyone at DEA acting
2 intentionally or willfully to release the
3 video-recording of your accidental discharge?
4  A. I'm not aware.
5  Q. Are you aware of any specific file other than
6 the one that Steve Collins provided you that the video
7 was stored in or a copy of the video-recording was
8 stored in at DEA?
9  A. I mean -- I didn't understand the previous
10 question. I mean, I really didn't understand what you
11 meant by that. If you could ask me that question again.
12  Q. Well, let's -- okay. We'll go back. Are
13 you -- the question is are you aware of anyone at DEA
14 who acted intentionally, willfully to release a
15 video-recording of your accidental discharge?
16  A. To release it where? I mean, I don't know what
17 you mean.
18  Q. To -- outside of DEA.
19  A. I just know that of the times that I testified
20 before, you know, like that I thought about, that it
21 shouldn't have been watched in the bay, when I heard
22 about it or in the conference room when I heard about
23 it.
24  Q. Do you think it was illegal for DEA agents to
25 watch it in the bay or in the conference room?

1  A. Well, during the course of how early on it was,
2 it was part of an investigation and part of a file and
3 part of, you know, my internal investigation file. So
4 we're not at liberty just because -- just because we're
5 DEA agents, we're not at liberty to look at a file when
6 it's an internal matter like an internal investigation.
7 Internal affairs investigation, it's not -- it's never
8 been permitted. Any internal investigation that I've
9 ever been in, I was always told not to talk about it or
10 not to discuss it or what have you. And that film at
11 the time was -- which I understand then and now, part of
12 my investigative file, and it shouldn't have been
13 watched or looked at by anybody other than the people
14 designated like my GS or the people that inspection
15 designated to look at it. So I would assume that it was
16 not supposed to be looked at from that respect.
17  Q. Now, when you say it was part of your
18 investigative file, do you know that for a fact?
19  A. I know that when the incident happens, like
20 when I have an accident in a car, immediately an
21 accident file and report is initiated. Whenever there's
22 an incident that takes place that has to be scrutinized
23 or judged by a specific group, like when you have an
24 accident in a car, an accident report has to be done, a
25 teletype has to be sent to Washington and to Miami

1 indicating that you were -- even if it was a fender
2 bender. A file is created and reports are done,
3 photographs are taken and they're put in a file and --
4 in a car report. And it's not as severe as an internal
5 affairs type investigation. And I was under
6 investigation at that point in time for accidentally
7 shooting myself. And accidental discharges are serious
8 matters because any accidental discharge in the manual,
9 in our agent's manual and I think in our standards of
10 conduct indicate that it should be investigated and
11 reported to headquarters.
12  Q. But, factually, do you know when the office of
13 inspections created a file with respect to your
14 accidental discharge?
15  A. Well, in my understanding, the video was part
16 of an incident that took place. And so it was part of
17 an investigation. So it had to be given an N number
18 which is -- any evidence that is put in a file is given
19 an N number which stands for non-drug exhibit. A drug
20 exhibit would be just an exhibit. But my -- my -- when
21 I looked at the paperwork in DC, I noticed that I think
22 when Mr. White -- I'm not -- don't quote me on
23 Mr. White, but he indicated that the video was a
24 non-drug evidence. It was assigned an N number. And it
25 doesn't become an N -- it immediately becomes an N