UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

LEE PAIGE,

        Plaintiff,

vs.                    Case No. 1:06cv00644

UNITED STATES DRUG

ENFORCEMENT ADMINISTRATION

and UNITED STATES OF AMERICA,

        Defendants.

DEPOSITION OF VICTOR WRIGHT

Taken on Behalf of the Defendant

DATE TAKEN:    December 20, 2007

TIME:           9:00 a.m. to 12:03 p.m.

PLACE:          Law Offices of Merkle & Magri,

                   P.A.

                   5415 Mariner St., Ste. 103

                   Tampa, Florida 33609

STENOGRAPHICALLY REPORTED BY:

KAREN ROMAN, FPR, CCR (WA)

PLAINTIFF'S EXHIBIT 299

```
                                    2
1              APPEARANCES
2
3  Counsel for the Plaintiff:
4  WARD A. MEYTHALER, ESQ.
5  Law Offices of Merkle & Magri, P.A.
6  5415 Mariner Street, Ste. 103
7  Tampa, FL 33609
8
9  Counsel for the Defendant:
10 PETER J. PHIPPS, ESQ.
11 United States Department of Justice
12 Civil Division, Federal Programs Branch
13 20 Massachusetts Avenue, N.W.
14 Washington, D.C. 20001
```

```
                                    3
1               INDEX
2  WITNESS
3  Called by the Defendant:
4  VICTOR WRIGHT
5    Direct Examination by Mr. Phipps      4
6    Cross-Examination by Mr. Meythaler  110
7  Errata Instructions                   112
8  Errata Sheet                          113
9  Certificate of Reporter Oath          114
10 Reporter's Deposition Certificate     115
11
12              EXHIBITS
13
14 Defendant's Exhibit No. 1              12
15   ORIGINAL EXPERT REPORT
16 Defendant's Exhibit No. 2              79
17   SUPPLEMENTAL REPORT
18 Defendant's Exhibit No. 3              91
19   SUPPLEMENTAL REPORT
```

```
                                    4
1             PROCEEDINGS
2      VICTOR WRIGHT, called as a witness by the
3  Defendant, having been first duly sworn, testified as
4             follows:
5      THE WITNESS: Yes.
6           DIRECT EXAMINATION
7  BY MR. PHIPPS:
8   Q   Good morning. I don't believe we met
9  before today. I want to formally introduce myself to
10 you on the record. My name is Peter Phipps. I'm an
11 attorney at the United States Department of Justice,
12 and I represent the DEA United States of America in
13 this case.
14  A   Okay.
15  Q   Please state your name for the record.
16  A   Victor Renard Wright.
17  Q   Have you ever been deposed before?
18  A   No.
19  Q   Because this is testimony under oath, just
20 one of the things that makes it go more smoothly is
21 to answer orally and audibly so the court reporter
22 can hear that; do you understand?
23  A   Yes, I do.
24  Q   Have you ever testified as an expert
25 before?
```

```
                                    5
1   A   No.
2   Q   Have you ever been retained before as an
3  expert in litigation?
4   A   No.
5   Q   Another rule of depositions is if at any
6  point in time you don't understand a question I ask,
7  please tell me and I'll try to rephrase it.
8   A   Okay.
9   Q   And, also, if you need to take a break at
10 anytime, let me know, and we'll arrange for a break
11 to be done.
12  A   Okay.
13  Q   I'd like to start with some questions about
14 your role in this case. When were you first
15 contacted about this case, I mean Paige versus DEA?
16  A   I would say I was contacted about a couple
17 months ago.
18  Q   Okay. And who contacted you?
19  A   Attorney Ward.
20  Q   Okay. So that's Ward Meythaler?
21  A   Yes.
22  Q   And did he contact you by phone or in
23 person or --
24  A   Well, actually, I do -- I do consulting
25 work here also, so -- and we discussed it here while
```

Page 82

1  A  The whole thing, correct.
2  Q  Okay. Did you keep track of which ones you
3  relied on the Windows media timer versus the play DVD
4  timer?
5  A  No, just basically just the same way.
6  Q  Okay. But you didn't say, okay, N3, I'm
7  using Windows media timer; N4 doesn't play in Windows
8  media, I'm going to use the play DVD timer?
9  A  No.
10  Q  I take it implicit in your answer that not
11  all of these videos played on Windows media player?
12  A  Not all of them, no.
13  Q  And do you know why that's the case?
14  A  Because media players may not have what
15  they call a "codec," the C-O-D-E-C player on there,
16  or the file, so it's a media file that the media
17  player may not have that the DVD software will have.
18  Q  Okay.
19  A  Because, normally, the media player doesn't
20  really play DVD movies unless you have a DVD-ROM, so
21  it's not really defaulted with all the associated
22  file type or file extensions that some media uses
23  versus a DVD software. Like you can't take a DVD/CD
24  or movie and put it in a regular CD-ROM. It's not
25  going to play because it can't read that format. It

Page 83

1  can't read it. Whereas a DVD software and a DVD
2  player will read the format.
3  Q  Now, with respect to point one, this video
4  N3, it says — you mention Roxio software?
5  A  Correct.
6  Q  What is Roxio software?
7  A  Roxio software is software designed by
8  Adaptec. It's just a burning software. It's just a
9  software that's used to burn CDs.
10  Q  And you state that a copy of this video was
11  burned using Roxio software. How do you know that?
12  A  Because you get an intro that says Roxio.
13  When you play the file, you will see the Roxio image
14  appear. That is from the Roxio Adaptec software.
15  That is very specific. That's a specific software.
16     Whereas, I use Nero software for burning to copy
17  CDs and all that. Nero software does not have a
18  Roxio introduction. So being that this was burned,
19  you can easily tell it was done by Roxio software
20  because it's one of those common software that you
21  can buy. Real good one, actually, burning software.
22  So when this image was burned to a CD, the Roxio
23  intro screen was put on there.
24  Q  Is it possible that something can be burned
25  from Roxio software without putting the image on?

Page 84

1  A  No. Roxio automatically put it on there
2  for you.
3  Q  Is it possible that — okay. Okay.
4  A  Because, like I was stating earlier, I use
5  Nero. I can't get the Roxio popup on the Nero
6  software because it's two different software, two
7  different authoring tools.
8  Q  Now, towards the end of this paragraph you
9  say "This was originally stored on April 15th, 2004,
10  at 3:12 p.m." You're talking about the original
11  storage of the —
12  A  The file itself.
13  Q  The file itself?
14  A  Correct.
15  Q  And how do you know it was April 15th,
16  2004, at 3:12 p.m.?
17  A  Because you can take any CD, and if you go
18  into the — I'm using my computer terms now — if you
19  go into the start/run command prompt, it will put you
20  into a DOS screen. From that DOS screen, you can
21  access that drive, which normally is your D or your E
22  drive. And when you hit the directory for that
23  drive, it will give you the information you need to
24  know about when that file was retrieved or burned
25  or — and the name that that image was given.

Page 85

1  Q  And how are those dates and times put in
2  that directory?
3  A  The minute you store anything on the
4  computer, you store any information on the computer
5  whatsoever, you're automatically given a date and
6  time that it was stored. So once it's stored, I can
7  go and burn a copy of that image and it will
8  automatically grab the date and time of the original
9  file.
10  Q  And that date and time comes from the
11  originating computer's internal clock?
12  A  Correct.
13  Q  Okay. So if the originating computer had
14  an incorrect computer clock, this date and time would
15  be incorrect?
16  A  It would be incorrect, but I just don't see
17  the — honestly, the federal government clock not
18  being on time and correct. But I mean, it will be
19  your — it would be the clock time that your PC, or
20  wherever this is stored, is coming from.
21  Q  But you've assumed the correctness of the
22  originating computer's computer clock?
23  A  Correct.
24  Q  Okay. So just to clarify, let's say
25  there's a computer out there whose computer clock

Page 86

1  never switched after the Y2K problem, just
2  hypothetically.
3    A   Okay. Wow, Y2K, okay.
4    Q   And let's say we go to burn a CD or DVD on
5  that and it never, ever switched over to the year
6  2000. The time that that clock may show might still
7  be December 31st, 1999?
8    A   Correct.
9    Q   Okay. Even though that's not the actual
10 time that that transmittal took place?
11   A   Correct.
12   Q   Okay. And so, on all the -- looks like a
13 lot of these conclusions and then the ones after
14 them, there's a reference to a date and time with
15 respect to each one of these different video files.
16 On each one of those, you're assuming the correctness
17 of the originating computer's computer clock?
18   A   Yes.
19   Q   Okay. On paragraph, Label No. 2, talking
20 about N4, your last sentence says, quote, this
21 appears to have been done in Miami since the name of
22 that file is Miami WMV, quote.
23   A   Correct.
24   Q   Can you explain what you're thinking is
25 there?

Page 87

1    A   Yes. You send me a file or I get a file
2  from you. And when I go to store that image, I might
3  store it like, okay, I got this from whatever and I
4  store the file, but when I go to burn the image,
5  anytime you burn an image, you -- most of the time,
6  you will put the name of where you get this image
7  from or what it's for, and you can actually give the
8  name of that CD that -- whatever the file name that
9  you're copying from.
10    Now, the reason why I bring that up is because
11 on one of the images it states that it's a file from
12 Orlando. And when I was discussing it with, talking
13 to Lee about how files are transferred from one
14 location to the next, and I specifically was asking
15 him about the Miami office, how does the office there
16 have access to everyone since it's, I guess, the
17 headquarters, that file was named
18 "Miami WMV" -- well, just Miami, that file extension
19 is given automatically by the software itself. So
20 you wouldn't put a name of Miami just because of
21 anything. You would put the name of the file so you
22 have an idea where you're getting it from.
23   Q   Okay. So what you're doing is you're
24 guessing, based on the file name, where it came from
25 or where it was going to?

Page 88

1         MR. MEYTHALER: Object to the word
2  "guessing." He may be inferring, but he's not
3  guessing.
4  BY MR. PHIPPS:
5    Q   You're inferring from the file name?
6    A   Correct.
7    Q   As to where it came from?
8    A   Correct.
9    Q   But there's nothing like an internal
10 computer clock stamp that says this came from Miami,
11 is there?
12   A   On the CD itself, it says Miami. From the
13 burn -- from the burn image, from that DOS printout
14 I'm telling you about before, you can see that it
15 says Miami on there.
16   Q   It says Miami WMV or Miami something else?
17   A   Correct, Miami, dot, WMV.
18   Q   Okay.
19   A   And one of the other CDs, it says Orlando,
20 dot, MPG, I believe.
21   Q   But anybody anywhere could name a file
22 Miami, dot, WMV, right? It's not unique to the Miami
23 office?
24   A   It could.
25   Q   Okay. So when you say this appears to have

Page 89

1  been done in Miami, what you're saying is this copy
2  appears to have been made in Miami or sent to Miami?
3    A   Well, it could have been burnt from Miami.
4    Q   Burnt from Miami?
5    A   Correct. The file is sitting on the Miami
6  server somewhere.
7    Q   Okay.
8    A   I am inferring that the file was stored
9  somewhere in Miami, and then the image was burned
10 from that area.
11   Q   And you're doing that just based on the
12 file name?
13   A   Correct.
14   Q   Do you know who created that file name?
15   A   No.
16   Q   And you don't know what that person was
17 thinking when they created that file name?
18   A   Oh, no, no.
19   Q   I know every now and then in computer
20 programming, you can inject remark columns into a
21 program and people tell you what they're thinking.
22 But I take it there's nothing like that going on
23 here?
24   A   No.
25   Q   And so now down to a paragraph labeled "4."

90

1  The timer writing this report, or this supplemental
2  report, you're saying that you think that that file
3  was originally stored on April 17th, 2004, at 4:05
4  a.m.?
5     A   That is the date stamp that's on the CD
6  itself.
7     Q   Okay. Is that when you think it was
8  actually created? I mean -- right -- that or the
9  date given in your second supplemental?
10    A   That it was stored, right.
11    Q   You have any idea what day of the week
12 April 17th, 2004, was?
13    A   No. It's easy to find out, though.
14    Q   Yeah. If I represent to you it was
15 Saturday, does that give you any reason to doubt the
16 accuracy of the internal computer clock there?
17    A   No.
18    Q   That this copy would be made at Saturday
19 early morning hours?
20    A   No, because again, logically speaking, an
21 agency that is the size of the DEA will always have
22 an IT team working even on Saturdays and even on
23 Sundays, and if copies need to be made, they will
24 make it whenever they have the time to do it.
25    So it's easy to have someone there to do what

91

1  they have to do. But you always have -- especially
2  when it comes to IT, as massive as the agency is
3  itself, I'm sure you wouldn't go a day without
4  someone working.
5     Q   So you think that time is possible because
6  you're assuming that somebody from DEA's IT office
7  was working those early morning Saturday hours?
8     A   I'm sure.
9     Q   You're sure they were?
10    A   I will -- I will say that to have an agency
11 without any IT team working at that time of the
12 morning would be unusual. At least, I would think
13 so.
14    Q   And would that mean that that IT team would
15 be working in the Orlando office at that point in
16 time, or the Miami office?
17    A   Oh, that, I'm not sure which office.
18    Q   Okay. And then just to confirm the reason
19 that you think those times could still be accurate is
20 because you think someone from DEA's IT department
21 might have been working at those hours?
22    A   Correct.
23    (Exhibit No. 3 is marked for identification.)
24 BY MR. PHIPPS:
25    Q   I'm handing you what's been marked as

92

1  Defendant's Exhibit 3. Do you recognize this
2  document?
3     A   Yes, I do.
4     Q   What is this?
5     A   It's a supplement to one of my reports.
6     Q   And why did you prepare this supplement?
7     A   To give a -- to show that one of the CDs or
8  disks -- to break it down easier how they had the
9  name of Orlando, which it can go through the same
10 process I described earlier, how you can figure out
11 the name of the disk. And most of the time, again,
12 that would -- logically, you will put down the name
13 so you know where it came from or where it's stored
14 at and make a comparison between this and the one
15 that says Miami so they would know it was done at two
16 different locations.
17    Q   All right. Looking at the paragraph
18 labeled "1," it appears that in the first two
19 sentences you're revising the time from your first
20 supplemental report, Defendants Exhibit 2?
21    A   Correct.
22    Q   From 3:12 p.m. to 2:12 p.m. Why was it
23 necessary to change that time?
24    A   Because, for some reason, when I -- the
25 prompt that I told you I went through -- when I

93

1  looked at that prompt, the prompt itself, for some
2  reason I was thinking it was three when it was
3  actually two. And it tells you right there on the CD
4  what time it was, the image was transferred.
5     Q   So you just misread?
6     A   Misread.
7     Q   Oh, okay.
8     A   So I was correcting myself.
9     Q   Okay. So you didn't go out and find any
10 new software or something like that?
11    A   No, no, no, no, no. Used the same way I
12 did it the first time, but I just misread it.
13    Q   And what was that way that -- was that
14 going through the -- how you said -- start/run
15 command prompt?
16    A   Yeah, start/run. Type the word "CMD," get
17 the little DOS screen and then you just go to the
18 drive which is D or C and then you just type the word
19 "DIR" of that drive, change the directory to D, then
20 from there, you type "DIR." The directory -- the
21 drive, you're just putting the drive name of the
22 CD-ROM, and then when you hit "DIR" for directory
23 information, it gives you the information of that CD
24 or that disk.
25    Q   Okay.

94

1  A  So I'm just correcting what I —
2  Q  Okay. And so then with points two and
3  three, I notice there's also —
4  A  Same thing.
5  Q  Changes in the time.
6  A  Correct.
7     MR. MEYTHALER: Well, point two.
8  BY MR. PHIPPS:
9  Q  Yes, correct. Point two, there's a change.
10 That's right. Excuse me.
11    And here, you already referenced this, but
12 explain to me — explain to me the basis in your
13 thinking for the last sentence in paragraph 1. And
14 this is the sentence that states, quote, It is my
15 professional opinion that N6 appears not to have been
16 created from N3, but from another source such as a
17 server in Orlando, quote.
18 A  Because if I recall, N3 had the Roxio image
19 that began at the beginning of it, and the other CD
20 does not have the Roxio display screen. So in other
21 words, a different software was used to burn it.
22 Q  Is it possible that N6 could have come from
23 N3 but they just excised that Roxio display screen?
24 A  The only way you can do that -- no, because
25 if you didn't copy it from a CD, that image is

95

1  already embedded in the CD. So if I make a disk copy
2  of it or a CD copy of it, that image will also appear
3  on the second CD.
4     So that's why I said that it was stored
5  someplace else on the server or workstation, and then
6  that image was copied from across the network to burn
7  that image using a different authoring tool.
8  Q  So you're saying that there's no way that a
9  CD that initially has that Roxio stamp, video file
10 that has that Roxio stamp can be transformed into a
11 video file, everything else the same, except without
12 that Roxio stamp? It's impossible to do that?
13 A  Now, if you're doing it from CD to CD, you
14 can't because you're copying the CD.
15 Q  What if you went from CD to hard drive?
16 A  If you went from CD to hard drive, no,
17 because you still got -- the image is still there.
18 Q  So it's your testimony, then, that it's
19 impossible, under your understanding of computers, to
20 take the CD file with the Roxio image on it, turn it
21 into the exact same contents minus the Roxio image?
22 A  Well, I'll put it this way, nothing is
23 impossible. Nothing is impossible, but
24 realistically, it's not feasible to do that. It's
25 just not feasible.

96

1     You would normally have it stored somewhere.
2  You would normally have it stored on a separate
3  workstation or server like the example I keep saying.
4     Like, for instance, this is my server. I have
5  the image stored on my server. I'm sitting at my
6  workstation, I want this file, so I go across the
7  network, grab this file, and I will burn it
8  utilizing, for instance, the Roxio software.
9     Now, if I'm sitting at his workstation or
10 someone else's workstation and I want to make a copy
11 of it and I'm not using Roxio, I can copy the same
12 file, the same size, the same everything, but when I
13 burn it, I'm not using Roxio software. I might be
14 using Windows software or I might be using Nero
15 software. It's not going to come up with that Roxio
16 image.
17    Now, once that Roxio image is embedded in the CD
18 and if I copy it someplace else, you're not going to
19 be able to just take that out. I mean, you have to
20 actually sit there for a long time and try to splice
21 right at the beginning of that presentation to take
22 that little embedded file out, which is not feasible.
23 Q  The only way to do it, that you're aware
24 of, is to splice it out, then?
25 A  That would be my opinion, yes. So that's

97

1  why I'm showing that it's two different locations.
2  And especially if you're familiar with the Adaptec
3  Roxio burning software.
4  Q  So you can't think of any way, short of
5  splicing out that Roxio introduction, that N6 could
6  have come from N3?
7  A  No. I'm saying that — no. It would have
8  to be stored some place, and then you use two
9  different software to get that file.
10 Q  And so you think that — correct me if I'm
11 wrong — but you think that N6 came from somewhere
12 else, such as a server in Orlando, and not N3?
13 A  I'm — yes. I'm thinking that it's stored
14 someplace else. It's stored at a single location.
15 And wherever it's stored, you have access to that
16 particular file, and then you're able to copy that
17 file.
18 Q  Okay.
19 A  You can use any CD copying software you
20 want to grab that file and store it on CD.
21 Q  Okay. And then as to paragraph 3, again,
22 you come up with a date and time. I think I asked
23 you about all the dates and times on your first
24 supplement.
25 A  Correct.

25 (Pages 94 to 97)

**Page 98**

1  Q   But this, again, you assume the correctness
2  of the internal clock?
3  A   Correct.
4  Q   Okay. Let me ask you a question just to
5  make sure I understand the bounds of your reports by
6  asking you some ideas of what's not in your
7  report -- your reports. Your reports don't cover any
8  opinions as to who you think released a copy of the
9  video, do they?
10 A   No.
11 Q   And you aren't able to specify where,
12 within the DEA, you believe the video came from?
13 A   No.
14 Q   And you aren't offering any opinions as to
15 what a person who hypothetically released a video
16 from within the DEA was thinking when they released
17 the video?
18 A   No. I wouldn't know what they were
19 thinking.
20 Q   Now, do you have any other opinions
21 relating to this litigation other than what we've
22 discussed today?
23 A   No, not at this time.
24 Q   Okay. I know on your second supplemental
25 report you started talking about this one might not

**Page 99**

1  have come from here and stuff like this. You don't
2  have any other opinions about different versions of
3  these videos that you haven't written down?
4  A   No.
5  Q   Okay.
6      MR. PHIPPS: How are you doing? You need a
7  break or anything?
8      MR. MEYTHALER: I do.
9      (A recess was had at 11:39 a.m.)
10 BY MR. PHIPPS:
11 Q   Let's turn back to Exhibit 1, the last
12 page. This is your CV; is that correct?
13 A   Yes.
14 Q   Okay. First section of this is a skills
15 summary and it says, "More than ten years of
16 experience in systems analysis and programming."
17     Do you see that?
18 A   Uh-huh.
19 Q   What do you mean by "systems analysis"?
20 A   I can -- I go to various companies and if
21 they want to change their -- the way they're doing
22 business and how they plan on doing future growth, I
23 go in and do a systems analysis of what they have
24 there of basically what they have, what they're going
25 to need to move in the right direction, the right

**Page 100**

1  steps. And then from there, whatever programming
2  languages that they need to make their software work
3  better, that's what I do. I go into a company and
4  basically get to run it the way it's supposed to;
5  hopefully flawlessly.
6  Q   So you evaluate their IT needs,
7  essentially?
8  A   Correct.
9  Q   Am I understanding that correctly?
10 A   Correct.
11 Q   Okay. I don't want to put words in your
12 mouth.
13 A   No, no.
14 Q   I just want to make sure I understood it
15 correctly. Okay.
16     I notice the skills summary talks about 10 years
17 of experience, but I'm looking at your background and
18 the only things I see are as far back as January,
19 '02. Do you see that, the Delta International?
20 A   Okay.
21 Q   What were the other five years of
22 experience?
23 A   Oh, I was -- I didn't put it on here.
24 That's when I was the staff coordinator for Saint Leo
25 University at MacDill Air Force Base. So I worked

**Page 101**

1  with the university when they was changing computers
2  from the Tandy 8088 computers -- I'm sure you
3  probably remember those and one that takes like 20
4  minutes to boot up.
5  Q   Two disk drives?
6  A   Correct. You know, using the old paper
7  floppies and switching them over to, at the time when
8  the 486DX2-66 came out. So during that capacity as a
9  staff coordinator, I was also responsible for the IT
10 at MacDill Air Force Base.
11 Q   Okay. That was before the Internet?
12 A   Well, the Internet -- as a matter of fact,
13 during that time, AOL was just coming online with the
14 dialup; and at the time, I believe your main dialup
15 was Prodigy and CompuServe. But trying to keep it on
16 one page or so, that's why I did it that way.
17 Q   You mentioned MacDill Air Force Base. Were
18 you employed by the federal government at that point
19 in time?
20 A   No, I had just -- no. I was going to
21 school at St. Leo. Saint Leo University have
22 branches at various military bases. MacDill was one
23 of the bases that Saint Leo operates from. And
24 then -- so I was employed by Saint Leo University.
25 Q   Okay.

**Page 102**

1  A  At the time, it was called Saint Leo
2  College, but I was the staff coordinator, slash, IT
3  guy there.
4  Q  And have you ever worked for the federal
5  government in any capacity?
6  A  Yes, I was in the military for about nine
7  years.
8  Q  Okay. And what branch?
9  A  Army.
10 Q  Okay. And because you're testifying as an
11 expert in this case, I'm just curious to hear what
12 you consider your areas of expertise?
13 A  Well, my area of expertise would be
14 definitely hardware, system hardware, and system
15 software application, setting up wide area networks,
16 satellite communications, the wireless communication
17 connectivity. Pretty sizable amount of things I can
18 do.
19 Q  Do you consider yourself an expert in
20 forensic computing?
21 A  I'm well-versed in it. I won't say expert,
22 but well-versed.
23 Q  Have you taken classes in forensic
24 computing?
25 A  No.

**Page 103**

1  Q  Have you ever worked on assignments
2  involving forensic computing?
3  A  Besides this, no.
4  Q  Now, under experience, it says that you
5  currently work for RYCOM Business Solutions?
6  A  Correct.
7  Q  What is that company?
8  A  That's my company.
9  Q  Oh, okay. And what does it do?
10 A  I go out and set up network, maintain
11 network for client, remote access for clients. Set
12 them up to where they can remote log in to their
13 network from no matter where they're at, set up
14 servers. Pretty much the whole gamut to make sure
15 they're up and running. When the network is down,
16 they call me and I take care of it.
17 Q  And so I take it -- it says here that you
18 train people on the systems operation?
19 A  Correct.
20 Q  And then it says collections?
21 A  Uh-huh. I have a lot of -- a few doctor
22 offices that they're switching their software and try
23 to get their database to work with their old database
24 and then help them with the collection of the
25 information.

**Page 104**

1  Q  Okay. So that's collection software
2  issues?
3  A  Collection software and then collection of
4  the information that they may need. So that's kind
5  of a broad statement. So, yeah, collection of
6  monetary, but also collection in data information
7  that they're trying to retrieve. You have some
8  clients, believe it or not, who still have a lot of
9  old floppy disks. And then we take -- I take the
10 floppy disks and put them all into a CD or even put
11 it in the file where it sits on the server so it's
12 readily available for them. So it's a whole bunch of
13 things dealing with the collection.
14 Q  And then before that -- and you had your
15 own company since January 2004?
16 A  Correct.
17 Q  And why did you start your own company?
18 A  To be honest with you, I got tired of being
19 on the clock. And I wanted to make my own money, you
20 know. It got to the point where you work hard and
21 you see you're working long hours and your employers
22 are driving Mercedes and everything like that, and
23 I'm still driving a car that you have to use
24 Band-Aids for.
25    So I figure since I'm making them money, I can

**Page 105**

1  go out there and do it myself. Even though I might
2  still be driving the same car, but at least I work on
3  my own time and I tend to make more money that way.
4  You know, at least I can see where my money and my
5  time is going to.
6  Q  And then before that, you were at, it
7  indicates ComPlus Data Services?
8  A  Correct.
9  Q  And what did they do?
10 A  ComPlus Data Services basically did the
11 same thing that I'm doing now, and they also help JSA
12 Healthcare, which is a huge company now, out in St.
13 Pete. As they were growing during their stages years
14 back, they would acquire clinics. I would go into
15 the clinics, which was through ComPlus Data Services,
16 set that clinic up to where they would connect to the
17 St. Pete location and run the software off of that,
18 the same platform.
19   So I would go in and set up companies for JSA.
20 And then if JSA had an issue with a client or one of
21 the clinics like in Daytona, I would go out there and
22 take care of it for them because they didn't have the
23 IT staff that they needed at the time. But now
24 they're good to go.
25 Q  So it sounds like a lot of your day-to-day

27 (Pages 102 to 105)

106

1 tasks were similar to what you're doing at RYCOM?
2    A    Correct.
3    Q    Okay.
4    A    But at least I dictate what time I go to
5 work, so if I don't want to go to work till noon, I
6 don't go to work till noon. If I want Friday off, I
7 take Friday off.
8    Q    And before that, it says you worked for
9 **Delta International Computer?**
10    A    Correct. Delta International Computer was
11 a wholesale computer distributor company. Only
12 resellers were allowed to buy from them, and I was
13 the senior sales and tech for them. In other words,
14 those are the companies that Dell put out of
15 business, basically. Dell was going after companies
16 such as Delta and trying to, you know -- basically, a
17 reseller would come buy a PC from me for a hundred
18 dollars for a whole PC. The reseller would take it
19 and take that computer and sell it for $300. So
20 there would be less than what the regular retail
21 stores were selling them for. So, but you'd buy your
22 components from us because it was a lot cheaper.
23       So I worked for them for a few years there and
24 took care of all their technical supports and
25 everything from clients when they couldn't figure out

107

1 what was wrong with the computer, only from the
2 resellers. Their clients couldn't call, but only the
3 resellers would call. And if they had problems with
4 the PC, they would bring it back in and just repair
5 it real quick for them.
6    Q    And then under systems proficiency,
7 you -- are there other systems that you're proficient
8 in other than the ones listed here?
9    A    No. I pretty much stay with the Microsoft
10 operating system. I mean, I'm familiar with Unix,
11 I'm familiar with Linux, but I don't use them enough
12 to -- those are the types of software that if you
13 don't use it all the time, you forget it. So, and
14 Clarion and all the stuff like that. So these are
15 the main systems that I deal with.
16       So all the platforms under Microsoft such as,
17 you know, your Windows; your Vistas; your servers,
18 2000, 2003 and T4, some are still using NT4, that's
19 what I mean by Microsoft operating systems. And your
20 database.
21    Q    And does Microsoft give some level of
22 certification for people that are familiar with their
23 systems to a certain level?
24    A    Yeah. There is a certification. I've just
25 never taken the test to get it. Never have the time

108

1 to do it.
2    Q    Okay.
3    A    I can easily pass it, though, just never
4 taken it.
5    Q    So that certification is just an
6 administrative test?
7    A    Yeah. You just go take the test and then
8 the next thing you know, okay, you're MCSE certified,
9 you're Microsoft certified.
10    Q    Okay.
11    A    Okay. It doesn't really open up that many
12 doors for you. They want your money, though, but it
13 doesn't really open up that many doors for you.
14    Q    Now, I notice that you don't list Roxio as
15 an area of PC software that you're proficient in. Is
16 there a reason why not?
17    A    It's just a generic burning software. It's
18 just a software that you can buy anywhere. It's just
19 a software burning tool. It's not that I'm not
20 proficient in it. I prefer Nero. To me, Nero is a
21 lot easier to use and it's quicker.
22       Roxio software, the Adaptec software, if you're
23 doing something wrong, it can actually corrupt your
24 system and lose your data and your system can lock
25 up, so I don't use Roxio. I tend not to use it. And

109

1 Nero, when they first came out, they were pretty
2 horrible, but now they're really user-friendly, and
3 when I deal with my client, they always ask me what
4 is the most user-friendliest software. 'Cause,
5 again, you have clients who don't really know
6 computers that much.
7       So I prefer to let them -- to have them use
8 Nero's. It's really simple to use, simplistic,
9 simplicity. Give your clients something simple,
10 they're happy with it. But it's not something you
11 have to be proficient with. They're all the same.
12 All the burning software, they do the same thing,
13 just different names, and they may have a feature
14 that's different here or there.
15    Q    And I also notice that you don't list the
16 Firebird computer system as an area of proficiency.
17 Is there a reason for that?
18    A    Well, yeah. Firebird is a DEA software,
19 part of the Department of Justice. And because I
20 don't work in that DOJ, I wouldn't know anything
21 about the Firebird software. I mean, I believe
22 that's a software that was specifically designed for
23 the Department of Justice. And so I'm not proficient
24 in that at all, just for what you read.
25       MR. PHIPPS: If you would, just give me a

110

1  few minutes to look over my notes. If we need
2  to take a break we can, but I'm probably just
3  going to be here for about two minutes.
4        (A recess was had at 11:56 a.m.)
5  BY MR. PHIPPS:
6    Q   Well, I have nothing else. So just one
7  thing. I'm going to make a request of your attorney
8  to get those other documents -- not of your attorney,
9  but of Mr. Meythaler, to get those other documents
10 that you referenced regarding the searches you made,
11 so I ask you to preserve those.
12   A   Okay.
13       MR. PHIPPS: I have nothing else.
14       MR. MEYTHALER: I just have a couple
15 questions.
16           CROSS-EXAMINATION
17 BY MR. MEYTHALER:
18   Q   Mr. Wright, why do you assume the
19 correctness of the originating computer clock?
20   A   Because most government agencies rely on
21 the accurate information. And your clock has to be
22 correct, especially when you're writing documents and
23 doing anything, your clock has to be correct. And it
24 will show it, so your clock always, especially with
25 the government, time, date, date stamps, all that has

111

1  to be correct.
2    Q   And do you have experience with government
3  computer clocks?
4    A   Just from the military itself, how their
5  clock is constantly on their documents is always,
6  always right.
7        MR. MEYTHALER: I have nothing else. He'll
8  read.
9        (The deposition was concluded at 12:01 p.m.)

112

1  DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS
2    The original of the Errata sheet has been
3  retained by WARD A. MEYTHALER, ESQ.
4
5    When the Errata Sheet has been completed by the
6  deponent and signed, a copy thereof should be
7  delivered to each party of record and the ORIGINAL
8  delivered to PETER J. PHIPPS, counsel for Defendant,
9  to whom the original deposition transcript was
10 delivered.
11
12         INSTRUCTIONS TO DEPONENT
13
14   After reading this volume of your deposition,
15 indicate any corrections or changes to your testimony
16 and the reasons therefore on the Errata Sheet
17 supplied to you and sign it. DO NOT make marks or
18 notations on the transcript volume itself.
19
20 ***REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
21 COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

113

1  ATTACH TO THE DEPOSITION OF VICTOR WRIGHT
2  CASE: PAIGE vs. U.S.D.E.A.
3  CASE NO.: 1:06cv00644
4         ERRATA SHEET
5    I, VICTOR WRIGHT, have read the foregoing
6  deposition given me on December 20, 2007, in Tampa,
7  Florida. And the following corrections, if any,
8  should be made in the transcript:
9  PAGE:   LINE:CORRECTION AND REASON THEREFORE:
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18   Under penalties of perjury, I declare that I
19 have read the foregoing document and that the facts
20 stated in it are true.
21   SIGNED at _____
22 Florida, this _____ day of _____,
23 2008.
24           _____
25           VICTOR WRIGHT