**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| LEE PAIGE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00644 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DRUG | ) | |
| ENFORCEMENT ADMINISTRATION | ) | |
| and UNITED STATES OF AMERICA, | ) | Hon. Emmet G. Sullivan |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST PLAINTIFF ON
      THE PRIVACY ACT CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Plaintiff Cannot Prove the System of Records Element. . . . . . . . . . . . . . . . . . . 1

            1.    There is no genuine dispute that a 4:09 version of the shooting video
                  was never contained in the IN file. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            2.    The IN investigation was not delegated, nor did anyone in Orlando
                  begin to construct the IN file. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            3.    The Bartel exception does not apply here. . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Plaintiff Cannot Prove an Intentional and Willful Disclosure. . . . . . . . . . . . . . . 9

      C.    Because Plaintiff's Presentation Was in the Public Domain, It Cannot Form
            the Basis of a Privacy Act Disclosure Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.    Plaintiff Cannot Recover Non-Pecuniary Damages under the Privacy Act. . . . . . . 14

II.   SUMMARY JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS ON THE
      PRIVACY TORT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    Plaintiff Cannot Recover for the Tort of Publicity Given to a Private Fact. . . . . . . . 16

            1.    Plaintiff fails to satisfy the private fact element. . . . . . . . . . . . . . . . . . . 16

            2.    Plaintiff cannot satisfy the "giving publicity" element. . . . . . . . . . . . . . . 17

            3.    Plaintiff cannot satisfy the "highly offensive" element. . . . . . . . . . . . . . . 18

            4.    Plaintiff fails to meet the legitimate public interest element. . . . . . . . . . . . 19

            5.    As a public figure, plaintiff cannot recover for unwanted publicity. . . . . . . . 20

      B.    Plaintiff's False Light Claim Fails Jurisdictionally and Substantively. . . . . . . . . . . 22

III.  PLAINTIFF HAS UNCLEAN HANDS AND CANNOT RECOVER HERE. . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

**INTRODUCTION**

After exhaustive discovery, it still is unknown how a 4 minute and 9 second version of

plaintiff's shooting video appeared on the internet.  Several critical facts, however, are firmly in

place.  It is certain that no 4:09 version of the shooting video was ever contained in the Office of

Inspections ("IN") within the Drug Enforcement Administration ("DEA"), which has the only

relevant system of records in this case.  Similarly, there is no doubt that plaintiff's presentation was

in the public domain and that plaintiff's shooting was legitimately newsworthy.  These established

facts prevent plaintiff from satisfying necessary elements of his Privacy Act and privacy tort claims,

such as retrieval from a system of records, disclosure of private information, and a lack of

newsworthiness.  Still other undisputed facts ensure the operation of the unclean hands defense, such

as plaintiff's reckless and dangerous handling of his duty firearm, which he misfired in front of an

audience of children and their parents.

The unknown also prevents plaintiff from recovering.  Plaintiff has the burden of proof in this

case.  Yet, he does not know who released a 4:09 version of the shooting video or the circumstances

under which it was released.  Without this information, plaintiff is unable to establish the requisite

mental state.  Plaintiff also fails to substantiate any out-of-pocket losses, which are required to

recover damages under the Privacy Act.

In sum, due to the established facts as well as the unknown details, defendants are entitled to

summary judgment as a matter of law.

**ARGUMENT**

**I.    SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST PLAINTIFF ON THE
       PRIVACY ACT CLAIM.**

    **A.    Plaintiff Cannot Prove the System of Records Element.**

Plaintiff cannot recover under the Privacy Act because he cannot demonstrate that the version

of the shooting video that appeared on the internet and email – the 4:09 version – was ever contained in a system of records.  Although plaintiff attempts to create factual disputes, the material facts cannot be genuinely disputed.  Nor can plaintiff avoid summary judgment by injecting tangential, conditional facts regarding the creation of the IN file.  Likewise, plaintiff's effort to apply the extremely limited <u>Bartel</u> exception fails here.

**1.     There is no genuine dispute that a 4:09 version of the shooting video was never contained in the IN file.**

While the parties dispute the number of copies and versions of the video that ultimately existed, that dispute is not material.  Rather, the Privacy Act's disclosure protections extend only to records "contained in a system of records."  5 U.S.C. § 552a(b).  Consequently, the relevant facts relate to the contents of the IN shooting file – the only applicable system of records here.  On this point, this is no genuine dispute.

Specifically, four facts regarding the shooting video and the IN file prevent plaintiff from satisfying the system of records requirement:

(i)      A 4:09 version of the video first appeared on the internet and email in early March 2005;

(ii)     The 4:09 version of the shooting video was created before the original Mini-DV was given to the IN inspectors;

(iii)    The IN inspectors who were responsible for creating the IN file never had a 4:09 version of the video, and thus a 4:09 version of the shooting video was never in the IN file;

(iv)    The versions of the shooting video in the IN file have never appeared on the internet or email.

If the Court finds these four facts, then it must enter summary judgment for defendants.  Although plaintiff has tried to challenge some of these facts, often in contradiction to his own deposition testimony, his efforts do not produce a *genuine* factual dispute.

As to the first critical fact – that the 4:09 version of the video began appearing on the internet and email in early March 2005 – plaintiff does not dispute that the earliest online versions of the

shooting video were 4:09 in length.  (<u>Compare</u> Defs' SMF ¶ 165 <u>with</u> Pl's SMF Opp. ¶ 165 (not

disputing that the earliest shooting videos on the internet were 4:09 in length)).  Similarly, plaintiff's

statement of facts admits that the shooting video was "widely noticed" on the internet in March

2005.  (Pl's SMF ¶ 329).  Even more, in his deposition, plaintiff admitted that the video did not

appear on the internet until March 2005.  (L. Paige Dep. at 41 ("Q: Do you know approximately

when in 2005, the video appeared on the Internet?  A:  Sometime in March, mid to early March.")

(copy attached as Ex. 1)).  Nor has plaintiff ever identified any website displaying the shooting video

before March 2005.  Finally, a DEA forensic computing specialist researched internet webpages and

found no indication that any version of shooting video appeared on the internet before March 2005.

(T. Gregg Decl. ¶ 5 (copy attached to Defs' SMF, as Ex. 41)).

Despite this evidence, in his recitation of material facts plaintiff suggests that some unknown

version of the video appeared on the internet in 2004.  (Pl's SMF Opp. ¶ 164; Pl's SMF ¶¶ 330-31).

Beyond the initial problem that such an assertion directly contradicts his own testimony, plaintiff's

efforts are flawed at many levels.  First, the witnesses upon whom plaintiff relies had imprecise and

uncertain memories as to when and where they first saw the shooting video on the internet.  (Barker

Dep. at 6-7 (copy attached to Pl's SMF as Ex. 65)); (Baughman Dep. at 54-55 (copy attached to Pl's

SMF as Ex. 66)); (Brunson Dep. at 27-29 (copy attached to Pl's SMF as Ex. 69)); (Walker Dep. at

23-24 (copy attached to Pl's SMF as Ex. 95)).  If the video were online in 2004 so that different

persons saw it on separate, independent occasions, then plaintiff (or his retained computer

consultant) should have found evidence of an earlier video on the internet.  ***Yet plaintiff is unable

produce a single website with the shooting video before March 2005.***  Thus, there is no genuine

dispute here requiring a trial – the video's first appearance on the internet was a 4:09 version in

March 2005.[1]

The parties agree regarding the second critical fact – the initial 4:09 versions of the shooting video were created before the Mini-DV was provided to the IN inspectors.  The 4:09 version was made from the Mini-DV during the week of April 12, 2004.  (Compare Defs' SMF ¶ 78 with Pl's SMF Opp. ¶ 78 (not disputing the timing of the copies)).  Later, between April 19 and 21, 2004, the Mini-DV containing the original recording was provided to the IN inspectors.  (Defs' SMF ¶ 108).

The third critical fact is that a 4:09 version of the video was never contained in the IN file. All of the testimony by persons with first-hand knowledge of this fact agree that it was a VHS that was initially sent to IN, with the Inspectors collecting the Mini-DV later in person from Group Supervisor ("GS") Peter Gruden .  (Defs' SMF ¶¶ 101, 103, 108).  Nevertheless, plaintiff's statement of facts suggests the possibility that GS Gruden sent a CD version of shooting video to IN.  Yet, even plaintiff's label for that alleged disk – "D-?" – signals his own doubts as to its existence.  (Pl's SMF ¶¶ 176-78, 313-14).  Plaintiff's doubts are warranted because no such transmission took place. Rather, sole suggestion of such a transmission comes from a statement by an inspector from DEA's Office of Professional Responsibility ("DEA-OPR") who was not testifying based on first-hand knowledge and whose recollection was admittedly unrefreshed.  (Reinke Dep. at 195 (explaining that he was testifying based on "his recollection of what was told to me by Mr. Gruden") (copy attached to Pl's SMF as Ex. 91)); (Reinke Dep. at 251-52 (copy attached as Ex. 2)).  In contrast, the DEA-OPR inspector's later testimony, as well as his prior interrogatory answers, make clear that he found no indication that a CD with a 4:09 version of the shooting video was ever contained in the IN file.

_____

[1]  The same holds true for the 4:09 version's appearance on the Firebird email system. Plaintiff relies on three DEA agents with similarly imprecise recollections of seeing the video in 2004 or 2005.  (Pl's SMF ¶¶ 319-20).  But, upon forensic review, the earliest Firebird emails containing the shooting video were in March 2005.  (Defs' SMF ¶ 166).

(Reinke Decl. ¶ 8 (copy attached to Def's SMF as Ex. 42)); (Defs' SMF ¶ 260); (Defs' Interrog. Resps. at 5 (copy attached to Pl's SMF as Ex. 2)). Thus, there is no genuine dispute here requiring a trial – a 4:09 version of the video was not sent to IN.

Finally, the fourth critical fact is that no version of the video contained in the IN file (or copies of that file) ever appeared on the internet or DEA email. The versions of the video contained in the IN file (or copies of that file) are all longer than 4:09. (Defs' SMF ¶¶ 63, 70, 101-03, 124, 128 (undisputed facts as to the lengths of the Mini-DV, the VHS that IN had, and the DVD copies in IN)). Neither plaintiff, nor his retained computer consultant, nor DEA's forensic computer specialist has located a version of the shooting video longer than 4:09 on the internet. (Defs' SMF ¶ 168). For that reason, it is safe to conclude that the shooting videos in the IN file, which all exceed 4:09 in length, were not released to the internet or DEA email. See Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (explaining that the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts").

These four facts establish that a 4:09 version of the video was never contained in the IN file. Because the IN file is the only relevant system of records, there could be no retrieval from a system of records here, as required for a Privacy Act disclosure claim. See generally Bechhoefer v. U.S. Dep't of Justice, 179 F. Supp. 2d 93, 98-101 (W.D.N.Y. 2001) (explaining that records not part of DEA's system of records are not Privacy Act protected).

Finally, the eventual placement of the original Mini-DV in the IN file does not transform the status of the 4:09 versions. Nothing in the Privacy Act suggests that storing a document in a system of records has a retroactive effect on all other versions of that document. See 5 U.S.C. § 552a(a)(5) (defining "system of records" without reference to retroactive application); id. § 552a(b) (setting forth the disclosure protections without reference to retroactive application). Such a result is

5

nonsensical and contrary to the well-established rule of retrieval.[2]  See McCready v. Nicholson,

465 F.3d 1, 11 (D.C. Cir. 2006); Krieger v. Fadely, 199 F.R.D. 10, 13 (D.D.C. 2001).

> ## 2.    The IN investigation was not delegated, nor did anyone in Orlando begin to construct the IN file.

Plaintiff attempts to rebut these critical facts by relying on a hypothetical scenario.

Specifically, plaintiff states that if the shooting investigation had been delegated to the field, then

GS Gruden "would [have] conduct[ed] the investigation for IN."  (Pl's Opp. at 4).  Plaintiff then

reasons that Mini-DV and the 4:09 copies that GS Gruden had made were part of the IN file.  (Pl's

Opp. at 4, 6-7).  This argument is flawed in several respects.  First, it is hypothetical.  In reality, the

shooting investigation was not delegated to the field, let alone to GS Gruden.  (Defs' SMF ¶ 102);

(McAleer Dep. at 10 (copy attached to Def's SMF as Ex. 25)).  Furthermore, GS Gruden did not

have the IN file number; instead, the paperwork that he and others in Orlando completed (the

teletype, the DEA-6, and the DEA-485) were all completed under a general file number, GFAO-04-

9020, entitled "Assaults / Threats / Shootings," and not under a file indexed to plaintiff, as required

for Privacy Act protection.[3]  Finally, during GS Gruden's custody of the original Mini-DV, it was on-

loan from the Orlando Minority Youth Golf Association ("OMYGA"), and it was not labeled, nor

was it stored in Orlando by plaintiff's identifying number or symbol.  (Defs' SMF ¶¶ 74, 78-79, 103,

---

[2]  For instance, under the regime suggested by plaintiff, if a federal supervisor placed an exceptional piece of an employee's writing, such as a memorandum, correspondence, legal brief, or a federal register notice, in the employee's personnel file to demonstrate superior performance, then all other versions of that writing would subsequently be subject to Privacy Act protection.  There is no legal support for such an inherently unworkable policy.

[3]  See DEA teletype dated Apr. 12, 2004 with file number GFAO-04-9020 and title "Assaults / Threats / Shootings" (copy attached to Def's SMF as Ex. 16 ); DEA-6 dated Apr. 19, 2004 with file number GFAO-04-9020 and title "Assaults / Threats / Shootings" (copy attached to Pl's SMF as Ex. 1 at 17-19); DEA-485 dated Apr. 15, 2004, with file number GFAO-04-9020 (copy attached to Def's SMF as Ex. 19).

109); (Brunson Dep. at 25-26 (copy attached to Pl's SMF as Ex. 69)).  Because the initial 4:09

versions were made during this time, they were not made from a Privacy Act protected record.

### 3.    The <u>Bartel</u> exception does not apply here.

Relying on <u>Bartel v. FAA</u>, 725 F.2d 1403 (D.C. Cir. 1984), plaintiff contends that the Privacy

Act protects records before they are contained in a system of records.  (Pl's Opp. at 11-13).  Factually

and legally, plaintiff's argument fails.

Due to critical factual differences between <u>Bartel</u> and this case, the narrow <u>Bartel</u> exception

does not apply, and the retrieval rule governs.  In <u>Bartel</u>, the supervisor commissioning an

investigation was the person responsible for the disclosures at issue, and the disclosures were the

result of a closed investigation.  <u>Bartel</u>, 725 F.2d at 1405-06.  Also, it was uncertain whether the

supervisor learned the leaked information from the investigatory file or from his independent

knowledge.  <u>See</u> <u>id.</u> at 1408.  On those specific facts, the D.C. Circuit held that summary judgment

for defendant was improper for two reasons: (i) because the disclosed information could have come

from the protected file; and (ii) alternatively, because the retrieval rule is relaxed when the person

disclosing the protected record also created it.  <u>Id.</u> at 1408-11.

In reaching these conclusions, the <u>Bartel</u> court repeatedly emphasized the narrowness of its

holding.  <u>See</u> <u>Bartel</u>, 725 F.2d at 1408-10 (emphasizing "peculiar circumstances of this case," and

the "peculiar set of circumstances present here," to underscore that the holding was limited to "the

factual context of this case").  As another court in this District noted, in <u>Bartel</u>, "the Court of

Appeals repeatedly, on six occasions, stated that its ruling was based on the particular facts of that

case." <u>Fisher v. Nat'l Insts. of Health</u>, 934 F. Supp. 464, 474 (D.D.C. 1996).  The <u>Bartel</u> panel even

went out of its way to distinguish the disclosures at issue there, which came from a protected

investigative file, from "disclosures of general office knowledge." <u>Bartel</u>, 725 F.2d at 1411.

Due to its extremely limited nature, the Bartel holding does not apply here. Unlike the facts of Bartel, here, as explained above, the 4:09 version of the shooting video was not contained in, or retrieved from, a system of records. Likewise, Bartel addresses a disclosure by the person who created the investigatory file, not by a person who had information relevant to the investigation. Id. at 1405-06. Indeed, the Bartel exception has been referred to as the "scrivener's exception." See Doe v. Dep't of Veterans Affairs, 519 F.3d 456, 462-63 (8th Cir. 2008) (refusing to apply the Bartel exception). Here, however, none of the persons who commissioned or reviewed the IN file (senior IN officials, the IN senior inspectors, and Inspector Greg White) ever had access to the 4:09 version of the shooting video because that version was never contained in the IN file. (Defs' SMF ¶ 260). In addition, Bartel dealt with a disclosure of conclusions of a closed investigation, and not "general office knowledge," Bartel, 725 F.2d at 1411. But here, as explained below, the events depicted in the shooting video were already in the public domain. Due to these critical differences, Bartel's narrow holding does not apply here.

Nor can plaintiff leverage Deputy Chief Inspector Gerard McAleer's statement that the IN file was opened "automatically" to somehow prove that the IN file was opened at the instant that plaintiff shot himself. (Pl's Opp. at 6). McAleer's statement that a file was opened "automatically" does not mean that the file was opened "instantaneously." Rather, the program analyst who opened the file testified that the IN file was opened on April 16, 2004, not beforehand. (Clifford Dep. at 18 (copy attached to Defs' SMF as Ex. 23)); (Defs' SMF ¶ 104).

Finally, Bartel rests on questionable legal ground. Its holding is directly contrary to the Privacy Act's unequivocal text because it disposes of the actual retrieval requirement. See 5 U.S.C. § 552a(b). In attempting to justify this deviation from the plain text, Bartel relied on legislative history favoring privacy protection. Bartel, 725 F.2d at 1411. Such reliance on legislative history to

override clear statutory language has subsequently been rejected by the Supreme Court in the sovereign immunity context, see Lane v. Pena, 518 U.S. 187, 192 (1996), and in the canons of statutory construction, see Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then the first canon is also the last: 'judicial inquiry is complete.'" (quoting Rubin v. United States, 449 U.S. 424, 430 (1981))); see also Dodd v. United States, 545 U.S. 353, 357 (2005); Barhardt v. Sigmon Coal Co., Inc., 534 U.S. 438, 450, 460-61 (2002). Because the Privacy Act contains a waiver of sovereign immunity and because unambiguous statutes should be given their plain meaning, Bartel is of questionable precedential value. Furthermore, if privacy protection were the paramount legislative concern, then Congress would not have included the actual retrieval requirement in the Privacy Act. Rather, it would have subjected all federal records about an individual to the Privacy Act. However, Congress was also concerned about the public fisc, and therefore it required actual retrieval from a system of records. See McCready v. Nicholson, 465 F.3d 1, 11 (D.C. Cir. 2006). Consequently, not all records about an individual are protected by the Privacy Act. In sum, the Bartel exception does not apply here; the rule of retrieval applies, which plaintiff cannot satisfy.

### B.    Plaintiff Cannot Prove an Intentional and Willful Disclosure.

Despite layer upon layer of speculation and conjecture, plaintiff cannot satisfy the "intentional and willful" element of a Privacy Act damages claim. (Pl's Opp. at 13-19). To meet this element, plaintiff must show a flagrant disregard for others' rights under the Act. See Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984). Yet, plaintiff cannot identify the person who released the shooting video, and he knows nothing of the circumstances of its release. Without such information essential to gauging mental state, summary judgment should be entered against plaintiff. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Plaintiff argues that he need not identify the person who released the video. (Pl's Opp. at 14, 17-19). But, his position is contrary to established law because to satisfy the Privacy Act's mental state element, a plaintiff must identify the person who released information. See Hatfill v. Gonzales, 404 F. Supp. 2d 33, 43 (D.D.C. 2007) (explaining that the identity of the sources within an agency was "central to [plaintiff's] case"); Edmonds v. U.S. Dep't of Justice, 323 F. Supp. 2d 65, 81 (D.D.C. 2004) (dismissing plaintiff's Privacy Act disclosure claims where plaintiff could not identify the persons responsible for the alleged leaks or the circumstances of the alleged leaks). In addition, plaintiff's desired formulation of the law would amount to nothing more than a strict liability standard requiring proof only that a disclosure came from an agency. But, that is plainly incorrect. As the D.C. Circuit explained, the Privacy Act "does not make the Government strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions." Albright, 732 F.2d at 189; see also Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1122 (D.C. Cir. 2007) (explaining that "proof of intent or willfulness is a necessary element of [Privacy Act] claims"). Thus, because plaintiff does not know who released the video, he cannot demonstrate that it was done with a reckless disregard for his Privacy Act rights.

Plaintiff also misunderstands the intentional and willful standard. He confuses this mental state standard, which is a legal term of art, with volitional or voluntary action. Instead, the Privacy Act requires a flagrant disregard for others' rights under the Act. See Albright, 732 F.2d at 189. When the correct legal standard is applied, plaintiff's failure of proof is apparent. For instance, plaintiff recites that GS Gruden voluntarily gave copies of the video to other DEA agents, and plaintiff surmises (incorrectly) that GS Gruden posted the shooting video online because he allegedly

did not like plaintiff.[4]  (Pl's Opp. at 18-19).  But even this supposed scenario does not demonstrate a flagrant disregard of plaintiff's Privacy Act rights.  In fact, there was no reason for GS Gruden to believe that the shooting videos were Privacy Act protected.  When the 4:09 copies were made, the Mini-DV was unlabeled, was not indexed to plaintiff's name, and was on-loan from the OMYGA.  (Defs' SMF ¶¶ 74, 78-79, 103, 109); (Brunson Dep. at 25-26 (copy attached to Pl's SMF as Ex. 69)).  Furthermore, plaintiff shot himself when he was on duty in public – at a community center in front of an audience of children and their parents.  While these facts provide reasons why the shooting videos were not protected under Privacy Act – they do not satisfy the system of records and disclosure requirements – these facts also explain why it is reasonable to conclude that plaintiff's rights under the Act were not implicated.  Put simply, it was reasonable (and correct) to believe that the 4:09 version of the shooting video was not protected by the Privacy Act.

Plaintiff also relies on opinions from Victor Wright, a computer consultant for plaintiff's counsel's law firm.  (Pl's Opp. at 15-18); (Wright Dep. at 5-6 (copy attached to Defs' Opp. as Ex. C)).  As set forth in defendant's opposition to plaintiff's motion, and incorporated by reference here, Mr. Wright's opinions are unreliable and cannot be admitted.  (Defs' Opp. at 17- 20).  Mr. Wright admitted that he does not know the legal meaning associated with the Privacy Act's intentional and willful mental state.  (Wright Dep. at 21-22).  Moreover, even under his understanding that only volitional action was required, Mr. Wright nonetheless admitted that some transmissions of the video could have been inadvertent. (Id. at 42, 48).  Thus, even if Mr. Wright

---

[4]  Previously, however, plaintiff had suggested that it might be one of three persons who released the video:  GS Gruden, GS Kevin Scully, or Special Agent Kevin Clark.  (Pl's SMF at 33 n.26).  But each of those agents expressly testified that they did not release the video to the public. (Gruden Dep. at 208 (copy attached to Defs' Opp., Ex. A)); (Scully Dep. at 54 (copy attached to Pl's SMF, Ex. 93)); (Clark Dep. at 63-64 (copy attached to Pl's SMF, Ex. 71)).

could somehow offer a valid expert opinion, his conclusions still come up short because he did not, and cannot, identify a flagrant disregard for plaintiff's Privacy Act rights.

**C.    Because Plaintiff's Presentation Was in the Public Domain, It Cannot Form the Basis of a Privacy Act Disclosure Claim.**

Plaintiff's presentation was in the public domain, and that precludes his ability to pursue a disclosure claim under the Privacy Act.  (Defs' Mot. at 20-21).  As courts have held, a party cannot recover under the Privacy Act for the information that is already within the public domain.  See Tripp v. Dep't of Defense, 193 F. Supp. 2d 229, 236 (D.D.C. 2002); Wright v. Fed. Bureau of Investigation, 385 F. Supp. 2d 1038, 1042 (C.D. Cal. 2005), rev'd on other grounds, 241 Fed. Appx. 367 (9th Cir. 2007).  Plaintiff does not dispute the correctness of these holdings.  (Pl's Mot. at 24 n.26).  Instead, plaintiff argues that the newspaper articles on plaintiff's shooting are different than the video-recording of plaintiff's shooting, and that the video-recording was not in the public domain.  (Pl's Opp. at 21-24).  Plaintiff misses the mark.  The newspaper reports are *evidence* that plaintiff's presentation was in the public domain.  They are not the *reason* that plaintiff had no privacy interest in the underlying presentation.  Rather, plaintiff's presentation was in the public domain because its details could be freely reported on, spoken of, and shared – as demonstrated by the various newspaper accounts.  (Defs' SMF ¶¶ 155-61).  Because plaintiff's live presentation was already in the public domain, re-transmissions of that presentation do not constitute disclosures under the Privacy Act.

Plaintiff attempts to gain leverage from the D.C. Circuit's decision in Pilon v. U.S. Dep't of Justice, 73 F.3d 1111 (D.C. Cir. 1996).  But, plaintiff misunderstands the limits that Pilon imposed on its scope.  In addressing a very specific question – whether information known to government employee could be transmitted to that same employee after he terminated government employment –

Pilon did not rule on information that was already in the public domain.  Id. at 1112.  Rather, through footnote 10, the D.C. Circuit clarified that it was not addressing a situation where a record was in the public domain (as opposed to within one former employee's knowledge).  See Pilon, 73 F.3d at 1123 n.10 ("This case does not present the question of whether an agency may, consistent with the Privacy Act's disclosure provisions, release a document that has already been fully aired in the public domain through the press or some other means.").  This is understandable, particularly when the D.C. Circuit had previously explained that "[o]ther courts have echoed the sentiment that when a release consists merely of *information* to which the general public already has access . . . the Privacy Act is not violated."  Hollis v. U.S. Dep't of the Army, 856 F.2d 1541, 1545 (D.C. Cir. 1988) (emphasis added).  Thus, footnote 10 in Pilon leaves no doubt that the Court was not interpreting the meaning of the term "disclose" as it applied to *information* that was previously in the public domain.

Nor can Pilon be extended to that situation.  The doctrine of sovereign immunity demands a narrow construction of any statutory ambiguity that subjects the sovereign to liability.  See Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999); Galvan v. Fed. Prison Indus., Inc., 199 F.3d 461, 464 (D.C. Cir. 1999).  Pilon recognized the ambiguity in the term "disclose," which is capable of a broad meaning and narrow meaning.  See Pilon, 73 F.3d at 1119.  Applying sovereign immunity principles, the term "disclose" must be interpreted narrowly in favor of the sovereign.  Thus, as district courts have found after Pilon, the term "disclose" excludes matters already in the public domain.  See Tripp, 193 F. Supp. 2d at 236; Wright, 385 F. Supp. 2d at 1042.

In sum, plaintiff's presentation was already in the public domain – as *evidenced* by the newspaper articles.  Consequently, any information contained in that presentation cannot later constitute a "disclosure" under the Privacy Act.

**D.      Plaintiff Cannot Recover Non-Pecuniary Damages under the Privacy Act.**

Under principles of sovereign immunity and, alternatively, under a legislative history analysis, the Privacy Act's "actual damages" requirement limits recovery to only out-of-pocket (i.e., pecuniary) losses.  See 5 U.S.C. § 552a(g)(4)(A).

Plaintiff does not dispute the proposition that if sovereign immunity principles apply, then plaintiff can recover only pecuniary losses.  (Pl's Mot. at 26-28).  Under sovereign immunity, a narrow reading must be given to a statutory ambiguity.  See Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999).  Because the term "actual damages" is ambiguous, sovereign immunity principles apply.  See id.; Galvan v. Fed. Prison Indus., Inc., 199 F.3d 461, 464 (D.C. Cir. 1999) ("If ambiguous, statutes **must be** construed in favor of immunity." (emphasis added)); Blackmon-Malloy v. U.S. Capitol Police Bd., 338 F. Supp. 2d 97, 103 (D.D.C. 2004).  Accordingly, plaintiff cannot recover damages beyond out-of-pocket losses, which he cannot substantiate here.[5]

Plaintiff urges the Court to follow a selection of cases from this District that interpret "actual damages" more broadly.  (Pl's Opp. at 27-28).  However, none of those cases follow the Supreme Court's mandate to conduct a sovereign immunity analysis, and many of them adopt the Fifth Circuit's erroneous interpretation of the Privacy Act's legislative history, which has weakened significantly over time, as explained below.  See Johnson v. Dep't of Treasury, Internal Revenue Serv., 700 F.2d 971 (5th Cir. 1983).  Notably, all of plaintiff's citations to reported decisions, and

---

[5]  Plaintiff alleges $2,000 in out-of-pocket expenses for a family vacation to Fort Lauderdale during Spring Break.  Plaintiff's only factual support for these alleged expenses comes from his own affidavit and from unclear deposition testimony from his wife, which allege that DEA told plaintiff to take this trip.  (Pl's Opp. at 26 n.27).  Yet, he does not provide an itemized list of his alleged expenses or any receipts – as would be required for reimbursement.  See 41 C.F.R. § 301-52.2(a) (requiring an itemized list of travel expenses); id. § 301-52.4(b) (requiring travel receipts); see also id. § 301-31.15 (requiring receipts for family travel of threatened law enforcement and investigatory employees).  Without such necessary information, plaintiff could not receive reimbursement from DEA, nor can he recover here.

one of the unreported decisions, were decided before the D.C. Circuit's decision in Sussman v. U.S. Marshals Service, 494 F.3d 1106 (D.C. Cir. 2007), which left no doubt that sovereign immunity principles govern the Privacy Act. Id. at 1123. In addition, the most recent appellate decision to construe the Privacy Act's "actual damages" requirement, applied sovereign immunity principles to limit "actual damages" to only out-of-pocket losses. See Hudson v. Reno, 130 F.3d 1193, 1207 n.11 (6th Cir. 1997), abrogated on other grounds by Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848 (2001). Thus, in accord with the Supreme Court's mandate and in light of Sussman, the Court should apply sovereign immunity principles, and there is no dispute that, under such an analysis, "actual damages" are limited to out-of-pocket losses.

Because a sovereign immunity analysis resolves the issue, there is no need to examine the Privacy Act's legislative history. See Lane v. Pena, 518 U.S. 187, 192 (1996); Blackmon-Malloy, 338 F. Supp. 2d at 103. Nonetheless, as explained in defendants' motion, the Privacy Act's legislative history favors a narrow reading of "actual damages." (Defs' Mot. at 26-30).

In response, plaintiff urges the Court to adopt the Johnson court's interpretation of legislative history. (Pl's Mot. at 28-30); Johnson, 700 F.2d 971. But, Johnson's analysis of the legislative history is suspect. First, the Johnson opinion is directly contradicted by the Eleventh Circuit. See Fitzpatrick v. Internal Revenue Serv., 665 F.2d 327 (11th Cir. 1982); see also Hudson, 130 F.3d at 1207 n.11. In addition, Johnson's legislative history analysis has subsequently been undermined by the Supreme Court. See Doe v. Chao, 540 U.S. 614, 622-23 (2004). While the Johnson court thought little of the deletion of the "general damages" from the Privacy Act, see Johnson, 700 F.2d at 981-83, the Supreme Court more recently gave weight to that deletion by relying on it to elucidate the relationship between the Privacy Act's "adverse effect" and "actual damages" requirements. Doe, 540 U.S. at 623. Similarly, plaintiff reports that "Johnson did not find the Privacy Protection

15

Study Commissions' conclusion as to damages persuasive . . . ." (Pl's Mot. at 29). But, again, in sharp contrast, the Supreme Court emphasized the significance of the Commission and the fact that the Privacy Act was purposely left unfinished – with the Commission to study specific issues and make a report. Doe, 540 U.S. at 622-23. Thus, the Court should not rely on Johnson's legislative history analysis, which runs contrary to several canons of construction, is opposed by other circuit decisions, and has been undermined by the Supreme Court.

## II.    SUMMARY JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS ON THE PRIVACY TORT CLAIMS.

### A.    Plaintiff Cannot Recover for the Tort of Publicity Given to a Private Fact.

#### 1.    Plaintiff fails to satisfy the private fact element.

On the private fact element, plaintiff concedes many of defendants' points, and then offers an alternative argument, which fails. Plaintiff's concessions are that a photograph taken in a public place is a public fact (Compare Defs' Mot. at 31-32 with Pl's Opp. at 31-32); that his on-duty law enforcement activities were public facts (id.); and that his presentation was a public fact because it was made voluntarily to an audience that owed him no duty of confidentiality (id.).

Plaintiff argues only that the private fact at issue is the video-recording of plaintiff's self-shooting – not the shooting itself. (Pl's Mot. at 30-32). Plaintiff's argument, however, has no basis in the law. As the Restatement explains, it is the underlying *information* that determines whether an event constitutes a private fact. See Restatement (Second) of Torts § 652D, cmt. b (1977) ("There is no liability when the defendant merely gives further publicity to ***information*** about the plaintiff that is already public." (emphasis added)); see also Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1149 (S.D. Fla. 1990) ("Republication of facts already publicized elsewhere cannot provide a basis for an invasion of privacy claim."). Thus, here, where plaintiff does not contest that his presentation

16

was a public fact, republication of his presentation does transform it into a private fact.[6]

## 2. Plaintiff cannot satisfy the "giving publicity" element.

Plaintiff does not dispute that his complaint fails to allege that someone at DEA "gave publicity" to the video. (Pl's Mot. at 33). Rather, he argues that defendants' case citations are not relevant because they apply Florida's "ultimate facts pleading" and not notice pleading. (Id.) Plaintiff is wrong. Only one of defendants' citations was to a Florida state court; the remainder were to either federal courts or a jurisdiction applying notice pleading. See Lewis v. Snap-on Tools Corp., 708 F. Supp. 1260 (M.D. Fla. 1989); Swanson v. Civil Air Patrol, 37 F. Supp. 2d 1312 (M.D. Ala. 1998); Elliott v. Healthcare Corp., 629 A.2d 6 (D.C. 1993); see also Williams v. City of Minneola, 575 So.2d 683 (Fla. Ct. App. 1991); (Defs' Mot. at 33). Thus, as a matter of pleading, plaintiff does not allege the "giving publicity" element.

Plaintiff also argues that because the video would predictably receive publicity, any circulation of the video would constitute "giving publicity." (Pl's Opp. at 33-36). This is also incorrect. Plaintiff needs proof of more than the resulting publicity and the inference that persons have an interest his video. Instead, he needs proof that a DEA employee, within the scope of his employment, showed the video to another person who had a substantial certainty of making the video public knowledge. See Restatement (Second) of Torts § 652D, cmt. a (1977); see also 28 U.S.C. § 1346(b)(1). Plaintiff has no such evidence here. He cannot identify a single DEA employee who showed the video so that it was "substantially certain" of receiving publicity. Rather, the instances that plaintiff identifies involve viewings by individuals or small groups, who often did not circulate

---

[6] The only legal authority that plaintiff cites is commentary in the Restatement that explains that a stolen photograph from a person's house can constitute a private fact. (Pl's Opp. at 32). Plaintiff takes this example out of context because the photograph discussed in the commentary was a private fact, and not an already public fact. As the commentary explains, there is no liability for giving further publicity to public facts. See Restatement (Second) of Torts § 652D, cmt. b (1977).

17

the video further – as evidenced by the eleven-month lag between plaintiff's shooting and the video's first appearance online.[7]  Such small-scale viewings do not constitute "giving publicity."  See Lewis, 708 F. Supp. at 1262; Swanson, 37 F. Supp. 2d at 1331; Elliott, 629 A.2d at 9 (D.C. 1993); Williams, 575 So.2d at 689.

Finally, plaintiff argues that the further publicity doctrine does not apply here because the video itself had not received prior publicity.  (Pl's Mot. at 36).  However, the method of publicity has no legal significance; instead, the focus is on whether the underlying information has received any publicity.  See Restatement (Second) of Torts § 652D, cmt. b (1977); Heath v. Playboy Enters., Inc., 732 F. Supp. 1145, 1149 (S.D. Fla. 1990).  Here, plaintiff's presentation was in the public domain, and it received a significant amount of media attention.  (Defs' SMF ¶¶ 155-61).  As a result, the further publicity doctrine precludes plaintiff from recovering.

### 3.    Plaintiff cannot satisfy the "highly offensive" element.

Plaintiff does not contest several of defendants' reasons explaining that the shooting video is not highly offensive.  The video does not involve the traditional highly offensive areas such as sex, nudity, or medical conditions.  (Compare Defs' Mot. at 34-35 with Pl's Opp. at 36-37).  Similarly, plaintiff concedes that neither the community center audience nor the national news media found the video to be highly offensive.  (Id.).  Plaintiff also acquiesces that he appeared on national television and permitted the shooting video to be shown during his appearances.  (Id.).  For these unchallenged reasons, plaintiff's presentation was not highly offensive.

Plaintiff nonetheless argues that his shooting incident is highly offensive for two reasons:

---

[7]  There is not reason to conclude that the Firebird email circulations of video precede the video's appearance on the internet.  To the contrary, the 4:09 version appeared on the internet before Firebird – the 4:09 version on the internet was of higher video quality than the 4:09 version on Firebird – indicating that the Firebird video was compressed from the internet version.

because it would be embarrassing to a reasonable person and because it exposed his undercover status. (Pl's Opp. at 36-37). Neither contention has merit. First, the Restatement draws a crucial distinction between highly embarrassing conduct and highly offensive conduct. See Restatement (Second) of Torts § 652D cmt. c (1977). The mere fact that certain conduct, such as falling down stairs and breaking an ankle, if made public, would be embarrassing does not make that conduct highly offensive. See id. For similar reasons, the video cannot be considered highly offensive to plaintiff. If it were, he should not have permitted it to be shown during his national television appearances, and the television programs would not have shown it. Nor does plaintiff's prior undercover work change the analysis. By his own admission, plaintiff has done minimal undercover work since 1999. (L. Paige Dep. at 23, 25-29 (copy attached to Defs' Opp. as Ex. B)). Instead of attempting to preserve his undercover identity, plaintiff has spoken at approximately 500 demand reduction presentations to groups of up to hundreds of people, and he appeared in print media articles, such Sports Illustrated and a Bahamas newspaper. (Defs' SMF ¶¶ 7, 9, 10-11, 14).[8]

### 4.    Plaintiff fails to meet the legitimate public interest element.

The newsworthiness element of a wrongful publicity claim is the most stringent requirement, and plaintiff cannot satisfy it. See Cape Publ'ns, Inc. v. Hitchner, 549 So.2d 1374, 1377 (Fla. 1989) (explaining that proving a lack of "newsworthiness" is a "formidable obstacle"). Plaintiff does not

---

[8] The sole case that plaintiff cites in support of his "highly offensive" argument does not help him. See Harris v. Dist. Bd. of Trs. of Polk Cmty. Coll., 9 F. Supp. 2d 1319, 1329 (M.D. Fla. 1998); (Pl's Opp. at 37). In Harris, the district court ruled on a motion to dismiss that an evaluative statement by an employee's supervisor could be highly offensive, but the court emphasized that its ruling was not dispositive, but rather was based on a liberal construction of the pleadings. Id. The court never ruled on the issue because the plaintiff voluntarily dismissed the case. See Harris, Endorsed Order Granting Stipulation for Voluntary Dismissal with Prejudice (M.D. Fla. June 30, 1998). Beyond the obvious differences between the standards of review at summary judgment and the motion to dismiss stages, plaintiff's shooting video is not an evaluative statement by his supervisors. The situation here closely resembles the Restatement's example of falling down stairs and breaking an ankle – an embarrassing event, which is not highly offensive.

challenge that his on-duty shooting was newsworthy, he simply claims that his identity was not a matter of legitimate public concern. (Pl's Opp. at 37-38). In contrast to that contention, the Restatement explains that the legitimacy of the public's concern is determined by the subject matter at issue, not the identity of the person at issue. See Restatement (Second) of Torts § 652D, cmt. d (1977) ("When **the subject-matter of the publicity** is of legitimate public concern, there is no invasion of privacy." (emphasis added)).

Nor do plaintiff's case citations assist him. The first case involved a private person who agreed to publicity "on [the] condition that her identity would be concealed." Doe v. Univision Television Group, Inc., 717 So.2d 63, 64 (Fla. Ct. App. 1998). The other citation involved publicity given to a truck-driver who failed a random drug test, but where there was "no evidence that [the truck driver] ever drove under the influence of drugs or that he was an unsafe driver." Veilleux v. Nat'l Broad. Co., 8 F. Supp. 2d 23, 38 (D. Me. 1998). Here, unlike those cases, plaintiff's presentation was already in the public domain, plaintiff did not seek to conceal his identity beforehand, plaintiff's conduct was patently unsafe, and it jeopardized an audience of children and parents. (Defs' SMF ¶¶ 13, 28, 155-61).

Finally, the 4:09 version of the video does not mention plaintiff's name. It has only his image, which is inseparable from his reckless mishandling of firearms – the very focus of the public's legitimate concern. Here, where the public interest is at its apogee due to the reckless conduct of a law enforcement officer, the public has an extremely high interest, and there can be no invasion of privacy. See Godbehere v. Phoenix Newspapers, Inc., 783 P.2d 781, 789 (Ariz. 1989).

**5.    As a public figure, plaintiff cannot recover for unwanted publicity.**

Despite receiving substantial publicity over the years and despite the significance of his shooting, plaintiff argues that he is not a public figure. (Pl's Opp. at 38-40). Plaintiff does not

dispute the legal point that if he were a public figure, then he could not recover for unwanted publicity. (Compare Defs' Mot. at 37-38 with Pl's Opp. at 38-40). Beyond that, however, plaintiff misapplies the law, under which he constitutes both a voluntary and an involuntary public figure.

Plaintiff is a public figure due to his athletic career and his role as a federal law enforcement officer. Plaintiff acknowledges that he played football at Florida State University and three games of professional football, but then argues that these events did not attract any meaningful publicity then or now. (Pl's Opp. at 38). This is incorrect – tens of thousands of fans fill stadiums each weekend of football season to watch the games, games are broadcast on television, and the players wear identifying numbers and names on their jerseys for the viewing public. See Restatement (Second) of Torts § 652D cmt. f (1977). In addition, as a law enforcement officer, particularly one who gave over 500 demand reduction presentations in the community, plaintiff is a public figure. See id. Ultimately, if plaintiff were not a public figure, either by his status as a former athlete or law enforcement officer, then there would have been no reason for him to sign autographs after his demand reduction presentations, as he did. (Defs' SMF ¶ 12).

Even if plaintiff were not a voluntary public figure, he would still qualify as an involuntary public figure. The Restatement plainly explains that persons "who have not sought publicity or consented to it [may] through their own conduct or otherwise . . . become a legitimate subject of public interest." Restatement (Second) of Torts § 652D cmt. f (1977). Plaintiff's shooting qualifies as such an instance, where, due to the public's interest, plaintiff became an involuntary public figure. See id. Plaintiff's attempted rebuttal focuses on a three-week delay between plaintiff's shooting and first press reports of the shooting. (Pl's Mot. at 39). Such an argument is not germane to the involuntary public figure doctrine. Instead, the legal analysis turns on whether the public is entitled to learn the details of plaintiff's shooting. See id. Nothing in plaintiff's response addresses this

point, and as explained above, the public has an interest in knowing if a law enforcement officer recklessly exposes an audience to gunfire during an anti-drug presentation.

**B.      Plaintiff's False Light Claim Fails Jurisdictionally and Substantively.**

The Federal Tort Claims Act (the "FTCA") does not allow claims arising out of the torts of libel, slander, or misrepresentation.  See 28 U.S.C. § 2680(h).  Because false light claims necessarily arise out of those torts, they are jurisdictionally barred.  See Kugel v. Small, 519 F. Supp. 2d 66, 75 n.8 (D.D.C. 2007); Edmonds v. U.S., 436 F. Supp. 2d 28, 35 (D.D.C. 2006).

Plaintiff argues that his specific false light claims do not arise out of libel or slander law because "the facts are true."  (Pl's Opp. at 41).  But, plaintiff cannot rebut that his false light claims arise out of misrepresentation.  (Id.)  As explained in defendants' opening brief (Defs' Mot. at 39-40), the Restatement defines the false light tort as rooted in misrepresentation.  See Restatement (Second) of Torts § 652E, cmt. c (1977) (explaining that false light is predicated on a "major misrepresentation of . . . character, history, activities or beliefs").  Consequently, plaintiff's false light claims – even if rooted in true facts – arise out of the misrepresentation tort.

Nor can plaintiff cure this jurisdictional deficiency by his attempted reliance on 'true facts' for a false light claim.  (Pl's Opp. at 41-42).  As with the torts of libel, slander, and misrepresentation, false light requires the communication of a false message.  Compare Thomas v. Jacksonville Television, Inc., 699 So.2d 800, 803-04 (Fla. Ct. App. 1997) and Restatement (Second) of Torts § 558 (1977) (explaining that defamation requires a false and defamatory statement) with id. § 652E, cmt. b (explaining that false light protects "the interest of the individual in not being made to appear before the public in an objectionable false light or false position").  Thus, even if plaintiff limited his action to 'true facts,' his claims still require the communication of a false message, and they therefore arise out of the torts of misrepresentation, libel, and slander.  Furthermore, Florida has

rejected the very distinction that plaintiff attempts to draw – a difference between 'false facts' and 'true facts' false light claims.  Gannett Co., Inc. v. Anderson, 947 So.2d 1, 8 (Fla. Ct. App. 2006) (explaining that the distinction between 'false facts' and 'true facts' false light claims is of no moment, rather it is the falsity of a communication that is "the essence of the claim").[9]

Beyond the jurisdictional failure, plaintiff cannot prove the elements of a false light claim, as already explained.  (Def's Mot. at 40-41).  In response, plaintiff states that he has been injured because the video does not include his entire presentation.  (Pl's Opp. at 42).  Plaintiff provides no legal support for that assertion, which is contradicted by Florida law, which does not recognize a false light claim when a person is portrayed 'as is.'  See Fla. Publ'g Co. v. Fletcher, 340 So.2d 914, 918 (Fla. 1976); Restatement (Second) of Torts § 652E, cmt. b (1977).

## III.    PLAINTIFF HAS UNCLEAN HANDS AND CANNOT RECOVER HERE.

Plaintiff can do little to contest his own unclean hands.  He offers only one legal argument for why unclean hands should not apply – the erroneous contention that the unclean hands defense applies only to equitable relief.  As explained in detail in prior briefing (Defs' Opp. at 21), the one case that plaintiff cites for this proposition did not apply the governing law here.  See First Am. Corp. v. Al-Nahyan, 17 F. Supp. 2d 10 (D.D.C. 1998).  Rather, it applied D.C. 'state' law, which has no relevance to plaintiff's Privacy Act and privacy tort claims.  Id. at 29.  In contrast, the applicable law here, federal common law and Florida law, is firm that unclean hands applies to both equitable and legal claims.  See Olmstead v. United States, 277 U.S. 438, 483-84 (Brandeis, J., dissenting), overruled in part on other grounds by Katz v. United States, 389 U.S. 347 (1967); Tempo Music, Inc. v. Myers, 407 F.2d 503, 507 (4th Cir. 1969); Kuehnert v. Texstar Corp., 412 F.2d 700, 704 (5th Cir.

---

[9]  Plaintiff also attempts to rely on conditional dicta from Kugel v. United States, 947 F.2d 1504 (D.C. Cir. 1991); (Pl's Mot. at 40-41).  But, as explained in defendants' motion, such dicta has no value on the § 2680(h) jurisdictional question presented here.  (Defs' Mot. at 39 n.18).

1969); Union Pac. R.R. Co. v. Chicago & N.W. Ry. Co., 226 F. Supp. 400, 410 (N.D. Ill. 1964); see also May v. Nygard Holdings Ltd, 2007 WL 2120269, at *3 (M.D. Fla. July 20, 2007).

As a factual matter, plaintiff essentially concedes his wrongdoing with respect to the shooting incident. (Pl's Mot. at 43 ("Paige is not going to make excuses here for the AD.")). Plaintiff's refusal to defend his reckless gunfire does not diminish the degree of danger to which he exposed the innocent children and parents in the audience. To the contrary, Plaintiff's reckless actions add up quickly – from his decision to use a live weapon, to his repeated failures to inspect the weapon, to his neglect of the first rule of safe handling (remove the source of ammunition), and to the fact that he had a civilian with unknown firearms training and knowledge inspect his duty weapon. (Defs' SMF ¶¶ 31-51); (Santillo Rep. at 9-15 (copy attached to Defs' SMF as Ex. 14)). Plaintiff's violations continued throughout his presentation – he repeatedly pointed the weapon in unsafe directions, he left his loaded weapon unattended on the table in front of children after shooting himself, and he tried to display more weapons after he shot himself. (Defs' SMF ¶¶ 31-51); (Santillo Rep. at 9-15 (copy attached to Defs' SMF as Ex. 14)). In sum, plaintiff committed a series of inherently hazardous actions that recklessly endangered the health, safety, and lives of 50 children and parents. For that reason, plaintiff comes before the Court with unclean hands and cannot recover.

Plaintiff also has unclean hands with respect to his privacy interests. Plaintiff's case emanates from his apparent desire to preserve his privacy. Yet, in direct contradiction to his privacy interests, plaintiff previously gave approximately 500 demand reduction presentations to groups of varying sizes, with some as large as hundreds of people at a time, where he has signed autographs, and at least one of those events received press coverage. (Defs' SMF ¶¶ 9-12). More directly, however, plaintiff went on a media blitz after filing suit. He appeared on numerous national television programs, such as the Today Show, CNN News, the Rita Cosby Show, and the O'Reilly

Factor, and during each broadcast he permitted his self-shooting video to be shown. (Defs' SMF ¶¶ 169-70). Therefore, a great deal of the publicity about plaintiff's shooting undoubtedly comes from his repeated mass media appearances. Seeking this public attention is clearly contrary to any desire to preserve his privacy. Thus, with respect to his privacy interests, plaintiff's hands are not clean – he cannot increase the publicity of his shooting by appearing on national television, and then at the same time complain about his privacy interests.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered for defendants.

Dated: July 14, 2008                                    Respectfully submitted,


GREGORY G. KATSAS                            /s/  Peter J. Phipps
Assistant Attorney General                        PETER J. PHIPPS
                                                                PAUL A. DEAN
JEFFREY A. TAYLOR                              United States Department of Justice
United States Attorney                            Civil Division, Federal Programs Branch
                                                                Tel: (202) 616-8482
                                                                Fax: (202) 616-8470
ELIZABETH J. SHAPIRO                        peter.phipps@usdoj.gov
Assistant Branch Director

Mailing Address:                                      Courier Address:
Post Office Box 883                                20 Massachusetts Ave., N.W.
Washington, D.C.  20044                        Washington, D.C. 20001

                                                                Attorneys for Defendants